IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BOSTON EDISON COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99-447C |
| | ) | (Judge Lettow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT UPON COUNTS I AND II AND FOR SUMMARY JUDGMENT UPON COUNT III OF PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully requests that the Court grant summary judgment in defendant's favor upon the amended complaint that plaintiff, Boston Edison Company ("Boston"), filed in this case. In the alternative, defendant respectfully requests that the Court grant partial summary judgment in defendant's favor upon one or more of the issues discussed below. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

STATEMENT OF THE ISSUE

1. Whether Boston, having assigned its contract prior to its accrual of any rights against the Government arising from the contract, has standing to maintain this action or, in any event, has any basis upon which to seek breach of contract damages that pre-date the Government's actual failure of obligations running directly to Boston.

2. Whether Boston's takings claim, which arises from an alleged breach of contract, fails as a matter of law.

3. Whether Boston's breach of the duty of good faith and fair dealing claim fails because Boston cannot present "well-nigh irrefragable proof" to overcome the presumption that the Government acted in good faith.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

Boston alleges in its amended complaint that the Department of Energy ("DOE") partially breached its Standard Contract on January 31, 1998, when it failed to begin acceptance of spent nuclear fuel ("SNF") from the nuclear utility Standard Contract holders on that date. However, under the terms of the Standard Contract, DOE was not obligated to accept SNF from every Standard Contract holder on that date. Instead, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. Boston acted in accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, submitting delivery commitment schedules ("DCSs") to DOE that DOE subsequently approved. Pursuant to these approved DCSs, DOE's first acceptance obligation running specifically to Boston was to accept 3.88 Metric Tons Uranium ("MTU") of SNF from Boston at some point in time between January 31, 1999, and January 30, 2000.

Before DOE's deadline for accepting any of Boston's SNF arose, Boston sold its nuclear power reactor facility, including its SNF, and assigned its Standard Contract to a third party.

Specifically, on November 18, 1998, Boston and Entergy Nuclear Generation Company ("Entergy") executed the "Purchase And Sale Agreement Between Entergy Nuclear Generation Company And Boston Edison Company" ("Purchase And Sale Agreement"). Pursuant to this agreement, Boston sold all of its assets to Entergy with the exception of certain "Excluded Assets." The "excluded assets" included "any claims of Seller related or pertaining to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing Date . . . ." On July 13, 1999, Boston assigned its Standard Contract, and transferred the Pilgrim nuclear power plant,[1] to Entergy. The assignment reserved to Boston "any and all claims of Assignor related or pertaining to the Department of Energy's defaults under the DOE Contract accrued as of July 13, 1999 . . . ." Id. (emphasis added).

Boston's original complaint in this case, filed on July 12, 1999, one day before its assignment of its Standard Contract, sought recovery under a partial breach of contract theory of "substantial additional costs to provide for extended on-site storage of its SNF." Com. ¶ 20. In its new complaint, submitted to the Court on January 13, 2004, Boston has add a new claim for a taking of its property and has included a diminution of the value of its Pilgrim plant as one of the damages in its partial breach of contract claim. Amend. Com. ¶¶ 73-84. Boston's amended complaint asserts damages for costs incurred by Boston to accommodate "additional on-site SNF storage" and for "developing an on-site dry cask storage facility," even though it also asserts that it will not need dry storage until 2012. Amend. Com. ¶¶ 62 & 71; see id. ¶ 8.

---

[1] See Boston Edison Co. v. FERC, 233 F.3d 60, 63 (1st Cir. 2000) ("Boston Edison transferred the Pilgrim plant to Entergy on July 13, 1999."); 93 FERC ¶ 63012 at *1 (Nov. 9, 2000) ("On July 13, 1999, BECO sold the Pilgrim Plant to Entergy Nuclear Generation Company"); 90 FERC ¶ 61039 at *5, n. 19 (Jan. 14, 2000) ("July 13, 1999 [was] the effective date of Boston Edison's transaction with Entergy Nuclear").

Nevertheless, under its partial breach of contract theory, Boston lacks standing to pursue this action because no rights under its contract with the Department of Energy accrued to Boston prior to Boston's sale of its nuclear plant and the assignment of its Standard Contract to Entergy. Boston transferred its contract before DOE breached its obligations to accept any of Boston's SNF, and Boston did not elect, at some point prior to the actual breach of DOE's obligations to accept any of Boston's SNF pursuant to the approved DCSs applicable to Boston's Standard Contract, to treat DOE's pre-partial breach actions as some type of anticipatory total breach of contract. Accordingly, and because there is no doctrine that would permit pre-partial breach damages, Boston can neither recover damages for the alleged diminution of value of its Pilgrim plant nor recover costs allegedly incurred for continued on-site storage of its SNF. Further, Boston's claim for an uncompensated taking fails as a matter of law because it arises from an alleged breach of contract.

## ARGUMENT

### I. THE STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT

#### A. The Standard For Dismissal For Lack Of Jurisdiction

To invoke the right to invoke the subject matter jurisdiction of this Court, the plaintiff must do more than merely allege that a contract exists. It must establish that this plaintiff has the right to maintain an action for a breach of that contract. Specifically, the plaintiff must establish that it has standing to maintain a cause of action for the alleged breach of contract. When a party's standing to maintain a cause of action has been challenged, the challenge is, in substance, a challenge to the Court's subject matter jurisdiction. Brunswick Corp. v. United States, 22 Cl. Ct. 278, 279 n.2 (1991) (citing Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26,

28 (1976)); see 5A C. Wright & A. Miller, Federal Practice and Procedure § 1350, at 77 & n.5.1 (Supp. 1995) (motion to dismiss for lack of subject matter jurisdiction is appropriate "when plaintiff lacks standing"). The requirement of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 484 (1982); see 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531, at 339 (1984) ("focus is on the party, not the claim itself"). "Standing doctrines are employed to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." 13 C. Wright, A. Miller, & E. Cooper, supra, § 3531, at 338-39. The standing requirement "is essential preliminary to reaching the merits of the claim . . . ." Bachur v. Democratic Nat'l Party, 666 F. Supp. 763, 770 (D. Md. 1987).

In considering a motion to dismiss for lack of subject matter jurisdiction, "the court must accept as true any undisputed allegations of fact made by the non-moving party." Reynolds v. Army & Air Force Exchange Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); Oakland Steel Corp. v. United States, 33 Fed. Cl. 611, 613 (1995). "If a motion to dismiss for lack of subjection matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); Cedars-Sinai Medical Center v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993), cert. denied, 114 S. Ct. 2738 (1994); Rocovich v. United States, 933 F.2d 991, 994 (Fed. Cir. 1991); see Exchange Nat'l Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1130-31 (2d Cir. 1976) (discussing reasons for rule that, for

motions under 12(b)(1), court can accept additional evidence outside pleadings). Consideration of information from outside the pleadings does not convert the motion into a motion for summary judgment. Brunswick, 22 Cl. Ct. at 279 n.2; 10 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2713, at 608-13 (1983). The United States Supreme Court has determined that these rules apply to standing issues in the context of Rule 12(b)(1). Warth v. Seldin, 422 U.S. 490, 501-02 (1975); see Price/CIRI Constr., J.V. v. United States, 27 Fed. Cl. 695, 697 (1993); Hasse v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). In these situations, the non-moving party still "bears the burden of establishing the court's jurisdiction." Oakland Steel, 33 Fed. Cl. at 613.

B. The Standard For Summary Judgment

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment upon the

issues presented here, including Boston's standing to pursue this action, whether Boston can maintain a takings claim that mirrors its breach of contract claim, and whether Boston's new claim for diminution of value fails as a matter of law because it seeks recovery of speculative damages.

## II. BOSTON EDISON HAS NO BASIS UPON WHICH TO SEEK DAMAGES FOR BREACH OF CONTRACT BECAUSE IT SOLD ITS NUCLEAR PLANT AND ASSIGNED ITS CONTRACT TO ANOTHER ENTITY BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SPENT NUCLEAR FUEL ACCRUED

### A. Boston Has The Burden To Establish Its Standing

The scope of Federal jurisdiction is determined, in the first instance, by the Constitution and, within those constitutional bounds, by Congress. Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 372 (1978). To satisfy the Constitution, there must be a justiciable case or controversy under Article III. U.S. Const., art. III, § 2, d.1. "Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing." Wooden v. Board of Regents of the Univ. Sys. of Ga., 247 F.3d 1262, 1273 (11th Cir. 2001). Federal courts have an independent obligation to examine their own jurisdiction before proceeding to the merits of a claim. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (courts must resolve jurisdictional issues before considering the merits of a dispute).

The requirement of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Valley Forge, 454 U.S. at 484 (internal quotations and citation omitted); see Morrison v. Olson, 487 U.S. 654, 670 (1988) (an objection to jurisdiction upon the basis of standing cannot be waived); Bender v. Williamsport

Area School Dist., 475 U.S. 534, 546-47 (1986); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531, at 339 (1984) ("focus is on the party, not the claim itself"). "Standing doctrines are employed to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." Id. at 338-39.

The "irreducible constitutional minimum" of standing places the burden upon the [plaintiff] to establish each of three elements: (1) a "concrete and particularized" injury in fact that is "not conjectural or hypothetical;" (2) a causal connection between the alleged violation and the injury; and (3) the ability of the court to redress the injury by a favorable decision:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends Of The Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citations omitted); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (complainant bears the burden of establishing all three elements of standing). "The plaintiff has the burden to 'clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements.'" Miccosukee Tribe of Indians v. Florida State Athletic Comm'n, 226 F.3d 1226, 1230 (11th Cir. 2000) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)); see White's Place, Inc. v. Glover, 222 F.3d 1327, 1329 (11th Cir. 2000) (plaintiff has the burden "to allege and then to prove facts sufficient to support jurisdiction"). "If the plaintiff fails to meet its burden, this court

lacks the power to create jurisdiction by embellishing a deficient allegation of injury." Miccosukee Tribe, 226 F.3d at 1230.

To satisfy the injury-in-fact requirement, the plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotations and citations omitted). Injury-in-fact, like the other elements of standing, "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of litigation." Id. at 561.

### B. Boston Cannot Satisfy Its Burden Of Establishing That It, Rather Than The Company To Which It Sold Its Facility And Assigned Its Contract, Has Suffered An Injury-In-Fact

#### 1. The Delivery Commitment Schedules That Boston Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case

Boston's complaint is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, automatically created an injury-in-fact to each and every member of the commercial nuclear utility industry. However, as explained below, this assumption is contrary to the express language of the Standard Contract and is neither supported by evidence nor precedent.

In its amended complaint, Boston asserts that "DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998." Amend. Com. ¶ 74. Boston contends that "DOE's failure to do so constitutes a breach of the Standard Contract for

which Boston Edison is entitled to damages." Id. However, as discussed below, Boston lacks standing to pursue its breach of contract action because it assigned its Standard Contract and sold its Pilgrim plant to Entergy before Boston accrued any claim against DOE for breach of contract. Based upon decisions of the United States Court of Appeals for the District of Columbia and Federal Circuits, DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a breach of the Standard Contract. However, the January 31, 1998, deadline for beginning SNF acceptance is not a deadline that required DOE to begin accepting SNF from each and every contract holder by January 31, 1998. Instead, that deadline was a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole.

As explained below, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, timely to submit a delivery commitment schedule ("DCS") to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

Although Boston claims that it is clear that DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that breach, in and of itself, does not render DOE liable to Boston. Nor does it establish that Boston has incurred any

damages as a result of DOE's breach of contract. Instead, as explained below, DOE's contractual liability arises from its inability to accept SNF identified in an approved DCS and final delivery schedule.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See

id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If

the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF

"specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[2] Id.

---

[2] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of

2. Because Boston Assigned Its Standard Contract And Sold Its Pilgrim Plant To Entergy Prior To January 30, 2000, The Date By Which DOE Was Obligated To Accept Boston's SNF Pursuant To Its 1999 Approved Delivery Commitment Schedule, Boston Lacks Standing To Maintain This Suit

Boston sold its Pilgrim plant and assigned its DOE contract to Entergy on July 13, 1999, long before DOE's obligation to accept Boston's SNF arose. DOE was not obligated to accept Boston's SNF until January 30, 2000, the end of the 12-month period during which DOE could have scheduled its acceptance of Boston's SNF under its 1999 approved DCS. Because Boston transferred its nuclear plant and assigned its DOE contract to Entergy on July 13, 1999, and because DOE was not obligated to accept Boston's SNF until January 30, 2000, Boston did not accrue any rights against DOE arising from the Standard Contract. Consequently, Boston lacks standing to maintain this action, and its suit should be dismissed for lack of jurisdiction.

Indeed, Boston fails to recognize that the existence of a breach of contract is but one element of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) ("Plaintiff requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)"); Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd on reh'g en banc, 64 F.3d 1531 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996).

---

fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

The Court of Claims has recognized that, before a Government contractor is entitled to judgment on entitlement, it must establish as part of its proof that it suffered *some* damage, beyond mere speculation, because of the Government's actions: "Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . . ." Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977);[3] see Cosmo Constr. Co. v. United States, 451 F.2d 602, 605 n.3 (Ct. Cl. 1971) ("A wrong done, but from which no loss or damage results . . . will not sustain an action.") (citation omitted). In an action involving issues of both entitlement and quantum, "evidence on damages or quantum is not totally excluded [from consideration of entitlement], because there must be *some* evidence of damage to support a finding on liability. . . . sufficient to demonstrate that the issue of liability is not purely academic." Id. at 605-06.

Here, Boston could not have suffered an injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Instead, any injury that Boston incurred would result from DOE's failure to accept Boston's SNF as identified in Boston's approved delivery commitment schedules. However, as explained above, Boston did not have an approved delivery commitment schedule that required DOE to begin SNF acceptance under Boston's Standard Contract before Boston sold its nuclear plant and assigned its DOE contract to Entergy. Consequently, Boston has no basis for arguing that DOE's failure to accept its SNF on January 31, 1998, caused it to incur damages, irrespective of whether the claim for

---

[3] Although Westlaw states that this is an unpublished disposition, the opinion is actually published in the United States Court of Claims Reports. See 215 Ct. Cl. at 976.

damages is for diminution of value of the Pilgrim plant or for costs incurred to store SNF and to develop a dry cask storage facility.

Instead, the first "breach" that would have caused an injury to Boston would not have occurred until January 30, 2000, the end of the 12-month period during which DOE was entitled, and obligated, to accept the first of Boston's SNF through its 1999 approved delivery commitment schedule. However, Boston sold its nuclear plant and assigned its DOE contract to Entergy on July 13, 1999. Therefore, Boston has no basis for seeking damages for DOE's failure to begin acceptance of its SNF in accordance with the delivery commitment schedules approved pursuant to Boston's Standard Contract. Consequently, the Government is not liable to Boston for breach of contract, and Boston can neither recover damages for the alleged diminution of value of its Pilgrim plant nor for costs incurred for continued onsite storage of its SNF.

Generally, "breach of contract damages are measured from the date of the breach." Lucente v. International Bus. Machines Corp., 310 F.3d 243, 262 (2d Cir. 2002) (applying New York law) (emphasis added); see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958) ("[t]he time when performance should have taken place is the time as of which damages are measured"). Yet, Boston is claiming that its damages preceded DOE's obligation to begin acceptance of Boston's SNF. To the extent that Boston is asserting that its contract breach damages actually preceded DOE's breach of its obligation to begin accepting Boston's SNF, Boston's assertion would conflict with the type of breach upon which it is maintaining an action in this case.

Here, Boston is not seeking damages for a total breach of contract, but instead is asserting only a partial breach.[4] In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). To recover damages preceding the actual performance date in a contract, the non-breaching party must establish that the other party anticipatorily repudiated the contract prior to the scheduled contract performance date. Yet, "a breach by repudiation alone can only give rise to a claim for total breach . . .," Restatement (Second) of Contracts § 253 cmt. b (emphasis added), and "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro.

[4] If Boston were to assert a claim based upon a total breach of contract, that would conflict with the complaint that Entergy Nuclear Generation Company, Boston's purported assignee of the Standard Contract, filed in this Court. When a total breach of contract occurs, the contract is deemed to be at an end, and, although the non-breaching party may recover damages for the total breach from the breaching party, neither party has any further obligations to continue performance under the totally breached contract. See Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976); Hanson Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002). Had it pursued and prevailed upon such a theory, the Department of Energy would have had no further obligation to perform the Standard Contract or to accept the SNF generated under Boston's Standard Contract, although DOE would potentially have been liable to Boston in damages for its total breach. Only under a partial breach of contract theory may Boston recover some damages for DOE's alleged breach of contract and, at the same time, insist on continuing contract performance obligations. See Lovink, 878 F.2d at 587. Yet, Entergy, Boston's assignee, is seeking continuing partial breach damages that post-date the first alleged partial breach and Boston's assignment of the Standard Contract to Entergy. The assignor cannot maintain a suit in this Court alleging that the Government totally breached the Standard Contract, effectively concluding the parties' further performance obligations under that contract, while its assignee seeks continuing partial breach damages for a continuing contract. See National City Bank of Evansville v. United States, 143 Ct. Cl. 154, 163 F. Supp. 846, 852 (1958) ("[i]t is well-established that an assignee stands in the shoes of assignor, and that by assignment could acquire no greater rights than its assignor"); see also Smith v. Tobacco By-Products & Chemical Corp., 243 F.2d 188, 191 (C.C.P.A. 1957) (assignee can acquire no greater rights than assignor).

Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). Accordingly, because Boston cannot claim the existence of an anticipatory repudiation of the Standard Contract, it cannot recover damages that precede the actual partial breach of contract. Because DOE's obligations to begin accepting Boston's SNF did not arise until after Boston had assigned its contract to Entergy, Boston has no basis upon which to recover partial breach damages here.

C. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce

As the Court is aware, this Court has issued two published decisions and two unpublished decisions resolving motions regarding the effect of the DCSs in the cases in which they were issued. In those cases, the Court has either determined that the DCSs are meaningless or have reserved the issue for trial. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the rationale of which the Court adopted by unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. April 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court

did not explain – from a practical standpoint – the manner in which SNF acceptance would, could, or will work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court failed to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further,

would make the Standard Contract virtually impossible to perform. As previously discussed, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in these cases.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented in Indiana Michigan required a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy.[5] DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found

---

[5] In the particular case currently before the Court, the Court does not need to determine a rate of SNF acceptance for the Standard Contract as a whole. Given the timing of Boston's sale of its plant and assignment of its Standard Contract, the Court need only determine whether Boston had any rights to acceptance of its SNF prior to the date upon which it assigned its contract.

that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a summary judgment proceeding. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

In fact, the trial court's decisions in all four cases eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary

for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 214 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1981). However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term

that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[6]

---

[6] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that,

As established above, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, the Department of Energy published its Acceptance Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to impose its own schedule into this contract. It is beyond dispute that DOE was not obligated to accept SNF from every Standard Contract holder by January 31, 1998. Other than through the DCS process, Boston cannot identify any specific acceptance obligation, with identification of a specific date by which DOE had to begin acceptance of Boston's SNF, that ran directly to Boston. Because Boston assigned its Standard Contract to a third party before DOE partially breached any acceptance obligations relating to Boston's SNF, Boston has no basis for maintaining an action for pre-breach damages.

---

where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to supply essential missing terms if the parties fail to reach an agreement following good faith negotiations. In any event, it does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

## III. BOSTON'S CLAIM FOR AN UNCOMPENSATED TAKING FAILS AS A MATTER OF LAW BECAUSE IT ARISES FROM AN ALLEGED BREACH OF CONTRACT

### A. The Nuclear Waste Policy Act Did Not Create Any Vested Property Rights For Nuclear Utilities, And A Utility's Right To Acceptance of Its SNF Was Based Upon Its Execution of The Standard Contract

In Count III of its amended complaint, Boston asserts a cause of action for an uncompensated taking, claiming that "DOE's failure to dispose of Boston Edison's SNF by January 31, 1998, as required by the Act deprived Boston Edison of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities." Amend. Com. ¶ 82. Boston further states that, "DOE's conduct has deprived Boston Edison of the full economic use of its nuclear facilities and related property, and reduced Pilgrim's tangible and intangible value without just compensation." Id. Boston thus concludes that "DOE has taken Boston Edison's property in violation of the Fifth Amendment . . . and is liable to Boston Edison for just compensation." Amend. Com. ¶ 83.

Although Boston attempts to ground its takings claim upon the Nuclear Waste Policy Act of 1982 ("NWPA"), codified at 42 U.S.C. §§ 10101-10270, the NWPA did not create any vested property rights for nuclear utilities. Pursuant to an operating license issued in 1972 by the United States Atomic Energy Commission, Boston's Pilgrim plant has been in commercial operation for more than 30 years. Amend. Com. ¶ 46. "As Pilgrim was designed and constructed prior to the enactment of NWPA, all SNF produced at that facility was originally expected to by shipped offsite for reprocessing following each refueling outage. As a result, the need for significant on-site storage capacity was not contemplated in the construction design of the facility." Amend. Com. ¶ 47. Prior to 1983, the Department of Energy had no statutory, regulatory, or other legal

obligation to accept or dispose of the SNF that Boston generated through its production of nuclear power. To the contrary, prior to 1983, Boston was responsible for the storage and protection of the SNF that it had generated and that it would continue to generate.

However, in 1983, Congress enacted the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270. One of the purposes of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel." Id. § 10131(b)(2). In passing the NWPA, Congress included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of SNF, although Congress also found that the costs of the interim and permanent storage and disposal of SNF were the responsibility of those entities that created the SNF. 42 U.S.C. § 10131(a)(4)-(5).

Pursuant to section 302(a) of the NWPA, 42 U.S.C. § 10222(a), the Secretary of Energy was "authorized to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1). Further, the Secretary of Energy was barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." 42 U.S.C. § 10222(b)(2) (emphasis added). As a result, DOE's obligation to dispose of a utility's SNF was conditioned upon the existence of a contract between the utility and DOE. DOE implemented the requirements of section 302(a) of the NWPA by promulgating the Standard Contract, 10 C.F.R. § 961.11 (1983). The Standard Contract required

DOE to begin "[t]he services to be provided by DOE" under the Standard Contract "not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II. On July 17, 1983, Boston executed its Standard Contracts with DOE. Amend. Com. ¶ 31. Absent that Standard Contract, DOE would not have any obligation to accept any SNF generated at the Pilgrim nuclear reactor.

B. To Establish A Viable Takings Claim, Boston Must Establish That It Is Not Merely Seeking A Contractual Remedy

"In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). As the Court of Claims has long recognized, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978). If "alleged damage is due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, plaintiffs' claim that the wrong originated in some statutory" or constitutional "violation does not strip the case of its contractual nature." A&S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995). "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil, 572 F.2d at 818; see also J.J. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct. Cl. 1969); Transpace Carriers, Inc. v. United States, 27 Fed. Cl. 269, 274 (1992); Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 338-39 (1989).[7]

[7] When the Government is acting in its contracting, or proprietary, capacity, rather than in its sovereign capacity, no "taking" under the Fifth Amendment can arise because the Government's dealings "are contractually oriented, not taking intended or motivated." Data Transformation Corp. v. United States, 13 Cl. Ct. 165, 177 (1987) (citing Radioptics, Inc. v. United States, 621 F.2d 1113, 1126-29 (Cl. Ct. 1980)).

That is, remedies for alleged infringement of any rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 572 F.2d at 818; see Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court); Buse Timber & Sales, Inc. v. United States, 45 Fed. Cl. 258, 263 (1999) ("the express terms of the contract define the parties' respective rights and responsibilities which address the eventualities at issue before this court," precluding a taking claim). In short, there are no extra-contractual rights that arise from the failed performance of a contract, just damages that accrue from the breach. Castle v. United States, 301 F.3d 1328, 1341-43 (Fed. Cir. 2002) ("[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance") (citing Winstar v. United States, 518 U.S. 839, 919 (1996) (Scalia, J., concurring)).

### C. Boston's Claim That, By Failing To Begin Removal Of Boston's SNF From Boston's Pilgrim Plant By The Contractual Deadline, The Government Has Taken Its Real Property, Is Nothing More Than A Breach Of Contract Claim, Which Cannot Be Recharacterized As A Taking

Boston asserts that DOE's failure to dispose of Boston's SNF by January 31, 1998, "constitutes a taking of Boston Edison's vested property rights." Amend. Com. ¶ 82. Boston contends that the delay has "destroyed Boston Edison's reasonable, investment-backed expectations arising from the NWPA" and deprived Boston "of the full use and value of its nuclear facilities, caused it to incur substantial and unnecessary capital and other expenses, and severely diminished the value of these facilities." Amend. Com. ¶ 82-83. Boston thus seeks damages to compensate it for the alleged taking of its property.

Another Standard Contract holder, Commonwealth Edison Company ("ComEd"), pursued a takings claim alleging that the Government's breach of the Standard Contract prevented ComEd from decommissioning its nuclear plant sites and depriving it of the commercial use of its real property. Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 654 (2003). However, this Court rejected ComEd's claim in its entirety, even though ComEd, like Boston, claimed that it had rights in its real property that were "separate and distinct" from its rights under the Standard Contract, finding that, "prior to the Standard Contract DOE did not have an obligation to accept or dispose of [ComEd's] SNF." Id. at 656. Because ComEd would have been obligated to conduct the same or similar storage activities that it had asserted gave rise to a takings claim, this Court found that ComEd's rights were enforceable through a contract remedy and dismissed ComEd's takings claim. Id.; see Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished) (dismissing Standard Contract holders' takings claims, finding that "plaintiff's taking claim is grounded on the SNF contracts that [plaintiffs] executed with the United States").[8]

Indeed, as previously discussed, any rights that Boston possesses with regard to DOE's removal of its SNF were conferred upon it by the Standard Contract. See Commonwealth

---

[8] This Court reserved judgment upon whether the plaintiff could state a claim for a taking under the Standard Contract in Detroit Edison Company v. United States, 56 Fed. Cl. 299 (2003). Although we respectfully disagree with the decision in Detroit Edison, even the reasoning in that case does not prevent the Government from prevailing upon its motion in this case. In Detroit Edison, the Court chose not to dismiss the takings claim at that "point in the litigation" because a "more fully developed record" would allow it to assess whether the property right implicated was outside of the rights granted under the Standard Contract. Id. at 302-03. Rejecting the contention that Detroit Edison could use its takings claim to obtain remedies unavailable to it pursuant to the Standard Contract, the Court concluded that Detroit Edison's takings claim would not be "fatally flawed" only if it could not recover contract damages pursuant to the Standard Contract. Id.

Edison, 56 Fed. Cl. at 656. Absent the Standard Contracts that Boston executed with DOE, DOE would have no responsibility to accept Boston's SNF. Boston cannot divorce its Standard Contract from its new claim that the contractual delay in beginning SNF acceptance somehow constitutes a taking of its real property. As previously discussed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818. Because its claim for a taking of its real property is wholly dependent upon the existence of its Standard Contract, and because Boston would have been wholly responsible for the storage and disposal of its SNF absent its Standard Contract, Boston's claim for an uncompensated taking pursuant to the NWPA fails as a matter of law.

Some plaintiffs in the SNF cases have suggested that the appellate court's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), supports a contract holder's right to pursue both a takings claim and a breach of contract claim. This Court recently addressed the application of Cienega Gardens and concluded that a takings claim is not permitted when the contract at issue is with the Government and the Government is the breaching party. Allegre Villa v. United States, 60 Fed. Cl. 11 (2004). The plaintiffs in Cienega Gardens had entered into loan agreements with third parties that were insured by the Department of Housing and Urban Development. The Government subsequently restricted the plaintiffs' prepayment rights in those contracts. Because their contracts were with third parties, the plaintiffs in Cienega Gardens were not in privity with the Government and, therefore, had no contract claim against the Government. Consequently, the plaintiffs in Cienega Garden were allowed to proceed upon a takings theory because they had no contract with the Government upon which to base a breach of

contract claim and had property rights that were created outside of a contractual relationship with the Government. Conversely, because the plaintiffs in Allegre Villa had a with the Government and was in privity of contract with the Government, this Court required it to pursue the breach of contract claim and dismissed its takings claims:

> Because their contracts were with private lenders, plaintiffs in Cienega Gardens and Chancellor Manor were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

Allegre Villa, 60 Fed. Cl. at 19. Applying the analysis of Allegre Villa to the facts of this case, Boston's takings claim should be dismissed. Boston is seeking to recover damages based upon rights that it obtained solely through its contract with DOE: a right to acceptance of its SNF. Therefore, the Court should enter summary judgment in favor of the Government upon Boston's takings claim.

## IV. BOSTON'S GOOD FAITH AND FAIR DEALING CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BASED UPON A DELAY IN CONTRACTUAL PERFORMANCE AND BOSTON CANNOT PRESENT "WELL-NIGH IRREFRAGABLE PROOF" TO OVERCOME THE PRESUMPTION THAT THE GOVERNMENT ACTED IN GOOD FAITH

In its amended complaint, Boston asserts that the "Standard Contract contains an implied covenant of good faith and fair dealing. . . . [that] requires DOE to cooperate with Boston Edison and to reasonably and in good faith perform its duties under the Standard Contract and not to take actions that are detrimental to Boston Edison's contractual rights." Amend. Com. ¶ 77. Boston claims that "DOE has breached the implied covenant of good faith and fair dealing by failing to

take appropriate action to meet its contractual commitment to begin accepting Boston Edison's SNF for disposal by January 31, 1998." Amend. Com. ¶ 78.

For the same reasons previously discussed regarding Boston's assignment of its Standard Contract prior to January 30, 2000, Boston's partial breach claim based upon the implied duty of good faith and fair dealing also fails. Boston's contention that the Government breached the covenant of good faith and fair dealing "by failing to take appropriate action to meet its contractual commitment to begin accepting Boston Edison's SNF by January 31, 1998," is nothing more than an allegation that the Government breached the Standard Contract. Nevertheless, even if this claim could survive a standing motion, this allegation, without more, cannot form the basis for a claim for breach of the covenant of good faith and fair dealing. As the Court held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by governmental officials. Id. at 1240.

Here, Boston cannot present any evidence, let alone "clear and convincing evidence," to indicate that the Government's delay in accepting Boston's SNF was in bad faith. In fact, Boston's allegation amounts to nothing more than a claim for breach of contract as a result of delay in performance. However, when performance of the contract at issue is highly regulated, where the contract involves disposal of nuclear waste, and where performance was initially contemplated to require over 15 years of preparation and many more years to complete, the Government's delay in performance cannot be said to be in bad faith. Further, Boston's claim

that, "[p]rior to the closing date of the sale of Pilgrim (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal," Amend. Com. ¶ 78, is factually inaccurate. Contrary to Boston's contention, DOE provided a commitment to accept Boston's SNF through Boston's submission, and DOE's approval, of Boston's DCSs. That DOE subsequently failed to meet its commitment, and publically acknowledged that it would be unable to accept SNF from any utility until at least 2010, does not render DOE's conduct in bad faith. Instead, DOE's delay in performance simply gives rise to a claim for breach of contract.

To establish that the Government's delay in performance was in bad faith, Boston must present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), "designedly oppressive," Struck Construction Co. v. United States, 96 Ct. Cl. 186, 222 (Ct. Cl. 1942), or "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959), cited in Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976), and Am-Pro Protective Agency, 281 F.3d at 1240. Boston cannot present any such evidence in this case. To the extent that its partial breach contract claims otherwise survive this motion, its motion premised upon the duty of good faith and fair dealing should be dismissed. See Am-Pro Protective Agency, 281 F.3d at 1240 ("the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith"); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it"); Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("there is a strong presumption in the

law that administrative actions are correct and taken in good faith"); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (the government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

## CONCLUSION

For the foregoing reasons, the Court should grant our motion to dismiss or, in the alternative, for summary judgment upon Counts I and II of Boston's amended complaint and for summary judgment upon Count III of that complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Stefan Shaibani
STEFAN SHAIBANI
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-305-7597
Fax: 202-307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

April 30, 2004

CERTIFICATE OF FILING

I hereby certify that on April 30, 2004, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT UPON COUNTS I AND II AND FOR SUMMARY JUDGMENT UPON COUNT III OF PLAINTIFF'S AMENDED COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.