7. After "Number of Assemblies" there should be three blanks -- one designated "BWR", one designated "PWR", and one designated "Other". More than one type of assembly could be shipped from the same reactor or facility.

8. "Proposed Shipping Mode" should include "(Rail/Truck/Barge)."

9. The penultimate paragraph is unnecessary. Article V.A.2.(b) requires that Appendix F -- "Detailed Description of Purchaser's Fuel" -- be submitted for each shipping lot sixty (60) days prior to scheduled transportation.

10. The final paragraph should be deleted and replaced by the following statement: "Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Delivery Commitment Schedule has been discharged from a Civilian Nuclear Power Reactor and that Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal." Proof of ownership could be difficult to produce in some cases, would unnecessarily increases the paperwork required, may be subject to dispute, or may change between the time the Delivery Commitment Schedule is executed and actual delivery occurs. DOE is required, in any event, to take all SNF and HLW derived from civilian nuclear power reactors (as that

term is defined in Article I(3)). The proposed certification assures DOE that Purchaser has the legal right to deliver the SNF to DOE and that the SNF is eligible for delivery to DOE pursuant to the Contract.

11. "Approved for DOE" should be changed to "Approved by DOE."

APPENDIX C

1. The information to be provided in Appendix C should be submitted on a separate form for each delivery site designated by Purchaser.

2. "Reactor Name" should be changed to "Reactor/Facility Name." See Comment 2 with respect to Appendix B above.

3. Delete the entry "Type Reactor -- PWR/BWR". See Comment 3 with respect to Appendix B above.

4. We presume the "Shipping Lot No." will be assigned by DOE. A parenthetical statement to that effect might be added.

5. "Discharge Date" should be "Range of Discharge Dates (Earliest To Latest)."

6. "Metric Tons Uranium" should be modified by the addition of "(Initial)." See Comment 6 with respect to Appendix B above.

SAMPLE

APPENDIX 'B'

DELIVERY COMMITMENT SCHEDULE

In accordance with the contract for disposal of spent nuclear fuel and/or high-level radioactive waste between Purchaser and DOE, the following delivery commitment schedule is submitted by Purchaser to DOE. This delivery commitment schedule shall be submitted by Purchaser to DOE for approval not later than sixty-three (63) months prior to the estimated date of delivery.

Purchaser ______________________________

Contract Number ______________ Date ____ / ____ / ____
Mo Day Yr

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ______________

Shipping Lot Number (Assigned by DOE) ________ Type Cask Required: ________

DOE Assigned Delivery Commitment Year ________

Proposed Shipping Mode: Truck ☐ Rail ☐ Barge ☐

Range of Discharge Date(s) (Earliest to Latest) ____ / ____ / ____ To ____ / ____ / ____
Mo. Day Yr. Mo. Day Yr.

Metric Tons Uranium (Initial) ________

Number of Assemblies:

BWR ________

PWR ________

Other ________

Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Delivery Commitment Schedule has been discharged from a Civilian Nuclear Power Reactor and that Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal.

By Purchaser ______________ Approved by DOE ______________

Title ______________ Contracting Officer ______________

Date ____ / ____ / ____ Date ____ / ____ / ____
Mo Day Yr Mo Day Yr

SAMPLE

APPENDIX 'C'

FINAL DELIVERY SCHEDULE

(To be submitted to DOE by Purchaser for each designated Delivery site not later than twelve (12) months prior to estimated date of first delivery.)

Purchaser: ____________________

Contract Number ____________ Date ____ / ____ / ____
Mo Day Yr

Reactor/Facility Name ____________________

Location:

Street ____________________

City ____________________

County/State ____________ / ____________

Zip Code

Shipping Lot Number (Assigned by DOE) ________

Type(s) of Cask(s) to be Used: ________

Shipping Mode: Truck [ ] Rail [ ] Barge [ ]

# Assemblies per cask ___

Metric Tons Uranium - Initial ______

Range of Discharge Date(s) (Earliest to Latest) ____ / ____ / ____ To ____ / ____ / ____
Mo Day Yr Mo Day Yr
(From approved commitment schedule)

Number of Assemblies
BWR ____
PWR ____
Other ____

Purchasers Delivery Estimate First ____ / ____ / ____ Last ____ / ____ / ____
Mo Day Yr Mo Day Yr

Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Final Delivery Schedule has been discharged from a Civilian Nuclear Power Reactor and Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal.

To confirm acceptability of delivery date.

Note:

Purchaser Contact ____________ Title ____________ Phone ____________

DOE Contact ____________ Title ____________ Phone ____________

By Purchaser ____________ Approved by DOE ____________

Title ____________ Contracting Officer ____________

Date ____ / ____ / ____ Date ____ / ____ / ____
Mo Day Yr Mo Day Yr

provided should be simply the total nuclear kilowatt hours generated and sold during the assigned three month period. In all cases, that number will not simply be read from a continuous meter, but may require calculations.

2. In the "Instructions for Completing DOE Remittance Advice," Section II, the first sentence should read: "Based on inventory of SNF and/or HLW from SNF discharged from a civilian nuclear power reactor prior to April 7, 1983, times the kilogram fee."

3. "Instructions for Completing DOE Remittance Advice," Section III, the first sentence should read: "Based upon electricity generated and sold on or after April 7, 1983 times the current fee of one mil per kilowatt hour." The second sentence should read: "Schedules should be attached specifying the net amount of kilowatt hours generated by each nuclear unit during the assigned period."

PENDIX H

1. The suggested Disputes Clause in Appendix H to the draft DOE Disposal Contract appears generally to be patterned after the old Disputes Clause in uranium enrichment contracts, developed prior to the Contract Disputes Act of 1978. DOE has subsequently determined that the enrichment contracts are governed by

the Contract Disputes Act. However, it is not clear that the statutory jurisdiction of the Contract Disputes Act would include the DOE Disposal Contract, which provides for services by the Government only. Nonetheless the disputes mechanism set forth in the Contract Disputes Act provides a model for the Disputes Clause that we recommend.

2. Our recommended Disputes Clause (attached hereto) provides: (1) In the event of a dispute or claim arising under or related to the Contract, the Purchaser would file a claim with the Contracting Officer. (2) The Contracting Officer must decide the claim in writing within 60 days. (3) The Purchaser could appeal the Contracing Officer's decision either to the DOE Board of Contract Appeals (within 90 days), or the Claims Court (within 1 year). (5) Arbitration would be available if both parties agree. (6) Pending final decision of a claim, DOE and the Purchaser would proceed diligently with performance of those aspects of the Contract not in dispute.

3. We propose deleting the certification of claims requirement for claims in excess of $50,000. This provision was designed for contracts where a contractor may be claiming money is owed under a supply contract. Here claims are more likely to be for schedule adjustments or regarding delivery

commitments rather than claims for money. The certification requirement is not necessary to protect the government from frivolous claims.

4. An arbitration provision was added as a disputes resolution mechanism where both parties agree and where consistent with Government Contracts Law. Both parties may prefer an expert in the field to arbitrate certain highly technical matters. The "Umpire" provision in uranium enrichment contracts is an example of such an arbitration mechanism.

5. The disputes clause in Appendix H to the draft DOE Disposal Contract provides that "In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the Contract and, in accordance with the Contracting Officer's decision." The meaning of this provision is not clear. It may mean that during the pendency of an appeal, Purchaser shall continue to perform under the Contract. If this is its meaning, the clause is one-sided. An appropriate substitute found in Paragraph D of our proposed Disputes Clause would be: "Pending final decision of a claim hereunder, Purchaser and DOE shall proceed diligently with the performance of those aspects of the contract not in dispute."

## RECOMMENDED DISPUTES CLAUSE

DISPUTES

A. Except as otherwise provided in this Contract, all disputes or claims arising under or relating to this Contract, including the performance or nonperformance thereunder, shall be resolved in accordance with this clause.

B. (1) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a matter of right, the payment of money, adjustment, or interpretation of contract terms, or other relief, arising under or relating to this Contract, including the performance or nonperformance by either party hereunder.

(2) A claim by the Purchaser shall be made in writing and be submitted to the Contracting Officer for decision. A claim by the Government against the Purchaser shall be subject to an initial decision by the Contracting Officer.

(3) The Contracting Officer must decide the claim in writing within sixty (60) days of his receipt of the claim from the Purchaser.

(4) The Contracting Officer's decision shall be final unless the Purchaser files an appeal or initiates legal action pursuant to Paragraph C herein.

C. An appeal of the Contracting Officer's decision may be taken by the Purchaser as follows:

(1) Upon agreement of the two parties and where authorized by law, the appeal of a Contracting Officer's decision may be submitted to binding arbitration. Such an appeal shall be initiated within ninety (90) days of Purchaser's receipt of the Contracting Officer's decision by notice to the Contracting Officer. The parties shall attempt to designate as arbitrator a person qualified by training and experience to pass upon the matter in dispute. If the parties cannot agree upon an arbitrator, each party shall designate one arbitrator and the two arbitrators so designated shall select a third arbitrator. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Arbitration proceedings shall be held in Washington, D.C., and judgment upon any arbitration award may be entered in any court having jurisdiction thereof in the District of Columbia or the State of ___________, the parties hereto consenting to the jurisdiction of such courts for this purpose, or any other court having jurisdiction thereof. The decision of the arbitrator(s) shall be in writing. The parties shall share the procedural costs of arbitration equally unless the arbitrator(s) decides otherwise. Each party shall pay its own attorney fees and costs incurred in connection with the arbitration. This agreement to arbitrate shall be specifically enforceable.

(2) The Purchaser may elect to appeal to the DOE Board of Contract Appeals ("Board"). The Purchaser shall take an appeal to the Board by a written notice of appeal addressed to the Board and the Contracting Officer within ninety (90) days of Purchaser's receipt of the Contracting Officer's decision. The appeal shall be governed by the DOE rules applicable to contract claims not subject to the Contract Disputes Act of 1978 (P.L. 95-563). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In any such appeal, the Purchaser shall be afforded an opportunity to be heard and to offer evidence in support of its appeal.

(3) The Purchaser may elect to appeal to the United States Claims Court by filing suit with the Claims Court within one year of Purchaser's receipt of the Contracting Officer's decision.

D. Pending final decision of a claim hereunder, Purchaser and DOE shall proceed diligently with the performance of those aspects of the Contract not in dispute.

PRESENTATION BY MR. MICHAEL COOK, VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT, FLORIDA POWER AND LIGHT

MR. COOK: Thank you. Before I get into my testimony, there are prepared copies available to you, and I will elaborate and amend to some extent that. And I would like to thank you also for having given us, Florida Power and Light, the opportunity to meet previously with the staff to negotiate on the specific terms of the Florida Power and Light contract as well.

For the record, I am Michael Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power and Light.

Among my duties is contracting for the elements of the nuclear fuel cycle in support of our four nuclear plants. And certainly the safe disposal of the spent nuclear fuel and high level waste is a major concern to our company and the 2.4 million customers we serve.

There are six areas I would like to discuss, specifically, and before I go into that though I would like to comment that, in general, Florida Power and Light Company endorses the extensive efforts made by the Edison Electric Institute and the Utility Nuclear Waste Management Group in the preparation of written comments on this contract.

The utility industry recognizes the great importance of this rule making and has mounted an extensive

effort to provide significant input into this document, using the expertise of the entire industry. These comments that you will be receiving represent a broad consensus of opinion on what is required to most effectively implement the activities mandated by the Act. And I think the Department should recognize these as a very serious and honest effort and give them extremely heavy weight in determining the final contract language.

Florida Power and Light will also provide detailed comments on the draft contract, and I expect, in general, to adopt the EEI/UNWMG comments in addition to those I previously submitted to the Department. And, in fact, if any inconsistencies exist between the previous comments I made and those that you will be receiving from EEI/UNWMG, I would actually give preference to the EEI version since they do represent the industry concensus.

But let me now take this opportunity to comment on six areas which I think are very significant. And I would invite you, in fact, if you want to ask questions on any of these areas, if it's more convenient for you, to go ahead and interrupt as I cover the issues.

One of these important areas is performance standards. In general, it's a feature of all contracts to include a description of what's to be done by the party, when the specific activities are to be performed, and the

remedy in the event of nonperformance of the party.

The proposed contract is actually silent or, in some cases, vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste and do this through the Department of Energy. It, in fact, requires the Department of Energy to prepare a Mission Plan detailing its schedule for the construction of repositories and their capacities.

And what I'm proposing is that once this Mission Plan has been approved by the Congress it become the standard by which the contract performance by the Department of Energy is judged.

And what I'm suggesting is that Article V B (3) of the contract be modified to include a statement such as: "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal costs incurred by the Purchaser."

This approved Mission Plan and the annual acceptance ranking for the spent nuclear fuel will be the basis on which the utilities will plan their commitments of

resources for interim storage, if necessary, in order to meet their own projected discharge requirements. Without a provision of the type I've suggested requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities could be forced into the unenviable position of having to make emergency expenditures for interim storage many years after the fuel is actually consumed, while continuing to pay millions in mandated fees to the Waste Disposal Fund.

Yet, since the utility regulatory commissions generally will have provided for a recovery of spent fuel disposal costs in prior periods, the utilities might be faced with being unable to recover these additional unanticipated costs from their customers.

So I think it's less more equitable for the Department to cover all the costs incurred because of any DOE schedule slippage, regardless of the cause of the slippage, using money in the Nuclear Waste Dispoal Funds, and then to replenish the Fund if necessary through fee adjustments on future generation in the manner provided in the Act.

The second issue I'd like to discuss is the fee for spent nuclear fuel discharged before April 7th, 1983, and there are several aspects there. One of these is that it's very important the fee be fixed as of April 7th, 1983 so that

83-1-1

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY

In the Matter of )
)
10 CFR Part 961 — )
) 48 Fed. Reg. 5458
Standard Contract for Disposal )
of Spent Fuel and/or High Level )
Radioactive Waste )

STATEMENT OF
M.C. COOK
VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT
ON BEHALF OF
FLORIDA POWER & LIGHT COMPANY

MARCH 1, 1983

I am Michael C. Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power & Light Company. Among my duties is contracting for all elements of the nuclear fuel cycle in support of our four nuclear power plants. The safe disposal of spent nuclear fuel and high level waste is a major concern of our Company and the 2.4 million Floridians we serve.

I want to briefly discuss six areas of concern with respect to the draft disposal contract:

1. Need for a performance standard;
2. Fee basis for spent nuclear fuel discharged prior to April 7, 1983;
3. Requirement for flexibility in the disposal contract;
4. Relationships with existing contracts for disposal obligations;
5. Indemnification; and
6. Credits for activities performed to reduce DOE's responsibilities and costs.

this opportunity to speak about the following major areas which need additional refinement:

## 1.0 PERFORMANCE STANDARDS

A common feature of all contracts is a description of what is to be done by each party, when the specific activities will be performed, and remedies in the event of nonperformance by a party. The proposed disposal contract is silent or at best vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste in an expeditious manner on a timetable which would relieve the uncertainty associated with the present situation. The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

The approved Mission Plan and the annual acceptance ranking for receipt of

SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements. Without the proposed provision requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities may be forced into the unenviable position of having to make emergency expenditures for interim storage many years after fuel is consumed, while continuing to pay millions in mandated fees to the Nuclear Waste Disposal Fund. Since utility regulatory commissions generally will have provided for spent fuel disposal costs in prior periods, the utilities may not be able to recover such additional unanticipated costs from their customers. It thus would be more equitable for the DOE to cover all costs incurred because of any DOE schedule slippage, using money in the Nuclear Waste Disposal Funds, and to then replenish the fund if necessary through fee adjustments on future generation as provided in the Act.

## 2.0 FEE FOR SPENT NUCLEAR FUEL DISCHARGED PRIOR TO APRIL 7, 1983

This issue has three aspects.

First, the fee must be fixed as of April 7, 1983, so that utilities in conjunction with regulatory bodies may provide for the orderly collection and payment of this fee for fuel previously utilitized.

Secondly, the fee must bear some relationship to the relative cost of disposal while at the same time satisfying the Nuclear Waste Policy Act requirement that "such fee shall be in an amount equivalent to an average charge of one mil per kilowatt hour for electricity generated by such spent nuclear fuel." We are in favor of the three tier approach based on exposure which has been presented in the DOE draft contract (Article XIII). This approach is the most

Case 1:99-cv-00447-CFL Document 193-5 Filed 04/30/2004 Page 18 of 20

83-1-9

NSP

Northern States Power Company

414 Nicollet Mall
Minneapolis, Minnesota 55401
Telephone (612) 330-5500

March 3, 1983

Mr Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Dear Mr Morgan:

Northern States Power Company has reviewed the Draft Waste Disposal Contract and respectfully submits the following comments:

(1) DOE commitment -

"The context of the contract is <u>inverted</u>. Rather than a context of spent fuel "delivery commitments" as a binding obligation placed upon the utility, the contracts should be restated as in terms of "acceptance commitments" as a binding obligation placed upon DOE.

In this case, the utilities are making payments in advance for a "prospective service", rather than arranging in advance for a service for which "prospective payments" are to be made upon receipt of the service. Therefore, the context of the contract should be stated in terms of DOE "acceptance commitments", as the operative contract obligation in return for payments received.

Further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel and high level waste at the earliest practicable time upon the request of the owner or generator of such fuel and waste."

(2) Determination of fee for spent nuclear fuel discharge prior to April 7, 1983 -

Northern States Power Company feels the preferred calculation of the above fee is by determining the average burnup of all discharged fuel prior to April 7, 1983, calculating the dollar per kilogram for that average burnup equivalent to one mil per kilowatt hour, and applying that dollar per kilogram charge to all discharged fuel. We feel this method most closely follows the intent of the enacted legislation.

(6) Effective date for fees charged on electricity generated after April 6, 1983 -

The Purchaser should be allowed to prorate charges accumulated during the month of April on electricity generated over the Purchaser's normal accounting monthly time period to eliminate the possibility of requiring the Purchaser to maintain two sets of books. Such total prorated charge for the month of April shall be equivalent to the charges that would have been accrued if the effective date of the charges commenced on April 7, 1983.

(7) Audit rights covering the program and administration of the Waste Fund -

The Purchaser or its representative should have the right to perform any reasonable audits or inspections necessary to monitor DOE's conduct of the waste disposal program and the operation of the Nuclear Waste Fund.

(8) Costs of Military and Civilian Waste Programs -

Northern States Power Company feels accounting and control procedures should be established to separate all costs associated with the development and operation of the Military Waste Program from the Civilian Program. The Purchaser, should be assured, under the contract, that he will not bear any of the costs of the Military Waste Program in his fees.

(9) Exchanges of approved delivery commitment schedules among and within utilities -

The Purchaser should have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of Spent Nuclear Fuel and/or High Level Waste.

(10) Acceptance Priority Ranking System -

This system does not readily provide explicit priority to keep reactors operating, provide priority based upon the size of the Purchaser's total Spent Nuclear Fuel inventory, allow for "swapping" of delivery dates, and limits the Purchaser's flexibility as to which Spent Nuclear Fuel or High Level Waste it may ship by allowing the DOE only to accept the oldest Spent Nuclear Fuel and/or High Level Waste first. The contract should take these concerns into consideration.

(11) Annual acceptance allocation reports -

Northern States Power Company feels the Department of Energy should issue annual acceptance allocation reports starting not later than April 1, 1984 These reports are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage.

(19) Interest on late Fee -

Interest should be levied according to the following formula:

$$\text{Interest} = \begin{array}{c}\text{Amount due to DOE}\\ \text{for Assigned Three}\\ \text{Month Period}\end{array} \times \begin{array}{c}\text{Quarterly}\\ \text{Treasury}\\ \text{Rate}\end{array} \times \frac{\text{Day(s) Late}}{\text{365 Days}}$$

(20) Non-Standard Fuel -

There should be only two categories of Spent Nuclear Fuel: (1) F that has to be canned (i.e., Spent Nuclear Fuel that must be encap prior to shipment) and (2) Fuel that does not.

With the above comments [noteable exceptions being comments (2) and (3)] States Power Company generally endorses the positions taken by the joint mittal of the Edison Electric Institute and the Utility Nuclear Waste Ma Group. If I may be of any help or if you wish further clarification of please feel free to contact me.

Sincerely,

D H Peterson
Manager
Fuel Supply Department

vf