B.6 Change to: "Beginning not later than April 1, 1991, DOE shall issue an annual acceptance allocation report. The report shall set forth the projected annual receiving capacity for the DOE facility or facilities and the annual acceptance allocation for each party to a DOE contract for the disposal of SNF and/or HLW. The report shall provide such capacity and allocation information for each of the following ten fiscal years."

B.7 Add this new section: "In the event that SNF must be encapsulated prior to shipment, DOE on a mutually acceptable schedule shall provide Purchaser with cannisters suitable for use at Purchaser's site and compatible with the cask furnished pursuant to paragraph B.2 above, and appropriate information and documentation."

ARTICLE VI

A.4 Delete this section.

B.1 Change to: "Prior to acceptance by DOE of SNF and/or HLW for transportation to the DOE facility, DOE shall have the right to verify the description of such SNF and/or HLW, and to determine that the material is properly loaded, packaged, marked, labeled and ready for transportation. DOE shall accept all SNF and/or HLW properly described loaded, packaged, marked and labeled pursuant to applicable regulations."

B.2(a) Delete last sentence and add: "Once such SNF and/or HLW has been properly described, DOE shall accept such material in accordance with the previously approved schedule unless it was not technically feasible to transport or dispose of such material on that schedule. Where that schedule is not technically feasible, the parties shall negotiate a mutually acceptable alternate schedule."

B.3 Change "Priority" to "Allocation". Delete all of B3(b) and substitute this for all of B.3. "Delivery commitment schedules for SNF and/or HLW may request the delivery to DOE of more material than can be accommodated by the annual receiving capacity of the DOE facility (or facilities). In this event, one-half of such annual receiving capacity shall be allocated based on annual

production of SNF and/or HLW and one-half based on Purchaser's share of the total inventory of SNF and/or HLW.

(a) The share of annual capacity based on SNF and/or HLW discharge shall be apportioned based on the annual average per unit discharge of the SNF and/or HLW

(b) The share of annual capacity based on inventory share shall be determined by the formula:

$$\text{Purchaser's share} = \frac{(.5)\ (\text{DOE annual capacity})\ (A)}{(B)}$$

Where (A) is the amount of SNF (including SNF which was the source of HLW) discharged from the civilian nuclear power reactors in Appendix "A" (without the intent to reinsert) more than five years prior to the delivery year, and (B) is the amount of all SNF (including SNF which was the source of HLW) discharged from all civilian nuclear power reactors (without the intent to reinsert) more than five years prior to the delivery year."

ARTICLE VII

Add this at end of last sentence: "provided that in the event that DOE uses or processes the SBF and/or HLW, the Nuclear Waste Fund will be credited with (1) the net proceeds from the sale of the materials used or the recovered products, or (2) the net value of any such materials or products which are not sold".

ARTICLE VIII

A.4 Change to: "For fuel which was in the core of Purchaser's civilian nuclear power reactor (s) as of April 7, 1983, fuel that was temporarily removed from such reactor (s) as of that date, or fuel that had been withdrawn prior to that date with the intent to reinsert it in the reactor(s) after that date, that portion of the fuel which was used to generate electricity prior to April 7, 1983, shall be subject to a one-time fee as calculated in accordance with the formula:

85-1-16

CONTRACT FOR THE DISPOSAL OF SPENT NUCLEAR FUEL

AND/OR HIGH LEVEL RADIOACTIVE WASTE

Comments by Wisconsin Public Service Corporation

WPS has reviewed the DOE proposed contract as specified in the Federal Register of February 4, 1983, and has reviewed the February 17, 1983, draft comments by EEI/UNWMG. We are in general agreement with the majority of these comments. The following discussion addresses the significant issues as determined by WPS.

I) The contract must provide the purchaser with an incentive to explore cost reducing alternatives. This can be accomplished by an article that provides for a negotiated credit when the purchaser provides services, equipment, or material of value to the parties.

II) The contract must allow the purchaser to utilize current corporate accounting practices. In particular:

A) Payment by wire transfer should not be required. A wire transfer was established to provide an efficient way to move money from one bank account to another; both accounts beir co the same organization. Wire transfers are expensive, inconvenient, and lack control of third party transactions. They were not intended by the Federal Reserve System for routine invoice payments. Their use is frowned on by Purchasing, Accounting, Treasury, and Auditing areas. Invoices should be paid by check.

B) If the option to pay for SNF generated prior to April 7, 1983, is over a 40 quarter schedule as suggested in Article VIII, B.2, the calculated interest should be part of the fee. Consideration should also be given to a reduction of this fee if the purchaser elects to accelerate the payments.

III) The contract must not require the purchaser to make untimely or unreviewed commitments.

A) It is not necessary that the purchaser chose the payment option for discharged SNF (Article VIII, B.2) "at the time of contract execution." Rate implications will have to be reviewed with the Public Service Commission prior to making the appropriate choice. Tax aspects will also have to be analyzed.

B) Schedules for delivery should not be over-restrictive. Changes should be routinely allowed and "swaps" between customers should be encouraged.

IV) The contract cannot impose abnormal penalties for non-compliance occurrences.

A) The Article VIII.C, Interest on Late Fees, is abnormally punitive if set at the Quarterly Treasury Rate plus 6% when the Quarterly Treasury Rate is low.

B) Article X.1, Suspension, should not allow DOE to suspend the <u>entire</u> contract on purchaser's "failure to perform its obligations hereunder" if that failure is not corrected after notice from DOE and does not arise from causes beyond the purchaser's control. This authority is too broad.

83-1-20

Telephone (617) 872-8100
TWX 710-380-7619

YANKEE ATOMIC ELECTRIC COMPANY

YANKEE

1671 Worcester Road, Framingham, Massachusetts 01701

March 4, 1983

Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
US Department of Energy
1000 Independence Avenue, SW, Room 7B-084
Washington, DC 20585

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (48 F. R. 5458; Friday, February 4, 1983; 10 CFR 961)

Dear Mr. Morgan:

By Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (48 Federal Regulations, 5458), the Department of Energy (DOE) requested comments on a proposed standard contract to be used by DOE in furnishing disposal services for spent fuel and/or high-level radioactive waste to the owners and generators of such material. In addition, comments were also solicited on DOE's proposed procedures for implementing Section 302 of the Nuclear Waste Policy Act of 1982. Yankee Atomic Electric Company ("Yankee") hereby respectfully submits for DOE's consideration its comments on the proposed standard contract. Ten copies of Yankee's comments are enclosed.

Yankee recognizes that the Nuclear Waste Policy Act of 1982 requires the collection by the DOE of fees for disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). Before commenting on particular terms of DOE's proposed contract, Yankee has a basic general concern. We are being required to make substantial advance payments for nuclear waste disposal long before the DOE has an operating disposal facility or even an approved plan or site for such a facility. Yankee's advance payments will be included in the cost of power from its plant and will ultimately be paid by electric customers throughout New England. We have a duty to these customers to assure that DOE is fulfilling its end of our bargain. Although Yankee would be contractually required to begin making payments to DOE in mid-1983, DOE will not be required to begin fulfilling its obligations until 1998. In order for this contract to be a serious commitment for all parties, we believe that DOE should use its best and most expedient efforts to construct and operate a disposal facility, as soon as possible. Signing of this contract by United States utilities does not alleviate the need for an expeditious resolution of the waste disposal issue. The DOE should not have 1998 as a goal but rather as an outer limit. Therefore, we request that DOE include in this contract best effort commitments to meet a progress schedule that results in operation of a waste disposal facility before the 1998 deadline.

We endorse the comments prepared by the Edison Electric Institute in cooperation with representatives of the utility industry, including

Please give all due consideration to inclusion of the substance of these comments in the final version of the waste contract.

Respectfully yours,

A. R. Soucy
Treasurer

JMB/dd

83-1-21

PSE&G Public Service Electric and Gas Company

80 Park Plaza, Newark, NJ 07101 / 201 430-6468 MAILING ADDRESS / P.O. Box 570, Newark, NJ 07101

Richard Fryling, Jr. Assistant General Solicitor - T5E

March 3, 1983

Robert Morgan, Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

**Re: Nuclear Waste Policy Act of 1982**
**Standard Contract for Disposal of**
**Spent Nuclear Fuel and/or**
**High Level Radioactive Waste**
**Notice of Proposed Rulemaking**
**10 CFR Part 961**
**48 F.R. No. 25 at pp. 5458, et seq.**

Dear Mr. Morgan:

Please accept this letter as our comments in response to the Federal Register notice referenced above.

These comments are being submitted by PSE&G as licensee and operator of Salem Nuclear Generating Station Units 1 and 2, and as licensee and co-owner of Peach Bottom Atomic Power Station Units 2 and 3.

By way of general comment, PSE&G favors the concept contained in the Act providing for the Federal Government to accept, transport and dispose of spent nuclear fuel and high level wastes. The law requires that the Department of Energy dispose of the spent nuclear fuel and that the generators of such fuel fund the program. It is in the interest of the electrical consumers who will ultimately bear these costs that the program be mutually developed by the Federal Government and the electric utilities so that cost benefit assessment be mutually determined.

The fee associated with the waste disposal program should be equitable to all those making payments and, therefore, the means of assessing this fee should be uniform. The fee on fuel subsequent to April 7, 1983 at one mill per kilowatt hour appears to accomplish this objective. However, the fee on fuel discharged prior to April 7, 1983 seems to be causing confusion as to the true intent and the means of being able to evaulate the several options. For discharged fuel, it would seem most appropriate to use a unit value in dollars per kilogram Heavy Metal that reflects the burnup associated with the fuel. For fuel in service as of April 7, 1983, or partially burned and awaiting reinsertion, it is possible to attribute electrical generation to this fuel and obtain a corresponding financial obligation by multiplying the burnup by an industry-wide constant approximating equivalent electrical energy.

The Energy People

The options for payment of prior fuel are unclear as to their calculations and will require time to analyze the financial effects once they are defined. Therefore, the requirement to identify a specific payment option at the time of contract signing is impracticable.

Although expressed by DOE personnel, there is no mention of credits brought about by consolidation of spent fuel assemblies or by reduction of material handled attributable to reprocessing. Credit for reprocessing of spent nuclear fuel may become an issue when it becomes a reality. Presently, the draft contract does not allow for reprocessing credits and talks about "full costs" as opposed to "full net costs" which would net out credited value for reprocessed spent nuclear fuel. Contract language should be incorporated to mention these credits into the waste disposal program.

Listed below are PSE&G's specific comments related to the sections indicated.

## Article I – Definitions

The definition of "Generator" and "Purchaser" should be modified such that it is clear that the contracting party, i.e., the "Purchaser", when a joint ownership is involved, is the operator of a civilian nuclear power plant. As the terms are presently defined, they include any person licensed to use the utilization facility. Since joint owners of nuclear power plants are all deemed to be licensed by the NRC, a strict reading would require each owner to execute a contract and pay the fee. The obvious intent is that the operator, or the one owner responsible to act on behalf of all of the owners, would be the contracting party and the burden would be on the operator to determine allocation of costs among the several owners. Although the definitions do not appear in the contract per se, they are set forth at the proposed Section 961.3 and should be modified to assure that where more than one licensee is involved for a particular facility, only one licensee authorized to act on behalf of all owners would be the necessary contracting party.

Section 14 defines generation as "net of all station uses". Appendix G, Section III, indicates that schedules should be provided specifying the gross amount of power metered through each plant. It appears that the wording in the Appendix should correspond to that of Section 14 to be consistent.

## Article III – Term

Article II provides that the disposal services continue until DOE has accepted SNF and/or HLW from purchasers. Article III does not use the word "all". Therefore, the word "all" should be inserted after the phrase "until such time as DOE has accepted".

## Article IV – Delivery SNF and/or HLW

Section B, Delivery Commitment Schedules, and Section C, Final Delivery Schedules, and Appendix B contain conflicting data for approvals. In addition, the lead time of 63 months for submittal of a delivery commitment schedule, with a permissible adjustment of only plus or minus 20% of quantity and plus two months for delivery dates, does not allow sufficient flexibility. We do not understand how this long of a lead time and this inflexibility of a schedule are necessary on the part of the DOE.

In Section D, Emergency Deliveries, the term "Emergency" is not defined. It is assumed that this involves a situation necessitating the removal of spent nuclear fuel in order to allow for the licensed operation of a reactor, but this should be specified.

## Article VI – Criteria for Disposal

### A. General Requirements

Under this Section, it should be stated that the DOE will accept all spent nuclear fuel and high level wastes as provided in the Act, the delivery of which shall be arranged for upon mutually agreed terms, conditions, and schedules.

### B. Acceptance Criteria

The acceptance criteria contained in the Appendices appear to have been formulated without sufficient input from the parties who will be providing the material. It is recommended that definitive terms and conditions not be made part of this contract at this time.

## Article VIII – Fees and Terms of Payment

### A. Fees and Terms of Payment

A. Fees

For the one-time fee, it is understood that there is support for the position that the Act provides such fee to be fixed on April 7, 1983 and that the amount to be paid at any time in the future should be the fixed fee plus the time value of money at the Federal Government interest costs. Aside from Federal income taxes, while it is desirable to allow flexibility in the time of payment, one could contend that it does not seem reasonable to permit the fee for prior fuel to be adjusted annually and thereby expose purchasers to unknown future costs. While the flexibility of two payment options, 40 quarterly payments or a single payment, may be appropriate from a Federal income tax standpoint, the fee for either option should be fixed as of April 7, 1983. It would appear that the fee should be increased only by the Government's actual cost of money until the time of payment.

The Proposed Rule Summary outlines three alternatives for the calculation of the one-time fee for fuel used in generating electricity prior to April 7, 1983. The draft contract does not contain the three alternatives. In addition, the power ranges referenced in the Summary are undefined. This fee structure should be resolved and stated in the contract. Item 3's last sentence states that, "the adjustment to the fee will not be retroactive to previously generated electricity". This appears to be in conflict with B. Payment, 2(a) Option 1, and (b) Option 2 where the payment will be at the fee schedule rate in effect at time of payment.

### B. Payment

Item 1

The draft contract specifies that for electricity generated after April 7, 1983, the first payment shall be due on July 7, 1983. We recommend for clarification this be revised to read as follows. "The first payment shall be due on July 7, 1983, and payable no later than August 31, 1983". The basis of this obligation should be specified.

Article IX B of the draft contract refers to avoidable delays by purchaser or DOE and provides that charges specified by the contract will be equitably adjusted to reflect any additional costs incurred by the party not responsible for or contributing to the delay. The "all events test" for a current deduction should be able to withstand this consideration of the possibility of later adjustment. More significantly, Artice X 2. provides that DOE reserves the right to suspend disposal service in the event that a national emergency requires that priority be given to government programs to the exclusion of work under the contract. In the event of such a suspension, DOE shall refund that portion of payments representing services not delivered as determined by the government contracting officer to be an equitable adjustment. Federal tax law deals with substance and not form; nevertheless, we would suggest that the language be modified to avoid any appearance of refund of payments and, thus, detract from the "fixed and ascertainable" nature of the earlier payment.

## CONCLUSION

We wish to thank you for this opportunity of commenting upon this proposed standard form of contract. As indicated above, we are wholly in support of the program whereby DOE will make available nuclear waste disposal services. In addition to our own comments contained herein, PSE&G also joins in and supports the comments being submitted by the Edison Electric Institute.

Very truly yours,

Richard Fryling, Jr.

RF:mbb

83-1.22

LILCO LONG ISLAND LIGHTING

# LONG ISLAND LIGHTING COMPANY

175 EAST OLD COUNTRY ROAD • HICKSVILLE, NEW YORK 11801

Direct Dial Number

March 3, 1983

Mr. Robert Morgan
Project Director Nuclear Waste Policy
Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

"Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste"

ar Mr. Morgan:

The draft standard contract for disposal of spent nuclear fuel and/or high level radioactive waste, published in the Federal Register on February 4, 1983, has been reviewed by the Long Island Lighting Company (LILCO). LILCO is a member of the Edison Electric Institute and supports the Edison Electric Institute comments except where those comments conflict with the comments that follow.

To facilitate your review of our comments, we have arranged them to follow the structure of the draft contract.

Article 5 - Responsibilities of the Parties

B.4 This is satisfactory if the contractors are under DOE supervision and are required to follow all DOE procedures. The following words should be added:

"or subcontractors, acting solely under the supervision and control of DOE."

B.6 It is obvious that the startup of the first Federal waste repository will not immediately solve the problem of interim storage of spent fuel. The need for at-reactor storage will continue until the backlog of spent fuel is disposed of. Therefore, a vital part of this contract is the method of allocation of disposal capacity available to DOE. The proposed method of establishing priorities based

solely on the age of spent fuel does not meet the Congressional mandate set forth in Section 132 which requires the Secretary to take such action necessary to encourage and expedite the effective use of available storage, and necessary additional storage at the site of each civilian nuclear power reactor. To the contrary, it is likely to maximize the need for additional at-reactor storage.

A method of allocating available disposal capacity should be established which meets the following objectives:

1. Minimize the need for additional storage capacity at operating reactors.

2. Equitably spread burden of continued storage until backlog is eliminated.

3. Minimize potential trans-shipment between reactor storage facilities.

4. Provide a firm planning base so customers know what their storage needs will be.

5. Provide for emergency needs.

To meet these objectives, there is a need to phase in the allocation of available repository receiving capacity. It is recommended that receiving capacity of the first repository be allocated such that each reactor with spent fuel at least 10 years old be allocated an amount equivalent to an annual year's discharge, thus placing a cap on the need for additional storage for those reactors that will have already made a substantial commitment to storage facilities. Excess receiving capacity should be allocated to reduce the inventory of old fuel. It is recommended that the receiving capacity of the second repository be allocated such that all reactors with spent fuel at least 5 years old be allocated an amount equivalent to an annual year's discharge with excess receiving capacity allocated to reduce inventory of old fuel.

Combining this contractual commitment for allocation with allowing customers to swap allocations should result in an equitable sharing of the burden of interim storage of spent fuel.

83-1.23

**NORTHEAST UTILITIES**

NU

THE CONNECTICUT LIGHT AND POWER COMPANY
THE HARTFORD ELECTRIC LIGHT COMPANY
WESTERN MASSACHUSETTS ELECTRIC COMPANY
HOLYOKE WATER POWER COMPANY
NORTHEAST UTILITIES SERVICE COMPANY
NORTHEAST NUCLEAR ENERGY COMPANY

Purchasing Offices • Selden Street, Berlin Connecticut

P.O. BOX 270
HARTFORD, CONNECTICUT 06101
(203) 666-6911

RALPH O. SMITH
*VICE PRESIDENT*

March 3, 1983

Mr. Robert Morgan
Project Director Nuclear Policy
Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: Contract For Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste; 10 CFR Part 961

Dear Mr. Morgan:

It is our understanding that DOE plans to finalize the Contract by April 7, 1983 after receiving comments from the industry and will change the terms and conditions based on comments received. While we recognize that DOE is working under a very short time schedule to complete this contract by June 1983, sufficient time for careful review is necessary for a major contract which will be in effect for over thirty (30) years. Recognizing that DOE has requested comments on the contract in the broad sense, we have not reviewed the detailed contract language and thus our silence on specific terms does not constitute an acceptance of that language. Prior to the signing of a contract, it is our corporate policy that specific language be reviewed in detail and approved by legal counsel in addition to similar reviews by other NU disciplines. We have not, at this time, performed such legal review due to the very short notice period and the high likelihood that the published draft contract will be modified.

As provided for in the Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (49 FR 5458), Northeast Utilities (NU), acting on behalf of The Connecticut Light and Power Company (CL&P), Western Massachusetts Electric Company (WMECO) and Connecticut Yankee Atomic Power Company (CYAPC), hereby submits its preliminary comments on 10 CFR Part 961 - Standard Contract for Disposal of Spent Nuclear and/or High-Level Radioactive Waste. In accordance with the Comment Procedures in the Federal Register Notice, ten copies are enclosed.

The NU System has 22 years of nuclear experience, including operating both pressurized water and boiling water reactors. For the past six years, NU has been actively involved in both technical and legislative solutions to the high-level waste issue. We were delighted to see the passage of the Nuclear Waste Act which assures a timely solution to this issue. Our comments therefore reflect our interest in assuring that the intent of the Act, as we

(9) Exchange of Delivery Schedule Commitments

DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period. Because the flexibility offered by DOE is not adequate, individual purchasers will need the right to exchange their delivery commitment schedules.

(10) Appendices

The appendices to the Contract containing descriptions and characterizations of fuel should serve only as a guide to the type of information that will be required by DOE. As the Waste Program progresses, the type and quantity of specific information needed can be expected to change. Incorporating specific appendices may then result in subsequent contract modifications to better clarify the actual requirements.

These comments are submitted in addition to those which we developed in conjunction with EEI. We are looking forward to working with you to have signed contracts to meet your schedules. Please contact our Mr. R.R. Calabro or Mr. A.W. Cretella at (203) 666-6911 if you wish further clarification of our comments.

Very truly yours,

Bernhardt W. Erk
Manager - Administration and
Nuclear Fuel Purchasing

BWE/lc

Mailing Address
Alabama Power Company
600 North 18th Street
Post Office Box 2641
Birmingham, Alabama 35291
Telephone 205 783-6081

F. L. Clayton, Jr.
Senior Vice President
Flintridge Building

83-1-25

Alabama Power
the southern electric system

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: <u>Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste</u>

Dear Mr. Morgan:

Alabama Power Company ("Alabama Power") is hereby submitting its comments on the proposed rulemaking contained in 48 <u>Federal Register</u> 5458 entitled "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste." Alabama Power is a public utility providing electric service at retail and wholesale in a large portion of the State of Alabama, and owns and operates the Joseph M. Farley Nuclear Plant under licenses from the Nuclear Regulatory Commission. We are, therefore, vitally interested on behalf of our Company and its customers in the contract proposed to be adopted by the Department of Energy ("DOE") as the standard contract for disposal services to be provided pursuant to the authorization of the Nuclear Waste Policy Act of 1982 (the "Act").

In general, Alabama Power supports the comments filed in connection with this proposed rulemaking by the Edison Electric Institute ("EEI") and, in fact, we participated in their development. In a few instances, however, as pointed out below, as an individual utility we would suggest approaches different from the view supported by EEI. In other instances, we are commenting specifically on particular items in which our views coincide with those presented by EEI. Our additional comments are intended to highlight items of particular importance to us and not to suggest that other items on which EEI commented are not equally deserving of consideration.

of Purchasers against the risks of nuclear hazards arising from the performance by DOE of services under the contract. We understand that while the proposed contract addresses indemnification agreements between DOE and its contractors, no explicit indemnification exists in the proposed contract where DOE is providing the service and a contractor is not involved. DOE is clearly authorized under the Act to take full responsibility for all consequences of its disposal of spent nuclear fuel. To remedy this concern, we endorse the observations of EEI that DOE should obligate itself to provide Purchaser with protection equivalent to that which would have been provided under the Section 170(d) indemnity provisions if it operates the facility. Further, if Section 170(d) were to expire (without Congressional action on extension) on August 1, 1987, or should it otherwise expire, indemnity protection for nuclear hazards must be assured in some alternate manner. We concur with EEI's suggestion that DOE should obligate itself, in the event of expiration of Section 170(d) protection, to provide Purchaser protection equivalent to the protection afforded Purchaser under the Section 170(d) indemnity.

We would note in this connection the need to assure that the indemnity obligation survives the stated term of the contract. To achieve this, the following sentence should be added to Article III - Term:

> The provisions of DOE under Article XIV of this Agreement shall continue beyond the term of this Agreement.

5. <u>Acceptance Criteria, Article VI. B</u>

Consistent with DOE's obligation to take title to, to transport, and to dispose of all spent nuclear fuel and high level waste, there should be no waste nuclear material which will be ultimately unacceptable to DOE provided such material is properly identified, packaged, labeled, scheduled, and loaded by the Purchaser pursuant to applicable regulations. Accordingly, we specifically endorse EEI's comments regarding Article VI. B. of the proposed contract and EEI's comments regarding Appendix E and Appendix F. In particular, we want to emphasize that DOE's obligation to remove spent nuclear fuel under the contract should remain regardless of the form or condition of the spent nuclear fuel. Thus, even if the fuel is not structurally intact, the contract for disposal

services should contain a clear obligation on DOE to accept such fuel for disposal. This would include fuel pellets which have escaped from the cladding, fuel rods which have been consolidated, and other instances where fuel does not meet a standard specification. Moreover the contract should contain a clear obligation by DOE to provide appropriate containers as they may be required.

6. Delays Clause - Article IX

We are concerned by the possible ambiguity of Article IX of the proposed standard contract. This section of the proposed agreement is intended to excuse delays, not failures to perform. The first sentence of Article IX should be revised as follows:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by delays in the performance of its obligations hereunder, if such delay arises out of causes beyond the control and without the fault or negligence of the party delayed.

This change will make this sentence consistent with the last sentence of Article IX which requires the parties to perform, notwithstanding excused delays, on an adjusted schedule.

7. Spent Fuel Receipt Rate at DOE Facility

The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent nuclear fuel desired by the holders of such fuel. In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner.

In addition, we support EEI's comments on the proposed priority system for allocation of spent fuel deliveries and

the concept of allowing exchanges of such allocations between different Purchasers. Clearly such allocation exchanges should at least be permitted between reactor units on Purchaser's own electric system.

CONCLUSION

Alabama Power appreciates the opportunity to provide comments on the draft standard contract. Since DOE has chosen to develop the standard contract through rulemaking with the stated intent to use the form contract to the maximum extent practicable, we consider these comments as our primary means of negotiating a final contract acceptable to both parties. We request that they be considered accordingly.

Yours very truly,

ALABAMA POWER COMPANY

F. L. Clayton, Jr.
Senior Vice President