Attachment 1

FPL Comments on the DOE Contract for the Disposal

of Spent Fuel and/or High Level Radioactive Waste

## 1.0 PERFORMANCE STANDARDS

A common feature of all contracts is a description of what is to be done by each party, when the specific activities will be performed, and remedies in the event of nonperformance by a party. The proposed disposal contract is silent or at best vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste in an expeditious manner on a timetable which would relieve the uncertainty associated with the present situation. The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:

> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

The approved 1984 DOE Mission Plan and the annual acceptance ranking for receipt of SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements. Without the proposed provision requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities may be forced into the unenviable position of having to make emergency expenditures for interim storage many years after fuel is consumed, while continuing to pay millions in mandated fees to the Nuclear Waste Disposal Fund. Since utility regulatory commissions generally will have provided for spent fuel disposal costs in prior periods, the utilities may not be able to recover such additional unanticipated costs from their customers. It thus would be more equitable for the DOE to cover all costs incurred because of any DOE schedule slippage, using money in the Nuclear Waste Disposal Funds, and to then replenish the fund if necessary through fee adjustments on future generation as provided in the Act.

## 2.0 FEE FOR SPENT NUCLEAR FUEL DISCHARGED PRIOR TO APRIL 7, 1983

This issue has three aspects.
First, the fee must be fixed as of April 7, 1983, so that utilities in

83-1. 4L

Duquesne Light

One Oxford Centre
301 Grant Street
Pittsburgh, PA 15279

(412) 393-6000

March 4, 1983

Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, DC 20585

Dear Mr. Morgan:

I am pleased to submit to you Duquesne Light Company's comments on the proposed Department of Energy regulations published in the February 4, 1983 Federal Register, including the proposed Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

Duquesne Light Company ("Duquesne") is an electric utility serving approximately 550,000 industrial, commercial and residential customers in the greater Pittsburgh metropolitan area. Duquesne is a participant in the CAPCO (Central Area Power Coordination) arrangements and operates the nuclear Beaver Valley Power Station Unit No. 1, which it jointly owns with two other CAPCO companies. Duquesne is presently constructing, and will operate, the nuclear Beaver Valley Power Station Unit No. 2, which it jointly owns with three other CAPCO companies. In addition, Duquesne owns undivided interests in two other nuclear generating units which are under construction by the CAPCO companies.

Except as set forth in General Comment A.1 and Specific Comment 4 concerning Article VIII, Duquesne supports and adopts the joint comments submitted on behalf of the Edison Electric Institute and the Utility Nuclear Waste Management Group.

Article IV - Delivery of SNF and/or HLW

Some consideration must be given in "ranking priority" to accepting fuel in such a manner as to prevent utilities from being required to increase on-site storage capacity by permitting some trading of allocations.

• Article V - Responsibilities of Parties

The proposed form does not accomplish the intent of Article V.A.1 (a). The appendix D form designated "Annual Forecast" should be discarded and replaced with the type of information most recently supplied, at DOE request, to Battelle Northwest. Such forms, to be used for DOE planning purposes, would simply present a projection of each of the next ten (10) years and would provide such information as estimated refueling shutdown data, metric tons of uranium to be discharged, etc. Such reporting would then meet what is intended by this contract provision.

Article VIII - Fees and Terms of Payment

1. We respectfully request a meaningful time period be established prior to designating an option payment plan. Inasmuch as the required payments will involve substantial amounts of money, utilities should have time to consider and review possible tax aspects and PUC rate implications identified with such payments.

2. We are concerned with how payments/charges are to be made on spent fuel (definition in question) scheduled for re-insertion.

3. We are unable to conclude from the present contract version whether the fee suggested in VIII A. 2 is fixed or subject to adjustment since both Option 1 and 2 describe a rate in effect at date of payment. While the options for payment may be appropriate, the fee should be fixed as of April 7.

4. We support and recommend the adoption the formula specified under the Proposed Rule section of 10 CFR Part 961 for the calculation of fees to be paid by the Purchaser under this contract. The actual fuel burn-up data is used to determine the dollar per kilogram of heavy metal equivalent to (1) mil/kilowatt hour with all calculations done on an individual assembly basis. We view the establishment of costs in this manner to be fair and equitable.

We trust that the Department will consider these comments and Duquesne's efforts to resolve the matters discussed herein to be part of Duquesne's active and good-faith effort to negotiate a contract with the Department for the disposal of spent nuclear fuel.

Please contact me at 412/787-5720 if I can provide any further information concerning our comments. Thank you very much.

Very truly yours,

R. D. Scherer
Nuclear Fuel
Management Coordinator

RDS:smb

83-1-57

# Comments Regarding The Proposed Contract For Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste and Related Regulations

(10 CFR Part 961)

Submitted By

Pacific Gas and Electric Company

March 4, 1983

sentence of Article II should be deleted. Provision for disposal by DOE not later than January 31, 1998, will be covered by additional language suggested below.

ARTICLE III - TERM

1. As written, Article III is ambiguous in that it may be interpreted to mean that the term of the contract continues only until DOE first accepts SNF and/or HLW from the reactor of a Purchaser. To make the contract consistent with the intent of the Agency as set out on page 5459 of the above-referenced Federal Register and Article II, the word "all" should be included and the provision in the contract be modified to read:

> The term of the contract shall be from the date of execution until such time as DOE has accepted and transported from Purchaser's site all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A."

ARTICLE IV - DELIVERY OF SNF AND/OR HLW

1. Article IV.B. Delivery Commitment Schedule. Under Article IV.B, if DOE disapproves a delivery commitment schedule, Purchaser shall resubmit a revised schedule within 30 days. No time limit is provided for DOE's response to the resubmitted schedule. Presumably a period of not more than 30 days would be adequate. If DOE were also to

disapprove the resubmitted schedule, it should propose an alternate schedule. If Purchaser does not accept DOE's alternate, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. Appropriate language should be inserted before the last sentence in the first paragraph of Section IV.B as follows:

> DOE shall approve or disapprove such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

A similar comment applies to the Final Delivery Schedule provision (Article IV.C).

2. <u>Article IV.B</u>. The second paragraph of Article IV.B allows the Purchaser to "change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract." The relationship between this provision and the acceptance priority ranking (Article VI.B.3) is unclear. Since the acceptance priority ranking does not appear to be part of the "acceptance criteria of the contract," the paragraph could mean that Purchaser, having been

necessary to monitor the administration of the waste disposal program established pursuant to the Nuclear Waste Policy Act of 1982. DOE shall furnish Purchaser annually a report including, but not limited to, kilowatt hours generated and sold for each reactor under contract with DOE pursuant to the requirements of such Act.

ARTICLE IX - DELAYS

1. Since waste disposal is a cooperative effort which is funded by a common fund, there should be no monetary liability of damages for delay either by a Purchaser or DOE. Should delay be caused by DOE, it most likely would result from an insufficient number of casks or cannisters or transportation equipment. The remedy for such would be to increase the amount of equipment for use, the cost of which would be an increased cost to the fund. If a Purchaser were to delay, the remedy is not monetary damages but rather loss of scheduled delivery date if such delay would cause another Purchaser, not a party to this particular contract, to miss its scheduled delivery date. And if a Purchaser could trade delivery dates with other Purchaser or make arrangements with the Purchaser next in line, so that DOE's services are efficiently utilized, then there should be no loss of scheduled priority for Purchaser. Accordingly,

both Article IX.A and Article IX.B should be deleted and the following Article IX should be substituted:

> In the event of any delay in the delivery of casks or cannisters by DOE, or in the acceptance, transportation or disposal of SNF and/or HLW by DOE, Purchaser shall not lose its priority for its scheduled delivery of SNF and/or HLW. In the event that delay in delivery of scheduled SNF and/or HLW is caused by Purchaser, except as provided in Article X, Purchaser will not lose its scheduled delivery priority, unless its delay will, in turn, delay the scheduled delivery of another Purchaser which is not party to this contract; provided, however Purchaser, by negotiation may obtain and utilize the delivery schedule rights of such other Purchaser or any other purchaser as provided in Article IV.E. Should Purchaser lose its delivery priority, the parties by mutual agreement will reschedule the delivery as expeditiously as possible.

ARTICLE X - SUSPENSION

1. The proposed suspension of the contract for the failure of a Purchaser to perform contract preconditions is a remedy which is more severe than necessary and could be contrary to the interest of the Government. Purchaser has obligations under the contract other than payment of fees such as notification requirements, reporting requirements, or preparation of SNF and/or HLW requirements. If the entire contract

8571ee

# CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

## Comments on Nuclear Waste Policy Act of 1982 (Act)

General Comments

1. It is unclear what DOE's intentions are regarding the number of contracts. Will each Purchaser enter into one contract, one contract for each reactor plant site, or one contract for each reactor unit? TVA believes a separate contract should be made for each reactor unit. However, if this is not done, each reactor unit under a multiunit contract should be treated as a separate entity for the purpose of exercising rights under the contract, such as with respect to payment options. This flexibility is necessary because some nuclear plant owners, including TVA, have fuel supply contracts under which Contractors have responsibility for spent fuel. Owners operating several nuclear plants should have no less flexibility than owners of only one plant.

2. TVA recommends that the contract provide the flexibility in DOE to allow appropriate credits for actions taken by the Purchaser which reduce DOE's costs of transportation or disposal of SNF and/or HLW. This is believed to be a very important concept in reducing the overall costs of SNF transportation and disposal. Without such credits, Purchasers will have less incentive (and may not have the ability) to take such actions. Such actions may include reprocessing, utilization of Purchaser-owned shipping casks, fuel rod consolidation, certain cask storage arrangements, use of high burnup fuel, and other actions which DOE determines to be advantageous.

7. Article V, "Responsibilities of the Parties" - Section B

Section 302(a)(5) of the Act requires that the contracts include certain specific items. For example, the contract must provide for the disposal of SNF and/or HLW beginning not later than January 31, 1998, but the draft contract does not specifically include this requirement. The Act also sets specific limitations on the allowable costs to be paid out of the Purchaser's fees, but the draft contract does not contain these limitations. DOE's obligations under the Act should be part of the contract. Accordingly, we suggest the following be added:

- DOE shall carry out all other responsibilities relating to the disposal of SNF and/or HLW as may be set forth in the Nuclear Waste Policy Act of 1982.

In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industrywide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V:

- DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts with DOE for disposal of SNF and/or HLW.

- After January 31, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for Purchaser's nuclear power plants specified in appendix A.

Houston Lighting and Power Company Comments on
the Proposed Standard DOE Contract for
Disposal of Spent Nuclear Fuel and High Level Radioactive Waste

1. Proposed 10CFR Part 961.4 - Deviations

The DOE's intent to allow deviations from the standard contract should be emphasized by adding a statement indicating that "the DOE recognizes that some situation may require special contractual provisions". This sentence should be added to the beginning of Part 961.4.

2. Article I

The "Assigned Three-Month Period" should be set by mutual agreement between the DOE and the Purchaser, rather than assigned by the DOE. This would allow the Purchaser to choose the end date most consistent with its internal record keeping system.

3. The term "shipping lot" as defined in Article I and as used in Appendices B, C, D and F should be clarified. It is unclear whether this refers to a single or multiple shipment of spent fuel.

4. Article II

There should be a provision in the contract whereby the DOE commits, on an annual basis beginning January 31, 1998, to accept title to a quantity of spent nuclear fuel or high level radioactive waste greater than or equal to the quantity projected to be generated during a given year. Otherwise, the utilities have no assurance as to when the DOE will actually begin to take title to spent nuclear fuel from their individual nuclear plants.

5. Article IV.B.

The Delivery Commitment Schedule, to be submitted 63 months prior to the delivery, is much too restrictive. This commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased. This flexibility could be increased by reducing the commitment leadtime to 36 months and/or increasing the quantity adjustment to ±35% (instead of ±20%).

The annual discharge forecasts to be provided by Purchaser should be sufficient for planning repository capacity.

6. Article V.A.2.c

The Purchaser should only be responsible for the incidental maintenance normally required during the cask loading process. Also, the Purchaser should only be liable for any loss or damage to the cask caused by the Purchaser's negligence.

83-1-66

MIDDLE SOUTH SERVICES, INC./BOX 51000/NEW ORLEANS, LA. 70161/(504) 529-5252

March 7, 1983

Mr. Robert Morgan
Project Director, Nuclear Waste
Policy Act Project Office
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

SUBJECT: Comments on Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

Dear Sir:

Middle South Services, Inc. would like to take this opportunity to comment on the Department of Energy's Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste - 10CFR961. The attached comments are being submitted on behalf of System Fuels, Inc., the fuel subsidiary and the three nuclear operating companies of the Middle South Utilities System: Arkansas Power & Light, Co. (AP&L), Louisiana Power & Light, Co. (LP&L) and Mississippi Power & Light, Co. (MP&L). In addition to these comments AP&L, LP&L, and MP&L will be submitting comments.

These comments are intended to enable DOE to provide information to the NRC pursuant to Section 302 (b) (ii) of the Act that Middle South Services, Inc. (MSS) is in good-faith negotiations with DOE. We request that DOE affirm in writing that MSS and DOE are actively involved in such good-faith negotiations for contracts for the disposal of spent nuclear fuel for the Grand Gulf Nuclear Station Unit 1 and the Waterford Steam Electric Station Unit 3. However, if further input is required from MSS in order that the Department be able to render the aforementioned affirmation to the Commission, please advise us immediately.

If you wish to discuss any of our comments or would like clarification on any comment please contact us.

Sincerely,

Felix M. Killar, Jr.
Manager, Nuclear Fuel Supply

FMK/tb

cc: Dr. T. W. Schnatz
Mr. S. Thompson
Mr. T. L. Temple
Ms. S. M. Temple
Mr. J. S. Brihmadesam
Mr. R. T. Lally
Dr. K. R. Iyengar
Mr. J. Patterson
Nuclear Fuels Commitee
Nuclear Oversight Committee

File: 037-14
041-01

# COMMENTS ON CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

In addition to the following specific comments we also endorse the comments being submitted by the Utilities Nuclear Waste Management Group and Edison Electric Institute.

## RECITALS

The wording for identification of purchaser should allow for lead utility to act on behalf of itself and co-owners in the plant and/or to allow a service organization to act on behalf of the plant owners.

## ARTICLE I - DEFINITIONS

General comment - Terms which are defined should be capitalized throughout the Contract and not just in Article I.

1. The term "Assigned Three-Month Period" should be negotiated with each Purchaser so that it coincides with that utility's internal bookkeeping and reporting requirements. This will avoid duplication of effort.

2. The term "Commission" should be expanded to include" or any successor thereto".

3. The term "Delivery Commitment" should be deleted. Defining this as a "promise" introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement. The "Delivery Commitment Schedule" described in Article IV.B is the applicable term.

4. The term "Delivery" should include "f.o.b. carrier" between custody and of.

5. The term "DOE" should should be expanded to include "or any successor thereto"

6. The term "DOE Facility" needs to be expanded to include any holding facilities which may be used prior to the SNF/HLW arriving at the actual disposal facility. This change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility.

7. The term "Full Cost Recovery" should be more precisely defined to ensure that funds are applied only to activities authorized by the Nuclear Waste Policy Act of 1982. Hence, delete the words "and conducting related activities" in the first sentence of this definition. The second sentence should be modified as follows:

ARTICLE V - RESPONSIBILITIES OF THE PARTIES

1. The penalty imposed by Article V.A1(b) seems disproportionately harsh for failure to provide an annual ten year forecast. This penalty should be deleted.

2. In Article V.A. 2(a) the Purchaser is obliged to afford "access" to DOE's representative at Purchaser's site. This should be revised to read Purchaser shall afford reasonable access to such representative subject to such representative's compliance with appropriate procedures regarding safety, security, and non-disruption of normal operation of the nuclear powerplant".

3. Change the first sentence of Article V.A.2 (c) to read as follows:

   "The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks. . ."

4. In Article V.A.2(c), second sentence, general comment - The liability as written is too broad. Only in the event of Purchaser's negligence should there be any liability. The ambiguous phrase" . . . expenses incidental to such loss or damage . . ." could include consequential damages and should be deleted. Also, revise this section to make it clear when liability and risk of loss transfer between Purchaser and DOE. We suggest the provision be redrafted as follows:

   "Purchaser shall be liable for loss or damage caused by Purchaser's negligence while such casks are in the possesion and control of Purchaser. Liability and risk of loss transfer from DOE to the Purchaser upon Purchaser's receipt and acceptance of DOE's cask at the Purchaser's site. Liability and risk of loss revert to DOE when the cask and its contents are transferred to DOE f.o.b. DOE's carrier."

5. Article V.B.1 should be deleted as it is somewhat inconsistent with Articles IV.B and C and is unnecessarily redundant to the previous Articles.

6. Article V.B.2, general comment - Add "DOE shall provide drawings, instructions, procedures and any other such descriptive technical information as well as any special tools or equipment necessary for Purchaser to make use of DOE's cask in accordance with all applicable regulatory requirements and other procedures and instructions. Purchaser shall have the right to request from DOE specific cask types from among those available." The provision should also state that casks arrive in good condition and good repair and shall be subject to receipt inspection and acceptance by the Purchaser, such acceptance shall not be unreasonably withheld.

7. Article V.B.5, general comment - To assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity. DOE should also provide annually a detailed financial statement rendering the status of the Nuclear Waste Fund. DOE should periodically meet with the Purchaser to discuss plans and budgets for the Nuclear Waste Fund and technical plans and schedules for the waste disposal program. Finally, DOE should provide to Purchaser the results of any research funded by the Nuclear Waste fund.

83-1-67

# VERMONT YANKEE NUCLEAR POWER CORPORATION

RD 5, Box 169, Ferry Road, Brattleboro, VT 05301

(802) 257-5271

March 7, 1983

Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
U. S. Department of Energy
1000 Independence Avenue, SW, Room 7B-084
Washington, D.C. 20585

Dear Mr. Morgan:

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (48 F.R. 5458; Friday, February 4, 1983; 10 CFR 961)

By Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (48 Federal Regulations, 5458), the Department of Energy (DOE) requested comments on a proposed standard contract to be used by DOE in furnishing disposal services for spent fuel and/or high-level radioactive waste to the owners and generators of such material. In addition, comments were solicited on DOE's proposed procedures for implementing Section 302 of the Nuclear Waste Policy Act of 1982. Vermont Yankee (VY) hereby respectfully submits for DOE's consideration its comments on the proposed standard contract. Ten copies of VY's comments are enclosed.

VY recognizes that the Nuclear Waste Policy Act of 1982 requires the collection by the DOE of fees for disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). Before commenting on particular terms of DOE's proposed contract, VY has a basic general concern. We will be required to make substantial advance payments for nuclear waste disposal long before the DOE has an operating disposal facility or even an approved plan or site for such a facility. VY's advance payments will be included in the cost of power from its plant and will ultimately be paid by electric customers throughout New England. We have a duty to these customers to assure that DOE is fulfilling its end of our bargain. Although VY would be contractually required to begin making payments to DOE in mid-1983, DOE will not be required to begin fulfilling its obligations until 1998. In order for this contract to be a serious commitment for all parties, we believe that DOE should use its best and most expedient efforts

to construct and operate a disposal facility as soon as possible. Signing of this contract by United States utilities does not alleviate the need for an expeditious resolution of the waste disposal issue. The DOE should not have 1998 as a goal but rather as an outer limit. Therefore, we request that DOE include in this contract, best effort commitments to meet a progress schedule that results in operation of a waste disposal facility before the 1998 deadline.

We endorse the comments prepared by the Edison Electric Institute in cooperation with representatives of the utility industry, including VY. We believe that those comments can serve as the basis for development of a workable contract from the standpoint of both the DOE and the purchasers of disposal services. In addition, we wish to emphasize the following points:

1. Fee for Spent Fuel

a. Fee for Fuel Used to Generate Electricity Prior to April 7, 1983 (existing spent fuel)

We support the fee calculation method proposed as Alternative 2 in the Notice of Proposed Rulemaking 48 FR, Pages 5459 and 5460. Our support is based on the fact that the fee thus charged for pre-April 7, 1983 SNF will be based on actual energy generation for each reactor and thus will most accurately equilibrate to the fee basis for post-April 6, 1983 SNF. As a result, Alternative 2 will be the most equitable and consistent method for charging waste disposal costs for all SNF to the ultimate consumers of energy generated by each contracting utility's nuclear reactor(s).

b. Fee for Spent Fuel in Core as of April 7, 1983

To be consistent with the charges to be assessed for generation after April 7, 1983, we suggest that each utility indicate the number of kilowatt hours already generated by the fuel in-core on April 7, 1983 and assign a 1 mil/kwh fee to this generation. This would be more equitable and easier to administer than the method in Article VIII.A.4 of the proposed contract.

Please give all due consideration to inclusion of these comments in the final version of the waste contract.

Respectfully yours,

William F. Conway

William F. Conway
President and Chief Executive Officer

WFC/jh

83-1-69

Con Edison
Consolidated Edison Company of New York, Inc.
4 Irving Place, New York, N.Y. 10003

March 7, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S. W.
Room 7B-084
Washington, DC 20585

Dear Mr. Morgan:

The Consolidated Edison Company of New York, Inc. commends DOE for its rapid preparation of the Draft Contract for Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste, in application of the Nuclear Waste Policy Act of 1982. Our Company has long supported the efforts which resulted in the passage of this legislation.

Accordingly, we are pleased to offer our general comments on this Draft Contract and, following these, various editorial comments which we hope will be of assistance.

(1) As this contract provides for considerable pre-payments over a period of nearly two decades, it would be most helpful if DOE's performance was as precisely defined as possible. Presentation by DOE of the "Mission Plan", in the Spring of next year, may provide such an opportunity. In any event, the Purchasers should be kept informed of DOE's views, as they develop, concerning the detailed schedule of its performance under the contract.

(2) For the sake of simplicity, we suggest that fuel in-core through April 6, 1983 be charged 1 mill/kwhr for the energy produced by then (Ref. Article VIII A-4). The words in the Draft Contract imply that such fuel will be treated in the same way as already discharged fuel.