(12) <u>Appendix "G"</u>

<u>Section III.a.</u>

Delete the word "power", replace by the word "energy".

(13) <u>General Comments</u>

<u>Consolidated Fuel Rods</u>

The contract is vague on the treatment and charge(s) for these type fuel rods. These items should be clarified in the contract.

<u>Control Rods</u>

The contract is silent on the disposal of cruciform control rods. This is an important item for older reactors, such as our Indian Point Unit 1, which utilized such control rods.

(14) <u>10 CFR Part 961</u>

<u>Article VIII</u>

The method of calculating the heat output of each assembly should be the object of reasonable mutual agreement.

We appreciate the opportunity to comment and we trust that our comments will be reflected in the final contract. Any further details specific to Con Edison fuel will be addressed in negotiation.

Very truly yours,

Henri M. Gueron

Dr. Henri M. Gueron
Director
Nuclear Fuel & Coal Supply

HMG/dl

83-1-77

DAIRYLAND POWER COOPERATIVE • P.O. BOX 817 • 2615 EAST AV SOUTH • LA CROSSE, WISCONSIN 54601
(608) 788-4000

FRANK LINDER
General Manager

March 7, 1983

Ref: GM-352

U. S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D. C. 20585

Attention: Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
Room 7B-084

Subject: U. S. Department of Energy
10 CFR Part 961
Standard Contract for Disposal
of Spent Nuclear Fuel and/or High
Level Radioactive Waste - Comments

Gentlemen:

We have reviewed the notice of proposed rulemaking on,

1) Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Waste

2) Nuclear Waste Policy Act of 1982 - Proposed Rule for General Guidelines for Recommendation of Sites for Nuclear Waste Repositories

and submit the following comments with respect to item 1) above:

Dairyland Power Cooperative is the owner and operator of the La Crosse Boiling Water Reactor (LACBWR), a relatively small 50 mWe reactor plant, which was designed and built by the Allis-Chalmers Manufacturing Company for the U. S. Atomic Energy Commission. The reactor plant was built as part of the AEC's second round demonstration program and first achieved criticality in July 1967.

The conventional power generating facilities associated with the reactor plant were built by Dairyland Power Cooperative. We also provided the staff to manage, operate and maintain the integrated plant.

Following a lengthy testing and break-in period, the plant was declared operational for contract purposes in November 1969. After several years of experience as an operational nuclear power plant, LACBWR was sold to Dairyland in August 1973.

We are currently operating the plant under the terms and conditions of a Provisional Operating License and are entering the final stages of obtaining a Full Term Operating License.

Because of the relatively small size of the plant, hence the smaller size of the fuel assemblies, relatively lower average burn-up of the fuel, the relatively higher enrichment and therefore potentially higher salvage value of the fuel and the unique contract arrangements which existed between the AEC and DPC regarding payments for the use of nuclear generated steam, there appear to be sufficient differences which merit discussions prior to our execution of a SNF, HLW disposal contract. From first criticality in July 1967 to August 1973 the reactor was producing steam as a government-owned facility.

Text

Change the statement - "whereas the DOE is authorized to enter into contracts for the permanent disposal. . ." to read ". . . long term disposal. . ."

Articles II-III

1) Article II specifies that contract termination shall take place at "such time as all SNF and/or HLW. . . has been disposed of . . ." Article III states that the contract shall terminate at "such time as DOE has accepted SNF and/or HLW." The termination event should be consistently defined.

2) The words "the Purchaser's" should be inserted before "civilian nuclear power reactors."

3) In Article III, the word "all" should be inserted before "SNF and/or HLW."

Article IV

1) In Section B, it is unclear whether DOE's written approval would be required for 1) adjustments to delivery quantities, 2) adjustments to delivery scheduled and 3) changes of specific assemblies, or only for changes of specific assemblies.

2) It should not be necessary to submit firm (within + or - 20%) delivery commitment schedules sixty-three (63) months prior to the delivery date. Thirty-six to forty-eight months would be more reasonable. In any case, the Purchaser should be allowed to delay the delivery and/or change the form of the delivery from SNF to HLW up to 12 months prior to the delivery date if the option to reprocess the SNF becomes available.

Article V

In Section B.2, DOE shall "arrange for shipping casks to be furnished. . ." In LACBWR's case, only two fuel assemblies can be shipped in a NSF-4 or similar cask. Schedule commitments would presume a compressed schedule utilizing multiple casks to efficiently coordinate a transfer campaign.

2) Instruction for completing DOE Remittance Advice, Section III, second sentence should read ". . . specifying the net amount of power metered through each plant. . ." instead of ". . . specifying the gross amount of power metered through each plant. . ."

3) Standard Remittance of Advice (RA) for Payment of Fees. Item III typographical error - change "spearate" to "separate".

Appendix H

1) The Disputes section provided procedures for dispute resolution based on the Contract Disputes Act. That statute, however, is not applicable to this type of contract. The terms in Appendix H limiting the procedures and forum for resolving disputed matters conflict with the language of Article XI, which states that neither party shall be precluded from asserting its rights and remedies under the contract or at law.

2) The copy of Draft Contract provided concluded with a handwritten title, "6. Rights in Technical Data." Without further information, we are unable to comment on that subject.

Appendix I

The fee calculation formula is based on the on-hand amount of SNF and/or HLW derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983. Much of the SNF and/or HLW at LACBWR resulted from operation of an AEC facility, not from electrical generation in a civilian nuclear power reactor, as that term is defined in Article I. Thus, the applicability of the fee to that material at LACBWR is unclear.

It is our intention to contact the office of the Project Director in the near future to schedule discussions relative to our comments and to initiate negotiations for a contract for DOE's disposal services.

Very truly yours,

Frank Linder

FWL:daj

Attachments (2)

cc: O. S. Hiestand
Morgan Dubrow - NRECA
E. Tremmel
S. Raffety
J. Taylor
R. Mueller
R. Shimshak
Jeff Hill - Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, D. C. 20503

83-1-78

Georgia Power Company
333 Piedmont Avenue
Atlanta, Georgia [illegible]
Telephone [illegible]

Mailing Address: [illegible]
[illegible]
Atlanta, Georgia [illegible]

J. T. Beckham, Jr.
Vice President and General Manager
Nuclear Generation

Georgia Power
the southern electric system

NED-83-145

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
U. S. Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D. C. 20585

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste

Gentlemen:

Georgia Power Company ("Georgia Power") is hereby submitting its comments on the proposed rulemaking contained in 48 Federal Register 5458 entitled "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste." Georgia Power is a public utility providing electric service at retail and wholesale in the State of Georgia, and operates the Edwin I. Hatch Nuclear Plant on behalf of itself and its co-owners. Georgia Power also has under construction the Alvin W. Vogtle Nuclear Plant which also has co-owners. We are, therefore, vitally interested on behalf of Georgia Power, its co-owners, and its customers in the contract proposed to be adopted by the Department of Energy ("DOE") as the standard contract for disposal services to be provided pursuant to the authorization of the Nuclear Waste Policy Act of 1982 (the "Act").

In general, Georgia Power supports the comments filed in connection with this proposed rulemaking by the Edison Electric Institute ("EEI") and, in fact, participated in their development. In a few instances, however, as pointed out below, as an individual utility we favor approaches different than those supported by EEI, particularly regarding the proposed fee for electrical generation prior to April 7, 1983. In other instances we are commenting specifically on particular items in which our views coincide with those presented by EEI. Our additional comments are intended to highlight items of particular importance to us and not to suggest that other items on which EEI commented are not equally deserving of consideration.

Georgia Power

Mr. Robert Morgan
March 4, 1983
Page Eight

8. Delays Clause - Article IX

We are concerned by the ambiguity of Article IX of the proposed standard contract. This section of the proposed agreement is intended to excuse delays, not to excuse failures to perform. The first sentence of Article IX should be revised as follows:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by delays in the performance of its obligations hereunder, if such delay arises out of causes beyond the control and without the fault or negligence of the party delayed.

This change will make this sentence consistent with the last sentence of Article IX, which requires the parties to perform, notwithstanding excused delays, on an adjusted schedule.

9. Spent Fuel Receipt Rate at DOE Facility

The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent nuclear fuel desired by the holders of such fuel. In this regard, it is important that the annual receipt rate of the disposal facility being designed be commensurate with the quantities of spent nuclear fuel being generated annually and also the need to reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner.

In addition, we support EEI's comments on the proposed priority system for allocation of spent fuel shipments and the concepts of allowing exchanges of such allocations between different Purchasers. Clearly, such allocation exchanges should be permitted between reactor units on Purchaser's own electric system.

Conclusion

Georgia Power Company appreciates this opportunity to provide comments on the draft standard contract. We respectfully request that DOE consider these comments and provide a contract which will be fair and workable to the nuclear utilities, such as Georgia Power, who will have to operate under the contract.

Very truly yours,

J. T. Beckham, Jr.

LTG/mb

700775

Comments on Contract for Disposal of
Spent Nuclear Fuel and/or High-Level Radioactive Waste

ARTICLE I - DEFINITIONS

1. The term "Assigned Three-Month Period" should be negotiated with each Purchaser so that it coincides with that utility's internal bookkeeping and reporting requirements. This will avoid duplication of effort.

2. The term "Delivery Commitment" should be deleted. Defining this as a "promise" introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement. The "Delivery Commitment Schedule" described in Article IV.B is the applicable term.

3. The term "Full Cost Recovery" should be more precisely defined to ensure that funds are applied only to activities authorized by the Nuclear Waste Policy Act of 1982. Hence, delete the words "and conducting related activities" in the first sentence of this definition. The second sentence should be modified as follows:

   "As used herein, the term 'Cost' includes the application of fees for those used expressly set forth in sections 302(d) and (e) of the said Act."

4. The term "Kilowatt Hours Generated and Sold" should be restricted to electricity generated by nuclear fuel and should exclude any fossil fuel generation from the plant.

ARTICLE II - SCOPE

1. This section should be expanded to recognize that DOE is also responsible for accepting title to the spent nuclear fuel and/or high-level waste (SNF/HLW), for providing transportation of the material, and for disposal of the material.

ARTICLE III - TERM

1. In accordance with Article VI.B.1, DOE accepts the SNF/HLW at the Purchaser's site. The term of the contract should be adjusted to include the acceptance and transportation from the Purchaser's site by DOE of the SNF/HLW.

ARTICLE IV - DELIVERY OF SNF and/or HLW

1. In Article IV.B, a time limit should be provided for DOE's acceptance of a revised schedule from the Purchaser. It is suggested that this time limit be 30 days. A similar adjustment should be made to Article IV.C.

This Page Intentionally Left Blank

THE SECRETARY OF ENERGY
WASHINGTON, D.C. 20585

September 7, 1984

Honorable J. Bennett Johnston
Ranking Minority Member
Committee on Energy and
Natural Resources
United States Senate
Washington, D. C. 20510

Dear Senator Johnston:

I am writing in response to your letter of June 21, 1984, which dealt with disposal of spent nuclear fuel under the Nuclear Waste Policy Act. In your letter, you expressed dissatisfaction with the completeness of the General Counsel's response of May 30, 1984, and stated you had requested "an opinion on the legal obligation of the Department and the Department's authority to take title to spent nuclear fuel in the event that a repository has not yet commenced operation" by January 31, 1998.

In our original letter, the Department stated a firm commitment to accept for disposal, on an orderly schedule, high level radioactive waste and spent nuclear fuel not later than January 31, 1998. The Nuclear Waste Policy Act provides clear intent and direction for acceptance and disposal of spent fuel and high level radioactive waste by the Department. The Department is authorized to implement the Act through contractual commitments. To this end, the Department plans to incorporate into its contracts provisions which specify the minimum amount of spent fuel and waste which the Department will be obligated to accept, not later than January 31, 1998. Since these contracts have not yet been modified, it would be premature for the Department to speculate on particulars that might ultimately be incorporated in any or all of the contracts. However, unless waived, the usual remedies and defenses provided to parties contracting with the government would be available. Pursuant to my authority, it is my intention that this commitment in the contracts, together with the overall thrust of the Act, will create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation. This should enable utilities to plan for their projected waste disposal needs with confidence and certainty.

With regard to your question concerning whether the Department has the authority to accept spent fuel and high level radioactive waste in the event a repository is not yet fully operational, I have been advised by the General Counsel that section 302(a)(1) of the Act vests the Department with the necessary authority to accept spent fuel and high level radioactive waste beginning January 31, 1998, in such a circumstance.

As you know, there is much to be done between now and the 1998 date to ensure that we meet this deadline. I would like to personally assure you that the Department is totally committed to achieving this objective.

I hope this information has been helpful and responsive to your request. If I may be of any additional assistance, please do not hesitate to call upon me.

Sincerely,

Donald Paul Hodel

DONALD PAUL HODEL

cc: Honorable James A. McClure
Chairman, Committee on Energy
and Natural Resources

This Page Intentionally Left Blank

This Page Intentionally Left Blank

Department of Energy
Washington, DC 20585

April 1, 1987

Honorable Philip R. Sharp
Chairman
Subcommittee on Energy and Power
Committee on Energy and Commerce
House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

This is in response to your March 20, 1987 letter to Secretary Herrington concerning my letter to you dated March 12, 1987.

You first requested that the Department submit a legislative proposal concerning the programmatic changes suggested in the draft Amendment to the Mission Plan, particularly, the recommendation to postpone indefinitely site specific work on the second repository and the extension, to 2003, for commencement of operation of the second repository. As you are aware, the draft Amendment to the Mission Plan is still being reviewed by other agencies, states and Indian Tribes and we are awaiting receipt of comments. Our plan is to submit the Amendment to the Mission Plan to the Congress in June, at which time we expect that the Congress would consider carefully our suggested alterations to the program. Until this process is completed, DOE will not be in a position to suggest specific legislation which may be necessary to implement a revised Mission Plan.

Your second question asks whether the acceptance of waste for storage in a monitored retrievable storage facility (MRS) met the statutory obligation of section 302(a)(5)(b) of the Nuclear Waste Policy Act.

As is made clear by its introduction in section 302(a)(5), this is one of two provisions required to be included in the contracts under which spent fuel is accepted by DOE from owners and generators. The threshold question is whether, in view of the definition of "disposal" in section 2(9) of the Act as "emplacement within a repository," this provision in substance

requires that a repository have commenced operations by January 31, 1998. */ This question requires examination whether the duty to "dispose" of spent fuel required to be included in the contracts by section 302(a)(5)(B) is confined to the statutory term "disposal" specified in section 2(9) of the Act. For the reasons set forth below we doubt that the terms were intended to have identical meanings, and thus section 302(a)(5)(B)'s use of the word "dispose" was not intended as a statutory mandate that the first repository begin operations by that date. The first reason for this view is that this section's immediate companion would have been the logical place within section 302(a)(5) to address the question when a repository would be required to begin operations. Section 302(a)(5)(A) reads as follows:

> [F]ollowing commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel....

Had Congress intended in section 302(a)(5) to specify a date by which a first repository was to begin operations, the logical point at which to express this policy would have been in that section's subsection that deals expressly with "commencement of operation of a repository." Instead it refrained from specifying a date certain for commencement of repository operations, but required only that, once a repository has begun operations, the Secretary shall act with expedition to take title to spent fuel on the request of the generator or owner of such spent fuel.

A second indication that the Congress did not, through use of the term "dispose" in section 302(a)(5)(B), indirectly mandate commencement of first repository operations by 1998 is that that subsection goes on to describe the duty to "dispose" of spent fuel in the manner "as provided in this subtitle." Section 302(a)(5)(B) appears in Title III of the Nuclear Waste Policy

---

*/ Since the term "repository" is defined as a system used for "permanent deep geological disposal" of spent fuel and the term "storage" is defined as "retention of...spent nuclear fuel...for subsequent disposal," it is doubtful that a storage facility alone could be regarded as a "repository." Nuclear Waste Policy Act secs. 2(18), 2(25), 42 U.S.C. 10101(18),(25).

Act, which title is not structured as to have subtitles. It is clear, however, that inclusion of the words "this subtitle" meant something other than the entirety of the Nuclear Waste Policy Act. It could mean the entirety of section 302 within which the subsection appears, which describes in detail the Secretary's authority to enter into contracts with generators or owners of spent fuel, specifies the fees to be paid by owners and generators for the services to be rendered by the Secretary in accepting spent fuel, requires annual subsequent review of those fees by the Secretary, conditions Nuclear Regulatory Commission license issuances or renewals for utilization or production facilities on entry into a contract for disposal of spent fuel, and establishes the Nuclear Waste Fund that is to finance the nuclear waste program.

None of these provisions deals even remotely with procedures or the schedules leading to commencement of operation of the first repository. Similarly, if one interprets the use of the words "this subtitle" as having been intended to relate the contract obligation to "dispose" of spent fuel "beginning not later than January 31, 1998" to the entirety of Title III of the Act, the only provision remotely germane to the time by which the first repository will begin operations is section 301, which imposes the requirement to formulate and submit to the Congress the original Mission Plan. If anything such a construction would suggest that the requirement to contract to "dispose" of spent fuel beginning in 1998 would be fulfilled in the manner specified in the Mission Plan.

With regard to a response to question 3(d) of your letter of February 2, 1987, it is my understanding that the analysis conducted by DOE of the impacts of the repository not being operational by 1998, was furnished to you by Mr. Rusche as an attachment to his letter to you of February 20, 1987.

I hope this information will be helpful to you and to the Subcommittee, and please let me know if you have any further questions.

Sincerely,

J. Michael Farrell
General Counsel

cc: Honorable Carlos J. Moorhead
Ranking Minority Member

PRE-HEARING QUESTIONS AND ANSWERS
RELATING TO THE APRIL 23, 1987, HEARING

BEFORE THE

SUBCOMMITTEE ON NUCLEAR REGULATION
COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS
UNITED STATES SENATE

WITNESS: SECRETARY JOHN S. HERRINGTON

## QUESTIONS FROM SENATORS BREAUX AND SIMPSON

Question 1: In Volume I of the Department's MRS report, the Department makes the following two statements:

> "The DOE has entered into contracts with the owners and generators of spent nuclear fuel and high-level waste. The contract provides for the DOE's acquisition of title to the spent nuclear fuel and high-level waste, transportation, and subsequent disposal. Under the contract, these services are to be provided 'after commencement of facility operations, not later than January 31, 1998.' The MRS facility would allow the DOE to begin receiving waste for disposal by 1998." (emphasis added) (p. 22)

> "Given this extension of the first-repository schedule and the DOE's recommendation that MRS operations start only when the construction authorization for the first repository has been received, the MRS facility would start receiving waste in the first quarter of 1998 and be the only CRWM facility available at that time. Thus, the MRS facility would be critical to the DOE's ability to accept waste for disposal in 1998." (Emphasis added). (p. 2)

Question 1(a): Please explain these statements. What is the nature of the Department's contractual obligation with regard to -- (i) taking of title to spent nuclear fuel or high-level radioactive waste; (ii) disposal of spent nuclear fuel or high-level radioactive waste; (iii) storage of spent nuclear fuel or high-level radioactive waste, and (iv) the January 31, 1998 date in section 302(a)(5)? Please be specific.

Answer: As required by Section 302 of the Nuclear Waste Policy Act (NWPA), the Department entered into contracts with the owners and generators of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," developed as part of the public rulemaking process (finalized in the Federal Register, 48 FR 16590, April 18, 1983), requires DOE to accept title, transport, and dispose of SNF and HLW. According to Article II of the contract, "the services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998...." The contract does not include providing services for storage of SNF and/or HLW which, under Section 111(a)(5) of the NWPA, is the responsibility of the owners and generators until it is accepted by the Secretary of Energy.

Question 1(b):- Is the MRS facility necessary in order to enable the Department to meet its legal obligations, under either the NWPA or the contracts with utilities? If so, please identify specifically what those obligations are, together with references, where appropriate, to the utility contract. In addition, please provide the supporting legal analysis for your conclusions.

Answer: With the 5-year delay of the first repository proposed in the Draft Mission Plan Amendment, the MRS becomes essential to meeting the January 31, 1998 date for beginning the waste acceptance process specified in Section 302(a)(5) of the NWPA and Articles II and IV B of the contract. The services set forth in Article IV B of the contract include acceptance of title to spent fuel by DOE, provision of subsequent transportation for such material to a DOE facility, and disposal of such material in accordance with the terms of the contract. The supporting legal analysis is provided as part of the responses to Questions 1(c), 2 and 4 below.

Question 1(c): Do you view the MRS facility as either a "disposal" facility or a facility in which to "dispose of" spent nuclear fuel?

Answer: No. The MRS is viewed as a DOE facility as defined in Article I 10 of the contract, which would be an integral part of the waste disposal system. That definition expressly includes a facility to which spent fuel "may be shipped by DOE prior to its transportation to a disposal facility." The purpose of that definition was described in the preamble of the final rule adopting the contract terms "to expressly state,