ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers.

## 1.2 STAFF-TO STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for effective and equitable implementation of the Civilian Radioactive Waste Management System (CRWMS) are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing 64 of the 66 owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the implementation of the Standard Contract provisions. Comments on this ACR should be addressed to:

Ms. Nancy Montgomery
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The NWPA and the Standard Contract condition waste acceptance by DOE upon the commencement of operation of a repository or a Monitored Retrievable Storage (MRS) facility. Section 302(a)(5) of the NWPA directs that contracts entered into in accordance with Section 302(a) of the NWPA are to provide that DOE will take title to SNF following commencement of operation of a repository. In response to this statutory requirement, the Standard Contract provides in Article II that "the services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998...." Section 142 of the NWPA authorizes DOE to site, construct, and operate an MRS facility for temporary SNF storage prior to disposal in a repository.

The acceptance rates in Table 2.1 are nominal and do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the CRWMS with the nominal waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first 10 years. This table provides only an approximation of the system throughput rates and is subject to change depending on congressional action regarding the conditions for the siting of an MRS facility, and the system design and configuration. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses, and inform the Purchasers accordingly at the earliest feasible time. Until the SNF is accepted by DOE, Section 111(a)(5) of the NWPA assigns the waste owners and generators the primary

responsibility to provide for, and pay the costs of, interim storage.

TABLE 2.1

Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| 2007 | 900 |
| TOTAL | 8,200 |

DOE/RW-0457



# ACCEPTANCE PRIORITY RANKING
# &
# ANNUAL CAPACITY REPORT



U.S. DEPARTMENT OF ENERGY

OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

MARCH 1995

## CONTENTS

1.0 INTRODUCTION . . . . . 1

1.1 BASIS FOR THE ACCEPTANCE PRIORITY RANKING . . . . . 3

1.2 BASIS FOR THE ANNUAL CAPACITY REPORT . . . . . 3

(Table 1 - Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel) . . . . 4

(Table 2 - Summary of Purchasers' Annual Allocations (MTU)) . . . . . 6

1.3 SUBMITTAL OF COMMENTS ON THIS REPORT . . . . . 7

REFERENCES . . . . . 8

APPENDIX - A 1994 ACCEPTANCE PRIORITY RANKING . . . . . A.1

APPENDIX - B ANNUAL ACCEPTANCE CAPACITY ALLOCATIONS FOR THE DISPOSAL OF SPENT NUCLEAR FUEL . . . . . B.1

APPENDIX - C CHANGES FROM 1992 APR TO 1994 APR BY RANKING DATE . . . . . C.1

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (the Act)[1], assigns the Federal Government the responsibility for the disposal of spent nuclear fuel and high-level waste. The Director of the Department of Energy's Office of Civilian Radioactive Waste Management (the Department) is responsible for carrying out the functions assigned to the Secretary of Energy by the Act. Section 302(a) of the Act authorizes the Secretary to enter into contracts* with the owners and generators** of commercial spent nuclear fuel and/or high-level waste. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for the Department's acceptance and disposal of spent nuclear fuel and high-level waste. It includes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the spent nuclear fuel and/or high-level waste by the Department, its transportation to Federal facilities, and its subsequent disposal.

The Standard Contract requires the Department to issue an annual Acceptance Priority Ranking (APR) report and an Annual Capacity Report (ACR). The APR establishes the order in which the Department allocates the projected acceptance capacity for commercial spent nuclear fuel. The ACR applies projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium (MTU). These capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS). As specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers.

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

**Owners and generators of spent nuclear fuel and high-level waste who have entered into agreements with the Department and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

In reviewing the data provided by Purchasers for preparation of the 1993 APR, the Department determined that discrepancies in the weights of the discharged fuel assemblies existed. These discrepancies were between the information provided by Purchasers on Annex B to Appendix G of the Standard Contract and information being provided by Purchasers on the Nuclear Fuel Data Form, RW-859. The Department initiated a review to determine the cause of these discrepancies in order to ensure consistency and accuracy of the detailed information used in the APR. This review, which was limited to fuel that was permanently discharged, incore, or temporarily discharged as of April 7, 1983, resulted in numerous minor adjustments to previously reported APR values. Previous editions of the APR, which reported discharges to a 0.01 MTU level of precision, required numerous adjustments as Purchasers implemented various fuel management activities. The Department has determined that this level of precision is not necessary for allocating nominal waste acceptance capacity. Therefore, beginning with this publication, all discharges in the APR will be listed to the 0.1 MTU level of precision. Consequently, the ACR and subsequent DCS reviews will also be to the 0.1 MTU level of precision. Since this change in precision was applied uniformly to the entire APR, changes from the 1992 report caused by the change in precision are not individually explained, however all other changes reported by the Purchasers are listed and explained in Appendix C. In all cases, adjustments to previously reported values have been made by rounding up to the next highest 0.1 MTU. An annual nominal waste acceptance capacity was used to assure that no Purchaser had been impacted adversely with respect to a waste acceptance allocation as compared to an allocation reported in previous editions of the ACR.

The length and thoroughness of this review delayed the issuance of the 1993 ACR and APR. The information from the 1993 APR and ACR is combined with this report. In an effort to reduce the administrative burden associated with the publication of separate ACR and APR reports, the Department has decided to issue a consolidated APR/ACR Report for 1994 and subsequent years. The 1994 APR/ACR Report has been printed in a loose-leaf binder format, to allow for the updating of selected pages rather than revision of the entire report.

## 1.1 BASIS FOR THE ACCEPTANCE PRIORITY RANKING

As required by the Standard Contract, the APR is based on the date the spent nuclear fuel was permanently discharged, with the oldest spent nuclear fuel, on an industry-wide basis, given the highest priority. The phrase "date the spent nuclear fuel was permanently discharged" means the date the reactor went subcritical for the purpose of permanently discharging the spent nuclear fuel, as reported to the Department by the Purchasers on the Nuclear Fuel Data Form, RW-859. The APR is the basis for allocating projected spent nuclear fuel (SNF) acceptance capacity in the ACR. The 1994 APR listing is based on SNF discharges through December 31, 1993. The APR listing has been included as Appendix A.

Revisions to the information base of this APR were, and in the future will be, addressed consistent with the Department's May 15, 1991, communication on the opportunity to verify the accuracy of the information contained in the draft version of the 1991 APR. Discharges that were not identified during the comment period on the draft 1991 APR were assigned a Ranking Date (i.e. the end of the priority ranking of the report year). Future discharges will be added to the priority ranking based on their date of permanent discharge. If SNF currently designated as temporarily discharged is redesignated as permanently discharged (without subsequent irradiation), the date of redesignation will become the Ranking Date, instead of the date of actual discharge. Reinserted assemblies, previously designated as permanently discharged, will be removed from the priority ranking. Appendix C itemizes all of the differences between the 1992 APR and the 1994 APR which have resulted in changes to the overall ranking.

## 1.2 BASIS FOR THE ANNUAL CAPACITY REPORT

The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather

than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

Operation of the system with the nominal waste acceptance rates presented in Table 1 will result in the acceptance of 8,200 MTU of SNF for the first 10 years. This table provides only an approximation of the system throughput rates and is subject to change depending on Congressional action regarding the conditions for the siting, construction, and operation of an interim storage facility, if any, the repository, and the system design and configuration. The Department will further define and specify the system operating and waste acceptance parameters as the Program progresses, and inform the Purchasers accordingly. Until the SNF is accepted by the Department, Section 111(a)(5) of the Act assigns the waste owners and generators the primary responsibility to provide for, and pay the costs of, interim storage.

The Tables in Appendix B list the Purchasers' annual allocations for each of the first 10 years*** of projected CRWMS operation. Table 2 presents a summary of all Purchasers' annual allocations based on the nominal waste acceptance rates for the 10-year period covered by this report. Fuel assembly reinsertions identified during the reporting period ending December 31, 1993, have resulted in changes to the APR. Additionally, modifications have been made to reflect changes in weight of certain fuel assemblies as determined from the review of the Annex B information. The allocations in years 1 to 10 have been adjusted to reflect; 1) reinsertions of SNF previously identified as being permanently discharged; 2) cycle discharge date correction; and 3) updated weights from Annex B information. However, the projected nominal waste acceptance rates were adjusted for each of the allocation years so that the acceptance queue would not be impacted. The notes to Appendix B, Tables B.1 through B.10, identify and document the reasons for the changes affecting the first 10 years of projected CRWMS operation.

*** The term "year," when used in reference to capacity allocation in this report, means the calendar year, beginning January 1 and ending December 31.

TABLE 2. SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)[a]

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | -- | -- | 21.2 | -- | -- | 24.4 | 12.9 | 58.5 |
| ARIZONA PUBLIC SERVICE | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ARK POWER & LIGHT COMP | -- | -- | -- | 23.3 | 28.2 | -- | 30.2 | -- | 46.4 | -- | 128.1 |
| BABCOCK AND WILCOX COM | -- | -- | 0.1 | 0.1 | -- | -- | -- | -- | -- | -- | 0.1[b] |
| BALTIMORE GAS & ELEC C | -- | -- | -- | 12.6 | 41.5 | 28.5 | 52.2 | -- | 55.3 | 29.6 | 219.7 |
| BOSTON EDISON COMPANY | -- | 3.9 | 25.5 | 82.6 | -- | -- | 11.5 | 5.6 | -- | 42.7 | 171.8 |
| CAROLINA POWER & LIGHT | -- | 70.1 | 24.3 | 23.7 | 50.5 | 32.1 | 20.6 | 93.1 | -- | 49.6 | 364.0 |
| CLEVELAND ELEC ILLUM C | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| COMMONWEALTH EDISON CO | 21.1 | 60.5 | 154.5 | 121.9 | 164.2 | 175.3 | 66.9 | 107.8 | 98.2 | 98.3 | 1068.7 |
| CONNECTICUT YANKEE ATO | 65.5 | 22.5 | 19.8 | 21.8 | 21.9 | 20.2 | -- | 21.9 | -- | 21.9 | 215.5 |
| CONSOLIDATED EDISON CO | 3.0 | 27.7 | 32.8 | -- | 27.1 | -- | 28.3 | 2.3 | 22.2 | -- | 143.4 |
| CONSUMERS POWER COMPAN | -- | 2.5 | 87.4 | 2.7 | 27.4 | 3.5 | 26.5 | -- | 2.9 | 30.8 | 183.7 |
| DAIRYLAND POWER COOP | 0.8 | 6.0 | 3.0 | 3.9 | -- | 3.4 | -- | -- | 1.5 | 3.3 | 21.9 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. DOE | 22.8 | 6.4 | 3.3 | 4.5 | 7.3 | 72.9 | 16.4 | -- | 3.3 | 20.0 | 156.9 |
| DUKE POWER COMPANY | -- | 24.9 | 47.7 | 62.5 | 58.4 | 56.2 | 61.2 | 31.6 | 63.5 | 66.4 | 472.4 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | -- | -- | -- | 16.2 | -- | -- | 24.4 | 40.6 |
| FLORIDA POWER & LIGHT | -- | 20.9 | 37.0 | 40.5 | 32.9 | 40.9 | 71.4 | 33.1 | 52.2 | 37.7 | 366.6 |
| FLORIDA POWER CORP | -- | -- | -- | -- | 1.4 | -- | 26.1 | 20.5 | -- | 30.2 | 78.2 |
| G. E. URANIUM MGT. | 145.2 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.2 |
| GENERAL ATOMICS | 0.1 | 0.1 | -- | -- | 0.1 | -- | -- | 0.1 | 0.1 | 0.1 | 0.1[b] |
| GEORGIA POWER COMPANY | -- | -- | -- | 0.8 | 4.5 | -- | 35.3 | -- | 56.4 | 15.2 | 112.2 |
| GPU NUCLEAR | 31.1 | 43.0 | 46.8 | 49.5 | 33.9 | 55.3 | -- | 27.6 | -- | -- | 287.2 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HOUSTON LIGHTING & POW | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| IES UTILITIES, INC. | -- | -- | 15.4 | 13.9 | 21.8 | 0.8 | -- | 16.6 | 15.5 | -- | 84.0 |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| INDIANA & MICH ELEC CO | -- | -- | -- | 28.6 | 29.2 | -- | 62.5 | 27.9 | 69.8 | -- | 218.0 |
| KANSAS GAS AND ELECTRI | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LONG ISLAND POWER AUTH | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LOUISIANA POWER AND LI | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| MAINE YANKEE ATOMIC | -- | 26.4 | 57.9 | 27.3 | -- | 50.7 | -- | 26.3 | 28.2 | -- | 216.8 |
| MISSISSIPPI POWER & LI | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NEBRASKA PUB POWER DIS | -- | -- | -- | 23.6 | 13.8 | -- | 31.2 | 28.7 | 21.0 | -- | 118.3 |
| NEW YORK POWER AUTH | -- | -- | -- | 25.9 | 3.7 | 51.1 | 34.7 | 30.0 | -- | 69.8 | 215.2 |
| NORTH ATLANTIC ENERGY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NIAGARA MOHAWK POWER C | 9.4 | 49.0 | 38.9 | 30.8 | -- | 31.2 | -- | -- | 36.9 | -- | 196.2 |
| NORTHEAST UTIL SVC COM | 5.5 | 40.7 | 28.2 | 24.3 | 41.9 | 26.6 | 28.1 | 59.1 | -- | 28.4 | 282.8 |
| NORTHERN STATES POWER | -- | 26.2 | 83.6 | 29.9 | 33.9 | 17.6 | 32.6 | 43.3 | 35.7 | 16.1 | 318.9 |
| OMAHA PUB POWER DIST | -- | -- | 9.4 | 12.9 | 19.0 | 16.4 | -- | 14.8 | -- | 14.6 | 87.1 |
| PACIFIC GAS AND ELECT | 7.3 | 6.0 | 2.6 | 13.3 | -- | -- | -- | -- | -- | -- | 29.2 |
| PENNSYLVANIA POWER & L | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PHILADELPHIA ELEC COMP | -- | -- | 36.3 | 68.1 | 47.7 | 48.8 | 51.7 | 51.3 | 40.6 | 50.8 | 395.3 |
| PORTLAND GENERAL ELEC | -- | -- | -- | -- | 0.5 | -- | -- | 24.4 | 16.1 | 17.0 | 58.0 |
| PUB SVC COMPANY OF COL | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PUB SVC ELEC & GAS COM | -- | -- | -- | -- | -- | -- | 17.5 | 29.5 | -- | 25.8 | 72.8 |
| ROCHESTER GAS & ELEC | 32.0 | 4.6 | 24.4 | 16.1 | 16.2 | 15.7 | -- | 14.2 | 5.9 | 6.8 | 135.9 |
| SACRAMENTO MUNICIP UTI | -- | -- | -- | 9.3 | -- | 26.0 | -- | 30.2 | 19.0 | -- | 84.5 |
| SOUTH CAROLINA ELEC & | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| SOUTHERN CALIF EDISON | 35.6 | 20.5 | 19.3 | 19.3 | -- | 19.2 | -- | 19.3 | -- | -- | 133.2 |
| TENNESSEE VALLEY AUTHO | -- | -- | -- | -- | 58.7 | 5.5 | 115.6 | 66.0 | 116.2 | 52.4 | 414.4 |
| TEXAS UTILITIES GENERA | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | 25.1 | 25.1 |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| VERMONT YANKEE NUCLEAR | -- | 72.9 | -- | 12.0 | 8.7 | 27.5 | 25.7 | 17.0 | -- | 22.2 | 186.0 |
| VIRGINIA POWER | -- | 8.2 | 69.4 | 43.9 | 54.7 | 20.2 | 23.4 | 32.9 | 29.0 | 52.8 | 334.5 |
| WASH PUB POWER SUPPLY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| WISCONSIN ELEC POWER C | 16.3 | 43.1 | 19.8 | 27.1 | 36.8 | 24.9 | 9.7 | 12.9 | 16.1 | 21.8 | 228.5 |
| WISCONSIN PUB SVC CORP | -- | -- | 4.4 | 17.7 | 16.1 | -- | 5.3 | 13.3 | 16.5 | 14.5 | 87.8 |
| YANKEE ATOMIC ELEC COM | 9.9 | 10.1 | 9.7 | 8.7 | -- | 9.4 | -- | -- | 8.5 | -- | 56.3 |
| NOMINAL TOTAL | 400.0 | 600.0 | 900.0 | 900.0 | 900.0 | 900.0 | 900.0 | 900.0 | 900.0 | 900.0 | 8200.0 |

a All allocations have been adjusted from the 1992 ACR to reflect the change in the degree of precision.
b These totals are not the sum of the annual allocations because the actual annual values are much less than .1 MTU.

## 1.3 SUBMITTAL OF COMMENTS ON THIS REPORT

Written comments are requested, especially from the Purchasers, on the content and format of this report. Comments received on previous reports were used to identify issues that needed to be addressed by the Department and the Purchasers in the implementation of the Standard Contract provisions. Comments on this report should be addressed to:

Mr. David K. Zabransky
Office of Civilian Radioactive Waste Management, RW-44
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585

**ORAL ARGUMENT SCHEDULED FOR JANUARY 17, 1996**

Nos. 95-1279, 95-1321, 95-1463

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

INDIANA MICHIGAN POWER COMPANY, PUBLIC SERVICE ELECTRIC AND GAS COMPANY, GPU NUCLEAR CORPORATION, and THE DETROIT EDISON COMPANY, et al.,

Petitioners,

NORTHERN STATES POWER COMPANY, KANSAS GAS AND ELECTRIC COMPANY, KANSAS CITY POWER & LIGHT COMPANY, KANSAS ELECTRIC POWER COOPERATIVE, INC., WOLF CREEK NUCLEAR OPERATING CORPORATION, CENTERIOR ENERGY CORPORATION, FLORIDA POWER AND LIGHT COMPANY, ILLINOIS POWER COMPANY, PORTLAND GENERAL ELECTRIC COMPANY, CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., FLORIDA POWER CORPORATION, PACIFIC GAS AND ELECTRIC COMPANY, COMMONWEALTH EDISON COMPANY, BOSTON EDISON COMPANY, ROCHESTER GAS AND ELECTRIC CORPORATION, ENTERGY OPERATIONS, INC., SYSTEM FUELS, INC., NORTHEAST UTILITIES SERVICE COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, NORTH ATLANTIC ENERGY SERVICE COMPANY, and TEXAS UTILITIES ELECTRIC COMPANY, et al.,

Intervenors,

v.

UNITED STATES DEPARTMENT OF ENERGY, et al.,

Respondents.

**PETITION FOR REVIEW FROM FINAL DECISIONS OF UNITED STATES DEPARTMENT OF ENERGY**

**FINAL JOINT BRIEF OF UTILITY PETITIONERS/UTILITY INTERVENORS**

George L. Edgar*
Michael A. Bauser

MORGAN, LEWIS & BOCKIUS LLP
1800 M Street, N.W.
Washington, D.C. 20036
(202) 467-7000

Attorneys for Intervenor Texas Utilities Electric Company

Jay E. Silberg*
Michael A. Carvin
Vincent J. Colatriano

SHAW, PITTMAN, POTTS & TROWBRIDGE
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

Attorneys for Utility Petitioners and Utility Intervenors

* Attorneys of Record

the Act, which both ignores clear language in the relevant statutory provisions and effectively inserts language that is simply not there, is patently unreasonable.

## II. The NWPA Unconditionally Obligates DOE to Begin Disposing of SNF by 1998

### A. The Language And Structure Of The Act Clearly Obligate DOE To Begin To Take SNF By January 31, 1998.

The plain language of Section 302(a)(5) unambiguously obligates DOE to begin taking SNF by 1998 in return for the payment of fees. Section 302(a)(5) provides that contracts entered into by DOE under this Section are to provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998 will dispose of the high-level radioactive waste or spent nuclear fuel as provided in this subtitle.

42 U.S.C. § 10222(a)(5) (emphasis added).

1. The language of Section 302(a)(5)(B) could not be more clear in requiring DOE to begin disposing of SNF by January 31, 1998. This obligation is qualified in only one respect; it comes into play only if DOE has been paid the fees established by this section of the Act. Since there is no dispute that DOE has been paid those fees, there can likewise be no legitimate dispute regarding the Act's command that DOE dispose of SNF beginning "not later" than January 31, 1998. DOE's interpretation of the Act,

which makes DOE's obligation conditional upon the presence of a "disposal or interim storage facility constructed under the Act," 60 Fed. Reg. at 21,794-95, contradicts this express language of the Act. According to DOE, if it does not have a repository or interim storage facility operational by January 31, 1998, it can begin taking SNF "later" than that date, even though the Act makes absolutely clear that DOE must begin disposing of SNF "not later" than that date. DOE's interpretation of the Act simply reads "not" out of the statute.[20]

Looked at another way, DOE seeks to add to the statute language that is simply not there. Namely, DOE states that its obligation is conditioned upon events which are not stated in the statute: the existence of a repository or MRS. Thus, DOE seeks to rewrite Section 302(a)(5)(B) as follows:

> In return for the payment of fees established by this section, and following commencement of operation of a repository or interim storage facility, the Secretary, beginning not later than January 31, 1998, will dispose of [HLW or SNF] as provided in this subtitle.

Since there is no such language in 302(a)(5)(B) as written, however, DOE's obligation is simply not so conditioned.

There is such language in Section 302(a)(5)(A), conditioning DOE's obligation to "take title" on the existence of a repository. Remarkably, DOE suggests that the presence of this

[20] This Court, in overruling DOE's interpretation of another provision of Section 302, noted that "the practical effect of DOE's interpretation is to blue pencil out two words in an already brief one-sentence provision." Wisconsin Elec. Power Co. v. DOE, 778 F.2d 1, 3-4 (D.C. Cir. 1985). "The Secretary's interpretation would thus have the unhappy result of obliterating express language from the [Section 302](a)(2) provision, in contravention of long-settled principles of statutory construction." Id. at 4.

reason for the Court to write this language into this section -- Section 302(a)(5)(B). 60 Fed. Reg. at 21,795 (JA 250). Of course, just the opposite is true. Section 302(a)(5)(A) further demonstrates that Congress knew how to explicitly refer to the commencement of repository operations when that was its intent. Accordingly, under well-established statutory construction principles, it would be particularly inappropriate to add to the statute a condition Congress chose to omit.[21/]

More generally, Sections 302(a)(5)(A) and 302(a)(5)(B) create independent obligations of DOE, as is reinforced by the fact that the provisions are joined by the conjunctive term "and." The two sections do not otherwise refer to each other. Nor do they in any other explicit or implicit way indicate that the 1998 deadline set forth in subsection (B) was somehow tied to the commencement of repository operations referred to in subsection (A).[22/]

language in another section -- Section 302(a)(5)(A) -- provides a

[21/] "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Cardoza-Fonseca, 480 U.S. at 432 (citation omitted). See also Environmental Defense Fund, 114 S. Ct. at 1593 (same); Russello v. United States, 464 U.S. 16, 23 (1983) (same); United States v. Azeem, 946 F.2d 13, 17 (2d Cir. 1991) (same); United States v. Espinoza-Leon, 873 F.2d 743, 746 (4th Cir.), cert. denied, 492 U.S. 924 (1989) (same); United States v. Lamere, 980 F.2d 506, 513 (2d Cir. 1992) (same); Wisconsin Elec., 778 F.2d at 4 (same).

[22/] Significantly, in analyzing Section 302(a)(5) of the Act, DOE noted in 1987 that since the statutory obligation to begin to "dispose" of waste by the 1998 date was found in Section 302(a)(5)(B), which did not specify a repository, and since the

Footnote continued on next page

Contrary to DOE's assertion, the two subsections in no way are rendered inconsistent by a reading of them which obligates DOE to begin to dispose of SNF under subsection (B) by the 1998 deadline. As discussed more fully below, DOE may begin to "dispose" of SNF by the 1998 deadline even if DOE does not "take title to [SNF] as expeditiously as practicable upon the request of the generator or owner of such [SNF]" until after a repository has begun operations. The duties imposed on DOE under subsections (A) and (B) are linked to different events and are triggered at different times: DOE's duties under subsection (A) are linked to the commencement of repository operations and are triggered when a generator or owner of SNF makes a request to DOE; DOE's duties under subsection (B) are conditioned on the payment of fees and are triggered, at the latest, by January 31, 1998. Subsections (A) and (B) are also easily reconcilable in that Congress in 1982 anticipated that a repository would be ready well before 1998. In such a circumstance, DOE could, under

Footnote continued from previous page

provision which did specify the repository, Section 302(a)(5)(A), did not include the deadline, DOE could meet the deadline without having a repository in operation. Prehearing questions and answers relating to April 23, 1987 hearing before the Subcommittee on Nuclear Regulation, Committee on Environment and Public Works, United States Senate, Answer to Question 4 ("Prehearing Answers") at 1-2 (JA 159-60). Of course, this analysis itself demonstrates that the companion provisions of Section 302(a)(5) have independent significance, and therefore underscores the unconditional nature of the 1998 deadline. In other words, if Section 302(a)(5)(B) did not modify Section 302(a)(5)(A) so as to require commencement of repository operations by January 31, 1998, then Section 302(a)(5)(A) does not modify Section 302(a)(5)(B) so as to condition DOE's obligation to accept waste by 1998 on the existence of a repository.

conclusion that Section 302(a)(5)(B) imposes an obligation upon DOE to begin SNF acceptance when a facility is operational. If this section is merely "predictive," then DOE has no obligation, conditional or otherwise, to begin SNF acceptance even when the repository is up and running; it "may" do so or may not.

In any event, the term "will," as used in Section 302(a)(5)(B), will simply not bear the weight that DOE is attempting to load upon it. "Will" and "shall" are generally considered to be synonymous. Thus, "will" has been defined as "[a]n auxiliary verb commonly having the mandatory sense of 'shall' or 'must.' It is a word of certainty while the word 'may' is one of speculation and uncertainty." Black's Law Dictionary at 1598 (6th ed. 1990).[24]

Furthermore, DOE's suggestion that "will" is predictive rather than mandatory is singularly unpersuasive when one considers all of Section 302(a)(5)(B). In particular, that section's use of the formulation "in return for payment of fees established by this section" is inconsistent with the view that the section is merely predictive. The "in return for" phrase strongly suggests an exchange of obligations, obligations which can only be created if "will" is, in accordance with its generally accepted meaning, read as a mandatory term. This meaning is borne out by the Standard Contract that DOE prepared pursuant to the Act's commands, which makes clear that DOE's services "shall

[24] See also The American Heritage Dictionary (2d College ed. 1985) (will "indicate[s] . . .[r]equirement or command: *You will report to me afterward.*").

begin . . . not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II (JA 94) (emphasis added).

3. DOE also points to the use of the term "dispose" in Section 302(a)(5)(B) to support its construction of the Act. While DOE correctly notes that the NWPA does not define the word "dispose," DOE does rely upon the Act's definition of the term "disposal," which is defined as the "emplacement in a repository of [SNF] with no foreseeable intent of recovery." 42 U.S.C. § 10101(9). See 60 Fed. Reg. at 21,795 (JA 250). This definition merely describes what Congress in 1982 obligated DOE to do sixteen years later. DOE, however, attempts to utilize this performance standard to read into Section 302(a)(5)(B) a requirement that a repository be operational before DOE may begin acceptance of SNF. DOE does not explain, however, why, if this were Congress' intent, Congress did not simply repeat the formulation it uses in Section 302(a)(5)(A), which quite clearly refers to the "commencement of operation of a repository." 42 U.S.C. § 10222(a)(5)(B).

DOE's focus on the Act's definition of "disposal" as delimiting the nature of its obligations under Section 302 also proves too much and yields results that even DOE rejects. DOE's current argument that Section 302(a)(5)(B)'s reference to "dispose" is synonymous with the Act's definition of "disposal" is inconsistent with DOE's ultimate conclusion that its obligation to begin taking SNF by 1998 is conditioned upon the presence of a repository or an interim storage facility such as an MRS. Since an