**No. 99-447C**
**(Judge Lettow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BOSTON EDISON COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF BOSTON EDISON COMPANY'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT UPON COUNTS I AND II AND FOR SUMMARY JUDGMENT UPON COUNT III OF PLAINTIFF'S AMENDED COMPLAINT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY REGARDING COUNT I OF THE AMENDED COMPLAINT

---

**Richard J. Conway**
**DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP**
**2101 L Street, NW**
**Washington, DC 20037**
**Tel: (202) 785-9700**
**Fax: (202) 887-0689**

**Attorney for Plaintiff**

**Of Counsel:**
**David M. Nadler**
**Nicholas W. Mattia, Jr.**
**Bradley D. Wine**
**Jeffrey P. Becherer**
**DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP**
**2101 L Street, NW**
**Washington, DC 20037**

**Neven Rabadjija, Esq.**
**Associate General Counsel**
**NSTAR Electric & Gas Corporation**
**800 Boylston Street, 17th Floor**
**Boston, MA 02199-0228**

**July 9, 2004**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INDEX TO APPENDIX .......... vii

INTRODUCTION .......... 1

ISSUES PRESENTED .......... 3

STATEMENT OF THE CASE .......... 4

A. Nature of the Case .......... 4

B. Statement of Facts .......... 4

STANDARD OF REVIEW .......... 4

A. Motion to Dismiss .......... 4

B. Motion for Summary Judgment .......... 5

ARGUMENT .......... 5

I. BOSTON EDISON HAS STANDING TO SUE BECAUSE IT SUSTAINED DAMAGES RESULTING FROM THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT ON JANUARY 31, 1998 .......... 5

A. Boston Edison Meets The Requirements For Standing .......... 5

B. DOE Breached The Standard Contract On January 31, 1998 .......... 10

C. The Government Is Collaterally Estopped From Arguing That The Breach Occurred On Any Date Other Than January 31, 1998 .......... 13

1. The D.C. Circuit Determined that the Breach Occurred on January 31, 1998 .......... 15

2. The Federal Circuit Determined that the Breach Occurred on January 31, 1998 .......... 16

3. The U.S. Court of Federal Claims Has Determined that the Breach Occurred on January 31, 1998 .......... 17

D. The DCS Process Does Not Create A Contractually Binding Obligation .......... 21

1. The Government's Interpretation of the DCS Process Would Render the Standard Contract Illusory .......... 21

2. DOE Knew that Utilities, Including Boston Edison, Relied on January 31, 1998 as the Performance Date .......... 23

II. BOSTON EDISON HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION .......... 26

A. Boston Edison's Takings Claim Arises Out Of Legal And Property Rights That Existed Prior To The Standard Contract .......... 27

B. Boston Edison's Real Property Rights Were Taken Without Just Compensation ... 30

C. The Standard Contract Was Not Entered Into Voluntarily ... 32

D. Boston Edison Has A Cognizable Takings Claim To Pursue Remedies That Are Not Available Under A Breach Of Contract Claim ... 35

E. Boston Edison's Takings Claim May Be Brought Concurrently With Its Breach Of Contract Claim ... 37

F. Since Boston Edison Asserts A Taking Independent Of The Standard Contract, The Court's Decision In *Commonwealth Edison* Has No Application Here ... 40

III. DOE INTERFERED WITH BOSTON EDISON'S ABILITY TO RECOGNIZE ITS RIGHTS UNDER THE STANDARD CONTRACT, THEREBY VIOLATING ITS DUTY OF GOOD FAITH AND FAIR DEALING ... 41

IV. CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY ... 46

CONCLUSION ... 50

# TABLE OF AUTHORITIES

Page

Cases:

*Ala. Power Co. v. Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002)........................31-32, 34, 35

*Allegre Villa v. United States*, 60 Fed. Cl. 11 (2004)........................................................... 39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) ................................................ 46

*Avedon Corp. v. United States*, 15 Cl. Ct. 771 (1988) ............................................................ 23

*Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) ......................................................... 31

*Burnside-Ott Aviation Training Ctr. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993).........6-7

*Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258 (1999) ........................................ 36

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part, vacated, and remanded in part,* 301 F.3d 1328 (Fed. Cir. 2002) ................................................. 35, 36, 39

*Centex Corp. v. United States*, 49 Fed. Cl. 691 (2001)........................................................... 42

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed Cir. 2003) .................................... 38, 39

*Coast Fed. Bank, FSB, v. United States*, 323 F.3d 1035 (Fed. Cir. 2003)................................ 23

*Coast-to-Coast Fin., Corp., v. United States*, 52 Fed. Cl. 352 (2002)....................................... 43

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000) .......................................... 4

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ...............................*passim*

*Connecticut Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 448 (1998) ............ 19, 49

*Cooper v. Ford Motor Co.*, 748 F.2d 677 (Fed. Cir. 1984) ........................................................ 5

*Cresswell v. United States*, 173 F. Supp. 805 (Ct. Cl. 1959) .................................................. 24

*Dana v. E.S. Originals, Inc.*, 342 F.3d 1320 (Fed. Cir. 2003).................................................. 14

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999)........................................................................................... 26, 27

*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003)...........................................*passim*

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)................................................................................ 27

*Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3d Cir. 2001) ................................. 43

*Exxon Corp. v. United States*, 45 Fed. Cl. 581 (1999), *aff'd in part and rev'd in part on other grounds,* 244 F.3d 1341 (Fed. Cir. 2001) ........................................................... 14

*Florida Power & Light v. United States*, 56 Fed Cl. 555 (2003)......................................... 19, 49

*Heydt v. United States*, 38 Fed. Cl. 286 (1997) ...................................................................... 36

*High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176 (1994) ................................................ 46

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2002).......... 9

Page

*In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994) .......... 14

*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... *passim*

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) .......... 19, 20, 34,49

*Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30 (1998) .......... 39

*Jet Forwarding, Inc. v. United States*, 437 F.2d 987 (Ct. Cl. 1971) .......... 24

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .......... 31

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......... 31

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 6, 7

*Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397 (9th Cir. 1993) .......... 21

*Maine Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 582 (1998), *aff'd*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 19, 49

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... *passim*

*Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988) .......... 42

*Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537 (1999) .......... 37

*N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997) .......... *passim*

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) .......... 16, 17, 42, 48

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) .......... 32

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922), abrogated .......... 32

*Perry & Wallis, Inc. v. United States*, 427 F.2d 722 (Ct. Cl. 1970) .......... 24, 26

*Peterson Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541 (Fed. Cir. 1984), *abrogated on other grounds by Beatrice Foods Co. v. New England Printing & Lithography Co.*, 899 F.2d 1171 (Fed. Cir. 1990) .......... 5

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001) .......... 43

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) .......... 43

*Prudential Ins. Co. of America v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) .......... 36, 37, 39

*Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002) .......... 19

*Roedler v. Dep't of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) .......... 16, 17, 48, 49

*San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957 (Fed. Cir. 1989) .......... 46

*Scheuer v. Rhodes*, 416 U.S. 232 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .......... 4

*Seal-Flex, Inc. v. Athletic Track & Ct. Constr.*, 98 F.3d 1318, 1321 (Fed. Cir. 1996) .......... 46

Page

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) .......... 5

*Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Filed Apr. 7, 2004) .......... 19, 49

*Specialty Transp., Inc. v. United States*, 57 Fed. Cl. 1 (2003) .......... 23

*Sun Oil Co. v. United States*, 572 F.2d 786 (Ct. Cl. 1978) .......... 30

*St. Regis Paper Co. v. United States*, 368 U.S. 208 (1961) .......... 42

*Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550 (2004) .......... 43

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) .......... 9, 19, 33, 49

*Tennessee v. Herrington*, 806 F.2d 642 (6th Cir. 1986) .......... 12

*Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982) .......... 21

*Unisys Corp. v. United States*, 48 Fed. Cl. 451 (2001) .......... 23

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) .......... 5

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) .......... 31

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) .......... 36

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .......... 27

*Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995), *aff'd*, 518 U.S. 839 (1996) .......... 12

*Woll v. United States*, 45 Fed. Cl. 475 (1999), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000) (Table) .......... 21

*Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 16, 29, 48

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. filed June 26, 2003) .......... 19, 49

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) .......... 9

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) .......... 27, 39

Statutes:

28 U.S.C. § 2516(a) .......... 36

42 U.S.C. § 10101 *et seq*. .......... *passim*

42 U.S.C. § 10222(a)(5) .......... 47

42 U.S.C. § 10222(a)(5)(B) .......... 19

42 U.S.C. § 10222(b)(2) .......... 33

Page

U.S. Constitution:

Fifth Amendment .......... 26, 31, 39

Rules:

Fed. R. Civ. P. 56(c) .......... 5, 46

Rules of the U.S. Court of Federal Claims:

Rule 7.2(c) .......... 1

Rule 12 .......... 1

Rule 12(b) .......... 1

Rule 56 .......... 46

Rule 56(b) .......... 1

Regulations:

*Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities*, 10 C.F.R. pt. 50, App. F .......... 28

Other Authorities:

*Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,* 48 Fed. Reg. 16590 (Apr. 18, 1983 .......... 25

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. on Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper) .......... 28

Restatement (Second) of Contracts (1981)

§ 201(2)(a)-(b) .......... 24

§ 204 .......... 19, 21

§ 205 .......... 44

§ 235(2) .......... 12

§ 350 .......... 9

## INDEX TO APPENDIX


| DOCUMENT | Page |
|---|---|
| July 6, 2004 Affidavit of Geoffrey O. Lubbock | 1 |
| May 20, 2002 Deposition of Michael J. Lawrence | 6 |
| May 17, 1984 Confirmation Statement of Benard C. Rusche | 13 |
| May 16, 2002 Deposition of Benard Rusche; | 20 |
| March 21-22, 2002 Deposition of Robert L. Morgan | 25 |
| October 12, 1983 Remarks of Robert L. Morgan before the IAEA | 34 |
| June 1987 OCRWM Mission Plan Amendment | 40 |
| December 1990 OCRWM Annual Capacity Report | 42 |
| February 9, 2004 Nuclear Energy Overview | 44 |
| February 12, 1998, letter from Thomas W. Bennet, Jr. to Joseph A. Pezello | 56 |
| September 28, 1995 letter from Daniel A. Dreyfus to Dr. Andrew C. Kadak | 67 |
| May 18, 1998 letter from Federico Pena to Eugene McGrath (and attached chart) | 68 |
| March 21-22 Deposition of Robert L. Morgan | 72 |
| April 17, 2002 Deposition of David K. Zabransky | 75 |
| June 13, 2002 Deposition of Nancy Slater Thompson | 77 |
| April 10, 2002 Deposition of Alan Brownstein | 80 |
| April 22, 2002 Deposition of Lake H. Barrett (pp. 1-4) | 83 |
| April 17, 2002 Deposition of David K. Zabransky | 86 |
| December 1991 Acceptance Priority Ranking | 89 |
| November 24, 1998 letter to H.V. Oheim from Beth A Tomasoni re: Boston Edison's Delivery Commitment Schedule | 93 |
| July 13, 1999 Boston Edison Company Purchase and Sale Agreement | 94 |
| December 1991 Annual Capacity Report | 97 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 99-447C (J. Lettow)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF BOSTON EDISON COMPANY'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT UPON COUNTS I AND II AND FOR SUMMARY JUDGMENT UPON COUNT III OF PLAINTIFF'S AMENDED COMPLAINT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY REGARDING COUNT I OF THE AMENDED COMPLAINT**

## INTRODUCTION

Pursuant to Rules 7.2(c), 12(b), and 56(b)[1] of the Rules of the U.S. Court of Federal Claims ("RCFC"), and further pursuant to the Court's Order dated May 28, 2004, Plaintiff Boston Edison Company ("Boston Edison"), through its undersigned counsel, hereby submits its brief in response to the Motion to Dismiss or, in the Alternative, for Summary Judgment upon Counts I and II and for Summary Judgment upon Count III of Plaintiff's Amended Complaint ("Motion") filed by Defendant, the United States of America ("Government"), acting by and through the U.S. Department

[1] Although the Government has styled its Motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment" on Counts I and II of the Amended Complaint, the Government cites only to RCFC 56(b). Motion at 1. While the Government has briefly discussed the standard for dismissal for lack of jurisdiction, *id.* at 4-6, it has *not* expressly invoked RCFC 12. For purposes of this response, Boston Edison treats the Government's Motion as having been filed under RCFC 12(b) and 56(b).

of Energy ("Government" or "DOE"). Boston Edison also cross-moves herein for summary judgment on liability for breach of contract pursuant to Count I of its Amended Complaint. As discussed below, both legal and factual issues preclude a judgment in favor of the Government on its Motion. Conversely, Boston Edison is entitled to summary judgment on its cross-motion as there are no legal or factual issues in dispute regarding the Government's liability for breach of the Standard Contract.

The Government's arguments about the Delivery Commitment Schedule ("DCS") in response to Count I of the Amended Complaint have no merit and, as a result, have been soundly rejected on numerous occasions by the Federal Circuit, the D.C. Circuit, and the U.S. Court of Federal Claims. These courts have unanimously held that the Government was required by the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* ("NWPA"), to begin accepting spent nuclear fuel ("SNF") from the nuclear utilities by January 31, 1998 in exchange for the payment of prescribed fees by the utilities into a Nuclear Waste Fund, and that the Government breached that obligation. Boston Edison owned the Pilgrim Nuclear Power Station ("Pilgrim") on the date of the Government's breach – January 31, 1998 – and was injured as a direct and proximate result of that breach. Accordingly, Boston Edison has standing to bring this action.

Boston Edison also has a viable claim for uncompensated taking pursuant to Count III of the Amended Complaint because Boston Edison's takings claim does not "arise from" its breach of contract claim. Finally, Boston Edison's good faith and fair dealing claim in Count II of the Amended Complaint is based on the Government's well-documented interference with Boston Edison's ability to recognize its rights under the Standard Contract. Additionally, material issues of fact exist that preclude

summary judgment on Counts II and III of the Amended Complaint. Accordingly, Boston Edison respectfully requests that the Court deny the Government's Motion in its entirety.

Boston Edison also respectfully requests that the Court grant its cross-motion for summary judgment on Count I of its Amended Complaint. There are no material facts in dispute regarding the Government's liability for breach of the Standard Contract. The Government has been found to have breached the Standard Contract by every court that has considered this issue. Boston Edison is entitled to judgment on Count I of the Amended Complaint as a matter of law.

## ISSUES PRESENTED

1. Whether Boston Edison has standing to bring an action for damages incurred as a direct and proximate result of the Government's breach of the Standard Contract on January 31, 1998.

2. Whether Boston Edison can pursue breach of contract and uncompensated takings claims concurrently, where Boston Edison's takings claims arise independently from the rights conveyed by the Standard Contract.

3. Whether Boston Edison can maintain a claim for breach of the Government's duty of good faith and fair dealing based on the Government's well-documented interference with Boston Edison's ability to realize its rights under the Standard Contract.

4. Whether the Government is liable for breach of contract where there is no genuine issue of material fact regarding the Government's contractual obligation to begin removal of Boston Edison's SNF by January 31, 1998 and the Government's undisputed failure to meet that material obligation.

## STATEMENT OF THE CASE

### A. Nature of the Case

This case involves claims by Boston Edison under both contract and takings theories arising from the Government's failure to fulfill both statutory and contractual obligations owed to Boston Edison. The breach of these obligations occurred on January 31, 1998 when DOE failed to begin accepting and disposing of Boston Edison's SNF as required by the NWPA and the Standard Contract.

### B. Statement of Facts

Boston Edison respectfully refers the Court to its Response to Defendant's Proposed Findings of Uncontroverted Fact, its Proposed Findings of Uncontroverted Fact in Support of Its Cross-Motion for Summary Judgment on Liability, and the Appendix in support thereof.[2]

## STANDARD OF REVIEW

### A. Motion to Dismiss

"When a federal court reviews the sufficiency of the complaint pursuant to a motion to dismiss, 'its task is necessarily a limited one.'" *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 35 (2000) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claims.'" *Id*. Toward this end, the court must presume that the "factual allegations included in the complaint by a plaintiff are true." *Id*. Given this minimal standard, the court should not dismiss a complaint for failure to state a claim "unless it is 'beyond doubt that the plaintiff can prove no set of facts which would

[2] In this brief, Boston Edison refers to its Response to Defendant's Proposed Findings of Uncontroverted Fact as "RPFF"; to Defendant's Proposed Findings of Uncontroverted Fact as "DPFF"; and to its Proposed Findings of Uncontroverted Fact as "PFF."

entitle [it] to relief.'" *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citation omitted). As discussed below, the Government's Motion fails to demonstrate that Boston Edison can prove no set of facts that would entitle it to relief.

### B. Motion for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence presented must be viewed in a light most favorable to the nonmovant and all reasonable inferences must be drawn in the nonmovant's favor. *See, e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Petersen Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541, 1546 (Fed. Cir. 1984), *abrogated on other grounds by Beatrice Foods Co. v. New England Printing & Lithography Co.*, 899 F.2d 1171 (Fed. Cir. 1990). "The movant bears the burden of demonstrating the absence of all genuine issues of material fact." *See, e.g., Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).

## ARGUMENT

## I. BOSTON EDISON HAS STANDING TO SUE BECAUSE IT SUSTAINED DAMAGES RESULTING FROM THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT ON JANUARY 31, 1998

### A. Boston Edison Meets The Requirements For Standing

Boston Edison's Amended Complaint demonstrates that it has standing to bring this action for breach of contract pursuant to Count I of the Amended Complaint. To present a justiciable controversy, a plaintiff must plead: (1) actual or threatened injury; (2) a causal connection between the injury and the allegedly illegal action that can be redressed by a judicial action; and (3) a likelihood that the injury will be

redressed by a favorable decision. *See*, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Boston Edison has properly pled injury, nexus, and redressability to the Government's breach.

Boston Edison was the sole owner and operator of Pilgrim and party to a Standard Contract with the Government on January 31, 1998. Am. Compl. ¶¶ 1-3, 31. Boston Edison sold Pilgrim to Entergy Nuclear Generating Company LLC ("Entergy") on July 13, 1999 and reserved in that transaction "all claims against DOE related to the Standard Contract up to the closing date of the sale." *Id.* ¶¶ 4, 55. Boston Edison has alleged that it was injured, in part, because it realized significantly less value in the sale of Pilgrim than it would have received had DOE properly fulfilled its obligations under the NWPA and the Standard Contract. *Id.* ¶¶ 58-71.

Boston Edison has clearly met its burden of pleading standing. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan,* 504 U.S. at 561 (citation omitted). Likewise, the Government's alternative request for summary judgment on Count I must be denied. The Government's Motion was filed shortly after the Court accepted Boston Edison's Amended Complaint and Boston Edison has not conducted any discovery on the Amended Complaint, including its amended damages analysis. It is well settled that "'summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery.' . . . Indeed, summary judgment should 'be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'" *Burnside-Ott Aviation Training Ctr., Inc.*

*v. United States*, 985 F.2d 1574, 1582 (Fed. Cir. 1993) (citations omitted). Moreover, as the Supreme Court noted in *Lujan*,

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. *If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it*.

504 U.S. at 561-62 (emphasis added). Boston Edison, as a party to the Standard Contract, was the object of the Government's breach and standing must be assessed accordingly.

The attached affidavit of Geoffrey O. Lubbock, Vice President of Financial Strategic Planning and Policy for NSTAR Electric & Gas Corporation ("NSTAR") and Boston Edison (an operating affiliate of NSTAR) ("Lubbock Affidavit"), describes some of the damages suffered by Boston Edison as a direct and proximate result of the Government's breach.[3] *See* Appendix ("App."), attached hereto, at 4; PFF No.15. As the Lubbock Affidavit states, Pilgrim was designed and constructed in a manner that required SNF to be shipped off-site to be reprocessed for future use. RPFF No. 1. When reprocessing was prohibited by the Government in the late 1970s, and with the subsequent passage of the NWPA, it was clear to all concerned that the operation and indeed the viability of Pilgrim relied heavily upon the Government's statutory and contractual obligation to remove and dispose of Boston Edison's SNF. *Id.*

[3] The Lubbock Affidavit is offered in response to the Government's Motion with respect to Count I of the Amended Complaint. The Lubbock Affidavit should not be construed as articulating the entirety of Boston Edison's damages analysis. Boston Edison expressly reserves its right to more fully develop its damages analysis through the use of documents, demonstrative exhibits, testimony (including the testimony of expert witnesses), and other means, as appropriate.

Consequently, the Government's breach of its obligations had a significant detrimental impact on the fair market value of Pilgrim. App. at 4. The manifestations of these damages include, but are not limited to, the economic impacts described in the Lubbock Affidavit and summarized below.

One measure of the impact of the Government's breach on the fair market value of Boston Edison's property was the dramatic decrease in the number of prospective bidders that actually participated in the auction of Pilgrim. App. at 3. The limited number of bidders for Pilgrim was "directly related to the increased risk and cost associated with the uncertain future for permanent disposition of SNF." *Id.* The Government's breach also directly resulted in a significant reduction in the per kWh purchase price of Boston Edison's nuclear assets. *Id.* The two bidders that submitted bids during the auction process were concerned about Pilgrim's ability to produce future revenues beyond the end of its initial license life. *Id*; PFF No. 16. Faced with the Government's failure to begin acceptance of SNF as required, a potential buyer did not know if it could have the facility re-licensed. App. at 3. In the alternative, the buyer was faced with the prospect of having to expend considerable funds to construct dry cask storage at Pilgrim. *Id.* These factors had a dramatic impact on the fair market value of Pilgrim prior to the sale. *Id.*

Moreover, the fair market value of Pilgrim was significantly decreased as a result of the future costs that encumbered the property as a direct result of the Government's breach. App. at 3-4. These costs included indefinite future payments to DOE of the one mil per kWh fee assessed by DOE, as well as increased costs associated with decommissioning Pilgrim. *Id.* Ultimately, as a direct result of the Government's breach of the Standard Contract, Boston Edison was required to transfer a larger

decommissioning trust fund than it otherwise would have been required to transfer had the Government not breached its contractual obligations. *Id.* at 4. Boston Edison suffered these (and other) damages as a direct and proximate result of the Government's breach of the Standard Contract on January 31, 1998. [4]

In short, Boston Edison sustained damages on January 31, 1998. Those damages were not forestalled to a later date after assignment of the Standard Contract in July 1999, as the Government now claims. By January 1998 the economic viability of Boston Edison's nuclear assets was significantly injured as a direct consequence of the Government's decision not to have an operational repository in place in order to permit permanent disposal of SNF by January 31, 1998. By 1998, the Government was unable to state when – if ever –permanent disposal would actually begin. As of January 1998,

[4] In its Motion, the Government argues that Count I of the Amended Complaint must be construed as asserting a claim for partial breach of contract, and therefore, pre-breach damages are not recoverable. Motion at 18-19. Boston Edison respectfully disagrees. To the contrary, as the court has recently found in *Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) (Merow, J.), damages incurred prior to January 31, 1998 may be recoverable to the extent that such damages were foreseeable and necessary to avoid further losses. Judge Merow held: "Consider the ramifications of defendant's position. Should plaintiffs have waited until December 31, 1998 and then decided what to do with their nuclear waste? The court thinks not, and accordingly, will not preclude evidence and argument in this regard." *Id.* slip op. at 10. Accordingly, the court held that Yankee Atomic would be permitted to present at trial evidence of pre-breach damages incurred as a result of DOE's breach. *Id.* (citing *Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665, 674 (2004), and Restatement (Second) of Contract § 350 cmt. B (1981). In *Tennessee Valley Authority*, the court, observing that DOE had notified all Standard Contract holders that it would not collect any SNF prior to 2010, concluded that the Standard Contract holder "was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance." 60 Fed. Cl. at 674. Reasonably foreseeable damages that "'place the injured party in as good a position as he or she would have been had the breaching party fully performed'" are recoverable irrespective of whether the breach is viewed as partial or total. *Yankee Atomic*, slip op. at 10-11 (quoting *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002)). Boston Edison respectfully requests that the Court take a similar view in the present case.

Boston Edison was also deprived of its valuable rights to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged. RPFF No. 9.

### B. DOE Breached The Standard Contract On January 31, 1998

The Government's Motion attempts to resurrect its tired and thoroughly discredited contention that the breach of the Standard Contract did not occur on January 31, 1998, but rather, at a later date. Motion at 10. The Government argues that the later date is the proper indicator of the Government's breach because it established when Boston Edison was first scheduled to deliver its SNF to DOE pursuant to Boston Edison's initial Delivery Commitment Schedule ("DCS"). Motion at 15. According to the Government, Boston Edison has no standing to bring this action because DOE's alleged first acceptance obligation of Boston Edison's SNF under its DCS occurred after Boston Edison sold Pilgrim to Entergy on July 13, 1999. Motion at 10.

The Government's position, however, flies in the face of the express language of the NWPA and the Standard Contract, and has been rejected by every court that has considered the issue – including two decisions by the U.S. Court of Appeals for the District of Columbia Circuit, two decisions of the U.S. Court of Appeals for the Federal Circuit, and at least three decisions of this Court. As discussed below, these decisions hold that the Government's breach occurred when it failed to have an operational repository in place for permanent SNF disposal by January 31, 1998 as required by the NWPA and the Standard Contract. The Government's breach was not limited to failing to dispose of particular or discrete units of SNF. As such, and as discussed in Section I.C *infra*, the Government is collaterally estopped from arguing that the breach of the Standard Contract occurred on any date other than January 31, 1998.

Moreover, as discussed below, the DCS process is administrative and does not create a binding contractual obligation for purposes of determining liability or standing. The Government's interpretation of the DCS process would render the Standard Contract illusory, as it would give the Government an unlimited right to walk away from its obligations without liability. Finally, the Government is bound by the January 31, 1998 deadline because it knew that the utilities, including Boston Edison, relied upon that date, not the DCS process, to trigger the Government's SNF disposal obligations.

The Government's assertion that Boston Edison lacks standing because Boston Edison sold Pilgrim and assigned its Standard Contract to Entergy before any right to SNF acceptance accrued is premised on the wrongheaded notion that the DCS triggers DOE's obligations. To this end, the Government maintains that the January 31, 1998 deadline was not binding on the Government with respect to Boston Edison, but rather, "was a statutory deadline by which DOE was required *to begin its program of accepting SNF from the contract holders as a collective whole.*" Motion at 10 (emphasis in original). The Government's argument, however, ignores the plain language of the NWPA and the Standard Contract, both of which expressly obligate DOE to begin disposal of Boston Edison's SNF by a date certain – "no later than January 31, 1998." Standard Contract, 10 C.F.R. § 961.11, Art. II. The Government's obligation to the utilities, including Boston Edison, was "'without qualification or condition,'" *N. States Power Co. v. United States Dep't of Energy,* 128 F.3d 754, 757 (D.C. Cir. 1997) (quoting *Ind. Mich. Power Co. v. Dep't of Energy,* 88 F.3d 1272, 1273 (D.C. Cir. 1996)), and, thus, essential to Boston Edison's obligation to pay the fees into the Nuclear Waste Fund. *See Indiana Michigan,* 88 F.3d 1276-77. Boston Edison timely paid in excess of $89 million in

fees to DOE in express reliance on DOE's obligation to take custody of the SNF by January 31, 1998. Am. Compl. ¶ 31. It is undisputed that DOE failed to meet its obligation to begin disposal on January 31, 1998. DPFF No. 37.

Courts have long held that the "[f]ailure to perform a contractual duty when it is due is a breach of the contract." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995) (citing Restatement of Contracts § 235(2)), *aff'd*, 518 U.S. 839 (1996). Indeed, notwithstanding its present position, the Government has previously acknowledged that January 31, 1998 is the operative date for the Government's breach. In Defendant's Second Motion to Renew Its Motion to Consolidate (filed July 29, 2003), at 15, the Government stated: "The holders of the remaining approximately 53 Standard Contracts have yet to file suit, although we understand from industry reports that most, if not all, of these contract holders are expected to file complaints by January 31, 2004 (six years from the January 31, 1998 acceptance date in the Standard Contract and the Nuclear Waste Policy Act)."

From a legislative perspective, Congress found the January 31, 1998 acceptance date "so important when it promulgated the [NWPA] that it took the unusual action of specifying that all the contracts must contain this explicit requirement." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Indeed, Congress demonstrated a strong "intent that DOE's various obligations be performed in a timely manner." *Indiana Michigan*, 88 F.3d at 1277 (quoting *Tennessee v. Herrington*, 806 F.2d 642, 648 (6th Cir. 1986)) ("'[T]he overall structure of the [NWPA] does reveal a consistent concern for timely implementation of the disposal provisions.'"). "DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that

contravene this court's prior ruling." *Northern States*, 128 F.3d at 760. Given this, the only reasonable interpretation of the Standard Contract and the NWPA is that the January 31, 1998 deadline was an express, material, and unconditional obligation of the Government. The Government's construction of the DCS process renders that obligation meaningless and contravenes the express intent of Congress.

Further, as discussed below, the Government's DCS argument has been soundly and repeatedly rejected by several courts, each of which has held that January 31, 1998 was the operative date of the Government's breach of the Standard Contract. As Boston Edison was a Standard Contract holder when the breach occurred, and retained its claim against DOE when Pilgrim was subsequently sold to Entergy, Boston Edison has standing to bring this action for the damages it incurred up to the closing date of the sale.

### C. The Government Is Collaterally Estopped From Arguing That The Breach Occurred On Any Date Other Than January 31, 1998

The Government's DCS argument not only ignores the express intention of Congress, as reflected in the plain language of the NWPA and the Standard Contract, it also requires the Court to ignore several cases that have consistently held that the Government's breach occurred on January 31, 1998. These cases have rejected the Government's argument that the breach occurred later, including the notion that the DCS determines when the Government's breach occurred. The Court is bound by these prior decisions and, in particular, by the decisions of the Federal Circuit that set the date of the Government's breach at January 31, 1998. Accordingly, Boston Edison respectfully requests that the Court take judicial notice of these prior decisions and

prohibit the Government from arguing that the operative date of the breach of Boston Edison's Standard Contract is anything other than January 31, 1998.[5]

Under the doctrine of collateral estoppel, "'once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.'" *Exxon Corp. v. United States*, 45 Fed. Cl. 581, 610 (1999), *aff'd in part and rev'd in part on other grounds,* 244 F.3d 1341 (Fed. Cir. 2001). A party asking a court to apply collateral estoppel must establish that:

> "(1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding."

*Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (citation omitted); *see also In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). As detailed below, the legal issue presented by the Government's Motion – whether the Government's breach of the Standard Contract occurred on January 31, 1998 or at some later date – is identical to the issue litigated and resolved in numerous prior proceedings. Moreover, the date of the Government's breach is "a critical and necessary part" of these prior decisions as it goes to the heart of the Government's liability. Finally, there is no question that the Government has had a full and fair opportunity to litigate the issue of when the breach occurred and did, in fact, litigate this issue. Thus, collateral estoppel is appropriate in this matter.

[5] Boston Edison is cross moving for summary judgment on the issue of liability (*see infra* Section IV). The doctrine of collateral estoppel requires a finding of liability in favor of Boston Edison.

**1. The D.C. Circuit Determined that the Breach Occurred on January 31, 1998**

The D.C. Circuit conclusively ruled that the Government breached the Standard Contract on January 31, 1998. Seeking a *writ of mandamus*, a consortium of utility plaintiffs in *Indiana Michigan,* and later in *Northern States*, argued that the January 31, 1998 deadline was a binding obligation on the Government. In both cases, the court agreed:

> We held in *Indiana Michigan* that the NWPA imposes an unconditional obligation, memorialized in the Standard Contract, to begin disposing of the materials by January 31, 1998. We rejected the Department's attempt to water-down its obligations, finding that DOE's interpretation would "destroy[] the *quid pro quo* created by Congress" and would mean that the payment of fees into the Nuclear Waste Fund "was for nothing." 88 F.3d at 1276. To effectuate DOE's duty, as we recognized in *Indiana Michigan*, petitioners must be able to enforce the terms of the contract in a meaningful way. Petitioners' ability to enforce the contract would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE "without qualification or condition."

*Northern States,* 128 F.3d at 759; *see also Indiana Michigan,* 88 F.3d at 1276 ("Under the plain language of the statute, the utilities anticipated paying fees 'in return for [which] the Secretary' had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain."). The D.C. Circuit concluded that "section 302(a)(5)(B) [of the NWPA] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF *no later than* January 31, 1998." *Indiana Michigan*, 88 F.3d at 1277 (emphasis added). The *Northern States* court concluded that utilities could sue the Government in the U.S. Court of Federal Claims if SNF disposal did not commence by January 31, 1998. 128 F.3d at 760.

### 2. The Federal Circuit Determined that the Breach Occurred on January 31, 1998

The Federal Circuit endorsed the D.C. Circuit's interpretation of the Standard Contract and the Government's breach in three key decisions. In *Maine Yankee*, the Federal Circuit held that DOE's failure to begin SNF disposal by January 31, 1998 constituted a breach of contract. 225 F.3d at 1343. The *Maine Yankee* decision notes that the NWPA "effectively made entry into such contracts mandatory" for all nuclear utilities. *Id.* at 1337. Citing the D.C. Circuit's holdings in *Indiana Michigan* and *Northern States,* the Federal Circuit affirmed the decision of the lower court that "the Department was obligated 'without qualification or condition' to begin disposing of the nuclear waste by January 31, 1998" and that failure to begin disposal by that date constituted a breach. *Id.* at 1338-40 (also citing *Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223, 235 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000)). Indeed, the Federal Circuit extended its decision beyond the three utility plaintiffs before it and held that "[t]he breach involved *all* the utilities that had signed the contract – *the entire nuclear electric industry.*" *Id.* at 1342 (emphasis added).

In *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), and *Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001), the Federal Circuit re-affirmed its decision in *Maine Yankee.* In *Northern States*, the Federal Circuit held:

> On the merits, our opinion in *Maine Yankee* fully explains why we have concluded that the utilities may maintain their damage suit, and we need not repeat that discussion here. In brief, we hold that the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

224 F.3d at 1367. It is again important to note that the Federal Circuit did not limit its decision regarding the Government's breach to the particular plaintiff in that case, but

rather applied its rationale to the utility industry as a whole. *See id.* Similarly, in *Roedler*, the Federal Circuit held:

> In *Indiana Michigan Power Co. v. Department of Energy* . . . and *Northern States Power Co. v. Department of Energy* . . . the District of Columbia Circuit held that the government's failure to meet this deadline was a breach of contract. This ruling led to further litigation in which the utility companies seek damages in the Court of Federal Claims. Appellate rulings in various threshold issues appear at *Maine Yankee Atomic Power Co. v. United States. . . .* and *Northern States Power Co. v. United States . . . .*

255 F.3d at 1350 (citations omitted).[6]

The Federal Circuit has spoken clearly and decisively on the issue of when the Government breached the Standard Contract and determined that the breach occurred on January 31, 1998. Moreover, the Federal Circuit held that the breach involved all of the utilities that signed the Standard Contract. As Boston Edison was a signatory and Standard Contract holder when the Government breached on January 31, 1998, the Federal Circuit decisions are equally applicable to Boston Edison and bind the Government in this case.

### 3. The U.S. Court of Federal Claims Has Determined that the Breach Occurred on January 31, 1998

Several decisions of the U.S. Court of Federal Claims also support Boston Edison's standing to bring this action. In *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) (Hewitt, J.), the court soundly rejected a virtually identical DCS argument by the Government. In *Commonwealth Edison*, the Government moved for partial summary judgment on the issue of the rate of acceptance of SNF. The Government argued that the DCS (and final delivery schedules) established the rate of

[6] *Roedler* differs from *Maine Yankee* and *Northern States* in that the plaintiffs in *Roedler* were rate payers, rather than utilities. Based on this distinction, the Federal Circuit affirmed the lower court's decision that the rate payers did not have a right of action against the Government. *Roedler*, 255 F.3d at 1353.

acceptance and that January 31, 1998 was not the operative date for determining the Government's liability. Like the Government's present Motion, in *Commonwealth Edison,* the Government argued that DOE was not contractually obligated to accept SNF other than in the amounts at all times stated in the approved DCSs.

Commonwealth Edison Company countered by arguing that the DCS did not create a binding contractual obligation akin to the January 31, 1998 deadline. *See* Plaintiff's Corrected Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance, No. 98-621C (filed Apr. 22, 2003) at 22-28, *Commonwealth Edison,* 56 Fed. Cl. 652. Commonwealth Edison cited the Government's own "Instructions to Standard Contract Holders to Complete the DCS" ("Instructions") to show that the DCSs were administrative matters and not material terms of the Standard Contract. *Id*. at 24. Commonwealth Edison also pointed to the depositions of Government witnesses who testified that the DCSs were only for planning purposes and not binding on DOE or the utilities. *Id.* at 24-26; *see also* RPFF No. 25.

The court rejected the Government's interpretation and held that the DCS was never intended to create contractual obligations between the Government and Standard Contract holders:

> [T]he DCSs merely "identify all SNF and/or HLW the Purchaser *wishes to deliver* to DOE . . . ." This mechanism does not create a contractually binding obligation for either party. The ACRs are, according to the Standard Contract terms, for "planning purposes" only. The court finds that there is no evidence that the exchange of DCSs was intended to create a contract between the parties.

*Commonwealth Edison*, 56 Fed. Cl. at 663 (citations omitted). The court found that the Government's failure to give any weight to the January 31, 1998 deadline would render the Standard Contract unenforceable as an illusory contract. *Id.* at 664, 665

("Defendant's interpretation that it is obligated only to 'begin' and not to 'continue' acceptance of SNF and/or HLW, would render much of the contract illusory because it would 'leave [DOE's] future action subject to [its] own future will' thereby leaving the parties with a promise that had little meaning"); *see also Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061-62 (Fed. Cir. 2002); *Indiana Michigan*, 88 F.3d at 1277 (the Government's interpretation of the DCS would render the statutory phrase, "not later than January 31, 1998," superfluous).

The court subsequently adopted the rationale of *Commonwealth Edison* in *Yankee Atomic Electric Co. v. United States*, Order No. 98-126C (Fed. Cl. filed June 26, 2003) (Merow, S.J.), and *Southern Nuclear Operating Co. v. United States* , No. 98-614C (Fed. Cl. filed Apr. 7, 2004) (Merow, S.J.); *see also* Restatement of Contracts § 204, Reporters Note: Case citations July 2003 – November 2003 (citing *Commonwealth Edison*, 56 Fed. Cl. at 662, for the proposition that a court can supply reasonable terms – i.e., delivery schedule – when a contract is sufficiently defined but otherwise missing a term).[7] The U.S. Court of Federal Claims also has held that the Government breached the Standard Contract on January 31, 1998 in *Maine Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 582 (1998), *aff'd*, 225 F.3d 1336 (Fed. Cir. 2000), *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003), *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003), *Florida Power & Light Co. v. United States*, 56 Fed. Cl. 555 (2003), and *Connecticut Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 448 (1998).

[7] In *Tennessee Valley Authority*, the court granted (in part) plaintiff's motion for summary judgment on liability, citing *Maine Yankee* for the proposition that the NWPA "required that [the Standard Contract] shall provide that [DOE] will dispose of the waste [or spent fuel] 'beginning not later than January 31, 1998." 60 Fed. Cl. at 667 (quoting *Maine Yankee*, 225 F.3d at 1337 (quoting 42 U.S.C. § 10222(a)(5)(B))) (internal quotation marks omitted). The court further held that "[t]he Standard Contract did not establish a specific rate or schedule for the collection of SNF." *Id.*

In its Motion, the Government takes issue with this Court's decisions in *Commonwealth Edison* and *Indiana Michigan* rejecting the Government's DCS arguments. Motion at 19-26. The Government criticizes these rulings by arguing that they "do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract." *Id.* at 19. The Government contends that the DCS process supplies most of the material terms of the Standard Contract, and that the Court's decision to interpret the DCS process as "administrative" and to supply its own rate of acceptance was improper. *Id.* at 19-22. The Government concludes that "[a] rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce." *Id.* at 25.

The Government's rebuttal, however, ignores the court's conclusions in *Commonwealth Edison* and *Indiana Michigan* that the Government's DCS theory is inconsistent with the explicit requirements of the Standard Contract and the NWPA that "(1) the Department of Energy must remove all nuclear materials (Standard Contract Art. III); (2) the consideration for removal is 'the payment of fees established by [42 U.S.C. § 10222(a)(5)(B)];' and (3) the process must begin 'not later than January 31, 1998.'" *Indiana Michigan*, 57 Fed. Cl. at 95; *see also Commonwealth Edison*, 56 Fed. Cl. at 664. As the court found in *Commonwealth Edison* (and as discussed *supra* Section I.C.3), the DCS process described in the Standard Contract is just that – a process – not a contractual rate of acceptance that is binding on the parties. *See* 56 Fed. Cl. at 662. Indeed, the Government's own witnesses testified that they considered the DCS to be non-binding. *See* RPFF No. 25. Thus, the decision by the court to read into the Standard Contract a reasonable rate of acceptance is consistent with cannons of contract

interpretation and necessary to effectuate the plain meaning of the Standard Contract. *See, e.g.*, Restatement of Contracts § 204.

### D. The DCS Process Does Not Create A Contractually Binding Obligation

The Court should deny the Government's Motion because the DCS process does not establish a contractually binding obligation for purposes of determining whether Boston Edison has standing. The Government's interpretation of the DCS process is patently unreasonable and would render the Government's obligations under the Standard Contract unenforceable and illusory. The Government also should be estopped from arguing that the DCS process is operative for determining liability or standing because the Government knew that the utilities, including Boston Edison, relied on January 31, 1998 as the commencement date for the Government's SNF disposal obligations.

#### 1. The Government's Interpretation of the DCS Process Would Render the Standard Contract Illusory

A contract that allows one party to "walk away from all obligations" without consequences is illusory. *Woll v. United States*, 45 Fed. Cl. 475, 478 (1999), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000). As such, "the government cannot reserve to itself an unlimited right to escape its contractual obligations 'without rendering its promises illusory and the contract void.'" *Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1405 (9th Cir. 1993) (quoting *Torncello v. United States*, 681 F.2d 756, 760 (Ct. Cl. 1982)). Thus, when faced with conflicting interpretations, courts must construe contracts so as to avoid rendering them "illusory." *Torncello*, 681 F.2d at 764, 769.

The DCSs simply do not provide "specific acceptance obligations from individual Standard Contract holders" as the Government's Motion states. Motion at 2.

In its Instructions, the Government clearly states that the DCSs do not establish an acceptance rate. The Preface to the Instructions emphasizes that the DCSs were for planning purposes only:

> The DCS provides the Purchasers with the *opportunity* to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will *assist* DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

(Emphasis added.) The Instructions also stated that the Government and purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding Annual Capacity Report ("ACR"). *Id.* The Instructions made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five years. *Id.* Instead, the utilities were asked to submit only a non-restrictive date range of when the SNF they planned to provide had been (or would be) removed from reactors. *Id.*

Nancy Slater-Thompson, the DOE official in charge of DCS submissions, testified in earlier SNF proceedings that she did not consider the DCS binding on DOE or the utilities: "In my personal opinion, [the DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them." RPFF No. 25. Ms. Slater-Thompson's supervisor and head of DOE's SNF acceptance and scheduling office, Alan Brownstein, also testified that the DCSs were for planning purposes only. *Id.* Lake Barrett, who began working on the SNF program in 1985 and served as Acting Deputy Director of OCRWM from 1993-2002, testified that the DCSs were "administrative" and did not matter to him in his responsibilities over the SNF program. *Id.*

The Government's assertion that "DOE was not obligated to accept SNF from *every* Standard Contract" holder by January 31, 1998, coupled with the non-binding nature of the DCS, demonstrates the illusory nature of the Government's position. Motion at 2, 26. Indeed, the Government's self-serving interpretation would allow the Government to reserve to itself an unlimited right to escape its contractual obligations while collecting tens of billions of dollars in Nuclear Waste Fund fees. The Government's theory that Boston Edison lacks standing because the Government's obligations did not commence until a DCS was accepted ignores and renders meaningless the January 31, 1998 deadline.

The court should not enforce an interpretation of a contract that ignores provisions that are otherwise clear and unambiguous. "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation." *Specialty Transp., Inc. v. United States,* 57 Fed. Cl. 1, 9 (2003); *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003); *Unisys Corp. v. United States*, 48 Fed. Cl. 451, 454 (2001). When resolution of a matter requires the application of clear and unambiguous contract terms, the court will not adopt a contractual interpretation that is inconsistent with those terms. *Avedon Corp. v. United States*, 15 Cl. Ct. 771, 775-76 (1988); *see also Unisys,* 48 Fed. Cl. at 454. The court should interpret the January 31, 1998 date in accordance with the unambiguous language of the NWPA and the Standard Contract and as the parties intended – a contractually enforceable deadline by which the Government was obligated to perform.

**2. DOE Knew that Utilities, Including Boston Edison, Relied on January 31, 1998 as the Performance Date**

Even if the Government's interpretation of the DCS process was reasonable and not subject to collateral estoppel, the Government should be estopped from arguing

that the DCS establishes the breach date because the Government encouraged the utilities, including Boston Edison, to rely on January 31, 1998 as the performance date under the Standard Contract.[8] "A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant." *Perry & Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970); *see also Jet Forwarding, Inc. v. United States*, 437 F.2d 987, 989 (Ct. Cl. 1971) ("[A] party knowing the meaning his opposite number gives to an agreement about to be consummated is bound by that understanding unless he speaks up."); *Cresswell v. United States*, 173 F. Supp. 805, 811 (Ct. Cl. 1959) (same); *see* Restatement of Contracts § 201(2)(a)-(b) & Reporter's Note to cmt. 6 (embracing the *Perry & Wallis* rule). Prior to the execution of the Standard Contract, the Government actively encouraged the utilities to believe that January 31, 1998, and not some subsequent date tied to the DCS, was the material date for gauging the Government's performance.

In 1983, DOE drafted a Standard Contract for use with participants in the program, published it in the Federal Register, and accepted comments from the public regarding the terms of the Standard Contract. During the public comment process, numerous utilities noted the importance of the January 31, 1998 performance date.

> [S]even commenters addressed the question of DOE performance standards and Purchaser remedies with respect to performance. In essence, these commenters pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, these commenters say, the contract provides no specific remedies against DOE for failing to meet the date. DOE has considered this comment and the

[8] Notwithstanding its current position that the DCS process is so important as to define the date of the Government's breach, the Government abandoned the DCS process in 1998, ordering Boston Edison to terminate future submissions of DCSs.

> suggestion that suitable language be included in the contract, but has decided not to adopt the recommended modification.

*Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste,* 48 Fed. Reg. 16590, 16,598 (Apr. 18, 1983). Thus, as early as 1983, the Government was aware that the nuclear industry viewed January 31, 1998 as the *single date* by which the Government's performance would be gauged.

The Government also recognized that the NWPA contemplated the opening of a permanent repository by January 1998. In its February 1983 Notice of Proposed Rulemaking that accompanied the proposed Standard Contract, DOE stated that the NWPA "directs DOE to begin repository operation no later than January 31, 1998." RPFF No. 1. Thereafter, the Standard Contract was promulgated containing the January 31, 1998 deadline.[9]

Had the Government viewed the DCS as a more precise date to measure its performance, it was obligated to articulate that position during the public comment phase. The Government, however, did not do so. In fact, the Government did not adopt its DCS position until well after it was apparent that it would not meet the January 31, 1998 deadline. At the very least, the Government's position regarding the January 31, 1998 date constitutes a breach of the duty of good faith and fair dealing. *See* Am. Compl. ¶¶ 76-79; *see also Commonwealth Edison*, 56 Fed. Cl. at 665 ("Defendant's use

[9] For example, notwithstanding its later DCS date, the Standard Contract permitted Boston Edison to exchange its DCS position with other utilities beginning on January 31, 1998. Standard Contract, 10 C.F.R. § 961.11, Art. V.E. This contractual mechanism allowed utilities to develop "SNF put option trading" – an industry market that permitted utilities to use, trade, or sell queue positions in exchange for millions of dollars. PFF No. 12. Indeed, the Government actively encouraged utilities, including Boston Edison, to engage in this trading process, noting that "the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the over-involvement of the Department [of Energy]." RPFF No. 9. The Government's breach of the Standard Contract precluded Boston Edison and other utilities from availing themselves of the DCS exchange process.

of the 1991 ACR to limit the utilities' DCS submissions does not appear to the court to be consistent with the 'justified expectations' of plaintiff . . . ."). By failing to contradict the express understanding of the utilities, including Boston Edison, regarding the Government's performance obligations under the Standard Contract, DOE "acquiesced in and [was] bound by" Boston Edison's interpretation. *Perry & Wallis*, 427 F.2d at 725. Accordingly, the Government's Motion should be denied.

## II. BOSTON EDISON HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

Boston Edison has asserted a valid claim against the Government for taking its property without just compensation. This claim alleges that the Government deprived Boston Edison of the full use and value of its nuclear facility, and in doing so, interfered with Boston Edison's investment-backed expectations. Contrary to the Government's assertion, and as explained in greater detail below, Boston Edison's takings claim arises out of property rights that are separate and distinct from rights accruing under the Standard Contract. Government action taken decades prior to the execution of the Standard Contract obligated the Government to assume responsibility for the permanent disposal of the SNF produced by Boston Edison and other nuclear utilities. Consistent with previous decisions by this and other courts, Boston Edison's takings and breach of contract claims may be pursued concurrently. Accordingly, Boston Edison respectfully requests this Court to deny the Government's Motion.

As an initial matter, takings claims are extremely fact-intensive, and thus it is inappropriate for the court to decide a takings claim on a dispositive motion. As the Ninth Circuit observed in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999), where a plaintiff claims that governmental action effects a taking, motions for summary judgment "must be viewed with particular

skepticism. . . . The importance of the specific facts . . . and circumstances relating to the governmental action militate against summary resolution in most cases. . . . This issue must await determination after a trial on the merits." *Id.* at 1508 (citation omitted); *see also E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (analysis of a takings claim "is essentially ad hoc and fact intensive"). Applying the same principle, the Federal Circuit in *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985), reversed the dismissal of a takings claim because it was "not a legal impossibility" that the claimant "might establish facts constituting a taking" given the allegations of the complaint; the court emphasized that "whether or not there has been a taking . . . is normally a fact issue that cannot be resolved except on a 'complete record,' or a trial." *Id.* at 1555, 1558-60; *see also Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983) ("fact-intensive nature of just compensation jurisprudence . . . argues against precipitous grants of summary judgment"). Among the takings claim issues that would benefit from factual development here as discussed below is the extent of the Government's taking and the nature of Boston Edison's expectations regarding use of its property, particularly given the long history of federal responsibility for SNF disposal.

### A. Boston Edison's Takings Claim Arises Out Of Legal And Property Rights That Existed Prior To The Standard Contract

In its Motion, the Government argues that Boston Edison's takings claim is predicated solely upon rights and privileges obtained through the execution of the Standard Contract. Motion at 29-30. Contrary to the Government's claim, Boston Edison possessed legal and property rights recognized by Congress and affirmed by numerous courts long before the drafting of the Standard Contract.

Since the enactment of the Atomic Energy Act ("AEA") in 1954, the federal Government has recognized its sovereign obligation to provide for the lawful and

permanent disposal of the wastes of nuclear power generation. As Congress found in the legislative history of the NWPA:

> Responsibility for the final disposition of nuclear waste has been lodged solely with the federal government because of the waste's hazardous nature. Various types of nuclear waste remain radioactive for periods of time ranging from several hundred years to several hundred thousand. Since it cannot be "disposed of" in the sense that a biodegradable product can, disposal must consist of permanent and isolated storage, generally in deep geologic formations. Therefore, when the Atomic Energy Act of 1954 (Public Law 83-703) authorized commercial development of nuclear energy, the federal government indicated it would control such potentially dangerous materials by *mandating that disposal occur on federal land.* In 1970, with Regulation 10 C.F.R. 50, the federal government formally accepted full responsibility for providing a final repository.

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. on Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper); RPFF No. 1. As this legislative history shows, an official Government policy statement that long-predates the NWPA, and remains current to this day, provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." *Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities* 10 C.F.R. pt. 50, App. F, ¶ 3.

Government experts who have testified previously in parallel SNF proceedings have corroborated this legislative history. For example, Michael Lawrence, DOE's Acting Assistant Secretary for Defense Programs in 1983, testified that "through the Atomic Energy Act, . . . the Department . . . had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so." RPFF No. 1. Similarly, Bernard C. Rusche,

Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM") in 1984, testified that "[f]rom the beginning of the Atomic Age, it has been a given that the Federal Government has the responsibility for eventual disposal of high-level radioactive wastes and spent fuel." *Id.* (confirmation statement to Congress and deposition testimony reaffirming statement). Robert Morgan, Acting Director of OCRWM in October 1983, also testified that the federal Government has had responsibility for the disposition of SNF since the AEA was enacted in 1954. *Id.*

The Government's argument that "[a]bsent th[e] Standard Contract, DOE would not have any obligation to accept any SNF generated at the Pilgrim nuclear reactor," Motion at 29, is incompatible with the foregoing. To the contrary, the Government's acknowledgment of its responsibility for the ultimate disposition of commercial SNF supports Boston Edison's assertion that the Government's responsibility to dispose of SNF pre-dated both the passage of the NWPA and the execution of the Standard Contract.

This Court has affirmed the legislative history discussed above and recognized that a nuclear utility's legal and property rights existed prior to the execution of the Standard Contract. Indeed, this Court recognized that DOE obligated itself to remove SNF prior to the execution of the Standard Contract when it denied similar motions by the Government in other SNF cases. In *Yankee Atomic*, the court noted that "Yankee asserts that DOE's failure to dispose of its SNF amounts to a taking of the real property on which its inoperative facility is located." 42 Fed. Cl. at 236. The court then concluded that "no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's takings claim is not converted into a claim arising under the contract . . . ." *Id.* In short, this Court already has recognized, and the

Federal Circuit has affirmed, that a nuclear utility's takings claim is distinct from its contract-based rights.

The Government's Motion simply recycles the same arguments soundly rejected by the Federal Circuit in the Government's previous motions. *See Maine Yankee*, 225 F.3d at 1342-43 ("the government's only basis for challenging the Court of Federal Claims' refusal to dismiss [the takings] . . . count[] is that in asserting [it] Yankee merely 'renam[ed] their contract claim'"); *see also* Brief for Defendant-Appellant, the United States (filed Nov. 8, 1999) at 48-49, *Maine Yankee*, 225 F.3d 1336 ("Interference with a property right created solely through the Government acting in its proprietary capacity generally only gives rise to a contract claim, not a taking.") (citing *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978)); *id.* at 49 ("[T]he only 'rights' that the Yankees have are created by the standard contract."). The Federal Circuit has rejected the same arguments advanced by the Government in its Motion and, thus, confirmed the viability of Boston Edison's takings claim. Accordingly, the Government's Motion should be denied.

**B. Boston Edison's Real Property Rights Were Taken Without Just Compensation**

Boston Edison has asserted two independent incidents of unjustified taking: (i) DOE's failure to dispose of Boston Edison's SNF by January 31, 1998 deprived Boston Edison of the full use of the value of its facility, and (ii) DOE's failure to begin acceptance of Boston Edison's SNF destroyed Boston Edison's reasonable, investment-backed expectations arising from the NWPA. Am. Compl. ¶¶ 82-83. The Government's actions and inactions have deprived Boston Edison of the use of its real property in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution. A Government-caused occupation of real property for public use constitutes a *per se* Fifth

Amendment taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (law allowing cable companies to attach equipment to apartment buildings requires just compensation). Government action that requires use of private property for a public purpose also is a taking. *See, e.g.*, *Benenson v. United States*, 548 F.2d 939, 949 (Ct. Cl. 1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest).

Further, a taking occurs when the Government forces a business to provide land and services for the benefit of the public. *See, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (taking occurred where Government federalized a coal mine); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949) (taking occurred where Government federalized laundry service and retained management and employees to operate the plant); *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979) (taking occurred where Government imposed a navigational servitude on the landowner's "private pond").

The Government's actions in this case are similar to those in the cases cited above. The Government prohibited Boston Edison from reprocessing its SNF and then failed to provide for the permanent disposal of SNF from Boston Edison's nuclear facility when it was congressionally obligated to do so, forcing Boston Edison to store the SNF at its own cost and encumbering its ability to utilize its property for other uses. RPFF No. 1. Indeed, the Government failed to act even though Boston Edison, along with all other nuclear utilities, had paid billions of dollars into a fund that was to ensure execution of the Government's responsibilities. *Ala. Power Co. v. Dep't of Energy*, 307

F.3d 1300, 1303 (11th Cir. 2002). The Government's failure to remove Boston Edison's SNF, forcing Boston Edison to suffer the economic consequences of that failure, is a taking of Boston Edison's property without just compensation. The NWPA, however, imposed an unconditional obligation on the Government to begin to remove and dispose of Boston Edison's SNF by January 31, 1998 "independent of whether DOE holds title to SNF when it begins to dispose of the material." *Indiana Michigan*, 88 F.3d at 1276. The Government's failure to remove and dispose of the SNF, and the Government's reliance on Boston Edison to provide its facilities to store SNF, constitute a taking of Boston Edison's property without just compensation.

A taking also occurs if "regulation goes too far," *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), and the character of the governmental action economically impacts a property owner and "interfere[s] with distinct investment-backed expectations of the owner," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Boston Edison invested in its real property in the belief that the Government was responsible for the permanent disposal of Boston Edison's SNF. App. at 2. In particular, Pilgrim was designed in a manner that did not anticipate nor allow for the on-site storage of any significant amount of SNF over a protracted period of time. *Id.* DOE's prohibition of reprocessing, coupled with its failure to take custody of SNF as Congress mandated, significantly deprived Boston Edison of its investment-backed expectations in Pilgrim. *Id.* at 4.

**C. <u>The Standard Contract Was Not Entered Into Voluntarily</u>**

The Government argues that a takings claim is inappropriate when the rights of the parties have been voluntarily created by contract. Motion at 29. The Government, thus, maintains that its obligation to dispose of Boston Edison's SNF is

conditioned upon rights contained in the Standard Contract between DOE and Boston Edison. *Id.* at 28. The Standard Contract, however, was not entered into "voluntarily" by Boston Edison or any of the nuclear utilities.

Execution of the Standard Contract was mandatory. *See Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 667-68 (2004); *Maine Yankee*, 225 F.3d at 1337. In fact, the NWPA required that Boston Edison (and the other nuclear utilities) enter into a contract committing to use DOE as the singular entity for the disposal of its SNF. 42 U.S.C. § 10222(b)(2). For example, the NWPA "effectively made entry into . . . contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses" to a utility unless it signed the Standard Contract. *Maine Yankee*, 225 F.3d at 1337.

Under the NWPA, the Government was entitled to refuse to dispose of a facility's waste if the facility owner did not sign a Standard Contract. 42 U.S.C. § 10222(b)(2). The failure to execute the Standard Contract would, at a minimum, effectively put a utility out of the nuclear generation business by the end of the nuclear facility's forty-year NRC-issued operating license, if not sooner. RPFF No. 3. Having been originally licensed in 1972, the NWPA's and Standard Contract's January 31, 1998 deadline was significant with respect to the future licensing and operation of Pilgrim. *Id.* If a utility did not execute the Standard Contract, the NRC would be prohibited from granting an extension of its license period. *Id.*

Furthermore, the utility would be unable to fully decommission its site at the termination of operations pursuant to federal, state, and local mandates and standards because it would have no lawful means of removing its SNF from the site. RPFF No. 3. The site could not be put to any other commercial use, thus depriving the utility of the

full use and enjoyment of the property. *Id.* Simply stated, the utility's nuclear operating site would be turned into a long-term, and perhaps permanent, nuclear waste disposal facility, in contravention of clear governmental and public policy. *Id.* Finally, Boston Edison and other nuclear utilities have paid billions of dollars into the Nuclear Waste Fund for DOE to dispose of SNF, *see Alabama Power*, 307 F.3d at 1303, with Boston Edison having contributed in excess of $89 million to the Nuclear Waste Fund. *Id.*

The Government itself recognized the involuntary nature of the Standard Contract in earlier SNF proceedings, where it argued that the Standard Contract should be interpreted as a regulation, not a contract. *See Indiana Michigan*, 57 Fed. Cl. at 94. While the courts in those instances refused to afford DOE regulatory deference in its interpretation of the Standard Contract, some courts did pointed out that elements of the Standard Contract, and its execution, were not voluntary. In *Indiana Michigan*, the Court of Federal Claims acknowledged that the Government "used superior bargaining power to maintain a flexible rate and schedule of fuel acceptance in the Standard Contract." *Id.* The court also noted that "[t]he utilities had little opportunity to negotiate" the Standard Contract despite it being published in the Federal Register for comment. *Id*.

This distinction drawn by the Court also would negate any argument by the Government that participation in the regulatory comment process somehow constituted negotiation of, or voluntary commitment to, the Standard Contract. Thus, the Court should give no credence to any Government argument that Boston Edison voluntarily entered into the Standard Contract simply because there was a regulatory notice and comment process for implementation of the Standard Contract.

### D. Boston Edison Has A Cognizable Takings Claim To Pursue Remedies That Are Not Available Under A Breach Of Contract Claim

Aside from the fact that Boston Edison's takings claim is predicated on rights that exist outside the Standard Contract, such a claim is appropriate to recover certain remedies that are not available under a breach of contract theory. Generally, a takings claim is appropriate where "the government ha[s] taken away the range of remedies associated with the vindication of a contract." *Castle v. United States*, 48 Fed. Cl. 187, 219 (2000), *aff'd in part, rev'd in part, vacated, and remanded,* 301 F.3d 1328 (Fed. Cir. 2002). Over the last several years, the Government has asserted numerous rationales for excusing its failure to perform its obligations under the Standard Contract and has systematically attempted to either eliminate or restrict Boston Edison's full range of remedies. *See Northern States*, 128 F.3d at 759-60 (rejecting Government's attempt to avoid paying damages based on failure to comply with the administrative process of the "Disputes" clause in Standard Contract); *Indiana Michigan*, 88 F.3d at 1273 (rejecting Government's attempt to avoid contractual obligation based on a Federal Register notice claiming Government lacked ability to begin to accept and dispose of SNF by January 31, 1998); *see also Alabama Power*, 307 F.3d at 1312-14 (rejecting Government's settlement agreement with one utility that would have been satisfied by altering payments to the Nuclear Waste Fund). The Government's efforts to further reduce Boston Edison's available remedies are precisely why this Court should allow Boston Edison to pursue its takings and breach of contract claims concurrently. The dismissal of the takings claim now could prevent Boston Edison from receiving its complete and proper remedy. Conversely, allowing both claims to go forward concurrently will have no deleterious effect on the Government.

The defenses discussed above also demonstrate that the Government is taking inherently inconsistent positions that, if adopted by this Court, could leave Boston Edison with no remedy. The Government argues that Boston Edison cannot assert a takings claim because its rights only exist under the Standard Contract while simultaneously arguing that Boston Edison does not have a contract to enforce. This inconsistency, and the potential that Boston Edison could end up not being justly compensated even if it prevails on liability, is another reason to preserve both causes of action.

Further, a takings claim is proper for recovery of damages not otherwise obtainable under a breach of contract claim. For instance, Boston Edison can seek to recover consequential damages through its takings claim. *See Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986). A takings claim also would allow Boston Edison to recover prejudgment interest from the time that the Government took Boston Edison's property, January 31, 1998. *Heydt v. United States*, 38 Fed. Cl. 286, 314-15 (1997). Such relief would not otherwise be available to Boston Edison because the Standard Contract includes no provision for the recovery of interest. *See* 28 U.S.C. § 2516(a).

Similarly, a takings claim is particularly appropriate where a contract does not cover the rights, such as real property rights, regarding some of the property that has been taken. *See Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 152 (2002); *Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 262 (1999) ("[I]n cases where the rights respecting the 'taken' material were not reduced to writing by the parties, both takings and breach claims have been permitted."); *see also Castle*, 48 Fed. Cl. at 218-19 (noting that a plaintiff may plead both claims where a landowner has "rights in the

property separate and distinct from any rights conferred by contract"). In this case, Boston Edison formerly owned the real property on which its nuclear power plant is situated. It is this real property interest (among others) which is separate from the Standard Contract, that has been taken by the Government by forcing Boston Edison to provide storage for the SNF that DOE should have removed. Accordingly, Boston Edison should be permitted to pursue its takings claim.

### E. Boston Edison's Takings Claim May Be Brought Concurrently With Its Breach Of Contract Claim

Contrary to the Government's assertion, Boston Edison's takings claim can be brought concurrently with its breach of contract claim. Substantive law supports the procedural rule that a takings claim and a breach of contract claim may be pled in the alternative. *See Prudential*, 801 F.2d at 1300 n.13 (indicating that plaintiff "may have an alternate avenue of relief under the Takings Clause"); *Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 559-60 (1999) (indicating possibility that plaintiff could "establish facts sufficient to support a Fifth Amendment takings claim as an alternative to its contract claims against the government"). Both this Court as well as the Federal Circuit have reached the same conclusion in other SNF cases and held that takings claims are not presumed to be foreclosed by claims for breach of contract merely because the claims share the same factual background. *See Maine Yankee*, 225 F.3d at 1342; *see also Detroit Edison*, 56 Fed. Cl. 299.

In *Maine Yankee*, the Federal Circuit expressly allowed another utility with a Standard Contract to proceed simultaneously with both its takings and breach of contract claims. *See* 225 F.3d at 1342 ("Our conclusion that Yankee may maintain its breach of contract claim in Count I also results in affirmance of the Court of Federal Claims' denial of the government's motion to dismiss Counts II [breach of duty of good

faith and fair dealing] and III [taking of property without just compensation]."). In fact, the Federal Circuit held that the Government was liable to Maine Yankee at the same time that it held that Maine Yankee's takings claim was similarly cognizable and could be pursued concurrently. *Id.* at 1342-43. Thus, in the very case holding that the Government breached the Standard Contract, the Federal Circuit rejected the Government's present assertion that an SNF plaintiff cannot pursue takings and breach of contract claims concurrently.

In *Detroit Edison*, this Court, presented with facts and a procedural posture similar to this case, re-affirmed the ruling in *Maine Yankee* that a utility may simultaneously bring a claim for an uncompensated taking as well as a claim for a breach of contract. The court held that as "the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right." *Detroit Edison*, 56 Fed. Cl. at 302. The court further held that the "vindication of rights existing independently of the contract at issue cannot be restricted to contractual remedies." *Id*.

The *Detroit Edison* court made clear that a takings claim should not be dismissed prior to the full development of the record. *Id.* at 303. The court found that a more fully developed record would allow it "to assess whether the property right implicated in plaintiff's takings claim falls outside the rights granted under the Standard Contract." *Id*. By allowing it to pursue both claims concurrently, the court acknowledged the right of Detroit Edison to pursue the totality of remedies available, including those not recoverable under a breach of contract claim.

Similarly, in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed Cir. 2003), the Federal Circuit affirmed a plaintiff's right to simultaneously pursue a takings claim and

a breach of contract claim. The Government maintains that the plaintiffs in *Cienega Gardens* were not in privity of contract with the Government, and thus, were allowed to bring a takings claim.[10] This point is not relevant to the present situation because Boston Edison has continually maintained that its takings claim is based upon property rights vested well before the execution of the Standard Contract. In addition, the Government fails to mention that *Cienega Gardens* holds that Government action, short of physical invasion, that restricts the full exercise of property rights is a taking that must be justly compensated under the Fifth Amendment.

Beyond *Maine Yankee, Detroit Edison*, and *Cienega Gardens*, numerous cases, including some that the Government cites in its brief, hold that a breach of contract claim does not foreclose a takings claim. *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34 (1998); *see also Castle*, 48 Fed. Cl. at 217 ("[A] litigant may indeed maintain a takings action even where its rights have been created exclusively by contract."); *Prudential*, 801 F.2d at 1300 n.13 (finding that a lessor may have a takings claim when the scope of the takings claim differs from the breach of contract claim).[11] Based on the foregoing, Boston Edison may maintain takings and breach of contract claims concurrently.

[10] The Government favors the Court of Federal Claims decision in *Allegre Villa v. United States*, 60 Fed. Cl. 11 (2004), dismissing the plaintiff's takings claim because the plaintiff was in privity of contract with the Government, and thus could pursue only a breach of contract claim. The Government's characterization, however, does not completely represent the ruling in *Allegre Villa*. In its decision, the court in *Allegre Villa*, actually cites the Court of Federal Claims's ruling in *Detroit Edison*, *see id.* at 18, which, as previously discussed, holds that a party may simultaneously pursue a takings claim as well as a breach of contract claim.

[11] The Government's sovereign-proprietary capacity distinction is meritless. The Federal Circuit has expressed doubt about the usefulness of analyzing a takings claim based on the sovereign-proprietary dichotomy. *Yuba Goldfields*, 723 F.2d at 889 ("In whatever other context it may be useful, . . . determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis.").

### F. Since Boston Edison Asserts A Taking Independent Of The Standard Contract, The Court's Decision In *Commonwealth Edison* Has No Application Here

*Commonwealth Edison* does not support the Government's argument that Boston Edison's takings claim must be dismissed as a matter of law. In *Commonwealth Edison*, the takings issue was resolved by this Court when it ruled on the Government's motion to dismiss. The court had already ruled that "DOE had breached the Standard Contract by not beginning to accept, transport, and dispose of SNF by the deadline of January 31, 1998." *Commonwealth Edison*, 56 Fed. Cl. at 655. After this ruling, since Commonwealth Edison's takings claim was dependent upon the existence of the Standard Contract, the court found that the plaintiff's rights were enforceable through a contract remedy and dismissed the plaintiff's takings claim. *Id.* at 656. Boston Edison respectfully submits that *Commonwealth Edison* was wrongly decided because the decision is inconsistent with the Federal Circuit's decision in *Maine Yankee.* There, the Federal Circuit affirmed a plaintiff's right to concurrently pursue both takings and breach of contract claims , even after a determination of liability has been made. *See* 225 F.3d at 1342.

Attempting to avail itself of *Commonwealth Edison*, the Government erroneously contends that Boston Edison's takings claim arises exclusively from (and is wholly dependent upon) the existence of the Standard Contract and, therefore, should be dismissed. However, Boston Edison's takings claim relies on duties imposed on the Government in the AEA and the NWPA that are independent of the obligations imposed by the Standard Contract. As such, Boston Edison's takings claim is a separate and distinct cause of action from its breach of contract claim under the Standard

Contract.[12] Additionally, Boston Edison alleges a taking of its property accomplished through over-collection of the 1 mil per kWh fee well in excess of that authorized by the NWPA. As set forth *supra*, Boston Edison had no choice but to pay DOE's unauthorized fees, since satisfaction of all of DOE's fee demands was essential to maintaining Boston Edison's NRC license and preserving Boston Edison's property interests in Pilgrim. Boston Edison's Count III is therefore a classic takings claim. Commonwealth Edison, on the other hand, did not allege the taking of its property through the imposition of excessive fees under color of the NWPA, and Commonwealth Edison was a Standard Contract holder at the time of suit. Because of these and other critical differences between the two cases, *Commonwealth Edison* supplies no basis for the relief sought by the Government.

## III. DOE INTERFERED WITH BOSTON EDISON'S ABILITY TO RECOGNIZE ITS RIGHTS UNDER THE STANDARD CONTRACT, THEREBY VIOLATING ITS DUTY OF GOOD FAITH AND FAIR DEALING

Boston Edison maintains that DOE breached its duty of good faith and fair dealing to Boston Edison by failing to commence disposal of Boston Edison's SNF by the date mandated in the Standard Contract. Am. Compl. ¶ 78. The Government argues that Boston Edison's allegation that DOE breached its duty of good faith and fair dealings is *per se* improper and does not state a claim upon which relief can be granted

[12] *Commonwealth Edison* is also distinguishable from this case. In *Commonwealth Edison,* the court distinguished that case from *Detroit Edison* solely on the basis of its procedural posture. 56 Fed. Cl. at 656 n.8. The court said that "[t]he court in *Detroit Edison* has not yet ruled on the liability of the government under the breach of contract claim. In contrast, defendant in this case has been held liable for partial breach of contract." *Id.* In the present case, which is analogous to the procedural posture of *Detroit Edison*, no determination has been made as to the Government's liability on Boston Edison's breach of contract claim. Thus, in accordance with *Detroit Edison*, and consistent with *Commonwealth Edison*, Boston Edison should be allowed to simultaneously pursue its takings and breach of contract claims.

because that allegation is the same as Boston Edison's breach of contract claim. Motion at 34. Moreover, although it failed to provide Boston Edison with a commitment as to when it would accept that SNF, DOE continued to assess and collect millions of dollars from Boston Edison for the Nuclear Waste Fund.

The Federal Circuit has held that utilities in the SNF cases may maintain a valid cause of action against the Government for violating the duty of good faith and fair dealing. Indeed, in *Maine Yankee*, the Federal Circuit held that the duty of good faith and fair dealing applies to the Standard Contract. 225 F.3d at 1342; *see also Northern States*, 224 F.3d at 1367. As Boston Edison was a signatory to a Standard Contract with virtually identical terms as Maine Yankee's, and was also a Standard Contract holder at the time of the breach, it is similarly entitled to pursue its claim that the Government breached its duty of good faith and fair dealing.

*Maine Yankee* and *Northern States* are consistent with the Restatement of Contracts § 205, which states that beyond the stated contractual obligations, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." This principle has been confirmed by the U.S. Court of Federal Claims in many other cases. In *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001), for example, the court held that "[a]ll contracts, including government contracts, contain an implied covenant of good faith and fair dealing." Indeed,

> [t]he need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement. "It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government."

*Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). The duty of

good faith and fair dealing protects against the unique ability of the Government to invoke its sovereign right and render any contract illusory at the will of the Government. *See Temple-Inland, Inc. v. United States*, 59 Fed. Cl. 550, 559 (2004).

The Government contends that DOE's alleged acts do not give rise to a violation of the duty of good faith and fair dealing and that, to overcome the presumption that DOE acted in good faith, Boston Edison must provide "clear and convincing" evidence that DOE acted in "bad faith." Motion at 35. The clear and convincing standard, however, hardly insulates the Government from liability. The "clear and convincing" standard requires evidence that the truth of the factual contention is "highly probable"; it does not require proof "beyond a reasonable doubt." *See Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993). Indeed, the Government has been found liable for violating its duty of good faith and fair dealing on many occasions. *See, e.g., Coast-to-Coast Fin. Corp. v. United States*, 52 Fed. Cl. 352, 362 (2002); *see also Temple-Inland*, 59 Fed. Cl. at 559; *Centex*, 49 Fed. Cl. at 708.

Courts have emphasized that to fulfill its duty of good faith and fair dealing, the Government must perform consistent with the mutual expectations of the parties and the purpose of the contract. *See Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-67 (2001) (Government's contractual discretion is subject to implied duty of good faith, which allows courts to monitor how a promise is performed so that it is consistent with the expectations of the contracting party); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 170 (3d Cir. 2001) (even where contract affords one party discretion, duty of good faith and fair dealing protects parties' reasonable expectations and right to receive fruits of the contract).

The determination of whether the Government's conduct rises to the level of "bad faith" is necessarily fact-specific. The Restatement's comments, however, contain a helpful description of the kinds of conduct that are considered "bad faith":

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt *or may consist of inaction*, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: *evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance*.

Restatement of Contracts § 205 cmt. d (emphasis added).

Consistent with these comments, DOE's actions and inactions have demonstrated that the Government did not act in good faith. Through its failure to begin acceptance of SNF from its nuclear facility, DOE interfered with Boston Edison's ability to fully realize the benefits of the Standard Contract. DOE's actions were not a mere accident. DOE evaded the spirit of the Standard Contract, knowing for years that it was not going to be able to uphold its end of the bargain, and yet still affirmatively and publicly maintaining that January 31, 1998 was a viable date for SNF acceptance and removal. RPFF No. 22. Even as the date approached and it was clear that DOE was not going to be able to meet its contractual obligation, DOE continued to collect Boston Edison's fee but took no action to alter the contract or relieve Boston Edison from its contractual obligations. Boston Edison has timely fulfilled all of its obligations under the Standard Contract, including paying in excess of $89 million into the Nuclear Waste Fund. *Id.* DOE, however, failed to reciprocate.

DOE's conduct clearly demonstrates that it breached its duty of good faith and fair dealing to Boston Edison by acting in a manner that was inconsistent with the

mutual expectations of the parties and the purpose of the Standard Contract. For example, in 1987, just four years after executing the Standard Contract with Boston Edison, DOE took the position that 1998 was no longer a viable date for the opening of a permanent SNF repository and that the new date would be 2003. RPFF No. 2.

Subsequently, in 1990, DOE advised that it would no longer be able to have a permanent repository functioning by 2003. RPFF No. 2. By then, DOE's revised deadline for a permanent repository had slipped to 2010. *Id.* DOE made no further mention of an interim or temporary SNF storage solution. In spite of these announcements, DOE continued to require utilities, including Boston Edison, to participate in the DCS process even though that process assumed that DOE would begin acceptance of SNF by January 31, 1998. *Id.*

DOE also continued (and continues to this date) to disregard limitations imposed by the NWPA on its authority to assess Nuclear Waste Fund fees, which has resulted in the collection of at least $15 billion more than DOE spent on activities to fulfill its disposal obligations prior to the January 31, 1998 deadline. RPFF No. 2. This fund surplus is significant, particularly when one considers that the NWPA requires the Secretary of Energy to annually submit to Congress a report on the status of the Nuclear Waste Fund balance and recommendations on whether to raise or lower the fee to ensure that the fund is neither under nor over-collected. *Id.* Despite the fund's massive surplus, the Secretary of Energy has never proposed an adjustment to the fee.

DOE has failed to meet its statutory and contractual mandate to remove Boston Edison's SNF, misled Boston Edison as to its intentions, and sought to evade its responsibilities at every turn. Under these circumstances, Boston Edison should be permitted to maintain its breach of the duty of good faith and fair dealing claim.

Accordingly, the Government's Motion to dismiss Count III of Boston Edison's Amended Complaint should be denied.

## IV. CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Pursuant to RCFC 56, Boston Edison respectfully requests that the Court enter summary judgment against the Government on the issue of liability for breach of contract pursuant to Count I of the Amended Complaint. There are no material facts in dispute with regard to the Government's obligation to begin accepting SNF for disposal by the Standard Contract's January 31, 1998 deadline, or the Government's failure to comply with that obligation. Accordingly, Boston Edison is entitled to judgment as a matter of law on the issue of liability for breach of contract.

Boston Edison has met the necessary prerequisites for a determination of liability against the Government. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Seal-Flex, Inc. v. Athletic Track & Ct. Constr.*, 98 F.3d 1318, 1321 (Fed. Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *High Star Toy, Inc. v. United States*, 32 Fed. Cl. 176, 180 (1994) (disputes of law resolved by use of summary judgment when facts are clear). Generally, to recover contract damages, a party must establish four factors: (1) a valid contract between the parties; (2) a duty or obligation arising out of the contract; (3) a breach of that duty; and (4) damages caused by that breach. *See San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Boston Edison has satisfied each of these elements.

It is undisputed that on or about June 17, 1983 Boston Edison and the Government entered into a valid Standard Contract for disposal of SNF. Am. Compl. ¶ 31; DPFF No. 28; PFF No. 2. It is also undisputed that the Government had a clear obligation to begin acceptance of SNF by January 31,1998 and that the Government breached that obligation. 42 U.S.C. § 10222(a)(5); Standard Contract, 10 C.F.R. § 961.11, Art. II; PFF No. 7. Indeed, every court that has considered the matter has concluded that the NWPA and the Standard Contract imposed an obligation on the Government to begin removal of SNF by January 31, 1998 and that the Government failed to meet that obligation. For example, the D.C. Circuit stated:

> We held in *Indiana Michigan* that the NWPA imposes an unconditional obligation, memorialized in the Standard Contract, to begin disposing of the materials by January 31, 1998. We rejected the Department's attempt to water-down its obligations, finding that DOE's interpretation would "destroy[] the *quid pro quo* created by Congress" and would mean that the payment of fees into the Nuclear Waste Fund "was for nothing." 88 F.3d at 1276. To effectuate DOE's duty, as we recognized in *Indiana Michigan*, petitioners must be able to enforce the terms of the contract in a meaningful way. Petitioners' ability to enforce the contract would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE "without qualification or condition."

*Northern States,* 128 F.3d at 759; PFF Nos. 6-8; *see also Indiana Michigan,* 88 F.3d at 1276 ("Under the plain language of the statute, the utilities anticipated paying fees 'in return for [which] the Secretary' had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain."). The D.C. Circuit concluded that "section 302(a)(5)(B) [of the NWPA] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF *no later than* January 31, 1998." *Indiana Michigan*, 88 F.3d at 1277 (emphasis added); *see also* PFF No. 9.

The Federal Circuit endorsed the D.C. Circuit's interpretation of the Standard Contract and the Government's breach in three key decisions. In *Maine Yankee*, the Federal Circuit held that DOE's failure to begin disposal of SNF by January 31, 1998 constituted a breach of contract. 225 F.3d at 1343; *see also* PFF Nos. 4-5, 11-12. Citing the D.C. Circuit's holdings in *Indiana Michigan* and *Northern States,* the Federal Circuit affirmed the decision of the lower court that "the Department was obligated 'without qualification or condition' to begin disposing of the nuclear waste by January 31, 1998" and that failure to begin disposal by that date constituted a breach. *Id.* at 1338-40 (also citing *Yankee Atomic*, 42 Fed. Cl. at 235). Indeed, the Federal Circuit extended its decision beyond the three utility plaintiffs before it and held that "[t]he breach involved *all* the utilities that had signed the contract – *the entire nuclear electric industry.*" *Id.* at 1342 (emphasis added); PFF No. 12.

In *Northern States* and *Roedler*, the Federal Circuit re-affirmed its decision in *Maine Yankee.* In *Northern States*, the Federal Circuit held:

> On the merits, our opinion in *Maine Yankee* fully explains why we have concluded that the utilities may maintain their damage suit, and we need not repeat that discussion here. In brief, we hold that the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

224 F.3d at 1367; PFF Nos. 6-8. Similarly, in *Roedler*, the Federal Circuit held:

> In *Indiana Michigan Power Co. v. Department of Energy* . . . and *Northern States Power Co. v. Department of Energy* . . . the District of Columbia Circuit held that the government's failure to meet this deadline was a breach of contract. This ruling led to further litigation in which the utility companies seek damages in the Court of Federal Claims. Appellate rulings in various threshold issues appear at *Maine Yankee Atomic Power Co. v. United States.* . . . and *Northern States Power Co. v. United States* . . . .

255 F.3d at 1350 (citations omitted). The U.S. Court of Federal Claims also has repeatedly held that the Government had a duty to commence disposal of SNF by January 31, 1998 and that the Government breached that duty. *Maine Yankee*, 42 Fed. Cl. 582; *Detroit Edison*, 56 Fed. Cl. 299; *Indiana Michigan*, 57 Fed. Cl. 88; *Florida Power*, 56 Fed. Cl. 555; *Connecticut Yankee*, 42 Fed. Cl. 448; *Tennessee Valley Authority*, 60 Fed. Cl. 665.

Finally, notwithstanding the Government's contorted DCS argument, there is no legitimate dispute that Boston Edison has been damaged as a result of the Government's breach of the Standard Contract. PFF No. 15. The Government argues that there was no breach of the Standard Contract because it did not have an obligation to remove SNF from Pilgrim until the date specified in Boston Edison's DCS. As discussed in Section I *supra*, however, the Government's DCS argument is without merit and flies in the face of the unambiguous language of the NWPA and the Standard Contract. Every court that has considered the matter has found that the breach occurred on January 31, 1998 – including two decisions by the U.S. Court of Appeals for the District of Columbia Circuit, two decisions of the U.S. Court of Appeals for the Federal Circuit, and at least three decisions of this Court. *See Commonwealth Edison*, 56 Fed. Cl. 652; *Yankee Atomic*, No. 98-126C; *Southern Nuclear Operating*, No. 98-614C. Certain of the specific damages incurred by Boston Edison are described in the Lubbock Affidavit. App. at 2-6.

Based on the foregoing, Boston Edison respectfully requests that the Court enter summary judgment against the Government on liability for breach of contract pursuant to Count I of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Boston Edison respectfully requests that the Court deny the Government's Motion on Counts I to III of the Amended Complaint and grant Boston Edison's cross-motion for summary judgment regarding liability for breach of contract pursuant to Count I of the Amended Complaint.

Date: July 9, 2004

Respectfully submitted,

s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffrey P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street
17th Floor
Boston, MA 02199-0228