IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BOSTON EDISON COMPANY<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendants. | No. 99-447C<br>(Judge Lettow) |

**PLAINTIFF BOSTON EDISON COMPANY'S RESPONSE**
**TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

**Boston Edison's Response No. 1:** Plaintiff, Boston Edison Company ("Boston Edison") disputes Defendant's, the United States of America (the "Government") first proposed finding of uncontroverted fact. The Government's characterization of the Department of Energy's ("DOE") responsibility for the disposal of SNF and HLW, and the generator's cost responsibility for interim storage and disposal is incomplete. First, the Government's solution to the nuclear waste problem was first addressed, not by the NWPA, but by the enactment of the Atomic Energy Act ("AEA") in 1954, where the federal Government recognized its sovereign obligation to provide for the lawful and

permanent disposal of the wastes of nuclear power generation. *See* Pub. L. No. 83-703, 1954 U.S.C.C.A.N. 1076. As Congress found in the legislative history of the NWPA:

> Responsibility for the final disposition of the nuclear waste has been lodged solely with the federal government because of the waste's hazardous nature. Various types of nuclear waste remain radioactive for periods of time ranging from several hundred years to several hundred thousand. Since it cannot be "disposed of" in the sense that a biodegradable product can, disposal must consist of permanent and isolated storage, generally in deep geologic formations. Therefore, when the Atomic Energy Act of 1954 (Public Law 83-703) authorized commercial development of nuclear energy, the federal government indicated it would control such potentially dangerous materials by mandating that disposal occur on federal land. In 1970, with Regulation 10CFR50, the federal government formally accepted full responsibility for providing a final repository.

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. On Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper). As this legislative history shows, an official Government policy statement that long predates the NWPA, and remains current to this day, provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." *Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities*, 10 C.F.R. pt. 50, App. F, ¶ 3. Further, through previously enacted legislation, the Government prohibited nuclear utilities from further reprocessing of their nuclear waste. Appendix to Boston Edison Company's Brief in Response to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment Upon

Counts I and II and for Summary Judgment Upon Count III of Plaintiff's Amended Complaint and Cross-Motion for Summary Judgment on Liability Regarding Count I of the Amended Complaint ("App.") at 2.

Government experts who have testified previously in parallel SNF proceedings have corroborated this legislative history. For example, Michael Lawrence, DOE's Acting Assistant Secretary for Defense Programs in 1983, testified that "through the Atomic Energy Act, . . . the Department . . . had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so." App. at 11. Similarly, Benard C. Rusche, Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM") in 1984, testified that "[f]rom the beginning of the Atomic Age, it has been a given that the Federal Government has the responsibility for eventual disposal of high level radioactive wastes and spent fuel." *Id.* at 16, 23. Robert Morgan, Acting Director of OCRWM in October 1983, also testified that the federal Government has had responsibility for the disposition of SNF since the AEA was enacted in 1954. *Id.* at 31-33, 36.

Congress's stated concern in passing the NWPA was protecting the nation against specific health and safety issues arising from (a) SNF generated by commercial nuclear reactors; and (b) radioactive waste from SNF reprocessing, medical applications involving nuclear material, as well as other sources of nuclear waste. 42 U.S.C. § 10131(a)(2). The NWPA provided that the generators' cost responsibility was for a specific timeframe within which DOE was obligated to perform disposal functions. The NWPA specifies that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility

to pay the costs of, the interim storage of such waste and spent fuel *until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter*." *Id.* § 10131(a)(5) (emphasis added). The referenced provisions required that such acceptance was to occur "*not later than* January, 31,1998." *Id.* § 10222(a)(5)(B) (emphasis added). The provisions of the NWPA pertaining to cost responsibility for interim storage and disposal occurring in accordance with the requirements of the NWPA. This includes the requirements of the NWPA that permanent disposal occur no later than January 31, 1998, and that the facilities necessary to accomplish such statutorily-mandated activity be in existence and operational by the specified deadline. Cost responsibility for activities occurring after the deadline – and thus not conducted in accordance with explicit and integral requirements of the NWPA – were expressly not assigned to generators.

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing:

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. at§ 10131(b).

**Boston Edison's Response No. 2:** Boston Edison disputes the Government's second proposed finding of uncontroverted fact. The references relied upon and cited by the Government do not accurately reflect the intent of Congress as mandated by the

NWPA. Specifically, the NWPA provides that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel *until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter.*" 42 U.S.C. § 10131(a)(5) (emphasis added). Congress also found that, "in return for the payment of fees [into the waste fund] established by this section, the Secretary, *beginning not later than* January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel." *Id.* § 10222(a)(5)(B) (emphasis added)

Over time, DOE altered the timetable as well as the utilities' obligations established under the NWPA. For example, in 1987, just four years after executing the Standard Contract with Boston Edison, DOE took the position that 1998 was no longer a viable date for the opening of a permanent SNF repository and that the new date would be 2003. App. at 41. Subsequently, in 1990, DOE advised that it would no longer be able to have a permanent repository functioning by 2003. By then, DOE's revised deadline for a permanent repository had slipped to 2010. *Id.* at 48. In spite of these announcements, DOE continued to require utilities, including Boston Edison, to participate in the delivery commitment schedule ("DCS") process even though that process assumed that DOE would begin acceptance of SNF by January 31, 1998. DOE also continued (and continues to this date) to assess Nuclear Waste Fund fees which (as of September 2003) has resulted in the collection of nearly $15 billion more than DOE had spent on the development and construction of an SNF repository. *Id.* The NWPA only authorizes the collection of funds from generators as necessary for pursuit of a waste program that achieves disposal of SNF and HLW in a repository beginning no later than January 31, 1998. 42 U.S.C. § 10222(a)(5)(B). The NWPA also requires the

Secretary of Energy to annually submit to Congress a report on the status of the Nuclear Waste Fund balance and recommendations on whether to raise or lower the fee in order to ensure that the fund is neither over- nor under-collected. *Id.* § 10222(a)(4). The Secretary of Energy has never proposed an adjustment to the fee prior to the deadline by which permanent disposal of SNF and HLW at a repository was to begin, or at any other time.

3. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(l) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:

> (a) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and (b) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31,1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5).

**Boston Edison's Response No. 3:** Boston Edison disputes the Government's third proposed finding of uncontroverted fact. The Standard Contract was to provide for the payment of fees by utilities sufficient to offset the costs associated with DOE's authorized SNF-related expenditures. Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, § 302(a), 96 Stat. 2201, 2257 (1982). Further, the notion that the Standard Contract was entered into "voluntarily" is disingenuous because contract was mandated by the NWPA. The NWPA required that Boston Edison (and the other nuclear utilities) enter into a contract committing to use DOE as the singular entity for the disposal of its SNF.

The failure to execute the Standard Contract would, at a minimum, effectively put a utility out of the nuclear generation business by the end of the nuclear facilities' forty-year Nuclear Regulatory Commission ("NRC")-issued operating license, if not sooner. App. at 2. Having been originally licensed in 1972, the NWPA's and the Standard Contract's January 31, 1998 deadline was of keen significance with respect to the future licensing and operation of the Pilgrim facility. *Id.* If a utility did not execute the Standard Contract, the NRC was prohibited from granting license renewal or extension of the license period. *See* 42 U.S.C. § 10222(b). Furthermore, the utility would be unable to fully decommission its site at the termination of operations pursuant to federal, state, and local mandates and standards because it would have no lawful means of removing its SNF from the site. App. at 2. The site could not be put to any other commercial use, thus depriving the utility of the full use and enjoyment of the property. Simply stated, the utility's nuclear operating site would be turned into a long-term, and perhaps permanent, nuclear waste disposal facility, in contravention of clear governmental and public policy.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. <u>The Proposed Rule</u>

4. On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

**Boston Edison's Response No. 4:** Boston Edison does not dispute the Government's fourth proposed finding of uncontroverted fact.

5. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

**Boston Edison's Response No. 5:** Boston Edison disputes the Government's fifth proposed finding of uncontroverted fact. The NWPA specified that the Secretary of Energy is to conduct an annual review of the fees collected pursuant to the program in order to determine whether such fees were appropriate for the cost of a statutorily compliant repository program, in particular, a program providing for repository disposal beginning no later than January 31, 1998, and to propose such adjustment to the level of the fees, either up or down, to ensure that the fund is in balance with the level of expenditures required to comply with the NWPA. 42 U.S.C. § 10222(a)(4). Not once during the more than fifteen years of fee payments authorized by the NWPA did the Secretary of Energy seek to "adjust" the aforementioned fee payments to reflect the correlation of the fee payment receipts with actual expenditures being made or necessary to complete the repository required by the NWPA, which was a repository that was sited, licensed, constructed, and in operation so as to receive SNF for disposal by at least January 31, 1998. *Id.* § 10222(a)(5)(B). Moreover, the Government continued insisting on fee payments beyond the time period and in excess of that which was authorized by the NWPA, and notwithstanding its failure to commence disposal activities as required by the statute. The Government's ongoing program of fee

collections resulted (as of September 2003) in a funding surplus of nearly $15 billion. Boston Edison paid in excess of $89 million into the nuclear waste fund as required by the Standard Contract. App. at 2. This amount constitutes Boston Edison's entire contractual obligation to pay Nuclear Waste Fund fees. *Id.* Boston Edison also incorporates herein its Response No. 2 *supra*.

6. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities') can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;
>
> (b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).

**Boston Edison's Response No. 6:** Boston Edison disputes the Government's sixth proposed finding of uncontroverted fact. The Standard Contract does not provide

"a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted." Neither the proposed nor the final Standard Contract contains any reference to a specific rate of acceptance. *See Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*, Notice of Proposed Rulemaking, 48 Fed. Reg. 5458, 5463-64, Arts V.B.6, VI.B.3 (Feb. 4,1983); Standard Contract, 10 C.F.R. § 961.11, Arts. IV.B.5(a), VI.B.1. Further, Boston Edison, as a seller of its nuclear facility following the Government's breach of its obligation to commence SNF disposal by a date certain, does not rely on a "rate of acceptance" analysis in its damages case against the Government. Accordingly, the Government's sixth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages for the Government's breach in the present case.

7. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6).

**Boston Edison's Response No. 7:** Boston Edison does not dispute the Government's seventh proposed finding of uncontroverted fact. However, the Government's seventh proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

8. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . <u>The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below</u>. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV-Delivery of SNF and/or HLW-* Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

**Boston Edison's Response No. 8:** Boston Edison disputes the Government's eighth proposed finding of uncontroverted fact. The Government's characterization of the material quoted as establishing a contractually binding or similar "obligation" is incorrect. No such obligation exists. Moreover, the "rate of acceptance" issues identified in the Government's eighth proposed finding of uncontroverted fact are not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

9. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or -

> 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

**Boston Edison's Response No. 9:** Boston Edison disputes the Government's ninth proposed finding of uncontroverted fact. The DCS-related provisions in both the proposed and final versions of the Standard Contract *did not* establish a contractually binding rate of acceptance. *See* 48 Fed. Reg. at 5463, Art. IV.B; Standard Contract, 10 C.F.R. § 961.11, Art. V.B. Furthermore, the definition of "Delivery Commitment" did not appear in the final version of the Standard Contract published in the Federal Register on April 18, 1983 and Article IV.B as quoted by the Government. *Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*, Final Rule, 48 Fed. Reg. 16590 (Apr. 18, 1983). Further, notwithstanding its later DCS date, the Standard Contract permitted Boston Edison to exchange its DCS position with other utilities beginning on January 31, 1998. Standard Contract, 10 C.F.R. § 961.11, Art. V.E. This contractual mechanism allowed utilities to develop "SNF put option trading" – an industry market that permitted utilities to use, trade, or sell queue positions in exchange for millions of dollars. App. at 56-58. Indeed, the Government actively encouraged utilities, including Boston Edison, to engage in this trading process, noting that "the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department [of Energy]." *Id.* at 67. Boston Edison also incorporates herein its Response No. 8 *supra*. Finally, to the extent that DCS provisions are being cited for "rate of acceptance" purposes, the issues identified in the Government's ninth proposed finding of uncontroverted fact are not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

10. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules, which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

**Boston Edison's Response No. 10:** Boston Edison disputes the Government's tenth proposed finding of uncontroverted fact. The amount listed on the DCS was merely a reflection of the Annual Capacity Report ("ACR"), which both the ACR and the Standard Contract said were non-binding. Standard Contract, 10 C.F.R. § 961.11, Art. IV.B.5.b; App. at 97. Additionally, Boston Edison incorporates herein its Response No. 9 *supra*. Finally, to the extent that DCS provisions are being cited for "rate of acceptance" purposes, the issues identified in the Government's tenth proposed finding of uncontroverted fact are not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

11. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

**Boston Edison's Response No. 11:** Boston Edison does not dispute the Government's eleventh proposed finding of uncontroverted fact.

**B. Comments Upon The Proposed Rule**

12. DOE received numerous comments in response to the proposed rule. One commenter, Northern States Power Company, stated that "[t]he context of the contract is inverted." A. 38 (emphasis in original). The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." A. 38.

**Boston Edison's Response No. 12:** Boston Edison disputes the Government's twelfth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. Assuming that the comments are relevant, the Government fails to mention the totality of comments received. In fact, during the public comment process, numerous utilities noted the importance of the January 31, 1998 performance date.

> [S]even commenters addressed the question of DOE performance standards and Purchaser remedies with respect to performance. In essence, these commenters pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, these commenters say, the contract provides no specific remedies against DOE for failing to meet the date. DOE has considered this comment and the suggestion that suitable language be included in the contract, but has decided not to adopt the recommended modification.

48 Fed. Reg. at 16,598. Thus, as early as 1983, the Government was aware that multiple members of the nuclear industry viewed January 31, 1998 as the *single date* by which the Government's performance would be gauged. *Id.*

13. Another commenter, Public Service Company of Colorado, stated that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months." A. 51 (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.

**Boston Edison's Response No. 13:** Boston Edison disputes the Government's thirteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

14. Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, suggested that the "definition of 'Delivery Commitment' (Article I.7) is unnecessary and should be deleted," since the term "'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. A. 6.

**Boston Edison's Response No. 14:** Boston Edison disputes the Government's fourteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the

non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

15. Another commenter requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract <u>commitment</u> or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." A. 108 (emphasis added); <u>see</u> A. 120 (Comments (after Georgia Power), at 1).

**Boston Edison's Response No. 15:** Boston Edison disputes the Government's fifteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

16. Another commenter, Northeast Utilities, recognized that, in the proposed rule, "DOE is requiring that utilities <u>firm</u> their delivery commitment five years prior to delivery and allows only minor changes within that five year period." A. 73 (emphasis added).

**Boston Edison's Response No. 16:** Boston Edison disputes the Government's sixteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal

determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

17. Another commenter, Mississippi Power & Light Company, stated as follows in its comments:

> Article I, Definition 7 - The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: ". . . within a specified year, <u>and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B</u>."

A. 85 (emphasis in original).

**Boston Edison's Response No. 17:** Boston Edison disputes the Government's seventeenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

18. Yet another commenter suggested that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his <u>commitment</u> should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." A. 106 (emphasis added); <u>see</u> A. 116 ("[i]t should not be necessary to submit firm (within + or - 20%) commitment schedules sixty-three (63) months prior to the delivery date").

**Boston Edison's Response No. 18:** Boston Edison disputes the Government's eighteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, while the Government has not identified the entity responsible for the comment referenced therein, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

19. Another commenter, Cleveland Electric Illuminating Company, requested that the "Delivery Commitment Schedule" be changed "for the sake of additional clarification" to "Preliminary Delivery Commitment Schedule." A. 53, 55.

**Boston Edison's Response No. 19:** Boston Edison disputes the Government's nineteenth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

20. In their comments to the proposed rule, EEI and UNWMG recognized the importance of having DOE receive Delivery Commitment Schedules from all contract holders for a given year:

> If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment

> schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.

A. 11.

**Boston Edison's Response No. 20:** Boston Edison disputes the Government's twentieth proposed finding of uncontroverted fact. Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

21. Many commenters suggested a contract change to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, "the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule." A. 25; see A. 44; A. 46; A. 100-01; A. 53; A. 86.

**Boston Edison's Response No. 21:** Boston Edison disputes the Government's twenty-first proposed finding of uncontroverted fact. DOE's citation to A.25 does not support the Government's assertion that utilities commented as quoted above. A.25 of the Government's appendix appears to bear no relation to the comments noted above. Plaintiff also disagrees with the Government's characterization of there being "many commenters." Comments to the proposed rule are not relevant to the extent that the Standard Contract is unambiguous regarding the non-binding nature of the DCS process. Additionally, the proposed finding is not relevant in that the comment cited was not made by Boston Edison, nor is it relevant to a legal determination of liability or

damages arising from the Government's breach in the present case. To the extent that comments are relevant, Boston Edison incorporates herein its Response No. 12 *supra*.

**C. The Final Rule**

22. On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31.1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel

> and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added). As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article 1.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

**Boston Edison's Response No. 22:** Boston Edison disputes the Government's twenty-second proposed finding of uncontroverted fact. The NWPA mandated that the Standard Contract contain a clause that required the commencement of disposal of SNF by January 31, 1998, and the NWPA required such disposal to take place at a repository. 42 U.S.C. § 10222(a)(5)(B); *see also* Standard Contract, 10 C.F.R. 961.11, Art. II. The final version of the Standard Contract defines the "services" to be provided by DOE under the contract as the "disposal" of SNF. Standard Contract, 10 C.F.R. § 961.11, Art. I(8). Those same "disposal" "services" are required by Article II of the Standard Contract to commence not later than January 31, 1998. *Id.* Art. II. Contrary to the Government's suggestion, the Standard Contract *does not* condition DOE's obligation to begin acceptance and disposal of SNF by January 31, 1998 upon the operational status of a disposal facility. *Id.* The textual changes made between the proposed rule and the final rule did not alter the statutory requirements of the NWPA. Beyond the Standard Contract, DOE's actions demonstrate that it evaded the spirit of the bargain, knowing for years that it was not going to be able to uphold its end of the bargain. *See* Boston

Edison's Response No. 2 *supra*. Yet DOE still affirmatively and publicly maintained that January 31, 1998 was a viable date for SNF acceptance and removal. *Id.* Even as the date approached and it was clear that DOE was not going to be able to meet its contractual obligation, DOE continued to collect Boston Edison's fee but took no action to alter the contract or relieve Boston Edison from its contractual obligations. *Id.* Shortly after the date had passed, DOE announced that it would continue to collect fees from Standard Contract holders through at least 2020, all the while being unable to state when, if ever, it would meet its contractual obligations. App. at 68-71. Boston Edison timely fulfilled all of its obligations under the Standard Contract, including paying more than $89 million into the Nuclear Waste Fund. *Id.* at 2.

23. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.l, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

**Boston Edison's Response No. 23:** Boston Edison does not dispute the Government's twenty-third proposed finding of uncontroverted fact. However, the Government's twenty-third proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case. Boston Edison also incorporates herein its Response No. 9 *supra*.

24. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b.

**Boston Edison's Response No. 24:** Boston Edison disputes the Government's twenty-fourth proposed finding of uncontroverted fact. The Standard Contract expressly states that the ACRs are for "planning purposes" and that the ACRs themselves, when issued, explicitly state that they are not binding on either party. Standard Contract, 10 C.F.R. § 961.11, Art. IV.B.5.b; App. at 97. The Standard Contract does not vest DOE with the discretion to use the ACR to "define" or "set" the rate of acceptance under the Standard Contract. *Id.* Robert Morgan testified on behalf of the DOE by way of deposition in the coordinated discovery phase of the early SNF cases that the ACR provision was added solely because of utility requests for "planning purposes," and that the ACR was not intended for any purpose other than planning. App. at 72-74. Additionally, David K. Zabransky, a DOE contracting officer, testified that the level set in the 1995 ACR was published for the express purpose of limiting DOE's exposure for breach of contract claims by setting an artificially low acceptance rate. *Id.* at 75-76. Finally, the Government's twenty-fourth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

25. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided,

DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article 1.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 annual capacity report ("ACR") and acceptance priority ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. <u>After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1. 1992 the Purchaser shall submit to DOE the delivery commitment scheduler(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter</u>. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added). Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE required to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id

**Boston Edison's Response No. 25:** Boston Edison disputes the Government's twenty-fifth proposed finding of uncontroverted fact. The Standard Contract does not contain or reference a contractual rate of acceptance. The Standard Contract provides that utilities could submit a DCS for any amount of SNF that they wished to deliver to DOE, *see* Standard Contract, 10 C.F.R. § 961.11, Art. V.B.1. and that each Standard Contract holder could vary its DCS by as much as 20% annually, *see id.* Art. V.B.2. The Instructions to the Standard Contract made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five years. Instead, the utilities were asked to submit only a non-restrictive date range of when the SNF they planned to provide had been (or would be) removed from reactors. The DOE official in charge of the DCS program testified that the DCS submissions "were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them." App. at 79. When asked in her experience if she know of anyone in DOE or the industry who thought that the DCSs were binding on either party, she replied "No, I don't." *Id*. Ms. Slater-Thompson's supervisor and the head of DOE's SNF waste acceptance and scheduling office, Alan Brownstein, also testified that the DCSs were for planning purposes only. *Id.* at 82. Lake Barrett, who began working on the SNF program in 1985 and served as the Acting Deputy Director of OCRWM from 1993 to 2002, testified that the DCS were "administrative" and did not matter to him in his responsibilities over the SNF program. *Id.* at 85. Boston Edison also incorporates herein its Response No. 9 *supra*.

26. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt, hi the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

**Boston Edison's Response No. 26:** Boston Edison does not dispute the Government's twenty-sixth proposed finding of uncontroverted fact. However, the Government's twenty-sixth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case. Boston Edison also incorporates herein its Response No. 9 *supra*.

27. Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

**Boston Edison's Response No. 27:** Boston Edison does not dispute the Government's twenty-seventh proposed finding of uncontroverted fact.

## III. BOSTON EDISON'S EXECUTION OF ITS STANDARD CONTRACT

28. On June 17, 1983, Boston Edison Company executed its Standard Contract with DOE. See Complaint, ¶ 9; Amend. Complaint, ¶ 31. Boston Edison's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983, 10 C.F.R. § 961.11. A265.

**Boston Edison's Response No. 28:** Boston Edison does not dispute the Government's twenty-eighth proposed finding of uncontroverted fact.

## IV. DOE'S ISSUANCE OF THE 1987 MISSION PLAN AMENDMENT

29. In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).

**Boston Edison's Response No. 29:** Boston Edison does not dispute the Government's twenty-ninth proposed finding of uncontroverted fact.

30. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE noted the importance of the Annual Capacity Report that would be issued in 1991, which would provide the basis for the submission of DCSs:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1. 1992. the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

A. 207 (emphasis added).

**Boston Edison's Response No. 30:** Boston Edison disputes the Government's thirtieth proposed finding of uncontroverted fact. The Acceptance Priority Ranking ("APR") *does not* establish the rate of SNF acceptance; it is merely a list of fuel assemblies discharged by reactors ranked by date of discharge. *See* Standard Contract, 10 C.F.R. § 961.11, Art. IV.B.5(a); App. at 86-87. The 1991 APR published by DOE merely indicates the order among utilities in which SNF will be removed, subject to exchanges between utilities. *Id.* at 90. The APR says *nothing* about the rate at which DOE will accept SNF. *Id.* Boston Edison also incorporates herein its Response No. 9 *supra*. Moreover, the Government's thirtieth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

## V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

31. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." DOE's ACRs expressly stated that "the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." A. 210, 212, 216. Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992. based on this priority ranking, the Purchasers will submit to DOE for approval. Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMSV Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

A. 210, 213, 216 (emphasis added).

**Boston Edison's Response No. 31:** Boston Edison does not dispute the Government's thirty-first proposed finding of uncontroverted fact.

32. In 1995, DOE issued a combined Acceptance Priority Ranking and Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." A. 236. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |

| | |
|---|---|
| Year 10 | <u>900</u> |
| TOTAL | 8,200 |

A. 239; <u>see</u> A. 224-233. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. . . . The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

A. 238-39. The 1995 ACR further provided that "[t]hese capacity allocations, as listed in the ACR. form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." A. 236 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." A. 236.

**Boston Edison's Response No. 32:** Boston Edison disputes the Government's thirty-second proposed finding of uncontroverted fact. Boston Edison incorporates herein its Response No. 24 *supra*.

## VI. BOSTON EDISON'S SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

33. On May 11,1992, the DOE contracting officer issued a letter to each of the contract holders, along with instructions for the submission of DCSs. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." <u>See</u>, <u>e.g.</u>, A. 143-52, 153-62, 163-72. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." A. 145, 155, 165. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." A. 145, 155, 165. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that

allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

**Boston Edison's Response No. 33:** Boston Edison disputes the Government's thirty-third proposed finding of uncontroverted fact. Boston Edison incorporates herein its Response Nos. 2, 22, and 24 *supra*. Moreover, the Government's thirty-third proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

34. On or about December 6, 1993, DOE approved a DCS that Boston Edison had submitted for acceptance of 3.88 MTU of SNF between January 31,1999, and January 30, 2000. A. 253-54. Through its approval of this DCS, DOE agreed to accept 3.88 MTU of SNF from Boston at some point in time between January 31, 1999, and January 30, 2000.

**Boston Edison's Response No. 34:** Boston Edison disputes the Government's thirty-fourth proposed finding of uncontroverted fact. Boston Edison also incorporates herein its Response No. 9 *supra*. Moreover, the Government's thirty-fourth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

35. On or about January 18, 1995, DOE approved a DCS that Boston Edison had submitted for acceptance of 25.42 MTU of SNF between January 31, 2000, and January 30, 2001. A. 256-57. Through its approval of this DCS, DOE agreed to accept 25.42 MTU of SNF from Boston at some point in time between January 31, 2000, and January 30, 2001.

**Boston Edison's Response No. 35:** Boston Edison disputes the Government's thirty-fifth proposed finding of uncontroverted fact. Boston Edison also incorporates herein its Response No. 9 *supra*. Moreover, the Government's thirty-fifth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

36. On or about January 25, 1996, DOE approved a DCS that Boston Edison had submitted for acceptance of 82.60 MTU of SNF between January 31, 2001, and January 30, 2002. A. 259-60.[1] Through its approval of this DCS, DOE agreed to accept 82.608 MTU of SNF from Boston at some point in time between January 31, 2001, and January 30, 2002.

**Boston Edison's Response No. 36:** Boston Edison disputes the Government's thirty-sixth proposed finding of uncontroverted fact. Boston Edison also incorporates herein its Response No. 9 *supra*. Moreover, the Government's thirty-sixth proposed finding of uncontroverted fact is not relevant to a legal determination of liability or damages arising from the Government's breach in the present case.

## VII. BOSTON EDISON'S COMPLAINT AND ASSIGNMENT OF CONTRACT

37. DOE did not begin accepting SNF and/or HLW from the nuclear utilities under the Standard Contracts by January 31, 1998.

**Boston Edison's Response No. 37:** Boston Edison does not dispute the Government's thirty-seventh proposed finding of uncontroverted fact except to add that Boston Edison was a Standard Contract holder on January 31, 1998.

38. On November 18, 1998, Boston Edison and Entergy Nuclear Generation Company ("Entergy") executed the "Purchase And Sale Agreement Between Entergy Nuclear Generation Company And Boston Edison Company" ("Purchase And Sale Agreement"). A 307. Pursuant to this agreement, Boston Edison sold its nuclear plant and all of its assets to Entergy with the exception of certain "Excluded Assets." A. 309 (Purchase And Sale Agreement ¶¶ 2.1 & 2.2).

**Boston Edison's Response No. 38:** Boston Edison does not dispute the Government's thirty-eighth proposed finding of uncontroverted fact.

---

[1] On September 29, 1998, Boston Edison also submitted a DCS for acceptance of 11.41 MTU of SNF between January 31, 2004 and January 30, 2005. App. at 91-92. However, by letter dated November 24, 1998, Beth Tomasoni, the DOE contracting officer, informed Boston Edison that DOE "is not able at this time to approve your DCS submittal" and that, "[consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." *Id.* at 93.

39. The "excluded assets" included "any claims of Seller related or pertaining to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing Date, whether relating to periods prior to or following the Closing Date." A. 310 (Purchase And Sale Agreement ¶ 2.2(g)).

**Boston Edison's Response No. 39:** Boston Edison does not dispute the Government's thirty-ninth proposed finding of uncontroverted fact.

40. The Purchase And Sale Agreement defined "Closing Date" as "fifteen (15) days . . . following the date on which all of the conditions set forth in Sections 6.1 and 6.2 have been satisfied or waived by the Party for whose benefit such condition exists . . . ." A. 317 (Purchase And Sale Agreement ¶ 2.9).

**Boston Edison's Response No. 40:** Boston Edison does not dispute the Government's fortieth proposed finding of uncontroverted fact. However, the Government's proposed finding of uncontroverted fact omits language which permitted the parties to mutually agree upon and establish a different closing date. Purchase and Sale Agreement § 2.9 (App. at 96).

41. Paragraphs 6.1 and 6.2 of the Purchase And Sale Agreement enumerated several conditions precedent that had to be satisfied by the buyer and seller in order for the agreement to consummate. A. 343-47 (Purchase And Sale Agreement ¶¶ 6.1, 6.2).

**Boston Edison's Response No. 41:** Boston Edison does not dispute the Government's forty-first proposed finding of uncontroverted fact.

42. On July 12, 1999, Boston Edison filed its complaint in this Court.

**Boston Edison's Response No. 42:** Boston Edison does not dispute the Government's forty-second proposed finding of uncontroverted fact. Additionally, Boston Edison amended its complaint without objection on January 13, 2004.

43. On July 13, 1999, Boston Edison assigned its Standard Contract with DOE, U.S. Department of Energy Contract No. DE-CR01-83NE44368, to Entergy. A 377. The assignment reserved to Boston Edison "any and all claims of Assignor related or pertaining to the Department of Energy's defaults under the DOE Contract accrued as of July 13, 1999, whether relating to periods prior to or following July 13, 1999." Id.

Boston Edison informed DOE's Office of Procurement Operations of its assignment of contract by letter dated July 13, 1999. A 378. In its letter, Boston Edison stated that it has "transferred title to the spent nuclear fuel and high-level radioactive waste located at the Pilgrim Nuclear Power Station to Entergy Nuclear Generation Company, effective July 13, 1999." Id. Boston Edison further stated that "pursuant to the terms of the Purchase and Sale Agreement dated November 18, 1998, Boston Edison Company has, effective July 13, 1999, consummated the sale of Pilgrim Nuclear Power Station to Entergy Nuclear Generation Company, and that such sale includes the transfer and assignment of Boston Edison's rights and obligations under the captioned contract, with the exception of any claims against the Department of Energy accrued prior to the date of transfer." Id. Boston Edison attached to its letter a copy of the Assignment of Contract executed in connection with the assignment. A 379. This was the full extent of Boston's notice of assignment to DOE and other entities, including the disbursing officer at DOE and the surety on a bond, to which notice of assignment of a government contract is statutorily required. A 378-79.

**Boston Edison's Response No. 43:** Boston Edison does not dispute the Government's forty-third proposed finding of uncontroverted fact.

44. On July 13, 1999, Boston Edison also transferred its Pilgrim nuclear plant to Entergy. See Amended Complaint ¶ 4; Boston Edison Co. v. FERC. 233 F.3d 60, 63 (1st Cir. 2000) ("Boston Edison transferred the Pilgrim plant to Entergy on July 13, 1999."); 93 FERC ¶ 63012, at *1 (Nov. 9, 2000) ("On July 13, 1999, Boston Edison sold the Pilgrim Plant to Entergy Nuclear Generation Company").

**Boston Edison's Response No. 44:** Boston Edison does not dispute the Government's forty-fourth proposed finding of uncontroverted fact.

45. Boston Edison's Purchase And Sale Agreement with Entergy thus consummated on July 13, 1999. Amended Complaint ¶ 4; 90 FERC ¶ 61039, at *5, n. 19 (Jan. 14, 2000) ("July 13, 1999 [was] the effective date of Boston Edison's transaction with Entergy Nuclear.").

**Boston Edison's Response No. 45:** Boston Edison does not dispute the Government's forty-fifth proposed finding of uncontroverted fact.

Date: July 9, 2004

Respectfully submitted,

s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700
*Counsel of Record for*
*Boston Edison Company*

Of Counsel: David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street
17th Floor
Boston, MA 02199-0228