No. 99-447C
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BOSTON EDISON COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX TO PLAINTIFF BOSTON EDISON COMPANY'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT UPON COUNTS I AND II AND FOR SUMMARY JUDGMENT UPON COUNT III OF PLAINTIFF'S AMENDED COMPLAINT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY REGARDING COUNT I OF THE AMENDED COMPLAINT

---

RICHARD J. CONWAY
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526
Tel: (202) 785-9700
Fax: (202) 887-0689

Attorney for Plaintiff

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffrey P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037-1526

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street, 17th Floor
Boston, MA 02199-0228

July 9, 2004

# INDEX TO APPENDIX

**DOCUMENT** **PAGE**

July 6, 2004 Affidavit of Geoffrey O. Lubbock ........ 1

May 20, 2002 Deposition of Michael J. Lawrence ........ 6

May 17, 1984 Confirmation Statement of Benard C. Rusche ........ 13

May 16, 2002 Deposition of Benard Rusche; ........ 20

March 21-22, 2002 Deposition of Robert L. Morgan ........ 25

October 12, 1983 Remarks of Robert L. Morgan before the IAEA ........ 34

June 1987 OCRWM Mission Plan Amendment ........ 40

December 1990 OCRWM Annual Capacity Report ........ 42

February 9, 2004 Nuclear Energy Overview ........ 44

February 12, 1998, letter from Thomas W. Bennet, Jr. to Joseph A. Pezello ........ 56

September 28, 1995 letter from Daniel A. Dreyfus to Dr. Andrew C. Kadak ........ 67

May 18, 1998 letter from Federico Pena to Eugene McGrath (and attached chart) ........ 68

March 21-22 Deposition of Robert L. Morgan ........ 72

April 17, 2002 Deposition of David K. Zabransky ........ 75

June 13, 2002 Deposition of Nancy Slater Thompson ........ 77

April 10, 2002 Deposition of Alan Brownstein ........ 80

April 22, 2002 Deposition of Lake H. Barrett (pp. 1-4) ........ 83

April 17, 2002 Deposition of David K. Zabransky ........ 86

December 1991 Acceptance Priority Ranking ........ 89

November 24, 1998 letter to H.V. Oheim from Beth A Tomasoni re:
Boston Edison's Delivery Commitment Schedule ........ 93

July 13, 1999 Boston Edison Company Purchase and Sale Agreement ........ 94

December 1991 Annual Capacity Report ........ 97

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **BOSTON EDISON COMPANY,** <br> **Plaintiffs,** <br> **v.** <br> **UNITED STATES OF AMERICA,** <br> **Defendant.** | **No. 99-447C (J. Lettow)** |

**AFFIDAVIT OF GEOFFREY O. LUBBOCK**

I, Geoffrey O. Lubbock, after being first duly sworn, make this declaration of my own personal knowledge and, if called as a witness, could and would testify competently as follows:

1. I am Vice President – Financial Strategic Planning and Policy for NSTAR Electric & Gas Corporation ("NSTAR"). My principal office is located at One NSTAR Way, Westwood, MA 02090. I hold the same position for Boston Edison Company ("Boston Edison" or "Company"). Boston Edison is an operating affiliate of NSTAR. I have been an employee of Boston Edison for 16 years. At the time of the sale of the Pilgrim Nuclear Power Station ("Pilgrim"), I held the position of Director of Generation Divestiture.

2. By way of background, I have a Bachelor and Masters of Arts degree in Natural Sciences and Economics, which I received from Cambridge University, and a Masters Degree in Business from the London Graduate School of Business. I joined Boston Edison in 1988 as Manager of Revenue Requirements. In 1991, I became Manager of Revenue Requirements and Financial Planning. In 1993, I became Manager of Energy Research Planning and Forecasting. In 1995, I became Manager of Corporate Service Commitments and in 1997, I became Director of Generation Divestiture. I assumed my current position in July 1998. Prior to my employment with Boston Edison, I was with Cabot Corporation, Exxon Corporation and Citibank.

3. At all times prior to the sale of Pilgrim, Boston Edison was the owner of Pilgrim. On behalf of Boston Edison, I was responsible for the divestiture of the company's fossil fuel generating assets and its nuclear powered Pilgrim generating facility. As such, I oversaw independent public auctions for all of Boston Edison's generating assets. I met regularly with

our due diligence team to discuss matters and issues raised by prospective buyers for Pilgrim during the due diligence process.

4. Boston Edison began the design and construction of Pilgrim in the late 1960's. Pilgrim received its federally issued operating license in 1972. At that time, Pilgrim's design criteria contemplated that spent nuclear fuel ("SNF") would remain on site for a limited number of years until it was suitable to be shipped off-site to be reprocessed for future use. With the elimination of reprocessing in the United States during the Carter Administration, and the subsequent passage of the Nuclear Waste Policy Act ("NWPA") in 1982, the future operation and viability of the Pilgrim facility relied heavily upon the Government's responsibility to remove and dispose of SNF.

5. Subsequent to the passage of the NWPA, Boston Edison was required to enter into the Standard Contract with the United States Department of Energy ("DOE"). Absent the reprocessing option and given the congressional mandate that only the federal government can provide a permanent repository for SNF, Boston Edison had no choice but to sign the Standard Contract. Boston Edison signed the Standard Contract on July 17, 1983, and remained a Standard Contract holder until the sale of the Pilgrim facility on July 13, 1999.

6. The required payments for SNF disposal services to be provided by DOE represented a significant expense to Boston Edison and its ratepayers. By the time of Pilgrim's sale in July of 1999, Boston Edison had fully paid all required DOE fees, which totaled in excess of $89 million, including the payment of the one time fee for pre-NWPA electric generation, into the Nuclear Waste Fund. It was my understanding that the DOE fee was to pay for the cost of developing and constructing a permanent repository for SNF, after which the fee would either terminate or be reduced significantly. Notwithstanding, just a year earlier and during the Pilgrim auction process, then DOE Secretary Pena announced that the fee would continue through at least 2020, irrespective of when a permanent repository would be operational and SNF disposal would actually commence.

7. These factors were all known to prospective purchasers for Pilgrim when it was offered for auction sale in 1998. Prospective purchasers were also aware of DOE's failure to abide by the provisions of the Standard Contract.

8. The auction sale of Pilgrim was in response to changes in the regulatory environment, both federal and in the Commonwealth of Massachusetts, which regulations govern the business conduct for regulated utilities such as Boston Edison. As a result of the federal restructuring of the electric industry pursuant to FERC Order 888, the Commonwealth of Massachusetts adopted its own industry restructuring scheme which

strongly encouraged local utilities such as Boston Edison to exit the electricity generation business through the divestiture of their generation assets. The intent of the restructuring in Massachusetts was to have electric generation become a competitive service to be provided by unregulated merchant generation companies. Accordingly, Boston Edison, under my direction and supervision, engaged in two open competitive auction processes to divest its generation assets. First, Boston Edison auctioned its fossil fueled generation, which auction was conducted in 1997, and second, Boston Edison auctioned its nuclear powered generation station (i.e. Pilgrim), which auction commenced in 1998.

9. There were initially ten prospective bidders for Pilgrim that expressed interest in pursuing due diligence of the nuclear plant. At the conclusion of the auction due diligence process, only two bidders, both of which were, and still are, nuclear plant owner/operators (and thus familiar with DOE's practices as to SNF), were willing to submit bids. This is in contrast with Boston Edison's fossil asset auction, which occurred during the prior year, where sixty (60) parties participated in the initial due diligence process, nineteen (19) bidders paid the $15,000 bidder's fee, and six (6) submitted final bids.

10. It is my understanding that the low number of Pilgrim bidders relative to the number of fossil bidders was affected by the increased risk and cost associated with the uncertain future of permanent disposition of SNF. In my opinion, this factor significantly reduced the per kWh purchase price for Pilgrim, as compared to the per kWh price received for Boston Edison's fossil fueled assets.

11. It is my further understanding that bidders, including the only two that chose to submit a bid, were concerned about the future viability of Pilgrim to continue to produce revenues beyond the end of its initial license life in 2012. While DOE maintained at the time that it could commence acceptance of SNF as early as 2010, it was apparent that bidders were not confident that DOE would actually perform by that date. Without a permanent repository in place and operational, the owner of Pilgrim could either (a) forego seeking a renewal of the operating license by the Nuclear Regulatory Commission ("NRC") and close the facility, or (b) expend considerable funds to construct a dry cask on-site storage facility. It is apparent to me that bidders reflected this additional risk in their bids, thus further reducing the price they would be willing to pay for Pilgrim.

12. Similarly, through the due diligence and contract negotiation process, it became apparent to me that the Government's inability to accept the SNF from Pilgrim caused prospective buyers to assume a significantly shortened operating life expectancy for Pilgrim in their valuation of the plant. This affected not only the items mentioned above, but also the

future costs that the buyer would have to incur in order to continue operating, and ultimately decommission the Pilgrim site. This included having to pay indefinitely the 1 mil/kWh fee for the funding of a permanent SNF repository pursuant to the NWPA. It is apparent to me that the continuation of that fee into the indefinite future was factored into the bidders' models and reduced the plant's value significantly.

13. As part of the license transfer process from Boston Edison to the buyer, we were required by the NRC to transfer a fully funded decommissioning trust fund (net of expected investment returns to end of license life) to the buyer in order to ensure that it would have sufficient funds to decommission the plant and the surrounding site once the plant could no longer operate. As discussed above, the ultimate buyer could face the need as early as three to four years from the date of sale to commence decommissioning. Because of the uncertainty as to the timing of decommissioning and the ultimate removal of the SNF caused by DOE's breach of the Standard Contract, Boston Edison was required to transfer a much larger decommissioning trust fund to the buyer than would otherwise have been the case had DOE met its obligations under the Standard Contract.

14. The uncertainty caused by virtue of DOE's breach with respect to when Pilgrim could, if ever, be fully decommissioned and returned to a condition where it could be used for other purposes, further substantially devalued the site in the valuation models of prospective buyers.

15. In my judgment, based upon the experience gained through managing Boston Edison's divestiture of both its fossil fueled and nuclear powered generation assets, the Government's breach of the Standard Contract with Boston Edison had a significant negative impact on the fair market value of Pilgrim relative to what the value would have been had DOE performed its obligations under the Standard Contract. This is demonstrated, in part, by the limited number of bidders and the low prices that they were willing to pay, for the reasons outlined above.

Under penalty of perjury, I hereby affirm that the above statements are true and accurate to the best of my knowledge.

Geoffrey O. Lubbock

NOTARY:
Subscribed to and sworn to before me this
6th day of July, 2004.

[Seal]

My Commission expires:

Stephen W. Gray, Notary Public
My Commission Expires November 26, 2004

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington

APPEARANCES

For the Plaintiff Yankee Atomic Electric,
Connecticut Yankee Atomic Power Company
Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Heide L. Herrmann
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax

APPEARANCES

For the Plaintiff Sacramento Municipal Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax

APPEARANCES

For the Plaintiff Boston Edison Company, Duke Power, Florida Light & Power, GPU Nuclear, Indiana Michigan Power Company, Northern States Power Company, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, PSEG Nuclear, LLC:

Daniel S. Herzeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

amendments and provisions, and basically you have members of Congress, or more particularly their staffs, trying to spell out how something should work. They would often ask the people who had the responsibility for doing that work, would this work or that work and how would this work. And consequently, through our Legislative Affairs Office, we would often discuss with them the pros and cons of the various approaches they were considering. Not me personally, but others within that group.

Q. Do you recall who was involved in that effort?

A. The director of -- Mr. Coffman was involved.

Q. And besides Mr. Coffman, do you recall anyone else who was involved in supporting the NWPA legislation effort?

A. Not in any major way.

Q. You said that you were not personally involved in -- in that effort. Did you have any role in -- in the NWPA legislative effort at all?

MS. HERRMANN: Objection. Vague.

THE WITNESS: I indicated previously that in staff meetings, certain things would be discussed and I could give my opinion. But it was never direct or specific or -- direct or specific.

Q. (By Mr. Shapiro) Do you remember any issues that came up at these meetings?
A. No.
Q. The Regan Administration, to your recollection, was generally supporting the NWPA?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The administration very much wanted to see the Nuclear Waste Policy Act passed.
Q. (By Mr. Shapiro) What was your understanding as to why the administration wanted the Act passed?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I previously had indicated that through the Atomic Energy Act, the -- the Department had a -- had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so. And it was clearly felt that a process set in law was far preferable to an ad hoc program.
Q. (By Mr. Shapiro) What do you mean by an ad hoc program?
A. One which does not specifically have a legal basis for the actions and steps you are taking.

Q. Let me try to rephrase to make sure I understand.
So the administration liked the NWPA because it provided a specific congressionally authorized, mandated path to meet the obligations that were otherwise set out in the Atomic Energy Act, but for which there was no particular mechanism for -- for achieving those responsibilities?

MS. HERRMANN: Objection. Foundation. Speculation.

THE WITNESS: With the exception of the term "liked." I would have said was supportive of the act. I would say that's -- that characterization is -- is accurate.

Q. (By Mr. Shapiro) Was there any particular about the pathway prescribed by the NWPA that was supported by the administration or was it just, Gee, this is -- this is a solution; let's go with it?

MS. HERRMANN: Objection. Foundation. Speculation.

THE WITNESS: Difficult to answer in a specific sense. But one thing that is very much timely is the process by which the Department could recommend a site and a state object to it and have Congress then override or deal with that

CONFIRMATION STATEMENT

Benard C. Rusche

May 17, 1984

Mr. Chairman and Members of the Committee, I appreciate the opportunity to come before you as President Reagan's nominee for Director of the Office of Civilian Radioactive Waste Management in the Department of Energy, a position established by Public Law 97-425, "The Nuclear Waste Policy Act of 1982." The adoption by Congress of P.L. 97-425 and its signing into law by the President represented a major step in addressing one key aspect of America's energy future. The opportunity to work closely with this Committee and with Secretary Hodel was added encouragement for me to accept this nomination. I am enthusiastic about carrying out the policy and mandate of the Act, giving it my full attention and energy.

My background of over 30 years in the nuclear field, most of it in the private sector, ranges from basic nuclear physics research to management of industrial, technical, policy, and regulatory activities. After graduating from Tennessee Polytechnic University in 1953 with a degree in physics, I joined the DuPont Company in South Carolina where the Savannah River Plant was being designed and constructed.

I started in basic experimental reactor physics involved in the design of production reactors for safe, efficient materials production. Safety is mentioned first as the most important element to be met in my work. It remains the highest priority for me, personally, in this endeavor.

My DuPont experience led from research to management of technical activities. In 1967, I became manager of the Experimental Physics Division and in 1970 began and subsequently managed the Environmental Sciences program at the site.

In 1975, the newly formed Nuclear Regulatory Commission invited me to become its first Director of Nuclear Reactor Regulation. I accepted, and for two years managed the NRC's program to assure that the public and the environment were adequately protected in the commercial use of nuclear power.

I returned to DuPont in 1978, as its first Corporate Director for Health and Safety. In this staff position, I focused my attention on assuring that both the public and employees were adequately protected in the manufacture, distribution, and use of chemical products made by DuPont.

After a year in this position, I accepted the invitation of a group of South Carolina business and government leaders to form a private, not-for-profit, Energy Research Institute in South Carolina. During this period, I worked with then Governor Edwards in his efforts through the National Governors Association to improve management of Low Level Radioactive Waste. About a year after the Institute was formed, I spent about 4 months on the TMI-2 site full time and another year in a major, but part-time, role assisting along with many others, in the early recovery activities.

In 1981 Energy Secretary Dr. James B. Edwards, appointed me his Special Assistant for Policy and Programs. I served Secretary Edwards in addressing technical and policy issues within DOE.

Since leaving the Department of Energy in July of 1982, I have been an officer

of Management Analysis Company of San Diego, providing executive management consulting services to energy and communications companies. My primary activities have been with electric utilities in the nuclear industry. I have also served as a consultant to Secretary Hodel on nuclear issues during this period. In September of 1983, I formed my own consulting firm, Management and Technical Resources, Inc., to continue these activities on a more personal basis.

The position to which I have been nominated broadens my involvement in the country's nuclear program. Some would say it may present the most challenging opportunity yet for balancing management, technical, political, and social concerns and priorities. I welcome the opportunity to apply my experience to this task. But success in this venture will require more than experience. It will require commitment to the purpose and spirit of the Act. It will require patience and dedication to assure that the legitimate interests of States and affected Indian tribes, the industry, and indeed, all Americans, are given full and fair consideration in carrying out the program.

The challenge in this job is putting in place, in a timely manner, the Federal components of a system for providing reasonable assurance, for the long-term, that the public and environment are adequately protected against the potential hazards from high level radioactive waste and spent fuel.

Moving ahead is a matter of national urgency because:

1. High-level radioactive waste and spent fuel now exists in 27 states of our country and will continue to grow.

2. As enunciated by the President in his October 1981 statement on nuclear power, a secure energy future for America depends, in part, on the ability to select from many options including nuclear power. From the beginning of the Atomic Age, it has been a given that the Federal Government has the responsibility for eventual disposal of high level radioactive wastes and spent fuel. However, the absence of specific arrangements for disposal of this material has been a substantial impediment to public acceptance of the use of nuclear energy. With the passage of the National Waste Policy Act of 1982, the course has been set and the process for making the necessary decisions laid out. We now can and must proceed.

Clearly, protection of the public and the environment is the central consideration. Today, commercial spent fuel is stored in fuel pools at reactors in 25 states. The NRC has held that such storage is safe for the life of the reactor, about 30 to 40 years, i.e. for the short term. Similarly, high level radioactive wastes are stored in several forms in 6 states in a manner that has been judged acceptable for the short term.

The NWPA establishes as public policy disposal of these wastes in a geologic respository as the anticipated long-term solution for America. America is not alone in selecting geologic disposal as the best long-term mode for the future. Canada, Belgium, West Germany, Switzerland, and Sweden have made a similar judgment. In planning and carrying out the numerous systematic elements of the program mandated by the Act, judgments must be made against the backdrop that we are choosing between the status quo, i.e. storage of substantial quantities of

such wastes on an acceptable short-term basis in many states; and a more secure, high-confidence system for the long-term future--geologic disposal.

The desire for perfection, which we all seek, must be balanced against the potential consequences of indefinite continuation of the status quo. This balance has been drawn by the Act in specifying target dates for acceptance of waste and in establishing appropriate procedures for considering the interests of States, affected Indian tribes, and the public in deciding on sites and carrying out the programs. I am committed to carrying out the provisions of the Act.

I am enthusiastic about proceeding, although I have no illusion about the ease of making key decisions. Nonetheless, these decisions must be made!

In my mind, several key points stand out as important.

1. The several elements of the program need to be brought into a common framework to avoid duplication and fiscal inefficiency. These are repository design and development, monitored retrievable storage design and development, packaging and preparation of fuel or waste, shipping and interim storage, transportation and handling. Standardization should be the approach where possible rather than countless custom designs.

2. An integrated program utilizing both geologic and MRS repositories should be considered as the best way to achieve both intermediate and

long-term goals in a timely fashion. Both MRS and repositories will probably be needed as complementary elements in the integrated system.

3. Discussions with States, affected Indian tribes, and other interested parties and the public must be carried out vigorously, openly and fairly to assure that the highest possible confidence can be attached to decisions made. I commit myself to active personal involvement on a regular basis.

4. The program must be managed like a business. Ratepayers and utilities have a right to demand this. Bottom line results are the measure of performance, not cash flow. Rigorous procedures must be in place to assure that fiduciary responsibility and accountability are exercised and demonstrable.

5. Close working relationships with other Federal agencies will be maintained, especially with NRC, EPA, and DOT.

I look forward to working with Secretary Hodel and the competent staff already working on waste management in the Department of Energy. In conversations with the Secretary on my role and function in the Department, we have agreed that the Directorship of the OCRWM will be my primary function. Also, I will move vigorously to further strengthen the staff and to tighten the organization and improve communications throughout the system.

I conclude my statement by expressing appreciation to the President and Secretary Hodel for their confidence in me. I pledge my best effort to you on this Committee, the Environmental and Public Works Committee of the Senate and the companion Committees in the House involved in the construction and implementation of the Act as we work together to carry out its mandate. Indeed, you have reserved for yourselves what may well be the final test of this country's resolve to get on with disposal of radioactive wastes--the final resolution of issues with States and affected Indian tribes if needed. I am pleased to have the opportunity to work with you in this important area. We must continue the progress so this issue can be removed as an impediment and nuclear power can be considered on its merits.

This concludes my statement, Mr. Chairman. I welcome your continued interest, participation and support in the program.

UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRONIC COMPANY, PLAINTIFF, ) CA NO. 98-126C
VS.
THE UNITED STATES, DEFENDANT.

MAINE YANKEE ATOMIC POWER COMPANY, PLAINTIFF, ) CA NO. 98-474C
VS.
THE UNITED STATES, DEFENDANT.

CONNECTICUT YANKEE ATOMIC POWER COMPANY, PLAINTIFF, ) CA NO. 98-154C
VS.
THE UNITED STATES, DEFENDANT.

CERTIFIED COPY

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

Appearances:

Representing the Plaintiffs:

JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305

Representing the Defendant:

R. ALAN MILLER, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

A. I do indeed.
Q. Okay. Take a look -- and then there's a list of Paragraphs 1 and 2?
A. Beg your pardon?
Q. After the because -- there's two becauses, and there's one and two.
A. Yes.
Q. Is that -- as you read that now, does that sort of cover it? Is there anything you would add to why you believed at that time that moving ahead with this program was a matter of national urgency?
A. What was your question?
Q. My question is does one and two sort of cover it? Is there anything you -- does this cover the reasons why you thought at that time --
A. Yes.
Q. -- that moving ahead --
A. Yes.
Q. Anything substantial that you would add to what's written there and what you told Congress about the reasons why moving ahead with the program at that time was a matter of national urgency?
A. No.

Q. All right. Now, in No. 2 says that the federal government from the beginning of the Atomic Age has been given the -- I'm sorry. Well, I read -- the sentence says that the federal government from the beginning of the Atomic Age has been given the responsibility for eventual disposal of high-level radioactive waste and spent fuel. Do you see that?
A. I do.
Q. Okay. And this statement was given after the enactment of the Nuclear Waste Policy Act?
A. Yes.
Q. Okay. Which was signed into law in, I believe, early January?
A. Early January, that's right.
Q. 1983. So is it your understanding that that statute carried forward this federal responsibility for eventual disposal of high-level radioactive waste and spent fuel?
MR. MILLER: Objection. Calls for a legal interpretation. Go ahead.
THE WITNESS: Yeah.
Q. (Mr. Stouck) Would you say that -- well, okay. Do you have a copy of this

confirmation statement yourself? When was the last time -- when was the last time you saw this?

A. This?

Q. Yeah.

A. Oh, I guess, maybe six months or a year ago I had some occasion that I was just going through my file and saw it.

Q. So you have a copy at home?

A. I don't know that I have a copy in this exact form, but I have a form that I believe is the same as this.

Q. Okay. Do you have -- when you say in your file, do you have files in your possession that relate to your work as director of the Office of Civilian Radioactive Waste Management?

A. The only files I have are those that I referred to, which are -- is my confirmation file, which is a notebook that has the material that I amassed looking at and which gave rise to this statement.

Q. Okay. No other files about your work for the Department? You left them there?

A. Absolutely. Absolutely.

Q. All right. So this statement outlines the task at hand when you joined the Department.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 2, Pg 213 - 330

2

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:

BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

A P P E A R A N C E S

(continued)

For Plaintiff Commonwealth Edison Company:

JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:

PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

# APPEARANCES

For Plaintiffs Florida Power & Light, et al.:

SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:

ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

# A P P E A R A N C E S

For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:

ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983

Q. Do they usually meet in Vienna, Austria?

A. Yes.

Q. Did Secretary Hodel make a presentation at that meeting, to the best of your recollection?

A. I believe that he did, but I'm not sure.

Q. Who, generally, would attend the meetings of the International Atomic Energy Agency?

A. The Secretary of Energy.

Q. I mean, who would be the attendees from other countries?

A. The head of their atomic energy activities. It was a high-level meeting of all the member states, if you will, of the IAEA.

Q. In this set of remarks, did you accurately attempt to describe what the DOE policy was regarding spent fuel at that time?

MR. BANES: Objection. Have you had time to look at the document, sir?

THE WITNESS: I don't know what's in the document.

BY MR. HIRSCH:

Q. Please take a look at the document.

(Pause.)

THE WITNESS: Can I go off the record for just a moment?

MR. HIRSCH: Sure.

(A discussion was had off the record.)

BY MR. HIRSCH:

Q. Mr. Morgan, in an effort to get you out of here and speed things along, let me just ask you some specific questions of the document, if that's all right with you.

A. Fine.

Q. Will you look at page -1644 of the document, first full -- second full paragraph.

A. -1644?

Q. That's the little page at the bottom --

A. Yes.

Q. -- page number. You see there's a reference in the middle to studies and explorations in the different media? And then there's a sentence that says, "However, while the responsibility for permanent disposal of this waste has rested with our Federal

Government since the Atomic Energy Act of 1954 was enacted, until recently, major obstacles have existed in the United States which have impeded the successful disposal of nuclear waste."

Is it correct that the U.S. Government had the responsibility for the permanent disposal of spent nuclear fuel since the Atomic Energy Act of 1954 was enacted?

MR. BANES: Objection. Calls for a legal conclusion and irrelevant.

A. I'd have to read the Atomic Energy Act of 1954 to -- otherwise it would be speculation. I'm sorry.

But these are the words that I used.

BY MR. HIRSCH:

Q. You made that statement to the leaders or the high-level people present at the International Atomic Energy Agency meeting. Is that correct?

A. Yes, that is correct.

Q. And presumably you wouldn't have made that statement if you didn't think it was correct. Right?

A. That's correct.

Q. Then you say at the bottom of the same page, reading from the last sentence, ". . . late last year, the United States Congress passed legislation to bring to an end years of indecision on how to solve the problem." Do you see that statement?

A. Yes.

Q. And the problem was the problem of disposing of spent fuel. Correct?

A. Yes.

Q. And was it your view at the time that the Nuclear Waste Policy Act was intended to end years of indecision --

A. That's correct.

Q. -- on how to solve the problem of disposal of spent fuel?

A. Yes. That's correct.

Q. Will you look at page -1646 at the bottom.

A. Yes.

Q. Do you see at the top of that page it says, "The Department of Energy has the responsibility to provide for the permanent disposal of high-level radioactive waste such as spent nuclear fuel or reprocessed spent nuclear

HQZ.870303
.6172

REMARKS BY
ROBERT L. MORGAN
ACTING DIRECTOR
OFFICE OF CIVILIAN RADIOACTIVE
WASTE MANAGEMENT
U.S. DEPARTMENT OF ENERGY
BEFORE THE
INTERNATIONAL ATOMIC ENERGY AGENCY
VIENNA, AUSTRIA
OCTOBER 12, 1983

I am honored to participate with this distinguished group to exchange views and policies on radioactive waste management. Radioactive waste management is an important and critical concern to us all--individually, nationally, and internationally. In the international arena, the International Atomic Energy Agency (IAEA) had its first Conference on this subject in the United States in May of this year. Unfortunately, I was unable to personally host Dr. Blix and the Agency at the Conference as I had hoped and expected. However, I understand it was a successful Conference at which the following major conclusions were reached:

(1) In most countries which are engaged in nuclear activities, management of nuclear waste disposal is well underway.

(2) Solutions to institutional, regulatory, financial and socio-political issues are prerequisites to successful deployment of the available technology.

HOHO41 [redacted]

(3) In general, nuclear power can be harnessed for mankind without creating an unmanageable waste disposal problem.

(4) There was a consensus that no technological breakthroughs are required for the safe management of radioactive waste.

All participants in that first Conference should be commended for their contributions, and Dr. Blix should be especially commended for his personal and knowledgeable involvement in the nuclear waste issue.

I wish to emphasize that we all have a great deal at stake in assuring that the IAEA maintains its basic technical capability for addressing critical issues, such as nuclear waste management.

Turning now specifically to waste management in the United States, for almost four decades high-level radioactive waste has been generated in the United States. These wastes have been stored prior to disposal in both large tanks for reprocessing waste and water basins for spent fuel.

Many isolation concepts have been discussed over the years and the concept of isolating nuclear waste in mined repositories deep underground was first advanced in 1957 by a committee of the National Academy of Sciences. Their recommendation was that rock salt be studied as having favorable characteristics for underground disposal.

HDM841 [redacted]

We spent a decade of research evaluating bedded salt as a host rock. Based on that research, we initiated an accelerated program in 1970 to develop a repository in bedded salt at Lyons, Kansas. However, we weren't ready either technically or politically for such a major step at that time. Consequently, this program was dropped and a broader national program looking at additional rock types around the country was initiated.

The studies and exploration in these media--salt, basalt, tuff and crystalline rock--have continued over the years. However, while the responsibility for the permanent disposal of this waste has rested with our Federal Government since the Atomic Energy Act of 1954 was enacted, until recently, major obstacles have existed in the United States which have impeded the successful disposal of nuclear waste. These obstacles have included fluctuations in national policy; unwillingness of States to host a repository; and uncertainty in annual funding for nuclear waste activities.

Recognizing these problems and the need to remove the waste management issue as an impediment to the future use of nuclear power, late last year the United States Congress passed legislation to bring to an end years of indecision on how to solve the problem.

RGN041 [redacted]

The Nuclear Waste Policy Act of 1982, signed into law by the President January 7, 1983, established a schedule and step-by-step process by which the President, the Congress, the States, affected Indian tribes, the U.S. Department of Energy and other Federal agencies must work together in the siting, construction and operation of geologic repositories for disposal of high-level radioactive waste generated by civilian nuclear reactors. This law has provided a mandate and, more important, a set of rules for proceeding with the identification and selection of sites for a repository as well as for interim storage facilities in the event they are needed.

The Act also established a mechanism to ensure adequate funding for the program to be paid for by the users of nuclear power. As of April 7, 1983, we began charging all U.S. utilities with nuclear power reactors a fee of one mill--one-tenth of a cent--per kilowatt hour of electricity generated by a civilian nuclear power reactor for disposal services. We believe the revenues from this fee, which will initially be about $400 million a year, will be adequate to cover all projected waste disposal costs.

HQH0[redacted]

The Department of Energy has the responsibility to provide for the permanent disposal of high-level radioactive waste such as spent nuclear fuel or reprocessed spent nuclear fuel. The Act strengthened this responsibility and confirmed the Nation's commitment to nuclear waste disposal and to the role of States and the public in the process leading to permanent disposal.

Site Selection Guidelines

As a basis for the site selection process, the Department of Energy must issue Site Selection Guidelines. These Guidelines will be used for the recommendation of sites for repositories in geologic formations. To date, we have gone through an elaborate review process regarding these Guidelines. After receiving concurrence on these Guidelines from our Nuclear Regulatory Commission, we plan to issue the Guidelines late this year.

The First Repository

Nine potential repository sites have been identified in six states--one Basalt site in Washington; one Tuff site in Nevada; two bedded salt sites in both Utah and Texas; and three domed salt sites, two in Mississippi and one in Louisiana.

The Nuclear Waste Policy Act requires that by January 1985, the Department of Energy recommend to the President at least three sites for detailed characterization which includes construction of exploratory shafts and extensive testing and data collection.

MOH041

Based on the results of site characterization, we will recommend to the President one of these sites for the first repository. Subsequently, the Nuclear Waste Policy Act calls for the President to recommend to Congress by March 1987 the site for the first repository.

When this recommendation is made, the Governor of the State in which the proposed site is located may veto the selection, in which case the veto stands unless overridden by both Houses of the United States Congress.

After a site is approved, the Department of Energy will submit a construction application to the Nuclear Regulatory Commission. The Commission has three-to-four years to approve the application; and once we receive the construction license, construction will begin with the mandated target to begin accepting waste by 1998.

The Second Repository

The Act also provides for the siting and licensing of a second repository. The schedule for the second repository is for DOE to recommend to the President by July 1989 three sites for detailed site characterization.