*Attachment 4*

# Department of Energy

Washington, DC 20585

September 28, 1995

Dr. Andrew C. Kadak
President and Chief Executive Officer
Yankee Atomic Electric Company
580 Main Street
Bolton, Massachusetts 01740-1398

Dear Dr. Kadak:

Thank you for your letter of September 7, 1995, expressing your thoughts on the viability of the exchange process for Delivery Commitment Schedules and restating your position on the Department's obligation to afford priority waste acceptance to the spent fuel from Yankee Atomic Electric Company's Rowe power station.

While your letter describes circumstances that you believe will impede the exchange of delivery commitment schedules, we continue to believe that once the Federal waste management system is operational, the exchange provision will be exercised by Purchasers as originally anticipated. Article V.E of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) grants Purchasers the right to exchange, with DOE concurrence, approved delivery commitment schedules. This provision was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.

With respect to the Department's ability to grant priority acceptance of the spent fuel from your Rowe power station, as I noted in my letter of July 13, 1995, to State Representative Herren, there are statutory limits on the amount of spent fuel that the Department can accept prior to the opening of a permanent repository. Consequently, the Department does not have the ability to grant priority acceptance to shutdown reactors without adversely affecting other utilities. The Congress is debating the issue of centralized interim storage of spent nuclear fuel. The outcome of this debate may involve new policy direction for this program, and may include policy guidance on the priority acceptance of spent fuel from shutdown reactors.

Sincerely,

Daniel A. Dreyfus, Director,
Office of Civilian Radioactive
Waste Management

Printed with soy ink on recycled paper

**The Secretary of Energy**
Washington, DC 20585

May 18, 1998

Mr. Eugene R. McGrath
Chairman, President, and Chief Executive Officer
Consolidated Edison Company of New York, Inc.
4 Irving Place
New York, NY 10003-3502

Dear Mr. McGrath:

In April of last year, I met with a group of nuclear industry executives to initiate a discussion of options available to the Department for addressing our delay in accepting spent nuclear fuel by January 31, 1998. Although no agreement was reached during that meeting, I offered to continue those discussions. Over the past year the Department has had a number of such discussions with individual Standard Contract holders in an effort to resolve these issues. Recently, the United States Court of Appeals for the District of Columbia Circuit reiterated its view that utilities should seek any relief warranted through the process set forth in the Standard Contract.

Building upon these discussions and in light of the Court's recent ruling, I would like to propose a modification to your company's waste disposal contract with the Department that would provide immediate and continuing financial relief to your company. In return for the settlement of pending and potential claims relating to the Department's delay, I am offering to modify your company's contract with the Department to postpone the payment of a portion of the fee your company pays into the Nuclear Waste Fund, thereby making available to your company a substantial amount of money that could be utilized to offset any costs that you may experience as a result of the Department's delay. The attachment to this letter provides further details of this proposal.

I believe that the proposal, which the Department can accomplish promptly within its current authority and in a manner that does not jeopardize the long-term viability of our geologic disposal program, demonstrates the Department's

willingness to deal in good faith in addressing the ramifications of our delay, and presents an attractive alternative to what could potentially be years of protracted litigation on this matter. I would appreciate it if you would advise the Department whether or not you would be interested in pursuing this settlement offer by June 15, 1998. Please contact Mr. David Zabransky of the Office of Civilian Radioactive Waste Management at (202) 586-9198 with your views on this proposal or to arrange for a meeting with my representatives.

Sincerely,

Federico Peña

Attachment

Amend individual contracts to allow a settling utility to retain a portion of the fees it is paying into the Nuclear Waste Fund until the Department is prepared to begin accepting that utility's spent fuel.

The fees to be paid into the Nuclear Waste Fund by each utility for any given year would be limited to its share of the funds appropriated by Congress from the Nuclear Waste Fund to support the Civilian Radioactive Waste Management program for that year. The utility would retain the balance of its fees.

Utilities would be allowed to invest the funds they retain, earning market rates of return. Any return on the investment which is above the interest due the government could be used by the utilities to cover their delay costs.

When the Department is ready to begin the acceptance of spent fuel from a utility, that utility's deferred fees, plus interest at the Treasury rate, would be due and payable in full.

Utilities would have to provide the Department with adequate assurance that the obligation to pay the deferred funds when due would be met.

In return, settling utilities would agree not to file claims or seek damages from the Department due to its delay in waste acceptance.

IMPACTS OF SETTLEMENT

The proposed settlement could provide between $2.8 to $5.0 billion dollars in financial relief to utilities, beginning immediately.

The settlement proposal avoids any further dispute or debate about whether delay costs must be paid out of the Nuclear Waste Fund.

Our proposed settlement terms create a strong incentive for the Department to meet its obligation to accept spent fuel as quickly as possible.

If adopted, the settlement would eliminate the costly and lengthy individual claims process, which would involve the Department's contracting officer, the Board of Contract Appeals and the Court of Federal Claims.

**ESTIMATE OF CURRENT PAYMENT FACTOR - TO BE USED IN ASSESING VALUE OF SETTLEMENT OFFER**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL kWh FEES | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $626 | $622 | $622 | $611 |
| APPROPRIATIONS FROM NUCLEAR WASTE FUND | $158 | $190 | $180 | $170 | $170 | $200 | $46 | $242 | $467 | $314 | $787 | $828 | $669 |
| CURRENT PAYMENT FACTOR | 0.25 | 0.30 | 0.28 | 0.27 | 0.27 | 0.32 | 0.07 | 0.38 | 0.74 | 0.50 | 1.00 | 1.00 | 1.00 |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL kWh FEES | $586 | $591 | $583 | $496 | $427 | $415 | $374 | $358 | $339 | $339 |
| APPROPRIATIONS FROM NUCLEAR WASTE FUND | $445 | $553 | $705 | $658 | $680 | $711 | $677 | $716 | $759 | $728 |
| CURRENT PAYMENT FACTOR | 0.76 | 0.94 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |

Each Contract Holder would multiply its current fee obligation by the current payment factor to determine the amount of fee to be paid on a current basis. These values are projections only. The Department cannot guarantee the actual values in any given year will be the same as these estimates.

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

**DEPOSITION OF ROBERT L. MORGAN**

**March 21 and 22, 2002 Volume 1, Pgs. 1 - 212**

2

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:

BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

3

APPEARANCES
(continued)

For Plaintiff Commonwealth Edison Company:

JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:

PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

4

APPEARANCES

For Plaintiffs Florida Power & Light, et al.:

SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:

ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

repository.
BY MR. BLANTON:
Q. The provision of the proposed rule you just referred to a minute ago under Article II, Scope, on page 5459 of Defendant's -- excuse me -- of Plaintiffs' Exhibit 3 says, "In exchange for these services, Purchasers will pay fees established in the contract."
My question is: At the time you were director of the program, did you view the fees being paid by the utilities as being in exchange for the services being provided under the contract?
A. Yes.
Q. And what were the services that the utilities were paying for?
MR. BANES: Objection. Asked and answered. Calls for a legal conclusion.
A. The scope -- the scope says we will accept spent fuel for -- from the commercial reactors and put it in the repository. And it would be on a full cost recovery basis. And if it cost more than the 1 mill per kilowatt, we would have to adjust the fees.
BY MR. BLANTON:



Q. What did the utilities get?
MR. BANES: Objection. Asked and answered.
A. Disposal of commercial spent fuel.
BY MR. BLANTON:
Q. When?
A. Beg your pardon?
Q. When?
MR. BANES: Objection.
A. Beginning January 31st, 1998.
THE WITNESS: Excuse me.
MR. BANES: Sorry.
BY MR. BLANTON:
Q. And continuing as expeditiously as possible?
MR. BANES: Objection. Misleading. Calls for a legal conclusion.
A. I think that that is stated in the contract, "as expeditiously as possible." I recall that was someplace.
BY MR. BLANTON:
Q. All right, sir. Let me get you to look at the next page of the final rule and the standard contract. I guess it's your Exhibit 4.
A. Right. Page?



Q. 16592.
A. 16592.
Q. Up there in the upper left-hand corner.
A. Okay.
Q. Down at the next-to-the-last paragraph on the far left-hand column, it says, "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . setting forth the projected annual receiving capacity for the DOE facility.'" Do you see that?
A. Yes.
Q. Why was a report like that not in the proposed rule? Do you know?
A. This was added, it says, at the request of a substantial number of commenters as a new provision. In other words, this was -- this was in response to comments we had received.
We could not commit to a rate in the contract, but we would establish an annual report for planning purposes so that people



would know what to plan on.
Q. Okay.
A. The utilities would know what to plan on.
Q. Is this the Annual Capacity Report? Is that what that ended up being called?
A. Yes. Yes.
Q. Was that document included in the contract for any purpose other than planning?
A. No.
Q. In the discussions about whether to include that provision in the contract dealing with the Annual Capacity Report, was there any discussion within your office about whether that report was necessary other than because the utilities asked for it?
MR. BANES: Objection as to form. Vague.
A. There were discussions, as I recall, that in the response to the commenters we felt that they should have as much notice as possible as to when we knew what we would accept and when, for their planning purposes, so they knew what they had to provide for on-site storage.
In other words, this is a heads-up

141

document to where they can properly plan their activities until we get the repository going. That was the whole intent of this change, as I recall.

Q. All right, sir. Staying on that same page, there is a -- down at the bottom there's a reference to the lack of definition of the term "emergency delivery." Do you see that?

A. Yes, I see that.

Q. And then the next sentence after that says, "One situation which would receive consideration is one in which a delivery is needed to permit licensed reactor operations to continue." Do you see that?

A. Yes.

Q. What was the basis for DOE's thinking about why that particular situation would satisfy the emergency -- might satisfy the emergency delivery definition?

MR. BANES: Objection. Calls for speculation.

BY MR. BLANTON:

Q. Well, to the extent you know.

A. Well, I think that -- You know, I don't recall specific discussions on this, but

142

sitting here today, it makes sense that we wanted to keep reactors operating and that that would be considered an emergency situation.

In other words, if they had to discharge fuel from a core and they didn't have a full core reserve, that we would maybe accept fuel from -- as an emergency basis from that reactor so they could continue with a full core reserve capacity.

It makes sense to me sitting here today.

BY MR. BLANTON:

Q. Was an emergency delivery an exception to the normal priority --

A. Yes.

Q. -- rights under the contract?

A. Yes.

Q. Was keeping reactors from having to shut down because of lack of storage space for spent fuel a purpose of the contract -- of the whole contract?

MR. BANES: Objection. Calls for a legal conclusion.

A. I don't think anywhere in the Nuclear Waste Policy Act is there any statement

143

regarding continued operation of commercial reactors.

BY MR. BLANTON:

Q. My question was: Was that a purpose of the contract? Was that one of your purposes as director of DOE Office of --

A. As I recall, the purpose of the contract was to comply with the Nuclear Waste Policy Act.

Q. Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

MR. BANES: Objection. Asked and answered. Don't answer that.

MR. BLANTON (to the Reporter): Would you index for me the questions that didn't get answered?

MR. BANES: That question has already been answered. I've been very, very lenient on that, but I'm not going to be lenient on it anymore. We have a limited amount of time here.

Let's take a break.

MR. BLANTON: Okay.

144

(A recess was taken.)

BY MR. BLANTON:

Q. Mr. Morgan, during your tenure as director -- or acting director of the Nuclear Waste Project Office, was there consideration of amending the standard contract to include a waste acceptance schedule?

A. No. I do not recall it. There were discussions on that because of the requests and the comments we'd received.

Q. Were you involved -- Let me just show you this letter, the Hodel letter from Senator Johnston.

(Deposition Exhibit No. 8 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I have marked as Exhibit 8 to your deposition a letter dated September 7, 1984, from Donald Paul Hodel to J. Bennett Johnston.

And my question is: Do you recall having been involved in an exchange of letters from Johnston and Secretary Hodel relating to the Nuclear Waste Policy Act?

A. This is dated after I had left, so I

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002





IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?
**A The Department of Energy never used these rates for the planning for the operation of a repository facility.**
Q I'm not asking -- not my question.
**A Okay. Repeat the question.**
Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?
**A No, we did not.**
Q Let me show you Exhibit 38.
(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)
Q Which is unsigned, but it has "official



file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?
**A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.**
Q Is that document the one that's marked Exhibit 5?
**A That's what this document refers to, yes.**
Q And all those initials to the right-hand side indicate various approvals of the document?
**A Right, to that point in time.**
Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
**A The department carried over the rates it had in the previous ACR and did not change them.**



Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
**A I believe that that was a consideration.**
Q Were there any other considerations that you can think of for using those rates?
**A There was no other basis to develop any other rates at that point in time.**
**(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)**
Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?
**A I've seen this document. I'm not familiar with it, but I know what it is.**
Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?



**A No, I don't believe I did.**
Q Do you use it in the course of your duties in the Department of Energy?
**A I don't use this document in the course of my duties, no.**
Q Let me refer you to page eight of Exhibit 39, Mr. Zabransky.
**A Okay.**
Q You found it before I did.
**A I found it.**
Q Do you know where those receipt and placement rates came from?
**A I don't know specifically where they came from, no.**
Q As far as you know, were those the rates that the DOE was using for planning purposes as of September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
**A Those were the rates that were used to cost out a repository and its operations that were used in**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 94

it calls for a legal conclusion. Objection, foundation.
A. I do not recall.
Q. Isn't such a limitation inconsistent with the language that we just focused on, all spent fuel or all SNF and/or HLW the purchaser wishes to deliver?
MS. SULLIVAN: Objection, argumentative. Objection to the extent it calls for a legal conclusion.
You may answer.
A. No, I don't believe it is inconsistent. It's all fuel that you wish to deliver within the bounds of what you are entitled to deliver.
Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?
MS. SULLIVAN: Objection. The documents speak for themselves.
You may answer.
A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget

Page 95

constraints, lack of a facility, unavailability of transportation casks.
For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.
Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?
A. That we viewed the DCSs as fungible,

Page 96

and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.
It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.
Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.
When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal

Page 97

conclusion.
A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.
Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.
A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.

Page 98

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

Page 99

commitment schedules were binding on either industry or the department?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
A. No, I don't.
Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?
A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until the FDS because that was actually done in

Page 100

consultation with the utilities because you don't want to show up and disrupt their operations, that's money.
You had no certainty about the age of fuel, however, because if they specified a range of discharge dates that's 10 years apart, that doesn't tell you much in terms of the thermal output of the fuel I am coming to get because conceivably it could range from five-year-old fuel to 15-year-old fuel. There's a big difference. There's a big difference in terms of the number of casks I would have to send to get that as well, assuming that they elected to deliver fuel that was all, say, six years old.
Q. Did the department ever consider restricting the utility's ability to put broad ranges of fuel discharge dates on their delivery commitment schedules?
A. Not that I recall, no.
Q. Would it be fair to say that the department didn't find it necessary to have narrower spent fuel discharge dates on the delivery commitment schedules for purposes of the department's planning?
MS. SULLIVAN: Objection.

Page 101

Argumentative.
You can answer.
A. Based on my experience on utilities' side of the table, I would say that the industry had communicated to them that they had the ability to fill that out with a range of discharge dates, and they intended to, and I would say from my side of the table as DOE, in my opinion I don't believe I could have restricted them to providing me with a specific discharge date.
Q. You don't recall when you were at DOE anyone within DOE coming to you or the waste acceptance division saying gee, for purposes of planning, transportation or the repository we really would like to have hour discharge date ranges on the delivery commitment schedules?
MS. SULLIVAN: Objection, vague. Objection, foundation.
A. No, I don't recall that.
Q. To your knowledge, how has DOE actually used the delivery commitment schedules that have been approved?
MS. SULLIVAN: Objection. Vague.
A. I have no specific knowledge of that.
Q. You are not aware of any use that the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.)
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.)
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)
McLean, Virginia
Wednesday, April 10, 2002
Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 375

So we then had to apply, so the utilities could meet these instructions, a projected waste acceptance rate which is referred to in the 1991 ACR to this unchanging if you will, queue.
Is that responsive to your question?
BY MR. TOMASZCZUK:
Q. I don't know, but I think I understood what you just told me.
Well, if these instructions -- strike that.
Given that DOE has not commenced performance, would you agree that the DCS process has been suspended?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I guess suspended is an appropriate word.
It's not ongoing.
BY MR. TOMASZCZUK:
Q. Okay. And assuming that these instructions remain applicable and are not changed, if DOE starts in 2010, isn't it true that the first DCSs per these instructions would be due in 2004?

Page 376

MR. BANES: Objection. Mischaracterizes the instructions, and calls for a legal conclusion.
THE WITNESS: A lot has occurred in the last seven years.
I would think the person responsible now would want to review what we did, why we did it, and how we did it, and to see, you know, the applicability in sum or in part as to how they're going to proceed.
I wouldn't purport to say that they should take these and throw them out or take them and adopt them in total.
I don't think a responsible manager would use this as input in helping make a decision.
BY MR. TOMASZCZUK:
Q. Changed circumstances might warrant reviewing and revising these to reflect those circumstances, is that fair?
A. I think that is.
Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?

Page 377

MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.
For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.
We ought to know how many truck casks and how many rail casks we ought to have available.
In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.
I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

Page 378

DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.
BY MR. TOMASZCZUK:
Q. Okay. Mr. Brownstein, did you have a role to play in the preparation of what I'll refer to as the TSLCC reports -- total system life cycle cost reports?
A. No. Again, I may have, consistent with, I may have reviewed drafts, you know, as my responsibilities as a division director or as a branch chief, but in terms of its preparation, no.
Q. Okay. Same question with respect to fee adequacy reports -- did you have a role to play in the preparation of those?
A. At one time in the organization, for one short period of time, I did, but under the time that I had that responsibility, I don't recall that we actually issued it during that time period.
Q. Can you put a year on that activity for me?

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY: : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume I
Reported by: Diane Gomez, RPR

2

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

3

Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

4

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

205

A Yeah, I got that. Summary.
Q Yes. Would you take a moment please to read that summary.
A Okay.
Q Are you familiar, I take it you are familiar from your prior testimony today with the Department of Energy's proposal with respect to spent nuclear fuel as it stood in June 1987, correct?
MR. CRAWFORD: Objection, vague.
A To a limited degree, yes.
Q And does this summary detail the plan with respect to the use of an MRS that you described earlier today?
A I didn't --
MR. CRAWFORD: Well, objection, vague.
A It's not inconsistent with my understanding.
Q It's not consistent --
A Not inconsistent with my understanding. I mean, that it was going to do 6,000 tons within '98 and 2003, that's a little detail I certainly don't remember, but.

206

Q Now, under this plan there's only the MRS that would start to operate in 1998, correct?
A Correct.
Q And the repository in 2003?
A Right.
Q You were not involved, were you, in the decision to advance the date of the repository operations from '98 to 2003, correct?
A That's correct, I was not involved in that.
Q Will you explain to me how the MRS and the repository would have worked together as described in the summary on these two pages?
A The proposal in early '87, you know, late '96, early '97 from the department to the Congress was that the integrated MRS that would begin operation between '96 and '98, it would receive the material based on the contractual allocations and then package it, store it as necessary for transmittal to the first repository, then the second repository.
Q Now, under this proposal, the MRS would accept 6,000 MTUs of spent nuclear fuel during the five-year period from 1988 to 2003, correct?

207

MR. CRAWFORD: Objection, foundation.
A That's what it says.
Q And would that have been a 1200 a year acceptance rate at the MRS?
MR. CRAWFORD: Objection, foundation.
A I don't know. I assume it has a ramp to it. It's not 1200. It's in here somewhere. The answer is I don't know.
Q Let's look on page seven.
A There you go. All right. Okay. There it is.
Q Are you familiar with the plans that existed in 1987 that the MRS would take 1200 MTU per year?
A Only very vaguely.
Q Are you familiar with the basis for that projection?
A No.
Q Do you know what factors would have been considered in making that projection?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.

208

A I don't recall them. I mean, I can think of what they might have been but it would just be speculation on my part.
Q What do you think they might have been?
A Well --
MR. CRAWFORD: Objection to the extent it calls for speculation.
A How quickly, what kind of facility, the receiving facility, the hot -- number of hot cells for unloading the casks, the number of casks we had. You know, basically the design and the construction of the MRS itself.
Q On page Roman V you see the statement, "The schedule presumes congressional approval of DOE's MRS proposal"?
A Yes.
Q And precisely what did your office presume Congress would do, simply issue an authorization that an MRS facility could start operation as of 1998?
MR. CRAWFORD: Objection, vague.
A We would have to look at the proposal. I don't remember exactly what their proposal proposed

Q Did you ever read part of a DCS?
**A Might have. Don't know.**
Q What is a DCS?
**A Well --**
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
**A Delivery commitment schedule.**
Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
**A These were all part of the administrative details of the contract that I did not pay much management policy attention to.**
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
**A That's correct.**
Q A delivery commitment schedule was administrivia?
**A Uh-huh.**
Q Didn't really matter much to you, correct?
**A That's correct, relative to running the**



**program and getting the site.**
Q So you really did not have a particular understanding of what role or what function the overall administrative process that a DCS played; it was just another kind of bureaucratic piece of paper, correct?
MR. CRAWFORD: Objection, vague. Objection, mischaracterizes the witness's prior testimony. And objection to the foundation.
Q Correct?
**A Yes.**
Q My statement is correct?
**A Correct.**
Q Would you turn to page seven of Exhibit 6. Are you there, sir?
**A Yes.**
Q You see the section captioned Projected Waste Acceptance Capacity? That's the caption of the section?
**A Yes. Yes.**
Q And about seven lines down there's a sentence that begins, "The schedule will serve as a



basis for planning and it will be updated annually," and it continues.
**A Yes.**
Q Did you in your positions with the Office of Civilian Radioactive Waste Management use the schedule for planning purposes?
MR. CRAWFORD: Objection, foundation.
**A This schedule was just subservient to the systems description documents and the system requirement documents. So this document itself never played a significant role to me.**
Q It was those other documents that played the significant role that you just referred to, correct?
**A Those were the primary programmatic documents.**
Q This document being Exhibit 6, page seven we're looking at, projected waste acceptance capacity, was simply a derivative of or derived from those other key documents, correct?
MR. CRAWFORD: Objection. Mischaracterizes the witness's prior testimony. Objection, foundation.



Q Correct?
**A That's my understanding.**
MR. CAYNE: Let's take a two-minute break.
MR. CRAWFORD: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 7 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 7. Do you have that before you?
**A Yes, I do.**
Q This is the nuclear waste fund adequacy assessment dated March 1986. Have you ever been involved in the preparation of this or any other nuclear waste fund fee adequacy assessment?
**A Yes.**
Q Were you involved in the 1986 fund fee adequacy assessment?
**A I don't recall.**
Q I'll ask you to look at this document, Exhibit 7, to see if it refreshes your recollection, but first let me ask you, which fee adequacy

DEPOSITION OF DAVID ZABRANSKY
CONDUCTED ON WEDNESDAY, APRIL 17, 2002





IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

668

A Yes.
Q Do you know why the contracting officer based the DCS instructions on the ACR rather than the APR?
A **The APR doesn't contain anything to base it upon. The APR is merely a listing of fuel assemblies.**
Q The APR is a listing of fuel assemblies ranked by the oldest fuel at the beginning and going forward. Is that right?
A **Correct.**
Q And the ACR takes that ranking and uses a particular acceptance rate to determine allocations. Is that right?
A **That's correct. So, by extension, the ACR is based on the APR.**
Q The standard contract provided for an ACR beginning in 1987. Is that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A **The standard contract in article -- in Article B -- or Article 4.B.2 -- 4.B -- 4.B.5.B requires that DOE begin publishing ACR not later than**

669

**July 1st, 1987, yes.**
Q And was the APR to be published subsequent to the ACR?
A **Yes, it was.**
Q Did DOE state that the APR was to replace the ACR?
A **No. In fact, if I recollect, when DOE published the APR, it told utilities to check the values because they would be used in the ACR.**
Q Look at Exhibit 33 for me.
A **What does it look like?**
Q It's the 1997 ACR.
A **Okay.**
Q I'm going to ask you to look at page two, numeric page two with a Bates label PA 103158 and ask you to look at the paragraph that states, "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF HLW. In 1992 based on this priority ranking the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF HLW purchasers propose to deliver." Do you see that?

670

A **Yes, I do.**
Q What does it mean that the ACR will be converted into an APR?
MS. SULLIVAN: Objection. The document speaks for itself.
A **And it doesn't say that. It says the ACR acceptance ranking. What that refers to is this Table B-1 in this document where DOE had put together a table that wasn't an APR but used an illustrative example of how it would work, and that was converted into the APR which was subsequently used as the basis for developing the ACR.**
Q So what you're referring to is a table in this 1987 ACR, and that table will be converted into the APR for receipt of SNF?
A **That's what was done.**
Q Was the APR based on receipt at an interim storage facility or a repository?
MS. SULLIVAN: Objection, vague.
A **The APR is based upon the age of the fuel and nothing more.**
Q You can look at the contract again. If you

671

would look at Article 4.B.5.A, which states, "Beginning on April 1, 1981, DOE shall issue an annual acceptance priority ranking APR. For receipt of SNF and/or HLW at the DOE repository." Do you see that?
A **Correct.**
Q Do you know what that means, specifically the "at the DOE repository"?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. It says DOE repository. I've taken it to mean DOE facility pursuant to the act, but it's basically still a listing.
Q When you say you've taken it to mean DOE facility, why is that?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A **That's what I've taken it to mean.**
Q Do you know if others at DOE have also taken the words "DOE repository" here to mean DOE facility?
A **I don't know.**
Q Have you ever had discussions with anyone at DOE about the meaning of those words?

DOE/RW-03:

# 1991 Acceptance Priority Ranking

December 1991

*U.S. Department of Energy*
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

The following number is for OCRWM Records Management purposes only and should not be used when ordering this publication.

Accession No: HQO•911211•0001

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) that the Department of Energy (DOE) has executed with the owners and generators of civilian spent nuclear fuel requires annual publication of the Acceptance Priority Ranking (APR). The 1991 APR details the order in which DOE will allocate Federal waste acceptance capacity. As required by the Standard Contract, the ranking is based on the age of permanently discharged spent nuclear fuel (SNF), with the owners of the oldest SNF, on an industry-wide basis, given the highest priority.

The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of Federal waste management facility operations may submit Delivery Commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

This document is based on SNF discharges as of December 31, 1990, and reflects Purchaser comments and corrections, as appropriate, to the draft APR issued on May 15, 1991. It should be noted that the ranking in the 1991 APR is subject to change for several reasons. First, if assemblies currently in the ranking are reinserted into the reactor, they will be removed from the ranking and added to the queue when they are permanently discharged. Second, for Purchasers who have informed DOE of assembly status changes in the comments on the draft APR, formal revisions to their existing Form RW-859 or Annex B to Appendix G of the Standard Contract must be submitted as appropriate or their ranking in the 1992 APR will revert back to the ranking reflected in the draft APR. Finally, because of variations in individual utility RW-859 reporting schedules, the final year's discharges reported in the APR will be subject to correction. Future editions of the APR will reflect SNF discharges beyond December 31, 1990.

Rec'd 10/6/98 DCS

**BOSTON EDISON**
Pilgrim Nuclear Power Station
Rocky Hill Road
Plymouth, Massachusetts 02360

September 29, 1998

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

Dear Sir/Madam:

Enclosed please find Boston Edison Company's Delivery commitment Schedule (DCS) for Pilgrim Nuclear Power Station for the year 2004.

Please note that we have added a footnote to the DCS stating that the use of a transfer cask or a crane upgrade would permit Pilgrim to utilize a 125 - ton standard cask.

Please call John H. Piascik at (508) 830-7905 if you have any questions.

Very truly yours,

[signature] For

H.V. Oheim
General Manager Technical

Enclosure

cc: 1) J.H. Piascik
✓2) Chief, Logistics & utility Interface Branch, U.S. DOE

JHP:jg

NWPA-830C
Revised 09/10/93

OMB No.: 1901-0260
Expires: 05/31/97

# U.S. DEPARTMENT OF ENERGY
## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 Name of Purchaser: Boston Edison Company

1.4 Contract Number: DE-CR01-83NE44368

1.2 DCS Identification Number: 01-0601-4368-01

1.5 Reactor/Facility Information:
(a) Name: Pilgrim
(b) Address: Rocky Hill Road
(c) City: Plymouth
(d) State: MA (e) Zip Code: 02360

1.3 Contact Person:
(a) Name: J.H. Piascik
(b) Telephone: (508 ) 830-7905

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ~~60~~ 125 (WITH UPGRADE) 60 (W/O UPGRADE) → use ...
2.2 Proposed Shipping Mode: Truck ____; Rail X ; Barge X (both possible)
2.3 Proposed Delivery Year: 2004
2.4 Range of Discharge Dates: 12/28/73 to 1 / 4 /80
(Earliest to Latest) Mo/Day/Yr to Mo/Day/Yr
2.5 Metric Tons Uranium: (Initial) 11.41
2.6 Number of Assemblies: BWR 62 PWR ____ Other ____
*Transfer cask or a crane upgrade required for use of 125-ton standard cask

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] for HVO — 9/30/98
Authorized Purchaser Signature — Date

3.2 H.V. Oheim
Name (Please Type or Print)

3.3 General Manager Technical
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the Unites States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE ACTION

4.1 ☐ Approved ☐ Disapproved

4.2 ____________________
Technical Representative Title Date

____________________
Contracting Officer Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

**Department of Energy**
Washington, DC 20585

November 24, 1998

Mr. H. V. Oheim
General Manager Technical
Boston Edison
Pilgrim Nuclear Power Station
Rocky Hill Road
Plymouth, Massachusetts 02360

Dear Mr. Oheim:

The Department of Energy received your Delivery Commitment Schedule (DCS) for the Pilgrim Nuclear Power Station (contract number DE-CR01-83NE44368) for 2004, submitted pursuant to Article V. B., and Appendix C "Delivery Commitment Schedule" of the Standard Contract for Disposal of Spent Nuclear Fuel and/ or High-Level Radioactive Waste (10 CFR 961).

The Department is not able at this time to approve your DCS submittal. Consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days.

If you have any questions regarding this matter, please contact me at 202-426-0076, or Mr. Dave Zabransky, Office of Civilian Radioactive Waste Management, at 202-586-9198.

Sincerely,

Beth A. Tomasoni

Beth A. Tomasoni
Contracting Officer
Office of Placement and Administration

cc: John H. Piascik

Printed with soy ink on recycled paper

**BOSTON EDISON COMPANY**

**Divestiture of**
**Pilgrim Nuclear Power Station to**

**ENTERGY NUCLEAR GENERATION COMPANY**

**JULY 13, 1999 (THE "CLOSING DATE")**

**Working Binder**

allocated between the Decommissioning Trust and the Provisional Trust in proportion to their respective fair market values as of the Closing Date. The Buyer and the Seller may jointly agree to obtain the services of an independent engineer or appraiser (the "Independent Appraiser") to assist the Parties in determining the fair value of the Acquired Assets solely for purposes of such allocation under this Section 2.7. If such an appraisal is made, both the Buyer and the Seller agree to accept the Independent Appraiser's determination of the fair value of the Acquired Assets. The cost of the appraisal shall be borne equally by the Buyer and the Seller. Each of the Buyer and the Seller agrees to file Internal Revenue Service Form 8594 and all federal, state, local and foreign Tax Returns in accordance with such agreed allocation. Except to the extent required to comply with audit determinations by a taxing authority with jurisdiction over either party, both the Buyer and the Seller shall report the transactions contemplated by this Agreement and the Related Agreements for federal Income Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Section 2.7. Each of the Buyer and the Seller agrees to provide the other promptly with any other information required to complete Form 8594. Each of the Buyer and the Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding the agreed upon allocation of the Purchase Price.

2.8. Proration.

(a) The Buyer and the Seller agree that all of the items normally prorated, including those listed below, relating to the business and operations of the Acquired Assets will be prorated as of the Closing Date, with the Seller liable to the extent such items relate to any period through the Closing Date, and the Buyer liable to the extent such items relate to periods after the Closing Date: (i) personal property, Real Property, occupancy and water, Taxes, assessments and other charges of the type that could give rise to a Permitted Encumbrance, if any, on or associated with the Acquired Assets; (ii) rent, Taxes and other items payable by or to the Seller under any of the Contracts, Emergency Preparedness Agreements or Leases assigned to and assumed by the Buyer hereunder; (iii) any Permit, license, registration or fees with respect to any Transferable Permit assigned to Buyer associated with the Acquired Assets; (iv) sewer rents and charges for water, telephone, electricity and other utilities; (v) any fees or charges imposed by INPO, NEI, the NRC or any other Governmental Authority; and (vi) payments regarding the Pilgrim Fixed Operating Costs pursuant to Section 5.11.

(b) In connection with the prorations referred to in Section 2.8(a), if the actual figures are not available at the Closing Date, the proration shall be based upon the actual Taxes or fees for the preceding year (or appropriate period) for which actual Taxes or fees are available and such Taxes or fees shall be re-prorated upon request of either the Seller, on the one hand, or the Buyer, on the other hand, made within 60 days of the date the actual amounts become available. If the Taxes which are apportioned are thereafter reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the Parties; provided that neither party shall be obligated to institute or

prosecute an abatement unless required pursuant to the Property Tax Agreement or otherwise agreed in writing. The Seller and the Buyer agree to furnish each other with such documents and other records that may be reasonably requested in order to confirm all adjustment and proration calculations made pursuant to this Section to 2.8.

2.9. The Closing. Unless otherwise agreed to by the Parties, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Ropes & Gray, One International Place, Boston, Massachusetts, commencing at 9:00 a.m. eastern time on the date that is fifteen (15) days (or, if the fifteenth day is not a Business Day, then the next Business Day following such fifteenth day) following the date on which all of the conditions set forth in Sections 6.1 and 6.2 have either been satisfied or waived by the Party for whose benefit such condition exists, such satisfaction or waiver to conform to Section 11.8, provided, however, that the deliveries contemplated by Sections 2.10 and 2.11 shall not be considered when determining whether the conditions to obligations to Close set forth in Sections 6.1 and 6.2 have been satisfied. The date of Closing is hereinafter called the "Closing Date" and shall be effective for all purposes herein as of 11:59 p.m. eastern time on the Closing Date.

2.10. Deliveries by the Seller at the Closing. At the Closing, the Seller shall deliver the following to the Buyer, duly executed and properly acknowledged, if appropriate:

(a) the deed for the Real Property and Improvements, substantially in the form attached hereto as Exhibit A, reserving the necessary Easements to be retained by the Seller;

(b) the Bill of Sale, substantially in the form attached hereto as Exhibit B, for the tangible personal property included in the Acquired Assets;

(c) the Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit C, in recordable form if necessary;

(d) the Asset Demarcation Agreement, substantially in the form attached hereto as Exhibit D;

(e) a FIRPTA Affidavit by the Seller;

(f) the Property Tax Agreement, substantially in the form attached hereto as Exhibit E;

(g) copies of all consents, waivers or approvals obtained by the Seller with respect to the Acquired Assets, the transfer of the Transferable Permits or the consummation of the transactions contemplated by this Agreement and the Related Agreement, to the extent specifically required under this Agreement or the Related Agreements (without limiting the generality of the foregoing, Seller is specifically required to provide Buyer with copies of

DOE/RW-0331P

Office of Civilian Radioactive Waste Management

# Annual Capacity Report

December 1991

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, DC 20585

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is the fourth in the series published by DOE. In December 1991, the Department published the 1991 Acceptance Priority Ranking (APR) that established the order in which the Department will allocate acceptance capacity. As required by the Standard Contract, the priority ranking for acceptance capacity is based on the date the spent nuclear fuel (SNF) was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR, resulting in individual Purchaser allocations. These allocations are listed in Appendix A and summarized in Table 3.1

The projected waste acceptance rates for SNF presented in Table 2.1 assume: a site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy of 1982, as amended (NWPA) will be modified. During the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA. The annual acceptance rates provide an approximation of the system throughput and are subject to change as the program progresses. The ACR allocates only that portion of the FWMS capacity assigned to SNF originating from reactors and covered by the Standard Contract and DOE-owned SNF from commercial industry and civilian development programs.

Section 1.0 provides a discussion of the requirement for the ACR and the role it plays in the Department's interaction with the Purchasers in implementing the provisions of the Standard Contract. The FWMS projected

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (NWPA)[1] assigns the Federal Government responsibility for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy (Secretary) under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT

Under the terms of the Standard Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance capacity allocations to the Purchasers for ten years following the projected commencement of DOE facility operations. Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers. As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

**Owners or generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

Purchasers. Beginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter. The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser.

## 1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for the effective and equitable implementation of the FWMS are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing sixty-four of the sixty-six owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

continue to be responsible for storing their spent fuel until acceptance by DOE.

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

After the SNF was listed in accordance with the APR, it was divided into ten groupings, each of whose cumulative MTU equals the projected annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The Purchasers' allocations for each year are presented in Tables A.1 through A.10 in Appendix A.

The tables in Appendix A list the owners of the SNF alphabetically, with a sublisting of the reactors that were the source of the qualifying SNF by the number of assemblies and their equivalent MTU. The exact order of deliveries within each year will not be specified until the Purchasers' Final Delivery Schedules (FDS) are approved by DOE.

As in past ACRs, allocations in the 1991 ACR are based on a 1-year allocation period. DOE continues to investigate the impacts on the system of expanding these allocation periods from eighteen to thirty-six months. Use of expanded allocation periods could result in a reduction in the frequency of deliveries when serving each Purchaser. Final results of this study are not yet available. DOE will keep Purchasers apprised of the results of this analysis.

3.2 DELIVERY COMMITMENT SCHEDULES

The Standard Contract provides that beginning January 1, 1992, Purchasers shall submit to DOE DCSs that identify all SNF the Purchasers plan to deliver to DOE beginning sixty-three months thereafter. Due to the limited projected annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year may be approved.

A summary of Purchaser allocations is presented in Table 3.1. These allocations are the basis for DCS submittals. Among other things, the DCS identifies the range of discharge dates from which the SNF will ultimately be selected for delivery. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation. DCS forms and instructions will be sent to Purchasers in early 1992.

The information contained on the Purchasers' approved DCSs will assist DOE in implementing the waste acceptance process. Approved DCSs will be the basis for the Purchasers' FDSs, to be submitted twelve months prior to delivery. As provided in Article V of the Standard Contract, the Purchasers also have the right to exchange approved DCSs with other Purchasers, subject to DOE approval.

DOE/RW-0418

# 1992 Annual Capacity Report

**Revision 1**

**May 1993**

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, DC 20585

SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is the fifth in the series published by DOE. In May 1993, DOE published the 1992 Acceptance Priority Ranking (APR) that established the order in which DOE will allocate projected acceptance capacity. As required by the Standard Contract, the acceptance priority ranking is based on the date the spent nuclear fuel (SNF) was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1992 ACR applies the projected waste acceptance rates in Table 2.1 to the 1992 APR, resulting in individual allocations for the owners and generators of the SNF. These allocations are listed in detail in the Appendix, and summarized in Table 3.1.

The projected waste acceptance rates for SNF presented in Table 2.1 are nominal and assume a site for a Monitored Retrievable Storage (MRS) facility will be obtained; the facility will initiate operations in 1998; and the statutory linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982, as amended (NWPA), will be modified. During the first ten years following projected commencement of Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 metric tons of uranium (MTU). This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA. The annual acceptance rates provide an approximation of the system throughput and are subject to change as the program progresses. The ACR allocates only that portion of the CRWMS capacity assigned to SNF that originated from civilian nuclear reactors and is covered by the Standard Contract, and DOE-owned SNF from civilian nuclear reactors and civilian development programs.

Section 1.0 provides a discussion of the requirement for the ACR and the role it plays in DOE's interaction with the Purchasers in implementing the provisions of

the Standard Contract. The CRWMS projected acceptance schedule is presented in Section 2.0. Section 3.0 discusses the basis and procedures for allocating acceptance capacity to each Purchaser, summarizes the annual allocations for the 10-year period covered by this report, and addresses Delivery Commitment Schedules (DCS). A description of the ACR Issue Resolution Process (IRP) and a report on its current status are provided in Section 4.0. The Appendix is a detailed listing of the annual acceptance capacity allocations for Purchasers with allocations in the first 10 years of projected CRWMS operations. Previous publications of the ACR included an additional Appendix, listing SNF by the date of permanent discharge. Since this information is published separately as the 1992 APR, it is no longer included here.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982 (NWPA)[1], as amended, assigns the Federal Government responsibility for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions assigned to the Secretary of Energy (Secretary) by the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for DOE's acceptance and disposal of SNF and HLW. It includes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT

Under the terms of the Standard Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance capacity allocations to the Purchasers for 10 years following the projected commencement of DOE facility operations. An allocation is a portion of the nominal acceptance capacity (measured in metric tons of uranium -- MTU) in a particular year for an individual Purchaser. These capacity allocations, as listed in the Appendix, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS), as discussed further in Section 3.2. As specified in the Standard Contract, the

---

* Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

** Owners and generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers.

1.2 STAFF-TO STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for effective and equitable implementation of the Civilian Radioactive Waste Management System (CRWMS) are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing 64 of the 66 owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the implementation of the Standard Contract provisions. Comments on this ACR should be addressed to:

Ms. Nancy Montgomery
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The NWPA and the Standard Contract condition waste acceptance by DOE upon the commencement of operation of a repository or a Monitored Retrievable Storage (MRS) facility. Section 302(a)(5) of the NWPA directs that contracts entered into in accordance with Section 302(a) of the NWPA are to provide that DOE will take title to SNF following commencement of operation of a repository. In response to this statutory requirement, the Standard Contract provides in Article II that "the services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998...." Section 142 of the NWPA authorizes DOE to site, construct, and operate an MRS facility for temporary SNF storage prior to disposal in a repository.

The acceptance rates in Table 2.1 are nominal and do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the CRWMS with the nominal waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first 10 years. This table provides only an approximation of the system throughput rates and is subject to change depending on congressional action regarding the conditions for the siting of an MRS facility, and the system design and configuration. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses, and inform the Purchasers accordingly at the earliest feasible time. Until the SNF is accepted by DOE, Section 111(a)(5) of the NWPA assigns the waste owners and generators the primary

responsibility to provide for, and pay the costs of, interim storage.

TABLE 2.1

Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| 2007 | 900 |
| TOTAL | 8,200 |