IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BOSTON EDISON COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99-447C |
| | ) | (Judge Lettow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this response to plaintiff's proposed findings of fact.

INTRODUCTION

Plaintiff's proposed findings of fact are not proposed findings of "fact" at all. Instead, they mostly consist of legal arguments. In fact, there appear to be only five proposed findings of fact, out of 16 proposed findings, that are not pure legal conclusions or arguments and that have any factual relevance to plaintiff's cross motion for summary judgment on liability. The bulk of plaintiff's proposed findings of "fact" are thus wholly improper because matters of legal interpretation do not and cannot create genuine issues of material fact. Although we have made an effort to respond to each of plaintiff's proposed findings, regardless of whether they address an issue of fact or, in reality, address solely an issue of law, to the extent that plaintiff's proposed findings address an issue of law, we respectfully refer the Court to our opening and reply briefs submitted in support of our Motion to Dismiss or, in the Alternative, for Summary Judgment.

GENERAL OBJECTIONS

Rule 56(h)(1) contemplates that a party's proposed findings of uncontroverted fact shall "set[] forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute." RCFC 56(h)(1). Plaintiff, Boston Edison Company ("Boston"), has submitted proposed findings that include argument pertaining to matters of law. To the extent that Boston's proposed findings advance legal arguments or are conclusions of law, we object to such proposed "findings" upon the ground that they are outside the scope of RCFC 56(h)(1) and (2). RCFC 56(h)(2) does not require the Government to respond to Boston's legal arguments in response to Boston's proposed findings of fact. To the extent that we provide a specific response to matters of law raised in Boston's proposed findings, we do so for the convenience of the Court, without waiving our general objection. Further, to the extent that plaintiff's proposed findings address an issue of law, we respectfully refer the Court to our brief submitted in support of our motion for summary judgment.

DEFENDANT'S RESPONSES

1. Boston Edison was the sole owner and operator of the Pilgrim Nuclear Power Station in Plymouth, Massachusetts ("Pilgrim") until the sale of that facility on July 13, 1999. Am. Compl. ¶¶ 2, 4.

<u>RESPONSE</u>: Defendant agrees with this proposed finding. Defendant notes that Pilgrim was sold to Entergy Nuclear Generation Company ("Entergy") in July 1999, and Entergy currently solely owns and occupies that facility.

2. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. § 10101 *et seq.* ("NWPA"), on June 17, 1983, Boston Edison and the U.S. Department of Energy ("DOE")

executed the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 10 C.F.R. § 961.11 ("Standard Contract"). Am. Compl. ¶ 31.

RESPONSE: Defendant agrees that Boston and DOE executed the Standard Contract on June 17, 1983. However, defendant notes that the Standard Contract was entered into voluntarily and that the NWPA did not require Boston to enter into such a contract with DOE.

3. The Standard Contract was an important and integral element of Boston Edison's conduct of its business of generating electricity at Pilgrim, in that it provided for the orderly disposal of spent nuclear fuel and/or high-level radioactive waste ("SNF") produced during the normal course of operation. The Standard Contract also facilitated the timely and orderly completion of post-retirement activities following the end of Pilgrim's life as a nuclear generation facility. Am. Compl. ¶ 3.

RESPONSE: Defendant disagrees with plaintiff's proposed finding. Plaintiff has not presented any evidence, other than the allegations in its complaint, to support its contention. Plaintiff cannot rely upon the allegations in its complaint to support its evidentiary burden in a summary judgment motion. See RCFC 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading"); 56(h)(1). Further, plaintiff's proposed finding is entirely irrelevant to whether the Government is liable to Boston for breach of contract.

4. The NWPA made entry into the Standard Contract mandatory for all utilities, including Boston Edison. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1338 (Fed. Cir. 2000).

RESPONSE: Defendant objects to the proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and

56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding.

In Maine Yankee, the Federal Circuit stated that the NWPA "authorized" DOE to enter into contracts with nuclear utilities and "effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not 'entered into a contract with the Secretary' or who is not 'actively and in good faith negotiating with the Secretary for a contract.'" Maine Yankee, 225 F.3d at 1337 (emphasis added). Contrary to plaintiff's contention, the NWPA did not make entry into the Standard Contract "mandatory" for all utilities, because the utilities could forego renewing their licenses and could either sell or shutdown their plants. Further, because Boston already had a 40-year license when the NWPA was enacted in 1983, it is unclear from the language of the NWPA that Boston was "required" to enter into a contract simply to maintain that license, as opposed to renewing that license many years into the future. See 42 U.S.C. § 10222(b)(1)(a). Specifically, Boston's original 40-year license was issued in 1972, Original Compl. ¶ 2, meaning that it will not need a renewal until 2012. Finally, the utilities, through their trade associations, heavily participated in the negotiation and drafting of the Standard Contract, and the utilities drafted provisions of the contract, including the "exchanges" provision, that were included in the final version of the Standard Contract. See 19 C.F.R. § 961.11, Art. V.E.; Indiana Michigan, 88 F.3d at 1273 ("The final standard contract adopted by DOE [was] following notice and comment . . . ."); Final Rule: Standard Contract for Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste, 48 Fed. Reg. 16590, at 16591 (Apr. 18, 1983) (discussing comments received by DOE upon the draft standard contract from 85 organizations representing electric

power associations and nuclear utilities).

5. In accordance with the Standard Contract, DOE was required to begin removal and disposal of Boston Edison's SNF no later than January 31, 1998 in exchange for Boston Edison's payment of fees into the Nuclear Waste Fund. Standard Contract, 10 C.F.R. § 961.11, Art. II; *see also Maine Yankee*, 225 F.3d at 1338.

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding.

As discussed in our opening and reply briefs in support of our Motion to Dismiss or, in the Alternative, for Summary Judgment, the January 31, 1998 deadline is the date that DOE was obligated to begin its acceptance of SNF from the nuclear utility industry as a whole, rather than from each and every Standard Contract holder. The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from which DOE would accept SNF from the various contract holders beginning no later than January 31, 1998. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among

other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the

contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; Gov't Supp. Appendix, at 153-160 ("Instructions For Completing The Appendix C Delivery Commitment Schedule"). DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2.

The acceptance date for each utility's SNF was determined by its submission of, and DOE's approval of, delivery commitment schedules. The delivery commitment schedules thus established the first year in which DOE was obligated to begin SNF acceptance from specific utilities. In the case of Boston, the first SNF acceptance year was 1999. However, because DOE could have scheduled its acceptance of Boston's SNF until January 30, 2000, the last day of the 1999 SNF acceptance year, Boston did not accrue any rights to acceptance of its SNF prior to selling Pilgrim to Entergy in July 1999. See Defendant's opening and reply briefs in support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, at Part I.

6. DOE was "under a statutory obligation . . . reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." *N. States Power Co. v. United States*, 224 F.3d 1361, 1366 (Fed. Cir. 2000) (quoting *Ind. Mich. Power Co. v. United States*, 88 F.3d 1272, 1277 (D.C. Cir. 1996)).

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and

56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding. Defendant respectfully refers the Court to defendant's response to plaintiff's proposed finding of fact No. 5.

7. "The [Nuclear Waste Policy Act] directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility." *N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997).

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding. Defendant respectfully refers the Court to defendant's response to plaintiff's proposed finding of fact No. 5.

8. "DOE's duty to take the materials by the 1998 deadline is also an integral part of the Standard Contract, which provides that the Department 'shall begin' disposing of the SNF by January 31, 1998." *Northern States*, 128 F.3d at 758 (citing and quoting the Standard Contract, 10 C.F.R. § 961.11, Art. II).

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding. Defendant respectfully refers the Court to defendant's response to plaintiff's proposed finding of

fact No. 5.

9. The duty to begin taking SNF by January 31, 1998 was "without qualification or condition." *Indiana Michigan*, 88 F.3d at 1276.

RESPONSE: Defendant denies this proposed finding. Even if DOE's obligation to begin accepting SNF and/or HLW from the nuclear utility contract holders as a collective whole may have been "without qualification or condition," DOE's obligation to begin accepting SNF and/or HLW from any particular contract holder was conditioned upon the contract holder's satisfaction of numerous conditions, including payment of all required fees, submission of appropriate delivery commitment schedules and final delivery schedules, and fulfillment of all other contract obligations.

10. On May 3, 1995, DOE formally admitted that it would be unable to begin to dispose of SNF until 2010. *Final Interpretation of Nuclear Waste Acceptance Issues*, 60 Fed. Reg. 21793, 21794 (May 3, 1995).

RESPONSE: Defendant admits the facts set forth in paragraph 10 to the extent supported by the Final Interpretation cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 10; avers that DOE represented that it currently anticipates that it will not be able to begin SNF and/or HLW acceptance until 2010, rather than it "would be unable to begin" by that date.

11. DOE did not begin to remove and dispose of Boston Edison's SNF at Pilgrim by January 31, 1998. *Maine Yankee*, 225 F.3d 1338.

RESPONSE: Defendant agrees with this proposed finding. However, defendant notes that DOE was not obligated to begin accepting Boston's SNF on January 31, 1998. Defendant

respectfully refers the Court to defendant's response to plaintiff's proposed finding of fact No. 5.

12. DOE's failure to begin removal and disposal of SNF at Pilgrim by January 31, 1998 constituted a breach of the Standard Contract and "the breach involved all the utilities that signed the contract – the entire nuclear electric industry," including Boston Edison. Maine Yankee, 225 F.3d at 1342.

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding.

As discussed in our Motion to Dismiss or, in the Alternative, for Summary Judgment, DOE did not breach any duties running directly to Boston under Boston's Standard Contract because Boston sold its Pilgrim plant and assigned its DOE contract to Entergy on July 13, 1999, before DOE's obligation to accept Boston's SNF arose. DOE was not obligated to accept Boston's SNF until January 30, 2000, the end of the 12-month period during which DOE could have scheduled its acceptance of Boston's SNF under its approved DCS for its 1999 allocation. Because Boston transferred its nuclear plant and assigned its DOE contract to Entergy on July 13, 1999, and because DOE was not obligated to accept Boston's SNF until January 30, 2000, Boston did not accrue any rights against DOE arising from the Standard Contract. Consequently, Boston lacks standing to maintain this action.

Further, Boston could not have suffered an injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Instead, any injury that Boston incurred would result from DOE's failure to accept Boston's SNF as identified

in Boston's approved delivery commitment schedules. However, as explained above, Boston did not have an approved delivery commitment schedule that required DOE to begin SNF acceptance under Boston's Standard Contract before Boston sold its nuclear plant and assigned its DOE contract to Entergy. Consequently, Boston has no basis for arguing that DOE's failure to accept Boston's SNF on January 31, 1998, caused it to incur damages.

Instead, the first "breach" that would have caused an injury to Boston would not have occurred until January 30, 2000, the end of the 12-month period during which DOE was entitled, and obligated, to accept the first of Boston's SNF through its 1999 approved delivery commitment schedule. However, Boston sold its nuclear plant and assigned its DOE contract to Entergy on July 13, 1999. Therefore, Boston has no basis for seeking damages for DOE's failure to begin acceptance of its SNF in accordance with the delivery commitment schedules approved pursuant to Boston's Standard Contract. Consequently, the Government is not liable to Boston, and Boston can neither recover damages for the alleged diminution of value of its Pilgrim plant nor for costs incurred for storage of its SNF.

13. Boston Edison sold Pilgrim to Entergy Nuclear Generating Company, LLC ("Entergy") on July 13, 1999. As part of the sales transaction for Pilgrim, Boston Edison assigned the Standard Contract to Entergy subject to an express reservation of certain rights and claims, including claims related to the Standard Contract. Am. Compl. ¶ 4.

RESPONSE: Defendant agrees with this proposed finding. However, to the extent that Boston's assignment violates any part of the Anti-Assignment Act or Assignment of Claims Act, 31 U.S.C. § 3727 and 41 U.S.C. § 15, defendant reserves the right to challenge that portion of the assignment. Defendant further notes that Boston and Entergy cannot recover duplicative

damages for costs relating to additional on-site storage of SNF upon Pilgrim.

14. By the closing date of Boston Edison's sale of Pilgrim, Boston Edison's payments into the Nuclear Waste Fund exceeded $89 million. Appendix to Boston Edison Company's Brief in Response to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment Upon Counts I and II and for Summary Judgment Upon Count III of Plaintiff's Amended Complaint and Cross-Motion for Summary Judgment on Liability Regarding Count I of the Amended Complaint ("App.") at 2.

RESPONSE: Defendant disagrees with this proposed finding. DOE's records show that, by the date of the sale of the Pilgrim facility, Boston had paid approximately $88.6 million into the Nuclear Waste Fund. Gov't Supp. Appendix, at 214-221.

15. Boston Edison suffered damages as a result of DOE's failure to dispose of its SNF. Boston Edison realized significantly less value in the sale of Pilgrim than it would have realized had DOE met its obligations under the Standard Contract. App. at 2.

RESPONSE: Defendant objects to this proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. To the extent that the allegations contained in this paragraph are deemed to be allegations of fact, defendant disagrees with plaintiff's proposed finding.

Indeed, Boston's contention that it suffered damages is unsupported by evidence. In support of its damages claim, Boston has relied exclusively upon the affidavit of Geoffrey Lubbock. However, as discussed in Defendant's Motion to Strike the Affidavit of Geoffrey Lubbock, Mr. Lubbock's affidavit is inadmissible. As further demonstrated in our reply brief in support of our Motion to Dismiss or, in the Alternative, for Summary Judgment, the damages

sought by Boston for alleged diminution of value of its Pilgrim plant at an auction are unrecoverable as a matter of law because they are too remote and speculative, they do not flow directly from the breach, they were not reasonably foreseeable at the time the contract was executed, and they cannot be calculated with any degree of certainty. Clearly, Boston has presented no admissible evidence to establish that its Pilgrim plant would have been sold for more at an auction had DOE timely begun accepting Boston's SNF. Boston cannot succeed in its motion for summary judgment upon liability without presenting evidence of damages. Therefore, Boston's motion for summary judgment should be denied. In any event, defendant has not had any discovery upon Boston's alleged damages and, pursuant to RCFC 56(f), defers a decision upon whether Boston has, in fact, suffered damage through a diminished sales price pending that discovery.

16. As part of the license transfer process from Boston to Entergy, Boston Edison was required by the Nuclear Regulatory Commission to transfer a fully funded decommissioning trust fund (net of expected investment returns to end of license life) to Entergy to ensure that it would have sufficient funds to decommission the plant and surrounding site once the plant could no longer operate. Because of the uncertainty as to the timing of decommissioning and the ultimate removal of the SNF caused by DOE's breach of the Standard Contract, Boston Edison was required to transfer a much larger decommissioning trust to Entergy than would otherwise have been the case had DOE met its obligations under the Standard Contract. App. at 2.

RESPONSE: Defendant disagrees with this proposed finding. Boston relies exclusively upon the affidavit of Mr. Lubbock to support its contention that its decommissioning trust fund would have been smaller had DOE timely begun accepting Boston's SNF. However, the affidavit

of Mr. Lubbock is inadmissible because he lacks personal knowledge regarding the matters asserted therein. Indeed, Boston's contention regarding the "uncertainty as to the timing of decommissioning and the ultimate removal of SNF" is speculative. Boston appears to suggest that DOE will not begin accepting utility SNF from 2010. However, there is no basis for this assertion. Boston has presented no evidence to support its position other than the speculative and baseless statements of Mr. Lubbock. Further, the timing of the decommissioning of Pilgrim is dependent upon the owner and operator of Pilgrim, not DOE.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester
HAROLD D. LESTER, JR.
Assistant Director

s/Stefan Shaibani
STEFAN SHAIBANI
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-305-7597
Fax: 202-307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

August 26, 2004

CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2004, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Stefan Shaibani