IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BOSTON EDISON COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99-447C |
| | ) | (Judge Lettow) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant, the United States, respectfully submits its reply to plaintiff's response to defendant's motion to dismiss or, in the alternative, for summary judgment upon Counts I and II and for summary judgment upon Count III of plaintiff's complaint, as well as defendant's response to plaintiff's cross-motion for summary judgment on liability.

SUMMARY OF ARGUMENT

As we established in our motion, the delivery commitment schedules ("DCS") in the Standard Contract for Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste ("Standard Contract") constitute binding contractual obligations for the purpose of determining the Department of Energy's ("DOE") liability to Boston Edison Company ("Boston") for breach of contract and Boston's standing. Pursuant to the delivery commitment schedules submitted by Boston and approved by DOE, Boston lacks standing to pursue this action because it sold its nuclear plant and assigned its DOE contract to Entergy Nuclear Generation Company ("Entergy") prior to accruing any rights to acceptance of its spent nuclear fuel ("SNF"). Consequently, Boston's suit should be dismissed. Boston's construction of approved DCSs as mere administrative mechanisms with no effect would render the Standard Contract illusory and

unworkable because it would eliminate the essential terms in the contract pertaining to quantity and time of performance.[1]

Similarly, Boston's takings claim fails as a matter of law because it arises from a breach of contract. Boston did not have any "vested property rights" prior to its execution of the Standard Contract. The Atomic Energy Act of 1954 did not obligate DOE to accept and/or permanently dispose of Boston's SNF. Nor did the Nuclear Waste Policy Act create any obligation that runs to Boston, absent Boston's execution of a contract with DOE. Clearly, there was no physical taking in this case because Boston sold its Pilgrim plant to Entergy in 1999, and Entergy currently owns and occupies Pilgrim. Further, the Government's delay in accepting Boston's SNF does not give rise to a regulatory takings claim because Congress did not enact a statute (and DOE did not promulgate a regulation) that altered the contractual rights of Boston. Boston is not entitled to consequential damages through a takings claim. That Boston may recover certain damages not recoverable through a breach of contract claim does not justify

---

[1] In our motion and in this reply, we have assumed that Boston has continued to claim only a partial breach of the Standard Contract, as it alleged in its original complaint in this case. See Complaint ¶ 1 (filed July 12, 1999). Nevertheless, we have discovered that, in its January 13, 2004 amended complaint and its July 9, 2004 response to our motion, Boston no longer references the term "partial" in discussing the Government's alleged breach. To the extent that Boston has changed its theory of the case and is now seeking damages for a total breach of contract, it is too late for Boston to change that theory. See Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976); Lucente v. IBM Corp., 310 F.3d 243, 258-59 (2d Cir. 2002). However, to the extent that the Court permits Boston to change its theory, that change will have serious implications for the lawsuit filed by its assignee, Entergy Nuclear Generation Company (Docket No. 03-2626C). As we have explained in our motion, a total breach of contract ends the parties' continuing performance obligations. If Boston is terminating the Government's future performance obligations by declaring a total breach of contract, Entergy has no basis for a suit against the Government, as "[i]t is well-established that an assignee stands in the shoes of the assignor, and that by assignment the assignee could acquire no greater rights than its assignor." National City Bank of Evansville v. United States, 143 Ct. Cl. 154, 163, 163 F. Supp. 846, 852 (1958).

Boston's pursuit of a facially frivolous takings claim that would entail a lengthy trial and significant expense and resources.

Boston's good faith and fair dealing claim also fails because it is dependent upon, and directly arises from, Boston's breach of contract claim, and because Boston lacks standing to pursue these claims. In addition, Boston has completely failed to present any evidence to overcome the presumption of good faith. Further, this Court lacks jurisdiction to entertain Boston's contentions regarding DOE's alleged over-collection of fees into the Nuclear Waste Fund. The Court should thus dismiss Boston's complaint in its entirety and deny Boston's cross motion for summary judgment on liability.

## DISCUSSION

### I. BOSTON'S CONTRACT CLAIM FAILS BECAUSE BOSTON LACKS STANDING TO PURSUE THIS ACTION AND IT CANNOT ESTABLISH THAT IT SUFFERED ANY COGNIZABLE DAMAGES

#### A. The Delivery Commitment Schedules In The Standard Contract Constitute Binding Contractual Obligations That Determine Liability And Standing

As we established in our motion, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept their SNF. See Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, at 9-14. That contractual mechanism required all contract holders to submit a delivery commitment schedule to DOE at least 63 months prior to any desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. As we further established in our motion, submission of a DCS, followed by actions necessary to obtain DOE's approval of that

DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.[2]

In response to our motion, Boston contends that "the DCS process is administrative and does not create a binding contractual obligation for purposes of determining liability or standing." Pl.'s Brief, at 11. Contrary to Boston's contention, the DCS mechanism is an essential term of the Standard Contract that defines the rights and obligations of the parties. In fact, without the DCS and final delivery schedule ("FDS") provisions, the Standard Contract would be wholly illusory. The DCS mechanism determines two essential terms of the Standard Contract: the time of performance and the quantity of SNF to be accepted by DOE. If the DCS mechanism were merely an "administrative" process that did not create binding contractual obligations, the Standard Contract would lack essential terms regarding both quantity and time of performance. The essential terms of the Standard Contract would then be so indefinite that the contract would be unenforceable, given that the Court cannot make an agreement for the parties that they did not make themselves. See Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been formed; the so-called 'contract to contract' is not a contract at all."); Shann v. Dunk, 84 F.3d 73, 78 (2d Cir. 1996) ("contracts are unenforceable unless they cover all essential terms."); Neeley v. Bankers Trust Co., 757 F.2d 621, 628 (5th Cir. 1985) ("Courts refuse to enforce agreements that contain indefinite promises or terms they deem

---

[2] In addition, as we established in our original motion and will discuss below, the plaintiff must provide some evidence that it has been damaged as a result of a breach to obtain an entitlement decision and to establish standing. As set forth in our motion to strike Mr. Lubbock's declaration, and as discussed later in this brief, Boston has not submitted any admissible evidence to support damage in this case.

essential precisely because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained.").

As we discussed in our original motion, to be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation and sufficient definiteness so as to provide a basis for determining the existence of a breach and for giving an appropriate remedy." Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (internal markings and citation omitted). A valid contract cannot be based upon illusory promises. Id. at 1062. When an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Systems Technology Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Woll v. United States, 45 Fed. Cl. 475, 477 (1999); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991), aff'd 980 F.2d 745 (Fed. Cir. 1992). In this regard, section 33 of the Restatement (Second) of Contracts provides:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981).

The Federal Circuit has held that, when a contract is missing an essential term, such as a quantity term, it is unenforceable because it lacks mutuality of intent and provides no basis for

determining the rights and obligations of the parties. See Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (citing Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493 (1923) ("There is nothing in the writing which required the government to take, or limited its demand to, any ascertainable quantity. It must be held that, for lack of consideration and mutuality, the contract was not enforceable.")); Modern Systems Technology, 979 F.2d at 206; Torncello v. United States, 681 F.2d 756, 761 (Ct. Cl. 1982). The same is true with respect to terms concerning the time and duration of performance. See Bel Pre Health, 24 Cl. Ct. at 496.[3]

Without the DCS and FDS provisions of the contract, the Standard Contract contains absolutely no mechanism by which acceptance of a contract holders' SNF could practically occur.[4] Under Boston's theory that the DCS provision is essentially meaningless, DOE would never have any definitive notice of the amount of SNF it has to accept at any given time, no definitive lead time to allow DOE to make preparations for SNF acceptance (including cask preparations, transport and travel planning and scheduling, and other time-consuming pre-

---

[3] As we acknowledged in our original motion, it is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

[4] We have included in our supplemental appendix an explanation of the DCS process that was written in the past by one of DOE's contractor personnel. Supplemental Appendix ("SA"), at 145-50. While Government contractors do not speak for the Government, this article provides a helpful explanation of the DCS process.

acceptance matters), and no guarantee that, if DOE went to the expense of preparing casks and transporting them to the contract holder's site for SNF acceptance, the contract holder would actually deliver SNF to DOE at that time. Boston's interpretation of the Standard Contract would render the entire acceptance process wholly unworkable.

In its decision in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004) (Lettow, J.), this Court explained the manner in which the DCS and FDS provisions were intended to function. The Court in Tennessee Valley stated that the DCS mechanism determines "the earliest scheduled pickup of [plaintiff's] SNF." Tennessee Valley, 60 Fed Cl. at 674. The Court stated in the circumstances of that case that, although the Government generally breached the Standard Contract with respect to the nuclear utility industry by failing to begin acceptance of the utilities' SNF on January 31, 1998, that breach did not apply to each and every nuclear utility because the DCS mechanism in the Standard Contract determined the earliest date that DOE was obligated to accept a particular utility's SNF, explaining as follows:

> TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. *See* Standard Contract Art. V.B.1. TVA submitted its first proposed DCS . . . in April of 1997. Consequently, the earliest scheduled pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674. Although the Court limited the application of its Tennessee Valley decision, accepting "only for the purposes of [that] case that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract," id. at 671 n.7, the rationale supporting that decision should apply here.

Here, Boston submitted its first proposed DCS to DOE on September 23, 1993. See Gov. Appendix, at 252-254. On December 6, 1993, DOE approved Boston's proposed DCS. Boston's DCS indicated that the proposed delivery date for Boston's SNF was sometime in 1999. Id.[5] However, Boston sold its Pilgrim plant and assigned its DOE contract to Entergy on July 13, 1999, several months before DOE's obligation to accept Boston's SNF arose. As discussed in our motion, DOE was not obligated to accept Boston's SNF until January 30, 2000 (or at least December 30, 1999), the end of the 12-month period during which DOE could have scheduled its acceptance of Boston's SNF under its 1999 approved DCS. See Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, at 10-14. Because Boston transferred its Pilgrim plant and assigned its DOE contract to Entergy on July 13, 1999, and because DOE was not obligated to accept Boston's SNF until January 30, 2000 (or at least December 31, 1999), Boston did not accrue any rights against DOE arising from the Standard Contract. Consequently, Boston lacks standing to maintain this action, and its suit should be dismissed for lack of jurisdiction.

### B. Contrary To Boston's Allegations, Ample Evidence Establishes The Binding Nature Of Approved DCSs

The plain language of the Standard Contract makes clear that DCSs, once approved by DOE, constitute the binding commitments under the Standard Contract by which DOE is obligated to accept a particular utility's SNF. Because the plain language of the Standard Contract is clear, it is inappropriate to look to extrinsic evidence to interpret the meaning of the Standard Contract, see Sylvania Electric Products, Inc. v. United States, 458 F.2d 994, 1005 (Ct.

[5] Boston's proposed DCS did not specify the particular month in 1999 in which DOE was to accept Boston's SNF, granting flexibility to DOE to determine the specific date on which to accept Boston's SNF.

Cl. 1972), particularly in light of the integration clause of the Standard Contract that precludes reliance upon extrinsic evidence. 10 C.F.R. § 961.11, Art. XXII. Nevertheless, to the extent that the Court considers such evidence, ample evidence supports the Government's position.

At trial in the Yankee Atomic case, Government witnesses have testified about the DCS process and its effect upon DOE's obligations, had performance begun in 1998. Specifically, Mr. David Zabransky, the current contracting officer, testified regarding the importance of DCSs when he was employed by Wisconsin Electric Power Company in the 1980s and 1990s:

> It was our belief that the DCSs represented a commitment, and that the company had reached a conclusion or a position that it wanted to get them into the Government and have them sign them before something happened that would cause them to cease signing them for some reason in the future, so it was seen as a good thing to do, to get these signed pieces of paper back from the Government.

SA100.[6] Mr. Ronald Milner, the current Chief Operating Officer, who has been with the program since 1985 and served twice as the acting deputy director of OCRWM, testified that the issuance of the Acceptance Priority Ranking ("APR") in 1991 began the "contractually binding waste acceptance process." SA106. As Mr. Milner explained, the APR was to be used in conjunction with the Annual Capacity Report ("ACR") to identify allocations that were the basis for the submission of purchasers' DCSs to be approved by DOE. With this process, DOE was to establish a firm waste acceptance schedule with individual utilities. Id. This evidence further buttresses the Government's showing that the contract contained a mechanism for the establishment of the rate of acceptance and the determination as to how much any purchaser could deliver in any given year. Because Boston only had an approved DCS for delivery by

---

[6] "SA__" refers to the supplemental appendix accompanying this reply brief. "A__" refers to the appendix to the Government's motion, dated April 30, 2004.

January 30, 2000 (year 2 of contract performance), DOE had no obligations to accept SNF from Boston before it sold its plant and transferred its rights to Entergy.

In its brief, Boston has cited to the deposition testimony of three DOE employees regarding their views as to the "binding nature" of the DCS submissions. Ms. Nancy Slater, formerly the contracting officer's technical representative, testified that, in "her personal opinion," the DCSs were not binding and that they were not very useful for planning purposes. However, Ms. Slater also testified at that same deposition that, if DOE had begun performance in 1998, she would have expected that the utilities which "had submitted DCSs and had them approved for year 1, which [in] the question you are posing would be 1998, those would be the utilities that I would expect to receive [final delivery schedules] from, and they would the utilities that would deliver in that year." SA97. Ms. Slater also testified that, if a contract holder failed to submit a DCS for an allocation granted to it in the ACR, DOE viewed that as "a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the [queue]." SA97. Further, Ms. Slater testified that she believed that the DCSs would be most useful in planning the transportation system, but that she had no responsibility for transportation planning. SA96-97.[7]

Boston also cites to the deposition of Mr. Alan Brownstein, another DOE employee who had responsibility for processing DCSs for a period of time, in which Mr. Brownstein states his understanding that the DCSs are "planning documents," not for "planning purposes only," as

---

[7] Further, when Ms. Slater worked with the Utility Nuclear Waste Management Group, a trade association group that represented nuclear utilities, including Boston, in discussions with DOE about various issues, she wrote a memorandum in which she stated the understanding that, in 1991, the ACR would become contractually binding. SA109; see SA93 (explaining that Ms. Slater was once known by the name Ms. Montgomery).

Boston contends. Boston App. at 82. Mr. Brownstein then proceeded to explain how DCSs can be used in planning for transportation. Id. Boston also cites to the testimony of Mr. Lake Barrett, former Deputy Director of the program, in which Mr. Barrett explained that the DCSs were "part of the administrative details of the contract that I do not pay much management policy attention to." Boston App., at 85. However, as Mr. Barrett testified, he focused upon "running the program and getting the site" for a repository. Id. None of this deposition testimony undercuts the fact that the Standard Contract established a mechanism by which utilities were to identify the fuel that they wanted to deliver to DOE by submission of a "delivery commitment schedule," and, with DOE's approval, these schedules became binding commitments upon the purchaser to deliver and upon DOE to accept fuel in the identified year.

### C. Boston's Collateral Estoppel Argument Lacks Merit Because No Appellate Court Has Addressed The Issue Whether The Delivery Commitment Schedules In The Standard Contract Constitute Binding Contractual Obligations

Boston contends that the Government's DCS argument "requires the Court to ignore several cases that have consistently held that the Government's breach occurred on January 31, 1998." Pl.'s Brief, at 13. Boston claims that these "cases have rejected the Government's argument that the breach occurred later, including the notion that the DCS determines when the Government's breach occurred" and that the doctrine of collateral estoppel prohibits the Government "from arguing that the operative date of the breach of Boston Edison's Standard Contract is anything other than January 31, 1998." Pl.'s Brief, at 14. "Under the doctrine of collateral estoppel, when the second action is upon a different cause of action, the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the

first action." International Air Response v. United States, 324 F.3d 1376, 1378-79 (Fed. Cir. 2003). "The principle underlying the doctrine is simply that later courts should honor the first actual determination of a matter that has been litigated. Thus, the doctrine incorporates the recognition that a party should not be permitted to prevail in successive lawsuits by taking inconsistent positions." Jackson Jordan, Inc. v. Plasser American Corp., 747 F.2d 1567, 1574 (Fed. Cir. 1984) (citations omitted). However, mere similarity of positions between different parties in separate actions is insufficient, and "there can be no collateral estoppel against a party who has not had a full and fair opportunity to litigate the claim at issue." Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Further, collateral estoppel is applicable only when "the issue previously adjudicated is identical with that now presented," and "that issue was actually litigated in the prior case." Kroeger v. United States Postal Service, 865 F.2d 235, 239 (Fed. Cir. 1988) (citations omitted).

Although Boston contends that the Government should be collaterally estopped from arguing that the delivery commitment schedules in the Standard Contract constitute binding contractual obligations because the District of Columbia Circuit and the Federal Circuit have already determined that DOE breached the Standard Contract on January 31, 1998, Pl.'s Brief at 13, no appellate court has yet addressed, let alone determined, whether the delivery commitment schedules in the Standard Contract constitute binding contractual obligations. Indeed, the issue whether the DCSs constitute binding contractual obligations for the purpose of determining Boston's (or any other utility's) liability and standing is neither "identical" to issues adjudicated in any other case nor "actually litigated" in prior cases before the District of Columbia and Federal Circuits. Consequently, collateral estoppel is inapplicable here.

The cases upon which Boston relies to support its collateral estoppel argument involve different issues, separate parties, and completely different procedural postures with this case. In Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996), the issue presented was whether DOE's obligation to begin its program of accepting SNF from the nuclear utility industry by January 31, 1998, was conditioned upon the existence of a permanent repository or other storage facility. The Court held that the NWPA imposed an unconditional obligation upon DOE to begin disposing of utility SNF by January 31, 1998. Indiana Michigan, 88 F.3d at 1276. Contrary to Boston's contention, the issue of whether approved DCSs from specific individual contract holders constitute binding commitments or define acceptance schedules was not actually litigated in Indiana Michigan. Indeed, the DCS issue was not even presented in that case. The issue presented in Indiana Michigan is thus not identical to that presented in this case.

In Northern States Power Co. v. United States, 128 F.3d 754, 761 (D.C. Cir. 1997), the issue presented was whether the unavoidable delays clause of the Standard Contract excused DOE's obligation to begin accepting industry SNF from January 31, 1998. The Court found that the unavoidable delays clause of the Standard Contract did not cover delays caused by DOE's own conduct and issued a writ of mandamus "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." Northern States, 128 F.3d at 761. The issue of whether approved DCSs constituted binding contractual obligations for the purpose of determining liability or standing was not actually litigated in that case. This is evident from the fact that the Court's opinion makes no references to DCSs. Clearly, the issue presented in Northern States is not identical to that presented in this case.

Similarly, Boston's assertion that the Government's position that plaintiff is not entitled to damages directly stemming from the January 31, 1998 acceptance date are barred by the United States Court of Appeals for the Federal Circuit's decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), is incorrect. When the Government filed briefing in its interlocutory appeal in Maine Yankee, all three of the plaintiffs-appellees in that appeal had previously submitted and obtained approval of DCSs that required DOE to begin acceptance of specific amounts of their SNF in 1998 and 1999 in accordance with their approved DCSs. Accordingly, because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach, and no reason existed to note the contractual mechanisms for establishing the specific SNF delivery and acceptance commitments. Unlike this case, the Government did not raise in the Maine Yankee appeal the point concerning the DCS process or the lack of specific commitments absent approved DCSs under the Standard Contract's schedule terms.

Because the Government did not, and did not need to, raise the DCS issue in the Maine Yankee appeal, the Maine Yankee decision does not constitute stare decisis regarding whether DOE partially breached the Standard Contract with regard to the plaintiff in this case. "Stare decisis applies only to legal issues that were actually decided in a prior action" and not to issues that "were not litigated or resolved" in a prior action. Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Because the issues regarding plaintiff's need to submit DCSs and the role of DCSs in the contractual scheme of defining acceptance commitments was not evaluated or decided in Maine Yankee, that decision does not constitute stare decisis regarding that issue and does not, in any event, establish that DOE breached every single Standard Contract on January

31, 1998, in a manner that creates liability to each contract holder. Further, it certainly cannot constitute collateral estoppel regarding an issue that was unnecessary and was not raised in another litigation.[8]

Indeed, Boston's contention that the District of Columbia and Federal Circuits have already determined that approved DCSs are not binding contractual obligations is completely unfounded. To this day, no appellate court has entertained this argument. Consequently, collateral estoppel is inapplicable here because the issue presented in this case is neither identical to that presented in the District of Columbia and Federal Circuit decisions cited by Boston nor actually litigated in those cases. See Kroeger, 865 F.2d at 239; Jackson Jordan, 747 F.2d at 1574. Boston's collateral estoppel argument is a desperate attempt to preserve Boston's standing in this case and to obtain a liability order against the Government without showing any evidence of damages.

Boston also cites several decisions of the Court of Federal Claims to support its contention that collateral estoppel is applicable here. However, these decisions are unavailing. Clearly, collateral estoppel is inapplicable to decisions of this Court involving different parties.

---

[8] Boston's references to the Federal Circuit's decisions in Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000), and Roedler v. Department of Energy, 255 F.3d 1347 (Fed. Cir. 2001), are irrelevant. In Northern States, the only issue presented was whether the plaintiff was required first to file an administrative claim with the contracting officer under the Standard Contract's disputes provision prior to filing a breach of contract action at the Court of Federal Claims, the Federal Circuit was neither presented with nor considered arguments regarding the contractually binding nature of DCSs, and the Federal Circuit made no ruling regarding liability in Northern States. Northern States, 224 F.3d at 1363. In Roedler, the Court found that Northern States' ratepayers, who were seeking to recover fees that Northern States had paid into the Nuclear Waste Fund had no "legally cognizable grounds for recovering from the United States the fees that Northern States Power paid into the Nuclear Waste Fund," Roedler, 255 F.3d at 1356, and the issue whether approved DCSs constitute binding obligations was not before the Court.

See Beacon Oil Co., 71 F.3d at 395. Further, one judge of this Court is not bound by decisions of other judges of this Court. Adoption of Boston's argument would mean that the Government could not advance any of its positions that are contrary to a single decision of this Court, even though the 60 pending spent nuclear fuel cases have not been consolidated. Such an approach would result in great prejudice to the Government. Further, collateral estoppel is inapplicable here because none of the cases cited by Boston address the issue whether approved DCSs constitute binding contractual obligations with respect to Boston's liability and standing.[9]

D. DOE's Representations During The Standard Contract's Notice And Comment Rulemaking Period Do Not Form A Justifiable Basis For Reliance

Boston next argues that "the Government should be estopped from arguing that the DCS establishes the breach date because the Government encouraged the utilities, including Boston Edison, to rely on January 31, 1998 as the performance date under the Standard Contract." Pl.'s Brief, at 23-24. In support of its contention, Boston points to the Federal Register notice issued by DOE in 1983 during the Standard Contract's notice and comment rulemaking, in which DOE responded to commentators. Boston argues that DOE's comments caused Boston justifiably to rely upon DOE's promise to begin acceptance of Boston's SNF on January 31, 1998. However, those comments, to the extent that they could be read into the express language of the Standard

[9] In discussing its collateral estoppel argument, Boston asserts that this Court found a breach of the Standard Contract on January 31, 1998, in Detroit Edison Co. v. United States, 56 Fed. Cl. 299 (2003), and Florida Power & Light Co. v. United States, 56 Fed. Cl. 555 (2003), vacated and remanded, 2004 WL 1378623 (Fed. Cir. June 15, 2004). Pl.'s Brief, at 19. Boston is incorrect. The Court in Detroit made no ruling upon liability in the cited decision, focusing only on the plaintiff's takings claim. The contract at issue in Florida Power was a uranium enrichment contract, not the Standard Contract, and is wholly unrelated to this litigation.

Contract,[10] do not indicate that DOE would begin accepting SNF from every single contract holder by January 31, 1998. Instead, that date relates to DOE's program of accepting SNF from all contract holders, as a collective whole. Boston cannot abolish the terms of the Standard Contract, including the contract's DCS mechanism, by misinterpreting comments made before the execution of Boston's contract.

Further, this claim is belied by the text of the contract itself, which identifies requirements for the purchasers to identify fuel that they intend to deliver 63 months in advance. If DOE owed an obligation to accept waste from all purchasers on January 31, 1998, the contract would not have specified "63 months in advance." Instead, it would have stated a date certain by which utilities were to identify their fuel. Moreover, the Standard Contract also requires DOE to issue an annual capacity report, which was to "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to the DOE contracts for disposal." 10 C.F.R. § 961.11, Art. IV.B.5.(b). If DOE's obligation was to accept from all utilities beginning on January 31, 1998, the requirement to rank the contracts for disposal would be superfluous.

Since inception of the program, DOE has identified the issuance of the 1991 ACR and APR as the start of the mechanism by which a delivery schedule would be established. For example, in the Mission Plan, issued in 1985, DOE stated:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity

---

[10] The Standard Contract's integration and merger clause should preclude Boston's reliance upon such statements. See 10 C.F.R. § 961.11, Art. XXII ("This contract . . . contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party.").

> report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

A204. In 1987, DOE issued the first ACR, which contained the following representation:

> Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE Waste Management System (WMS). Once approved, these schedules will become the basis for final delivery schedules to be submitted by the purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

A210; see also A213, 216. With the issuance of each of these publications, DOE confirmed the mechanism set forth in the contract for the establishment of binding acceptance schedules with individual utilities.

Boston never took any action during the course of contract performance that would have allowed DOE to take any of its SNF by January 31, 1998, or to challenge DOE's interpretations of its obligations regarding the order of SNF acceptance. Had it wanted DOE to begin acceptance of its SNF by January 31, 1998, it would have had to have submitted a DCS identifying the SNF that it wanted taken and the time period within which it wanted that SNF taken. Yet, it never submitted a DCS to DOE for 1998 acceptance. Apparently, Boston now believes that DOE was simply supposed to appear at its site on January 31, 1998, and "begin" to take some undefined amount of its SNF. Yet, outside the DCS procedures identified in the Standard Contract, there is no other mechanism through which the parties could notify each other

of the dates upon which DOE will accept specific amounts of SNF from a particular contract holder.

The costs that DOE incurs to prepare to accept SNF from a particular site, including travel and transport, are extensive, and it also takes time for the nuclear utility to prepare to deliver the SNF to DOE. Boston's suggestion that no mechanism exists in the Standard Contract for ensuring that, if DOE travels to a site, the contract holder will actually have SNF to deliver to DOE is extraordinary. Given that Boston never satisfied the only procedure contained in the Standard Contract for obtaining an acceptance and delivery obligation in 1998, Boston's assertion that DOE breached its contract by not accepting its SNF in 1998 is ludicrous. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1566 (Fed. Cir. 1987). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Although Boston correctly recognizes that the Standard Contract required DOE to begin its program of SNF acceptance by January 31, 1998, Boston's assertion that it also required DOE to begin accepting Boston's SNF by that date, absent Boston's compliance with the contractual mechanism for obtaining 1998 acceptance rights, would render the schedule mechanism of the Standard Contract, and its "oldest fuel first" requirements, meaningless, contrary to accepted contract interpretation principles. Because, as we discussed in

detail in our original motion, damages generally run from the date of the actual breach (here, DOE's failure to accept Pilgrim SNF by the date required by the approved DCS), and because pre-breach damages are not available in a partial breach case, Boston has no basis for seeking damages for a partial breach that did not occur until after it sold its Pilgrim facility and assigned its Standard Contract to a third party.

## II. THE COURT SHOULD DISMISS BOSTON'S TAKINGS CLAIM BECAUSE ALL OF BOSTON'S RIGHTS ARISE FROM THE STANDARD CONTRACT

### A. Boston's Contention That The Atomic Energy Act And 10 C.F.R. Part 50 Created Federal Obligations To Accept Its SNF Prior To The Enactment Of The NWPA Lacks Merit

In its response brief, Boston contends that it has a viable takings claim because "the Government deprived Boston Edison of the full use and value of its nuclear facility, and in doing so, interfered with Boston's investment-backed expectations." Pl.'s Brief, at 26. Boston does not deny that DOE is supposed to accept its SNF pursuant to the Standard Contract, as outlined in its breach of contract claim. However, Boston contends that its "takings claim arises out of property rights that are separate and distinct from rights accruing under the Standard Contract" and claims that the Government's responsibility to dispose of Boston's SNF "arose decades prior to the execution of the Standard Contract." Id. Boston thus concludes that its "takings and breach of contract claims may be pursued concurrently." Id.

To support its assertion that DOE had some obligation outside of the Standard Contract to accept Boston's SNF by January 31, 1998, Boston cites to a Congressional Budget Office Staff Working Paper, dated May 1981, which represents that, prior to the enactment of the NWPA, "the federal government formally accepted full responsibility for providing a final repository"

and "mandat[ed] that disposal [of SNF and HLW] occur on federal land." Pl.'s Brief, at 28; see SA11. Boston also cites to 10 C.F.R. Part 50, for the proposition that "an official Government policy" that "long-predates the NWPA" required that disposal of SNF and HLW occur on land owned and controlled by the Federal Government. Pl.'s Brief, at 28. Yet, Boston does not refer to any language in the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2297g-4, that creates that obligation, and we are not aware of any such language, particularly to the extent that it obligated the United States to dispose of SNF generated by commercial utilities by a date certain or without compensation. Instead, the Atomic Energy Act authorized private ownership of nuclear reactors to promote the development of atomic energy. See Commonwealth Edison Company v. United States, 271 F.3d 1327, 1330 (Fed. Cir. 2001) (stating that the Atomic Energy Act of 1954 "for the first time authorized private ownership of nuclear power reactors"); United States v. Commonwealth of Kentucky, 252 F.3d 816, 821 (6th Cir. 2001) ("Congress enacted the Atomic Energy Act in 1954 to promote the development of atomic energy for peaceful purposes under a program of federal regulation and licensing.").[11]

In fact, in Nuclear Energy Institute, Inc. v. Environmental Protection Agency, 373 F.3d 1251, 1286-89 (D.C. Cir. 2004), the District of Columbia Circuit recently held that the NRC's promulgation of licensing criteria governing disposal of civilian radioactive waste was "under the

[11] See also Bullcreek v. Nuclear Regulatory Commission, 359 F.3d 536, 538 (D.C. Cir. 2004) ("While the AEA does not specifically refer to the storage or disposal of spent nuclear fuel, it has long been recognized that the AEA confers on the NRC authority to license and regulate the storage and disposal of such fuel."); Natural Resources Defense Council v. Abraham, 244 F.3d 742, 744 (9th Cir. 2001) (Atomic Energy Act "established a comprehensive scheme for military and domestic nuclear energy" and "authorized the Atomic Energy Commission . . . to establish instructions . . . governing possession and use of nuclear material and the operation of facilities used in conducting its activities.").

NWPA," despite the statute's reference to the NRC's authority to promulgate such licensing criteria under "other provisions of law," namely, the Atomic Energy Act of 1954 and the Energy Reorganization Act of 1974.[12] Nuclear Energy Institute, 373 F.3d at 1286-89; see id. at 1258 ("In 1982, responding to growing quantities of radioactive waste and their potentially deadly health risks, Congress enacted the Nuclear Waste Policy Act, directing the federal government to assume responsibility for permanently disposing of the nation's nuclear waste.").[13]

Similarly, although Boston quotes from a particular portion of 10 C.F.R. Part 50, Appendix F, to show that, as of 1970, the NRC had precluded "[d]isposal of high-level radioactive fission product waste" on land not "owned and controlled by the Federal Government," Pl's Brief, at 28, that restriction obviously applied to waste generated during reprocessing. To the extent that the working paper cited by Boston overstated the requirements

[12] Boston also quotes the deposition testimony of three DOE officials and employees, Michael Lawrence, Bernard C. Rusche, and Robert Morgan, for the proposition that the Government's responsibility to accept Boston's SNF arose with the passage of the Atomic Energy Act. Boston's contention lacks merit. None of that deposition testimony identified a specific statutory obligation to accept commercial utilities' SNF and did not identify any specific time frame within which the Government was obligated to do so. Only Congress can enact legislation rendering the Government responsible for such a task. Boston's attempt to base an alleged statutory obligation upon the deposition testimony of DOE employees shows the tenuous nature of Boston's contention.

[13] Indeed, the District of Columbia Circuit's 60-page opinion addressing challenges brought against the Government's planned disposal of SNF and HLW at Yucca Mountain is based almost entirely upon the Court's analysis of the Nuclear Waste Policy Act, with the only reference to the Atomic Energy Act being made in a single footnote. See Nuclear Energy Institute, 373 F.3d at 1286, n. 2.

of a statute or regulation, that overstatement does not override the actual statutory and regulatory requirements.[14]

B. Boston's Contention That The NWPA Creates A Basis For A Takings Claim, Without Reference To The Existence Of A Contract, Is Unfounded

Similarly, the NWPA itself did not create any self-executing obligation upon DOE to accept a particular utility's SNF. Section 302(a) of the Nuclear Waste Policy Act, 42 U.S.C. § 10222(a), authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (emphasis added). However, the Secretary of Energy was, and is, expressly barred from disposing of any SNF or HLW under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." Id. § 10222(b)(2) (emphasis added). As a result, DOE's obligation to dispose of any particular generator's SNF was expressly conditioned upon the existence of a contract

---

[14] Further, to the extent that Boston had some right under the Atomic Energy Act, 10 C.F.R. Part 50, or some other unidentified statute to have DOE accept its SNF by a date certain, the NWPA clearly abrogated that right. As previously discussed, the NWPA requires DOE to accept commercial SNF solely pursuant to the terms of the NWPA and requires commercial utilities, to the extent that they elect to enter into contracts for disposal, to pay for that disposal. See 42 U.S.C. § 10222; State of Idaho v. U.S. Dep't of Energy, 945 F.2d 295, 297-99 (9th Cir. 1991), cert. denied, 504 U.S. 956 (1992). The NWPA was enacted in 1983. "[A] cause of action for an unconstitutional taking accrues at the time the taking occurs." Steel Improvement & Forge Co. v. United States, 174 Ct. Cl. 24, 29-30, 355 F.2d 627, 631 (1966). Boston's claims for a taking based upon rights purportedly abrogated by the NWPA are time-barred. Similarly, to the extent that Boston is complaining that the Government "prohibited Boston Edison from reprocessing its SNF" through President Carter's order in the 1970s, see Pl's Brief, at 31, that claim is also time-barred.

between the generator and DOE. Indeed, absent a contract between DOE and a particular utility, DOE is barred from accepting that utility's SNF and HLW. Boston's contention that it somehow has an undefined statutory right to have DOE begin acceptance of its SNF and/or HLW, outside the context of its contract with DOE, is unsupported by precedent and contrary to the express language of the NWPA.[15] See Commonwealth Edison, 56 Fed. Cl. at 656.

C. Boston's Complaint That Its Property Rights Were Taken Without Just Compensation Is Merely A Re-description Of Boston's Complaint About DOE's Failure To Satisfy Its Obligations Under The Standard Contract

"The Court of Claims taught that the concept of a taking has limited application when rights have been voluntarily created by contract." Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 494 (2002). "Interference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a 'taking' for public use." Id. (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy.'" Id. at 495 (quoting Castle v. United States, 48 Fed. Cl. 187, 218 (2000), aff'd in relevant part, rev'd in part on other grounds, 301 F.3d 1328 (Fed. Cir. 2002)). The Federal

---

[15] Because the NWPA in and of itself does not create a "property right" requiring DOE to accept and dispose of Boston's SNF, an alleged violation of the NWPA cannot constitute a taking of Boston's property right. See, e.g., Commonwealth Edison Company v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (provision of Energy Policy Act requiring domestic utilities that had entered into contracts with the Government for processing uranium to pay for costs of cleanup of environmentally contaminated uranium processing facilities was not a Fifth Amendment taking); Mack v. United States, 225 Ct. Cl. 187, 191, 635 F.2d 828, 832 (1980) (provisions of Veterans' Preference Act "do not create an interest in property subject to being taken for public use"); Brown v. United States, 3 Cl. Ct. 31, 46 (1983) (same), aff'd, 741 F.2d 1374 (Fed. Cir. 1984).

Circuit and this Court have repeatedly dismissed takings claims based upon rights emanating from a contract that was breached. See, e.g., Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003); Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 566 (2001), aff'd, 48 Fed. Appx. 752 (Fed. Cir. 2002); Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 166-67 (Fed. Cl. 2003); Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002); Home Sav. of Am., 51 Fed. Cl. at 494-96.

Here, the "property right" about which Boston complains is its "right" to have the Department of Energy begin acceptance of SNF and/or HLW generated by Pilgrim by January 31, 1998. That "right," if it exists, was created by the Standard Contract. Apparently, Boston believes that it can take an obligation created by contract, identify a breach of that contractual obligation, and, at the same time that it seeks contract damages for a breach of that obligation, seek additional damages resulting from the same breach of that obligation under a takings theory merely by focusing on the alleged effects, rather than the cause or basis, of the breach. Yet, the Government has not "taken" Boston's real property. The Government has not seized Boston's land or facilities. Further, the Government has not invaded Boston's land or facilities by placing Government property upon Boston's land or in Boston's facilities. Indeed, Boston sold its Pilgrim plant to Energy in July 1999 without any encumbrances or interferences from the Government. The only Government obligation relating to Boston's SNF arises from, and will be identified by reference to, Boston's contract with DOE. If "alleged damage is due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, plaintiffs' claim that the wrong originated in some statutory" or constitutional "violation does not

strip the case of its contractual nature." A&S Council Oil Co. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995). Boston's efforts to distance its contract from its takings claim are wholly unfounded.[16]

### D. The Government's Failure To Accept Boston's SNF In A Timely Manner Does Not Constitute A Regulatory Taking

As an alternative to its physical takings claim, Boston appears to assert that DOE's failure to begin accepting its SNF by January 31, 1998, constitutes a regulatory taking.[17] A regulatory

---

[16] Recently, this Court denied a motion to dismiss one of the SNF plaintiff's takings claims in Sacramento Municipal Utility District v. United States, No. 98-488C, 2004 WL 1708968 (Fed. Cl. July 30, 2004), stating that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. With all due respect, we disagree with that decision to the extent that it applies to rights created by a contract with the Government. The fact that the plaintiff's rights to removal of the SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking.

[17] The Supreme Court has stated that, for regulatory actions challenged on takings clause grounds, three factors have "particular significance" in the takings analysis: (1) the character of the government action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with "reasonable investment-backed expectations." Branch v. United States, 69 F.3d 1571, 1579 (Fed. Cir.) (citing Connolly v. Pension Benefit Guarantee Corp., 475 U.S. 211, 224 (1986), and Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984)).

Here, the "character of the governmental action" is contractual, since, absent the Standard Contract, Boston (and now Entergy) would have to store the SNF generated by Pilgrim indefinitely. In addition, in discussing the "economic impact of the regulation on the claimant" prong, the Federal Circuit has recognized that "it is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question," Branch, 69 F.3d at 1580 (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 18 (1976)), which, in this case, would be the nuclear power utilities that generated SNF while profiting from their generation and sale of nuclear power. See Nuclear Energy Institute, 373 F.3d at 1259 ("To finance the creation and operation of such repositories, the NWPA established the Nuclear Waste Fund to ensure that 'the costs of carrying out activities relating to the disposal of [radioactive] waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.' 42 U.S.C. § 10131(b)(4) (2000).").

taking occurs when regulations go "too far" and impinge upon private freedom. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

However, as previously discussed, the "right" to acceptance of Boston's SNF was not created by statute or regulation, but by a contract between DOE and Boston. Although those terms of the Standard Contract that were promulgated through notice-and-comment rulemaking in the Federal Register should, like clauses from the Federal Acquisition Regulation, be interpreted by reference to the rules applicable to regulatory interpretation, see Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981), that rule of interpretation does not change the character of the action here: a claim for a breach of contract affecting rights created by contract. The "regulation" that created the terms of the Standard Contract did not create any agreement between DOE and any particular nuclear utility. No "agreement" existed until such time as the nuclear utility and DOE mutually executed the Standard Contract identifying the particular nuclear power generator to which the contract would apply. As a result, it is clear that no regulatory action has "taken" Boston's real property. Instead, Boston's use of its real property to store SNF that Boston contends DOE was otherwise obligated to accept under the terms of the

---

Finally, and importantly, in analyzing the "reasonable investment-backed expectations" prong, the Supreme Court has held that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Connolly, 475 U.S. at 227. The "legislative end" of the NWPA is identified in the Act itself: to protect the public health and safety, to establish Federal responsibility and policy for disposal of SNF, and to ensure that the costs of carrying out activities relating to disposal are "borne by the persons responsible for generating such waste and spent fuel." 42 U.S.C. § 10131(b). Because of the important need to ensure the public health and safety, the nuclear industry is heavily regulated, see Rushton v. Nebraska Public Power Dist., 844 F.2d 562, 566 (8th Cir. 1988), weighing heavily against the existence of any regulatory taking outside the context of a breach of contract action.

Standard Contract relates to Boston's contract and gives rise only to a claim for breach of contract.

E. Boston's Argument That It Could Recover Additional Types Of Damages Under A Takings Theory That Are Otherwise Not Recoverable Under A Breach Of Contract Theory Provides No Basis For A Takings Claim

Boston argues that it must be permitted to pursue a takings claim as an alternative to its contract claim because it might not recover all of the damages that it would like under a contract theory. Pl.'s Brief, at 35. Boston asserts that it "can seek to recover consequential damages through its takings claim" and that a "takings claim also would allow Boston Edison to recover prejudgment interest from the time that the Government took Boston Edison's property." Id. However, contrary to Boston's contention, consequential damages are not recoverable in a takings action. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law, however, that the measure of just compensation is the fair value of what was taken, and not the consequential damage the owner suffers as a result of the taking.") (citing United States v. General Motors Corp., 323 U.S. 373, 360 (1945) ("that which is taken or damages is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage.")).

Even if consequential damages were recoverable in a takings action, Boston could not somehow create a viable takings claim. In Castle, this Court rejected the contention that a plaintiff should be allowed to maintain a taking claim when it cannot recover prejudgment interest and consequential damages in its breach of contract claim, explaining as follows:

> [Plaintiffs assert] that if [they] recover less than "just compensation" (*e.g.*, because the court denies lost profits or because contract damages cannot include pre-judgment interest), the Fifth Amendment requires the government to make up the difference . . . .
>
> [P]laintiffs' rule proves too much. If we were to characterize as a taking the failure to award pre-judgment interest on a contract claim, we would essentially invalidate the law's proscription against the allowance of pre-judgment interest when not specified by contract or congressional act. 28 U.S.C. § 2516(a). Further, the [limited] congressional waiver of sovereign immunity . . . means that plaintiffs have no reasonable expectation - and hence no property interest - in the money they might otherwise have earned as interest on an earlier-paid judgment.
>
> Similarly, the court's refusal to award lost profits does not transform plaintiffs' loss into a taking. As discussed earlier, the court was not reasonably convinced that profits would have existed, so the failure to award them in no way diminishes the value of plaintiffs' contract rights.

Castle, 48 Fed. Cl. at 219-20; see Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2002); Home Sav. of Am., 51 Fed. Cl. at 495-96 ("lack of a 'complete' contract remedy, either because it would not include interest or because the contract theory does not yield a recovery, does not give life to a takings theory"), quoted with approval in Bailey, 53 Fed. Cl. at 256; see also Granite Mgt. Corp., 55 Fed. Cl. at 166-67 (rejecting plaintiff's assertion that, because "prejudgment interest is not available as a contractual remedy[,] it will not receive just compensation," and holding that the Court "is unwilling to open such a loophole"). Boston raises precisely the same contentions concerning prejudgment interest and "additional damages" that were rejected in Hughes Galaxy Communications, Castle and Home Savings.

Boston also argues that "a takings claim is appropriate where 'the government ha[s] taken away the range of remedies associated with the vindication of a contract.'" Pl.'s Brief, at 35

(quoting Castle, 48 Fed. Cl. at 219). However, Boston's only allegation that it will not be permitted to pursue the full range of remedies that its contract provides is that, "[o]ver the last several years, the Government has asserted numerous rationales for excusing its failure to perform its obligations under the Standard Contract and has systematically attempted to either eliminate or restrict Boston Edison's full range of remedies." Pl.'s Brief, at 35. To the extent that Boston is relying upon unidentified positions that the Department of Energy has taken outside the context of this litigation to support a takings claim, Boston's response brief itself establishes that various courts have rejected those Department of Energy positions to which Boston refers. See Pl.'s Brief, at 37 (citing the Federal Circuit's decision in Maine Yankee, 225 F.3d 1342, and this Court's decision in Detroit Edison, 56 Fed. Cl. 299, and asserting that, in each case, the court "rejected" the Government's position). In fact, Boston's response brief establishes that Boston has had ample protection from the courts in defending against those "positions" by the Department of Energy that it dislikes. Clearly, Boston's "range of remedies" has not been abrogated. See Granite Mgt., 55 Fed. Cl. at 166-67.

Alternatively, Boston cites to this Court's decision in Integrated Logistics Support Systems v. United States, 42 Fed. Cl. 30 (1998), to support its ability to recover both for a breach of the Standard Contract and for a taking of its real property. Pl.'s Brief, at 39. In Integrated Logistics, although the plaintiff alleged a breach of an express contract by the Government, the plaintiff also alleged claims that the Government had breached an unwritten implied-in-fact contract that was "entirely unrelated" to the express contract and, "in the alternative, a compensable taking of its [personal] property." Integrated Logistics, 42 Fed. Cl. at 33, 36. The Court found that, because it could not "conclude that the contract conferred expressly upon

defendant rights of possession, use, ownership, and alienation in the materials" that the Government allegedly took from the plaintiff, "and because plaintiff has alleged facts sufficient to support the converse," the plaintiff had alleged a potentially viable takings claim. The Court's denial of the Government's motion to dismiss was premised upon the plaintiff's factual allegations that the express contract did not relate to the materials of which the Government had taken physical possession.

Here, however, the Standard Contract plainly encompasses the parties' rights and obligations relating to Boston's SNF and HLW. Although Boston asserts that its real property interests relating to the land upon which "its nuclear power is situated" are separate from its contract, see Pl.'s Brief, at 37, absent the Standard Contract, Boston, not the Federal Government, would be solely responsible for the storage and disposition of Boston's SNF and HLW. The tenuous nature of Boston's position is marked by the fact that Boston no longer owns its nuclear plant, as Pilgrim was sold to Entergy in July 1999. Clearly, the Government has not taken physical possession of Boston's real property. Entergy remains in sole possession and control of Pilgrim. In addition, absent the Standard Contract, Boston cannot identify any physical invasion or seizure of its real property by the Government, which, absent a contract, might entitle it to compensation under the Fifth Amendment. Accordingly, this Court's decision in Integrated Logistics provides no support to Boston. See A&S Council Oil, 56 F.3d at 241. Boston cannot divorce the Standard Contract from its current takings claim.[18]

---

[18] Boston also relies upon Detroit Edison Co. v. United States, 56 Fed. Cl. 299 (2003), to support its contention that it should be allowed to pursue its takings claim simultaneously with its breach of contract claim. However, the Court in Detroit Edison indicated that it would not allow Detroit Edison's takings claim to proceed as a mechanism to collect pre-judgment interest and consequential damages, the very damages that Boston seeks to recover in its takings claim. See

Boston also cites Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), for the proposition that the Federal Circuit has "affirmed a plaintiff's right to simultaneously pursue a takings claim and a breach of contract claim." Pl.'s Brief, at 38-39. In Cienega, the Court held that Congress's enactment of the Emergency Low Income Housing Preservation Act of 1987 and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, which abrogated the owners' contractual rights to prepay their mortgage loans in low-rent housing programs, constituted a taking of the owners' vested property rights. Cienega, 331 F.3d at 1324. The Court explained that a taking occurred because the statutes enacted by Congress went "too far" by retroactively altering the owners' mortgage contracts with the Government without any recourse for the owners. Id. at 1331, 1337. The Court stated that "[t]o hold otherwise would mean that Congress could have changed the mortgage contracts in any way to affect any of the rights established by the contracts – including changing the contracts to extend their term from forty to, for example, eighty years – and the owners would be without a remedy. Again, this is not and cannot be the law." Cienega, 331 F.3d at 1334; see id. at 1346 ("Here, the issue is not an imposition of a new regulatory regime, but legislative abrogation of the key rule of a pre-existing regime."). The Court's decision that a taking occurred was thus based upon its determination that Congress nullified the owners' contracts with the Government through the passage of legislation. Here, in contrast, Congress did not enact any laws that abrogated (or altered) the contractual

---

Detroit Edison 56 Fed. Cl. at 303. Further, if damages pursuant to the contract theory are found inappropriate because of the absence of a viable breach claim, that fact does not somehow eliminate the "full range of remedies" that were available to the contract holder, Admiral Financial Corp. v. United States, No. 03-5168, 2004 WL 1746143, at *4 (Fed. Cir. Aug. 5, 2004), and should not suddenly change the character of the Government's action from contract-based to takings-based.

rights of nuclear utilities. Indeed, the contractual rights of nuclear utilities did not exist prior to the passage of the NWPA, which directed DOE to enter into contracts with nuclear utilities for the disposal of SNF and HLW. Cienega is thus clearly distinguishable from this case.

F. Boston's Contention That The Federal Circuit Has Already Determined That Spent Nuclear Fuel Plaintiffs May Pursue Both Contract and Takings Claims Concurrently Is Both Unfounded And Misleading

Boston contends that the Federal Circuit has held that takings and breach of contract claims "can be brought concurrently" in the spent nuclear fuel cases, citing Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), and the decision issued by the Federal Circuit upon review of the Yankee decision, Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl.'s Brief, at 29-30, 37. Boston's representation is misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract and takings claim in this Court. However, the Court found that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses contained in the Standard Contract did not encompass the delay at issue in this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that Maine Yankee "was not required to invoke the contract's disputes clause before bringing suit" and that its takings count "cannot be viewed as constituting avoidable delays under that clause." Id. at 1342-43.

Contrary to Boston's contention, the Federal Circuit in Maine Yankee did not make any determination that the plaintiff's takings claim stated a viable cause of action. To the contrary,

the only motion that the Court was considering was a jurisdictional motion requesting dismissal based upon the plaintiff's failure to exhaust its administrative remedies. The Federal Circuit was neither presented with nor considered arguments regarding the viability of a takings claim outside the context of the Standard Contract. Boston's suggestion that the Federal Circuit somehow has already ruled favorably upon the merits of its takings claim is disingenuous.

### G. Boston's Vague Assertion That Payment Of Fees Into The Nuclear Waste Fund Somehow Constitutes A "Taking" Is Meritless And Not Properly Before This Court

Boston also contends that its takings claim should proceed because Boston "alleges a taking of its property accomplished through over-collection of the 1 mil per kWh fee well in excess of that authorized by the NWPA." Pl.'s Brief, at 40. It is unclear whether Boston believes that the collection of the fee itself constitutes a taking of its property or, instead, whether the payment of the fee somehow creates some right that has been taken. Regardless of the meaning of its allegation, it is meritless and, further, is not properly before this Court.[19]

---

[19] Boston's contention that the fees collected by DOE are "excessive" is entirely frivolous. Boston has no evidence to support its baseless contention. Boston merely argues that DOE has spent less than it has collected into the NWF. However, the NWF is supposed to cover the entire costs for the construction of a repository, the disposal of SNF and HLW, and the continued maintenance of the Yucca Mountain repository for over 10,000 years. See Nuclear Energy Institute, 373 F.3d at 1259, 1273 (holding that the Environmental Protection Agency's 10,000-year compliance period for radiation levels of SNF and HLW intended for disposal at Yucca Mountain violated the Energy Policy Act). Further, appropriations from the NWF have to be requested each year by DOE and approved by Congress as part of DOE's annual budget. The mere fact that DOE has spent less than it has collected into the NWF at the beginning stages of the SNF disposal program in no way supports Boston's contention that the fees collected by DOE are "excessive." To the contrary, as DOE's Fee Adequacy Reports indicate, the fees collected by DOE into the Nuclear Waste Fund are not excessive, but estimated to be sufficient to cover the costs of the program. See *Nuclear Waste Fund Fee Adequacy Report: An Assessment*, at 15 (U.S. Department of Energy, May 2001) (stating that "the current 1 mill per KWh fee charged on generators of commercial SNF is adequate and . . . [should] remain unchanged."); see also *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management*

First, fee payments into the Nuclear Waste Fund ("NWF") are made quarterly pursuant to the terms of the Standard Contract. 10 C.F.R. § 961.11, Art. VIII. Although the amount of the fee is set by statute, based upon a "1.0 mil per kilowatt-hour" charge, 42 U.S.C. § 10222(a)(2), nothing in the NWPA itself requires any entity to pay this fee into the NWF. Instead, the NWPA provides that contracts into which the Secretary of Energy enters pursuant to the NWPA "shall provide for the payment to the Secretary of [these] fees . . . sufficient to offset expenditures . . ." and that, if an entity enters into a contract with the Secretary for disposal of its SNF, the contract will require the entity to pay the fees. 42 U.S.C. § 10222(a)(1). For the reasons previously explained, Boston cannot take a fee payment required only by contract and somehow create a takings claim.

Second, this Court lacks jurisdiction to adjudicate plaintiff's challenge to the legality of DOE's actions concerning the collection of fees under the NWF. Section 10139 of Title 42 of the United States Code provides that the United States Court of Appeals shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C). In this regard, section 10222(a)(4) provides that the Secretary shall annually review the amount of the fee and, if he views it as insufficient or excessive, to report to Congress:

---

*Program* (U.S. Department of Energy, RW-0533) (discussing the costs for the SNF disposal program at the Yucca Mountain repository).

> The Secretary shall annually review the amount of the fees established by paragraphs (2) and (3) above to evaluate whether collection of the fee will provide sufficient revenues to offset the costs as defined in subsection (d) of this section. In the event the Secretary determines that either insufficient or excess revenues are being collected, in order to recover the costs incurred by the Federal Government that are specified in subsection (d) of this section, the Secretary shall propose an adjustment to the fee to insure full cost recovery. The Secretary shall immediately transmit this proposal for such an adjustment to Congress. The adjusted fee proposed by the Secretary shall be effective after a period of 90 days of continuous session have elapsed following the receipt of such transmittal.

42 U.S.C. § 10222(a)(4). The District of Columbia Circuit has held unequivocally that challenges relating to the collection of fees under the NWPA are under the original and exclusive jurisdiction of the United States Court of Appeals. General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985); see Natural Resources Defense, 244 F.3d at 743 (acknowledging original and exclusive jurisdiction of United States Courts of Appeal to entertain challenges relating to NWF).

Although Boston contends that DOE's alleged over-collection of fees into the NWF constitutes a taking of Boston's property, Boston has never previously challenged DOE's assessment of the fee, either pursuant to the "Disputes" provision of the Standard Contract, 10 C.F.R. § 961.11, Art. XVI, or through a direct challenge at the United States Court of Appeals. If the Governmental action about which a party complains leaves open the possibility that the owner of the property may obtain a change or exception to the Government action, the owner must pursue that possibility and be denied before a taking can occur. Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc. v. United States, 452 U.S. 264, 297 (1981); E-Systems, Inc. v. United States, 2 Cl. Ct. 271, 278 (1983). Boston's failure to pursue any challenge to DOE's fee

collections since 1983, either through the contract or through a challenge to the United States Courts of Appeal, precludes Boston's challenge to the fee here.[20] Accordingly, its takings claim relating to fee payment issues should be rejected.[21]

## III. BOSTON'S GOOD FAITH AND FAIR DEALING CLAIM FAILS BECAUSE BOSTON LACKS STANDING TO PURSUE ITS BREACH OF CONTRACT CLAIM AND BECAUSE BOSTON HAS NOT PRESENTED ANY EVIDENCE TO OVERCOME THE PRESUMPTION OF GOOD FAITH

### A. Boston's Good Faith And Fair Dealing Claim Fails Because It Is Dependent Upon A Breach Of Contract, And Boston Lacks Standing To Pursue Its Contract Claim

In its brief, Boston concedes that its count for breach of the covenant of good faith and fair dealing is dependent upon, and directly arises from, Boston's count for breach of contract. See Pl.'s Brief, at 42 ("all contracts, including government contracts, contain an implied covenant of good faith and fair dealing."); id. at 44-45 ("DOE's conduct clearly demonstrates that it breached its duty of good faith and fair dealing to Boston Edison by acting in a manner that was inconsistent with the mutual expectations of the parties and the purpose of the Standard

[20] We are not suggesting that, if Boston had pursued a challenge to the fee collection at a United States Court of Appeal and was denied, it would then have a basis for asserting a takings claim in this Court. To the contrary, the United States Courts of Appeal have exclusive jurisdiction to entertain challenges to the fee. However, having failed to pursue that avenue of relief, Boston cannot circumvent that requirement by proceeding directly in this Court.

[21] In addition, to the extent that Boston is seeking a refund of its NWF payments, its claim does not constitute a proper "takings" claim. "[W]hile a taking may occur when a specific fund of money [in a private party's possession] is involved, the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001); see United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). "Unlike real or personal property, money is fungible." United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989), quoted in Commonwealth, 271 F.3d at 1338. Accordingly, "[r]equiring money to be spent is not a taking of property." Atlas Corp. v. United States, 895 F.2d 745, 756, cert. denied, 498 U.S. 811 (1990).

Contract."). Because Boston lacks any basis to pursue its breach of contract claim, Boston also lacks a basis to pursue its breach of the covenant of good faith and fair dealing claim.

Citing Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1342 (Fed. Cir. 2000), and Northern States Power Co. v. United States, 224 F.3d 1367 (Fed. Cir. 2000), Boston contends that the "Federal Circuit has held that utilities in the SNF cases may maintain a valid cause of action against the Government for violating the duty of good faith and fair dealing." Pl.'s Brief, at 42. Boston's contention is both unfounded and misleading. In those cases, the issue presented was whether the plaintiff was required to exhaust its administrative remedies before it could proceed with its breach of contract, takings, and good faith and fair dealing claims. The Court stated in Maine Yankee that the plaintiff there "was not required to invoke the contract's disputes clause before bringing suit." Maine Yankee, 225 F.3d at 1342. The Federal Circuit was neither presented with nor considered arguments regarding the merits of the plaintiff's good faith and fair dealing claim in either case.

B. Boston Has Completely Failed To Present Any Evidence To Overcome The Presumption Of Good Faith

Boston alleges bad faith as a result of the Government's delay in performance of the Standard Contract. See Amend. Comp. ¶ 78 ("DOE has breached the implied covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting Boston Edison's SNF for disposal by January 31, 1998."); Pl.'s Brief, at 44 ("Through its failure to begin acceptance of SNF from its nuclear facility, DOE interfered with Boston Edison's ability to fully realize the benefits of the Standard Contract."). However, a mere delay in performance cannot form the basis for a claim for breach of the covenant of good faith

and fair dealing. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff," and generally applicable to "fraud" or "quasi-criminal wrong-doing" by Governmental officials). Boston has not submitted any evidence to overcome the presumption of good faith.[22]

---

[22] Boston seeks to buttress its allegations of bad faith by claiming that DOE continued to state that "January 31, 1998 was a viable date for SNF acceptance and removal" while "knowing for years that it was not going to be able to uphold its end of the bargain." Pl's Brief, at 44. Boston's only evidence, however, is incomplete documents contained in its appendix. Moreover, Boston links DOE's obligation to begin performance with the opening of a repository, a linkage which the D.C. Circuit in Indiana Michigan ruled did not exist. Indiana Michigan, 88 F.3d at 1276. The Indiana Michigan court held that "[t]he duties imposed on DOE under subsections (A) and (B) [of section 302 of the NWPA] are linked to different events and are triggered at different times" and that "DOE's duty under subsection (A) to take title is linked to the commencement of repository operations," while "DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees and is triggered, at the latest, by the arrival of January 31, 1998." Id. As a result, as the Indiana Michigan court held, the language of subsection (A), dealing with the repository, may not be read into subsection (B), dealing with the January 31, 1998 date. Id. at 1276, 1277. The court found that the requirement to open a repository and the requirement to begin SNF acceptance by January 31, 1998, were "two independent requirements" and "separate obligations." Id. at 1276. Although the D.C. Circuit recognized that "Congress anticipated the existence of a repository by 1998," id. at 1277, the statute did not create a statutory obligation, or a contractual obligation, mandating it. Accordingly, the Government's obligation was to begin acceptance of SNF from the nuclear industry by January 31, 1998, in some form of facility, but not necessarily to have a repository available by that date. Id.

In the 1987 ACR, DOE set forth a schedule that showed both the Monitored Retrievable Storage ("MRS") facility and the repository beginning operations in 2003. In 1989, the Secretary of Energy required a reassessment of the program, the result of which was to push back the date for the beginning of repository operations until 1998. SA121-22. However, DOE also planned to open the MRS in 1998, based upon the assumption that Congress would remove the statutory linkages between the construction of the repository and operation of the MRS. SA116-17. The 1990 and 1991 ACRs reflected this planning. SA124, 137. Mr. Milner testified in the Yankee Atomic trial that, at the time the 1991 ACR was issued, he thought an MRS could still be sited and opened in time for waste acceptance in 1998. SA105-06. In 1994, with the failure of the Office of the Nuclear Waste Negotiator to obtain a host state for the MRS, DOE first publicly

In fact, Boston is essentially relying upon the allegations in its complaint to support its good faith and fair dealing claim. However, those allegations relate to DOE's delay in accepting Boston's SNF and simply give rise to a claim for breach of contract. Clearly, Boston cannot establish that the Government's delay in performance of the Standard Contract was in bad faith because Boston cannot prove, by "clear and convincing evidence," that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), was "designedly oppressive," Struck Construction Co. v. United States, 96 Ct. Cl. 186, 222 (Ct. Cl. 1942), or was "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959).[23]

C. This Court Lacks Jurisdiction To Entertain Boston's Claim Pertaining To DOE's Alleged Over-Collection Of Fees Into The Nuclear Waste Fund

To the extent that Boston's good faith and fair dealing claim rests upon DOE's alleged over-collection of fees into the Nuclear Waste Fund, this Court lacks jurisdiction to adjudicate plaintiff's challenge to the legality of DOE's actions concerning the collection of fees under the Nuclear Waste Fund. As previously explained, the United States Court of Appeals have original and exclusive jurisdiction over challenges to the Secretary's decisions regarding whether to petition Congress to modify the fee. See General Elec. Uranium, 764 F.2d at 907. Boston cannot seek to reduce its fee payments, or to recoup past fee payments, through the back door,

announced that it might not be able to meet the 1998 date. 59 Fed. Reg. 27,007-27,008 (May 25, 1994). In May 1995, DOE formalized this announcement. 60 Fed. Reg. 21,793-21,794 (May 3, 1995).

[23] Further, Boston's good faith and fair dealing claim fails because the damages sought by Boston are unrecoverable as a matter of law. As we will discuss below, the damages sought by Boston for alleged devaluation of its Pilgrim plant at an auction are unrecoverable because they are remote, consequential, and speculative.

rather than through the procedures that Congress mandated for that purpose. Further, even if the Secretary were to decide that the fee amount was too high, he would not have the authority simply to change the fee. Instead, he would have to petition Congress for permission to alter the statutorily-set fee amount. 42 U.S.C. § 10222(a)(4). In addition, assuming that Congress did not disapprove the fee change, the change would be only prospective. Id. Given that no court could determine judicially the manner in which Congress would respond to a fee adjustment request from the Secretary, no court could adjust the fee itself. At best, a United States Court of Appeal, which can consider challenges to "any final decision or action of the Secretary" or "alleging the failure of the Secretary . . . [to] take any action" under the NWPA, could potentially decide whether the Secretary has properly evaluated whether to make a request to Congress. However, it could not assume that, if a request was made, Congress would approve or disapprove it. Boston cannot seriously suggest that the Court can assume greater powers than the NWPA grants, place itself into Congress' shoes, and decide whether the statutory fee should be adjusted retroactively. Boston's claims regarding its former fee payments are far beyond this Court's jurisdiction and should be rejected.

## VI. BECAUSE BOSTON LACKS STANDING TO PURSUE THIS ACTION, AND BECAUSE BOSTON HAS FAILED TO PRESENT ANY EVIDENCE THAT IT WAS DAMAGED BY DOE'S PARTIAL BREACH, BOSTON IS NOT ENTITLED TO A RULING UPON LIABILITY

Boston has filed a cross-motion for summary judgment upon liability, claiming that it is entitled to judgment as a matter of law as a result of DOE's breach of contract. Pl's Brief, at 46. For the reasons previously explained, Boston is not entitled to a liability ruling based upon DOE's breach because it sold its reactor and assigned its Standard Contract before DOE's

obligations to begin accepting Boston's SNF accrued. Nevertheless, even if the Court believed that the Government's failure to begin SNF acceptance from the nuclear industry by January 31, 1998, constituted a breach that was otherwise actionable by Boston, Boston still would not be entitled to a liability ruling because it has failed to identify any damage from that alleged breach.

Apparently, Boston believes that it can obtain a liability order without showing any admissible evidence of damages and that it can do so even though the damages sought by Boston are unrecoverable as a matter of law. However, before a plaintiff is entitled to a ruling upon liability, it still "must show it was damaged to some extent, by defendant's derelictions . . . ." Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977); see Cosmo Constr. Co. v. United States, 451 F.2d 602, 605 n.3 (Ct. Cl. 1971). The only damages that Boston has identified in its motion for summary judgment regarding liability relate to the alleged devaluation of its Pilgrim plant as a result of the Government's delay in accepting Boston's SNF beginning on January 31, 1998.[24] Boston claims that the Government's delay in accepting Boston's SNF led to a "dramatic decrease in the number of prospective bidders that actually participated in the auction of Pilgrim" and "a significant reduction in the per kWh purchase price of Boston Edison's nuclear assets." Pl.'s Brief, at 8. Boston also alleges that "the fair market value of Pilgrim was significantly decreased as a result of the future costs that encumbered the property as a direct result of the Government's breach." Pl.'s Brief, at 8. Boston thus contends that "the Government's breach of the Standard Contract with Boston Edison had a significant negative impact on the fair market

[24] As we have established in our motion to strike Mr. Lubbock's affidavit, the only evidence that Boston has presented regarding this alleged damage is inadmissible. Nevertheless, even if the Court considers that affidavit, Boston has not identified any damage that would entitle it to a liability ruling.

value of Pilgrim relative to what the value would have been had DOE performed its obligations under the Standard Contract" and that "[t]his is demonstrated, in part, by the limited number of bidders and the low prices that they were willing to pay . . . ." Lubbock Affidavit ¶ 15.

Remote and consequential damages generally are not recoverable in suits for breach of contract against the United States. Northern Helex Co. v. United States, 524 F.2d 707, 720 (Ct. Cl. 1975); see Wells Fargo Bank, NA v. United States, 88 F.3d 1012, 1020 (Fed. Cir. 1996). A "consequential damage" is "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act." Black's Law Dictionary 352 (5th ed. 1979). To recover damages from the Government, a plaintiff must establish that the Government's breach was the sole cause of its loss. San Carlos Irrig. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The damages must not result from an intervening event. Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). Further, damages are remote and uncertain as a matter of law if they represent monies that would have been realized from undertakings independent from and collateral to the contract at issue:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Wells Fargo, 88 F.3d at 1022-23 (emphasis added), quoted in Energy Capital Corp. v. United States, 302 F.3d 1314, 1328 (Fed. Cir. 2002).[25]

The damages sought by Boston for the alleged devaluation of its Pilgrim plant and its reduced 1999 sales price are not recoverable because they do not directly flow from the breach, but instead arise from "independent and collateral undertakings." Specifically, the Standard Contract provides for the acceptance of the SNF from Pilgrim. Direct damages from DOE's breach in an appropriate case might be those relating to the need to incur costs for at-reactor SNF storage that otherwise would not have been required had DOE satisfied its acceptance obligations under the Standard Contract. In contrast to damages for costs directly arising from additional at-reactor storage of SNF, damages for alleged devaluation of a nuclear plant at an auction are so remote and indirect as to exemplify the types of consequential damages that are not recoverable in a breach of contract case. The Standard Contract is unrelated to the means by which Boston might seek to sell its nuclear facility, the sales price that it might obtain, or the profits that it might make from that sale. The sale of the Pilgrim facility clearly was not an activity associated with the work to be performed under the Standard Contract, and, accordingly, any profits gained or lost because of the Government's delays in SNF acceptance are plainly consequential to any breach. See Scott Timber Co. v. United States, 333 F.3d 1358, 1372 (Fed. Cir. 2003) (costs related to sawmill operations were "remote and speculative damages" because they were "not

---

[25] Because this is a suit against the United States, the Court lacks jurisdiction to award consequential damages unless "there has been a waiver of sovereign immunity." Bohac v. Department of Agriculture, 239 F.3d 1334, 1339 (Fed. Cir. 2001); see Johns-Manville Corp. v. United States, 893 F.2d 324, 326 (Fed. Cir. 1989). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." Lane v. Pena, 518 U.S. 187, 192 (1996). The Government has not waived its sovereign immunity to be sued for this consequential damage.

directly related to the timber sales contracts" that had been suspended and were "not a direct result of the suspensions in this case").

Further, "[f]or a damage to be direct there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage. . . . There must not be two steps between cause and damages." Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); see Quiman, 39 Fed. Cl. at 183. The possible intervening causes pertaining to the alleged devaluation of Boston's Pilgrim plant are numerous, including the highly regulated nature of the nuclear energy industry, the limited market for nuclear energy as compared to other forms of energy, the environmental consequences of the use of nuclear energy, and the decision of many utilities to exit the nuclear energy industry for profitability concerns.[26] The absence of a direct relationship between the Standard Contract and Boston's sale of its facility preclude an award of damages. See Hughes Communications, 271 F.3d at 1072 (increased launch insurance costs for

---

[26] The Federal Circuit's decision in Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002), is distinguishable. In Energy Capital, the Court found that a lender's lost profits for a housing venture were recoverable because they flowed directly from the breach and were not speculative. See Energy Capital, 302 F.3d at 1328. The Court stated:

> In the present case, Energy Capital's anticipated profits flowed directly from the AHELP agreement and not from "other independent and collateral undertakings. As the Court of Federal Claims found, the express purpose of the AHELP agreement was to permit Energy Capital to make up to $200 million worth of loans to HUD-assisted property owners. When the government breached the AHELP agreement, Energy Capital was no longer able to issue those loans, and its resulting loss of profits flowed directly from the government's breach.

Energy Capital, 302 F.3d at 1328-29. In contrast, the damages sought by Boston in this case for alleged devaluation of its Pilgrim plant at an auction are both remote and speculative, and they do not flow directly from the breach. Consequently, Boston's damages are unrecoverable.

substitute launch services "were not direct damages," and plaintiff's "independent business decision to obtain launch insurance" was an "intervening cause [that] precludes the award of increased insurance costs as direct damages").

To be recoverable, damages for breach of contract must also be foreseeable at the time the contract was formed and subject to calculation with a reasonable degree of certainty. See Wells Fargo Bank, 88 F.3d at 1025; Bohac v. Department of Agriculture, 239 F.3d 1334, 1339 (Fed. Cir. 2001). The damages sought by Boston for alleged devaluation of its Pilgrim plant at an auction cannot be determined with any degree of certainty. Indeed, there is no reasonable or reliable method to determine the price that Pilgrim would have been sold for at an auction had the Government timely begun accepting Boston's SNF. Such an inquiry is by its very nature highly speculative. Consequently, the damages sought by Boston for alleged devaluation of its Pilgrim plant are not recoverable.

Further, Boston's sale of Pilgrim was neither required by the Standard Contract nor related to any performance obligations in the Standard Contract. Such a speculative damages claim was not within the contemplation of the parties when the contract was formed. Consequently, the damages sought by Boston are not recoverable. See First Height Banks v. United States, 57 Fed. Cl. 162, 174 (2003) ("We hold, as a matter of law, that the subject of the bargain was confined to the opportunity to take advantage of the tax laws; that it would not have been foreseeable to federal negotiators that plaintiffs were entering into the arrangement to secure future funds for homebuilding projects. Absent some specific reference, those projects, and the potential profits on them, were simply too remote to be within the parties' contemplation as a potential collateral damage from a breach.").

## CONCLUSION

For the foregoing reasons, we respectfully request the Court to grant our motion and dismiss plaintiff's complaint. We further respectfully request the Court to deny Boston's cross-motion for summary judgment on liability.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Stefan Shaibani
STEFAN SHAIBANI
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-305-7597
Fax: 202-307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

August 26, 2004

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that, on August 26, 2004, a copy of the foregoing "DEFENDANT'S REPLY TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.