## INDEX TO THE SUPPLEMENTAL APPENDIX

Document — Page

Excerpt of compiled legislative history for the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, "Financing Nuclear Waste Disposal," Staff Working Paper, Congressional Budget Office, May 1981 .... 1

Letter from Larry Hobart, American Public Power Association, to Thomas Dillion, Department of Energy, dated January 21, 1983 .... 23

Memorandum from Eileen Peerless, American Public Power Association, to APPA Members with interests in nuclear power plants, dated January 24, 1983 .... 38

Memorandum from Emanuel Gordon, Atomic Industrial Forum, Inc., to Working Group on Nuclear Waste Fund Draft Contract, dated January 24, 1983 .... 48

Letter from S.P. Kraft, Edison Electric Institute, to Robert Mullin and Douglas Nichols, Tennessee Valley Authority, dated January 24, 1983 .... 49

Excerpts of Deposition of Nancy Slater, taken April 21, 1999 and June 13, 2002 .... 92

Excerpt of Trial Testimony of David Zabransky, Department of Energy, in Yankee Atomic Electric Co. v. United States, No. 98-126C, August 5, 2004 .... 99

Excerpt of Trial Testimony of Ronald Milner, Department of Energy, in Yankee Atomic Electric Co. v. United States, No. 98-126C, August 11, 2004 .... 103

Memorandum from Nancy Montgomery (Slater), Utility Nuclear Waste Management Group, to Members, Standard Contract Task Force, dated June 24, 1987 .... 107

Excerpts of the Annual Capacity Report, December 1990 .... 114

Excerpts of the Annual Capacity Report, December 1991 .... 130

Article, "The Standard Contract's Delivery Commitment Schedule Process," by Scott Vance, Pacific Northwest Laboratory, Washington Operations .... 145

Letter from M. Detmer, Contracting Officer, Department of Energy, to J.M. Buchheit, New Hampshire Yankee Division of Public Service of New Hampshire, enclosing DCS Instructions, dated March 4, 1992 151

**INDEX TO THE SUPPLEMENTAL APPENDIX** (con't)

Document Page

Excerpt of the Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, May 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Nuclear Waste Fund Fee Adequacy: An Assessment, May 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Excerpt of Quarterly Statement of Payments to the Nuclear Waste Fund for Entergy Nuclear Generating Company, as of June 30, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

DOE/GC-0007
Vol. 3 of 6

# Nuclear Waste Policy Act of 1982 Pub. L. No. 97-425

## Appendix C: Joint Hearings Before the Senate Committees on Energy and Natural Resources and Environment and Public Works

May 1983

**U.S. Department of Energy**
Office of General Counsel
Deputy General Counsel for Legal Services
Assistant General Counsel for Legislation

# FINANCING NUCLEAR WASTE DISPOSAL

Staff Working Paper

May 1981

The Congress of the United States
Congressional Budget Office

## PREFACE

Although the nuclear age is more than three decades old, nearly all of the country's high-level commercial radioactive waste remains in temporary storage. Further delay in establishing a radioactive waste disposal system may limit the future use of nuclear power. On the other hand, moving too quickly on any particular strategy may create unnecessary hazards. The Office of Technology Assessment (OTA) is studying radioactive waste management and disposal strategies in response to increasing Congressional and public concern. The Congressional Budget Office (CBO) has worked with OTA in analyzing the federal role in financing nuclear waste disposal programs. This paper addresses the issues involved in distributing the costs of nuclear waste disposal and the options available to the federal government for collecting fees and managing the revenues. In keeping with CBO's mandate to provide objective analysis, this working paper offers no recommendations.

The report was prepared by Barry J. Holt of the Natural Resources and Commerce Division, under the supervision of Raymond C. Scheppach. Deborah L. Vogt and Dorleen Dove typed the numerous drafts, and Patricia H. Johnston edited the manuscript.

Alice M. Rivlin
Director

May 1981

CONTENTS

| | | Page |
|---|---|---|
| PREFACE | | i |
| SUMMARY | | iii |
| CHAPTER I. | INTRODUCTION | 1 |
| CHAPTER II. | BACKGROUND | 3 |
| | Waste Disposal Problems | 3 |
| | Costs of Nuclear Waste Disposal | 6 |
| CHAPTER III. | DISPOSAL FEE COLLECTION | 9 |
| | Options | 9 |
| | Evaluation | 9 |
| | Evaluation Summary | 13 |
| CHAPTER IV. | FUNDING MECHANISMS | 14 |
| | Options | 14 |
| | Evaluation | 15 |
| | Evaluation Summary | 16 |

## SUMMARY


Every year, one-fourth to one-third of the fuel that powers nuclear generators must be replaced. Although reusable uranium and plutonium could be recovered from this "spent" fuel through a technique called reprocessing, commercial reprocessing efforts have to date been technically and economically unsuccessful. Furthermore, once separated, the plutonium could be diverted for nuclear weapons use. Consequently, as part of the U.S. nuclear nonproliferation policy, the Carter Administration indefinitely deferred commercial reprocessing. Thus, commercial spent fuel has become high-level radioactive waste which must be safely managed.

The Atomic Energy Act of 1959 (P.L. 83-703), which authorized the commercial development of nuclear energy, and Federal Regulation 10CFR50, require disposal of nuclear waste in a federally owned facility. Prior to final disposal, utilities are primarily responsible for storing the waste. Since spent fuel cannot be reprocessed and federal repositories will not be available for at least 10-15 years, utilities face storage capacity constraints, which could force some reactor shutdowns.

The 97th Congress will likely consider legislation both to provide federal storage facilities to alleviate utility capacity constraints and to hasten repository development. While the federal responsibility for final disposal is clearly established, the role the federal government will play in providing storage facilities and in financing nuclear waste disposal still needs to be determined. Only the disposal aspect is considered in this paper.

One major financing issue facing the Congress is deciding who shall pay for nuclear waste disposal. About 7,000 metric tons of commercial spent fuel currently rests in storage. An additional 20-40 metric tons moves into storage annually from each of the about 70 domestic operating power plants. The ultimate disposal of this waste is now estimated to cost about $100,000 per metric ton, which, if added to the consumer's average price of electricity, would result in an increase of about 2 percent. Nevertheless, only when utilities know the total costs of power production can they make investment decisions efficiently. Arranging payment of disposal costs, though, is complicated by timing factors. The primary benefits of electricity generation--and therefore, spent fuel production-- generally accrue to consumers near the time of power generation. The costs of disposal, however, are not borne until many years later, so any costs not accounted for and collected at the time of electricity generation will be transferred onto future consumers.




90-812 0 - 82 - 20

One possible role for the government, then, is to bridge this timing gap. By setting and collecting disposal fees and by managing the funds, the government could establish a more certain operating environment to allow better utility planning, assure an equitable and efficient distribution of the direct and indirect costs of nuclear waste disposal, and protect the federal budget from large, unanticipated expenditures. Decisions facing the Congress would then center on the mechanisms for collecting disposal fees and the budgetary treatment of such revenues.

FEE COLLECTION

Disposal fees could be established and collected at any one of various points in the nuclear fuel cycle--uranium enrichment, fuel fabrication, electricity generation, spent fuel removal from reactors, or delivery to the federal repository. Two primary options would impose either a mandatory tax-like assessment, based on projected fuel discharges, or a voluntary user-type fee, at the time of repository use. In choosing between the mandatory assessment or the user fee, the Congress will need to consider the degree of certainty each creates for utility planning and operation, and the assurance each provides for generating revenues sufficient to cover the total costs of disposal. In general, the voluntary, use-based fee would provide utilities with more operational discretion than a mandatory assessment. Concomitantly, the voluntary fee would provide the government with an unpredictable revenue stream and possibly insufficient revenues. On the other hand, a mandatory assessment would provide less utility discretion, but a more predictable revenue stream.

In either case, certainty for utilities and assurance of sufficient revenues are most sensitive to how and when adjustments in the fee are made. The greatest certainty for utilities--and the easiest passthrough of costs to consumers--would be achieved with a fee established as early as possible. Early fee collection, however, would provide less assurance to the federal government of sufficient revenues, since the estimated costs of the disposal program will remain highly uncertain until the facility nears completion.

To cover any additional costs, two approaches could be used. The first, a "reach-back" provision, would reassess previous users. Alternatively, the fee could be adjusted periodically, with the new rate charged to all users at the time it is imposed. Both methods would assure ultimate recovery of total costs. The periodically adjusted, one-time fee would provide some near-term planning certainty for utilities, but would make long-term planning difficult. A reach-back provision would leave utilities vulnerable to unanticipated costs. If, however, the government were to set limits on

the amount of later assessments, it could provide a more stable, long-term operating environment, while recognizing that the government might be responsible for some cost increases.

These adjustment mechanisms reflect the likelihood of initial under-estimation of costs and future cost overruns. The probability of such problems arising might be reduced by using the high end of the range of cost estimates or by setting higher fees initially. This would, however, depend on a determination that cost overruns and unanticipated costs were a more likely or more serious problem than current overpayments. Thus, a high mandatory fee, with a federally limited reach-back provision, might provide utilities with a reasonably certain operating environment and assure an appropriate level of revenue generation.

## FUNDING MECHANISMS

The Congress will also have to decide how to treat the fees within the federal budget. The budgetary treatment should provide certainty that the funds will be available and spent when needed, but allow for continued Congressional budgetary and policy control. The fees could be deposited in the general fund, or earmarked and deposited in a trust fund. Alternatively, a revolving fund could be established, which would recognize and treat the disposal program as a business-like operation.

The Congress maintains the highest level of control over federal funds that are not earmarked. Since such funds are subject to the annual appropriations process and its associated pressures, however, this method would provide little assurance that the funds would be spent for their intended use. Trust funds, on the other hand, could provide some insulation from the annual decision process, but in doing so take away some degree of Congressional control. Thus, a revolving fund, in which the receipts are earmarked, but without the restrictions of a trust agreement or statute, might provide an appropriate mix of Congressional control and security of funding.

## CHAPTER I. INTRODUCTION

Although the commercial nuclear industry has been operating for nearly 30 years, questions concerning the disposition of its nuclear waste--both interim storage and ultimate disposal--remain unanswered. Decisions on waste disposal become increasingly pressing as the stocks of waste grow.

Most commercial high-level nuclear waste is produced by electric utilities, which must replace one-fourth to one-third of their enriched uranium fuel rods annually. While it is technically possible to reprocess this "spent" fuel to recover the useful uranium and plutonium, commercial attempts have to date been unsuccessful. Moreover, because plutonium is also a basic ingredient of nuclear weapons, President Carter indefinitely deferred commercial efforts as part of his nuclear weapons non-proliferation policy. Nor can utilities send the spent fuel to a disposal facility. Although the federal government is responsible for providing repositories, none is expected to be available for at least 15 years. Currently, then, utilities must continue to store the spent fuel at reactor sites in facilities that were intended only for short-term use. As reactors continue to generate electricity and produce spent fuel, utility storage capacity becomes strained, threatening continued reactor operation.

Although the Carter Administration proposed establishing a federal storage facility as early 1977, none has yet been built. The 97th Congress will likely consider legislation that will not only provide for federal storage facilities, but also would more clearly delineate the federal responsibility for the development and operation of final nuclear waste repositories. While some technical problems still have to be resolved, the Congress specifically must address the federal role in financing the nuclear waste disposal program. To do so, the Congress will need to consider alternatives that affect the distribution of waste management costs, collection of fees, and the federal budget.

<u>Cost Distribution</u>. The Congress must first decide who will pay the direct and indirect costs of nuclear waste disposal. Electricity consumers receive the primary and separable benefits of the commercial nuclear reactors that produce waste. Other groups, however--the nuclear industry, states, and communities--also have important stakes in disposal decisions and may be forced to bear some of the costs of disposal programs. The next chapter describes the background of the nuclear waste problem and discusses the cost distribution issues in more detail.

Fee Collection. Another decision facing the Congress concerns the choice of a method to collect fees. Fee collection is complicated by the time lag between waste production and its disposal. An ideally constructed fee mechanism should meet three objectives. First, it should ensure that the cost is paid by those consumers using the electricity at the time the waste is produced. Second, the fee rate should be relatively stable and established in advance of the time of collection, so that electric utilities can make the most efficient decisions. Third, the fee should be set at a level to ensure that it collects enough revenues to cover the direct and indirect costs of disposal, but not so high as to produce profits. Chapter III discusses and evaluates the alternative fee-collection options.

Budgetary Treatment of Revenues. Finally, utilities, consumers, and the public will want some assurance that the collected funds will be spent to provide safe and efficient waste disposal. The Congress can use the federal budget process to provide such security by insulating spending from political and budgetary pressures. At the same time, however, efforts to insulate the funds from political pressures are likely to reduce Congressional budget and policy control. Chapter IV describes and evaluates the federal budget options.

CHAPTER II. BACKGROUND

The nuclear fuel cycle begins in uranium mines, where ore containing uranium oxide is obtained. Milling facilities then extract the useful uranium oxide. The next few steps in the cycle chemically and physically convert this product into nuclear fuel rods for use in nuclear reactor cores. Fission reactions within these enriched fuel rods produce the heat that powers nuclear electric power plants. During power generation, however, accumulating fission products reduce the efficiency of these fuel rods. Therefore, one-third to one-fourth of these "spent" fuel rods must be replaced annually.

## WASTE DISPOSAL PROBLEMS

Through the 1960s and early 1970s, government and industry planners assumed that this spent fuel would be stored at reactor sites for only about six months to cool and to allow the most intense, but short-lived, radioactivity to decay. It was then to be sent to a reprocessing facility, where the plutonium created by the fission process and the still-useful uranium would be chemically separated from the fission products for reuse in new fuel rods. The waste products from the reprocessing operation would be solidified and disposed of in a federally owned and operated geologic repository.

### Commercial Reprocessing Efforts

This part of the nuclear fuel cycle--spent fuel reprocessing and waste disposal--was never fully developed. While the Department of Energy (DOE) currently owns and operates two reprocessing facilities in support of defense programs, commercial reprocessing efforts have been technically and economically unsuccessful. Nuclear Fuels Services, Inc., for example, operated a commercial facility in West Valley, New York, for six years. It closed in 1972 for technical modifications to control effluent releases more effectively, reduce worker radiation exposure, and increase capacity. Since the modifications were considered uneconomic, however, the plant remained closed. Another plant, constructed by General Electric near Morris, Illinois, encountered technical problems and never reprocessed any fuel. A third facility, Allied Nuclear Services' plant in Barnwell, South Carolina, was never completed.

A change in federal policy prevented further efforts. Because the plutonium recovered by reprocessing is not only a useful fuel but also can be

used in nuclear weapons, reprocessing could contribute to the proliferation of such weapons and to nuclear terrorism. Therefore, in 1977, President Carter indefinitely prohibited commercial reprocessing as part of his nuclear weapons nonproliferation policy. Even without this prohibition, whether or not reprocessing would be commercially viable remains unclear.

Federal Involvement in Disposal

The federal responsibility for nuclear waste disposal is an outgrowth of the long-standing connection between the federal government and nuclear technology. To avoid the spread of nuclear weapons capability after World War Two, the United States classified nuclear technologies--military and commercial--as secret. This policy was revamped in 1953, with the introduction of the Atoms-for-Peace program to encourage the peaceful development of nuclear energy through sharing knowledge of nuclear technology. At the same time the government has tried to stem the tide of nuclear weapons proliferation. Along with these international goals, the government has maintained its relationship with the U.S. nuclear industry by supporting research and development, and regulating other commercial activities.

Responsibility for the final disposition of nuclear waste has been lodged solely with the federal government because of the waste's hazardous nature. Various types of nuclear waste remain radioactive for periods of time ranging from several hundred years to several hundred thousand. Since it cannot be "disposed of" in the sense that a biodegradable product can, disposal must consist of permanent and isolated storage, generally in deep geologic formations. Therefore, when the Atomic Energy Act of 1954 (Public Law 83-703) authorized commercial development of nuclear energy, the federal government indicated it would control such potentially dangerous materials by mandating that disposal occur on federal land. In 1970, with Reglation 10CFR50, the federal government formally accepted full responsibility for providing a final repository.

Federal efforts to establish a repository have, however, been unsuccessful thus far. The Atomic Energy Commission's site for a full-scale demonstration facility in Lyons, Kansas, was abandoned in 1972 because of pressure from the state and technical problems. Four years later, the Federal National Waste Terminal Storage Program called for the development of six pilot-scale repositories, scheduled to begin operations in 1985. By 1979, this schedule had slipped by at least five years; and, in February 1980, President Carter announced that a full-scale repository would not be operational until the mid-1990s. Only two months later, however, DOE, in a position paper for the Nuclear Regulatory Commission's proceedings on

radioactive waste, indicated that a repository would be available sometime between 1997 and 2006.

## Utility Planning Problems

Under current policy, spent fuel stored at reactor sites cannot be reprocessed, while at the same time the availability of federal storage and disposal facilities remains uncertain. As reactors continue producing spent fuel, the on-site storage capacity, intended only for short-term use, becomes filled. Some utilities can rerack the fuel rods in a more dense configuration to provide additional storage capacity. Others may be able to expand capacity through new construction. The storage capacity at some reactors, however, may be exhausted during the 1980s, with limited possibilities for capacity expansion. Exhausted storage capacity would force reactor shutdown, unless the spent fuel could be transferred to alternative facilities.

Some utilities, therefore, face difficult decisions concerning their options for spent fuel management in the face of great uncertainties. Since they do not know when federal storage or disposal facilities will be available, they do not know the appropriate time frame for evaluating their storage options. In addition to timing uncertainties, many costs are uncertain, and consequently, no fee for either temporary storage or final disposal has been established.

These uncertainties compound the already difficult planning problems associated with fuel mix selection and capital investment choices. Utilities must decide on the best ways to meet forecast electricity demand and to replace worn out equipment, while constrained by limited capital budgets. To provide new electricity production capacity, for example, many utilities are comparing the costs of coal-fired power plants to nuclear-powered generators. The capital costs of nuclear power plants are generally higher than those for coal-fired plants. The fuel costs, however, may tilt the comparison in the other direction. In addition, projecting future costs is very difficult because of the uncertainties of energy resource markets, environmental and safety regulations, and electricity demand. While the costs of waste storage and disposal may turn out to be small relative to the cost of generation, these costs and, perhaps even more, the uncertainties, affect utility decisions. These issues are discussed in the following section.

## COSTS OF NUCLEAR WASTE DISPOSAL

### Direct Costs of Disposal

A single 1,000 megawatt reactor generates between 30 and 40 metric tons of spent fuel annually. There are now about 7,000 metric tons of commercial spent fuel stored at reactor sites. About 5,000 metric tons of nuclear fuel currently powers the approximately 70 commercial reactors in this country. Although utility plans to build additional nuclear reactors are not entirely clear, current levels of production alone would result in at least 50,000 metric tons of spent fuel by the mid-1990s. Regardless of how utilities store spent fuel in the interim, it will all have to be moved to a federal repository eventually.

Since there is so little experience in dealing with nuclear waste disposal, its costs are very uncertain. There is no consensus on the proper disposal or regulatory requirements. In addition to the extensive evaluation of disposal methods and sites that must be made, basic technical and economic issues still have to be resolved. While the purpose of long-term disposal is to isolate nuclear waste from human activities, for example, there is still no clear decision on whether or not the disposed spent fuel should be retrievable. The current reprocessing prohibition, which effectively makes spent fuel waste, could be reversed, giving the spent fuel a positive resource value. Retrievability might also be desirable if unanticipated technical problems arose at disposal facilities.

The Office of Technology Assessment (OTA) estimates the direct cost of developing a geologic repository for 45,000 metric tons of waste, with supporting surface facilities, would likely be $3 to $4 billion in 1980 dollars. A facility of this size would provide the currently operating powerplants with waste disposal capacity for 15 to 20 years. Since the required development, including site screening, testing, construction, and licensing, would take close to 20 years, this cost estimate is very uncertain. A fee to cover these costs would probably be about $100,000 per metric ton, or the equivalent of about 1.0 mill (one-tenth of a cent) per kilowatt hour. If the fee cost was passed through completely, it would add about 2 percent to the average consumer's price of electricity.

### Indirect Costs of Disposal

The direct costs of disposal programs represent only a part of the total price. States and local communities may require compensation to allow repository development within their jurisdictions. Most communities find the prospect of a local waste disposal facility unattractive. The benefits of such facilities--mostly in the form of jobs and economic growth--may not be enough in themselves to convince communities to accept repositories.

These communities, and those through which the waste is transported, may have to bear the cost of contingency planning. The threat alone of accidents may also represent a cost to these areas. While this cost may be primarily psychological, it could appear in the form of reduced property values and a smaller tax base.

Another related cost that is difficult to measure is the possible loss of states' autonomy resulting from federal actions. No state has volunteered to provide a repository site, and no such offer is expected. Nevertheless, the states do not want the federal government to dictate where the sites should be. In fact, a number of states have voted on referenda that would restrict the transportation and disposal of nuclear waste. While these measures have not been uniformly successful, they point to the growing concern over the waste issue and states' role in selecting disposal sites and regulating transportation of nuclear waste. Although determining the states' participation in disposal decisions is very important, the discussion concerning the political solutions remains outside the scope of this paper.

Distributing the Cost Burden

Carter Administration proposals and recent legislative initiatives assume that the full costs of disposal would be recovered through fees paid by the utilities and other users of the services. The costs would be borne ultimately by those people who benefit from the activities generating the wastes. Just as the costs of waste disposal go beyond the capital costs and standard operating expenses, the benefits of a disposal program are realized by various groups. The distinctions between the types of benefits are important to make, however, in determining an equitable distribution of costs.

The general public, for example, benefits from the safe disposal of spent fuel as well as the reprocessing prohibition. The right to an environment free of nuclear waste is properly vested in the public, however, and the private generation of nuclear waste places this right at risk. So, while some of the costs and benefits of spent fuel disposal are difficult to calculate, the primary and separable benefit of spent fuel production is realized by the consumers of the nuclear-generated electricity. Therefore, it may be reasonable to assess these consumers with the total cost of disposal.

The Costs of Uncertainty

For any government program, unresolved problems and policy changes often lead to additional costs. Such costs for disposal result primarily from

two factors. First, unanswered technical questions leave the costs of geologic disposal uncertain, and make utilities' planning difficult. Second, poor planning or mismanagement could cause even wider cost variations. While the current cost estimates could turn out to be too high, the reverse may be more likely. Consumers and stockholders may reasonably be expected to bear the additional costs resulting from technical problems or poor utility planning. On the other hand, the burden of increased costs resulting from poor government planning, management, or policy changes might appropriately be borne by the public.

It is difficult to pass on the cost of disposal for currently generated spent fuel to the consumer for several reasons. The costs of disposal are not incurred at or near the time of electricity generation. Public Utilities Commissions (PUCs) generally allow the passthrough of only those costs which are definite and certain to be paid. In order to charge the electricity consumer for the future treatment of the spent fuel, then, a fee must be established near the time of generation. A set fee which turns out to be inaccurate can create intergenerational transfers, whereas more flexible fees are not likely to be allowed by PUCs. The next chapter introduces and evaluates the fee collection alternatives.

CHAPTER III. DISPOSAL FEE COLLECTION

The exact nature of the fees to be imposed on the users of federal storage facilities and repositories depends in part on the role that such facilities play in the nuclear fuel cycle. For example, if all spent fuel were to be moved to federal storage for additional cooling prior to disposal, the fees for storage and disposal could be combined. On the other hand, if only some utilities were to use the federal storage facilities, a separate fee for disposal would be necessary. This analysis focuses on the collection of disposal fees, independent of possible storage charges.

## OPTIONS

Two basic mechanisms would allow fee collection at any of the steps in the well-defined nuclear fuel cycle. The first, a mandatory assessment, would effectively tax a nuclear operation, relating such operation to the ultimate production of waste. This could be in the form of a surcharge on fuel rod manufacture, or a tax levied on electricity generation, for example. Alternatively, a user fee could be imposed on utilities at the time they dispose of their fuel. Such a fee would allow utilities to determine when disposal costs should be faced. These two options are evaluated in the next section by the criteria of certainty of costs for utilities, revenue sufficiency, and fee adjustment.

## EVALUATION

### Cost Certainty for Utilities

The way in which the disposal fee is collected determines the degree of certainty of its cost for utilities. While the cost of disposal may be only a small part of the annual cost of nuclear power, utilities need to compare carefully the total costs of alternative fuels in making investment decisions for new power plants. Further, the more certain are the charges, the more easily will Public Utility Commissions (PUCs) allow the charges to be passed through to the ratepayers. The fee's certainty is less sensitive, however, to its nature--tax-like or use-based--than it is to the timing of imposition and method of adjustment over time.

Fees to cover the costs can clearly best be determined at the time at which the costs are actually incurred, generally years after the spent fuel is generated. In order for the utilities to analyze investment decisions and for PUCs to allow the passthrough of costs to the current ratepayers, however, the fees would have to be paid, or at least established, much earlier. Thus, there is a direct tradeoff between the degree to which the fee can be imposed upon those consumers benefiting from the spent fuel generation and the risk of transferring part of the cost burden to future consumers. 1/

If a disposal fee were set and imposed at the fuel fabrication or electricity generation stage, for example, it could be considered an additional fuel cost. The various states, however, treat increases in fuel costs differently. Some have fuel adjustment clauses, with which the increases can be passed through to the ratepayers immediately without review by the state commissions. In those states without such clauses, increases may not be recoverable until after a commission rate review. Further, some fuel adjustment clauses only apply to oil and gas, and increases in the cost of nuclear fuel might be excluded. In any case, if the fee were imposed early in the fuel cycle, utilities could probably start to recover the costs relatively quickly. Setting a fee at such a time, well before the disposal costs are incurred, however, would increase the chances that it would be based on inaccurate cost estimates and, therefore, be set at an incorrect level. This is especially probable while the repositories are in the early stage of development. If the fee was set using the high end of the cost estimate range, it would be more apt to cover costs and thus lessen the probability of transferring costs to future ratepayers. This approach would depend on a determination that underestimation of costs is more likely or more serious than early over-collection of fees.

Imposing a fee much later in the fuel cycle would create other problems. While the level of the fee would probably more accurately reflect the correct costs, it would be very difficult to recover the fee from those consumers who benefited from the electricity generation that produced the spent fuel, and the cost would probably be transferred to future consumers. It might be possible for utilities to create reserve funds at the time of electricity generation to be used to pay a later-imposed fee. This method would, however encounter the same problem as an earlier-imposed fee, that is, its amount would have to be set at the time of collection from the ratepayers. Thus, the advantage of cost certainty in delaying fee imposition would be offset by the need for the utilities to charge an approximation of the fee to consumers much earlier to build the reserve account. Once the

1/ The spent fuel currently in storage poses this problem, since the users of the electricity associated with the waste were not charged for disposal. Thus, the costs have effectively been transferred to another group, either future consumers or taxpayers.

repository becomes fully operational, the costs will be better known, of course, and can be more accurately charged to utilities early in the fuel cycle.

Revenue Sufficiency

There are two aspects of revenue sufficiency. First, the fee collection mechanism must ensure that the full costs of the disposal program are eventually recovered. Second, the need for federal front-end funding and borrowing will be determined by the rate of revenue generation in relation to the rate of spending. In general, the fee collection mechanism must reflect the fact that any costs not paid for as the spent fuel is produced will be imposed upon someone in the future. Failure to provide for the total costs--including emergency funds and compensation to communities if necessary--would lead to intergenerational cost transfers, either through modified fees or government subsidies. Failure to generate a sufficient stream of revenues would create additional budgetary pressure if the federal government was forced to provide funds to meet any shortfall.

The Carter Administration plan, in which the disposal fee for those utilities also using federal storage facilities is tied to the storage fee, might introduce such timing problems. DOE apparently intends to rely on the disposal portion of the storage fee to provide for the advance funding necessary for the research and development phase of the disposal program. During the past few years, as more utilities have been providing for their own storage requirements, DOE has revised downward its projections for the use of federal storage facilities. Thus, the proposed tie between the storage facility use and the disposal fee leaves the revenue stream for disposal research and development uncertain. Since the timing of receipts from a voluntary user fee would depend on utility decisions, imposing an assessment type fee for disposal would probably provide the most assurance of a sufficient stream of revenues.

Fee Adjustment

Whether the fee is imposed as a mandatory assessment or as a user fee, some mechanism by which the fee can be adjusted must be devised to assure ultimate recovery of the total costs. Setting and collecting the fee as early as possible in the fuel cycle would most easily allow the utilities to both make sound investment decisions and recover the costs from the appropriate group of consumers. This type of cost certainty, however, provides the least assurance that the collected funds would reflect actual costs. The cost estimates for other long-term, capital-intensive projects

have often been low, and such underestimation of costs can result in insufficient total revenues.

There are two basic options that would allow the recovery of additional costs. The first, a "reach-back" provision, would allow the recovery of unanticipated costs in the future from the utilities that have previously paid for disposal services. The second, a periodic fee adjustment, would simply reestimate the fee for all future deliveries of radioactive waste to the disposal site, but not affect utilities with waste already there. Any reach-back provision would reintroduce the problems of uncertain fees and open-ended liabilities, since utilities would be liable for unanticipated assessments. A provision that periodically reevaluated and adjusted the fee, without retroactive adjustments, might be more acceptable to PUCs, since the short-term certainty would allow the passthrough of costs to consumers. In the face of a periodically changing fee, utilities might choose to deliver spent fuel early to avoid anticipated cost increases. This would not be a long-term problem, however, since these utilities would simply have to pay the higher fee for the next delivery. With either adjustment provision, though, later ratepayers would bear additional costs for services provided to former consumers. The specific equity concern raised by future ratepayers subsidizing earlier ones might, however, be reduced by using high initial cost estimates in setting a fee.

The financial risks of collecting insufficient revenues stem from three sources: technological problems, government policy changes, and inefficiency or poor management. Traditionally, industry has absorbed some of the costs of technical risks in any new venture. Since the federal government has created uncertainty by not building the promised repositories or promulgating regulations, there may be reason for the public to absorb cost escalation resulting from this inaction. Thus, the Congress may want to limit the extent to which utilities would have to pay the fee adjustments. Such limits might provide a more favorable and more certain operating environment for utilities and force the public to absorb excessive increases resulting from government action or inaction.

Operational inefficiency or poor planning can also cause cost escalation. Allowing DOE to recover the full costs for the operation of storage and disposal facilities would reduce the incentives to provide the services at minimum cost. Such inefficiency is not, however, restricted to government operations. For example, the fuel adjustment clauses now in effect allow public utilities to pass the rising costs of fuel through to the consumers without regulatory review. This has created a situation in which the utilities continue to rely on expensive oil, when the long-run costs to the consumer might be minimized by conversion of oil-fired boilers to allow the use of coal. Therefore, since the government is not uniquely inefficient, it

might not be fair to force the public to pay for the cost of all poor planning or inefficient management. A further consideration in nuclear fuel disposal is that some cost-cutting actions could jeopardize operational safety.

EVALUATION SUMMARY

Either the mandatory or voluntary user fees, coupled with an adjustment provision, could eventually provide enough revenues to cover the costs of nuclear waste disposal. Since a voluntary user fee would allow utilities a high degree of operational flexibility, though, the timing of the revenue stream would remain uncertain. This might tend to place pressure on the federal budget during repository development. On the other hand, while a mandatory assessment would reduce utilities' discretion, it would provide a more certain operating environment for both utilities and the government. Further, such planning certainty might be enhanced if coupled with a reach-back provision within set limits.

## CHAPTER IV. FUNDING MECHANISMS

There are several ways in which the government could manage the revenues generated by disposal fees. If they were treated as general revenues, then spending for the disposal program might be subject to the annual cycle of budget decisions. Alternatively, a trust fund could be established, with the revenues automatically earmarked for the disposal program. A third option, the revolving fund, would treat the disposal program as a continuing cycle of businesslike operations. In choosing the mechanism to fund the disposal programs, the Congress will want to maintain budgetary and policy control while providing assurance to the nuclear industry, utilities, and the public that the collected fees will be applied to the safe disposal of nuclear spent fuel. The general characteristics of these options are discussed below, followed by an evaluation of their applicability to disposal funding problems.

### OPTIONS

Direct Appropriations. In the annual budgetary cycle, the Congress appropriates funds that allow federal agencies to incur obligations and to make payments out of the Treasury. The most common form of budget authority is a one-year (annual) appropriation. Appropriations can also be made for a specified period exceeding one fiscal year, or an indefinite period of time, usually until certain objectives have been met.

Trust Fund. Funds collected and used by the federal government for carrying out specific purposes and programs according to the terms of a trust agreement or a statute are handled through trust funds. Such funds are administered by the government in a fiduciary capacity and are not available for the general purposes of the government. Trust fund surpluses are generally invested in government securities which pay interest to the fund.

Revolving Fund. The Congress can establish a revolving fund to finance a continuing cycle of operations in which expenditures generate receipts. Such funds can be set up so that the receipts are available for expenditure without further Congressional action. Only the net excess of expenditures over receipts is included in the budget as an expenditure. Temporary fund surpluses are also generally invested in interest-bearing government securities. Trust revolving funds, a special category of trust funds, are used to carry out a cycle of businesslike operations according to the terms of a trust agreement or statute.



90-812 0 - 82 - 21

These options entail varying degrees of Congressional control and provide different levels of funding stability. In order for the Congress to establish national policy goals and work towards them, it must maintain control over federal spending programs. The close control afforded by direct appropriations allows the Congress to effect policy changes quickly. This method may not, however, provide the assurance required by utilities, consumers, states, and communities that the disposal program will receive funds necessary to provide for the safe disposal of the nuclear waste. These tradeoffs are discussed in the next section.

EVALUATION

Security of Funds

While the Congress could provide directly appropriated funds essentially when they are needed, it might not be desirable to subject funds for disposal programs to this short-term decision process, even when full repayment is planned. Short-term budget constraints, which can affect the commitment of funds for any program, could reduce the credibility and success of disposal efforts. Pressure from a variety of sources could influence budget decisions, leaving expected appropriations vulnerable to cutbacks. This vulnerability could be reduced through the mechanisms of multiyear budgeting. For example, appropriations could be provided for use in one or more fiscal years beyond the year for which the appropriation is provided.

Revolving funds and trust funds could also reasonably assure the future availability of funds. While the Congress can control the spending of trust and revolving funds, receipts are credited to a specific account rather than to the general fund. A trust fund, or a trust revolving fund, would make the earmarking more formal, with a trust agreement or statute. A trust agreement, the major difference between a trust fund and a revolving fund, might indicate more of a commitment, although such agreements and statutes can be changed. Nevertheless, since fee collection would begin in the early years of repository development to provide funds in later years, the federal government would have to hold these funds in trust and could not use them for other purposes without changing the law. A revolving fund might be more appropriate if there were greater congruence between the rate of fund collection and spending, as may be the case after the disposal facilities are fully operational.

Congressional Budgetary Control

Direct appropriations afford the greatest level of Congressional control. The Congress decides annually the level of funds that it is willing to spend, and changes in policy are reflected relatively quickly in budget decisions. This feature does, however, conflict directly with the stability criterion discussed above.

With nuclear waste disposal, incremental decisionmaking, which can easily result in deferred action, might lead to substantial long-term costs. A trust fund might provide assurance for future funding and reduce the problems associated with incremental decisionmaking. This may, however, reduce budgetary control by the Congress, since trust funds are intended to be insulated from the annual review process. The Congress could maintain some degree of control by careful establishment of the trust fund, and by exercising its right to legislate changes as they are needed in the future. Further, since trust funds are to some degree isolated from the rest of the budget, they provide an opportunity for scrutiny.

Revolving funds theoretically allow greater Congressional control over spending than trust funds. While the receipts to a revolving fund are held in a specific account, there is no explicit trust agreement that prohibits using the money for other purposes. Thus, a revolving fund would provide less security than a trust fund, but somewhat more than annual appropriations.

EVALUATION SUMMARY

If disposal fees were collected and deposited in the Treasury's general fund, there is no assurance that the fees would be applied to their intended purpose. With this option, however, the Congress would maintain the greatest degree of budgetary control. Some assurance and stability for utilities' planning could be provided by advance budgeting. Depositing fee revenues into a trust fund, would place the federal government in a fiduciary capacity and provide written, although revocable, assurance that the money would be spent for its intended use. Removing these funds from the annual decision process, however, would limit Congressional control. Alternatively, a revolving fund might provide some assurance to utilities, consumers, and the public that the money will be available and spent for disposal services without severely limiting Congressional control.

**AMERICAN PUBLIC POWER ASSOCIATION**

2301 M STREET, NW WASHINGTON, DC 20037 • 202/775-8300


OFFICERS

President JAMES E. BAKER
President-elect ROBERT L. McKINNEY
Vice President J. K. SPRUCE
Treasurer C. M. PERKINS
General Counsel NORTHCUTT ELY
Executive Director ALEX RADIN

DIRECTORS

JAMES E. BAKER, Shrewsbury, Massachusetts
HENRY A. BELL, Columbus, Ohio
ALBERTO BRUNO-VEGA, Puerto Rico Electric Power Authority, San Juan, Puerto Rico
WALTER A. CANNEY, Lincoln, Nebraska
BILL D. CARNAHAN, Fort Collins, Colorado
WILLIAM H. CORKRAN, JR., Easton, Maryland
RUSSELL DAU, Missouri Basin Municipal Power Agency, Sioux Falls, South Dakota
R. HARRY DAWSON, Grand Haven, Michigan
JOE B. DYKES, JR., Tallahassee, Florida
JOE H. EXUM, Jackson, Tennessee
PAUL P. HEMBREE, Nashville, Tennessee
DON HOWLAND, Duncan, Oklahoma
JACK H. MADISON, Tillamook People's Utility District, Tillamook, Oregon
RICHARD E. MALON, Columbia, Missouri
N. L. McCARTNEY, Springfield, Missouri
THOMAS H. McCAULEY, Moorhead, Minnesota
MIKE McDOWELL, Committee on Public Power for the Southwest, Edmond, Oklahoma
ROBERT L. McKINNEY, Cowlitz County Public Utility District, Longview, Washington
JOHN S. McQUEEN, Chattanooga, Tennessee
WILLIAM MESCHER, Santee Cooper, Moncks Corner, South Carolina
ERNEST J. MULLEN, Kaukauna, Wisconsin
JAMES L. MULLOY, Los Angeles, California
JOHN P. MUNNELLY, Omaha Public Power District, Omaha, Nebraska
PAUL J. NOLAN, Tacoma, Washington
PAUL W. OBLER, Tipton, Indiana
PHILLIP C. OTNESS, Massachusetts Municipal Wholesale Electric Company, Ludlow, Massachusetts
C. M. PERKINS, Salt River Project, Phoenix, Arizona
JAMES H. PHILLIPS, Sebring, Florida
GEORGE D. REICH, Plattsburgh, New York
HAROLD SCHIEBOUT, Sioux Center, Iowa
SIMON C. SITTERSON, Kinston, North Carolina
WYLIE H. SMITH, Dothan, Alabama
J. K. SPRUCE, San Antonio, Texas
WILLIAM C. WALBRIDGE, Sacramento Municipal Utility District, Sacramento, California
ROBERT C. YOUNG, Burlington, Vermont


January 21, 1983

Dr. Thomas Dillon
Department of Energy
Room 5A115
Forrestal Building
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Dear Tom:

As you will recall, at the briefing session held January 20, 1983, the American Public Power Association presented a paper laying out concerns of public power systems with respect to the existing draft contract for disposal of spent nuclear fuel and high-level radioactive waste. Another copy of that statement is enclosed for your records.

Since that meeting, APPA representatives, meeting separately and with representatives of private power companies and the Edison Electric Institute, have attempted to prepare language which can be inserted into the contract to deal with some of the major problems we have identified. That language is enclosed for your use. While it does not address all present or potential difficulties in the contract, its inclusion in the contract would definitely aid in insuring that the contract is an equitable and effective means of implementing the intent of Congress.

Individual public power systems may also be submitting comments to you, but I think that the enclosed language addresses a number of common concerns in a manner which would be generally acceptable to them. There were, of course, many comments made during the meeting on January 20 which also should be taken into account, and other such views may be brought to your attention in the future in connection with public comments and hearings. For example, during discussions among EEI and APPA representatives, various differences in views were expressed regarding the advisability of allowing the one-time fee for fuel irradiated before April 7, 1983 to be firmed up before delivery to DOE commences.

I understand that you will be receiving additional comments from EEI. EEI and APPA representatives have agreed on a number of common approaches, as you will recognize from examining the proposed words submitted by the two groups. I believe that this fact reinforces the desirability of the proposed changes.

TV 1236

TVP0041022

Your willingness to consider our comments and suggestions is much appreciated.

Sincerely,

Larry Hobart

Larry Hobart
Deputy Executive Director

LH:ep

Enclosures

TV 1237

SPECIFIC LANGUAGE CHANGES
To
1/19/83 DOE DRAFT CONTRACT

January 21, 1983

Members of the utility group are impressed with the energetic way in which the DOE staff is tackling the nuclear waste disposal agenda. While the Nuclear Waste Policy Act of 1982 contains a great deal of detail about the procedure which DOE is to follow in establishing repositories, little guidance is given about the relationship between DOE and utilities on nuclear waste. Instead, DOE has been authorized to negotiate contracts to establish this relationship.

Because the contracts will provide for the payment of huge sums of money over a very long time, the accuracy with which the expectations of the parties are expressed is extremely important. As presently drafted, the contract provides little assurance that DOE will take sufficient deliveries of nuclear waste to meet utility needs or that a repository will ever be established. Since the expectation of the parties is that such needs will be met and a repository will be established, the contract should include this among DOE's responsibilities. If for some reason DOE does not meet its contractual obligations, appropriate remedies should be available. Otherwise, those signing the contracts would appear to have only the right to pay and would be without recourse in the event the repository is seriously delayed or is never established. Any such failure is certain to result in substantial additional costs to utilities and their ratepayers. It would be consistent with section 302(a) of the Act for the contract to be much more specific about DOE's responsibilities and to provide appropriate remedies in the event such responsibilities are not fulfilled.

Scope, Best Efforts to Keep on Schedule

Article II should be revised to, among other things, make it clear that both parties will use their best efforts to maintain project schedules. Accordingly,

TV 1238



TVP0041024

we recommend revising Article II as follows:

ARTICLE II - SCOPE

A. Disposal

This Contract applies to the delivery by Purchaser to DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and, with respect to such material, establishes the charges to be paid by the Purchaser for the services rendered hereunder by DOE.

The services provided to the Purchaser by DOE under this contract are related to disposal of SNF and/or HLW from civilian nuclear power reactors. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article III below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear powerplants specified in Appendix "A" hereto has been delivered by Purchaser to DOE. Each party agrees to use its best efforts to avoid delays in furthering the purposes of this contract.

B. Term

The term of this contract shall be from the date on which it is entered into, until such time as DOE has taken delivery of all SNF and/or HLW from the civilian nuclear power reactors identified in Appendix "A".

Scheduling Deliveries

The scheduling process needs to be classified and should include flexibility for utilities consistent with DOE planning requirements. Accordingly, it is recommended that the following substitution and addition be made to Article III. B:

TV 1239



TVP0041025

III.B. Purchaser Forecasts

On an annual basis, commencing on October 1, ______ Purchaser shall provide DOE a forecast of estimated deliveries during the succeeding 10 year period. The form and content of this forecast shall be in the form set forth in Appendix "C". This forecast is to be used by DOE for planning purposes and is not a binding commitment by Purchaser.

C. Delivery Commitment Schedule

1. Delivery commitment schedule(s), in the form set forth in Appendix "A", for SNF and/or HLW shall be furnished to DOE by Purchaser. Purchaser shall submit delivery commitment schedules at least 63 months prior to the delivery date specified therein. DOE shall approve or disapprove a delivery commitment schedule within 3 months after receipt (Note: Contract needs to provide for what happens if there is disapproval.) Purchaser shall have the right to adjust the quantities of SNF and/or HLW upward or downward by 20% up to the submission of the final delivery schedule subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

2. Final delivery schedule(s), in the form set forth in Appendix "B", for SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. Purchaser shall submit final delivery schedules not less than 12 months before the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within 45 days after receipt. (Note: Contract needs to provide what happens if there is disapproval.)

D. Exchanges

Purchaser shall have the right to exchange approved delivery commitment schedules and final delivery schedules with purchasers under other contracts

for disposal of SNF and/or HLW, provided that DOE shall have the right to approve such exchanges to ensure consistency with DOE transportation arrangements, which approval shall not be unreasonably withheld.

DOE Obligation To Dispose Of SNF and HLW

DOE's obligation to take delivery of SNF and HLW needs to be more specific. Since DOE's obligation to dispose of SNF and HLW is "in return for the payment of fees" (see sec. 302(a)(5)(B) of the Act), in the event the disposal services are not available further payments should stop and fees for services not provided should be returned. Accordingly, it is recommended that the following be substituted for paragraph IV. B:

IV.B. DOE Responsibilities

1. DOE shall take delivery of all SNF and/or HLW that is packaged for safe transportation.

2. DOE shall have complete responsibility for all SNF and/or HLW after it has taken delivery of such material.

3. DOE shall review and approve or disapprove Purchaser's proposed delivery commitment schedules and final delivery schedules within ninety (90) days after receipt thereof.

4. DOE shall start accepting delivery of SNF and/or HLM not later than January 31, 1998 at not less than the annual rate SNF and/or HLW is then being produced from Purchaser's nuclear powerplants specified in Appendix A.

5. After January 31, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for Purchaser's nuclear powerplants specified in Appendix A.

6. DOE shall arrange for and provide all necessary transportation of the SNF and/or HLW. Unless otherwise agreed in advance by DOE, DOE shall arrange for a shipping cask to be furnished to the Purchaser sufficiently in advance to accommodate scheduled deliveries. Casks to be furnished by DOE shall be suitable for use at the Purchaser's site.

7. In the event DOE does not meet its obligations under paragraphs 1 through 6 above, Purchaser's obligations to pay further fees under Article VII shall end and fees previously paid by Purchaser shall be returned to Purchaser in proportion to the SNF and HLW covered by this contract which have not been accepted by DOE.

8. At Purchaser's request, and in any event not less often than annually, DOE shall periodically provide information to support waste disposal program cost projections, details of project plans and progress reports. If requested by Purchaser, DOE shall, in addition to providing such documents, periodically discuss plans and budgets for Nuclear Waste Fund monies with Purchaser or its designated representative and provide technical briefings on Nuclear Waste Fund activities.

9. DOE and Purchaser or its designated representative shall make a good faith effort during the study period under section 303 of the Act to consult on alternative approaches to managing the planning, design, licensing, construction and operation of civilian radioactive waste management facilities. It is contemplated that increased Purchaser access to information, Purchaser program audit rights, and an increased Purchaser oversight role will be considered by the parties.

6-6-6-6

10. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

Reprocessing

In the event SNF is reprocessed any proceeds therefrom or the value thereof to the Government should be credited to the Nuclear Waste Fund to reduce Purchasers' payments. Accordingly, it is recommended that Article VII be revised as follows:

ARTICLE VII - TITLE

Title to all SNF and/or HLW shall pass to DOE upon delivery to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be solely responsible for control of all material upon assuming title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to the title to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material; provided, that in the event such SNF is reprocessed, the Nuclear Waste Fund will be credited with any net proceeds from the sale of recovered products and byproducts or for the net value of any recovered products and byproducts not sold.

Expenditures from Nuclear Waste Fund

Permissible expenditures from the Nuclear Waste Fund should be included. Accordingly, it is recommended that the following be added to Article VIII:

F. Use of Fees

All fees paid hereunder shall be deposited in the Nuclear Waste Fund established by section 302(c) of the Nuclear Waste Policy Act of 1982. Fees may be used only for the following purposes:

(1) the identification, development, licensing, construction, operation, decommissioning, and post-decommissioning maintenance and monitoring

of any repository, monitored, retrievable storage facility or test and evaluation facility constructed under the Act;

(2) the conducting of nongeneric (i.e., site specific) research, development, and demonstration activities under the Act;

(3) the administrative cost of the radioactive waste disposal program;

(4) any costs that may be incurred by DOE in connection with the transportation, treating, or packaging of spent nuclear fuel or high-level radioactive waste to be disposed of in a repository, to be stored in a monitored, retrievable storage site or to be used in a test and evaluation facility;

(5) the costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at a repository site, a monitored, retrievable storage site or a test and evaluation facility site and necessary or incident to such repository, monitored, retrievable storage facility or test and evaluation facility; and

(6) the provision of assistance to States, units of general local government and Indian tribes under sections 116, 118; and 219 of the Act.

Remedies

Each party should have appropriate remedies. Accordingly, it is recommended that Article X be changed to read as follows:

ARTICLE X - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law. Provided, that in light of the Federal responsibility for the disposal of SNF and/or HLW, DOE shall not have any right to terminate this contract. Provided further, that DOE shall have the right to suspend performance of its responsibilities under this contract,

in whole or in part, only in the event of national emergency that requires priority be given to government programs to the exclusion of the work under this contract.

Contracts with Third Parties

As noted in the legislative history (see September 30, 1982 Congressional Record p. H8171 and Report of the Committee on Energy and Commerce on H.R. 6598 p. 85) the Act was not intended to affect contract obligations already in existence regarding disposal costs. The contract should express a like intent. Accordingly, it is recommended that the following Article be added:

ARTICLE XV - OTHER CONTRACTS

Nothing in this contract is intended to relieve or in any way affect the contractual obligation of any other person who may have contracted with Purchaser to be responsible for some or all disposal costs or to accept title to SNF or HLW.

PUBLIC POWER REACTION TO DOE DRAFT CONTRACT
FOR DISPOSAL OF SPENT NUCLEAR FUEL
AND/OR HIGH-LEVEL RADIOACTIVE WASTE

January 20, 1983

Members of the American Public Power Association representing nine major public power systems with a significant stake in operating nuclear power plants have completed a preliminary review of the draft contract for disposal of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) released by the Department of Energy at a briefing session on January 19 at Washington's Hyatt Regency Hotel.[1]

The group developed a number of specific suggestions for changes which would protect the economic interests of the large number of electric consumers who will be affected by implementation of the proposed contract.

APPA believes that the contracts should make it crystal clear that DOE has responsibility to take all spent fuel which utilities wish to deliver to it; DOE's obligation should be further refined in the contract. In this regard, DOE is strongly encouraged to take an integrated approach to the overall program such that, among other matters, consolidated fuel will be an acceptable form for delivery and casks used for on-site storage will be acceptable for shipping with appropriate credits provided to utilities.

The contract should also provide that if DOE cannot physically take the spent fuel which is available to it, the utility affected can deduct from DOE charges utility expenses for casks, rod consolidation, or other such costs associated with retention of the spent fuel on site.

[1] *Public power systems represented at the APPA review meeting included Tennessee Valley Authority, Power Authority of the State of New York, Sacramento Municipal Utility District, Washington Public Power Supply System, Nebraska Public Power District, Omaha Public Power District, Massachusetts Municipal Wholesale Electric Company, Municipal Electric Authority of Georgia, and Los Angeles Department of Water and Power.*

TV 1246



TVP0041032

While reflecting the Nuclear Waste Policy Act, the contract should represent a binding commitment which stands on its own. If DOE breaches the contract, then utilities should have appropriate remedies to protect their ratepayers from failure of the essential elements of the contracts.

More specifically, APPA believes that the contract should be clarified in the following areas:

1. DOE Obligation to Dispose of SNF and HLW

   a. DOE should be required to start accepting SNF and HLW by a date certain (the 1998 date in the Act is appropriate) at not less than the rate SNF and HLW are produced from individual nuclear power plants.

   b. DOE should have the further obligation to accept delivery of each Purchaser's backlog of SNF and HLW during the remaining projected life of such Purchaser's power plants.

   c. DOE should pay Purchasers out of funds other than the Nuclear Waste Fund additional costs of interim storage caused by DOE's inability to meet these obligations, regardless of good faith efforts on the part of DOE.

   d. DOE should accept through the contract its responsibility to provide an adequate repository by 1998.

2. Remedies for Utility Relief

The contract should reserve to utilities their remedies under the contract and at law including, but not limited to, the right to terminate the contract consistent with applicable laws and a refund with interest of that portion of fees paid for which disposal services were not provided by DOE.

3. Right to Plans and Other Information

The contract gives DOE rights to secure detailed information from utilities but is not reciprocal with respect to utilities. Utilities should receive

TV 1247



TVP0041033

automatically on a periodic basis the basic non-security classified documents supporting DOE cost projections and details of projects, plans, and progress reports. These rights should be spelled out in the contract. Specifically, APPA believes that: DOE should have a duty under the contracts to inform Purchasers of plans and budgets for Nuclear Waste Fund monies, should provide an accounting to Purchasers for what is spent, and should be required to consider Purchasers' comments and recommendations in utilizing monies from the Fund.

4. Fees for "Old" Spent Fuel

Utilities should be given flexibility in the scheduling and payment of fees for disposal of spent fuel generated prior to April 7. Some utilities may not wish to deliver such spent fuel immediately. APPA believes that partial payments over time, e.g. 10 years, would be an appropriate option. If the fee is to be subject to full cost recovery adjustment in accordance with the Act, that fact should be spelled out in the contract.

5. Credit in the Event of Reprocessing

If reprocessing of spent nuclear fuel takes place in the U.S., utilities who contract with DOE should receive a credit for the recovered fissionable material. DOE told utilities on January 19 that it will "entertain" this idea; APPA suggests that it be put in the contract.

6. "Best Efforts" to Keep on Schedule

While there may be unavoidable delays in putting the waste disposal program together, both DOE and Purchasers should pledge to work to maintain schedules. The contract should specify that both parties agree to use their best efforts to avoid or minimize delay. DOE should also make it clear that acceptance of SNF will not be unreasonably withheld.

TV 1248

7. Decontamination Penalty Payments

Article V of the draft contract places on a utility the entire burden of paying for cask contamination between the time that DOE accepts the SNF at the site and its delivery to the disposal site -- even though the casks were received by DOE in acceptable condition and become contaminated due to actions of DOE. As with the rest of the costs associated with disposal, these should be distributed uniformly as a cost of DOE's operation. Since anything occurring after DOE takes title to the fuel is outside the control of the utility, this approach is sound and in no way creates additional costs directly to DOE.

8. Contracts With Third Parties

Utilities have contractual arrangements with third parties which are not recognized in the contract. To avoid problems which are created by this fact, the contracts should state that "nothing in the contract is intended to relieve or in any way affect the contractual obligations of any other parties who may have contracted with Purchasers to be responsible for some or all disposal costs or to accept title to SNF or HLW."

9. Problem of "Domestic Origin"

The contract refers to DOE duties by describing them in terms of "responsibility for the disposal of high-level radioactive waste and spent nuclear fuel of domestic origin from civilian nuclear power reactors". The phrase "of domestic origin" should be deleted wherever it appears because the term "civilian nuclear power reactor" is defined to include any obligation by DOE for SNF or HLW from domestic reactors. Foreign uranium is incorporated (and in an untraceable fashion) in the fuel rods of a number of U.S. power reactors which should be disposed of under these contracts.

10. Definition of "kwh"

Confusion has been expressed about what is a "kwh" for purposes of assessing the 1 mill/kwh waste disposal fee. APPA proposes that "kwh" be defined as a net kwh, i.e. gross generation less station use.

11. Possibility of utility bankruptcy

Commencement of bankruptcy should not be used to decide whether a utility can perform under the contract. If a utility meets all its obligations under the contract, there is no justification for applying this provision. If it fails, i.e. does not meet payment, that in itself would provide sufficient grounds for termination. The draft contract provision should be stricken.

12. Description of DOE Expenditures

The contract should set forth permitted expenditures under the Act with appropriate clarification, e.g. non-generic R&D means site specific research and development.