APPENDIX "F"

Standard Remittance of Advice (RA) For Payment of Fees

DRAFT

Three Month Assigned Period Covered: From:______ To:______

I. Purchaser (Utility name and address) and contract number

II. Charge based Upon Spent Nuclear Fuel Fee Schedule/One-Time Fee Payment Agreement $__________

A. Date of First Delivery__________
B. Unpaid Balance to Date__________
C. Date Fee Paid__________
(Check # if applicable__________)

III. MKWH Fee (Identify powerplant(s) covered by this RA showing on a separate schedule the beginning meter reading, ending meter reading, difference for each) $__________

A. Total Nuclear KWH Generated During Assigned Three Month Period Covered__________
B. Date Fee Paid__________
C. (Check # if applicable__________)

IV. Underpayment (as notified by DOE) $__________

A. Date of Notification__________
B. DOE Invoice #__________
C. Date Fee Paid__________
(Check # if applicable__________)

V. Late Payments (as notified by DOE) $__________

A. Date of Notification__________
B. DOE Invoice #__________
C. Date Fee Paid__________

VI. Other Credits Claimed (explain) $__________

VII. Total Remittance $__________

Prepared by:
Phone #:
Date:

FOR DOE USE ONLY BELOW THIS LINE

1. Deposit to account 89 ----
2. Receipt of Payment Verification
   a. Date Payment Received__________
   b. Verification Performed by__________
3. Posted to Cumulative Remitter Ledger
   a. Date Posted__________
   b. Posted by__________
4. Late Payments
   a. Calculation of late charge (attach schedule)
   b. Billing date
5. After processing RA furnish a copy to OCRWM

TV 1348



TVP0041134

INSTRUCTIONS FOR COMPLETING DOE REMITTANCE ADVICE

DRAFT

SECTION I:

Name & address self-explanatory

Contract number will be the identification number assigned by DOE upon execution

SECTION II: Based upon inventory of spent fuel and HLW amassed prior to April 7, 1983, times the kilogram fee. Liability for this waste is fixed as of April 7th and payments are spread over 10 years. Section II will not be completed until the date of the first scheduled delivery is known and payments will not be made until 5 years before the first scheduled delivery. Thereafter, fees will be paid quarterly, Section II of the RA completed, and RAs filed for the normal 3 month assigned period.

A. To be taken from DOE approved Delivery Commitment Schedule

B. Enter the cumulative unpaid liability, after this payment

C. Self explanatory

D. " "

$. Amount paid

SECTION III: Based upon electricity generated on or after April 7, 1983, times the current fee of 1M/KWH. Schedules should be attached specifying the gross amount of power metered through each plant during the assigned period.

A. Total power generated from attached schedules

B. Self explanatory

C. " "

$. Amount paid

SECTIONS IV & V: (Same instructions) DOE will invoice purchasers, when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.

A. The date the purchaser received DOE invoice

B. DOE's invoice #

C. Date purchaser dispatches payment

D. Self explanatory

$. Consists of interest if late payment or fees plus interest if under payment.

DRAFT

SECTION VI: Explanation on an attached sheet of paper if necessary why DOE has been overpaid and the proposed disposition of the overpayment, e.g. apply credit against this payment or send refund.

S. If applied against this payment this number is negative. If refund desired, leave blank and pay gross amount due from sections II through V.

SECTION VII: The sum of Sections II through VI.

DRAFT

Instruction Guide For Remittance of
Nuclear Waste Disposal Fees to
Department of Energy Via Wire Transfer

Payments made to the Department of Energy (DOE) for Nuclear Waste Disposal Fees will be effected by the Purchaser's commercial bank via the Federal Reserve Communications System (also known as Fedwire) to the Department of the Treasury. If the Purchaser's commercial bank is not a Federal Reserve member, then the Purchaser's bank will use a correspondent member bank to effect the transfer of funds.

Purchaser must provide specific information to its bank so that the transfer of funds can take place. Failure to correctly provide the information could result in delayed crediting of the remittance to DOE and could subject the purchaser to late charges.

A wire transfer of funds message with descriptions of specific date elements is provided in Enclosure A. Enclosure B contains instructions and a sample form of a transfer of funds that shows the specific information to be supplied by the Purchaser when requesting its commercial bank to initiate a transfer of funds. Enclosure C shows a transfer of funds message form that may be photocopied and used each time a transfer of funds must be made. Constant information has been preprinted on the form. Only that information applicable to that particular monthly remittance (i.e., amount, date, company name) must be filled in prior to submitting the form to your bank.

If additional information is required, contact DOE representatives Mark Loop or Joe Startari on (301) 353-4899 or 353-5857).

ENCLOSURE A

DRAFT

Guide for Funds Transfer
Messages to Treasury

The following instructions provide specific information which is required so that a funds (wire) transfer message can be transmitted to the Department of the Treasury. The funds transfer message format is shown in Exhibit 1. A narrative description of each item on the funds transfer message follows:

Line 1

Item 1 - Priority Code - The priority code will be provided by the sending bank. (Note: Some Federal Reserve district banks may not require this item.)

Line 2

Item 2 - Treasury Department Code - The nine-digit identifier "021030004" is the routing symbol of the Treasury. This item is a constant and is required for all funds transfer messages sent to Treasury.

Item 3 - Type Code - The type code, 10, identifies fund transfer messages. This item is a constant and is required for all funds transfer messages sent to Treasury.

Line 3

Item 4 - Sending Bank Code - This nine-digit identifier will be provided by the sending bank.

Item 5 - Class - The class field may be used at the option of the sending bank. (Note: Some Federal Reserve Districts prohibit use of this class/field.)

Item 6 - Reference Number - The reference number will be inserted by the sending bank to identify the transaction.

Item 7 - Amount - The amount must include the dollar sign and the appropriate punctuation including cents digits. This item will be provided by the Purchaser.

Line 4

Item 8 - Sending Bank Name - The telegraphic abbreviation which corresponds to item 4 will be provided by the sending bank.

DRAFT

ENCLOSURE A
Page 2

Line 5

Item 9 - Treasury Department Name - This item is of critical importance. It must appear on the funds transfer message in the precise manner as stated to allow for the automated processing and classification of the funds transfer message to Treasury for credit to the Department of Energy. This item is comprised of a rigidly formatted, nonvariable sequence of 28 characters as follows:

TREAS NYC/(89000003) DOE NWF

Line 6, 7, and 8

Payment Identification - The payment identification should be furnished by the remitter in the following manner:

Item 10 - The constant "DOE NUCWASTE FEE" will be inserted.

Item 11 - The month and year the fees were incurred (i.e.; May 80) followed by a slash (/).

Item 12 - The company name is inserted following the slash.

DRAFT

EXHIBIT 1

ENCLOSURE A
PAGE 3






TV 1354

TVP0041140

**TRANSFER OF FUNDS MESSAGE FORM**
**(COMPLETED SAMPLE)**

ENCLOSURE B

DRAFT




The above example is a completed transfer of funds message form detailing those items (A thru E) filled in by the remitting company.

| Item | DESCRIPTION |
|---|---|
| A | Amount-must be properly punctuated to include cents digits. |
| B | Date - month and year followed by a slash(/) |
| C | Company Name. |

TRANSFER OF FUNDS MESSAGE FORM

ENCLOSURE C

DRAFT

| TO | TYPE | | |
|---|---|---|---|
| 021030004 | 10 | | |
| FROM | | REF | AMOUNT |
| | | | $ |

ORDERING BANK AND RELATED DATA

1
2
3
4
5 TREAS NYC/(29000003) DOE - NWF
6 DOE
7
8

88

TV 1356

DRAFT

APPENDIX G

GENERAL TERMS AND CONDITIONS

1. DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within thirty (30) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within 60 days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within 60 days or notify the Purchaser of the date when the decision will be made.

C. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A. above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

2. OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

DRAFT

3. COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

4. ASSIGNMENT

~~Neither this contract nor any interest therein or claim thereunder shall be assigned or transferred by the Purchaser except as expressly authorized by the Contracting Officer.~~

5. EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract unless DOE authorizes their prior disposition.

6. PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

In addition to the authority provided by Article III.E hereto, the rights and duties of a party to ~~a~~ this contract may be assignable with transfer of title to the SNF and/or HLW involved.

Appendix "H"

DRAFT

FEE CALCULATION FORMULA

For SNF, and/or HLW derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, the following formula shall be used by the Purchaser to calculate the fees to be paid by the Purchaser under this contract:

$$\left(\frac{1\ \text{Mill}}{\text{KW - HR}}\right)\left(\frac{\$1}{1000\ \text{Mills}}\right)\left(\frac{1\ \text{MWe}}{3\ \text{MWth}}\right)\left(\frac{1\text{MTU}}{1000\ \text{Kg.}}\right)\left(\frac{24\ \text{Hrs.}}{1\ \text{Day}}\right)\left(\frac{1000\ \text{KWe}}{1\ \text{MWe}}\right)(X) = \$\ \frac{}{\text{Kg}}$$

or .008 (X) = $ Kg

where X = the burn up of each assembly in $\frac{\text{MWth Days}}{\text{MTU}}$.

1. Fuel Burnup data is used to determine a dollar per kilogram of heavy metal that is equivalent to one (1) mil per kilowatt - hour.

2. The calculation shall be done on an individual assembly basis.

Not acceptable as only option. Does not follow 5 years of experience between utilities and PUC's.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 3

CONTENTS

| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |

EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted' to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


Page 4

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

Page 45

And secondly I did my stint at TMI after the accident and was responsible for developing the plan to decontaminate the reactor vessel head structure and the plan for RAD waste volume production. That was three months in the middle of winter.

And then Grand Gulf project as a member of the licensing group. And I eventually became the licensing engineering supervisor for Grand Gulf. At the time we were getting a full power license.

Q. As the licensing engineering supervisor, what kinds of thing did you do for Grand Gulf?

A. We were working on developing tech specs, we were reviewing design documents to make sure that they did not obviate commitments we might have made to the NRC, we were responding to questions and requests for additional information from the NRC, revising sections of the FSAR, you name it. If it went on in the project, we were probably involved.

Q. Do you recall when was your involvement with TMI?

A. That would have been within four months

Page 46

of my joining Bechtel.

Q. And that's the '79, '80 time period?

A. Right.

Q. Do you recall who you worked for in that project?

A. Which one?

Q. On the TMI project.

A. Jim Tarpinian.

Q. Do you recall anything else you did for Bechtel?

A. Not really, no.

Q. And what was your position before Bechtel?

A. I worked for Kaiser Aluminum. My degree is in metallurgical engineering. And I managed the lab and the NDE facility at a heavy extrusion plant outside of Baltimore.

Q. When were you at Kaiser Aluminum?

A. '78 through '79, roughly two years.

Q. Let me go back to Bechtel. Why did you leave Bechtel?

A. I was bored. A power plant project is a very boring project. Once you've gotten on line and you're at full power, you're done with licensing, it's maintenance. And I wanted to do

Page 47

something different. And I was very much interested in plant life extension. And I knew that that consulting firm was going to get involved in it. And I knew people there.

Q. And why did you leave Kaiser to go to Bechtel?

A. Let's see. Aside from the fact that there was no air-conditioning, no heating, no ladies room because Kaiser had never hired a female engineer before, I again wanted to do something a little cleaner. It was very challenging work, but I couldn't see myself in a factory for the next 20 years.

Q. Before Kaiser what was your position before that?

A. School.

Q. And what's your educational background?

A. A bachelor's in metallurgical engineering with some graduate studies in nuclear engineering from the University of Florida.

Q. When did you complete that work?

A. 1978.

Q. You said there was some postgraduate work in nuclear engineering. Did you ever have any other postgraduate work in any subject?

Page 48

A. No.

Q. You never completed a degree in nuclear engineering?

A. No.

Q. Let me also ask this. I've seen this in the documents, maybe you can clear it up for me. How was your name changed, your last name changed?

A. Okay. When I started all this -- I married in 1980. And my last name was Montgomery. Actually I think I went by Slater Montgomery for awhile. And I divorced in 1993 and resumed the use of my maiden name.

I married in 1993 and kept my maiden name to avoid the confusion that had ensued as a result of the first marriage, because there are so many people across the country that I communicate with. It was very hard for them to realize that Montgomery was really Slater.

Q. After 1993 it was difficult for them to recognize that Slater was previously Montgomery?

A. Right, right.

Q. How did you prepare for your deposition today?

A. I did not.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

Page 3

CONTENTS


WITNESS EXAMINATION
NANCY SLATER THOMPSON
By Mr. Shapiro 4
By Ms. Sullivan 149
By Mr. Shapiro 153

Afternoon Session - Page 67


EXHIBITS


| Ex.No. | Description | Page |
|---|---|---|
| 1 | December, 1990 ACR | 17 |
| 2 | 6-22-83 contract | 25 |
| 3 | March, 1995 APR and ACR | 32 |
| 4 | June, 1987 ACR | 47 |
| 5 | June, 1988 ACR | 67 |
| 6 | December, 1991 ACR | 69 |
| 7 | May, 1993 ACR | 84 |
| 8 | March, 1993 ACR | 86 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 113 |
| 10 | Instructions for Completing the Appendix C - Delivery Commitment Schedule | 127 |
| 11 | Review Record | 139 |


Page 4

PROCEEDINGS

\- - - - -

Whereupon,
NANCY SLATER THOMPSON,
was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF:

BY MR. SHAPIRO:

Q. Would you state your name for the record, please?

A. Nancy Slater Thompson.

Q. Ms. Slater Thompson, my name is Robert Shapiro. As you recall I deposed you, gee --

A. Some time ago.

Q. -- a couple years ago now in these cases, and they are still going on. I won't have to go back over the procedures, I have your deposition, and I think you understand what we are doing today. It also saves -- I mean, we are not going to cover the same material the same way again, either. I just have a couple, I guess, catch-up items to make sure I understand what's happened with your background in the last couple years, and I have some additional topics I want to

Page 5

cover with you today.

What is your current position?

A. I am the acting division director of the regulatory coordination division.

Q. How long have you been in that position?

A. I have been in that position since January of 2001.

Q. What was your position before that one?

A. Team leader in the regulatory coordination division.

Q. How did your duties change when you moved from the team leader position to the acting director position?

A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.

Q. Are there any other teams in that division other than the one in which you were team leader?

A. No, there are not.

Q. How many people are in that division?

A. There are, including details, four in

Page 146

fuel in any NRC licensed container, licensed by the NRC for transport?
MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.
You can answer.
A. No, I am not focusing on anything related to transportation.
Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?
A. No, it does not. There is a separate transportation group that does that.
Q. The regulatory issues that your division is involved in are limited to those of the repository?
A. The repository, and I would say those in part two issues, that would be license and process issues.
Q. Has the issue of greater than class C waste come up in your role in the regulatory division?
A. No.
Q. Do you recall any discussion of whether or not to include greater than Class C

Page 147

waste in the EIS for Yucca Mountain?
MS. SULLIVAN: Objection. Vague.
A. No, I don't.
Q. Has the issue of high-level waste come up in your role in the regulatory division?
MS. SULLIVAN: Objection, vague. Objection, foundation.
A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.
Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?
MS. SULLIVAN: Objection. Vague.
A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low

Page 148

strategic significance.
Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. I have never heard that.
Q. Has such an interpretation ever played a role in your work in the waste acceptance division?
MS. SULLIVAN: Objection, foundation. Objection, vague.
A. I have never heard it, and I don't recall even considering that.
MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.
I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address

Page 149

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.
A. I understand. Thank you.
MS. SULLIVAN: I have a couple questions.
EXAMINATION
BY MS. SULLIVAN:
Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?
A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.
Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?
A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.
Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

Page 154

BY MR. SHAPIRO:
Q. In response to one of Ms. Sullivan's first questions, I believe you said that if a utility did not submit a proposed delivery commitment schedule for all of its spent fuel allocation, then that part of their allocation that they didn't submit for would be deemed waived and would be reallocated to other purchasers. Is that your understanding?
A. That's my recollection.
Q. How would that reallocation have worked?
A. If we were to go to the Acceptance Priority Ranking, as you are aware, if you have -- let's use an example. Let's go to the 1995 combined APR and ACR.
MS. SULLIVAN: Exhibit 3?
A. Exhibit 3. And let us assume that we have 400 MTU in the first year as an acceptance capacity, and let me see if I can find a number that's a nice round number. No. Naturally.
But let's say the Consolidated Edison has the ability to deliver 3 MTU, chooses not to submit a DCS. I would go to the Acceptance Priority Ranking, and I would simply move my line

Page 155

down three more MTU, and I would look at the utilities who comprise that additional 3 MTU, and it would in essence move them up from year 2 to year 1, and we would just roll the cue up in essence.
Q. I guess I am asking a little bit more basic or a more practical question, maybe it's a matter of speculation since I am not sure that it happened, but would you have sent a letter to the utility or utilities that would be getting that extra allocation then? How would those utilities themselves then know to submit a proposed delivery commitment schedule for their extra allocation? How would that have worked?
A. That would have been my intention is that had we done that, I would have anticipated notifying the utility who would have been next in the cue, so to speak, that in fact they had an opportunity to deliver in the preceding year in the amount of however many MTU it turned out to be.
Q. And you would have done that even though that utility otherwise didn't strictly have that allocation under the ACR?
MS. SULLIVAN: Objection. Vague.

Page 156

A. I think you are going to have to better define for me what you are saying.
Q. It goes back to something you said subsequently where you said that the instructions, if a utility was strictly following the instructions, it said look at their allocation on the ACR and don't submit more than that, you would basically be telling a utility to deviate from that instruction because of some subsequent intervening event?
A. No.
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. In my personal opinion, absent a legal determination or a determination by the contracting officer, what I would be doing in essence is allocating excess capacity in that year that was not used by the particular utility that decided not to submit a delivery commitment schedule.
Q. Let's go back to the utility that gave us some capacity, and perhaps let's use the example of the 3 MTU for Consolidated Edison Company. When would Consolidated Edison Company ever get that 3 MTU allocation back to enable them

Page 157

to deliver all of their spent fuel to DOE?
A. If my recollection serves me correctly, and I would need to go through and really review this document, but my understanding is that they would commute to the end of the cue.
Q. My question is: Would they ever get back on the cue? Don't you only get onto the cue based upon discharges of spent fuel, and that if you give up an allocation based upon a discharge, you can't get that allocation back because you only discharge a final time once?
Do you understand what I'm asking?
MS. SULLIVAN: Objection. Vague.
A. I'm not really sure. I think -- let me see if I can put it this way. You don't lose your ability to deliver that fuel. What you are in essence giving up is your ability to deliver it in that year, and other people have theoretically already submitted DCSs and have slots in the cue, so you move to the end of the cue. You will still deliver it.
Q. You move to the end of the cue as the cue stood at the time you waived that particular allocation?
A. Correct. That would have been my

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.
COMPANY and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.
THE COURT: Okay.
MS. SULLIVAN: The government calls David Zabransky.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A Yes, I am.
Q And to what office within the Department of Energy are you currently assigned?
A I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q What are your current responsibilities?
A I report to Chris Kouts, and I work on issues related to the standard contract, other

99

Page 4111

technical issues on commercial waste acceptance. waste acceptance issues, and I serve as the contracting officer for the standard contracts.
Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?
A. Yes. Mr. Kouts reports to Ted Garrish, the deputy director.
Q. And to whom does Mr. Garrish report?
A. Mr. Garrish reports to Dr. Choo, the director of the program.
Q. When did you become the contracting officer?
A. I believe it was in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes. I have.
Q. And when did you serve as the technical representative to the contracting officer?
A. From, I believe, around 1995 through July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.

Page 4112

Q. When did you join DOE?
A. I came to DOE in 1994, I believe July of 1994.
Q. Prior to joining DOE, where were you employed?
A. I was employed by Wisconsin Electric Power Company in Milwaukee, Wisconsin.
Q. How long were you employed by Wisconsin Electric Power Company?
A. I started there in 1978 and left in 1994.
Q. What was your position at Wisconsin Electric Power Company when you left?
A. When I left Wisconsin Electric in 1994, I was the manager of nuclear fuel services.
Q. Did your responsibilities as manager of nuclear fuel services include administering Wisconsin Electric's standard contract with Department of Energy?
A. Yes, my responsibilities were for all the contracts that the nuclear power department had for fuel and fuel disposal, as well as analysis of fuel designs and storage of spent fuel at Point Beach.
Q. Mr. Zabransky, do you hold a Bachelor's degree?
A. Yes, I do.

Page 4113

Q. In what?
A. I have a Bachelor's in Civil Engineering from Marquette University in Milwaukee, Wisconsin.
Q. And when did you receive that degree?
A. 1980.
Q. As part of your duties at Wisconsin Electric Power Company, were you familiar with the annual capacity reports and acceptance priority ranks issued by DOE?
A. Yes, I was.
Q. What did you understand to be the purpose of those documents?
A. The purpose of the documents, as I understood it, was to set forth the acceptance allocations to each contract holder the Department was going to have in its facilities for disposal of spent fuel.
Q. At the time you were at Wisconsin Electric, were you also familiar with what are known as delivery commitment schedules or DCSes?
A. Yes, I was.
Q. And what did you understand to be the function of a DCS?
A. When I was at Wisconsin Electric, it was my understanding that DCSes, delivery commitment

Page 4114

schedules, were the mechanism, the contractual mechanism, by which utilities took the allocations that were allocated to them and conveyed to DOE that they wanted that service, what particular reactor and what year and what range of fuel, and made a commitment to the government to provide that fuel for pickup.
Q. And at the time you were at Wisconsin Electric, were you responsible for completing DCSes and submitting them to DOE on behalf of Wisconsin Electric?
A. My organization was responsible for preparing the DCSes, and they were subsequently submitted by my organization. They were signed off by a vice president of nuclear power, but we did all the work for the preparation and transmittal of those documents.
Q. Thank you. Can we have Defendant's Exhibit 24, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, sure.
BY MS. SULLIVAN:
Q. Mr. Zabransky, you've been handed what's been marked as Defendant's Exhibit 24. Do you recognize this document?

100

A. Yes, I do.
Q. Could you explain to the Court what this document is?
A. This is the 1991 ACR that was used as the basis for the submittals made by Wisconsin Electric of DCSes, I believe, in 1992.
Q. Could you turn to page nine of this document, table 3.1? Mr. Zabransky, did you or did your organization at Wisconsin Electric use the information contained on this chart in the submission of its DCSes?
A. Yes, Wisconsin Electric DCSes that were submitted in 1992 relied upon the acceptance allocations that are in this table, third line up from the bottom.
Q. Could we highlight that line, please? Is that the line that you're referring to that I've highlighted on the screen?
A. Yes, it is.
Q. I believe you've already testified that Wisconsin Electric submitted DCSes in 1992. Was that your testimony?
A. I believe it was in 1992.
Q. Okay. Do you recall how many DCSes Wisconsin Electric submitted in 1992?



A. The company submitted DCSes for each of the 10 allocations that are put forth in this table.
Q. And why did WEPCO submit DCSes for each of those allocations?
A. It was our belief that the DCSes represented a commitment, and the company had reached a conclusion or a position that it wanted to get them into the government and have them sign them before something happened that would cause them to cease signing them for some reason in the future, so it was seen as a good thing to do, to get these signed pieces of paper back from the government.
Q. Were the DCSes that WEPCO submitted approved by the government?
A. They were eventually approved, the initial submittal was -- I think a number were sent back for numbering errors, but ultimately, they were all approved with no changes to substance, just to the numbers that were put upon them.
Q. Was 1992 the earliest opportunity that Wisconsin Electric had to submit its DCSes?
A. I believe that was the first opportunity after the government started the process. I think earlier in 1992, and provided the forms and the instructions as to how to fill them out, so it was 63



months prior to 1998, and that's really when the process was started by the government.
Q. Turning now to your time at DOE, when you came to DOE, did you have responsibility for reviewing and approving DCSes submitted by utilities?
A. When I became the COTR in 1995, I acted as the individual that reviewed them and gave the contracting officer technical recommendations as to whether they should be approved or not.
Q. And when would you recommend approval of DCSes?
A. The DCSes were approved as long as they were complete and the allocations put forth on them were consistent with the allocations in the ACRs that provided the allocation to the utility. So generally, it was a review of completeness and compliance with the allocation size.
Q. Did you recommend approval or disapproval of all DCSes that were submitted after you became the COTR?
A. I think there were a few that were eventually approved or initially not approved because of numbering errors or other administrative errors, but beyond that, yes, they were all generally approved through the period of time that we processed



them.
Q. Was there a time at which DOE stopped processing these DCSes?
A. Yes, I believe it was in early '97. It's hard to remember the exact year that the Department stopped processing DCSes. We did acknowledge that we had received them, but we no longer processed them. We neither approved or disapproved them.
Q. Who made the decision to stop processing DCSes?
A. I think the decision was made by the contracting officer on the advice of counsel.
Q. Can we pull up DX-29.002?
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Sure.
MS. SULLIVAN: Your Honor, this is two exhibits with multiple pages. I'd like to provide copies to the Court.
BY MS. SULLIVAN:
Q. Mr. Zabransky, I've actually handed you copies of what have been marked as Defendant's Exhibit 29.002 and 29.003. Do you recognize these documents?
A. I do.
Q. Do you recognize these documents to be a

101

Page 4119

set of DCS submittals from Maine Yankee?
A. Yes, 29.002 is a set of submittals from Maine Yankee to the Department of Energy, in September of '92, for allocations for Maine Yankee.
Q. And what is 29.003?
A. 29.003 is the approved DCSes being sent back by the contracting officer to Maine Yankee.
Q. Okay. And you were not involved in the processing of these DCSes?
A. I was not at DOE at the time, no.
Q. And just based on your review of the document, is it your understanding that Maine Yankee submitted DCSes for all of its allocations in the first 10 years in 1992?
A. From review of this document and review of the '91 ACR, this appears to be a DCS for each of the allocations that Maine Yankee had in the '91 time frame that they could have submitted in 1992, yes.
Q. Okay. And looking at 29.003, is it your understanding that these DCSes were approved by DOE?
A. Looking at the exhibit, yes, they all seem to have been approved by DOE.
Q. Thank you. Mr. Zabransky, are you familiar with the former industry organization known as the Utility Nuclear Waste Management Group?

Page 4120

A. I am familiar with the organization known as the Utility Nuclear Waste Management Group, also known as UNWMG.
Q. Was Wisconsin Electric a member of UNWMG while you were there?
A. Yes, Wisconsin Electric was a member of UNWMG when I was employed at Wisconsin Electric.
Q. And did you represent Wisconsin Electric at meetings of UNWMG?
A. I was a representative of Wisconsin Electric at meetings of UNWMG, yes, I was.
Q. What did you understand to be the purpose of UNWMG?
A. UNWMG was a organization within, I believe, Edison Electric Institute that was set up to work on issues related to nuclear waste disposal, interfaces with DOE. It was an organization to facilitate industry involvement on those topics.
Q. Are you familiar with the process commonly referred to as the ACR issue resolution process?
A. Yes, I am.
Q. What was the ACR issue resolution process?
A. The ACR issue resolution process was a group, subgroup that was set up within the UNWMG, a high-level waste working group, which focused on

Page 4121

dialogue with the Department of Energy on issues related to interpretations of the standard contract.
Q. And did you participate in the ACR issue resolution process on behalf of Wisconsin Electric while you were there?
A. Yes, I did.
Q. Mr. Zabransky, was one of the issues considered during this process whether priority should be granted to shutdown reactors?
A. That issue was an issue that was brought up and talked about as an issue that the group should consider and develop a position on, but it's my recollection that we never did develop a consensus position on that issue.
Q. And why was that?
A. There was no consensus position reached. There were utilities who felt that priority should be granted to shutdown reactors. There were utilities that held very strong positions that it shouldn't be granted to shutdown reactors. And it was impossible to come up with a position that all could endorse.
Q. Did UNWMG report this inability to come to a consensus to DOE?
A. I believe it did, and I think that was not one of the issues we ultimately put on the table to

Page 4122

talk about because of our inability to come up with a meaningful position. I don't think we ever conveyed a consensus position to them.
Q. Do you recall meetings, industry meetings, in which Yankee Atomic lobbied other nuclear reactor companies for priority for shutdown reactors?
A. I recall there were industry meetings where representatives from Yankee made their case for priority acceptance for shutdown reactors to the group, and there was discussion about the merits and other ways of approaching that within the group.
Q. Do you recall the outcome of these meetings?
A. I think the outcome was that the group never reached any consensus on that position.
MS. SULLIVAN: Your Honor, we don't have an electronic version of this, so I'll hand that out to the Court too. Your Honor, Plaintiffs' Exhibit 81 was an exhibit that was on Plaintiffs' may use list. I provided notice to Mr. Shapiro yesterday or last evening after we concluded court that we were possibly going to use it with Mr. Zabransky today.
BY MS. SULLIVAN:
Q. Mr. Zabransky, do you recognize what's been marked as Plaintiffs' Exhibit 81?

Page 4710

memo to which the plaintiffs have referred that Mr. Rusch had -- that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch -- anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break

Page 4711

for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.

A Good afternoon.

Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?

Page 4712

A Yes, I am.

Q What is your current position?

A Chief operating officer.

Q What are your responsibilities as chief operating officer?

A I assist the deputy director for strategy and program development in the day-to-day management of that office.

Q And do you report to the deputy director?

A Yes, I do.

Q And who is the department director?

A Ted Gerrish.

Q Does anybody report to you?

A Not directly.

Q How long have you served as chief operating officer?

A In total, about four years.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A I believe it was April of '84.

Q What was your first position? And I'm going to refer to it as RW, if that's all right.

A Okay.

Q What was your first position with RW?

A I was the branch chief of the

Page 4713

organization.

Q What were your responsibilities in that position?

A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.

Q What position did you next hold in RW?

A I was a division director.

Q And what were your responsibilities in that position?

A Budget, human resources, total system life cycle costs, fee adequacy analyses.

Q And what position did you next hold in RW?

A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.

Q And do you remember when you became acting director of the Office of Storage and Transportation?

A Roughly 1990.

Q And how long did you serve as director of the Office of Storage and Transportation?

A About four years.

Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?

A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.
Q You said that you were responsible for management of the MRS process. What specifically were you doing?
A At that point in time, we were attempting to find a volunteer site to construct an MRS.
Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?
A Yes, he was.
Q Did you report to Dr. Bartlett?
A Yes.
Q After serving as the director of office – of storage and transportation, what position did you next hold?
A Director of the Office of Program Management and Integration.
Q And what were your responsibilities in that position?
A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.
Q Did you also have responsibility for regulatory interface with the NRC?
A Yes, uh-huh.
Q And then what position did you hold next after you were director of program management and integration?
A After that, I was appointed the acting deputy director of the program.
Q Do you recall approximately when that was?
A I believe that was 1996.
Q And how many times have you served as deputy director of the program?
A I was acting deputy two different times.
Q And what time periods were those?
A It was '96 through '99, roughly, and then 2001 through 2002, roughly.
Q What position did you hold in between these periods that you were data director?
A Chief operating officer.
Q And were your responsibilities as the chief operating officer then substantially the same as they are today?
A Substantially the same, yes.
Q And then in 2002, is that when you became

Page 4716

chief operating officer again?
A Yes, uh-huh.
Q Mr. Milner, prior to joining RW, where were you employed?
A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.
Q Prior to becoming a DOE employee, where were you employed?
A Prior to that, I served eight years as a Naval officer.
Q Mr. Milner, do you hold a Bachelor's degree?
A Yes, I do.
Q In what?
A Mechanical engineering.
Q Where did you obtain that degree?
A University of Mississippi.
Q When?
A 1966.
Q And do you also hold a Master's degree?
A I do.
Q In what subject?
A Also mechanical engineering.
Q When did you obtain that degree?

Page 4717

A 1967.
Q Was that also from the University of Mississippi?
A Yes.
Q Can we have Plaintiff's Exhibit 95, please?
MS. SULLIVAN: May I approach?
JUDGE MEROW: Sure.
MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.
JUDGE MEROW: All right.
MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.
BY MS. SULLIVAN:
Q Mr. Milner, do you have water there? Do you want a cup of water?
A Yeah, that would be great.
MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?
JUDGE MEROW: Of course.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4734

cycle.

Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?

A The viability assessment that was submitted to Congress.

Q Can we go to page little Roman numeral v, the introduction by – actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?

A Acting deputy director, yes.

Q Thank you. Could we highlight the second paragraph, bring up the second paragraph? Mr. Milner, could you read that portion, the highlighted portion into the record?

A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included. Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept

Page 4735

open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring. Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.

Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?

A No, it is not.

Q Why not?

A Well, you would issue a new one once the assumptions have changed, the program has evolved.

Q Does DOE prepare a test TSLCC every year?

A Not every year.

Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 – or the preparation of the 1991 ACR, correct?

A Yes.

Q Were you – was your office also responsible for the preparation of the 1990 ACR?

A Yes, it was.

Q Could I have Defendant's Exhibit 130,

Page 4736

please? Mr. Milner, do you recognize this document?

A Yes, I do.

Q Could you identify it for the Court, please?

A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.

Q Who was the director at the time you prepared this memo?

A Dr. John Bartlett.

Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?

A Yes, it is.

Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?

A Yes.

Q Or Dr. Bartlett, excuse me.

A Yes.

Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it? Mr. Milner, would you please read that, the highlighted portion, into the record?

A The ACR is required to project both the

Page 4737

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.

Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?

A Yes, it does.

Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?

A Yes, I do.

Q Would you identify it for the Court, please?

A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.

Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?

A Yes, at that time.

Page 4738

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from – letter from the department's contracting officer.
Q Thank you.
Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.

Page 4739

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?
A Yes, it is.
Q Do you recognize the other signature to be that of Mr. – Dr. Bartlett?
A Yes.
Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?
A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.
Q Mr. Milner, what was your understanding as to the – about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?
A Well, if – if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

Page 4740

Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?
A Yes, I do.
Q Would you identify it for the Court, please?
A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.
Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?
A Yes.
Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?
A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

Page 4741

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.
Q Thank you.
Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?
A It does, yes.
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.
Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?
A No.
Q During your tenure at DOE, are you aware of any planning basis by which – by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

106

# UNWMG

***Utility Nuclear Waste Management Group***

1111 19th Street, N.W. ■ Washington, D.C. 20036-3691 ■ (202) 778-6512



MEMBERS
Alabama Power Company
Arizona Public Service Company
Baltimore Gas & Electric Company
Boston Edison Company
Carolina Power & Light Company
The Cleveland Electric Illuminating Company
Commonwealth Edison Company
Consolidated Edison Co. of New York, Inc.
The Detroit Edison Company
Duke Power Company
Duquesne Light Company
Florida Power Corporation
Florida Power & Light Company
Georgia Power Company
Gulf States Utilities Company
Houston Lighting & Power Company
Indiana & Michigan Electric Company
Iowa Electric Light & Power Company
Los Angeles, Department of Water & Power
Middle South Services, Inc.
Nebraska Public Power District
New York Power Authority
Niagara Mohawk Power Corporation
Northeast Utilities
Northern States Power Company
Omaha Public Power District
Pacific Gas & Electric Company
Pennsylvania Power & Light Company
Philadelphia Electric Company
Portland General Electric Company
Public Service Company of Colorado
Public Service Electric & Gas Company
Rochester Gas & Electric Corporation
Sacramento Municipal Utility District
SNUPPS
Union Electric Company
Kansas Gas & Electric Company
Kansas City Power & Light Company
South Carolina Electric & Gas Company
Southern California Edison Company
Texas Utilities Company
Toledo Edison Company
Virginia Power
Washington Public Power Supply System
Wisconsin Electric Power Company
Wisconsin Public Service Corporation
Yankee Atomic Electric Company


June 24, 1987

To: Members, Standard Contract Task Force

Subject: <u>Meeting Notes - June 4, 1987</u>

File: HLW-87-86

Enclosed for your information are the meeting notes from our June 4 meeting of the Standard Contract Task Force. Please note that I have updated the status of several issues due to recent developments or completion of related evaluations. As we established at the meeting, the next Task Force meeting is scheduled for September 10, 1987 from 10:00 a.m. until 3:00 p.m. here at EEI's offices.

As always, should you have any questions or require additional information, please feel free to call.

Best regards,

Nancy

Nancy S. Montgomery
Program Manager

NSM/mlf
Enclosure



A Program Administered by Edison Electric Institute


YDK038296

UTILITY NUCLEAR WASTE MANAGEMENT GROUP

STANDARD CONTRACT TASK FORCE

MEETING NOTES - JUNE 4, 1987

On June 4, 1987, the Standard Contract Task Force met to discuss the following issues:

- o Defense waste;
- o DOE's Annual Capacity Report;
- o Net vs. gross (Rulemaking and interest on overpayments);
- o Standard Contract clarifications, etc. (Jedry letter);
- o DOE's 1998 statutory obligation; and
- o Task Force activities for the remainder of 1987.

The following meeting notes briefly summarize the highlights of the meeting. Copies of the agenda and attendance list are attached as are copies of handouts not previously provided as part of regular mailings.

Defense Waste

Before discussing of the draft Petition for Rulemaking prepared by UNWMG counsel, Mr. Jay Silberg (Shaw, Pittman, Potts and Trowbridge), Mrs. Nancy Montgomery (UNWMG Program Manager) and Mr. Len Mongeon (UNWMG financial consultant) discussed the status of DOE actions on the Notice of Inquiry (NOI) learned from recent contacts with OCRWM. It was indicated that the Office of Defense Programs (ODP) and OCRWM have reached agreement on the final version of the methods and timing of fee payments, interest rates and other implementing procedures. Subsequent to the Task Force meeting, DOE briefed UNWMG representatives on an informal basis on June 12. The official release of the final NOI is scheduled for late June/early July, 1987. OCRWM indicated that the defense share now approximates 18 percent of total repository costs instead of the previous 13 percent contribution level in the earlier draft NOI.

The draft petition for rulemaking prepared by Mr. Silberg was then considered by the Task Force. Mr. Mongeon suggested a





YDK038297

change to the starting quarter for DOE defense waste payments from July 1, 1987, to October 1, 1987, to coincide better with the budgetary situation. There are no funds in DOE's FY87 budget for this purpose, and DOE will not get any money in their FY88 budget from OMB or Congress until the NOI is in force. Since October 1 is the beginning of FY88, DOE would have the choice of reprogramming their FY88 approved defense program budget or seeking an FY88 supplemental appropriation in order to cover fee payments required by the NOI for that year. Thereafter, the DOE budget requests for FY89 and later years would contain necessary funds for the defense fee payments. A minor wording change was also suggested. With these changes, the rulemaking petition was approved by the Task Force.

The proper timing for submission of this rulemaking petition was discussed. The discussion weighed: 1) the desirability of having DOE release the NOI with the improved 18 percent contribution; 2) the potential for further undue delays; and 3) the need to synchronize the UNWMG approach with NARUC, which also is working on a rulemaking petition. After considerable discussion, the Task Force agreed that DOE should be given until July 31, 1987, to issue their final NOI; should DOE not issue the final NOI by July 31, the UNWMG rulemaking petition will be forwarded on the first business day of August 1987. If the NOI is in fact issued in July, the Task Force will determine its final strategy after review of the NOI. At the June 17 meeting of the High-Level Waste/Spent Fuel Storage Working Group, the proposed approach descirbed above was approved by the Working Group. ACORD will be informed of this strategy.

## Annual Capacity Report

OCRWM's concept and planned approach on the Annual Capacity Report (ACR) were summarized by Mr. Mongeon based on April contacts with OCRWM on this matter. It was indicated that the ACR is essentially OCRWM's allocation of the aggregate waste acceptance rate among individual utilities on a yearly basis. OCRWM will issue the first ACR in July, 1987, which will cover the ten year period from 1998 to 2007. This first ACR and the next three ACRs issued annually through 1990 are not contractually binding. While developing the first ACR, OCRWM and their contractor (PNL) compiled a list of contractual and technical issues identified as important to the report's acceptability. Although the Utilities will be asked to formally comment on this list of issues, OCRWM would also like assistance from the industry through an informal interchange to resolve satisfactorily as many of these contractual and technical issues as feasible. This will improve the acceptability of future ACRs before they become contractually binding in 1991.


YDK038298

Representatives of OCRWM and PNL elaborated for the Task Force on this approach and gave examples of types of issues to be resolved. The Task Force members generally supported an informal interchange for issue resolution since it may eliminate a major percentage of ACR issues and could be less time consuming and costly than other options for issue resolution. Brian Mann (Virginia Power) and Bill Yario (New York Power Authority) spoke favorably on recent results of RW-859 negotiations accomplished through such an informal interchange. Dave Zabransky (Wisconsin Electric Power Company) cautioned that informal negotiations will not necessarily insure that Utility or DOE top management will not take official actions different from conclusions of the negotiators. Mr. Silberg discussed the applicability of the Federal Advisory Committee Act to such informal negotiations. He also suggested that Utility members begin to put together a list of ACR issues from their perspective so as to be in the best position for potential future actions on this subject anticipated in August.

Subsequent to our discussion of the upcoming release by DOE of the first Annual Capacity Report, Barrie McLeod (E.R. Johnson Associates) completed development of a draft list of issues related to contractual matters that deserve our attention; the draft list should serve as the focus for our further efforts to identify specific issues of interest/concern to individual member companies. We will be contacting individual member companies through our Working Group representatives to identify the appropriate contractual and technical personnel to whom the draft list should be sent for review and comment. A copy of the draft list will be provided to you in the near future.

## Net vs. Gross

A draft of the final rule on this subject is reportedly being circulated within DOE at this time. However, expectations of OCRWM officials are that issuance of the final rule will not occur until August or September, 1987. On the subject of interest, letters were sent on May 18, 1987, by the DOE Contracting Officer to Utility contract administrators and by the OCRWM Director to Utility CEOs, which indicated that as a consequence of the legal doctrine of sovereign immunity, a determination had been made that interest cannot be paid by DOE under existing circumstances on previous Utility overpayments into the Nuclear Waste Fund. Assurances were given in these letters that DOE would seek specific legislation from Congress that would allow them to pay the interest in question. The Task Force also was advised that $40.9 million had been refunded to Utilities based on the change from gross to net generation.


YDK038299

Letter to Jedry on Standard Contract Clarifications

The UNWMG letter of May 6, 1987, requested DOE to interpret, clarify or amend the standard contract to cover additional performance standards, Purchaser's program overview rights and other matters. An OCRWM staff analysis with recommendations has been provided to the OCRWM Director and his reaction is expected shortly.

Response to DOE Position on 1998 Statutory Obligation

The Task Force was advised by Mrs. Montgomery that Mr. Silberg has been asked to draft a letter to DOE that presents the industry's strong position on DOE's obligation to accept spent fuel by 1998. Mr. Silberg advised the Task force that he has been evaluating the NWPA, its legislative history and the provisions of the Standard Contract. The draft letter will be forwarded to Utility CEOs for their use in individual letters to DOE.

Task Force Activities for Remainder of 1987

This was not discussed at length. Activities related to the industry's probable participation on informal negotiations related to the ACR was mentioned as a major effort for the rest of 1987. The Task Force expects to continue activities currently underway, as described above.

Before the Task Force adjourned, the date for the next meeting was established as September 10, 1987, at 10:00 a.m.


YDK038300

STANDARD CONTRACT TASK FORCE
June 4, 1987 MEETING

AGENDA

| | |
|---|---|
| 10:00-10:30 a.m. | Comments on Defense Waste Petition for Rulemaking |
| 10:30-11:00 a.m. | Annual Capacity Report |
| 11:00-11:30 a.m. | Net vs. Gross |
| | o Status of Rulemaking |
| | o Interest on Overpayments |
| 11:30-12:30 p.m. | Annual Capacity Report (Lunchtime Discussion) |
| 12:30-1:15 p.m. | Letter to Jedry on Standard Contract Clarifications |
| 1:15-1:45 p.m. | Response to DOE Position on 1998 Statutory Obligation |
| 1:45-3:00 p.m. | Task Force Activities for Remainder of 1987 |



YDK038301

June 4, 1987

Standard Contract Task Force Meeting
Attendance List

| Name | Affiliation | Phone No. |
|---|---|---|
| NANCY MONTGOMERY | UNWMG | 202/778-6513 |
| BILLY M. COLE | PNL | 509-376-8393 |
| V[illegible] | YAEC | 617/872-8100 |
| William Yario | NYPA | 212-397-7052 |
| Brian Mann | Virginia Power | 804/771-4001 |
| Ed Brezinski | Northeast Utilities | 203/665-3704 |
| MICHAEL SCHWARTZ | PICKERING, LOWE & GARRICK | 202/659-1122 |
| BARRIE McLEOD | E.R. JOHNSON ASSOC. | 703/471-7880 |
| LEN MONGEON | CONSULTANT to UNWMG | 301-571-5637 |
| Dave Zabransky | Wisconsin Electric Power | 414-221-3360 |
| JAY SILBERG | Shaw Pittman Potts & Trowbridge | 202 663 8063 |
| Jim Bennett | Baltimore Gas & Electric | 301-234-5607 |
| Alan Brownstein | DOE/RW | 202-586-1652 |





YDK038302