DOE/RW-0294P

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

**December 1990**

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

## CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT . . . . . . . . . . . . . . . . . . . . . . 1

1.2 EXPANDED SCOPE OF THE ANNUAL CAPACITY REPORT . . . . . . . . . . 2

1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . 3

2.0 WASTE ACCEPTANCE PROJECTIONS . . . . . . . . . . . . . . . . . . . . . 4

3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . . . . . . . . 8

3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY . . . . 8

3.2 BASIS FOR CAPACITY AVAILABLE FOR ALLOCATION . . . . . . . . . . 10

3.3 ALTERNATIVE ALLOCATION METHODOLOGIES . . . . . . . . . . . . . . 10

4.0 THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION . . . . . . . . . . . . . 13

4.1 STATUS OF THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS . . . . . . . . . . . . . . . . . . . . . 13

4.2 WRITTEN COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . . . . . 16

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.1

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B.1

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is currently scheduled to be the last in the series of ACRs to be published by DOE. The Standard Disposal Contract states that beginning in April 1991, DOE will publish the first annual Acceptance Priority Ranking report which will formally set forth the acceptance queue in which Purchasers will receive priority for allocation of the Waste Management System (WMS) acceptance capacity.

This 1990 issue of the ACR utilizes two projected WMS waste acceptance schedules as the bases for allocation of acceptance capacity to the Purchasers for a 10-year period following the projected commencement of facility operations. The acceptance schedules were selected to be representative of upper and lower boundaries for a WMS which includes a Monitored Retrievable Storage (MRS) facility capable of receiving and storing SNF starting in 1998. Use of an MRS in 1998 would require early MRS siting and modifications to the licensing conditions of the Amendments Act. The projected annual acceptance capacity allocations to Purchasers presented in Appendix A and summarized in Tables 3.1 and 3.2, are based on the oldest-fuel-first (OFF) priority ranking of spent nuclear fuel (SNF) and the two bounding case WMS acceptance schedules.

During 1989, the Secretary of Energy directed an extensive review of the Civilian Radioactive Waste Management Program to include a thorough and comprehensive assessment of the repository-related activities and to develop a schedule based on a realistic assessment of activity durations and past experience. On November 29, 1989, the results of that review were published in a report to Congress. In April 1990, DOE informed all Purchasers by letter that the 1989 ACR would not be published prior to development of revised waste acceptance schedules based on the Secretary's assessment of the program since such an effort would not be useful for planning purposes. As indicated in the Secretary's report to Congress, the reference development schedule for the MRS

assumes that a site will be obtained through the efforts of the Nuclear Waste Negotiator and that the statutory linkages between the MRS and the repository established by the Nuclear Waste Policy Amendments Act will be modified. (The President's nominee for the position of Nuclear Waste Negotiator was confirmed by the Senate on August 3, 1990.)

The system configuration used as the basis for this ACR is the system authorized by the Nuclear Waste Policy Amendments Act of 1987 and includes an MRS facility. During the first 10 years of projected WMS operation, the total quantity of spent fuel that could be accepted is projected to be: 24,100 Metric Tons Uranium (MTU) for the upper bounding case, as projected in the 1988 Draft Mission Plan Amendment; and 7,375 MTU for the lower bounding case. Acceptance priority ranking for the annual allocation of this WMS capacity is based on assigning the highest priority, on an industry-wide basis, to the owners of the oldest SNF as determined by date of final discharge. The annual acceptance rates provide an approximation of the system throughput rates for the two selected waste acceptance schedules and are subject to change as program activities progress. The ACR allocates only that portion of the WMS capacity assigned to SNF originating from commercial reactors and covered by the Standard Disposal Contract.

Section 1.0 of the ACR provides a discussion of the requirement for the ACR and the role it plays in DOE's interaction with the Purchasers in implementing the provisions of the Standard Disposal Contract. The two selected bounding cases for WMS waste acceptance schedules are presented in Section 2.0. Section 3.0 discusses the basis and procedure for allocating this capacity to each Purchaser and summarizes the annual allocations for each selected receipt rate for the 10-year period covered by this report. A description of the ACR issue resolution process and a report on its current status are contained in Section 4.0, along with DOE's responses to Purchasers' comments on previous ACRs. Annual acceptance capacity allocated to each Purchaser, based on the chronological listing of spent fuel assembly final discharge dates and the two selected WMS acceptance rates is summarized in Appendix A. Appendix B is a detailed listing of the eligible SNF, by date of final discharge, covered by the Standard Disposal Contract.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982 (NWPA)[1] assigns to the Federal Government responsibility to provide for the permanent disposal of spent nuclear fuel (SNF) and high-level radioactive waste* (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy (Secretary) under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts** with owners or generators*** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] represents the sole contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the parties to the Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Disposal Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT

Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual SNF/HLW receiving capacity and present the annual acceptance ranking of the Purchasers for 10

---

*HLW means the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

**Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961), which will be referred to as the "Standard Disposal Contract" or "Contract" for subsequent discussion in this report.

***Owners or generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

years following the projected commencement of DOE facility operations. As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers. The Standard Disposal Contract states that beginning in April 1991, the ACR is scheduled to be replaced by the annual Acceptance Priority Ranking report for receipt of SNF/HLW. The Contract further specifies that, beginning in January 1992, and based on the Acceptance Priority Ranking, the Purchasers shall submit Delivery Commitment Schedules (DCS) to DOE identifying the range of discharge dates of the SNF/HLW that the Purchasers propose to deliver to the Waste Management System (WMS). The Contract provides that the approved DCSs will become the bases for Final Delivery Schedules, which are to be submitted by the Purchasers not less than 12 months before the designated year of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

## 1.2 EXPANDED SCOPE OF THE ANNUAL CAPACITY REPORT

DOE recognizes that there is a need for DOE and the Purchasers to coordinate the implementation of the provisions of the Standard Disposal Contract to enable both parties to carry out all of their responsibilities and/or for the Purchasers to make certain spent fuel management decisions. DOE acknowledges that the configuration and operating details of the WMS are still at the conceptual design stage and subject to some uncertainty.

DOE also recognizes that the identification and resolution of Contract-related issues and the development of procedures for the effective and equitable implementation of the WMS are elements of an iterative process that requires the cooperative efforts of both DOE and the Purchasers. DOE has identified a number of issues and system considerations that could affect the waste acceptance process, including the capacity available for allocation, as well as instances where overall WMS efficiency considerations may affect delivery quantities. DOE has expressed its intention to work with the Purchasers' representatives to address these issues and provide appropriate guidance to the Purchasers for their use in planning for at-reactor storage and ultimate delivery of SNF/HLW to the WMS.

In response to DOE's offer in the 1987 ACR[3] to cooperate with the Purchasers, the Utility Nuclear Waste Management Group of the Edison Electric Institute (subsequently expanded and renamed Utility Nuclear Waste and Transportation Program, EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing 64 of the 66 owners/generators of commercial SNF who are parties to the Contract, requested DOE to begin a cooperative effort to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Contract. Interactions to date with representatives of these groups (the ACR Response Team) indicate a desire by both parties to continue these staff-to-staff technical exchanges.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the implementation of the Contract provisions. Appendix B contains more data than are required for the priority listings and annual capacity allocation. These data will be the basis for the Acceptance Priority Ranking report. As the WMS develops, the accuracy of these data becomes more important since they reflect DOE's interpretation of information provided by the Purchasers through their submittal of Nuclear Fuel Data Form, RW-859. Purchasers are urged to carefully review the data in Appendix B.

Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The two waste acceptance schedule projections used in this ACR are representative of bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act),[4] which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act. Article II of the Contract indicates that "The services to be provided by DOE under this Contract [acceptance of title, subsequent transportation, and disposal of SNF/HLW] shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement with a host State or Indian Tribe for the siting of an MRS facility which has been approved by Congress.

On November 29, 1989, the Secretary submitted a Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program[5] which reported the results of a comprehensive review of the schedule for the waste management system. This schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations--from the year 2003 to approximately 2010. The current restrictions in the Amendments Act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository. DOE has indicated its preference that the MRS be sited through the efforts of the Office of the Nuclear Waste Negotiator[5], which was established by the Amendments Act. The Negotiator is a representative of the Federal Government, appointed by the President, and is

authorized to seek a State or Indian Tribe willing to host an MRS or a geological repository. Assuming that the site for the MRS will be obtained through the efforts of the Negotiator and approved by Congress, this may provide an opportunity to modify existing linkages with the repository to enable the MRS to begin receiving SNF significantly earlier than the repository and increase the amount of SNF that can be stored at the MRS. If the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007.

The projected waste acceptance rates, presented in Tables 2.1 and 2.2, represent potential bounding cases for the Transportation System and an MRS facility receiving waste starting in 1998 as detailed in the Secretary's report to Congress. The waste acceptance rates for the first 10 years of WMS operation project a total acceptance of 24,100 MTU for the upper bounding case and 7,375 MTU for the lower bounding case. The upper bounding case is taken from the 1988 Draft Mission Plan Amendment and was used in the last ACR[6]. The lower bounding case requires early MRS siting but complies with the current 10,000 MTU storage limit prior to repository operation. These tables provide only an approximation of the system throughput rates and are subject to changes depending on the conditions for the siting of an MRS and the system design and configuration. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers at the earliest feasible time.

Under current conditions, the owners and generators of SNF/HLW will continue to be responsible for storing their spent fuel until acceptance by DOE. DOE will continue working with the Purchasers through cooperative efforts on developing technologies to expedite the effective use of available storage and the development of additional storage at reactor sites.

The number of Purchasers whose Final Delivery Schedules may be accommodated in any given year will be constrained by the acceptance capacity of the WMS. As in the last ACR[6], acceptance capacity available for allocation to the Purchasers equals the system operating capacity as shown in Tables 2.1 and

2.2. The capacity available for allocation to Purchasers in a given year may be adjusted should any of that capacity be used to accommodate contingencies (e.g., emergencies ).

**TABLE 2.1.**

**Projected Waste Acceptance Rate for Spent Nuclear Fuel for the Upper Bounding Case**

| Year | SNF (MTU) |
|---|---|
| 1998 | 1,200 |
| 1999 | 1,200 |
| 2000 | 2,000 |
| 2001 | 2,000 |
| 2002 | 2,700 |
| 2003 | 3,000 |
| 2004 | 3,000 |
| 2005 | 3,000 |
| 2006 | 3,000 |
| 2007 | 3,000 |
| TOTAL | 24,100 |

Source: Draft Mission Plan Amendment, DOE/RW-0187, June 1988.

**TABLE 2.2.**

**Projected Waste Acceptance Rate for Spent Nuclear Fuel for the Lower Bounding Case**

| Year | SNF (MTU) |
|---|---|
| 1998 | 300 |
| 1999 | 400 |
| 2000 | 550 |
| 2001 | 875 |
| 2002 | 875 |
| 2003 | 875 |
| 2004 | 875 |
| 2005 | 875 |
| 2006 | 875 |
| 2007 | 875 |
| TOTAL | 7375 |

## 3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY

DOE is required to accept all commercial SNF/HLW for permanent disposal from owners or generators who executed and have complied with the Contract as prescribed by the NWPA. However, since acceptance capacity will be limited in any given year, a ranking or sequencing process is necessary to allocate the available acceptance capacity. The ranking is based on the date-of-final-discharge data supplied by the Purchasers and the "oldest fuel first" (OFF) criterion established by the Contract. Tables in Appendix A list the Purchasers and the sum of their quantities of eligible SNF for each of the first 10 years of projected WMS operation for each bounding case acceptance rate. The table in Appendix B lists chronologically for the same period the SNF which provides the basis for the allocation of acceptance rights. Tables 3.1 and 3.2 present a summary of Purchasers' annual allocations for each bounding case acceptance rate, for the 10-year period covered by this report.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process, detailed in past ACRs, apportions available acceptance capacity to the Purchasers on an annual basis. The priority for acceptance capacity allocation is based on assigning the highest priority in the acceptance queue to the owners of the oldest fuel on an industry-wide basis. The age of a particular fuel assembly discharged from a specific reactor is the basis for determining the Purchaser's place in the ranking*. Acceptance "rights" are expressed in MTU of allocated acceptance capacity. The SNF data used as the basis for priority ranking and allocating annual acceptance rights for the first 10 years is based on the historical data on SNF discharges available through December 1989 and projections of future SNF discharges. All SNF, regardless of its subsequent classification for

*The age of SNF is based on the date of final discharge as indicated on the Purchaser's Nuclear Fuel Data Form (RW-859) submittal. Since the day of the month was not supplied for 28 percent of such data, only the month and year of the discharge were used for ordering in Appendix B. Where the month and year were the same for more than one reactor, the order was randomly selected.

delivery,* qualifies for allocation of acceptance rights based on an OFF priority. There are currently no procedures for assigning priority ranking to nonfuel components or high-level radioactive waste, which are expected to be a minor contributor to the total amount of waste accepted. DOE and the Purchasers have identified this as one of the priority issues to be addressed as part of the ACR issue resolution process and intend to examine alternative bases for the inclusion of these wastes in the allocation queue.

After the SNF was listed by date of discharge on an industry-wide basis, it was divided into ten groupings, each of whose cumulative MTU equaled the projected annual acceptance capacity to be allocated under each bounding case acceptance rate. The annual groupings were then summed for each reactor and aggregated by Purchaser. The Purchasers' allocations for each delivery year are presented in Tables A.1 and A.2 in Appendix A.

The exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements. The tables, therefore, list the owners of the SNF alphabetically with a sublisting of the reactors that were the source of the qualifying SNF assemblies, the number of qualifying assemblies, and their equivalent MTU.

Although the Contract provides that priority may be afforded to shutdown reactors, DOE has not determined whether or not priority will be accorded to shutdown reactors, or if priority is granted, under what circumstances. Such priority would not affect the annual capacity available for allocation and could result in a reordering of the listing of SNF in Appendix B on an other-than-OFF basis. This would result in a subsequent change in the order of annual allocation of capacity to the specific Purchasers listed in Appendix A and summarized in Tables 3.1 and 3.2.

---

*The Standard Disposal Contract (Appendix E) requires the Purchaser to classify SNF as standard, nonstandard and/or failed SNF prior to delivery.

## 3.2 BASIS FOR CAPACITY AVAILABLE FOR ALLOCATION

The annual acceptance rates for each bounding case assume the indicated WMS operating capacity is allocated to commercial SNF during the 10 year period. The capacity available for allocation to the Purchasers will be equal to the WMS operating capacity unless part of that operating capacity is reserved to accommodate contingencies (e.g., emergencies).

Adjustments to the priority ranking resulting from the inclusion of approximately 80 MTU of DOE-owned SNF from commercial reactors for which disposal fees have been paid are included in this ACR. Other Federally-owned SNF (e.g. partial assemblies and fuel from research and university reactors) has not been included. Data on the quantities of SNF from these sources, while not complete, indicate that they constitute a very small percentage (less than 0.1%) of the wastes to be received by DOE. The ACR does not assign priority at this time to nonfuel wastes. The data currently available on nonfuel wastes are insufficient to determine a need for priority ranking or allocation of acceptance capacity.

## 3.3 ALTERNATIVE ALLOCATION METHODOLOGIES

Previous issues of the ACR have used a 1-year allocation period for assigning acceptance capacity to the Purchasers. DOE is currently examining how expanding the allocations period (e.g., to 18-36 months) would affect WMS operating efficiency. Tables 3.1 and 3.2 indicate that using annual allocations could result in DOE accepting less than full cask loads of SNF. Summing allocations over a longer period could result in a reduction in the frequency of deliveries (larger shipping campaigns) when serving each Purchaser. DOE will keep Purchasers apprised of the results of this analysis.

TABLE 3.1
SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)
FOR UPPER BOUNDING CASE ACCEPTANCE RATE

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | 40.0 | 72.5 | 125.7 | 58.8 | 63.2 | 65.0 | 87.2 | 512.4 |
| ARIZONA PUBLIC SERVICE COMPANY | -- | -- | -- | -- | -- | -- | -- | 78.4 | 126.5 | 120.1 | 325.0 |
| ARK POWER & LIGHT COMPANY | -- | 23.2 | 28.2 | 30.1 | 103.6 | 87.5 | 55.2 | 50.3 | 61.5 | 56.7 | 496.3 |
| BALTIMORE GAS & ELEC COMPANY | -- | 12.5 | 69.9 | 79.2 | 78.2 | 106.5 | 89.2 | 37.3 | 36.2 | 70.4 | 579.5 |
| BOSTON EDISON COMPANY | 3.9 | 25.4 | 82.6 | 16.9 | 42.7 | 41.2 | 34.2 | -- | 35.0 | -- | 282.0 |
| CAROLINA POWER & LIGHT COMPANY | 70.1 | 48.0 | 57.7 | 138.8 | 92.0 | 94.5 | 102.0 | 112.1 | 100.0 | 76.9 | 892.2 |
| CLEVELAND ELEC ILLUM COMPANY | -- | -- | -- | -- | -- | -- | -- | 5.5 | 43.9 | 48.2 | 97.6 |
| COMMONWEALTH EDISON COMPANY | 128.7 | 216.9 | 318.8 | 206.6 | 303.6 | 282.9 | 347.2 | 352.0 | 350.6 | 318.8 | 2826.0 |
| CONNECTICUT YANKEE ATOMIC POWER | 107.7 | 21.8 | 42.0 | 21.8 | 42.1 | 21.8 | 22.2 | 21.8 | 22.1 | 19.3 | 342.6 |
| CONSOLIDATED EDISON COMPANY | 30.6 | 32.7 | 27.0 | 52.7 | 33.8 | 32.5 | 31.0 | 31.1 | 33.0 | 32.5 | 337.0 |
| CONSUMERS POWER COMPANY | 2.5 | 87.3 | 33.5 | 29.3 | 30.8 | 33.8 | 23.3 | 29.2 | 29.5 | 2.6 | 301.8 |
| DAIRYLAND POWER COOP | 9.7 | -- | 7.2 | 1.4 | 3.3 | 5.4 | 10.8 | -- | -- | -- | 38.0 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | 40.5 | 37.1 | 77.6 |
| U.S. DOE | 29.5 | 7.3 | 13.9 | 0.4 | 23.1 | 6.4 | -- | -- | -- | -- | 80.7 |
| DUKE POWER COMPANY | 24.8 | 48.1 | 176.4 | 92.7 | 129.8 | 216.4 | 234.7 | 297.2 | 228.4 | 230.0 | 1678.5 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | 16.6 | 24.4 | 59.5 | 29.9 | 33.7 | 89.1 | 33.6 | 286.7 |
| FLORIDA POWER & LIGHT COMPANY | 40.7 | 42.3 | 88.9 | 120.9 | 125.7 | 110.1 | 153.4 | 114.3 | 93.8 | 71.6 | 961.6 |
| FLORIDA POWER CORP | -- | -- | 1.9 | 46.4 | 30.1 | 61.9 | -- | 43.1 | 35.7 | -- | 219.2 |
| G. E. URANIUM MGT. CORP | 145.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.0 |
| GEORGIA POWER COMPANY | -- | -- | 5.2 | 35.2 | 90.8 | 147.9 | 104.4 | 104.7 | 116.9 | 107.2 | 712.4 |
| GPU NUCLEAR | 74.1 | 46.8 | 138.5 | 27.6 | 36.4 | -- | 67.4 | 59.1 | 34.8 | 64.2 | 548.8 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | 30.5 | 41.5 | 37.0 | 109.0 |
| HOUSTON LIGHTING & POWER | -- | -- | -- | -- | -- | -- | -- | -- | 45.5 | 121.2 | 166.7 |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | 30.9 | 40.0 | 37.0 | 107.9 |
| INDIANA & MICH ELEC COMPANY | -- | 28.5 | 29.1 | 90.3 | 134.3 | 110.2 | 73.1 | 32.2 | 65.9 | 36.8 | 600.3 |
| IOWA ELEC LIGHT & POWER COMPANY | -- | 15.4 | 36.4 | 16.5 | 39.1 | 22.0 | 23.4 | 21.9 | 17.2 | 17.2 | 209.1 |
| KANSAS GAS AND ELECTRIC COMPANY | -- | -- | -- | -- | -- | -- | 16.1 | 65.1 | 37.1 | 39.0 | 157.3 |
| LONG ISL LIGHT COMPANY | -- | -- | -- | -- | -- | -- | 93.9 | 8.6 | -- | -- | 102.5 |
| LOUISIANA POWER AND LIGHT | -- | -- | -- | -- | -- | -- | 38.6 | 33.0 | 35.7 | 35.0 | 142.3 |
| MAINE YANKEE ATOMIC | 67.4 | 16.7 | 77.9 | 26.2 | 56.3 | 52.6 | 26.0 | 23.9 | 26.4 | 26.4 | 399.8 |
| MISSISSIPPI POWER & LIGHT | -- | -- | -- | -- | -- | -- | 48.6 | 52.9 | 50.4 | 50.1 | 202.0 |
| NEBRASKA PUB POWER DIS | -- | 23.5 | 13.7 | 59.8 | 41.4 | 42.7 | 27.8 | 22.7 | 49.6 | 24.8 | 306.1 |
| NNY DIVISION OF PSNH | -- | -- | -- | -- | -- | -- | -- | -- | -- | 29.5 | 29.5 |
| NIAGARA MOHAWK POWER CORP | 58.3 | 69.5 | 31.1 | -- | 36.8 | 39.2 | 35.4 | 31.0 | 33.4 | 45.0 | 379.8 |
| NORTHEAST UTIL SVC COMPANY | 46.1 | 52.5 | 41.9 | 113.7 | 63.7 | 97.3 | 93.4 | 95.7 | 90.5 | 88.3 | 783.1 |
| NORTHERN STATES POWER COMPANY | 41.8 | 83.9 | 65.2 | 75.7 | 113.8 | 82.6 | 93.9 | 58.2 | 76.3 | 60.3 | 751.7 |
| OMAHA PUB POWER DIST | 9.3 | 12.8 | 35.3 | 14.7 | 21.9 | 9.4 | 35.4 | 15.2 | 14.6 | 16.1 | 184.7 |
| PACIFIC GAS AND ELECT | 15.9 | 3.5 | -- | -- | -- | 9.5 | 61.3 | 67.2 | 64.5 | 71.0 | 292.8 |
| PENNSYLVANIA POWER & LIGHT | -- | -- | -- | -- | -- | 35.3 | 113.8 | 86.5 | 78.6 | 80.2 | 394.3 |
| PHILADELPHIA ELEC COMPANY | -- | 72.1 | 128.6 | 102.9 | 143.3 | 105.0 | 106.2 | 124.0 | -- | 106.4 | 888.5 |
| PORTLAND GENERAL ELEC | -- | -- | 1.4 | 28.0 | 57.0 | 42.2 | 54.2 | 9.2 | 47.0 | 20.3 | 259.3 |
| POWER AUTH OF NY STATE | -- | -- | 80.5 | 64.7 | 69.8 | 104.1 | 72.3 | 62.9 | 27.7 | 70.3 | 552.3 |
| PUB SVC COMPANY OF COLORADO | -- | -- | -- | -- | -- | -- | -- | -- | 15.6 | -- | 15.6 |
| PUB SVC ELEC & GAS COMPANY | -- | -- | -- | 44.6 | 67.1 | 64.1 | 61.4 | 118.9 | 122.1 | 89.9 | 568.3 |
| ROCHESTER GAS & ELEC | 46.4 | 14.5 | 47.8 | 14.1 | 14.4 | 28.8 | 25.6 | 12.7 | 24.1 | 22.4 | 251.0 |
| SACRAMENTO MUNICIP UTIL DISTR | -- | -- | 35.2 | 30.1 | 50.9 | 30.1 | -- | -- | 82.0 | -- | 228.4 |
| SOUTH CAROLINA ELEC & GAS CO | -- | -- | -- | -- | -- | 20.1 | 58.3 | 28.0 | 35.7 | 31.5 | 173.7 |
| SOUTHERN CALIF EDISON COMPANY | 75.3 | 19.2 | 19.2 | 19.2 | -- | 23.0 | 112.7 | 114.8 | 106.8 | 43.9 | 534.2 |
| TENNESSEE VALLEY AUTHORITY | -- | -- | 64.1 | 181.5 | 236.0 | 306.9 | 33.0 | 36.7 | 31.2 | 84.8 | 974.2 |
| TEXAS UTILITIES GENERATING CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | 25.8 | 25.8 |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | 25.0 | 67.9 | -- | 30.5 | 28.6 | 18.3 | 170.2 |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | 38.7 | 44.3 | 38.0 | 40.9 | 161.9 |
| VERMONT YANKEE NUCLEAR POWER CORP | 72.8 | -- | 40.1 | 50.5 | 41.5 | 19.4 | 21.9 | 49.8 | 22.8 | 23.5 | 342.3 |
| VIRGINIA POWER | 20.0 | 101.4 | 74.8 | 56.3 | 112.4 | 167.3 | 120.8 | 152.4 | -- | 123.4 | 928.9 |
| WASH PUB POWER SUPPLY SYSTEM | -- | -- | -- | -- | -- | -- | 50.7 | 27.7 | 50.5 | 23.9 | 152.7 |
| WISCONSIN ELEC POWER COMPANY | 59.3 | 46.8 | 51.9 | 35.7 | 55.1 | 38.9 | 53.4 | 39.4 | 37.3 | 47.6 | 465.6 |
| WISCONSIN PUB SVC CORP | -- | 17.6 | 16.0 | 18.4 | 39.2 | 39.0 | 28.4 | 31.1 | 12.5 | 26.6 | 228.9 |
| YANKEE ATOMIC ELEC COMPANY | 19.9 | 9.6 | 18.0 | -- | 17.8 | 8.4 | 17.6 | 9.2 | 8.3 | 9.2 | 118.1 |
| | 1200 | 1200 | 2000 | 2000 | 2700 | 3000 | 3000 | 3000 | 3000 | 3000 | 24100 |

## TABLE 3.2
## SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU) FOR LOWER BOUNDING CASE ACCEPTANCE RATE

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | -- | -- | -- | 21.1 | -- | 24.4 | 4.6 | 50.1 |
| ARIZONA PUBLIC SERVICE COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ARK POWER & LIGHT COMPANY | -- | -- | -- | -- | 23.2 | 28.2 | 30.1 | -- | -- | 46.6 | 127.9 |
| BALTIMORE GAS & ELEC COMPANY | -- | -- | -- | -- | 12.5 | 41.4 | 36.4 | 44.2 | 27.1 | 28.1 | 189.8 |
| BOSTON EDISON COMPANY | -- | 3.9 | -- | 25.4 | 82.6 | -- | -- | 16.9 | -- | 42.7 | 171.5 |
| CAROLINA POWER & LIGHT COMPANY | -- | 24.2 | 45.9 | 48.0 | 26.3 | 24.2 | 52.6 | -- | 93.5 | -- | 314.6 |
| CLEVELAND ELEC ILLUM COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| COMMONWEALTH EDISON COMPANY | 21.1 | 29.9 | 84.2 | 160.0 | 127.9 | 97.0 | 175.3 | 105.3 | 70.2 | 138.0 | 1008.9 |
| CONNECTICUT YANKEE ATOMIC POWER | 43.3 | 44.6 | 19.7 | 21.8 | 21.8 | -- | 20.2 | -- | 21.8 | 21.8 | 215.1 |
| CONSOLIDATED EDISON COMPANY | -- | 7.8 | 22.8 | 32.7 | -- | 27.0 | -- | 28.3 | 24.4 | -- | 143.0 |
| CONSUMERS POWER COMPANY | -- | 2.5 | -- | 87.3 | 2.7 | 27.3 | 3.5 | 26.5 | 2.8 | 28.0 | 180.6 |
| DAIRYLAND POWER COOP | -- | 6.7 | 3.0 | -- | 3.9 | -- | 3.4 | -- | 1.4 | -- | 18.4 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. DOE | 15.0 | 14.0 | 0.7 | 7.1 | 0.9 | 6.4 | 6.6 | -- | 0.4 | 2.9 | 54.1 |
| DUKE POWER COMPANY | -- | -- | 24.8 | 48.1 | 61.9 | 58.3 | 86.1 | 32.0 | 40.8 | 21.3 | 373.5 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | -- | -- | -- | -- | 16.6 | -- | -- | 16.6 |
| FLORIDA POWER & LIGHT COMPANY | -- | -- | 40.7 | 17.1 | 40.4 | 60.0 | 42.8 | 42.2 | 49.6 | 60.5 | 353.3 |
| FLORIDA POWER CORP | -- | -- | -- | -- | -- | 1.9 | -- | 46.4 | -- | -- | 48.3 |
| G. E. URANIUM MGT. CORP | 145.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.0 |
| GEORGIA POWER COMPANY | -- | -- | -- | -- | 0.7 | 4.5 | 35.2 | -- | 14.0 | 42.4 | 96.9 |
| GPU NUCLEAR | 4.6 | 69.4 | 21.9 | 24.9 | 49.4 | 64.9 | 24.1 | 27.6 | -- | -- | 286.9 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HOUSTON LIGHTING & POWER | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| INDIANA & MICH ELEC COMPANY | -- | -- | -- | -- | 28.5 | 29.1 | -- | 62.4 | 27.9 | 69.7 | 217.6 |
| IOWA ELEC LIGHT & POWER COMPANY | -- | -- | 0.4 | 15.0 | 13.9 | 22.5 | -- | 16.5 | -- | 15.5 | 83.8 |
| KANSAS GAS AND ELECTRIC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LONG ISL LIGHT COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LOUISIANA POWER AND LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| MAINE YANKEE ATOMIC | -- | -- | 84.2 | -- | 27.2 | 50.6 | -- | 26.2 | -- | 28.2 | 216.5 |
| MISSISSIPPI POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NEBRASKA PUB POWER DIS | -- | -- | -- | 23.5 | 2.3 | 11.4 | 31.2 | -- | 28.6 | 21.0 | 118.1 |
| NNY DIVISION OF PSNH | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NIAGARA MOHAWK POWER CORP | 9.3 | 49.0 | 4.3 | 34.5 | 30.7 | -- | 31.1 | -- | -- | 36.8 | 195.8 |
| NORTHEAST UTIL SVC COMPANY | -- | 5.4 | 40.6 | 52.5 | -- | 41.9 | 54.6 | -- | 59.1 | -- | 254.1 |
| NORTHERN STATES POWER COMPANY | -- | 26.1 | 15.7 | 67.8 | 33.6 | 30.1 | 33.9 | 43.3 | 16.0 | 51.7 | 318.3 |
| OMAHA PUB POWER DIST | -- | -- | 9.3 | -- | 12.8 | 18.9 | 16.4 | 14.7 | -- | 14.6 | 86.7 |
| PACIFIC GAS AND ELECT | 3.1 | 8.2 | 4.7 | 3.5 | -- | -- | -- | -- | -- | -- | 19.4 |
| PENNSYLVANIA POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PHILADELPHIA ELEC COMPANY | -- | -- | -- | 36.3 | 68.0 | 47.7 | 48.7 | 51.6 | 51.3 | 40.5 | 344.1 |
| PORTLAND GENERAL ELEC | -- | -- | -- | -- | -- | 1.4 | -- | -- | 28.0 | 21.2 | 50.6 |
| POWER AUTH OF NY STATE | -- | -- | -- | -- | 25.8 | 29.2 | 25.5 | 34.7 | 30.0 | -- | 145.2 |
| PUB SVC COMPANY OF COLORADO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PUB SVC ELEC & GAS COMPANY | -- | -- | -- | -- | -- | -- | -- | 15.2 | 29.4 | -- | 44.6 |
| ROCHESTER GAS & ELEC | 12.9 | 23.6 | 9.8 | 14.5 | 16.0 | 16.1 | 15.7 | 14.1 | -- | 7.7 | 130.7 |
| SACRAMENTO MUNICIP UTIL DISTR | -- | -- | -- | -- | 9.3 | -- | 25.9 | 30.1 | -- | 18.9 | 84.2 |
| SOUTH CAROLINA ELEC & GAS CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| SOUTHERN CALIF EDISON COMPANY | 35.6 | 20.5 | 19.3 | 19.2 | -- | 19.2 | -- | -- | 19.2 | -- | 132.9 |
| TENNESSEE VALLEY AUTHORITY | -- | -- | -- | -- | 32.8 | 25.8 | 5.5 | 115.5 | 136.2 | 45.8 | 361.7 |
| TEXAS UTILITIES GENERATING CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| VERMONT YANKEE NUCLEAR POWER CORP | -- | 9.5 | 63.3 | -- | 20.6 | 19.5 | 7.9 | 25.6 | 16.9 | -- | 163.4 |
| VIRGINIA POWER | -- | -- | 20.0 | 93.3 | 43.6 | 19.2 | 20.1 | 23.4 | 32.9 | 29.0 | 281.5 |
| WASH PUB POWER SUPPLY SYSTEM | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| WISCONSIN ELEC POWER COMPANY | -- | 44.9 | 14.4 | 32.6 | 29.4 | 34.8 | 11.6 | 10.0 | 16.0 | 12.9 | 206.6 |
| WISCONSIN PUB SVC CORP | -- | -- | -- | -- | 17.6 | 16.0 | -- | 5.2 | 13.2 | 16.4 | 68.5 |
| YANKEE ATOMIC ELEC COMPANY | 9.8 | 10.1 | -- | 9.6 | 8.6 | -- | 9.4 | -- | -- | 8.5 | 56.1 |
| | 300 | 400 | 550 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 7375 |

DOE/RW-0331P

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

**December 1991**

**U.S. Department of Energy**
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

# CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT . . . . . . . . . . . . . 1

1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES . . . . . . . . . . . . . . 2

1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . 2

2.0 WASTE ACCEPTANCE PROJECTIONS . . . . . . . . . . . . . . . . . . . 4

3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . . . . . . 6

3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY . . . . 6

3.2 DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . . 7

4.0 ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . . . . . . . . . . 10

4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . 10

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.1

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B.1

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is the fourth in the series published by DOE. In December 1991, the Department published the 1991 Acceptance Priority Ranking (APR) that established the order in which the Department will allocate acceptance capacity. As required by the Standard Contract, the priority ranking for acceptance capacity is based on the date the spent nuclear fuel (SNF) was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR, resulting in individual Purchaser allocations. These allocations are listed in Appendix A and summarized in Table 3.1

The projected waste acceptance rates for SNF presented in Table 2.1 assume: a site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy of 1982, as amended (NWPA) will be modified. During the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA. The annual acceptance rates provide an approximation of the system throughput and are subject to change as the program progresses. The ACR allocates only that portion of the FWMS capacity assigned to SNF originating from reactors and covered by the Standard Contract and DOE-owned SNF from commercial industry and civilian development programs.

Section 1.0 provides a discussion of the requirement for the ACR and the role it plays in the Department's interaction with the Purchasers in implementing the provisions of the Standard Contract. The FWMS projected

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (NWPA)[1] assigns the Federal Government responsibility for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy (Secretary) under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT

Under the terms of the Standard Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance capacity allocations to the Purchasers for ten years following the projected commencement of DOE facility operations. Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers. As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

**Owners or generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

Purchasers. Beginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter. The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser.

## 1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for the effective and equitable implementation of the FWMS are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing sixty-four of the sixty-six owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the

implementation of the Standard Contract provisions. Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

continue to be responsible for storing their spent fuel until acceptance by DOE.

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

## 3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY

DOE is required to accept for disposal all commercial SNF/HLW from owners or generators, as prescribed by the NWPA. However, since acceptance capacity will be limited in any given year, an acceptance priority ranking is established in the Standard Contract to allocate the projected acceptance capacity to individual Purchasers. The ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. Tables in Appendix A list the Purchasers' annual allocations for each of the first ten years of projected FWMS operation. The table in Appendix B is extracted from the 1991 Acceptance Priority Ranking (APR) and chronologically lists the SNF which provides the basis for the allocation of acceptance capacity. Table 3.1 presents a summary of Purchasers' annual allocations for the ten year period covered by this report.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process apportions projected acceptance capacity to the Purchasers on an annual basis. The priority for acceptance capacity allocation is based on the 1991 APR. The permanent discharge date for each spent fuel assembly is the basis for determining the Purchasers' positions in the APR. Acceptance capacity allocated in the ACR is expressed in terms of MTU. All SNF, regardless of its subsequent classification for delivery,* qualifies for an allocation based on an OFF priority on an industry-wide basis. There are currently no procedures for assigning priority ranking to non-fuel components or high-level radioactive waste. Priority ranking has not been afforded to temporarily discharged fuel or to projected SNF discharges.

---

*The Standard Contract (Appendix E) requires the Purchaser to classify SNF as standard, nonstandard and/or failed SNF prior to delivery.

After the SNF was listed in accordance with the APR, it was divided into ten groupings, each of whose cumulative MTU equals the projected annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The Purchasers' allocations for each year are presented in Tables A.1 through A.10 in Appendix A.

The tables in Appendix A list the owners of the SNF alphabetically, with a sublisting of the reactors that were the source of the qualifying SNF by the number of assemblies and their equivalent MTU. The exact order of deliveries within each year will not be specified until the Purchasers' Final Delivery Schedules (FDS) are approved by DOE.

As in past ACRs, allocations in the 1991 ACR are based on a 1-year allocation period. DOE continues to investigate the impacts on the system of expanding these allocation periods from eighteen to thirty-six months. Use of expanded allocation periods could result in a reduction in the frequency of deliveries when serving each Purchaser. Final results of this study are not yet available. DOE will keep Purchasers apprised of the results of this analysis.

## 3.2 DELIVERY COMMITMENT SCHEDULES

The Standard Contract provides that beginning January 1, 1992, Purchasers shall submit to DOE DCSs that identify all SNF the Purchasers plan to deliver to DOE beginning sixty-three months thereafter. Due to the limited projected annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year may be approved.

A summary of Purchaser allocations is presented in Table 3.1. These allocations are the basis for DCS submittals. Among other things, the DCS identifies the range of discharge dates from which the SNF will ultimately be selected for delivery. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation. DCS forms and instructions will be sent to Purchasers in early 1992.

The information contained on the Purchasers' approved DCSs will assist DOE in implementing the waste acceptance process. Approved DCSs will be the basis for the Purchasers' FDSs, to be submitted twelve months prior to delivery. As provided in Article V of the Standard Contract, the Purchasers also have the right to exchange approved DCSs with other Purchasers, subject to DOE approval.

## TABLE 3.1 SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | -- | -- | 21.1 | -- | -- | 24.4 | 12.9 | 58.4 |
| ARIZONA PUBLIC SERVICE COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ARK POWER & LIGHT COMPANY | -- | -- | -- | 23.2 | 28.2 | -- | 30.1 | -- | 46.4 | -- | 127.9 |
| BABCOCK AND WILCOX COMPANY | -- | -- | <0.1 | <0.1 | -- | -- | -- | -- | -- | -- | <0.1 |
| BALTIMORE GAS & ELEC COMPANY | -- | -- | -- | 12.6 | 41.4 | 28.5 | 52.1 | -- | 55.3 | 29.5 | 219.3 |
| BOSTON EDISON COMPANY | -- | 3.9 | 25.4 | 82.6 | -- | -- | 11.4 | 5.5 | -- | 42.7 | 171.5 |
| CAROLINA POWER & LIGHT COMPANY | -- | 70.1 | 24.3 | 23.7 | 50.4 | 32.0 | 20.6 | 93.1 | -- | 49.5 | 363.7 |
| CLEVELAND ELEC ILLUM COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| COMMONWEALTH EDISON COMPANY | 21.1 | 60.4 | 153.6 | 121.0 | 163.8 | 175.3 | 66.8 | 107.8 | 98.2 | 98.2 | 1066.4 |
| CONNECTICUT YANKEE ATOMIC POWER | 65.5 | 22.5 | 19.8 | 21.8 | 21.8 | 20.2 | -- | 21.8 | -- | 21.8 | 215.1 |
| CONSOLIDATED EDISON COMPANY | 2.9 | 27.7 | 32.7 | -- | 27.0 | -- | 28.3 | 2.3 | 22.2 | -- | 143.0 |
| CONSUMERS POWER COMPANY | -- | 2.5 | 87.3 | 2.7 | 27.3 | 3.5 | 26.5 | -- | 2.8 | 30.8 | 183.4 |
| DAIRYLAND POWER COOP | 0.7 | 6.0 | 3.0 | 3.9 | -- | 3.4 | -- | -- | 1.4 | 3.3 | 21.7 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. DOE | 18.1 | 11.1 | 3.2 | 4.5 | 7.3 | 72.8 | 16.3 | -- | 3.3 | 19.9 | 156.5 |
| DUKE POWER COMPANY | -- | 24.8 | 47.6 | 62.4 | 58.3 | 56.1 | 61.1 | 31.5 | 63.5 | 66.3 | 471.7 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | -- | -- | -- | 16.6 | -- | -- | 24.4 | 41.0 |
| FLORIDA POWER & LIGHT COMPANY | -- | 20.8 | 37.0 | 40.4 | 32.8 | 40.8 | 71.3 | 33.1 | 52.1 | 37.6 | 366.1 |
| FLORIDA POWER CORP | -- | -- | -- | -- | 1.4 | -- | 26.0 | 20.4 | -- | 30.1 | 78.0 |
| G. E. URANIUM MGT. CORP | 145.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.0 |
| GENERAL ATOMICS | <0.1 | <0.1 | -- | -- | <0.1 | -- | -- | <0.1 | <0.1 | <0.1 | <0.1 |
| GEORGIA POWER COMPANY | -- | -- | -- | 0.7 | 4.5 | -- | 35.2 | -- | 56.4 | 15.2 | 112.1 |
| GPU NUCLEAR | 31.1 | 43.0 | 46.8 | 49.4 | 33.9 | 55.2 | -- | 27.6 | -- | -- | 286.9 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HOUSTON LIGHTING & POWER | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| INDIANA & MICH ELEC COMPANY | -- | -- | -- | 28.5 | 29.1 | -- | 62.4 | 27.9 | 69.7 | -- | 217.6 |
| IOWA ELEC LIGHT & POWER COMPANY | -- | -- | 15.4 | 13.9 | 21.8 | 0.8 | -- | 16.5 | 15.5 | -- | 83.8 |
| KANSAS GAS AND ELECTRIC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LONG ISL LIGHT COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LOUISIANA POWER AND LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| MAINE YANKEE ATOMIC | -- | 26.3 | 57.9 | 27.2 | -- | 50.6 | -- | 26.2 | 28.2 | -- | 216.5 |
| MISSISSIPPI POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NEBRASKA PUB POWER DIS | -- | -- | -- | 23.5 | 13.8 | -- | 31.2 | 28.7 | 21.0 | -- | 118.1 |
| NHY DIVISION OF PSNH | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NIAGARA MOHAWK POWER CORP | 9.3 | 49.0 | 38.8 | 30.7 | -- | 31.1 | -- | -- | 36.8 | -- | 195.8 |
| NORTHEAST UTIL SVC COMPANY | 5.4 | 40.6 | 28.2 | 24.3 | 41.9 | 26.5 | 28.1 | 59.1 | -- | 28.3 | 282.4 |
| NORTHERN STATES POWER COMPANY | -- | 26.1 | 83.5 | 29.8 | 33.9 | 17.5 | 32.5 | 43.2 | 35.7 | 16.0 | 318.3 |
| OMAHA PUB POWER DIST | -- | -- | 9.3 | 12.8 | 18.9 | 16.4 | -- | 14.7 | -- | 14.6 | 86.7 |
| PACIFIC GAS AND ELECT | 7.2 | 6.1 | 2.6 | 13.0 | -- | -- | -- | -- | -- | -- | 28.9 |
| PENNSYLVANIA POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PHILADELPHIA ELEC COMPANY | -- | -- | 36.3 | 68.0 | 47.7 | 48.7 | 51.6 | 51.3 | 40.5 | 50.7 | 394.9 |
| PORTLAND GENERAL ELEC | -- | -- | -- | -- | 0.5 | -- | -- | 24.4 | 16.1 | 17.5 | 58.4 |
| POWER AUTH OF NY STATE | -- | -- | -- | 25.8 | 3.7 | 51.1 | 34.7 | 30.0 | -- | 69.8 | 215.0 |
| PUB SVC COMPANY OF COLORADO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PUB SVC ELEC & GAS COMPANY | -- | -- | -- | -- | -- | -- | 17.5 | 29.4 | -- | 25.8 | 72.7 |
| ROCHESTER GAS & ELEC | 32.0 | 4.6 | 24.4 | 16.0 | 16.1 | 15.7 | -- | 14.1 | 5.9 | 6.7 | 135.5 |
| SACRAMENTO MUNICIP UTIL DISTR | -- | -- | -- | 9.3 | -- | 25.9 | -- | 30.1 | 18.9 | -- | 84.2 |
| SOUTH CAROLINA ELEC & GAS CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| SOUTHERN CALIF EDISON COMPANY | 35.6 | 20.5 | 19.3 | 19.2 | -- | 19.2 | -- | 19.2 | -- | -- | 132.9 |
| TENNESSEE VALLEY AUTHORITY | -- | -- | -- | -- | 58.6 | 5.5 | 115.5 | 65.9 | 116.1 | 52.3 | 414.0 |
| TEXAS UTILITIES GENERATING CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | 25.0 | 25.0 |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| VERMONT YANKEE NUCLEAR POWER CORP | -- | 72.8 | -- | 11.9 | 8.6 | 27.4 | 25.6 | 16.9 | -- | 22.1 | 185.5 |
| VIRGINIA POWER | -- | 8.2 | 69.4 | 43.9 | 54.7 | 20.1 | 23.4 | 32.9 | 29.0 | 52.8 | 334.3 |
| WASH PUB POWER SUPPLY SYSTEM | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| WISCONSIN ELEC POWER COMPANY | 16.3 | 43.0 | 19.8 | 27.1 | 36.7 | 24.8 | 10.0 | 12.8 | 16.1 | 21.7 | 228.4 |
| WISCONSIN PUB SVC CORP | -- | -- | 4.4 | 17.6 | 16.0 | -- | 5.2 | 13.2 | 16.4 | 14.5 | 87.4 |
| YANKEE ATOMIC ELEC COMPANY | 9.8 | 10.1 | 9.7 | 8.6 | -- | 9.4 | -- | -- | 8.5 | -- | 56.1 |
| TOTAL | 400 | 600 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 8200 |

## 4.0 ACR ISSUE RESOLUTION PROCESS

In the 1987 ACR, DOE indicated that many Standard Contract-related issues will require analysis and resolution so that the FWMS can achieve maximum efficiency while attempting to assure equity among the parties. EEI/UWASTE and USCEA established an ACR Committee to represent the Purchasers in staff-to-staff technical exchanges with DOE. The ACR Committee is represented by an ACR Response Team in its interactions with DOE. DOE and the Purchasers' representatives initiated a cooperative effort in 1987, in response to an offer by DOE, to address and ultimately develop recommendations for resolution of Standard Contract-related issues. The dual objectives of this process are to retain SNF/HLW management flexibility and equity among the Purchasers while providing for the effective and economical functioning of the FWMS.

### 4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS

DOE has prepared a list of thirty-four Standard Contract-related issues that are under consideration by the ACR Response Team. In May 1989, DOE submitted preliminary draft discussion papers to the ACR Response Team for review and comment. These papers discussed several issues, including canister specifications, classification of SNF for delivery, DOE acceptance of multi-element sealed canisters and transportable storage casks, failed fuel, and waste selection for delivery.

DOE met with the ACR Response Team in November 1989 to discuss the issue of waste selection for delivery and in March 1990 to discuss the Purchasers' position on proposed canister specifications.

In October 1990, the ACR Response Team met with DOE and presented the Purchasers' positions on seven of the original thirty-four issues. The ACR Response Team indicated that these positions represented the consensus, not necessarily unanimous, non-binding views of the Purchasers. The issues addressed were: clarification of the phrase "all SNF" as applied to DCS

instructions; whether Purchasers should be subject to sanctions for improperly described SNF after DOE acceptance; the Purchaser two-month and ±20 percent flexibility clause in the Standard Contract's DCS/FDS process; whether the ACR and FDS should be adjusted to accommodate for full cask loads; whether acceptance priority should be provided for emergency deliveries and shutdown reactors; and the use of Nuclear Waste Fund (NWF) monies for capital improvements to Purchasers' facilities. In June 1991, the ACR Response Team submitted their consensus positions on eleven additional issues. DOE is evaluating the Purchasers' responses to all eighteen issues.

## REFERENCES

1. "Nuclear Waste Policy Act of 1982," Public Law 97-425 (January 7, 1983) and the "Nuclear Waste Policy Amendments Act of 1987," Title V, Subtitle A, Public Law 100-203 (December 22, 1987).

2. U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," *Code of Federal Regulations*, Title 10, Part 961 (1990).

3. U.S. Department of Energy, *Annual Capacity Report*, DOE/RW-0146, Washington, D.C. (June 1987).

Attachment 2

# THE STANDARD CONTRACT'S DELIVERY COMMITMENT SCHEDULE PROCESS

Scott A. Vance
Pacific Northwest Laboratory
Washington Operations
370 L' Enfant Promenade S.W.
Washington, DC 20024-2115

## I. ABSTRACT

The Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste specifies various activities necessary for the eventual acceptance of spent nuclear fuel from utilities by DOE. One of these activities is the Delivery Commitment Schedule process. This paper discusses the background for the Delivery Commitment Schedule process, outlines the Delivery Commitment Schedule process as it is contained in the Contract, and suggests some modifications that might be adopted to improve the process.

## II. INTRODUCTION

The *Reassessment of the Civilian Radioactive Waste Management Program*, the Secretary of Energy's report to Congress published on November 29, 1989, indicated that DOE's preference is that a monitored retrievable storage (MRS) facility be sited through the efforts of the Office of the Nuclear Waste Negotiator. This office was created by the Nuclear Waste Policy Amendments Act of 1987, and is authorized to seek a State or Indian Tribe willing to host an MRS facility or a geological repository. If such a site can be obtained, there is a possibility that waste acceptance could begin by 1998 or soon thereafter. Regardless of the exact timing of initial waste acceptance by the DOE, certain aspects of the waste acceptance process need to be addressed by both the utilities and DOE in order to avoid unnecessary delays.

According to the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the Contract, 10 CFR 961), both DOE and utilities (referred to as "Purchasers" since they are purchasing a disposal service) have certain obligations before any spent nuclear fuel (SNF) can be delivered. One of the first of these obligations is the Delivery Commitment Schedule (DCS), which begins over 5 years prior to the delivery of any waste. Because the DCS process is essential for the development of a system to accept waste and is initiated so far in advance of system startup, interested parties need to familiarize themselves with the process as soon as possible.

Figure 1 illustrates selected major activities that are expected to take place, either logically or contractually, prior to initial waste acceptance by DOE. The purpose of this presentation is to describe the next major step, the Delivery Commitment Schedule (DCS) process, and indicate some of the opportunities for mutual benefit that the DCS process offers to the Purchasers and DOE.

## III. BACKGROUND

In order to appreciate the importance and usefulness of the DCS process, a clear understanding of the concepts of priority ranking and acceptance capacity allocation is required. Both of these concepts are introduced in the Contract and affect the DCS process.

Purchasers as a group have been generating SNF and high-level waste (HLW) for over three decades. While the waste they have generated will eventually be accommodated by the system, the volume is certainly too great to be accepted in a single year. In light of this, the Contract provided a mechanism of prioritizing the SNF by date of final discharge in order to rank the Purchasers for acceptance capacity allocation. With a few exceptions, the method established for allocating annual acceptance capacity between the various Purchasers is to rank the SNF in order of "Oldest Fuel First," commonly referred to as OFF, on an industry-wide basis. Under this method, the SNF that was first permanently discharged from a reactor entitles the discharging Purchaser to the highest priority for capacity allocation. To determine the date the SNF was permanently discharged, DOE collects data characterizing the SNF inventory on the Nuclear Fuel Data Form RW-859. The Purchasers are required to submit the RW-859 to DOE, which reports, among other things, the date that the SNF was permanently discharged from the reactor. The discharge dates are then listed in

HQ0003734




<u>FIGURE 1</u>. Selected Major Activities Expected Prior to Waste Acceptance

chronological order to establish the acceptance queue of any given discharge among all other discharges from the Purchasers as a group.

This ranking is only half of the equation, however. The OFF queuing of the SNF has to be combined with the established waste acceptance schedule to determine which Purchasers qualify for an allocation in each year of system operation. To accomplish this, DOE needs to first determine the quantity of SNF and HLW that the system can accommodate in each year of operation. Then, the ranked queue of Purchaser SNF discharges is summed until each year's total system acceptance capacity is filled. All Purchasers with qualifying SNF falling within a

given year of system operation will be entitled to an acceptance allocation in that year. The volume of qualifying SNF, measured in metric tons uranium (MTU) to provide an interchangeable unit value between PWRs and BWRs, is combined for each of a Purchaser's various reactor sites to arrive at that Purchaser's total acceptance capacity allocation for a given year of waste management system (WMS) operation.

The date of final discharge of the SNF establishes the various Purchasers' place in the acceptance queue and the amount of the discharge establishes their yearly allocation; however, the Contract does not imply that the SNF that afforded the Purchaser the allocation is the specific SNF that must be delivered. Rather, the qualifying SNF entitles the Purchaser to a given capacity allocation which the Purchaser can then distribute among any permanently discharged fuel in order to meet operating needs. The purpose of the DCS process, then, is for the Purchasers to begin to inform DOE of the manner in which they intend to distribute their annual allocation among their operating reactors.

Using this method of coupling OFF queuing with a projected acceptance schedule, DOE published the first Annual Capacity Report (ACR) in 1987. The ACR is published as a non-binding planning document, consistent with the Contract, that indicates the relative priority of the various Purchasers according to DOE plans at that time. The publication of the ACR affords all parties to the Contract the opportunity for verifying the information to be used by DOE for establishing the acceptance queue. This verification is extremely important, because the Contract calls for the replacement of the ACR with the publication of the annual Acceptance Priority Ranking (APR) report in 1991. The APR report will be a contractually binding document and will officially rank the Purchasers in order of acceptance priority for all discharges in inventory as indicated in the Purchaser's RW-859 data.

## IV. DELIVERY COMMITMENT SCHEDULES

Subsequent to the publication of the first APR report, the Contract specifies that the Purchasers can begin submission of DCSs to DOE beginning in January, 1992. Before this submittal period begins, guidelines are needed to assist the Purchasers in making DCS submissions. The purpose of these guidelines would be to clarify the content of each entry on the DCS forms to ensure the acceptability of the DCSs and expedite the approval process. A sample Proof of Ownership statement, which is required by the Contract to be included with each DCS, should also be included in these instructions.

The Contract indicates that the DCS should be used by the Purchasers to "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three months thereafter." In discussions with the Purchasers, they have indicated that their consensus opinion is that the term "all SNF and/or HLW" should mean all SNF and/or HLW that qualifies for delivery according to the annual allocation in the APR. Even assuming that this definition is used, the current DCS form does not require the identification of the assembly-specific fuel that the Purchaser wishes to deliver. Specifically, the information that the Purchasers provide to DOE with submission of the DCS includes the location from which they intend to deliver the fuel, the general category of SNF to be delivered (BWR, PWR, or Other), the range of discharge dates, and the number of assemblies and equivalent MTU of the SNF that will be designated for delivery on the Final Delivery Schedule (FDS). Depending on how the Purchasers complete the DCS form, this information can either be very informative to DOE for planning purposes or add virtually no new information. Because of this, discussions should be conducted to identify ways in which the information can be most useful to the development of the WMS and yet allow Purchasers to make the best decisions for their own operations.

Assuming that an understanding is reached in which both Purchasers and DOE benefit from the submission of the DCS form, DOE will be able to combine the DCS data with some additional information from data already collected on the Nuclear Fuel Data Form RW-859 and begin to identify some of the characteristics of the SNF which will have to be handled by the system in a given year of operation. DOE will then be able to accomplish some early planning on cask fleet development and other transportation system requirements.

An important point that needs to be recognized by the Purchasers is that all SNF designated for delivery on a DCS is assumed to be "Standard Fuel" as described in the Contract (fuel that meets certain age and physical dimension limits). Only after the DCS is approved is the Purchaser required to submit a request to DOE to deliver other-than-standard fuel. Then DOE will inform the Purchaser whether or not the original schedule must be modified for acceptance of the non-standard SNF.

Up to this point in the process, several important events will have occurred. DOE will have ranked the SNF discharged by the Purchasers by date of discharge and determined the yearly capacity that the WMS will have the capability of handling. Combining these two, a yearly allocation will be assigned to each qualifying Purchaser. Then these qualifying Purchasers will have determined the manner in which they intend to distribute their allocation and have completed a DCS form. The Purchaser will then

submit the form to DOE for approval. Upon receipt, DOE will have 3 months in which to consider the DCS.

V. DOE EVALUATION OF DCS SUBMISSIONS

In anticipation of reviewing DCSs, DOE is developing a computer-based DCS Management Control System. Part of this system, the DCS Processing and Approval System (PAS), is designed to permit the Contracting Officer and Technical Representative to quickly evaluate the submitted DCSs on the basis of such factors as:

1. Verification that the DCS has been submitted at least 63 months prior to requested delivery.

2. Verification that the total MTU for all DCSs submitted to date by the Purchaser for each delivery year is within the Purchaser's APR allocation for that year.

3. Verification that the range of discharge dates designated on the DCS is for "standard fuel."

4. Verification that all disposal fee payments are current.

5. Verification that either Proof of Ownership has been provided with the DCS or a copy of a previous agreement to waive the Proof of Ownership requirement has been included.

6. Verification that the DCS has been signed by the Purchaser's authorized representative, committing the Purchaser to accuracy of the information, under penalty of law.

After the DCS is evaluated, DOE informs the Purchaser whether or not the DCS can be approved as submitted. If the DCS is approved, the Purchaser has the option of exchanging the DCS with another Purchaser who also has an approved DCS or submitting an FDS based on the approved DCS 12 months prior to the delivery year. The exchange process will be discussed in detail below. If the DCS is not approved, the Purchaser has 30 days to re-submit an acceptable DCS.

The Contract allows DOE 60 days to determine if the second DCS is acceptable or not. If the second DCS is not approved, the Purchaser is informed of the disapproval and DOE is also required to furnish the Purchaser with an alternative schedule that would be approved if the Purchaser were to agree.

The Purchaser then determines if the schedule proposed by DOE is acceptable. If so, this schedule is submitted, DOE approves the DCS, and the Purchaser has an approved DCS. If the Purchaser does not agree with the DOE proposed schedule and again submits a DCS that is not approved, the Contract states that the two parties will promptly seek to negotiate an acceptable schedule.

VI. THE DCS EXCHANGE PROCESS

After a DCS has been approved, Purchasers will have the opportunity for exchanging DCSs with other Purchasers who also have approved DCSs. The exchange process is outlined in the Contract, although some specific details in implementing the process remain to be finalized. The basic concept is that a Purchaser who has an approved DCS for a later year of system operation can exchange this DCS with a Purchaser who has an approved DCS for an earlier year of system operation. This type of an exchange could be beneficial to both parties in situations such as when the first Purchaser has insufficient storage capacity and the second Purchaser does not need the early delivery rights.

The exchange process presents somewhat of a dilemma to the Purchasers, who must decide between the value of flexibility and long-term commitments. Since only approved DCSs can be exchanged, there will be an incentive for the Purchasers to seek approval of DCSs as early as possible. However, the DCS represents a commitment for delivery, and Purchasers may be reluctant to commit to a delivery far into the future. Each Purchaser will have to decide the appropriate approach for their own operations, which makes the prediction of the usefulness of the exchange process difficult.

A significant question regarding the exchange process as described in the Contract is the interpretation of the phrase "exchange approved delivery commitment schedules." Since Purchasers will eventually have to deliver their entire SNF inventory to DOE, they cannot decrease their lifetime capacity allocation requirements through the exchange process. If the DCSs to be exchanged have differing quantities, how shall this difference be accounted for? There appear to be two possible approaches, each relying on a slightly different interpretation of the above phrase: either 1) accommodate complete flexibility, with DOE evaluating the exchange of any DCSs submitted, or 2) establish some criteria for DCS submittal that would put bounds on the exchange process.

The first alternative, where DOE evaluates the exchange of any approved DCSs regardless of quantity differences, presents the fewest problems to the Purchasers at the submittal stage. Purchasers would submit a DCS that covered their yearly allocation, and, if approved, would be able to offer any portion of this allocation for exchange with any other holders of approved DCSs. When DOE received the exchange request,

evaluation would include such factors as quantity, fuel type, transport mode and delivery location. The DCSs under consideration would probably cover different amounts of SNF, since very few DCSs will cover the same quantity. Therefore, any residual SNF on either DCS would remain assigned to the original Purchaser and the original DCS would be decreased by the exchange amount.

There are some problems with this approach. First, this approach without some restrictions could significantly affect the cask fleet utilization in a given service year. For example, suppose that Purchaser 1 has an approved DCS for 100 MTU in 2000, and Purchaser 2 has an approved DCS for 50 MTU in 2008. Further, suppose a rail cask holds 10 MTU and both Purchasers can accommodate rail. Purchaser 2 has run out of pool storage space and needs to deliver fuel before 2008. He negotiates an exchange with Purchaser 1 for 50 MTU in 2000, and DOE approves the exchange request. Purchaser 1 now has a 50 MTU delivery commitment in 2000 and a 50 MTU delivery commitment in 2008. Purchaser 2 now has a 50 MTU delivery commitment in 2000 instead of 2008. Over the lifetime of the WMS, the delivery requirements have not changed; 100 MTU must be delivered from Purchaser 1 and 50 MTU must be delivered from Purchaser 2. However, in year 2000, the cask commitments have gone from servicing only Purchaser 1 to servicing both Purchasers. A large number of this type of exchange could impact the ability of DOE to service other commitments in a given year.

If, for efficiency reasons, Purchasers are encouraged to ship full casks then the situation is complicated even further. Scenarios can be envisioned in which more SNF is proposed for delivery through an exchange than what the system can accommodate. Since DOE has discretion for approval in the exchange process, DOE could deny the exchange request if system capacity was exhausted. However, this could mean that the Purchaser would have to add additional storage capacity, resulting in exactly the situation that the exchange process was designed to prevent.

The second approach to the exchange process, which does not allow DCSs of differing quantities to be exchanged, overcomes some of these difficulties but presents other challenges. This approach involves an alternative interpretation of the phrase "exchange approved delivery commitment schedules." The phrase is interpreted in a more literal sense, indicating that the Purchasers would request an exchange of approved DCSs, without modification, which would represent to DOE only a change in delivery location for any given year. This interpretation implies that the Purchasers would have to establish a standard quantity for DCS submittal if they were interested in submitting exchange requests. Provided the DCS SNF quantities were interchangeable, the Purchasers could exchange the approved DCSs and not be concerned with differing DCS allocations. The unit of exchange would have to be agreed upon by the Purchasers in advance, and might be something like 10 MTU or a full cask load. This method would present a situation where the majority of exchange requests could be approved since the impact to the WMS may be minimal, representing only a change in delivery location for a given year. The end result would be optimum in terms of potential benefit to Purchasers, since they could be fairly certain of the approval of their submitted exchange request. However, it would require more effort on the Purchasers' part at the time of DCS submission, since they may be required to submit several DCSs for a single year's allocation if they plan on participating in the exchange process.

The eventual utilization of the exchange process is somewhat unclear at this point, since no one can predict how many Purchasers may take advantage of exchanges or what kind of impacts they may have on the system. However, the option was placed in the Contract at the request of the Purchasers. The exchange process needs to be evaluated well in advance of submittal of FDSs, so that Purchasers who may need this option are aware of both the potential benefits and the requirements. This understanding will be necessary if Purchasers are to make an informed decision regarding whether or not to pursue an exchange. Without this understanding, Purchasers will not be able to adequately choose between such options as additional storage, transshipments of SNF or indeed the exchange process.

## VII. SUGGESTIONS FOR IMPROVING THE DCS PROCESS

The DCS process can offer substantial opportunities for a better understanding of the implications of Contractual obligations for both DOE and the Purchasers, especially if some modifications to the process can be agreed to by both parties. Discussions between DOE and the Purchasers on possible modifications should be encouraged. Two examples of such modifications follow.

One suggested modification is to implement a two-tiered DCS system if the Purchasers are reluctant to submit DCSs for delivery dates well over 63 months away. Under this system, a DCS would be required at least 63 months prior to intended delivery, just as the Contract specifies. Further, if a Purchaser wished to exchange a DCS with another Purchaser, both would have to obtain approved DCSs as the Contract currently specifies. The difference would be that the Purchasers could submit "non-binding DCSs" to DOE for planning purposes, giving

DOE the ability to more accurately estimate the cask-fleet requirements well into the future. These DCSs would not be submitted for approval, and the Purchasers would not be committed to them. Instead, their purpose would be to inform DOE of the Purchaser's "best guess" of how they plan to allocate their delivery rights, to allow DOE to have a greater than 63 month planning horizon for cask-fleet procurement.

Another possible modification would be to better define the SNF to be delivered than is currently required. The current form requests the range of discharge dates for the SNF to be delivered, but this could cover essentially everything in storage. Appendix F of the Contract, Detailed Description of Purchaser's Fuel, specifically identifies the assemblies proposed for delivery and the physical condition of these assemblies. When the Contract was first drafted, Appendix F was associated with the submittal of a DCS. Prior to final publication, however, this provision was changed and Appendix F is not required until 60 days prior to delivery. Hopefully, a process can be developed which allows for Purchasers to retain flexibility in fuel management decisions but affords DOE with the necessary specifics of SNF age and burnup on a time frame that will allow adequate planning.

Initiation of the DCS process can be a very positive step in the development of the WMS. The key to ensuring this will be an early and active dialogue of the specifics of the process as well as the potential benefits. For DOE, the DCS process can begin to define the necessary system requirements, particularly the rail/truck cask mix. Purchasers need to be aware of DOE's need for this information to properly plan for an efficient system that will meet the Purchaser's needs. For the Purchasers, the DCS process can allow for the determination of some long-term storage requirement decisions and fuel management planning. For both parties, initiation of the DCS process will continue the implementation of the Contract and will represent a firm commitment for disposal services by DOE.

## VIII. REFERENCES


1. U.S. Department of Energy, *Annual Capacity Report*, DOE/RW-0146, Washington, DC (June 1987) and DOE/RW-0191, Washington, D.C. (June 1988).

2. U.S. Department of Energy, *Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program*, DOE/RW-0247, Washington, DC (November 1989).

3. U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," *Code of Federal Regulations*, Title 10, Part 961 (1990).