**No. 99-447C**
**(Judge Lettow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BOSTON EDISON COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF BOSTON EDISON COMPANY'S REPLY TO THE GOVERNMENT'S RESPONSE TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON LIABILITY REGARDING COUNT I OF THE AMENDED COMPLAINT AND MOTION TO STRIKE THE GOVERNMENT'S OPPOSITION

---

**Richard J. Conway**
**DICKSTEIN SHAPIRO MORIN**
**& OSHINSKY LLP**
**2101 L Street, NW**
**Washington, DC 20037**
**Tel: (202) 785-9700**
**Fax: (202) 887-0689**

**Attorney for Plaintiff**

**Of Counsel:**
**David M. Nadler**
**Nicholas W. Mattia, Jr.**
**Bradley D. Wine**
**Jeffrey P. Becherer**
**DICKSTEIN SHAPIRO MORIN**
**& OSHINSKY LLP**
**2101 L Street, NW**
**Washington, DC 20037**

**Neven Rabadjija, Esq.**
**Associate General Counsel**
**NSTAR Electric & Gas Corporation**
**800 Boylston Street, 17th Floor**
**Boston, MA 02199-0228**

**August 30, 2004**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

I. BOSTON EDISON'S MOTION TO STRIKE PAGES FORTY-TWO, LINE TEN THROUGH FORTY-SIX OF THE GOVERNMENT'S BRIEF ..... 2

II. THE GOVERNMENT BREACHED THE STANDARD CONTRACT ON JANUARY 31, 1998 WHEN IT FAILED TO BEGIN ACCEPTANCE OF SNF ..... 3

III. BOSTON EDISON HAS SUFFICIENTLY ESTABLISHED DAMAGES AS NECESSARY TO SUSTAIN ITS CLAIM FOR SUMMARY JUDGMENT ..... 6

IV. THE INJURIES SUSTAINED BY BOSTON EDISON ARE THE DIRECT AND FORESEEABLE CONSEQUENCE OF THE GOVERNMENT'S BREACH ..... 11

CONCLUSION ..... 16

# TABLE OF AUTHORITIES

Page

Cases:

*Chem. Tech., Inc. v. United States*, No. 303-80C, 1982 WL 36669 (Ct. Cl. Apr. 28, 1982) ..... 7

*Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) ..... 15

*Cosmo Construction Co. v. United States*, 451 F.2d 602 (Ct. Cl. 1971) ..... 7

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ..... 12, 13

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ..... 15

*Larson v. Valente*, 456 U.S. 228 (1982) ..... 7

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..... 7, 9

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ..... 8, 9

*Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129 (8th Cir. 1997) ..... 7

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ..... 8, 9

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ..... 8, 9

*S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) ..... 12

*Suess v. United States*, 52 Fed. Cl. 221 (2002) ..... 11, 12

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ..... 4, 5

*Univ. Med. Ctr. v. Shalala*, 5 F. Supp. 2d 4 (D.D.C. 1998) ..... 7

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) ..... 13

*Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998) ..... 8

Administrative Decisions:

*Arnold M. Diamond, Inc.*, ASBCA No. 31783, 87-1 BCA ¶ 19,511 ..... 7

*PAE International*, ASBCA No. 45314, 98-1 BCA ¶ 29,347 ..... 7

Statutes:

31 U.S.C. § 3727 ..... 14

Rules:

Rules of the Court of Federal Claims 56 ..... 1

Other Authorities:

Restatement (Second) of Contracts § 350 (1981) ..... 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | ) | **No. 99-447C (J. Lettow)** |

**PLAINTIFF BOSTON EDISON COMPANY'S REPLY TO THE GOVERNMENT'S RESPONSE TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON LIABILITY REGARDING COUNT I OF THE AMENDED COMPLAINT AND MOTION TO STRIKE THE GOVERNMENT'S OPPOSITION**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, Plaintiff Boston Edison Company ("Boston Edison"), by its undersigned counsel, respectfully submits this Reply to Defendant's Response to Boston Edison's Cross Motion for Summary Judgment on Liability Regarding Count I of the Amended Complaint, and requests that the Court grant Boston Edison's Cross Motion.[1] The Government's Response demonstrates that

[1] The Government's Response basically consists of two arguments: (1) Boston Edison does not have standing to pursue a breach cause of action because it has suffered no injury, even if the Government is found to have breached the Standard Contract as of January 31, 1998, and (2) even if Boston Edison has been injured, such injuries are consequential, and therefore not cognizable. As described in greater detail in Boston Edison's Response to the Government's Motion to Dismiss and for Summary Judgment ("Boston Edison's Response"), the Government's standing argument makes no effort to rebut the substance of the Affidavit of Geoffrey O. Lubbock ("Lubbock Affidavit") and misstates the legal standard a plaintiff is required to meet to prove standing in the summary judgment context, the proper standard which Boston Edison more than satisfies. Moreover, the Government's consequential damages argument ignores the express terms of the Standard Contract that anticipated the sale of nuclear facilities as well as the Government's knowledge that failure to adhere to the January 31, 1998 deadline would have an immediate and severe detrimental impact on the entire nuclear utility industry, including Boston Edison.

there are no material facts in dispute regarding the Government's breach of the Standard Contract's January 31, 1998 deadline. Boston Edison has exceeded its obligation to demonstrate (for purposes of the present Cross Motion) that it sustained damages as a direct result of that breach. For example, Boston Edison has proven for purposes of its Cross Motion that it sustained three specific types of damages that are not related to the delivery commitment schedule ("DCS") process: (1) the damages associated with re-racking; (2) damages associated with the value of Boston Edison's Standard Contract itself, including Boston Edison's inability to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged; and (3) damages associated with the diminished fair market value of the Pilgrim nuclear facility as a direct consequence of the Government's breach. The arguments asserted by the Government regarding the specific nature and quality of damages being pursued by Boston should be addressed during subsequent proceedings regarding the quantum of Boston Edison's damages. Boston Edison also hereby moves to strike the Government's Opposition to Boston Edison's Cross Motion, specifically from page forty-two (line ten) through page fourty-six, as unrelated to the question of whether Boston Edison has made a sufficient showing to warrant partial summary judgment as to liability. This portion of the Government's brief are an inappropriate attempt to expand the scope of and bases for the Government's Motion to Dismiss, filed previously on April 30, 2004. Accordingly, Boston Edison is entitled to judgment as a matter of law regarding liability on Count I of the Amended Complaint.

## I. BOSTON EDISON'S MOTION TO STRIKE PAGES FORTY-TWO, LINE TEN THROUGH FORTY-SIX OF THE GOVERNMENT'S BRIEF

Boston Edison hereby moves to strike the Government's Opposition to its Cross Motion because the Government has inappropriately raised new arguments

regarding the nature and viability of Boston Edison's damages claims under the guise of challenging Boston Edison's entitlement to seek a liability ruling on its Cross Motion. In particular, the Government's Opposition argues for the first time that Boston Edison's damages are impermissibly consequential in nature, and therefore should be prohibited as a matter of law. It is now too late for the Government to attempt a transparent expansion of the grounds that it initially put forward for dismissal. On March 16, 2004, this Court ordered the Government to file its jurisdictional motion no later than April 30, 2004. It would be a violation of that Order to allow the Government to expand its jurisdictional arguments nearly four months after they were to be filed and a mere two business days prior to the hearing on the Motion.

As stated in greater detail in Section IV *infra*, the Government's consequential damages argument is also factual in nature, and is not properly raised for purposes of the Court's of Boston Edison's Cross Motion. To the extent that the Court may subsequently desire a more complete briefing as to the legal sufficiency of Boston Edison's damages, then Boston Edison respectfully requests that such issues be addressed after the completion of discovery and the exchange of experts' reports.

## II. THE GOVERNMENT BREACHED THE STANDARD CONTRACT ON JANUARY 31, 1998 WHEN IT FAILED TO BEGIN ACCEPTANCE OF SNF

The Government's Response is merely another attempt to further an already discredited and tortured defense theory in these SNF proceedings – a theory that has been rejected by *every* court that has considered it to date. Although the Government argues that "[t]he DCS mechanism determines *two essential terms* of the Standard Contract: the *time of performance* and the *quantity* of SNF to be accepted by DOE," Response at 4 (emphasis in original), this argument completely fails to account for the January 31, 1998 deadline mandated by Congress in the Nuclear Waste Policy Act and

contained in the Standard Contract. In fact, the DCS provision of the Standard Contract contains *no* date or deadline and *no* quantity or amounts of SNF to be accepted by the Government. Rather, the DCS provision in the Standard Contract merely defines an administrative process for the Government's processing of SNF acceptance.

The present iteration of the Government's DCS argument is not unique to Boston Edison as the seller of the Pilgrim facility. In fact, it is precisely the same argument made in a number of parallel SNF proceedings with existing owners and operators. The Government's interpretation of the DCS process cannot be reconciled with the myriad cases from the D.C. Circuit, the Federal Circuit, and the Court of Federal Claims that have unanimously held that the January 31, 1998 deadline delineated the date of the Government's breach.

Indeed, the only case that the Government has been able to cite in support of its DCS argument is *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ("*TVA*"). Surely *TVA* does not assist the Government's argument here, when TVA successfully argued that "the government should not be allowed to use the lack of an approved DCS as a shield to protect itself from liability when the very lack of such approval was caused wholly by the government's own inaction." 60 Fed Cl. at 671. It is clear that by at least 1994 DOE's awareness that a repository would not be available irretrievably tainted the DCS process, which was itself abandoned prior to the 1998 breach. The conclusion reached in TVA was that "TVA's DCSs [have] no legal validity because the Standard Contract does not tie DOE's obligation to accept SNF to the

existence of a repository." *Id.* at 673. *TVA* is also unavailing to the Government because there the plaintiff *agreed* with the rates of acceptance proposed by the Government.[2]

Boston Edison objects to the Government's attempt to employ the DCS process in a manner that would completely vitiate the January 31, 1998 deadline and otherwise misconstrues the plain meaning of the Nuclear Waste Policy Act and the Standard Contract. Boston Edison has alleged that its damages were the direct and proximate result of (and can be measured subsequent to) the Government's failure to begin a program of accepting SNF on January 31, 1998. Accordingly, the Government's attempt to use *TVA* to support its arguments here are misplaced.

Boston Edison has sufficiently established for purposes of its Cross Motion that the Government breached the January 31, 1998 deadline of the Standard Contract – an essential term of that agreement that is in no way reliant upon the contract's DCS process or DOE's rate of acceptance. This breach occurred *prior* to the sale of Pilgrim. As explained in greater detail in Boston Edison's Response, Boston Edison is entitled to a liability ruling based on the Government's failure to begin acceptance of SNF by the statutorily and contractually mandated deadline of January 31, 1998. As a direct consequence of the Government's decision not to have an operational repository in place in order to permit permanent disposal of SNF by January 31, 1998, the economic viability of Boston Edison's Standard Contract and its other nuclear assets was significantly injured. Appendix ("App.") at 3. The measure of the Government's breach was not dependent upon, or in any way related to the DCS process.

[2] This Court expressly limited its decision by stating "the Court accepts *only for the purposes of this case* that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract." *TVA*, 60 Fed. Cl. at 671 n.7 (emphasis added).

By January 1998, the Government was unable to state when – if ever – permanent disposal would actually begin, although it asserted that the earliest date by which disposal could commence was 2010, some twelve years hence. The Government's failures ultimately resulted in its decision to abandon the DCS process altogether, a decision that completely undermines the Government's current contention that the DCS process somehow vital to the NWPA and Standard Contract.

As of January 1998, Boston Edison was also deprived of its valuable rights to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged. *See* PFF No. 12 and RPFF No. 9. This loss to Boston Edison (which the Government conspicuously fails to address in its papers) also pre-dates the dates proposed in Boston Edison's DCSs for SNF disposal, which the Government so unpersuasively suggests define an SNF litigant's contractual entitlements.

It is abundantly clear that Boston Edison has articulated and established for purposes of its cross motion ample damages to sustain a judgment in its favor regarding the Government's liability for breach of contract. Any issue regarding the precise quantum of Boston Edison's damages should be determined at a later date.

## III. BOSTON EDISON HAS SUFFICIENTLY ESTABLISHED DAMAGES AS NECESSARY TO SUSTAIN ITS CLAIM FOR SUMMARY JUDGMENT

Boston Edison has sustained its burden of establishing damages to the extent necessary for the Court to grant Boston Edison's Cross Motion. The Government would have this Court believe that it must place the cart before the horse and perform an in-depth analysis of Boston Edison's damages claims before it can ever address the question of whether breach liability against the Government can be determined. While some indication of damages is a necessary element of the Court's liability determination, it is not nearly the type of inquiry the Government suggests is required.

The Government's reference to *Cosmo Construction Co. v. United States*, 451 F.2d 602 (Ct. Cl. 1971) (Response at 42) demonstrates that Boston Edison has offered sufficient evidence of damages it suffered in order to establish liability. While there should be *some* showing of damage put forth to establish liability – i.e., the Lubbock Affidavit – the evidentiary requirement is appropriately limited in nature, typically coming as it does at the early stages of a case prior to extensive discovery. A plaintiff need not offer evidence "*of the quantity, quality, or precision necessary to support a judgment in a precise sum*; it is only sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred." *Cosmo*, 451 F.2d at 605-06 (emphasis added); *see also Chem. Tech., Inc. v. United States*, No. 303-80C, 1982 WL 36669, at *3 (Ct. Cl. Apr. 28, 1982); *PAE International*, ASBCA No. 45314, 98-1 BCA ¶ 29,347, at 145,922; *Arnold M. Diamond, Inc.*, ASBCA No. 31783, 87-1 BCA ¶ 19,511, at 98,624.

Indeed, as the Supreme Court held in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992):

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. *If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it*.

*Id.* at 561-62 (emphasis added); *see also Univ. Med. Ctr. v. Shalala*, 5 F. Supp. 2d 4, 8 (D.D.C. 1998) ("Such a party satisfies the redressability requirement 'when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.'" (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 131 (8th Cir. 1997), citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). The Government's suggestion that Boston

Edison "has failed to identify any damage" (Response at 42) is utterly unsupported and ignores the documentary and testimonial evidence offered in support of the Cross Motion. The facts presented by Boston Edison, both as to out-of-pocket mitigation ("re-racking") costs and the indefinite postponement of its allotment trading rights, coupled with the Government's failure to address them and the undisputed absence of an SNF repository, demonstrate that there are no material questions of fact regarding the Government's liability. Therefore, Boston Edison is entitled to a judgment on liability as a matter of law.

It bears emphasizing that the Federal Circuit has not required proof of damages before granting summary judgment on liability in previous SNF cases. For example, the court in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), did not engage in a damages analysis before it agreed to award summary judgment in favor of the plaintiffs on the issue of liability. The court simply noted that the plaintiffs "'ha[d] paid all the contract fees and . . . that DOE ha[d] not begun accepting, transporting, and disposing of [Plaintiffs'] SNF. Accordingly, DOE has breached the contract.'" *Maine Yankee*, 225 F.3d at 1343 (quoting from the lower court decision in *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 235 (1998)). The Federal Circuit did not require an analysis of the DCS process to conclude that the Government breached an essential element of the Standard Contract when it failed to perform by the January 31, 1998 deadline, an analysis that the Government asserts is required before making any finding of liability.

The Federal Circuit, in *Northern States*, 224 F.3d 1361, and *Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001), went further, separating issues of

liability and damages, and held that a finding that the Government breached the Standard Contract on January 31, 1998 allowed Northern States to pursue its own damages theories. In *Northern States*, the Federal Circuit held that, "[o]n the merits, our opinion in *Maine Yankee* fully explains why we have concluded that the utilities may maintain their damage suit, and we need not repeat that discussion here." 224 F.3d at 1367; PFF Nos. 6-8. Similarly, in *Roedler*, the Federal Circuit held:

> In *Indiana Michigan Power Co. v. Department of Energy* . . . and *Northern States Power Co. v. Department of Energy*, . . . the District of Columbia Circuit held that the government's failure to meet this deadline was a breach of contract. This ruling led to further litigation in which the utility companies seek damages in the Court of Federal Claims.

255 F.3d at 1350.

The *Maine Yankee* and *Northern States* decisions are entirely consistent with the Supreme Court's decision in *Lujan*, in that they recognize that Standard Contract holders who were the object of the Government's breach on January 31, 1998 should be presumed to have been injured and that this Court can offer redress for those injuries. Boston Edison, as a Standard Contract holder at the time of the Government's breach, should be treated no differently in the Court's assessment of liability. The Court need not engage in a complete damages analysis in order to rule on liability. As the Federal Circuit has already concluded, the Government's failure to perform its contractual obligations by January 31, 1998 is the basis for the Government's liability for breach of contract.

There can be no question that Boston Edison has provided ample evidence of the damages it suffered as a result of the Government's failure to remove SNF from the

Pilgrim facility.[3] Boston Edison has pled in its Amended Complaint that it actually incurred costs to expand SNF storage capabilities at its Pilgrim nuclear plant. It cannot seriously be questioned that damages associated with exchangeable disposal queue allotments immediately flow from a twelve-year adjournment of the Government's disposal performance date. By way of the Lubbock Affidavit, Boston Edison provided additional detailed support for its claim that the Government's breach led to direct and immediate losses to Boston Edison, including the reduction in value of its Standard Contract in which it had invested $85 million, as well as the diminished value of the Pilgrim facility.

The Lubbock Affidavit demonstrates that the impact of the Government's breach on the fair market value of the Pilgrim facility can be measured by the dramatic decrease in the number of prospective bidders that actually participated in the auction of the Pilgrim facility. App. at 3. The impact of the breach on the value of Pilgrim also manifested itself in a significant reduction of the per kWh purchase price of Boston Edison's nuclear assets. *Id*. According to Mr. Lubbock's experience with the due diligence and auction processes, the buyers were concerned about Pilgrim's ability to produce future revenues beyond the end of its initial license life, and the buyers faced the potential untenable choice of having to close the facility for failure to receive a license renewal, or having to construct a dry-cask storage facility for the ever-growing

---

[3] Recognizing that the Lubbock Affidavit is dispositive of both the Government's Motion to Dismiss and for Summary Judgment and Boston Edison's Cross Motion, the Government filed a Motion to Strike in a desperate attempt to preclude this evidence. As Boston Edison demonstrated in its Response to the Motion to Strike, the Lubbock Affidavit is more than appropriate, and in fact, is exactly what the Government has demanded in its attacks on Boston Edison for failing to offer evidence of damages. Beyond its Motion to Strike, however, it is telling that the Government has made no attempt to rebut the evidence as presented by Geoffrey O. Lubbock. Nowhere in its brief does the Government contest the facts as Mr. Lubbock has described them. As such, there are no material facts in dispute regarding the Cross Motion.

amount of SNF. *Id*. These factors, as reflected by the concerns expressed to Mr. Lubbock by prospective buyers and further demonstrated throughout the due diligence and auction processes, had a dramatic impact on the fair market value of Pilgrim prior to the sale. *Id*.

The Lubbock Affidavit also provided evidence that the fair market value of Boston Edison's Standard Contract and its Pilgrim facility were significantly decreased as a result of the future costs that encumbered the property itself as a direct result of the Government's breach. App. at 3-4. These costs included indefinite future payments to DOE of the one mil per kWh fee assessed by the Department of Energy ("DOE"), as well as the increased costs of decommissioning the Pilgrim facility.[4] This evidence is unrebutted and requires the Court to grant Boston Edison's Cross Motion for summary judgment on liability pursuant to Count I of the Amended Complaint.

## IV. THE INJURIES SUSTAINED BY BOSTON EDISON ARE THE DIRECT AND FORESEEABLE CONSEQUENCE OF THE GOVERNMENT'S BREACH

Boston Edison's claim for diminished value is, as a matter of law, entirely consistent with prior decision of the Court that found such damages to be recoverable.[5] For example, in *Suess v. United States*, 52 Fed. Cl. 221 (2002), the court awarded damages for diminished value of the plaintiffs banking franchise. *Suess*, a *Winstar* case, was brought derivatively on behalf of Franklin Federal Savings and Loan Association ("Franklin"). As a direct result of the Government's breach of contractual promises

---

[4] Boston Edison will address this Court's jurisdiction to hear claims associated with the Government's Nuclear Waste Fund overcharges at oral argument.

[5] In addition to these diminished value arguments, Boston Edison will also prove that it sustained damages associated with re-racking as well as damages associated with Boston Edison's inability to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged

regarding the treatment of "goodwill" due to the passage of Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Suess alleged that Franklin suffered damages, including the diminished valued of the bank. The court found that the passage of FIRREA was the substantial factor leading to the demise of Franklin, and was sufficient to establish the causation element of damages based on the bank's diminished value. *Id.* at 231. In its holding, the court described the plaintiff's diminished value theory in the following manner:

> These are *classic contract damages*, because it was both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure. Further, the breach was the substantial factor in the seizure of Franklin. In short, but for the breach, Franklin would have been a going concern with a market value of $35 million.[6]

*Id*. (emphasis added); *see also S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294, 310 (2003) (court should determine at trial whether plaintiff could prove the diminished value of its business opportunity).

Like *Suess* and *Southern National*, the Federal Circuit's ruling in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002), supports Boston Edison's damages theory as an appropriate measure of damages. In *Energy Capital*, the Federal Circuit held that lost profits are recoverable when they are benefits that were anticipated from the contract and are necessary for plaintiff's ongoing operation. *Id.* at 1324-25. The Government's breach of the Affordable Housing Energy Loan Program ("AHELP") agreement precluded Energy Capital from issuing the loans AHELP was designed to permit. *Id.* at 1328. Just as there was no intervening cause in *Energy Capital*, there is no intervening cause in Boston Edison's present claims against the Government. As the

[6] In making its award, the court determined that the clearest indicator of Franklin's value prior to the breach was its market value of its stock on the day prior to the breach.

AHELP agreement was intended to permit lenders to offer certain loans, the Standard Contract was designed to ensure Boston Edison's operational viability by shifting to the Government (for a fee) the burden posed by SNF. The Government's failure to perform its obligations pursuant to the Standard Contract, much like its failure to abide by the AHELP agreement, directly and severely impacted Boston Edison's operation of Pilgrim. Moreover, diminished value is equivalent to and consistent with the lost profit damages awarded in *Energy Capital*.

Much like the plaintiffs in *Energy Capital*, *Suess*, and *Southern National*, Boston Edison seeks to recover the diminished value of the Standard Contract and Pilgrim as a direct consequence of the Government's breach. By executing the Standard Contract, the Government promised decades ago to remove the SNF from the Pilgrim facility on or before January 31, 1998. When it executed the Standard Contract, the Government knew what impact the failure to fulfill its contractual obligations would have on the nuclear power industry, including Boston Edison. *See Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) (Merow, J.). Given the Government's prohibition of nuclear fuel reprocessing, the Standard Contract and the NWPA were implemented to ensure the viability of the nuclear industry. RPFF No. 1. The Government should not be permitted to shirk these obligations and avoid fully compensating Boston Edison for the resultant injuries, merely because Boston Edison sold it facility in the wake of the Government's breach.[7]

---

[7] It is noteworthy that the Government, acting through the Federal Energy Regulatory Commission in 1996, adopted Orders 888 and 889. The express intent of these orders was to mandate the restructuring of the country's utility industry in order to provide an openly competitive market for electric generation. The essence of the restructuring was the separation of electric generation from traditional utility transmission and distribution functions. The Government essentially mandated these changes for interstate electric sales, and also encouraged states to follow suit. The Government should therefore not be heard to complain that it could not have foreseen that the

Contrary to the arguments contained in the Government's Response, the sale of Pilgrim was foreseeable, specifically contemplated by the parties, and memorialized in the Standard Contract. Article XIV of the Standard Contract explicitly allowed Boston Edison to assign its rights to the Standard Contract to a subsequent purchaser.[8] In order to effectuate an assignment, Boston Edison was required to provide the Government with ninety days notice. Boston Edison provided the Government with the requisite notice of its intended sale and assignment of the Standard Contract to Entergy Nuclear Generating Company, LLC. The Government *never* objected to the assignment. At the time of contract formation, the Government therefore recognized that nuclear facilities were bought and sold regularly, and that they would continue to be bought and sold after the execution of the Standard Contract. Thus, it is disingenuous at best for the Government to now argue that a sale of the Pilgrim facility was unforeseeable. Nevertheless, the sale of the Pilgrim facility is not the cause of Boston Edison's damages, but rather, a measure by which the diminished value of the Pilgrim facility can be assessed.

The damages sustained by Boston Edison are a direct and proximate result of the Government's breach. The sale of the Pilgrim facility to Entergy is not an intervening cause. Rather, the sale is merely indicia of the damages sustained by Boston Edison. The sale of the Pilgrim facility in the wake of the Government's breach was but one step in Boston Edison's attempt to mitigate its losses; namely, the

---

physical and economic separation of nuclear electric generating plants was strongly encouraged at the same time the Government was severely compromising the economic viability of these nuclear plants by disavowing its obligations under the Nuclear Waste Policy Act.

[8] This assignment clause within the Standard Contracts is significant because it is an exception to the general rule that government contracts are non-assignable. *See* 31 U.S.C. § 3727.

precipitous drop of the value of the Pilgrim facility. Under generally accepted principles of contract law, Boston Edison was required to take reasonable steps to mitigate its losses. *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002) (citing Restatement (Second) of Contracts § 350 (1981)); *see also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 355 (2004). Given the significant impact the Government's breach had on Pilgrim, one of the only ways Boston Edison was able to reasonably mitigate its damages was through a sale of its facility. Had Boston Edison not acted to sell when it did, it would have faced a continued decline in its value. Boston Edison will demonstrate at trial regarding the quantum of its losses that these mitigation efforts were reasonable and actually encouraged by the Government.

Boston Edison has adequately demonstrated that the diminished value of its plant as a result of the Government's breach was contemplated during the formation of the Standard Contract and was otherwise a foreseeable consequence of the Government's breach. As such, the Government is liable to Boston Edison for such damages.

**CONCLUSION**

For the foregoing reasons, Boston Edison respectfully requests that the Court grant its Cross Motion for Summary Judgment on liability for breach of contract pursuant to Count I of the Amended Complaint.

Date: August 30, 2004

Respectfully submitted,

s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffrey P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street
17th Floor
Boston, MA 02199-0228

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on August 30, 2004 a copy of the foregoing Plaintiff Boston Edison Company's Reply to the Government's Response to Plaintiff's Cross Motion for Summary Judgment on Liability Regarding Count I of the Amended Complaint and Motion to Strike the Government's Opposition was filed electronically. I understand that the notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*