**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 99-447C (J. Lettow)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF BOSTON EDISON COMPANY'S POST-HEARING REPORT**

Pursuant to the Court's request during the August 31, 2004 hearing, Boston Edison Company ("Boston Edison"), by its undersigned counsel, hereby submits this post-hearing report with respect to Boston Edison's actions regarding preparation of Delivery Commitment Schedules ("DCSs") and Final Delivery Schedules ("FDSs") under Article V of the Standard Contract, 10 C.F.R. § 961.11 ("Standard Contract"). In response to the Court's inquiry, Boston Edison did not submit an FDS for the Pilgrim facility because it had been previously informed by the Department of Energy ("DOE") that DOE was suspending the DCS/FDS process described in Article V of the Standard Contract. By the time DOE so advised Boston Edison, DOE had announced to the entire nuclear utility industry that disposal of spent nuclear fuel ("SNF") was not likely to commence until 2010 at the earliest, so the suspension of the DCS/FDS process was hardly unexpected. *See* Boston Edison's Appendix at 43. The submission by Boston Edison in the late 1990s of an FDS was therefore unnecessary and would have been futile.

In addition to the information requested by the Court regarding Boston Edison's DCS and FDS history, Boston Edison also attaches the Government's briefs and

the final order of the Court of Appeals for the D.C. Circuit in *Consolidated Edison Co. of New York, Inc. v. Department of Energy*, No. 98-1358, 1999 WL 325517 (D.C. Cir. Apr. 16, 1999). In *Consolidated Edison*, numerous utilities raised the same claims relating to DOE's Nuclear Waste Fund ("NWF") fee collection and expenditure practices that are asserted by Boston Edison in this case.[1] In dismissing the *Consolidated Edison* petition, the D.C. Circuit specifically referenced its prior decision in *Northern States Power Co. v. United States Department of Energy*, 128 F.3d 754 (D.C. Cir. 1997), as dispositive of the appropriate venue for determining such fee assessment claims.

In *Consolidated Edison*'s reference to *Northern States*, the court held that such claims should be pursued in the U.S. Court of Federal Claims. *See* 1999 WL 325517. Accordingly, consistent with the position previously articulated by the Government and accepted by the D.C. Circuit, Boston Edison's fee-related claims have been conclusively determined to be properly before this Court, and the Government is now estopped from claiming otherwise. Finally, in connection with the FDS and DCS information submitted below, Boston Edison explains why breach of the Standard Contract is not dependent on particular fuel pick-up dates preliminarily developed under a DCS/FDS process that was subsequently suspended by DOE.

## I. BOSTON EDISON DID NOT SUBMIT AN FDS BECAUSE THE GOVERNMENT HAD ALREADY SUSPENDED THE DCS/FDS PROCESS

As the following chronology demonstrates, Boston Edison did not submit an FDS in the late 1990s because the Government had suspended the DCS/ FDS process described in Article V of the Standard Contract. Boston Edison submitted a total of four DCSs, three of which were approved by DOE. Boston Edison submitted its 1999 DCS

[1] See especially paragraphs 41-45, 68-69, and 82-84 of Boston Edison's January 13, 2004 Amended Complaint ("Am. Compl.").

for Pilgrim on or about September 21, 1993. Government Appendix ("Gov. App.") at 0252. The Government approved the 1999 DCS on or about December 6, 1993. *Id.* at 0253. Boston Edison submitted its 2000 and 2001 DCSs on or about September 20, 1994 (*id.* at 0255) and September 26, 1995 (*id.* at 0258), respectively, which the Government approved on or about January 18, 1995 (*id.* at 0256) and January 25, 1996 (*id.* at 0259), respectively. Boston Edison submitted its final DCS on or about September 29, 1998. *Id.* at 0261; *see also* Affidavit of Henry V. Oheim ¶¶ 2-5, attached hereto as Exhibit 1. As described below, DOE had suspended the entire DCS/FDS process.

While Boston Edison's 1999 DCS did not contain a specific proposed delivery date, the date of its submission would have required a delivery date no later than December 1999. Gov. App. at 0254. Pursuant to the terms of the Standard Contract, Boston Edison's first FDS would have been due in December 1998, *i.e.*, twelve months prior to the delivery date specified in the DCS. *See* Standard Contract Art. V.C.

On November 24, 1998, however, DOE informed Boston Edison that it was suspending the disposal procedures in Article V of the Standard Contract. Specifically, DOE advised Boston Edison that the Government had received Boston Edison's 2004 DCS, but that it was "not able at this time to approve your DCS submittal." Gov. App. at 0263. DOE's letter goes on to state "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." *Id.*

In fact, DOE had begun its suspension of the DCS process as early as March 1996. According to the Government's own witness, David Zabransky, who was specifically identified in DOE's November 24, 1998 DCS suspension letter as a DOE point of contact, the decision to suspend the DCS process was made perhaps as early as

March of 1996. Deposition of David Zabransky, dated Apr. 18, 2002 ("Zabransky Dep."), attached hereto as Exhibit 2, at 362-63. Once that decision was made, it was impossible for a utility to obtain an approved DCS. *Id.* at 353. In 1999, Boston Edison sold the Pilgrim facility and filed its initial complaint in this matter.

The early suspension of the DCS process has been confirmed by DOE on other occasions as well. In a March 13, 1997 letter to Michael Wallace, Senior Vice-President of Commonwealth Edison, attached hereto as Exhibit 3, DOE stated:

> The Department is not able at this time to approve your DCS submittal. Consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days.

This letter is consistent with Judge Hewitt's finding in *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003), that in fact, DOE never approved an FDS for Commonwealth Edison:

> In 1997, DOE notified the utilities that it was waiving until further notice the utilities' obligation to submit revised DCSs because DOE was unable either to approve or disapprove the submissions. Plaintiff then stopped submitting DCSs. There is no evidence before the court that plaintiff ever submitted or DOE ever approved a FDS for any year.

*Id.* at 665 (citations omitted). Such is true of Boston Edison as well. As confirmed by the Government, no DCSs or FDSs for Boston Edison have ever been approved.[2]

While the March 13, 1997 DOE letter to Commonwealth Edison is in several respects similar to the November 24, 1998 DOE letter received by Boston Edison, the Commonwealth Edison letter is important for two reasons. First, it confirms an earlier date for DOE's suspension of the DCS/FDS process as a vehicle for Standard Contract

[2] Counsel for the Government informed Boston Edison's counsel on September 8, 2004 that after reviewing its files it could confirm that no FDSs or DCSs for Boston Edison had ever been approved.

administration. Second, the Commonwealth letter specifically links this suspension with DOE's contemporaneous prediction that it would not in fact commence SNF disposal by the January 31, 1998 deadline (referred to in the Commonwealth letter as an "anticipated delay"). The March 13, 1997 DOE letter to Commonwealth Edison also states:

> As you know, my letter of December 17, 1996, invited submission of views by all contract holders on how the anticipated delay can best be accommodated. The Department looks forward to receipt of those views by March 14, 1997, and will advise you promptly of further developments in this program as they occur.

Specifically, due to the fact that the early suspension of the DCS/FDS process was initiated by DOE, and was prompted by its then-current belief that SNF disposal would not in fact commence on January 31, 1998, it is particularly inappropriate and unseemly that the Government would attempt to utilize Boston Edison's DCS/FDS experience for defensive purposes at this juncture.[3]

---

[3] At the hearing conducted by this Court on August 31, 2004, there was considerable colloquy as to the significance of the Court's June 2, 2004 opinion in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004), and that decision's limitation of the treatment of DCSs, *see id.* at 671 n.7, to "the purposes of this [viz. TVA's] case." It is important to keep in mind that in *TVA*, the DCS process was being used for a much different purpose than is sought by the Government here. In *TVA*, the court was grappling with causation issues as to SNF storage mitigation costs which had actually been incurred, and attempting to link those out-of-pocket costs with expenditures that may or may not have been incurred anyway in the absence of a DOE breach. In *TVA*, presumably this and possibly other candidate "but for" tests will be considered in a specific factual setting during an upcoming trial. As *TVA* came before the court, the plaintiff was able to concede the Government's DCS arguments because this strategic concession simplified the establishment of causation for purposes of quantifying damages. Here, the DCS argument is being pressed by the Government for a much different purpose not present in *TVA*. There will be time enough in this case for Boston Edison to establish the foreseeability and proximity of its damages relative to the Government's breach, a task that is made significantly easier by Boston Edison's assignment of its Standard Contract and associated nuclear assets on July 13, 1999, at a time when all of the Government's contract administration processes remained suspended and DOE's breach of its January 31, 1998 SNF disposal obligations had already occurred.

## II. THE GOVERNMENT'S BREACH IS MEASURED FROM ITS FAILURE TO PERFORM "NOT LATER THAN JANUARY 31, 1998," AND NOT FROM THE DCS OR FDS FUEL PICK-UP DATES

It bears repeating that the Federal Circuit has consistently held that the Government breached the Standard Contract on January 31, 1998, a decision that binds this Court with respect to pending motions. The Government argues that the Federal Circuit's decision in *Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000), is not binding on this Court because the Federal Circuit was not faced with the same legal arguments that are now being proffered in this matter. The Government is incorrect, and mischaracterizes the earlier litigation.

Here, just as in *Maine Yankee*, the Government argues that the Standard Contract was not breached because Boston Edison did not suffer an injury in fact, and that Boston Edison's claims should therefore be dismissed. Like *Maine Yankee*, the Government argues that Boston Edison's position in the SNF delivery queue somehow trumps the express statutory and contractual deadline of January 31, 1998. Judge Merow expressly rejected the identical argument – that Maine Yankee Atomic Power Company did not sustain actual injury until SNF pick-up was to have occurred some time after January 31, 1998. *See Maine Yankee Atomic Power Co. v. United States,* 42 Fed. Cl. 582 (1998), *aff'd*, 225 F.3d 1336 (Fed. Cir. 2000). Judge Merow characterized the Government's argument, and then rejected it, as follows:

> The most recent APR/ACR[4] was issued by DOE in March 1995. The excerpt provided by defendant indicates that DOE does not

[4] Pursuant to Article IV.B.5(a) of the Standard Contract, DOE is obligated to issue an annual acceptance priority ranking ("APR") by April 1, 1991, for receipt of SNF at the DOE repository. DOE was also required to issue, no later than July 1, 1987, an ACR for planning purposes. Standard Contract Art. IV.B.5(b). The Government has previously argued in other SNF proceedings that its ACRs and APRs established "a framework for definitizing a specific rate of SNF acceptance" that would then be reflected in utilities' DCS submissions. Defendant's Motion for Partial Summary Judgment Regarding the

> plan to begin disposing of Maine Yankee's SNF in the repository until the second year of its operation. According to the government, this means that:
>
> "Had a permanent repository constructed under the NWPA been available to DOE in January, 1998, for use in meeting its NWPA disposal obligations, calendar year 1998 would have been 'year one' in the disposal queue. Maine Yankee had no disposal allocations in year one of the disposal queue; hence, none of its fuel would have been subject to NWPA disposal during calendar year 1998 even had the NWPA repository been constructed."
>
> Defendant argues that "[b]ecause Maine Yankee had no entitlement to disposal of its SNF during 1998, *its complaint should be dismissed as unripe for decision since Maine Yankee has not yet suffered any injury in fact.*" "Maine Yankee's claim is not ripe because DOE's obligation to begin disposal of Maine Yankee's SNF does not require any removal of SNF before 1999."
>
> The APR/ACR issued by DOE may indeed indicate that, had a permanent repository been available in 1998, DOE would not have begun disposing of Maine Yankee's SNF in that repository until 1999. However, it does not follow that Maine Yankee "had no entitlement to disposal of its SNF during 1998," or that "DOE's obligation to begin disposal of Maine Yankee's SNF does not require any removal of SNF before 1999." *On the contrary, under Article II of the Standard Contract, DOE was obligated to begin accepting, transporting, and disposing of Maine Yankee's SNF "not later than January 31, 1998." Aside from Maine Yankee's duty to pay fees (which it has done), DOE's obligation under Article II is without qualification or condition – i.e., it is not qualified by or conditioned on either the information DOE includes in the APR/ACRs or the existence of a permanent repository constructed pursuant to the NWPA.*

*Id.* at 583 (emphasis added) (citations omitted).

The Government then appealed Judge Merow's decision to the Federal Circuit (along with appeals from Yankee Atomic and Connecticut Yankee Power Company), which held that his interpretation of the January 31, 1998 deadline was correct. *Maine Yankee*, 225 F.3d at 1342. The court held:

> The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no

---

Rate of Spent Nuclear Fuel Acceptance at 11-14 (filed Dec. 12, 2001), *Commonwealth Edison*, 56 Fed. Cl. 652 (No. 98-621 C).

> later than January 31, 1998. . . . As the Court of Federal Claims noted, the parties do not dispute "that Yankee has paid all the contract fees and . . . that DOE has not begun accepting, transporting, and disposing of Yankee's SNF. Accordingly, DOE has breached the contract."

225 F.3d at 1343 (citing *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 235 (1998)). Indeed, the Federal Circuit found a breach of each and every Standard Contract as of January 31, 1998, even though "[a]t present there are no schedules containing specific dates for disposing of the waste of particular companies." *Id.* at 1342. Indeed, the Federal Circuit had already come to the same conclusion previously in *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000), when it held that DOE had breached the "statutory and contractual deadline of January 31, 1998."

Recognizing the devastating impact of the Federal Circuit's *Maine Yankee* conclusion that there were "no schedules containing specific dates," the Government then petitioned for rehearing *en banc*, specifically requesting the court to clarify

> that, in making its statement, the panel meant only that, at the present time, DOE has not identified any schedule upon which it actually will perform SNF acceptance in the future and that it was not ruling upon the weight or force of the 1995 capacity report and priority ranking, or any other previously published schedules, upon any party's damages claims.

Petition for Rehearing and Suggestion for Rehearing *En Banc* at 15 (Nov. 15, 2000), *Maine Yankee Atomic Power Co. v. United States*, Nos. 99-5138 et al., attached hereto as Exhibit 4. The Federal Circuit denied the Government's request. *See Maine Yankee*, 225 F.3d 1336, *reh'g denied, in banc suggestion declined* (Dec. 12, 2000).

The arguments made by the Government and rejected in *Maine Yankee* are identical to the DCS/FDS arguments now being reprised before this Court. In all such instances, the Government asserts that an SNF plaintiff's position in the queue (whether established through the ACR, APR, and/or DCS) defines the Government's obligations

to that utility, and therefore determines the date of the Government's breach. Judge Merow rejected that theory, the Federal Circuit reached the same conclusion on at least two occasions, and then denied reconsideration *en banc*.

The Government should not now be heard to argue, as it did at the August 31 hearing, that no breach occurred because DOE was allegedly not scheduled to pick up Boston Edison's SNF until after the sale of the Pilgrim facility. At the August 31, 2004 hearing, the Court specifically asked the Government:

> THE COURT: . . . In this case, if I can summarize your position on standing, it is as I understand it: no breach occurred prior to the sale by Boston Edison of the plant, or no damages occurred?
>
> MR. LESTER: Well, no breach that runs specifically to Boston occurred. The breach here is the breach of DOE's obligation to accept fuel from Boston.

Transcript of Hearing dated Aug. 31, 2004, at 11-12. This is precisely the argument rejected by Judge Merow and affirmed by the Federal Circuit. The Federal Circuit specifically found that the obligation to which the Government refers arose on January 31, 1998 and no later (or earlier), and was breached when DOE disposal activities did not commence on that date.

The Government's DCS arguments here simply cannot be reconciled with the Federal Circuit's previous rulings relating to the Government's breach. Each of the utilities in these cases had approved DCSs that specified SNF delivery *after* January 31, 1998 (in Maine Yankee's case, over a year after the January 31, 1998 deadline), and yet the court unanimously concluded that the date of breach occurred on January 31, 1998. Boston Edison respectfully requests that this Court's ruling adhere to and conform with the Federal Circuit's previous decisions. As discussed in greater detail in Boston Edison's Opposition and Reply briefs, the Government's DCS argument is not only

inconsistent with the express language of the Nuclear Waste Policy Act of 1982 (the "NWPA") and the Standard Contract, but has been rejected by every court that has entertained it. These decisions unanimously hold that the Government's breach occurred as of the January 31, 1998 date when it failed to have an operational repository in place for permanent SNF disposal, as required by the NWPA and the Standard Contract.[5]

It necessarily follows that the Government's breach was not limited to failing to dispose only of particular or discrete units of SNF. Indulgence of such an interpretation, particularly when it has been established that by the late 1990s the Government's contract administration practices had already been tainted and corrupted by litigation defense strategies (*see* Zabransky Dep. at 352), would only give the Government a free pass to walk away from its obligations with impunity, and without incurring any liability, by the simple device of making self-serving determinations under the DCS approval process. Such a path would render the Standard Contract "illusory." *See Commonwealth Edison*, 56 Fed. Cl. at 664.

The Government's assertion that Boston Edison lacks standing because Boston Edison sold Pilgrim and assigned its Standard Contract to Entergy Nuclear Generating Company, LLC before any right to SNF acceptance accrued is also premised on the faulty notion that only a DCS can trigger DOE's obligations. To this end, the

[5] As set forth in Boston Edison's earlier memoranda, a central objective of the NWPA was to equate supply and demand for disposal services by creating a market for queue positions in which Standard Contract holders with more exigent needs would exchange queue positions on mutually agreeable bases. Standard Contract holders had invested billions of dollars in obtaining such rights, and everything turned on disposal activities beginning by January 31, 1998. All Standard Contract holders were thwarted when this date passed without the commencement of disposal activities. It is thus no small wonder that the Federal Circuit concluded that the Government breached *all* of the Standard Contracts by failing to commence disposal of *any* SNF by January 31, 1998.

Government maintains that the January 31, 1998 deadline was not binding on the Government with respect to Boston Edison, but rather, "was a statutory deadline by which DOE was required *to begin its program of accepting SNF from the contract holders as a collective whole*." Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment Upon Counts I and II and for Summary Judgment Upon Count III of Plaintiff's Amended Complaint, dated Apr. 30, 2004, at 10 (emphasis in original). The Government's argument, however, ignores the plain language of the NWPA and the Standard Contract, both of which expressly obligate DOE to begin disposal of *Boston Edison's* SNF by a date certain – "not later than January 31, 1998." Standard Contract Art. II.

The Government's obligation to the utilities, including Boston Edison, was "'without qualification or condition,'" *Northern States,* 128 F.3d at 757 (quoting *Ind. Mich. Power Co. v. Dep't of Energy,* 88 F.3d 1272, 1273 (D.C. Cir. 1996)), and, thus, essential to Boston Edison's obligation to pay the fees into the NWF. *See Indiana Michigan,* 88 F.3d 1276-77. Boston Edison timely paid in excess of $89 million in fees to DOE in express reliance on DOE's obligation to take custody of Pilgrim's SNF by January 31, 1998. Am. Compl. ¶ 31. It is undisputed that DOE failed to meet its obligation to begin disposal on January 31, 1998, and instead announced that disposal activities would not even begin until at least a decade hence. Defendant's Proposed Findings of Uncontroverted Fact, dated Apr. 30, 2004, No. 37.

Moreover, from a legislative perspective Congress found the January 31, 1998 acceptance date "so important when it promulgated the [NWPA] that it took the unusual action of specifying that all the contracts must contain this explicit requirement." *Maine Yankee,* 225 F.3d at 1342. Indeed, Congress demonstrated a strong

"intent that DOE's various obligations be performed in a timely manner." *Indiana Michigan*, 88 F.3d at 1277 (citing *Tennessee v. Herrington*, 806 F.2d 642, 648 (6th Cir. 1986) ("'[T]he overall structure of the [NWPA] does reveal a consistent concern for timely implementation of the disposal provisions.'")). "DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that contravene this court's prior ruling." *Northern States*, 128 F.3d at 760.

Given this series of consistent and explicit rulings as to the nature and timing of DOE's obligations, the only reasonable interpretation of the Standard Contract and the NWPA is that the January 31, 1998 deadline to commence actual disposal was an express, material, and unconditional obligation of the Government. The Government's repeated attempts to utilize the DCS process to achieve a different result seek to render that obligation meaningless, and contravene the express intent of Congress, as has now been confirmed by innumerable courts.

## III. THE D.C. CIRCUIT HAS REFERRED ALL CLAIMS REGARDING FEE ASSESSMENTS, INCLUDING BREACH AND TAKINGS CLAIMS, TO THE COURT OF FEDERAL CLAIMS

Boston Edison's claims relating to DOE's NWF fee assessment and collection practices are properly before this Court in the context of Boston Edison's breach and takings claims. The Government argues that the Court of Federal Claims "lacks jurisdiction to adjudicate plaintiff's challenge to the legality of DOE's actions concerning the collection of fees under the NWF." Defendant's Motion for Leave to Exceed the Page Limit in Defendant's Reply to Motion to Dismiss or, in the Alternative, for Summary Judgment, and Defendant's Response to Plaintiff's Cross Motion for Summary Judgment on Liability, dated Aug. 26, 2004, at 35. Rather, according to the

Government, these claims must be brought before the U.S. courts of appeals. *Id.* at 35-37, 40-41. The Government's earnest assertions here can only be read side by side with its assertions in the Court of Appeals for the District of Columbia Circuit, where the Government contended that that court lacked jurisdiction to adjudicate NWF claims as well.

A number of SNF plaintiffs, including Consolidated Edison Company of New York, Inc., Consumers Energy Company, Illinois Power Company, Pacific Gas and Electric Company, and Rochester Gas and Electric Corporation, brought just such NWF fee challenges before the D.C. Circuit in 1998, arguing that DOE's NWF fee assessment practices were improper and in violation of the NWPA. *See Consolidated Edison*, 1999 WL 325517. There, the Government argued that the D.C. Circuit lacked "jurisdiction" because the D.C. Circuit's prior decision in *Northern States*, 128 F.3d 754, had held such claims should be litigated in the Court of Federal Claims. *See* Respondent's Motion to Dismiss Petition at 8 (filed Jan. 19, 1999), *Northern States*, 128 F.3d 754 (Nos. 97-1064 et al.).

In that instance the D.C. Circuit agreed with the Government. Citing its *Northern States* decision, it relegated litigants contesting DOE's fee assessment practices to the Court of Federal Claims. *See Consolidated Edison*, 1999 WL 325517. It is inconsistent and incorrect for the Government to now argue, once NWF claims have in fact been brought in the Court of Federal Claims, that these claims may only be brought before the D.C. Circuit, when it previously argued that such claims could not be raised there either. A copy of the Government's briefs and the D.C. Circuit's order are attached hereto as Exhibit 5.

Date: September 10, 2004

Respectfully submitted,

s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffrey P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street
17th Floor
Boston, MA 02199-0228

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on September 10, 2004 a copy of the foregoing Plaintiff Boston Edison Company's Post-Hearing Report was filed electronically. I understand that the notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*