# EXHIBIT 4

Nos. 99-5138, -5139, -5140

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MAINE YANKEE ATOMIC POWER COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY,
and YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiffs-Appellees,

v.

THE UNITED STATES,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN 98-CV-474, 98-CV-154 AND 98-CV-126, SENIOR JUDGE JAMES M. MEROW

## PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC


DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D. C. 20530
Tele: (202) 307-6288

Attorneys for Defendant-Appellant

OF COUNSEL:

MARC JOHNSTON
L. DOW DAVIS, IV
JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530


November 15, 2000

TABLE OF CONTENTS


| | Page |
|---|---|
| PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC | 1 |
| POINTS OF LAW OVERLOOKED OR MISAPPREHENDED BY THE COURT | 1 |
| STATEMENT OF THE CASE | 1 |
| ARGUMENT | 9 |
| I. THE PANEL ERRED IN HOLDING THAT THE "AVOIDABLE DELAYS" CLAUSE IS LIMITED TO DELAYS AFTER SNF ACCEPTANCE HAS COMMENCED | 9 |
| II. THE COURT SHOULD CLARIFY A STATEMENT IN ITS DECISION REGARDING THE CURRENT EXISTENCE OF AN ACCEPTANCE SCHEDULE | 13 |
| CONCLUSION | 15 |

## TABLE OF AUTHORITIES

CASES PAGE(S)

Connecticut Yankee Atomic Power Co. v. United States, 42 Fed. Cl. 448 (1998), aff'd, No. 99-5139 (Fed. Cir. Aug. 31, 2000) . . . . . . . . . . . . . 7

Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . . 9, 10

Len Co. & Associates v. United States, 385 F.2d 438 (Ct. Cl. 1967) . . . . . . . . . . . . 12

Maine Yankee Atomic Power Co. v. United States, 42 Fed. Cl. 582 (1998), aff'd, (Fed. Cir. Aug. 31, 2000) . . . . . . . . . . . . . 7

McKart v. United States, 395 U.S. 185 (1969) . . . . . . . . . . . . . . . . 13

Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 540 (1998) . . . . . . . . . . . . . . 5

Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) . . . . . . . . . . 8

Northern States Power Co. v. United States, 43 Fed. Cl. 374 (1999), rev'd, No. 99-5096 (Fed. Cir. Aug. 31, 2000) . . . . . . . . . . . . 7

Schlesinger v. United States, 383 F.2d 1004 (Ct. Cl. 1967) . . . . . . . . . . . . 13

Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), aff'd, (Fed. Cir. Aug. 31, 2000) . . . . . . . . . . . . . 6

TABLE OF AUTHORITIES (cont'd)


| STATUTES AND REGULATIONS | PAGE(S) |
|---|---|
| 41 U.S.C. §§ 601-613 . . . . . . . . . . . . . . . . . . | 3 |
| 42 U.S.C. §§ 10101-10270 . . . . . . . . . . . . . . . . | 1 |
| 42 U.S.C. § 10131 . . . . . . . . . . . . . . . . . . . | 2 |
| 42 U.S.C. § 10133 . . . . . . . . . . . . . . . . . . . | 4 |
| 42 U.S.C. § 10165 . . . . . . . . . . . . . . . . . . . | 5 |
| 42 U.S.C. § 10168 . . . . . . . . . . . . . . . . . . . | 5 |
| 10 C.F.R. § 901.11 (1999) . . . . . . . . . . . . . . . . | **passim** |
| 60 Fed. Reg. 21793 (May 3, 1995) . . . . . . . . . . . . | 5 |

STATEMENT OF COUNSEL

1. Based upon my professional judgment, I believe the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedent(s) of this court:

United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 (1966)

United States v. Joseph A. Holpuch Co., 328 U.S. 234 (1946)

United States v. Utah Construction & Mining Co., 384 U.S. 394 (1966)

Len Co. v. United States, 385 F.2d 438 (Ct. Cl. 1967)

McKart v. United States, 395 U.S. 185 (1969)

Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991)

2. Based upon my professional judgment, I believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance:

Whether the plain meaning of the contract phrase "any delay in the delivery, acceptance or transport of SNF [spent nuclear fuel] and/or HLW [high-level radioactive waste]" requires that the phrase apply to "any" delay in "acceptance," rather than solely to delays after the parties have begun performing certain unspecified obligations under the contract.

3. In addition to the question identified in paragraph 2, the petition for review also requests that the Court clarify a sentence in its panel decision to eliminate any possible

confusion regarding the effect of previously issued schedules for spent nuclear fuel acceptance.

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

Attorney of Record for Defendant-Appellee,
The United States

PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Pursuant to Rules 35 and 40 of this Court's rules, the United States respectfully petitions this Court for rehearing and suggests rehearing en banc of the panel decision issued in these consolidated appeals on August 31, 2000.

POINTS OF LAW OVERLOOKED
OR MISAPPREHENDED BY THE COURT

1. The panel erroneously interpreted the plain meaning of the contract phrase "any delay in the delivery, acceptance or transport of SNF [spent nuclear fuel] and/or HLW [high-level radioactive waste]" by holding that the phrase does not apply to "any" delay in "acceptance," but applies only after the parties have begun performing certain unspecified contract obligations.

2. The Court should clarify a sentence in its opinion to eliminate any possible confusion regarding the scope of its decision with regard to the effect of previously issued schedules for spent nuclear fuel acceptance.

STATEMENT OF THE CASE

The Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270 (1994), authorized the Secretary of Energy to enter into contracts with generators of high-level radioactive waste and spent nuclear fuel – mostly commercial nuclear power utilities – through which, in return for the commercial utilities' payment of fees into the Nuclear Waste Fund ("NWF"), DOE agreed to start, beginning not later than January 31, 1998, accepting and

disposing of spent nuclear fuel and high-level radioactive waste ("SNF") created by the utilities' production of nuclear power. The NWPA, however, mandates that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel," id. § 10131(a)(4), and ensures that those costs "will be borne by the persons responsible for generating such [SNF]." Id. § 10131(b).

In 1983, DOE promulgated a standard contract through notice and comment rulemaking, 10 C.F.R. § 960.11 (1999), and entered into standard contracts with each nuclear utility. Under these standard contracts, each utility pays (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mill per kilowatt-hour on electricity generated and sold by the utility's nuclear power reactor. JA96-100.[1] DOE is annually to review the adequacy of the quarterly fee amount and adjust it, "if necessary," to "assure full cost recovery by the Government." JA98.

Although the standard contract requires DOE to begin acceptance of SNF by January 31, 1998, it contains two clauses governing damages for delays in acceptance of the SNF. First, pursuant to Article IX.A, entitled "Unavoidable Delays," the Government will not be liable for damages caused by delays in

---

[1] "JA___" refers to the parties' joint appendix in these appeals, dated February 14, 2000.

scheduled acceptance or transport of SNF "[i]n the event [that] circumstances beyond the control of . . . DOE" caused those delays. JA102. Second, under Article IX.B, entitled "Avoidable Delays," the contract provides for an equitable adjustment in "the charges and schedules specified by this contract" for "any delay" in acceptance within the reasonable control of DOE:

> In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

JA103 (10 C.F.R. § 961.11, Art. IX.B (1999)).

In addition, the standard contract contains a "disputes" clause, Article XVI, that establishes a mandatory administrative process for resolving disputes "arising under" the contract, similar to those included in Government contracts before the Contract Disputes Act, 41 U.S.C. §§ 601-613 (1994). JA106. The "disputes" clause requires the utility to submit a claim to the DOE contracting officer and, for utility claims of more than $50,000, a claim certification. Id.

The standard contract also identified additional responsibilities for DOE. Pursuant to Article IV(B) of the standard contract, DOE was to issue an annual acceptance priority ranking for receipt of SNF beginning on April 1, 1991, based upon the age

of SNF as calculated from the date of SNF discharge from civilian nuclear power reactors; issue an extensive and complex annual capacity report for planning purposes beginning not later than July 1, 1987, setting forth the projected annual receiving capacity for the DOE facility and the annual acceptance ranking for SNF disposal; and annually provide pertinent information on the waste disposal program such as cost projections, project plans, and progress reports. JA89. DOE has expended substantial time, effort, and resources in performing these responsibilities. See, e.g., JA152-61, 170-79, 229-30. Further, DOE has expended billions of dollars in attempting to develop an appropriate repository for SNF disposal. JA152-61.

In 1987, Congress designated Yucca Mountain in Nevada as a potential site for a permanent repository. 42 U.S.C. § 10133(a). Further, the 1987 amendments to the NWPA prohibited DOE from developing a facility for interim storage of the commercial SNF until DOE obtains a license from the Nuclear Regulatory Commission ("NRC") for construction of a permanent repository. Before DOE may apply for this license, DOE must complete the extensive and lengthy process of obtaining congressional approval of the Yucca Mountain site.[2] DOE has publicly represented that,

---

[2] Before applying for a license, DOE must first complete the scientific investigation, environmental review, and public participation process required by law to determine whether to recommend the site to the President for approval. If the site is approved by the Secretary and the President, the State of Nevada

at the present time, it anticipates that the Federal repository will not be operational until 2010. 60 Fed. Reg. 21793, 21794 (May 3, 1995); JA159.

DOE's inability to begin acceptance of the SNF by January 31, 1998 has resulted in two different tracks of litigation. The first set of cases was filed by utilities which had paid fees to the Secretary of Energy under the NWPA and by state public utility commissions. These cases were filed in the United States Court of Appeals for the D.C. Circuit, as permitted by section 119 of the NWPA, seeking to require, among other things, specific performance of the terms of the standard contracts requiring DOE to begin disposal of SNF by January 31, 1998. The D.C. Circuit denied the utilities' demand for specific performance, finding that the standard contracts' remedial scheme offers a potentially adequate remedy to the utilities. Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 758-59, 761 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 540 (1998). That court, however, also issued a writ of mandamus precluding DOE from excusing its delay in beginning disposal efforts by arguing that "unavoidable delays" have prevented it from having available a permanent repository or interim storage facility. Id. at 760.

---

may disapprove of the designation. Congress may override the disapproval. Only when a site designation becomes effective can DOE submit a license application to the NRC. Id. §§ 10165(b) & (g), 10168(d)(1); JA160-61.

A second set of lawsuits is currently pending before the United States Court of Federal Claims. To date, utilities have filed 12 complaints in that court, seeking damages ranging from $70 million to $1.5 billion, and totaling several billion dollars, for alleged breaches of contract and takings under the Fifth Amendment. The Government sought dismissal of several cases because the utilities had failed to exhaust the administrative remedies that the "Avoidable Delays" and "Disputes" clauses in the standard contracts require, through submission of a request for an equitable adjustment to the DOE contracting officer followed by an appeal to the Energy Board of Contract Appeals.

On October 29, 1998, and April 6, 1999, two judges at the Court of Federal Claims issued conflicting decisions regarding the necessity of administrative exhaustion. Although both judges agreed that DOE's delay in beginning SNF acceptance constituted a delay cognizable under the plain language of the standard contract's "Avoidable Delays" provision, they disagreed regarding whether the clause provided the exclusive remedy for the delay. Senior Judge Merow, in Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), determined that the standard contract did not expressly state that the "Avoidable Delays" clause was an exclusive remedy, that the utility therefore had to proceed under the administrative process only if it could obtain

"complete relief" administratively, and that, because the Government had not proven that the utility would be able to obtain administratively all of the damages that it could in a breach action, the clause did not provide adequate relief.[3] However, Judge Wiese disagreed, finding in Northern States Power Co. v. United States, 43 Fed. Cl. 374 (1999), that (1) the administrative remedy of an equitable adjustment to the charges and schedule specified by the contract, as contained in the "Avoidable Delays" clause, was, pursuant to the plain language of the contract, the mandatory and exclusive remedy for any "avoidable" delay in beginning acceptance of the SNF and that (2) the clause provided the "complete relief" that the parties had agreed would represent full compensation for any damages arising out of any such delay.

The plaintiff in Northern States filed an appeal of Judge Wiese's decision, and the Government filed consolidated interlocutory appeals in Yankee Atomic, Connecticut Yankee, and Maine Yankee. On appeal, a panel of this Court rejected the rationale of both judges. The panel decided that the "Avoidable Delays" clause, on its face, does not cover "any" delay in the "acceptance" of SNF by DOE, but instead is "a more limited

[3] Senior Judge Merow made similar jurisdictional findings in Connecticut Yankee Atomic Power Co. v. United States, 42 Fed. Cl. 448 (1998), and Maine Yankee Atomic Power Co. v. United States, 42 Fed. Cl. 582 (1998).

[provision] dealing with specified kinds of delays" that arise after the parties "have begun performance of their obligations relating to disposal of the nuclear waste." Addendum, at 10-11; see Northern States Power Co. v. United States, 224 F.3d 1361, 1367 (Fed. Cir. 2000) (delays provision "deals with delays arising after performance of the contract has begun"). Although DOE had performed many of the tasks required under the contract terms, such as mandatory preparation and issuance of annual rankings and acceptance schedules as required by section IV.B of the contract, the panel determined that, because DOE had not begun SNF disposal, it had not sufficiently begun performance to trigger the "Avoidable Delays" clause. Addendum, at 10-11. The panel further stated that the Government's interpretation of the clause as applying to "any delay" in SNF acceptance, regardless of the stage of contract performance, "may be a possible interpretation and application of the provision," but that "it is neither plausible nor persuasive, and certainly is not preferred." Id. It further stated, without elaboration, that the "limited relief available under the excusable delays provision also leads to the conclusion that 'complete relief' would not be available for [the utility] under that provision, so that [the utility] is not precluded from seeking judicial relief by its failure to invoke the contract's disputes clause." Id. at 12-13.

ARGUMENT

I. THE PANEL ERRED IN HOLDING THAT THE "AVOIDABLE DELAYS" CLAUSE IS LIMITED TO DELAYS AFTER SNF ACCEPTANCE HAS COMMENCED

The panel's decision - that the plain language of the "Avoidable Delays" clause refers only to those delays that begin after SNF acceptance has commenced - is unsupported by the language of the clause itself. To the contrary, that clause is expressly applicable to "any delay" in SNF acceptance. The panel even acknowledges that the Government's interpretation of the clause "may be a possible interpretation and application of the provision," but concludes that "it is neither plausible nor persuasive, and certainly is not preferred." Addendum, at 10-11. However, the panel cites nothing - neither legislative or regulatory history, nor limiting provisions found elsewhere in the standard contract - to support its restricted interpretation of the clause.

The panel's interpretation of the "Avoidable Delays" clause, which essentially adds restrictive language not found in the clause or the contract themselves, directly conflicts with basic Government contract interpretation principles. Courts are required to interpret provisions in accordance with their plain language, without adding restrictions or meanings that are not evident from the plain language of the contract. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). The plain

language of the "Avoidable Delays" clause does not contain the restrictions that the panel has placed upon it.

Further, the panel's interpretation of the delays clause renders portions of the contract superfluous, in violation of standard Government contract interpretation principles. Gould, 935 F.2d at 1274. Since the delays clause applies not only to "any delay" in SNF acceptance, but also to "any delay" in SNF "transport," the panel's decision that the delays clause applies only to delays after SNF acceptance has begun would, to be consistent, require that the clause apply only to delays in SNF transport only after SNF transport has begun. However, as soon as SNF transport begins, DOE is wholly responsible for the SNF. JA88, 95-96. Any delay in SNF transport after SNF transport has begun is, therefore, irrelevant to the utilities under the contract. The panel's interpretation of the delays clause as applying to delays in SNF acceptance only after SNF acceptance has begun renders the delays clause's application to delays in SNF transport either inconsistent or meaningless.

Even if the panel's restrictive interpretation of the clause were supported by the plain meaning of the contract language, DOE has been performing under this contract since 1983. The ultimate purpose underlying the NWPA, from which this contract arises, is DOE's development and implementation of a permanent Federal repository for storage of utility SNF. It is indisputable that

DOE has expended significant effort, as well as billions of dollars, to achieve this goal. Even assuming that DOE's significant work in developing the permanent repository did not constitute "performance" under the standard contract, DOE has fulfilled its prior express obligations under the contract to develop and issue, beginning in 1987, annual capacity reports and, beginning in 1991, acceptance priority rankings for all of the utilities' SNF, as required by section IV.B of the contract. Further, for many years, DOE has undertaken extensive work in reviewing and either accepting or rejecting the utilities' delivery commitment schedules, as required by section V.B. JA90, 162-64. The panel's assertion that DOE has not commenced its performance under the contract is unsupported by the record.

Finally, the panel's determination that the possible limited relief provided by the "Avoidable Delays" clause supports its restricted application is neither discussed nor supported by any case law. To the extent that the remedy of an equitable adjustment limited to "additional costs" contained in the standard contract is less or different than the amount of money damages that the utilities now seek, they are bound by the remedy to which they agreed in their contracts. We have found no binding precedent which even suggests that, if the parties agree to a specific remedy for an action that otherwise would constitute a breach of contract, the remedy is ineffective if the

agreement includes a definition of, or limitation upon, the available relief. Because the remedy in the contract is exclusive, it offers the utilities the "complete relief" under the contract to which they agreed and to which they are entitled.

"Complete relief" means that a claim arises under a specific provision of the contract and is made adjustable by or under it. In addressing this precise issue, the Court of Claims in Len Co. & Assoc. v. United States, 385 F.2d 438 (Ct. Cl. 1967), found that the administrative process is required if a substantive contract provision authorizes a specific type of relief to which the parties had agreed:

> The Supreme Court, this court, and the Armed Services Board have said on many occasions that disputes cannot "arise under" the contract and need not be presented to an administrative tribunal unless some substantive contract provision authorizes the granting of a specific type of relief.

Id. at 451 (footnote with citations omitted). The panel's assertion that the "Avoidable Delays" clause does not apply in this circumstance because the clause limits the type of relief available for delays to the utilities' "additional costs" resulting from the delays conflicts with this binding precedent.

Importantly, the effect of the panel's jurisdictional decision will be significant, particularly in light of the number of cases that utilities may file and the billions of dollars in damages that are already being sought in existing cases. Both

the Supreme Court and this Court have repeatedly emphasized the importance of strictly enforcing administrative exhaustion requirements in Government contracts. See, e.g., McKart v. United States, 395 U.S. 185, 193-94 (1969); Schlesinger v. United States, 383 F.2d 1004, 1007 (Ct. Cl. 1967). In these cases, with billions of dollars at stake, it is extremely important that the administrative agency have the first chance to apply its significant expertise to the complex technological issues that will drive the contract holders' contract claims. See McKart, 395 U.S. at 193-94. The plain language of the "Avoidable Delays" clause in the standard contract is clear - requiring that any claim relating to "any delay" in SNF acceptance proceed through an administrative process - and should be enforced.

## II. THE COURT SHOULD CLARIFY A STATEMENT IN ITS DECISION REGARDING THE CURRENT EXISTENCE OF AN ACCEPTANCE SCHEDULE

In its August 31, 2000 decision, the panel stated that "equitable adjustment of the contractual schedules would provide virtually no basis for compensating [the utility] for any damages it may have sustained from the Department's failure to perform its contractual obligations" because "[a]t present there are no schedules containing specific dates for disposing of the waste of particular companies." Addendum, at 12. We believe that the Court was referring to the absence of a schedule identifying the specific dates that DOE now anticipates that it will actually

accept the contract holders' SNF. However, it has been insinuated that the plaintiff utilities may attempt to argue that this statement means that the schedules that DOE published in 1995 are ineffective and provide no basis for computing damages in these cases.

The standard contract contained no mandatory schedule for SNF acceptance or disposal. Although the contract requires DOE to begin SNF acceptance by January 31, 1998, it does not mandate or reference the speed with which DOE must take the SNF, any minimum amount of SNF that DOE must accept each year, and any date by which DOE must complete its SNF acceptance. Instead, it required DOE to issue an annual capacity report and an annual SNF acceptance priority ranking identifying the projected annual receiving capacity for the utilities' SNF. JA89. Each utility subsequently would have to submit a delivery commitment schedule, based upon the capacity report and priority ranking, detailing acceptance dates and amounts for its SNF, which DOE could reject if the proposed delivery commitment schedule did not comport with the capacity report and priority ranking. JA90. In accordance with the standard contract, DOE issued capacity reports and priority rankings through 1995. See, e.g., JA159, 170-79. DOE has acknowledged that the 1995 capacity report and ranking represent the schedule by which DOE intended to accept the utilities' SNF. One of the main issues regarding the manner in

which damages will be measured in these cases may involve a comparison of the schedule by which DOE would have accepted, or was required to accept, SNF from the utilities, absent a delay, against the schedule by which DOE is now projected to accept it. In defending damages claims, we expect to rely upon these published acceptance schedules as the schedule under which DOE expected to perform its obligations.

It appears clear that the panel was not ruling upon the weight or force of the 1995 capacity report and priority ranking, as that issue was not before the panel in these appeals. However, to preclude any possibility that any argument may be made regarding the meaning, scope, and precedential value of the panel's statement, we respectfully request that the Court clarify that, in making its statement, the panel meant only that, at the present time, DOE has not identified any schedule upon which it actually will perform SNF acceptance in the future and that it was not ruling upon the weight or force of the 1995 capacity report and priority ranking, or any other previously published schedules, upon any party's damages claims.

CONCLUSION

For the reasons set forth above, this Court should grant our petition for rehearing and/or suggestion for rehearing *en banc*; vacate the panel's decision dated August 31, 2000; and reverse the trial court decisions at issue in these appeals.

Respectfully submitted,

DAVID W. OGDEN
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6288

OF COUNSEL:

MARC JOHNSTON
L. DOW DAVIS, IV
JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave, S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
Commercial Litigation
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant-Appellant

November 15, 2000