00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VOLUME 1
PAGES 1 - 227

| | | |
|---|---|---|
| BOSTON EDISON COMPANY, Plaintiff, v. UNITED STATES, Defendant. | ) | No. 99-447C |
| ENTERGY NUCLEAR GENERATION CO., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | No. 03-262C (Judge Lettow) |

DEPOSITION OF JOHN J. REED, a deponent in the above-entitled cause, taken before Susan Lozzi, Shorthand Reporter and Notary Public in and for Middlesex County, pursuant to Rule 30 of the Rules of the Court of Federal Claims, at the offices of NSTAR, 800 Boylston Street, Boston, Massachusetts, on Tuesday, October 3, 2006, commencing at 9:36 a.m.

ORIGINAL

APPEARANCES:

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W. - Room 12070
Washington, D.C. 20530
(202) 307-0226
For the Defendant, United States.
BY: ALAN J. LO RE, ESQ.

DICKSTEIN, SHAPIRO, LLP
1825 Eye Street - NW
Washington, D.C. 20006-5403
(202) 420-2235

For the Deponent, John J. Reed,
and the Plaintiff, Boston Edison Company.
BY: RICHARD J. CONWAY, ESQ.

WISE, CARTER, CHILD & CARAWAY, P.A.
1340 Echelon Parkway
Jackson, Mississippi 39213
(601) 368-5572
For the Plaintiff,
Entergy Nuclear Generation Company.
BY: L. JAGER SMITH, JR., ESQ.

ALSO PRESENT:
Joshua E. Gardner, Esq., U.S. Department of Justice.
Patrick Bryan, Esq., U.S. Department of Justice.
Nicholas Mattia, Esq., Dickstein, Shapiro.
Caroline O'Neill, Concentric Energy Advisors.
Bruce Biewald, Synapse Energy Economics, Inc.
Jonathan A. Neuberger, Economists Incorporated.

MR. CONWAY: I appreciate that.

BY MR. LO RE

Q. Let's go back to what's been marked as Reed Exhibit One. And under the heading Professional Experience, there are several headings: Strategic Planning, Litigation Support, Litigation Support, continued, Contract Negotiations. I'm on the second page. Mergers, Acquisitions, Divestitures and Project Development.

What I would like you to do for me, Mr. Reed, is take a look at these headings here and tell me, if you would, the work that you performed on the sale of the Pilgrim plant that relate to each of these different topics. In other words, if you can tell me whether there was strategic planning and utility restructuring work, litigation support, et cetera.

(Reviewing document.)

A. In our work on the Pilgrim sale, there were activities that involved strategic planning and utilities restructuring issues, yes.

Q. And can you describe what that is? And feel free to refer to this exhibit.

A. What comes to mind as examples are in the

Pilgrim sale a significant aspect of the due diligence that bidders wanted to do was on the projected shape, scope and substance of the deregulated power market post restructuring in New England and how this plant would fit into that restructured power market.

We wrote a chapter in the Offering Memorandum, for example, for Pilgrim that had to do with the restructured electric utility market in New England. So, certainly, those activities fall within the realm of utility restructuring.

Q. Anything else in that regard?

A. Since the sale was being undertaken in compliance with the settlement agreement and Restructuring Act that governed the quantification of stranded costs, those issues also certainly related to utility restructuring and to the regulatory process for approving stranded cost recovery. That's also in that category. That's what comes to mind.

Q. And with respect to strategic planning, did you have involvement in -- did you perform strategic planning analyses as part of your work on the Pilgrim sale -- sale of the Pilgrim asset?

A. No. I don't think anything that we did in that sale process would be something I would include within the category of strategic planning.

Q. How do you define "strategic planning"?

A. The development of long-term plans. That is, strategic plans for an organization based around the goals, objectives and financial targets that the company has developed.

Q. Did you look -- I want to back up even before your engagement on the Pilgrim sale. You also ran the auction for the sale of Boston Edison's fossil assets, is that right?

A. Yes.

Q. Did you perform any analysis, personally, or your company with respect to what the order of sale would be? In other words, whether Boston Edison would sell its fossil assets before selling its nuclear asset?

A. No. I don't think we prepared anything on that topic.

Q. Do you know why Boston chose to sell its fossil assets first?

A. I had a discussion with the company about that.

Q. Did you review this document prior to its submission?

A. Yes.

Q. Were you involved in the creation of this document?

A. Yes.

Q. What was your involvement?

A. I would say I had overall responsibility for the parts that were prepared by Reed Consulting Group.

Q. And what parts were that?

A. I was going to say is probably most of it.

Q. And who in Boston -- at Boston Edison reviewed this document, if you know, prior to its submission?

A. I know that Jeff Lubbock did. I'm not aware of who else may have been involved in its review.

Q. Were you actually retained through a specific retainer agreement for the divestiture of the Pilgrim asset? "You" meaning Reed Consulting.

A. I believe so, yes.

Q. And that was separate from the retainer agreement that you had for the sale of fossil

assets, is that right?

A. I believe they were separate.

Q. And do you recall when the retainer agreement with respect to the Pilgrim asset was actually executed?

A. Executed? No.

Q. Do you know when -- you stopped at the word "executed." Do you know when it was agreed upon and when it was signed?

A. I don't know when it was signed. I believe that we reached agreement on the terms of our retention in the first week of February of '98.

Q. First week in February. Okay. And the staff that you had on the -- for the Pilgrim sale, was it the same staff that you used for the fossil asset sale?

A. No. There were some new people on the Pilgrim sale, "new" meaning they had not worked on the fossil sale.

Q. And was there anybody who worked on the fossil sale who did not work on the nuclear sale?

A. Yes.

Q. Let's turn to page Bates number ending in 19 of this document, which is Reed Exhibit Two.

A. Okay.

Q. And it's a chart that's got the heading Senior Officers, Appendix A. Project Management, it says Lubbock and Reed. And, obviously, the Reed is you, is that right?

A. Yes.

Q. And then Lubbock, what was Mr. Lubbock's role with respect to the Divestiture Plan?

A. He was our manager. He was the internal project manager for the company, so he had day-to-day line responsibility for managing the effort.

Q. Did he have a staff at Boston Edison work over him?

A. He had staff members working for him and he had people assigned to him specifically for this project.

Q. And are those individuals set forth here on this chart?

A. Let's see. Marc Potkin, whose name is in the third box of the second row, had been assigned to do this project under Geoff's supervision.

Q. And what was Mr. Pitkin's role?

A. He was in charge of gathering all of the

data needed from the plant and providing bidder support for on-site due diligence at the plant.

Q. I see his name in two places. I see him under marketing, due diligence and bidder support and then I also see him under terms of sale in the sub box.

A. In the sub box labeled boundaries.

Q. Do you know what that means?

A. Yes. He was also responsible for helping to define the real estate boundaries of the parcel of land being sold.

Q. I see. Anybody else on this list -- on this chart, rather, who worked directly for Mr. Lubbock?

A. I'm not sure I'm aware of all of the reporting relationships within the company, but I'm not aware of anyone else on that list that I'm aware of that reported directly to Mr. Lubbock.

Q. Okay.

A. And Mr. Potkin, to be clear, was -- I think he reported to the plant vice president, but he was secondered to Geoff's team for this project.

Q. And he was a Boston Edison employee?

A. Yes.

wholesale contracts, transition contract/option, boundaries we talked about, and NRC issues, taxes purchase and sale.

Can you just briefly walk through all of those categories and tell me what they are and what the individuals next to those categories did, to your knowledge?

A. The issues surrounding labor have to do with how we're going to handle the transfer of employees, both management and bargaining unit.

That includes also establishing terms of employment for the new employees, retention agreements, transfer of pension assets and pension liabilities and other benefits, as well as any employment protections that we're going to impose on the purchaser.

Mr. Manning was in charge of labor relations at Boston Edison at the time. He was the internal lead. Ms. Colello was the lead at Reed Consulting Group at the time. And those two, basically, met to establish what they wanted to propose as the terms relating to all labor issues. Moving on down the list, wholesale contracts. This is the set of contracts that existed with EUA, with

00130

Commonwealth Electric or Com Energy and with the municipal power companies.

And the issues there were, again, developing terms as to how to handle those contracts and the sale. The first name there is Vaitkus. That is Paul Vaitkus. He was a Boston Edison employee in charge at that time of power purchases. And Mr. Mattia, Nick Mattia, was with Reed Consulting Group and one of the project team members.

Transition contract is the contract to buy power back from the plant for a period of years. That was being handled by Mr. Vaitkus for Boston Edison and Mr. John Dalton for RCG. And that was, again, specifying terms associated with that contract, purchase obligations, duration, remedies, and so forth.

Boundaries, it was defining exactly what we were selling, what we were keeping. It was everything from literally meets and bounds on the real estate to trucks, tours, ancillary equipment and other things. NRC issues was -- I should have said by the way, boundaries, that was Mr. Marc Potkin for Boston Edison and Mr. Michael Roach for

Reed Consulting Group. NRC issues was helping to ensure that whatever we did would ultimately be approvable by the NRC; and that had to do both with license transfer, decommissioning fund transfer, anything else having to do with the ongoing regulation of the property by the Nuclear Regulatory Commission. Taxes --

Q. That was Mr. Mattia?

A. That was Mr. Mattia. Taxes were establishing terms relating to property taxes, as well as any taxes for a capital gain and any taxes related to the transfer of the decommissioning trust funds. That was managed by Mr. Don Anastasia at Boston Edison and Mr. Nick Mattia for Reed Consulting Group.

And last on that list is the purchase and sale agreement, drafting terms in terms of everything from force majeure definitions and, again, all the legal language that goes with the P&S. That was headed up by Mr. Neven Rabadjija for Boston Edison and Mr. Nick Mattia for Reed Consulting Group.

Q. Okay, thank you. With respect to the box, the items that you just listed through this box, do

you know whether any of these issues involved a review or analysis related to DOE's Standard Contract with Boston Edison for the removal of spent nuclear fuel?

A. The purchase and sale team had some aspects of that issue and the NRC team had some aspects of that issue.

Q. And when you say "some aspects," do you know specifically?

A. The terms having to do with whether we transferred the claim for any breach of contract or diminished value claims was in the purchase and sale team. That also established the terms for the transfer of the decommissioning liability and decommissioning trust funds.

Q. Would that be under NRC issues?

A. No. That was under the purchase and sale.

Q. Okay.

A. The NRC issues related to getting NRC approval for that transfer of the decommissioning liability and decommissioning trust funds and any recourse back to the company. I should say the taxes group also had issues relating to the transfer of the decommissioning trust funds, but they weren't

really specific to SNF or SNF breach issues.
Q. Now, Mr. Mattia -- strike that. As the person who had responsibility from Reed Consulting for the terms of the sale, did you review the work that all these individuals did?
A. Yes.
Q. And did you take responsibility for the conclusions that they reached?
A. Ultimately, yes.
Q. And how about Mr. Lubbock? Did he review that work, as well?
A. Yes, he did. I thought you meant if I took responsibility for Mr. Lubbock.
Q. No. That's an unfair question. Do you know whether he took responsibility for that work, as well?
A. Yes.
Q. Was Mr. Mattia acting in his capacity as an attorney or a consultant for the terms of the sale?
A. As a consultant.
Q. And when you say that, what do you mean by that?
A. He worked for a consulting firm; not a

legal firm.

Q. I see. And as opposed to Mr. Rabadjija?

MR. CONWAY: Rabadjija.

MR. LO RE: Thank you.

A. Mr. Rabadjija was in-house counsel for Boston Edison. It's my understanding he was working as in-house attorneys -- an in-house attorney for the company.

Q. Let's look at marketing, due diligence and bidder support. What does that mean?

A. It was gathering all of the information necessary to draft marketing materials such as the Offering Memorandum. Supporting due diligence, which is all of the gathering of documentation provided to bidders and management of the Q&A process.

And bidder support, we had bidder handlers for each bidder. We had on-site bidder support for on-site tours and on-site due diligence and, basically, walking the bidders through the process.

Q. And with respect to due diligence, does due diligence actually include the review -- a detailed review of each bid?

A. No. That would be bid evaluation. Bid

00136

already done this. Could you just quickly go through the different bullets and explain what each of those are?

A. Bidder management was assigning a bidder representative to each bidder and handling all communications back and forth between the company, Reed Consulting Group, and the bidder.

Nuclear forum, I think this was -- this was a speaking engagement in an industry conference where we were using that conference to, as I recall, this is vague, to engage in marketing activities for the sale.

Direct marketing is the development of materials that are sent out to potential bidders, like the early interest letter. Documentation is gathering all of the documents we think a bidder would need to have access to to conduct due diligence.

We gathered many, many thousands of pages of documents and put them on CD's for bidders. The Offering Memorandum speaks for itself. It is roughly, as I recall, a 75 five-page document that provides the terms of the offering. Question and answer process is receiving the questions from

bidders at both stages of the auction and sending those questions out to the subject matter experts, getting answers back and providing the answers to the bidder.

And then site tours and meetings, it's the on-site due diligence where bidders would bring dozens of people on site to, basically, swarm through the plant over a four or five-day period.

Q. Kick the tires?

A. Kick the tires, yes.

Q. With respect to the bidder management, did you say that -- did Ms. Spada -- was she the point of contact for each of the bidders?

A. No. She assigned bidder reps to each of the bidders.

Q. Thank you.

A. But she had overall responsibility for it.

Q. Do you know who the bidder reps were for Entergy or was or were?

A. Who was the bidder rep for Entergy, specifically?

Q. Yes.

A. No, I don't recall.

Q. And how about Amergen?

A. Same answer. I don't recall.
Q. And then the last column says closing, and that is in-house counsel for Boston Edison and Mr. Mattia?
A. Yes. Those were the leads.
Q. And what was the activity that they pursued?
A. The pursuit of regulatory approvals and satisfaction of all closing conditions to actually be able to close on a sale.
Q. And then let me back up, if I may. Under marketing, due diligence and bidder support, do you know whether there were any issues related to the delay in the acceptance of spent nuclear fuel under that heading?
A. Certainly, there were. It was documented in the Offering Memorandum. It was documented in the documentation that was provided to bidders. It was the subject of several Q&A's. It may have also been discussed at site tours or meetings. I wasn't at all of those.
Q. And then with respect to closing, do you know whether there were issues related to the delay by DOE to accept spent nuclear fuel under the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VOLUME 2
PAGES 228 - 429

| | | |
|---|---|---|
| BOSTON EDISON COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | ) | No. 99-447C<br>No. 03-262C<br>(Judge Lettow) |
| ENTERGY NUCLEAR GENERATION CO.,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | |

DEPOSITION OF JOHN J. REED, a deponent in the above-entitled cause, taken before Susan Lozzi, Shorthand Reporter and Notary Public in and for Middlesex County, pursuant to Rule 30 of the Rules of the Court of Federal Claims, at the offices of NSTAR, 800 Boylston Street, Boston, Massachusetts, on Wednesday, October 4, 2006, commencing at 9:47 a.m.

ORIGINAL

APPEARANCES:

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W. - Room 12070
Washington, D.C. 20530
(202) 307-0226
For the Defendant, United States.
BY: ALAN J. LO RE, ESQ.

DICKSTEIN, SHAPIRO, LLP
1825 Eye Street - NW
Washington, D.C. 20006-5403
(202) 420-2235
For the Deponent, John J. Reed,
and the Plaintiff, Boston Edison Company.
BY: RICHARD J. CONWAY, ESQ.

WISE, CARTER, CHILD & CARAWAY, P.A.
1340 Echelon Parkway
Jackson, Mississippi 39213
(601) 368-5572
For the Plaintiff,
Entergy Nuclear Generation Company.
BY: L. JAGER SMITH, JR., ESQ.

ALSO PRESENT:
Joshua E. Gardner, Esq., U.S. Department of Justice.
Patrick Bryan, Esq., U.S. Department of Justice.
Nicholas Mattia, Esq., Dickstein, Shapiro.
Bradley D. Wine, Dickstein, Shapiro.
Bruce Biewald, Synapse Energy Economics, Inc.
Jonathan A. Neuberger, Economists Incorporated.

MR. CONWAY: Correct.

BY MR. LO RE

Q. Do you recall, Mr. Reed, ever representing to anyone at Entergy that our understanding is that this amount of funding, this $535 million at this point which is under negotiation, that is Boston Edison/Reed's understanding that that amount -- I'm talking now contemporaneous to the negotiations. Did you ever make a representation that this $535 million represents costs associated with spent fuel storage?

A. No. I don't think we ever made that representation.

(Exhibit No. 13; so marked.)

BY MR. LO RE

Q. Mr. Reed, the court reporter has handed you what's been marked as Reed Exhibit No. 13. Please take a moment to review it.

This document consists -- this exhibit consists of two letters: One dated -- first page dated October 30th, 1998, from Entergy by Mr. Donald Hintz to John J. Reed. Second page of this exhibit is a second letter dated October 29, 1998, from Donald C. Hintz of Entergy to John J. Reed.

(Reviewing document.)

Q. Mr. Reed, are you familiar with this exhibit?

A. Yes, I'm familiar with the documents.

Q. And what are these documents, sir?

A. The second page, which is the letter dated October 29th, 1998, appears to be a copy of the supplemental bid submitted by Entergy on that date in the Pilgrim sale process.

The first page, which is the letter dated October 30th, appears to be a copy of a revision to that supplemental bid that was submitted on October 30th, 1998.

Q. Now, what's happening on the ground here now with respect to the negotiations with Entergy, if you can tell me?

A. We are -- as I recall, at this stage of the bid evaluation process, we were comparing and contrasting the top two bids of which the Entergy bid was one, and we were seeking to maximize the value of the transaction by going back and allowing each of the two top bidders to supplement and prove their bid as they felt appropriate.

Q. And now Entergy's bid, and I'm looking at

the first page of Exhibit 13, Entergy's bid with respect to the decommissioning funding, what is their offer, as you understand it right now?

A. That they were seeking a decommissioning target, funding level, if you will, that ranged between 400 million and $466 million, assuming April 1st, 1999 close, depending on the level of the transferred funds that were qualified and non qualified.

Q. And the first sentence in this letter says, "This will confirm Entergy's approved supplemental bid dated October 29, 1998. This was faxed to you yesterday and confirmed as received by Nick Mattia." What was Mr. Mattia's role in this process at this point?

A. He was one of the staff members involved in the bid evaluation process.

Q. Was he part of the negotiations with Entergy Nuclear at this point?

A. I guess I would say he was supporting the negotiations. We had several people that were supporting the negotiations from Reed Consulting Group and from Boston Edison.

Q. Now, at this point, this range between 466

and $400 million for funding the decommissioning trust, at this point now, October 30th, did you have an understanding as to whether that range of funding included costs associated or included covering costs associated with spent fuel storage?

MR. CONWAY: Same objection as before. The question is incomplete.

A. At this date, I don't think I had an understanding as to how Entergy had arrived at those figures or what was included in their estimates and not included.

Q. Let me ask the other way. What was the amount that Boston Edison ultimately agreed to fund into the transfer, into the decommissioning fund?

A. As I recall, the purchase and sale agreement specified a range of 396 to 466, depending upon the resolution of the provisional trust.

The final amount that was arrived at in that range, I don't recall the exact figure. It was between 400 and a quarter and 25 million. I don't recall the exact number.

Q. I think we talked about this before. Was it your understanding that the amount that Entergy was -- strike that -- that Boston Edison was

transferring into the fund included costs associated with spent fuel storage?

MR. CONWAY: Objection. Same objection as before. Incomplete question.

A. Our understanding was that we were transferring funds sufficient to satisfy all of the decommissioning obligations that the buyer was taking on and that those obligations included obligations with regard to spent nuclear fuel.

Q. So the answer is, yes, you did expect that those dollars, at least some of those dollars were going to go to dry fuel -- spent fuel storage?

A. Yes.

Q. And we talked about Entergy personnel who you believed shared that understanding. Can you tell me if there was anyone else at Reed Consulting who shared that understanding with you?

A. Just to correct, I don't think we discussed any Entergy people that shared that understanding.

Q. I'm sorry. I meant to say Boston Edison. Thank you.

A. I don't know what was in the minds of other Reed Consulting Group people. I don't recall

discussing it with anyone else at the firm.

Q. Now, there is a reference here at the bottom of the first bullet. It says, "These decommissioning trust fund levels fully comply with 10CFR50.75 as amended September 22nd, 1998." Do you see that?

A. You're in the first bullet on the first page?

Q. First bullet, first page, yes.

A. Yes, I see that.

Q. Are you familiar with the funding levels required under 10CFR50.75?

A. If that's the regulation that I'm thinking of, I have a general understanding of that.

Q. What is the regulation that you're thinking of?

A. The minimum funding formula for decommissioning is established by the NRC.

Q. Do you know whether that minimum funding level includes costs associated with spent fuel storage?

A. My understanding is that it does not.

MR. LO RE: This is probably a good time to take a lunch break. Go off the record.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
BOSTON EDISON COMPANY: No. 99-447C
        Plaintiff    : No. 03-2626C
   vs.               :
THE UNITED STATES    :
        Defendant    :
______________________

ENTERGY NUCLEAR      :
GENERATION CO.,      :
        Plaintiff    :
   vs.               :
THE UNITED STATES    :
```

Deposition of Lisa Quilici

Washington, D.C.

November 29, 2006

Reported by: Bonnie L. Russo

JOB NO. 177989





006488c8-d925-48bb-a258-b4bc839b5cec

November 29, 2006

9:12 a.m.

Deposition of Lisa Quilici held at:

DICKSTEIN SHAPIRO, LLP
1825 Eye Street, N.W.
Washington, D.C.

Pursuant to notice, before Bonnie L. Russo, Notary Public





0O6488c8-d925-48bb-a258-b4bc839b5cec

Boston Edison?
A. The day-to-day contact at Boston Edison from the overall project perspective was Jeff Lubbock.
Q. Now, this chart 426 there is a reference here to Pilgrim. It says "NM and AS." Do you see that?
A. I do.
Q. And NM is Nick Mattia?
A. Correct.
Q. And do you know what Mr. Mattia's role was with respect to this chart that we are looking at here?
A. I believe Nick Mattia was the point person for Navigant in supporting Boston Edison's closing of the transaction with Pilgrim, for Pilgrim.
Q. And when you say "point person," what do you mean by that?
A. I believe he had day-to-day responsibility for whatever level of





006488c8-d925-48bb-a258-b4bc839b5cec

involvement the firm had in the closing activities for Pilgrim.

Q. And then it says "AS." That is Arthur Strain?

A. Correct.

Q. Who is Mr. Strain?

A. Mr. Strain is an individual who used to work for Boston Edison and who joined Navigant Consulting and I don't recall the time frame.

Q. When you refer to "closing activities," what do you understand that to be?

A. Closing activities entail completing all of the steps necessary to actually transfer ownership of a plant.

Q. And that is under a regulatory scheme; is that right?

A. A regulatory as well as a corporate scheme or structure.

Q. I see.

Now, are you familiar with the term





006488c8-d925-48bb-a258-b4bc839b5cec

projects.

Q. Of these boxes that we looked at, which would be the boxes or the tasks that would relate to reviewing bids, for instance?

A. Sometimes there are a whole other box that specifically bid evaluation, and review looking. At just these boxes here, it would likely come out of terms of sale and the marketing bidders' support boxes.

(Deposition Exhibit No. 4 was marked for identification.)

BY MR. Lo RE:

Q. Ms. Quilici, the court reporter has handed you what has been marked as Quilici 4. Please take a moment to review it.

This is a document entitled "Plaintiff Boston Edison Company Rule 26 Initial Disclosures" with a heading of the caption of this case, "Boston Edison versus United States and Entergy Nuclear Generation Company versus United States."

Before I make you read this entire document, I am really only interested in page 10 which has the heading "BECo Agents and Consultants."

A. May I ask a question?
Q. Yes.
A. What does the acronym DMSO stand for?
Q. I believe that is Dickstein Shapiro.
A. Sorry. Thank you.
What page did you want me to direct my attention?
Q. Page 10.
A. Thank you.
Q. Sure. And the reason I am asking you to look at that page is if you look under the heading "Individual Consultants," halfway down you will see your name. And it says above that "The following individuals were formerly employed by Navigant Consulting, Inc., Boston Edison's auction agent with respect to the sale





006488c8-d925-48bb-a258-b4bc839b5cec

of nuclear station, who may have discoverable information to the extent not privileged regarding the auction."

There is a list of people there and there is your name.

A. Uh-huh.

Q. Do you -- first of all, were you aware that you were listed as somebody who might have discoverable information in this case?

A. I don't believe I was aware of that. No, I don't recall it.

Q. Do you have any idea why your name is listed there?

A. I can only presume it was in an effort to be comprehensive with regard to anyone who had had any involvement at all in the Pilgrim sale.

Q. Looking at this list, and you will see a number of names there, do you consider yourself more or less knowledgeable about the

Pilgrim sale relative to the other people on this list?

A. I consider myself much less involved than virtually all of the people on the list, if I recall correctly, the roles that they played in the transaction process.

Q. And sitting here today, what is your recollection as to -- looking at this list as to the folks that would be most involved in the transaction?

A. I believe it would have been Mr. Reed.

Q. Okay.

A. Mr. Mattia. I'm not certain of the specific role Ms. Cameron played. Ms. Colello was extensively involved. I'm not certain of the role Mr. Dalton played. I'm not certain of the role Mr. Roach played. Ms. Spata, I'm not certain of the full nature of the role she played.

Mr. Strain, I believe once he joined





006488c8-d925-48bb-a258-b4bc839b5cec

the firm was significantly involved. And Ms. Yang I believe was significantly involved.

Q. Okay. Do you have any sense as to those who you identified as being significantly involved, what percentage of their time they were spending on the Pilgrim sale during the period that it took place?

A. No. Not on a percentage of time basis.

Q. Did you provide documents to Dickstein Shapiro as part of the discovery process in this case with respect to the Pilgrim sale?

A. Documents as it pertains to anything I may have worked on?

Q. Yes. In other words, did the attorneys come to you say "The government is asking for documents with respect to the Pilgrim sale"?

A. I did not provide any documents because I didn't have any. There was a





006488c8-d925-48bb-a258-b4bc839b5cec

Q. And then Colello?

A. Colello I think was very actively involved in helping support due diligence which is a fairly time-intensive time process helping get folks get to the station, ask their questions, meet with people as well as supporting Boston Edison in developing their communications plan to articulate what the end result was.

Q. And then Mattia?

A. Mr. Mattia I believe was extensively involved in transaction terms and documentation and closing activities.

Q. And then Strain. Is it Arthur strain?

A. Strain. I'm not sure what Arthur did specifically.

Q. And then Becky Yang?

A. Becky Yang was also in support I believe of due diligence activities.

Q. And of those folks that we talked





006488c8-d925-48bb-a258-b4bc839b5cec

questions.

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. CONWAY:

Q. When did you leave the Pilgrim transaction on behalf of Reed Consulting?

A. The limited work I did on the Pilgrim transaction would have been in the very formative stages before the transaction even went to market, I believe.

Q. Once you left the Pilgrim transaction, did you have any personal knowledge of what Mr. Mattia was doing on the Pilgrim project?

A. No. I wasn't working on the project.

Q. I think you talked to Mr. Lo Re earlier this morning about whether Mr. Mattia had extensive or significant involvement in the Pilgrim project. Do you recall that dialogue with Mr. Lo Re?

A. I do.

Q. Do you have personal knowledge whether Mr. Mattia had any extensive or significant participation in the Pilgrim project?

A. Not personal knowledge as I wasn't working on the project.

MR. CONWAY: No further questions.

MR. Lo RE: Okay. Thank you.

MR. CONWAY: We don't waive signature.

(Whereupon, the proceeding was concluded at 2:36 p.m.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VOLUME 1
PAGES 1 - 223

| | | |
|---|---|---|
| BOSTON EDISON COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | ) | No. 99-447C<br>No. 03-262C<br>(Judge Lettow) |
| ENTERGY NUCLEAR GENERATION CO.,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | ) | |

DEPOSITION OF GEOFFREY O. LUBBOCK, a deponent in the above-entitled cause, taken before Susan Lozzi, Shorthand Reporter and Notary Public in and for Middlesex County, pursuant to Rule 30 of the Rules of the Court of Federal Claims, at the offices of NSTAR, 800 Boylston Street, Boston, Massachusetts, on Thursday, October 5, 2006, commencing at 9:40 a.m.

ORIGINAL

APPEARANCES:

U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W. - Room 12070
Washington, D.C. 20530
(202) 307-0226
For the Defendant, United States.
BY: JOSHUA E. GARDNER, ESQ.

DICKSTEIN, SHAPIRO, LLP
1825 Eye Street - NW
Washington, D.C. 20006-5403
(202) 420-2235
For the Plaintiff, Boston Edison Company.
BY: BRADLEY D. WINE, ESQ.

WISE, CARTER, CHILD & CARAWAY, P.A.
1340 Echelon Parkway
Jackson, Mississippi 39213
(601) 368-5572
For the Plaintiff,
Entergy Nuclear Generation Company.
BY: L. JAGER SMITH, JR., ESQ.

ALSO PRESENT:
Alan J. Lo Re, Esq., U.S. Department of Justice.
Patrick Bryan, Esq., U.S. Department of Justice.
Richard J. Conway, Esq., Dickstein, Shapiro.
Nicholas Mattia, Esq., Dickstein, Shapiro.
Stuart Gurrea, Economists Incorporated.

other item and that was during the break, Mr. Lubbock wanted to make a correction to the record from his previous testimony, so I would like him to do that just before we move on.

MR. GARDNER: Before the correction, I'm sorry. I just want to make sure, Mr. Smith, that you had an opportunity to voice any concerns you had before we started back up to extent you have any.

MR. SMITH: I don't have any concerns beyond those that have been already expressed.

BY MR. GARDNER

Q. Now, Mr. Lubbock, I understand from Mr. Wine that you have a clarification to make about your previous testimony, is that correct?

A. Yes.

Q. What's that clarification, sir?

A. I omitted the name of Nicholas Mattia from the people who were with me in yesterday's briefing.

Q. All right. Now, prior to your deposition, did you know Mr. Mattia?

A. Yes.

Q. How did you know Mr. Mattia?

A. He was working for the Reed Consulting

Group, who was responsible for the sale of both the fossil and nuclear units.

Q. And what kind of work specifically did Mr. Mattia perform for the Reed Consulting Group in connection with the Pilgrim divestiture?

A. I can't state specifically.

Q. Can you speak generally as to the kind of work he was doing?

A. He was part of the Reed team.

Q. Now, is it your understanding that -- I understand now that Mr. Mattia is an attorney, correct?

A. I think so.

Q. Now, at the time that he was working at Reed Consulting and assisting BECO in the Pilgrim divestiture, was he serving in a lawyer capacity or as a consultant capacity?

A. He was serving in the consulting capacity.

Q. And did you have dealings specifically with Mr. Mattia during the divestiture process?

A. I'm sure I did.

Q. Can you describe the nature of the dealings that you had with Mr. Mattia, just generally?

A. My recollections are only with him being a member of the team with whom we would discuss the issues of getting answers to the bidders, making sure that the information was complete. The normal, general consulting remit that was given to Reed Consulting Group.

Q. Remit? What's a consulting remit?

A. Remit, I believe, in English means to say that is our charter with them. Remit.

Q. I'm sorry. So the normal general consulting charter that was given to Reed Consulting Group, is that another way of saying it?

A. Yes.

Q. So Mr. Mattia would have been involved in the Reed Consulting Group in the valuation process for Pilgrim?

A. (No response.)

(Discussion off the record.)

Q. I think we were talking about Mr. Mattia and his role in the divestiture process as a consultant for Reed, correct?

A. Yes.

Q. And you had a general recollection as to what Mr. Mattia was doing with respect to the

divestiture process, correct?

A. Yes.

Q. And Mr. Mattia was involved in the -- strike that. When you met with Mr. Mattia yesterday in preparation for your deposition, were you meeting with him in his capacity as a consultant for Reed or as a lawyer for Dickstein & Shapiro?

MR. WINE: You can answer the question without giving the substance of the communications that you had with Mr. Mattia.

A. My understanding he's a lawyer with Dickstein, Shapiro.

Q. And were you meeting with Mr. Mattia in his capacity as a lawyer for Dickstein & Shapiro based upon his previous role as a consultant for Reed Consulting?

A. I assume it was as a lawyer.

Q. He never made that clear to you one way or another?

A. We didn't discuss it.

Q. Now, hopefully save a little bit of time here, maybe a little bit. Back to Exhibit One. You refer to some of the previous positions you held, as well as your education at BECO, correct?

regulators and one of the bidders complains that they did not receive information, so this was a critical issue to us.

Q. And I guess my only question is, would you -- let's take John Reed, for example. Would you rely upon John Reed to provide you with accurate and current information about the status of the bid process?

A. Yes and no.

Q. Let's take the no first.

A. Okay. No, because we had weekly meetings of the entire bid team with both sides, and we went through the status of every component of the bid every week, Wednesday, 12:00 noon, lunch served, which helped bring people in, but -- potentially, but that was a strategically determined objective.

Q. Lunch?

A. Lunch. We served lunch at 12:00 noon. We got more people coming because other things are going on so you have competing interests.

Q. Sure.

A. The people that are reporting to me on a functional basis have got other people that they are reporting to. We actually had lunches paid for by

the regulators for part of the bid process, so they agreed that it was part of the process. So I'm going a rather longwinded, roundabout way but saying the teams were the key players that exchanged information.

John Reed was sometimes there; sometimes not there. He had other deals that he was doing. I would communicate with John Reed a lot of the time, but the whole bid process was really the teams working together and my involvement was more when it went off track. John's involvement was more when it went off track. We shepherded it together, but the teams would be the ones that would drive the whole process.

Q. Now, let's talk about these weekly meetings at noon which they served lunch. Who attended these meetings? Can you give me a list of people, generally?

A. Generally, it was the people that you saw on --

Q. Exhibit Two?

A. -- Exhibit Two. And if you come down the sublist there of the names, --

Q. We're back to Page 19, Bates labeled 19?

A. Yes.

Q. Okay.

A. Page 19.

Q. So we're talking about Tarantino, right?

A. Yes.

Q. And Colello?

A. Yes.

Q. And, obviously, you've already identified yourself and Mr. Lubbock as attendees, correct, --

A. Yes.

Q. -- at times, right?

A. Sorry?

Q. At times?

A. I would be there most of the time. This was not one of my minor -- John Reed had other projects. That was mine to deliver or die. This was very important to me.

Q. I completely understand. Obviously. Now, Mr. Potkin and Ms. Spada would also attend these meetings?

A. Yes.

Q. And Mr. -- I'm not going to get it.

A. Neven. You can call him Neven.

Q. I'll call him Neven. Neven would attend

it?

A. Yes.

Q. As well as Mr. Mattia?

A. Yes.

Q. Was Mr. Mattia a regular at these meetings?

A. I think so. I just don't remember back then.

Q. And if I understand --

A. If you also go down the list here, below those, it wasn't just those, you know, four, six people. This list was -- this was a cast of many people.

Q. Got it.

A. It would typically have -- you see Site Tours/Meetings (Roach), Roach was one of them, but there would have been four or five contacts that would be dealing with different bidders.

So the team that you see here is a subset of the number of people that would come to these meetings. Plus, if there was an issue like, for example, human resources, you would have -- the head of human resources would come. So it was more flexible than this and it depended on the specific

issues that would be covered.

Q. Got it. Now, these weekly meetings, was there a name for these meetings? Like the divestiture group meetings or something like that?

A. I've never been good on names. Free lunch.

Q. The free lunch meeting. Fair enough. Let me ask you this: Did anyone take notes at these meetings or were these meetings memorialized in any way?

A. If they did, it would have been someone at the Reed Consulting Group that did it.

Q. I see. Now, did BECO select particular employees to pair up with the prospective bidders through the due diligence process?

A. No.

Q. Do you know, did Reed select individuals from Reed Consulting to pair up with the individual bidders through the due diligence process?

A. Yes.

Q. Do you know -- let's take Entergy, for example. Do you know who Reed selected to pair up with Entergy during the due diligence process?

A. I don't remember.

Q. Do you remember for Amergen who Reed selected?

A. I don't remember.

Q. Let's go back very quickly to Exhibit Three because you had made a reference to it. This is the Paths to the Future document.

(Reviewing document.)

A. Yes.

Q. And at the bottom on Page 113, again, we're talking Bates labels. It's the second page.

A. I'll put my stuff back in order so I don't get confused.

Q. No problem. I'll try not to jump around too much more.

A. No, it's good. Okay.

Q. Perfect. The last line talks about a company called UMS, "the firm which co-developed with Boston Edison best practice transformations of Fossil and Electric Delivery, to assist in evaluating all of the options for Pilgrim's future." Do you see that?

A. Yes.

Q. Now, do you recall a company called UMS?

A. Yes.

CERTIFICATE OF FILING

I hereby certify that on this 7th day of December 2006, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF BOSTON EDISON COMPANY'S MOTION FOR A PROTECTIVE ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Scott R. Damelin