# In the United States Court of Federal Claims

No. 99-447C
No. 03-2626C
(partially consolidated)

(Filed: February 26, 2007)

BOSTON EDISON COMPANY,

Plaintiff,

UNITED STATES,

Defendant.

ENTERGY NUCLEAR GENERATION CO.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Spent nuclear fuel case; motion for a protective order; RCFC 26(c); deposition of attorney; work product doctrine; leave to take further depositions under RCFC 30(b)(6)

Richard J. Conway, Dickstein Shapiro LLP, Washington, D.C., for plaintiff Boston Edison Co. With him on the briefs were Nicholas W. Mattia, Jr., Bradley D. Wine, Bernard F. Sheehan, and Lisa M. Barbas, Dickstein Shapiro LLP. Of counsel was Neven Rabadjija, Associate General Counsel, NSTAR Electric & Gas Corp., Boston, MA.

Alex D. Tomaszczuk, Pillsbury, Winthrop, Shaw, Pittman, LLP, McLean, VA, for plaintiff Entergy Nuclear Generation Co. With him on the briefs were Jay E. Silberg, Pillsbury, Winthrop, Shaw, Pittman, LLP, Washington, D.C., and L. Jager Smith, Jr., Wise, Carter, Child & Caraway, PA., Jackson, MS.

Alan J. Lo Re, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Of counsel were Joshua

E. Gardner, Scott R. Damelin, Patrick B. Bryan, and Sonia M. Orfield, Trial Attorneys, United States Department of Justice, Washington, D.C., and Jane K. Taylor, Office of General Counsel, United States Department of Energy, Washington, D.C. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Pending before the court are two pairs of motions related to pre-trial discovery in this spent nuclear fuel case.[1] By the first motion, Boston Edison Company ("Boston Edison") seeks a protective order precluding the government from deposing a lawyer, Nicholas W. Mattia, Jr., who previously served as a non-lawyer consultant to Boston Edison regarding its sale of the Pilgrim Nuclear Power Station ("Pilgrim") in 1999, and who currently serves on the legal team representing Boston Edison in this matter. The government has filed a cross-motion to compel Mr. Mattia's deposition. By a second motion, Boston Edison seeks leave to take a deposition under Rule 30(b)(6) of the Rules of the Court of Federal Claims ("RCFC") of six governmental witnesses, some of whom Boston Edison had previously deposed in the context of coordinated discovery proceedings in which Boston Edison and several other nuclear utility plaintiffs participated in 2001 and 2002. The government has filed a cross-motion for a protective order.

A hearing on these pending motions was held on January 11, 2007. For the reasons stated below, Boston Edison's motion for a protective order to preclude Mr. Mattia's deposition is granted in part and denied in part. The government's cross-motion to compel Mr. Mattia's deposition is granted. Boston Edison's motion for leave to take a deposition under RCFC 30(b)(6) is granted in part and denied in part. The government's cross-motion for a protective order is granted in part and denied in part.

**BACKGROUND**

On June 17, 1983, Boston Edison entered into a Standard Contract with the Department of Energy ("DOE") under the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257-2261 (1983) (codified as amended at 42 U.S.C. § 10222). Boston Edison Compl. ¶¶ 7-9. Under the Standard Contract, beginning no later than January 31, 1998, DOE was required to dispose of spent nuclear fuel ("SNF") and high-level radioactive waste generated at Pilgrim, and Boston Edison was required to pay a one-time fee and continuing fees to DOE. *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 170 (2005) ("*Boston Edison I*");

---

[1]A second case, *Entergy Nuclear Generation Co. v. United States*, No. 03-2626C, has been consolidated with No. 99-447C for limited purposes, as explained *infra*, but references in this opinion to "this case" relate only to No. 99-447C.

*see* 42 U.S.C. § 10222(a)(5)(B). To date, DOE has not disposed of the SNF at Pilgrim, and DOE is not likely to have a SNF repository available to begin acceptance of SNF from Pilgrim or any other source for at least another ten years. *See Boston Edison Co. v. United States*, 67 Fed. Cl. 63, 64 (2005) ("*Boston Edison II*"); *System Fuels, Inc. v. United States*, 73 Fed. Cl. 206, 208 n.2 (2006).

Boston Edison sold Pilgrim to Entergy Nuclear Generation Company ("Entergy") on July 13, 1999, assigning its Standard Contract to Entergy as part of the Purchase and Sale Agreement. *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 338 (2005).[2] Boston Edison and Entergy construe the assignment as retaining for Boston Edison any claims accruing as of the closing date, with Entergy acquiring claims accruing thereafter. *Boston Edison I*, 64 Fed. Cl. at 170. Boston Edison filed its complaint in this court on July 12, 1999, one day before closing on the Pilgrim sale, alleging that the United States had partially breached the Standard Contract and had breached the implied covenant of good faith and fair dealing. Boston Edison Compl. ¶¶ 1, 23, 26; *Boston Edison II*, 67 Fed. Cl. at 64. Boston Edison subsequently amended its complaint to add a claim alleging an uncompensated taking of Boston Edison's property in violation of the Fifth Amendment. Boston Edison's Mot. for Leave to Take a Rule 30(b)(6) Deposition at 3; Boston Edison's Am. Compl. ¶¶ 80-84.[3] Boston Edison alleges that it has suffered damages measured by the diminution in the value of Pilgrim at the time of the sale to Entergy, by expenses incurred in storing SNF before the sale, and by losses caused by its inability to purchase an earlier disposal time in the SNF queue as permitted by Article V.E. of the Standard Contract. *Boston Edison II*, 67 Fed. Cl. at 64-65.

In an Opinion and Order rendered February 15, 2005, this court denied the government's motions to dismiss and for summary judgment on liability and also denied Boston Edison's motion for partial summary judgment on liability. *Boston Edison I*, 64 Fed. Cl. at 170. On July 29, 2005, the court issued a further order granting in part and denying in part the government's motion to consolidate *Boston Edison,* No. 99-447C*,* and *Entergy,* No. 03-2626C. The cases were consolidated for the limited purpose of addressing (1) contract formation, (2) contract implementation through the date of sale of Pilgrim, and (3) Boston Edison's diminution-in-value claim and the government's attendant offset claim against Entergy. *Boston Edison II*, 67 Fed. Cl. at 67.

---

[2]Section 302(b)(3) of the NWPA, as amended, authorized assignment of Standard Contracts. *See* 42 U.S.C. § 10222(b)(3); *see also Boston Edison II*, 67 Fed. Cl. at 64 n.1.

[3]Entergy filed suit against the United States on November 5, 2003, alleging a partial breach of the contract, breach of the implied duty of good faith and fair dealing, and an uncompensated taking. *Entergy*, 64 Fed. Cl. at 338. This court subsequently granted Entergy's motion for partial summary judgment on liability. *Id.*

In a Scheduling Order dated February 17, 2006, the court set a schedule for pre-trial steps in this case, with trial to commence in May 2007. The pending discovery disputes arose out of these pre-trial proceedings.

## ANALYSIS

### A. *Boston Edison's Motion for a Protective Order to Preclude Mr. Mattia's Deposition*

#### 1. *Background.*

From 1998 to 2001, Mr. Nicholas W. Mattia, Jr., currently a member of Boston Edison's litigation team at Dickstein Shapiro LLP, worked for Navigant Consulting, Inc. ("Navigant"), where he "serve[d] as a member of the Pilgrim auction team on behalf of Boston Edison . . . [,] functioned as a non-lawyer[,] and worked with numerous Navigant and Boston Edison employees, as well as numerous outside consultants and potential bidders." Boston Edison's Mot. for a Protective Order at 2; Hr'g Tr. 19:3-5 (Jan. 11, 2007). By letter of September 27, 2006, the government notified Boston Edison's counsel of the government's intent to depose Mr. Mattia about his role in the Pilgrim sale. Boston Edison's Mot. for a Protective Order, Ex. C (Letter from Mr. Alan J. Lo Re, Senior Trial Counsel, Dep't of Justice, to Mr. Bradley Wine, Attorney, Dickstein Shapiro LLP (Sept. 27, 2006)) at 1-2.[4] In a subsequent letter of November 17, 2006, the government also explicitly stated that in deposing Mr. Mattia it would not delve into Mr. Mattia's legal representation of Boston Edison and that it "agree[d] to limit the scope of Mr. Mattia's fact deposition to topics that relate solely to his knowledge as a percipient fact witness at the time he served as the auction agent at [Navigant] in connection with the Pilgrim sale during the late 1990s." *Id.*, Ex. E (Letter from Mr. Patrick B. Bryan, Trial Attorney, Dep't of Justice, to Messrs. Richard J. Conway and Bradley D. Wine, Attorneys, Dickstein Shapiro LLP (Nov. 17, 2006)) at 1.[5] Responding, counsel for Boston Edison indicated that his client would object to Mr. Mattia's deposition, *id.*, Ex. D (Letter from Mr. Richard J. Conway, Attorney, Dickstein Shapiro LLP, to Mr. Alan J. Lo Re, Senior Trial Counsel, Dep't of Justice (September 29, 2006)) at 2, and on November 20, 2006, Boston Edison filed its motion seeking a protective order to preclude Mr. Mattia's deposition.

---

[4]In its letter, the government also pointed out that Boston Edison had listed Mr. Mattia as a fact witness in its initial disclosures under RCFC 26. *See* Boston Edison's Mot. for Protective Order at 9, Ex. C (Letter from Lo Re to Wine (Sept. 27, 2006)) at 2.

[5]The government's letter of November 17, 2006 actually refers to Mr. Mattia's employment with the Reed Consulting Group, which Navigant acquired in 1997 – long before the closing of the Pilgrim sale. *See* Boston Edison's Mot. for Protective Order, Ex. E (Letter from Bryan to Conway and Wine (Nov. 17, 2006)) at 1. According to the government, most of the documents the government has received through the discovery process about the sale refer to the Reed Consulting Group. Def.'s Resp. to Boston Edison's Mot. for Protective Order and Cross-Motion to Compel at 3 n.2.

2. *Scope of discovery allowed.*

In seeking a protective order, Boston Edison relies on *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), which enunciated a three-part test for determining when a court should approve the taking of an opposing counsel's deposition. *See* Boston Edison's Mot. for a Protective Order at 2. Under the *Shelton* test, which was later applied in this court in *Sparton Corp. v. United States*, 44 Fed. Cl. 557 (1999), the deposition of an opposing counsel is permitted if "(1) no other means exist to obtain the information than to depose opposing counsel . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Shelton*, 805 F.2d at 1327; *see Sparton*, 44 Fed. Cl. at 563-68 (applying *Shelton* test). Boston Edison argues that each element of the *Shelton* test is satisfied because (1) the government can obtain identical information from sources other than Mr. Mattia, Boston Edison's Mot. for a Protective Order at 4, 7,[6] (2) the information the government seeks will "necessarily" cross the thresholds of the attorney-client privilege and the work product doctrine, *id.* at 6, 8, and (3) Mr. Mattia can offer no "crucial" information because his testimony would merely duplicate that of other witnesses. *See id.* at 6, 9.

The government counters that the *Shelton* test is inapplicable because the government proposes to depose Mr. Mattia as a fact witness, not in his capacity as counsel for Boston Edison. Def.'s Resp. to Boston Edison Company's Mot. for a Protective Order and Cross-Motion to Compel ("Def.'s Resp. to Mot. for Protective Order") at 8-13. The government also avers that Boston Edison's arguments about the potential for infringement of the attorney-client privilege or the protection provided by the work product doctrine are without merit for two reasons. First, the government asserts that Boston Edison's concerns about Mr. Mattia's potential deposition are "of its own doing" because Dickstein Shapiro LLP, the law firm representing Boston Edison, voluntarily decided to include Mr. Mattia as part of its litigation team in this case, knowing that he was a percipient fact witness. *See id.* at 14-15. Second, the government argues that Boston Edison may object during any deposition of Mr. Mattia to questions that implicate the attorney-client privilege or the work product doctrine. *Id.* at 16.

RCFC 30(a) grants parties significant latitude to depose individuals during the course of discovery: "A party may take the testimony of any person, including a party, by deposition upon oral examination . . . ." RCFC 30(a).[7] Although a request to depose a party's attorney is

---

[6]As alternative sources of information, Boston Edison points to Mr. John Reed, Mr. Mattia's former direct supervisor at Navigant during the Pilgrim auction, and Mr. Geoffrey Lubbock, a vice president of Boston Edison's parent company and Mr. Mattia's chief contact at the time of the auction. Boston Edison's Mot. for Protective Order at 4.

[7]RCFC 30(a) is identical to Fed. R. Civ. P. 30(a). Leave of court is necessary to take a deposition only if the deponent is in prison or if, absent the written stipulation of the parties, (1) a proposed deposition would result in more than ten depositions being taken under RCFC 30 or RCFC 31; (2) the deponent already has been deposed; or (3) a party seeks to take a deposition

"generally viewed with disfavor," 7 James Wm. Moore, *Moore's Federal Practice* § 30.03[5] at 30-23 (3d ed. 2006), the breadth of RCFC 30(a) – "any person" – encompasses even the attorney for a party. *See Kaiser v. Mutual Life Ins. Co.*, 161 F.R.D. 378, 379 (S.D. Ind. 1994) (Fed. R. Civ. P. 30(a) does not preclude deposition of a party's counsel); *N.F.A. Corp. v. Riverview Narrow Fabrics, Inc*., 117 F.R.D. 83, 84 (M.D.N.C. 1987) (same); 7 *Moore's Federal Practice* § 30.03[5] at 30-23 (same).

RCFC 26, however, imposes certain limitations on discovery, two of which are particularly relevant to depositions of attorneys. First, RCFC 26(b)(1) allows a party to "obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party," but RCFC 26(b)(2) constrains discovery if a court

> determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit.

RCFC 26(b)(2). RCFC 26(b) mirrors the standard of Fed. R. Civ. P. 26. *See System Fuels*, 73 Fed. Cl. at 215. In analyzing Fed. R. Civ. P. 26, the Supreme Court explained that "the deposition-discovery rules are to be accorded a broad and liberal treatment." *Hickman v. Taylor,* 329 U.S. 495, 507 (1947); *see also* 6 *Moore's Federal Practice* § 26.02 at 26-26.3 ("By requiring disclosure of all relevant information, the discovery rules allow ultimate resolution of disputed issues to be based on full and accurate understanding of true facts.").

Second, RCFC 26(c) tempers the breadth of discovery by authorizing the court, for good cause shown, to issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." RCFC 26(c); 6 *Moore's Federal Practice* § 26.101 at 26-240 ("To temper the liberal scope of discovery, Rule 26(c) empowers a district court to issue" a protective order.); *cf. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) ("Because of the liberality of pretrial discovery permitted by [Washington Superior Court Civil] Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c).") To meet the "good cause" standard of the rule so as to preclude a deposition, the party seeking a protective order must show "that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden." *Forest Prods. Nw., Inc. v. United States*, 453 F.3d 1355, 1361 (Fed. Cir. 2006); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) ("Rule 26(c) places the burden of persuasion on

---

before the time specified in RCFC 26(d), unless the notice of deposition certifies that the deponent is expected to leave the United States and thereafter be unavailable for examination in the United States. RCFC 30(a)(2).

the party seeking the protective order."); *Capital Props., Inc. v. United States*, 49 Fed. Cl. 607, 611 (2001).

3. *Whether good cause exists for a protective order.*

Boston Edison does not dispute that the information the government seeks from Mr. Mattia meets the relevancy test of RCFC 26(b)(1).[8] The resulting question is whether Boston Edison has shown good cause for the court to issue a protective order precluding Mr. Mattia's deposition. *See* RCFC 26(c). Boston Edison's argument in this respect focuses strongly on the *Shelton* test. *Shelton* was a products liability suit brought against a vehicle manufacturer, and the discovery dispute arose when an attorney in the defendant's litigation department refused during her depositions to confirm or deny the existence of certain documents about which plaintiffs' counsel posed several questions. *Shelton*, 805 F.2d at 1324-26.[9] Based on the defendant's decision to hold firm to the position taken by its attorney, the district court ultimately granted the plaintiffs' motion for default judgment on liability. *Id.* at 1325-26. After enunciating its three-part test for determining the propriety of deposing an opposing counsel, the Eighth Circuit reversed the trial court's decision, concluding that forcing the defendant's attorney to answer plaintiffs' counsel's questions violated the work product doctrine. *Id.* at 1327, 1329. When an attorney is involved in selecting and compiling documents in preparation for litigation, the court found, "the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product." *Id*. at 1329.[10] The appeals panel also stressed that its decision turned on the role of the defendant's attorney in the litigation: "In-house counsel in this case had nothing to do with this lawsuit except to represent her client. She did not design the jeep or have any duties in relation to the design of the jeep; nor, of course, was she a witness to the accident." *Id.* at 1330.

---

[8]A number of witnesses whom the government already has deposed have pointed to Mr. Mattia's role in the Pilgrim auction. Def.'s Resp. to Mot. for Protective Order at 18-19. For example, Mr. Mattia's former supervisor at Navigant, Mr. Reed, has indicated that Mr. Mattia was involved in drafting the "reservation of rights" clause in the Boston Edison-Entergy Purchase and Sale agreement, and the government contends that the clause is central to determining whether the buyer or the seller retained the claims against the government for delays in accepting spent fuel from Pilgrim. *See* Hr'g Tr. 30:25 to 33:17 (Jan. 11, 2007); Def.'s Resp. to Mot. for Protective Order at 12.

[9]The plaintiffs were seeking to determine whether the defendant possessed documents on "rollover" tests and "rollover" accidents involving a particular type of vehicle the defendant manufactured. *Shelton*, 805 F.2d at 1327.

[10]The plaintiff's attorney averred that he asked the defendant's attorney the questions about the existence of the documents to determine whether she had honestly and completely complied with his document requests and interrogatories. *Shelton*, 805 F.2d at 1327-28.

The facts of this case are distinguishable from those in *Shelton*. First, the court's chief concern in *Shelton* was the plaintiffs' attempt to learn the "mental selective process" the attorney had employed in identifying, selecting, and compiling documents during discovery. *Shelton*, 805 F.2d at 1329. As the Eighth Circuit noted in *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (8th Cir. 2002): "The *Shelton* test was intend[ed] to protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney's litigation strategy. . . . [T]his Court erected the *Shelton* test as a barrier to protect trial attorneys from these depositions." 281 F.3d at 730 (internal citations omitted). In this case, the government seeks to address Mr. Mattia's knowledge of the Pilgrim auction process and the surrounding circumstances, not his work in preparing and implementing Boston Edison's litigation strategy. *See* Boston Edison's Mot. for Protective Order, Ex. E (Letter from Bryan to Conway and Wine) (Nov. 17, 2006)) at 1; Def.'s Resp. to Mot. for Protective Order at 12. Second, in *Shelton*, the court explicitly distinguished the litigation role of the defendant's in-house counsel from an attorney who was a fact witness, observing: "[N]or, of course, was [the attorney] a witness to the accident." *Shelton*, 805 F.2d at 1330. In contrast, it is undisputed that Mr. Mattia participated in the sale of the Pilgrim power station in a meaningful way. Boston Edison's Mot. for Protective Order at 2; Hr'g Tr. 19:3-5 (Jan. 11, 2007).

Other courts also have distinguished *Shelton* from cases in which the attorney whose deposition was sought was a fact witness. A prime example is *Sparton*, which Boston Edison cites for the proposition that this court has adopted the *Shelton* test for determining the propriety of deposing a party's attorney. Boston Edison's Mot. for Protective Order at 5-6. Before applying the *Shelton* test, the court in *Sparton* distinguished several cases involving the depositions of attorneys who were fact witnesses by noting that "the attorney[s in those cases] had independent knowledge of the facts underlying the litigated cause of action before depositions of opposing counsel were permitted." *Sparton*, 44 Fed. Cl. 561-62; *see also id.* at 562 ("[T]he parties concede that [the defendant's former attorney] does not have independent or first hand knowledge of the facts, nor has he been directly involved in the events giving rise to the alleged patent infringement. "). Here, however, Mr. Mattia does have "independent knowledge of the facts underlying" the Pilgrim auction. *See* Boston Edison's Mot. for Protective Order at 2; Hr'g Tr. 19:3-5 (Jan. 11, 2007).

In *United States v. Philip Morris, Inc.,* 209 F.R.D. 13 (D.D.C. 2002), the district court also found *Shelton* inapplicable under facts similar to those presented here. In that case, the United States sought to depose defendants' in-house counsel concerning topics such as "non-privileged information relating to 'public relations,' 'corporate conduct and positions,' marketing strategies, tobacco research and development." 209 F.R.D. at 14. The court found the *Shelton* test inapplicable because (1) the proposed deponents were the defendants' employees who had been "knowingly assigned substantial non-legal, non-litigation responsibilities," (2) the United States was "not seeking to depose counsel about the defense or litigation strategies related to this case," (3) the rationale of *Shelton* – preventing a litigant from obtaining the mental impressions of opposing counsel – was not implicated by the proposed depositions, and (4) "the

proposed deponents here [were] not litigation or trial counsel." *Id.* at 17-18. As the court explained:

> Defendants contend that the [*Shelton* test] appl[ies] to *any* attempt to depose an attorney, without regard to the subject matter of the deposition or the attorney's role in the pending litigation. This is not only a misinterpretation of the holding in *Shelton* and the subsequent case law re-affirming that holding, but is contrary to the language and philosophy of the Federal Rules of Civil Procedure.

*Id.* at 16 (emphasis added).

Although Mr. Mattia is a member of Boston Edison's trial team, the government's proposed deposition is focused on his "substantial non-legal" responsibilities as a consultant to Boston Edison at the time of the Pilgrim sale, and the government is not seeking to discover Boston Edison's litigation strategy or to obtain Mr. Mattia's mental impressions of that strategy. *See* Boston Edison's Mot. for Protective Order at 2, Ex. E (Letter from Bryan to Conway and Wine) (Nov. 17, 2006)) at 1; Def.'s Resp. to Mot. for Protective Order at 12. As the court in *Philip Morris* observed, only if a deposition of a party's attorney "would reveal litigation strategy in the pending case" should the deposition be precluded. *Philip Morris*, 209 F.R.D. at 18. Other courts have similarly recognized that the deposition of a party's attorney who is a fact witness may be appropriate in certain cases. *See, e.g., Kaiser*, 161 F.R.D. at 379; *Bogan v. Northwestern Mut. Life Ins. Co.*, 152 F.R.D. 9, 14 (S.D.N.Y. 1993); *Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990); *see also In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71 (2d Cir. 2003) ("[W]e have never adopted the *Shelton* rule and have stated specifically that the disfavor with which the practice of seeking discovery from adversary counsel is regarded is not a talisman for the resolution of all controversies of this nature.")

Based on these considerations, the court concludes that the *Shelton* test is not applicable to the facts of this case, and that Boston Edison has not shown good cause for the court to issue a protective order to preclude Mr. Mattia's deposition. In short, Boston Edison has not shown that the government's proposed deposition of Mr. Mattia would be "likely to oppress [it] or might otherwise impose an undue burden." *See Forest Prods.*, 453 F.3d at 1361; *Capital Props.*, 49 Fed. Cl. at 611. The government may depose Mr. Mattia, provided the deposition's scope is limited to the events and circumstances surrounding the Pilgrim sale. The deposition of Mr. Mattia may not delve into any matters pertaining to his representation of Boston Edison as a member of its legal team, including his mental impressions or legal conclusions formed in that capacity. *Hickman,* 329 U.S. at 511 ("Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."); *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (The work product doctrine "promotes a fair and efficient adversarial system by protecting 'the attorney's thought processes and legal

recommendations' from the prying eyes of his or her opponent.").[11] To the extent that Boston Edison believes that the government's questions to Mr. Mattia during his deposition impinge on the work product doctrine or the attorney-client privilege, Boston Edison may make a proper objection. *See Bogan*, 152 F.R.D. at 14 ("If questions put [to opposing counsel] at the deposition relate to privileged matters, a proper objection can be interposed at that time.").

B. *Boston Edison's Motion for Leave to Take Depositions Under RCFC 30(b)(6)*

1. *Background.*

In 2001 and 2002, Boston Edison, along with a number of other nuclear utility plaintiffs, agreed to pursue coordinated discovery through which the plaintiffs jointly sought to obtain documents from the government and to depose witnesses related to the Standard Contract and DOE's steps to develop repositories for spent nuclear fuel. Def.'s Resp. to Boston Edison Company's Mot. for Leave to Take a Rule 30(b)(6) Deposition and Cross-Mot. for a Protective Order ("Def.'s Resp. to 30(b)(6) Mot.") at 2. As part of coordinated discovery, these plaintiffs served RCFC 30(b)(6) deposition notices on the government on February 8, 2002, April 3, 2002, and April 18, 2002. *See* Boston Edison Company's Mot. for Leave to Take a Rule 30(b)(6) Deposition ("Boston Edison's 30(b)(6) Mot.") at 2. Pursuant to these notices, the government produced three representatives – Mr. Thomas Pollog, Ms. Susan Klein, and Mr. David Zabransky – for depositions in April and May of 2002 regarding:

> document custodial matter[s]; issues pertaining to [the] rate of acceptance, Delivery Commitment Schedule ("DCS"), Annual Capacity Reports, and Acceptance Priority Rankings[; and] the Government's termination of the DCS process, Greater-Than-Class-C waste issues, projections regarding the date of the Government's compliance with the Standard Contract, and the provision in the Standard Contract giving priority to shutdown reactors.

Boston Edison's 30(b)(6) Mot. at 2-3 (footnote omitted). Despite the breadth of these topics, the overall scope of the depositions was confined by the judge overseeing the coordinated discovery to "discovering facts essential to justify plaintiff[s'] opposition to the dispositive motions" (*i.e.*, to the then-pending motions in the early-filed spent nuclear fuel cases for summary judgment and to dismiss). *See* Boston Edison's Reply in Support of its Mot. for Leave to Take a Rule 30(b)(6) Deposition ("Boston Edison's 30(b)(6) Reply"), Ex. A (Order of February 1, 2002) (Sypolt, J.) at 2.

---

[11]The proposed deposition of Mr. Mattia is unlikely to implicate the attorney-client privilege because the government does not propose to ask Mr. Mattia about post-sale communications Boston Edison had with him in the course of seeking legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981); *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997).

As this case was being prepared for trial, Boston Edison informally requested in September 2006 that the government make six governmental witnesses available for depositions: Mr. Pollog, Mr. Zabransky, and four other individuals. Boston Edison's 30(b)(6) Mot. at 3; Def.'s Resp. to 30(b)(6) Mot. at 4, App. at 22 (Letter from Patrick B. Bryan, Trial Attorney, Dep't of Justice, to Richard J. Conway, Attorney, Dickstein Shapiro, LLP (Sept. 27, 2006)). The government refused Boston Edison's request, arguing that "these individuals ha[d] been deposed extensively already," but offered to allow Boston Edison – and two other plaintiffs in separate spent nuclear fuel cases – to participate in limited depositions of governmental representatives ordered by a judge of this court in one of the other such cases, *System Fuels, Inc. v. United States*, No. 03-2624C. Def.'s Resp. to 30(b)(6) Mot. at 4, App. at 22-24 (Letter from Bryan to Conway (Sept. 27, 2006)). Boston Edison declined the government's request, citing the inability of its counsel to prepare for the deposition and its unwillingness to have its request "shoehorn[ed]" into other depositions involving plaintiffs with different claims. Def.'s Resp. to 30(b)(6) Mot. at 5, App. at 26 (Letter from Mr. Richard J. Conway, Attorney, Dickstein Shapiro, LLP to Mr. Patrick B. Bryan, Trial Attorney, Dep't of Justice (Sept. 29, 2006)). In due course, on November 7, 2006, Boston Edison served on the government a deposition notice, listing eight main topics on which it wished to examine governmental representatives. Boston Edison's 30(b)(6) Mot., Ex. D (Boston Edison Company's Rule 30(b)(6) Deposition Notice of Defendant United States (Nov. 7, 2006)). The government objected to the notice and asked Boston Edison to narrow its request. Def.'s Resp. to 30(b)(6) Mot. at 5-9. Boston Edison then filed the instant motion for leave to take depositions, and the government filed its cross-motion for a protective order.[12]

2. *Topics on which Boston Edison seeks deposition testimony under RCFC 30(b)(6).*

In its motion for leave to take additional depositions under RCFC 30(b)(6), Boston Edison has curtailed the original notice of November 7, 2006, to encompass the following topics:

> 1. The Government's understanding of the history and development of the nuclear industry and the impact of the [NWPA] on the nuclear industry, including the Government's responsibility for the storage, removal, and disposal of spent nuclear fuel prior and subsequent to the passage of the NWPA.
>
> 2. The Standard Contract entered into between [DOE], on behalf of the United States, and Boston Edison Company dated June 17, 1983, including:
>
> a. the purpose of the Standard Contract;

---

[12]After the hearing held on these cross-motions, the parties endeavored to resolve some or all of the further-deposition dispute by agreement. Hr'g Tr. 108:9-14, 109:17-24, 111:3-16 (Jan. 11, 2007). That effort evidently has not been productive, however, and the court accordingly has proceeded to render this decision.

b. the formulation of the terms of the Standard Contract;

c. comments received during the "notice and comment" period for the Standard Contract;

d. the terms and requirements of the Standard Contract (except for the provision on priority for shutdown reactors, which was part of the April 18, 2002 notice served on the Government as part of coordinated discovery);

e. the provision of the Standard Contract which permitted Boston Edison to assign its rights and duties pursuant to the Standard Contract;

f. the expectations of the parties at the time of contracting;

g. the relationship of the Standard Contract to the renewal of the operating licenses of nuclear plant operators and utilities; and

h. the intent of the parties at the time of contracting regarding future onsite storage of SNF.

3. Boston Edison's performance under the Standard Contract.

4. The Government's performance under the Standard Contract, including the projected or estimated first operational date for an SNF repository, to the extent the Government's estimates have changed since 2002.

5. The Government's understanding of the costs or potential costs to the nuclear power industry, and to Pilgrim in particular, of alternative means of temporary fuel storage associated with the DOE's failure to begin accepting SNF as of January 31, 1998.

6. The Government's estimated potential liability related to the delayed acceptance of SNF under the Standard Contract, including the Government's potential liability to Boston Edison.

7. The Government's knowledge, oversight, and approval of the sale of Pilgrim from Boston Edison to Entergy and any related regulatory activities, including:

a. the Government's understanding of the provisions of the Pilgrim Purchase and Sale Agreement, including the provisions that provided for retention by Boston Edison of claims related to the Standard Contract;

> b. the transfer from Boston Edison to Entergy of the Standard Contract;
>
> c. the transfer from Boston Edison to Entergy of decommissioning funds related to Pilgrim;
>
> d. the Requests for Additional Information . . . made by the [Nuclear Regulatory Commission] in connection with the December 21, 1998, application for transfer of the Pilgrim operating license;
>
> e. the Safety Evaluation by the Office of Nuclear Reactor Regulation – Proposed Transfer of Operating License and Materials License for Pilgrim Nuclear Power Station to Entergy Nuclear Generation Company, dated April 29, 1999, Bates Nos. ENGC/BECO DOE 1st RFP-21-19047 – 19065, including the comments and conclusions therein relating to decommissioning.

Boston Edison's 30(b)(6) Mot., Ex. E (Boston Edison Company's Proposed Rule 30(b)(6) Deposition Notice of Defendant United States (Dec. 1, 2006)) ("Proposed Deposition Notice") at 4-6.

Under RCFC 30(b)(6), a party may serve a deposition notice on a "governmental agency . . . describ[ing] with reasonable particularity the matters on which examination is requested," and the government must then designate persons to "testify on its behalf." RCFC 30(a)(2), however, limits a party's ability to re-depose individuals: "A party must obtain leave of court, which shall be granted to the extent consistent with the principles stated in RCFC 26(b)(2), . . . if, without the written stipulation of the parties, . . . (B) the person to be examined already has been deposed in the case." *See Independence Park Apts. v. United States*, 59 Fed. Cl. 765, 769 (2004) (granting leave for a second deposition of a witness and extending the total time allowed for deposition of that witness beyond seven hours). As noted previously, the principles of RCFC 26(b)(2) permit a court to limit discovery where "the discovery sought is unreasonably cumulative or duplicative," "obtainable from some other source that is more convenient," or creates an undue burden or expense, given the likely benefit. RCFC 26(b)(2), quoted *supra*, at 6. Moreover, the plain language of RCFC 30(a)(2), which parallels Fed. R. Civ. P. 30, *see* RCFC 30 (Rules Committee Note), indicates that – aside from questions of relevance under RCFC 26(b)(1) – the barriers to re-deposing individuals are that (1) leave of court must be sought absent the written consent of the parties and (2) the standards of RCFC 26(b)(2) must be satisfied. *See* RCFC 30(a)(2). If these two requirements are met, the court "shall" grant the moving party's request. *Id.* "Leave to conduct a second deposition should ordinarily be granted; the burden is on the opposing party to demonstrate that [Rule 26(b)(2) is not satisfied]." *Judicial Watch, Inc. v. United States Dept. of Commerce*, 34 F.Supp.2d 47, 54 (D.D.C. 1998); *accord* Fed. R. Civ. P. 30 advisory committee note, 1993 amendment ("Leave to take additional depositions should be granted when consistent with the principles of Rule 26(b)(2)."); *see also Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) ("It is very unusual for a court to prohibit the taking of a

deposition altogether and absent extraordinary circumstances, such an order would likely be in error."); *Jade Trading, LLC v. United States*, 64 Fed. Cl. 85, 86-87 (2005) ("Some courts have opined that . . . the party opposing the second deposition must demonstrate good cause why the second deposition should not be taken."); 8 Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice & Procedure* § 2037 at 494 (2d ed. 1994) ("It is even more difficult to show grounds for ordering that discovery not be had when it is a deposition that is sought, and most requests of this kind are denied.").

Boston Edison argues that the amendment of its complaint and the associated shift in legal strategy to include a diminution-in-value approach to damages support its motion for leave to take the additional depositions. Boston Edison's 30(b)(6) Mot. at 7-10. Moreover, Boston Edison contends that the benefits of allowing it to develop its theory of the case outweigh any potential burden imposed on the government by the depositions. *Id.* at 10. The government counters that the topics included in Boston Edison's proposed deposition notice (1) do not meet the standard of "reasonable particularity" in RCFC 30(b)(6), (2) are overbroad, (3) seek discovery that is cumulative and duplicative in light of the coordinated discovery already conducted in 2002, and (4) would impose an undue burden on the government. Def.'s Resp. to 30(b)(6) Mot. at 10-12, 17-18. The government also sets out specific objections to each of the subject areas that Boston Edison identified in its proposed deposition notice. *Id.* at 13-16.

3. *Cumulative topics that may not be addressed, subject to exceptions.*

Several topics identified by Boston Edison for the further depositions under Rule 30(b)(6) overlap the areas covered by the prior depositions. Under Topic 1, for example, Boston Edison seeks: "The [g]overnment's understanding of the history and development of the nuclear industry and the impact of the [NWPA] on the nuclear industry, including the Government's responsibility for the storage, removal, and disposal of spent nuclear fuel prior and subsequent to the passage of the NWPA." Proposed Deposition Notice at 4. This topic is duplicative and cumulative because this general subject was central to addressing the previously-filed dispositive motions that were the focus of the coordinated discovery conducted several years ago. Boston Edison had ample opportunity to question the government's representatives on these areas. *See* RCFC 26(b)(2)(i)-(ii).

Similarly, under Topic 2, Boston Edison seeks deposition testimony about eight subtopics related to "[t]he Standard Contract entered into between [DOE], on behalf of the United States, and Boston Edison Company dated June 17, 1983." Proposed Deposition Notice at 4. Topic 2.a. relates to the governmental representatives' view of the purpose of the Standard Contract. *Id*. This subtopic is cumulative and duplicative of the prior depositions. In like vein, Topic 2.b. concerns the formulation of the terms of the Standard Contract. *Id*. Here, however, Boston Edison may conduct depositions on this subtopic under RCFC 30(b)(6), but *only* insofar as the subtopic relates to the formulation of the assignment provision in the Standard Contract agreement. The assignment provision of the Standard Contract was not put at issue in the previously pending motions that circumscribed the prior discovery. *See* Hr'g Tr. 71:4-10 (Jan.

11, 2007) (government counsel's concession that the assignment provision of the Standard Contract was not at issue during the coordinated discovery previously conducted).

Topic 2.c. relates to the comments DOE received during the "notice and comment" period for the Standard Contract. Proposed Deposition Notice at 4. This subtopic is duplicative and cumulative. Further, Topic 2.d. has a parallel to Topic 2.b. in that Boston Edison seeks to gather information on the government's views of the "terms and requirements of the Standard Contract." *Id*. Thus, this subtopic also is duplicative and cumulative, *see* RCFC 26(b)(2)(i), except that Boston Edison may conduct depositions insofar as the subtopic relates to the formulation of the assignment provision in the Purchase and Sale agreement.

Under Topic 2.e., Boston Edison wishes to examine governmental witnesses as to the assignment provision of the Standard Contract. Proposed Deposition Notice at 4. The assignment provision of the Standard Contract was central to Boston Edison's sale of the Pilgrim nuclear facility and is at the heart of its theory of damages – that the government's breach diminished the value Boston Edison received from Entergy in the Pilgrim sale. *See Boston Edison II*, 67 Fed. Cl. at 64-65. It was not addressed during the prior coordinated discovery. As a result, Boston Edison may conduct depositions under RCFC 30(b)(6) regarding this subtopic. Correlatively, Topic 2.f. focuses on the expectations of Boston Edison and DOE at the time the two parties signed the Standard Contract in 1983. Proposed Deposition Notice at 4; Boston Edison Compl. ¶ 9. Boston Edison may conduct depositions on this subtopic under RCFC 30(b)(6), insofar as the parties' expectations in 1983 concerned the assignment provision.

Under Topic 3, Boston Edison seeks discovery on the government's view of the utility's performance under the Standard Contract. Proposed Deposition Notice at 5. The government objects that the topic is "overly broad and vague." Def.'s Resp. to 30(b)(6) Mot. at 14-15. The government has made no claim that Boston Edison breached the Standard Contract, so Boston Edison's interest in this subject is simply not "relevant to [a] claim or defense." *See* RCFC 26(b)(1). Boston Edison may not conduct depositions under RCFC 30(b)(6) regarding this topic.

Topic 4 concerns the government's performance under the Standard Contract, including the government's latest estimate of when it expects to bring on-line an SNF repository, to the extent that estimate differs from those the government made in 2002. Proposed Deposition Notice at 5. The government claims that this topic is not relevant to Boston Edison's damages claim and is cumulative and duplicative. Def.'s Resp. to Boston Edison's 30(b)(6) Mot. at 15. Coordinated discovery gave Boston Edison ample opportunity to delve into the government's views on its performance under the Standard Contract up to 2002. *See* RCFC 26(b)(2)(ii). Undoubtedly, the government's estimates on the availability of a SNF repository have changed since 2002, but that circumstance does not affect Boston Edison's claims because it sold Pilgrim in 1999. *See* RCFC 26(b)(1); *Entergy Nuclear Generation*, 64 Fed. Cl. at 338. Boston Edison may not conduct depositions under RCFC 30(b)(6) regarding this topic.

4. *New topics that may be addressed, subject to limitations.*

Topics 2.g. and h. relate to "the relationship of the Standard Contract to the renewal of the operating licenses of nuclear plant operators and utilities" and the intent of Boston Edison and DOE at the time of contracting regarding future on-site storage of SNF, respectively. Proposed Deposition Notice at 5. Boston Edison, as part of the process for transferring its operating license to Entergy, was required to transfer to Entergy a "fully funded decommissioning trust fund." *Boston Edison I*, 64 Fed. Cl. at 180. Boston Edison alleges that because the government's breach led the utility to keep onsite more SNF and high-level radioactive waste, Boston Edison transferred to Entergy a much larger decommissioning fund than it would have in the absence of the government's breach. *Id.* at 184. Boston Edison's counsel also explains that models used to measure Boston Edison's damages make certain assumptions about whether the facility's operating license would be extended, both to encompass on-site storage of SNF and to provide a lengthier operating period. *See* Hr'g Tr. 103:16 to 104:5 (Jan. 11, 2007). Boston Edison wishes to question officials of the Nuclear Regulatory Commission ("NRC") about whether there was any linkage between the Standard Contract and license renewal in this connection. *See* Hr'g Tr. 103:16 to 104:5 (Jan. 11, 2007). The previously conducted depositions appear not to have addressed these issues with any particularity. Boston Edison may conduct depositions under RCFC 30(b)(6) regarding these subtopics.

Topic 5 addresses the government's understanding of the costs incurred by nuclear utilities for temporary fuel storage as a result of DOE's failure to begin accepting SNF on January 31, 1998. Proposed Deposition Notice at 5; 42 U.S.C. § 10222(a)(5)(B). The government objects to any depositions on Topic 5, claiming that the information Boston Edison seeks is legal, not factual, and involves information protected by the attorney-client privilege and the work product doctrine. Def.'s Resp. to 30(b)(6) Mot. at 15-16. Inquiring about the government's views on the costs associated with temporary fuel storage is a factual, not a legal matter. Moreover, to the extent that any deposition questions encroach upon the attorney-client privilege or the protection provided by the work product doctrine, the government may interpose a contemporaneous objection. *See* RCFC 30(c), (d)(1); *Bogan*, 152 F.R.D. at 14. Information on temporary fuel storage costs might be relevant to Boston Edison's diminution-in-value claims because part of the utility's damages theory is that the "anticipated capital expenses associated with storing SNF indefinitely" created uncertainty in the market that limited the price Boston Edison could demand for Pilgrim. *See* Boston Edison's Am. Compl. ¶ 6; RCFC 26(b)(1). Moreover, this topic might be relevant to Boston Edison's efforts to rebut government claims that any damages in this case were unforeseeable. Hr'g Tr. 98:4-23 (Jan. 11, 2007); *see also Boston Edison I,* 64 Fed. Cl. at 183 ("The government argues that such damages are too remote, speculative, and unforeseeable to be recovered."). Nonetheless, Boston Edison's relevant interest in this topic ended in 1999 when it sold Pilgrim. *See Entergy Nuclear Generation*, 64 Fed. Cl. at 338. Therefore, Boston Edison may conduct depositions under RCFC 30(b)(6) regarding this topic, but only as to the government's understanding of the costs associated with temporary fuel storage up to July 13, 1999.

Under Topic 6, Boston Edison requests leave to depose governmental representatives concerning the government's estimated liability, particularly to Boston Edison, due to the government's failure to accept SNF. Proposed Deposition Notice at 5; 42 U.S.C. § 10222(a)(5)(B). As with Topic 5, the government asserts that Boston Edison inappropriately is seeking legal, rather than factual, information and that the subject matter involves materials and knowledge protected by the attorney-client privilege and the work product doctrine. Def.'s Resp. to 30(b)(6) Mot. at 15-16. That the government's representatives might have had knowledge about the government's estimated liability is not necessarily a legal matter, and, as noted *supra*, to the extent that any deposition questions implicate the attorney-client privilege or the work product doctrine, the government may object during the depositions.

In this vein, some courts have permitted discovery of reserve funds that defendants might have established with respect to a claim. Courts permitting discovery of a defendant's reserves have reasoned that the reserves might be relevant not because they constitute an admission of liability, but because they might be pertinent to other issues such as the plaintiff's attempts to rebut a defense, notice, or the defendant's bad faith. *See Simon v. G.D. Searle & Co.*, 816 F.2d 397, 400-02, 404 & n.8 (8th Cir. 1987) (reserve information on a self-insured defendant is discoverable under Fed. R. Civ. Pro. 26(b)(1); the work product doctrine precludes discovery of defendant's individual case-reserve figures, but permits discovery of aggregate case-reserve data in risk-management documents); *Athridge v. Aetna Cas. and Sur. Co.*, 184 F.R.D. 181, 193-94 (D.D.C. 1998) (plaintiff's request for production of information on defendant's establishment of a reserve for plaintiff's tort claims was relevant to the plaintiffs' accusations of bad faith and breach of duty); *Savoy v. Richard A. Carrier Trucking, Inc.*, 176 F.R.D. 10, 12 (D. Mass. 1997) ("[T]he date and amount of the reserve, as well as any modification of that amount, may well relate to [the defendant's] determination of its potential risk in this matter and, hence, reveal its view on liability" and thus be illustrative of whether defendant's insurer acted in bad faith by not settling.); *Stonewall Ins. Co. v. National Gypsum Co.*, 1988 WL 96159, at *7 (S.D.N.Y. 1988) (upholding magistrate judge's order permitting third-party plaintiff to discover via deposition testimony information related to defendants' reserves because "the very limited burden imposed . . . [did] not outweigh the possibly relevant information [about the reserves]" and because defendants still had the "opportunity, upon deposition, to object to the production of certain information on the grounds of privilege."). *But see Carlson v. Freightliner LLC* , 226 F.R.D. 343, 366-67 (D. Neb. 2004) (denying discovery of reserves on work product grounds); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 139 F.R.D. 609, 614 (E.D. Pa. 1991) (same); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chemical Co.,* 558 A.2d 1091, 1097-1098 (Del. Super. Ct. 1989) (denying discovery of reserves on relevancy grounds); *Leksi, Inc. v. Federal Ins. Co.*, 129 F.R.D. 99, 106 (D.N.J. 1989) (same); *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 117 F.R.D. 283, 288 (D.D.C. 1986) (same); *Union Carbide Corp. v. Travelers Indem. Co.*, 61 F.R.D. 411, 413 (W.D. Pa. 1973) (same). Given that Boston Edison has alleged that the government has breached its duty of good faith and fair dealing, *see* Boston Edison's Am. Compl. ¶¶ 1, 23, 26, 77-78, and that the government has contended that Boston Edison's damages are not foreseeable, *see Boston Edison I,* 64 Fed. Cl. at 183, limited discovery on this subject would be relevant both to a claim and to a defense. Nonetheless, any

estimates of liability to owners and operators of facilities other than Boston Edison arguably would not be relevant, and even Boston Edison's relevant interest in the government's estimates ended upon the sale of Pilgrim in 1999. Therefore, Boston Edison may conduct depositions on this topic under RCFC 30(b)(6), but only regarding the government's estimates of its potential liability up to July 13, 1999, and not related to facilities other than the Pilgrim nuclear power generating station.

Finally, Topic 7 relates to the government's knowledge of various aspects of the Pilgrim sale. Proposed Deposition Notice at 5-6. As a general matter, the government argues that some subportions of Topic 7 seek information that either is not relevant to a claim or defense or is legal, not factual in nature. *See* Def.'s Resp. to 30(b)(6) Mot. at 16; Hr'g Tr. 79:5-7, 82:14-17, 85:5 to 86:25 (Jan. 11, 2007). Regarding other portions of this Topic, the government would prefer that Boston Edison provide more specificity, but the government does not expressly object to the projected depositions on such subtopics. *See* Def.'s Resp. to 30(b)(6) Mot. at 16; Hr'g Tr. 87:23 to 89:19 (Jan. 11, 2007).

Addressing the particular subtopics in order, Topic 7.a. concerns the government's understanding of the provisions of the Pilgrim Purchase and Sale Agreement, including those related to Boston Edison's retention of claims related to the Standard Contract. Proposed Deposition Notice at 5. The government asserts that "the [g]overnment's interpretation of a sales contract between two private parties simply has no bearing [on] the resolution of the claims at issue in this case." Def.'s Resp. to 30(b)(6) Mot. at 16. The government's contention in this connection is persuasive. The government's views as to the Boston Edison-Entergy Purchase and Sale Agreement are not relevant to any claim or defense in this case. RCFC 26(b)(1). Boston Edison may not conduct depositions under RCFC 30(b)(6) regarding this subtopic.

Topic 7.b. focuses on the government's knowledge, oversight, and approval of the transfer of the Standard Contract from Boston Edison to Entergy. Proposed Deposition Notice at 5. The NRC's approval of the transfer of the Pilgrim operating license from Boston Edison to Entergy is at the heart of this subtopic. Among other things, Boston Edison transferred the decommissioning fund for Pilgrim to Entergy, and under Topic 7.c., Boston Edison requests leave to take depositions of governmental representatives concerning that transfer. Proposed Deposition Notice at 5. As noted *supra* in the discussion of Topic 2.g., an integral part of Boston Edison's theory of damages involves its claim that the government's breach in effect forced the utility to transfer to Entergy a larger sum that it otherwise would have transferred. The role of governmental officials, including NRC personnel, in approving the transfer of the Pilgrim operating license might be relevant, particularly because Boston Edison, as part of the sale of Pilgrim to Entergy, was required to transfer a "fully funded decommissioning trust fund." *Boston Edison I*, 64 Fed. Cl. at 180. The limits on the previously conducted coordinated discovery would have precluded Boston Edison from pursuing this line of inquiry. *See* Boston Edison's 30(b)(6) Reply, Ex. A (Order of February 1, 2002, Sypolt, J.) at 2. Therefore, Boston Edison may conduct depositions on these subtopics under RCFC 30(b)(6).

Topic 7.d. and e. concern events in the proceedings before the NRC related to the transfer of Pilgrim to Entergy. Proposed Deposition Notice at 5-6. Subtopic 7.d. addresses Requests for Additional Information made by the NRC in connection with the application for transfer, *see* Proposed Deposition Notice at 5; Hr'g Tr. 93:22 to 94:1 (Jan. 11, 2007), and subtopic 7.e. focuses on a safety evaluation performed by the NRC's Office of Nuclear Reactor Regulation, including "comments and conclusions therein relating to decommissioning." Proposed Deposition Notice at 6. The government makes no direct objection to depositions on these subtopics, and the government's counsel conceded that governmental representatives had not been deposed on these subtopics during coordinated discovery. Hr'g Tr. 87:23 to 88:17 (Jan. 11, 2007). Boston Edison may conduct depositions on these subtopics under RCFC 30(b)(6).

In sum, Boston Edison is granted leave to depose the government's designated representatives under RCFC 30(b)(6), but only as to the subjects approved in this opinion.

## CONCLUSION

For the reasons stated, Boston Edison's motion for a protective order to preclude the deposition of Mr. Mattia is GRANTED IN PART and DENIED IN PART. The government's cross-motion to compel Mr. Mattia's deposition is GRANTED. The government may depose Mr. Mattia, provided the scope of the deposition is limited to the events and circumstances surrounding the Pilgrim sale and excludes areas of inquiry protected by the work product doctrine.

Boston Edison's motion for leave to take further depositions under RCFC 30(b)(6) is GRANTED IN PART and DENIED IN PART. The government's cross-motion for a protective order is GRANTED IN PART and DENIED IN PART. Boston Edison may conduct additional depositions regarding the subject matters identified as appropriate in this opinion and order.

It is so ORDERED.

s/ Charles F. Lettow
Judge