*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY,**<br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant.** | ) | |
| **ENTERGY NUCLEAR GENERATION CO.,**<br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant.** | ) | **No. 99-447C**<br>**No. 03-2626C**<br>**(Judge Charles F. Lettow)** |

**PLAINTIFF BOSTON EDISON COMPANY'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**Richard J. Conway**
**DICKSTEIN SHAPIRO LLP**
**1825 Eye Street, NW**
**Washington, DC 20006-5403**
**Tel: (202) 420-2200**
**Fax: (202) 420-2201**

**Counsel of Record for Boston Edison Company**

**Of Counsel:**
**Bradley D. Wine**
**Nicholas W. Mattia, Jr.**
**Bernard F. Sheehan**
**DICKSTEIN SHAPIRO LLP**
**1825 Eye Street, NW**
**Washington, DC 20006-5403**

**Neven Rabadjija, Esq.**
**Associate General Counsel**
**NSTAR Electric & Gas Corporation**
**800 Boylston Street, 17th Floor**
**Boston, MA 02199-0228**

**March 30, 2007**

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iv

I. INTRODUCTION ........ 1

A. Resolved Issues Of Fact And Law ........ 3

1. This Court Has Subject Matter Jurisdiction over This Case ........ 3

2. Boston Edison and DOE Entered into a Standard Contract ........ 3

3. DOE Breached the Standard Contract ........ 3

4. Boston Edison Performed All of Its Obligations Under the Standard Contract ........ 4

5. Boston Edison's Damages Were a Foreseeable Consequence of DOE's Breach ........ 4

B. Unresolved Issues Of Fact And Law ........ 5

1. The Rate of Acceptance of SNF Under the Standard Contract ........ 5

2. DOE's Breach Diminished the Value of Pilgrim ........ 5

3. The Amount That DOE's Breach Diminished the Value of Pilgrim ........ 6

II. CONTENTIONS OF FACT ........ 6

A. Introduction ........ 6

B. The NWPA And The Standard Contract Were Intended As Solutions To The National Crisis Of SNF Storage And Disposal ........ 7

1. The NWPA ........ 7

2. The Standard Contract ........ 8

3. Boston Edison's Nuclear Power Operations and Entry into the Standard Contract ........ 10

C. Even After DOE Breached The Standard Contract, It Continued To Require Performance Of The Owners And Operators ........ 11



DSMDB-2234756v01

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Page

D. DOE's Performance At A Rate Of 3,000 MTU Per Year Is Reasonable And Is Consistent With DOE Documents And Statements ..... 13

1. The 3,000 MTU Rate Is Consistent with the Understanding of the Parties and with Various DOE Documents and Statements ..... 13

2. The 3,000 MTU Rate Avoids the Need for Additional Storage and Reduces the Backlog ..... 15

3. The Government Has Charged Boston Edison Fees Based on the 3,000 MTU Rate ..... 16

4. The Government's Suggested Rate of Acceptance Is Inconsistent with the Expectations of Boston Edison and with the Goals of the NWPA and the Standard Contract ..... 17

E. DOE's Breach Adversely Affected The Sale Of Pilgrim ..... 17

1. Background on the Sale of Pilgrim ..... 17

2. Boston Edison Sold Pilgrim to Entergy and Assigned Its Standard Contract to Entergy ..... 18

3. Entergy Based Its Bid, in Part, on the Prospect and Necessities of Extended Storage of SNF On-Site at Pilgrim ..... 21

F. DOE's Breach Significantly Reduced The Value That Boston Edison Received For Pilgrim ..... 21

1. Boston Edison Transferred a Greater Amount in Its Decommissioning Fund to Address the Impact of DOE's Breach on Entergy's Future Costs for Decommissioning Pilgrim ..... 22

a. Background on Decommissioning Pilgrim ..... 23

b. Estimates of Decommissioning Costs and Risks in Entergy Bid ..... 24

c. Background on the Decommissioning Fund Transferred as Part of the Pilgrim Sale ..... 25

d. Decommissioning Cost Estimates ..... 26

2. Entergy Included Costs Associated with Re-Racking Pilgrim's Spent Fuel Pool in Its DCF Valuation Model ..... 27

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Page

3. Entergy Used a Higher Rate of Return and Was Unable to Obtain External Financing ........ 28

G. Comparable Transactions Involving Other Similar, But Non-Nuclear, Electric-Generating Assets Demonstrate The Reasonableness Of Boston Edison's Calculation Of Damages Associated With The Diminished Value Of Pilgrim ........ 29

III. CONTENTIONS OF LAW ........ 30

A. DOE Breached The Standard Contract And Boston Edison Should Be Awarded Its Resulting Damages ........ 30

1. Boston Edison Is Entitled to Recover Damages for DOE's Breach of the Standard Contract ........ 30

2. Under Well-Established Contract Principles, the Diminished Value of the Pilgrim Plant upon Sale by Boston Edison Is the Proper Measure for Damages ........ 31

3. Use of a Discounted Cash Flow Analysis Is an Accepted Reasonable and Appropriate Methodology to Determine Boston Edison's Damages with Reasonable Certainty ........ 32

4. Boston Edison's Diminished Value Damages Were Reasonably Foreseeable and Caused by DOE's Breach ........ 34

5. Because There Is No Standard Contract Term Specifying DOE's Rate of Performance Obligation, This Court Should Supply an Acceptance Rate Term Which Comports with Standards of Fairness and Policy and Is Consistent with the Intent of the NWPA and the Standard Contract ........ 36

B. DOE's Actions Violated The Duty Of Good Faith And Fair Dealing ........ 38

IV. CONCLUSION ........ 40

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

TABLE OF AUTHORITIES

Page

Cases:

*Am. Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586 (2006) ....................35

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) ....................38

*Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126 (2003) ....................34

*Bank of Am., FSB v. United States*, 70 Fed. Cl. 246 (2006) ....................36

*Barco Urban Renewal Corp. v. Hous. Auth. of Atl. City*, 674 F.2d 1001 (3d Cir. 1982) ....................37

*Barrett Ref. Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001) ....................33

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ....................35

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) .................... *passim*

*Boston Edison Co. v. United States*, Nos. 99-447C, 03-2626C, 2007 WL 610885
(Fed. Cl. Feb. 26, 2007) ....................4

*Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) ....................35

*Cane Tenn., Inc. v. United States*, 71 Fed. Cl. 432 (2005), *aff'd*, No. 06-5045,
2007 WL 188155 (Fed. Cir. Jan. 10, 2007) ....................33

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ....................38

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) ....................35, 36

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ....................37

*Commonwealth Edison v. Dep't of Energy*, 877 F.2d 1042 (D.C. Cir. 1989) ....................9

*Consol. Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285 (2005) ....................31, 32

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ....................36, 37

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ....................36

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ....................30

*Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) ....................4, 30

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) ....................37

Page

*Fifth Third Bank v. United States*, 71 Fed. Cl. 56 (2006) ........................................................34

*Foster v. United States*, 2 Cl. Ct. 426, 447 (1983) ........................................................33

*Howell v. United States*, 51 Fed. Cl. 516 (2002) ........................................................36

*Hubbard v. United States*, 52 Fed. Cl. 192 (2002), *aff'd in part, vacated in part*, 2007 WL 817647 (Fed. Cir. Mar. 20, 2007) ........................................................38

*Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88 (2003) ....................................36, 37, 38

*Ind. Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ........................30, 34, 35

*Landmark Land Co. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365 (Fed. Cir. 2001) ........................34

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ................3, 30

*N. States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ...............................3, 30

*Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) ..........................................35

*Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460 (2006) ...............................34

*Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122 (2004) ...............................34

*Seravalli v. United States*, 845 F.2d 1571 (Fed. Cir. 1988) ..............................................33

*Suel v. Sec'y of HHS*, 192 F.3d 981 (Fed. Cir. 1999) ..........................................................5

*Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) ..............................................35

*United States v. Miller*, 317 U.S. 369 (1943) ........................................................33

*Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394 (1989), *aff'd*, 926 F.2d 1169 (Fed. Cir. 1991) ........................................................34

*Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249 (2006) ..................................35

*Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997) ...............................38

Statutes and Regulations:

Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257-61 (1983) (codified as amended at 42 U.S.C. § 1022296 Stat. 2201 (1983) ........................ *passim*

42 U.S.C. § 10222 ........................................................1

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Page

42 U.S.C. § 10222(a)(1) ........ 8

42 U.S.C. § 10222(a)(4) ........ 16

42 U.S.C. § 10222(a)(5)(B) ........ 9

42 U.S.C. § 10222(b)(1)(A) ........ 8

42 U.S.C. § 10222(b)(3) ........ 4, 9

42 U.S.C. § 10224 ........ 14

10 C.F.R. pt. 20 subpt. E ........ 23

10 C.F.R. § 50.54(bb) ........ 23

10 C.F.R. § 50.75 ........ 23

10 C.F.R. § 50.75(e)(1)(ii) ........ 25

10 C.F.R. § 50.82 ........ 23

10 C.F.R. § 51.53 ........ 23

10 C.F.R. § 51.95 ........ 23

10 C.F.R. § 961.11 ........ 9

Rules:

Rules of the Court of Federal Claims, Appendix A ¶ 14(a) ........ 1

Other Authorities:

11 Arthur Linton Corbin, *Corbin on Contracts* § 1009 (1964) ........ 34

DOE, A Roadmap to Deploy New Nuclear Plants in the United States by 2010, Oct. 31, 2001 ........ 25

48 Fed. Reg. 5,458 (Feb. 4, 1983) ........ 9

59 Fed. Reg. 27,007, 27,008 (May 25, 1994) ........ 12

60 Fed. Reg. 21,793, 21,794 (May 3, 1995) ........ 12

Mass. DTE, D.P.U./D.T.E. 96-23, Feb. 24, 1998 ........ 18

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Page

Mass. DTE, D.T.E. 98-119 ....................18, 20

NRC Fact Sheet on Decommissioning Nuclear Power Plants....................23

Prudential Securities, Nuclear Power Plants – Annual Update, May 16, 1997 ....................25

Restatement (Second) of Contracts § 204 (1981)....................36, 37

Restatement (Second) of Contracts § 348 (1981)....................31, 32

Steven Tetreault, *Yucca Director Downplays Project Timeline*, Stephens Washington Bureau, Nov. 30, 2006 ....................12

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **BOSTON EDISON COMPANY,** **Plaintiff,** v. **THE UNITED STATES,** **Defendant.** | **No. 99-447C** |
| **ENTERGY NUCLEAR GENERATION CO.,** **Plaintiff,** v. **THE UNITED STATES,** **Defendant.** | **No. 03-2626C** **(Judge Charles F. Lettow)** |

**PLAINTIFF BOSTON EDISON COMPANY'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's Order of February 26, 2007, and Rules of the Court of Federal Claims, Appendix A ¶ 14(a), Plaintiff Boston Edison Company ("Boston Edison")[1] submits the following Memorandum of Contentions of Fact and Law.

I. INTRODUCTION

On June 17, 1983, Boston Edison entered into a Standard Contract with the Department of Energy ("DOE") under the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257-61 (1983) ("NWPA") (codified as amended at 42 U.S.C. § 10222). The Standard Contract obligates DOE to dispose of spent nuclear fuel and high-level radioactive waste ("SNF") that has been generated at the Pilgrim Nuclear Power Station ("Pilgrim"). Under the Standard Contract, DOE was to begin accepting SNF for disposal no later than January 31, 1998. To date, DOE has not yet begun accepting SNF for disposal

[1] Effective January 1, 2007, Boston Edison formally changed its name to NSTAR Electric Company.

from Pilgrim or from any other nuclear power facility, and DOE does not currently expect to begin accepting SNF for disposal until at least 2020.

On July 13, 1999, Boston Edison sold Pilgrim to Entergy Nuclear Generation Company ("Entergy"). As part of the Purchase and Sale Agreement, Boston Edison assigned its Standard Contract to Entergy. Also as part of the Purchase and Sale Agreement, Boston Edison expressly retained claims against DOE that had accrued as of the closing date, whether those claims related to periods prior to or following the closing date. Boston Edison will demonstrate at trial that it suffered compensable damages as a result of DOE's breach when it sold Pilgrim to Entergy. In particular, Boston Edison seeks damages for the diminished value that Boston Edison received for Pilgrim, including both a reduced purchase price and an increased decommissioning trust fund that was required to be transferred as part of the sale.[2] The Government's actions and omissions which resulted in the breach of the Standard Contract also violated DOE's duty of good faith and fair dealing.

As a seller of a nuclear facility, Boston Edison is entitled to damages associated with the diminished value it suffered in the sale of Pilgrim resulting from DOE's failure to meet its obligations under the NWPA and the Standard Contract. Boston Edison's damages are readily ascertainable as of the closing date of its sales transaction. Boston Edison will prove at trial that DOE's breach reduced the value that Boston Edison received for Pilgrim in three ways, for a total of $123.5 million. First, DOE's breach caused an increase in Pilgrim's projected decommissioning funding requirement, i.e., the amount that Boston Edison was required to transfer to Entergy pursuant to its bid for Pilgrim was increased by $86.2 million in an effort by

[2] The same conduct underlying the breach also constituted a taking for which Boston Edison is entitled to just compensation. Boston Edison has elected not to pursue its takings claim. On February 15, 2007, Boston Edison notified the Government and Entergy by letter that it elected not to pursue its takings claim. Again, on March 20, 2007, Boston Edison sent a letter notifying the Government that Boston Edison was willing to dismiss its takings claim.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Entergy to minimize the future costs associated with DOE's breach. Second, Entergy's valuation of Pilgrim reflected the need to install additional spent fuel pool racks because of DOE's breach, reducing the value of Pilgrim by $0.947 million. Third, DOE's breach increased the business risk associated with owning and operating a nuclear facility, thereby reducing Entergy's valuation of Pilgrim. Entergy had to rely upon a higher rate of return and had to finance the transaction entirely through equity, thereby reducing the deal value of Pilgrim by $36.4 million.

A. Resolved Issues Of Fact And Law

1. This Court Has Subject Matter Jurisdiction over This Case

The Court of Appeals for the Federal Circuit held that the Court of Federal Claims has jurisdiction over suits for partial breach of the Standard Contract brought by nuclear utilities against the Government. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) ("*Maine Yankee*"); *N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). More recently, this Court confirmed that the Tucker Act granted it subject matter jurisdiction over claims arising under the Standard Contract. *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 179 (2005) (Lettow, J.) ("*Boston Edison*").

2. Boston Edison and DOE Entered into a Standard Contract

It is uncontested that, on June 17, 1983, Boston Edison and DOE entered into a Standard Contract (No. DE-CR01-83-NE44368). *See* Defendant's Answer and Affirmative Defenses to Plaintiff's Amended Complaint ¶ 31.

3. DOE Breached the Standard Contract

The Federal Circuit held as a matter of law that the Government's failure to begin acceptance of SNF by January 31, 1998, was a partial breach of the Standard Contract that applied to all nuclear utilities: "The breach involved all the utilities that had signed the contract – the entire nuclear electric industry." *Maine Yankee*, 225 F.3d at 1342. More recently, this

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Court granted Entergy's motion for summary judgment and held that the Government was liable to Entergy for partial breach of the Standard Contract, and this breach of the Standard Contract at issue in this case occurred prior to the sale of Pilgrim (i.e., during Boston Edison's ownership of Pilgrim). *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343-44 (2005). Further, this Court held that Boston Edison demonstrated a sufficient showing of damages to be granted judgment on liability against DOE for its breach, but the Court denied that judgment because the time of the breach had not been established. *See Boston Edison*, 64 Fed. Cl. at 188.

4. Boston Edison Performed All of Its Obligations Under the Standard Contract

Boston Edison fully complied with all of its obligations under the Standard Contract in a timely fashion, including payment of the one-time fee and the ongoing "One Mil Fee." In its February 26, 2007 order, this Court confirmed that Boston Edison's performance under the Standard Contract was uncontested. *Boston Edison Co. v. United States*, Nos. 99-447C, 03-2626C, 2007 WL 610885 (Fed. Cl. Feb. 26, 2007) ("The government has made no claim that Boston Edison breached the Standard Contract . . . .").

5. Boston Edison's Damages Were a Foreseeable Consequence of DOE's Breach

This Court has previously found that the diminution in value of Pilgrim was a foreseeable result of DOE's breach of the Standard Contract:

> That damages might arise from diminution in value was foreseeable. That sale of nuclear facilities was contemplated by Congress and by DOE is shown by the existence of the assignment provision of the NWPA and by Article XIV of the Standard Contract . . . . It is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained from a sale. Such a diminution resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage.

*Boston Edison*, 64 Fed. Cl. at 183-84 (citations omitted). The existence of the assignment provision in the NWPA, 42 U.S.C. § 10222(b)(3), and in Article XIV of the Standard Contract

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

shows that Congress and DOE contemplated the sale of nuclear facilities. *Boston Edison*, 64 Fed. Cl. at 183. The issue of foreseeability has been resolved and should remain so as the law of the case. *Suel v. Sec'y of HHS*, 192 F.3d 981, 985 (Fed. Cir. 1999).

B. Unresolved Issues Of Fact And Law

1. The Rate of Acceptance of SNF Under the Standard Contract

Although no set rate of acceptance is specified in the Standard Contract, Boston Edison will show at trial that the appropriate and reasonable rate of acceptance of SNF under the Standard Contract was one that: (1) disposed of the current backlog of SNF; (2) disposed of the SNF generated annually; and (3) precluded the need for further storage of SNF on-site after January 31, 1998. Boston Edison will show that a rate of 3,000 metric tons of uranium ("MTU") per year, after an initial "ramp-up" period, is consistent with those goals and is the most efficient means of ensuring that the waste management system capacity had not been overbuilt or underutilized. This rate of acceptance leads directly to the determination that DOE's breach reduced the value that Boston Edison received for Pilgrim. Had the Government performed, there would have been no need for an extended period of storage of SNF on-site at Pilgrim, a fact that bidders took into account when formulating their purchase offers.

2. DOE's Breach Diminished the Value of Pilgrim

Causation of the damages to Boston Edison in the form of diminution in value is an issue of fact. *Boston Edison*, 64 Fed. Cl. at 183. Boston Edison will show that DOE's breach caused a diminution in value of Pilgrim. In particular, Boston Edison will elicit proof at trial that will isolate the effect of DOE's breach by comparing what happened in the "actual" (breach) world to what would have happened had DOE performed as required.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

3. The Amount That DOE's Breach Diminished the Value of Pilgrim

This Court has already held that "if Boston Edison can prove that DOE's failure of performance under the Standard Contract caused a diminution, a calculation of damages based upon diminution in value might be made." *Boston Edison*, 64 Fed. Cl. at 183. At trial, Boston Edison will quantify with reasonable specificity the amount of the damages it incurred.

## II. CONTENTIONS OF FACT[3]

### A. Introduction

The NWPA and the Standard Contract were intended to solve the national crisis associated with the storage and disposal of SNF. When DOE failed to begin acceptance of SNF in 1998, owners and operators of nuclear facilities were forced to deal with the prospect of storage of SNF on-site for many years to come. And when Boston Edison offered Pilgrim at auction in 1998, bidders formulated their offers, in part, on the prospect and necessities of extended storage of SNF on-site. DOE's breach thereby significantly reduced the value that Boston Edison received for Pilgrim.

Specifically, Boston Edison will show at trial that DOE's breach reduced the value that Boston Edison received for Pilgrim in three ways, for a total of $123.5 million: (1) the decommissioning funding that Boston Edison transferred to Entergy was increased by $86.2 million; (2) the need to install additional spent fuel pool racks reduced the value of Pilgrim by $0.947 million; and (3) the increased business risk resulting from DOE's breach caused Entergy to rely upon a higher rate of return and had to finance the transaction entirely through equity, thereby reducing the value of Pilgrim by $36.4 million. Boston Edison will also show at trial that this calculation of damages is reasonable when measured against comparable transactions involving other electric-generating assets.

[3] To the extent that any of the contentions of fact herein are deemed to be contentions of law, or vice versa, Boston Edison hereby incorporates them into the appropriate section.

### B. The NWPA And The Standard Contract Were Intended As Solutions To The National Crisis Of SNF Storage And Disposal

In the late 1970s, the federal ban on reprocessing of SNF created a crisis in the nuclear industry. Many of the nation's nuclear power plants continued to generate highly radioactive SNF, but they had limited capacity to store it and no means to dispose of it. Congress enacted the NWPA to respond to that crisis and to provide a solution to the problem of SNF after the ban on reprocessing.

#### 1. The NWPA

Since the 1950s, the Government has encouraged commercial development and use of nuclear energy. Throughout this period, the Government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Consequently, electric utilities, including Boston Edison, designed, and the U.S. Atomic Energy Commission ("AEC") (and its successor, the Nuclear Regulatory Commission ("NRC")) licensed and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and only for a fraction of the plants' forty-year license lives.

Reprocessing was expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, but in 1976, a moratorium on reprocessing SNF consistent with new arms control initiatives was instituted. In the absence of reprocessing, the inventories of SNF at reactor sites began to increase rapidly until the limited, temporary storage capacity of the spent fuel pools at these plants was consumed. In February 1978, the Task Force for Review of Nuclear Waste Management issued a draft report that provided that disposing of both existing and future nuclear waste from civilian plants was a "fundamental principle." In 1979, the Interagency Review Group on Nuclear Waste Management ("IRG") proposed that the Government construct and operate a repository for permanent SNF disposal by the early 1990s.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

On January 7, 1983, President Ronald Reagan signed into law the NWPA. The NWPA authorized the Secretary of DOE to "enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1). Additionally, the NWPA provided that SNF could only be sent to a federally licensed facility.

Boston Edison will prove at trial that, although the NWPA did not specify a rate for the acceptance of SNF from the utilities, both utilities (including Boston Edison) and the Government intended and understood that SNF would be accepted at a rate consistent with the purpose of the NWPA to alleviate the problem of SNF storage caused by the termination of reprocessing. To alleviate that problem, the rate had to be sufficient to pick up SNF that was currently being generated and also begin to reduce the accumulated backlog of SNF already on-site at the nuclear facilities. It was also understood that the rate of acceptance would be sufficient to preclude the need for any additional on-site storage of SNF after January 31, 1998.

2. The Standard Contract

The NWPA conditioned the NRC's renewal of nuclear facilities' licenses on their entering into, or negotiating in good faith towards, a contract for the disposal of SNF. 42 U.S.C. § 10222(b)(1)(A). Prior to promulgating the Standard Contract, the NRC published a draft of the Standard Contract and solicited comments from the public. Many industry participants, including Boston Edison, submitted comments. In its comments, Boston Edison stated that it would need some indication of the rate at which the planned repository would receive SNF to plan for its own spent fuel storage needs. Despite the comments from Boston Edison, and from many other utilities, DOE declined to insert such a term in the Standard Contract. At the end of the notice and comment period, DOE promulgated a Standard Contract for Disposal of Spent

Nuclear Fuel and/or High-Level Radioactive Waste, codified at 10 C.F.R. § 961.11 ("Standard Contract"). *See* 48 Fed. Reg. 5,458 (Feb. 4, 1983).

Under the Standard Contract, nuclear facilities paid (or deferred, subject to accrual of interest) a one-time fee based on electricity generated prior to April 7, 1983, *see* Standard Contract, art. VIII.B.2; *Commonwealth Edison v. Dep't of Energy*, 877 F.2d 1042, 1043-44 (D.C. Cir. 1989). Utilities also pay a continuing fee based on the amount of further electricity a facility generated and sold. Standard Contract, art. VIII. Boston Edison paid the one-time fee in the amount of $40,582,782.42 on June 27, 1985. Additionally, Boston Edison had paid the continuing one mil/kWh fee ("One Mil Fee") through July 13, 1999, totaling approximately $48,800,000. In exchange, DOE was obliged to begin its disposal services no later than January 31, 1998. *Id.*, art. II.[4]

The NWPA and the Standard Contract both include assignment provisions – at 42 U.S.C. § 10222(b)(3) of the NWPA and Article XIV of the Standard Contract. These provisions indicate that the "rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW [High Level Waste] involved." Beginning with its first draft, the regulations containing the Standard Contract provided for the assignment of the Standard Contract from one Purchaser to another. 10 C.F.R. § 961.11. This provision clearly contemplates the sale of an SNF-generating nuclear plant. As this Court has noted, both Congress and DOE foresaw, or reasonably should have foreseen, that a breach of the Standard Contract would lead to a diminution in value of a plant offered for sale. *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 183-84 (2005) (Lettow, J.) ("*Boston Edison*").[5]

[4] This date was specified in the Standard Contract in conformity with the express requirements of the NWPA. *See* 42 U.S.C. § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.").

[5] Boston Edison was scheduled to depose David K. Zabransky, the Government's Rule 30(b)(6) designee regarding assignment issues, on Tuesday, March 26, 2007. Due to the unavailability of

Further, the Standard Contract sets forth the procedure by which DOE anticipated SNF would be collected. Pursuant to Article IV.B.5(b) of the Standard Contract, starting no later than July 1, 1987, DOE was to issue annual capacity reports ("ACRs") for planning purposes. The ACRs were used to project the total amount of SNF that DOE would accept in a given year. To assist in determining the order in which DOE would accept SNF, DOE issued annual priority rankings ("APRs"), with the general rule being that the oldest fuel or waste was to be given the highest priority. Standard Contract, arts. IV.B.5(a), VI.B.1. To further assist in this process, contract holders were required to provide DOE with information on both actual and projected discharges of SNF on a periodic basis. *Id*., arts. IV.B.5 and VI.B.1(a). Boston Edison submitted all required SNF discharge information in compliance with the Standard Contract.

Beginning January 1, 1992, contract holders could also submit to DOE Delivery Commitment Schedules ("DCS"), which identified "all SNF and/or HLW [the facility] wishes to deliver to DOE beginning sixty-three (63) months thereafter." *Id.*, art. V.B.1. The contract holder had the right to "adjust the quantities of SNF and/or HLW plus or minus (+-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." *Id.*, art. V.B.2. Not less than twelve months before the delivery date, the facility was to submit a Final Delivery Schedule, which was subject to DOE approval. *Id.*, art. V.E.

### 3. Boston Edison's Nuclear Power Operations and Entry into the Standard Contract

Boston Edison is an operating subsidiary of NSTAR, an energy company that provides electricity, gas, and related energy services in Eastern and Southern Massachusetts. Prior to July 13, 1999, Boston Edison was the sole owner and proprietor of the Pilgrim Nuclear

---

the witness as a result of illness, the deposition has been postponed. Boston Edison reserves its right to amend its Memorandum of Contentions of Fact and Law as a result of that deposition.

Power Station in Plymouth, Massachusetts ("Pilgrim"). Pilgrim was issued an operating license by the NRC in December 1972 and has remained in commercial operation to this day. Having been designed and constructed before the enactment of the NWPA, all SNF produced at Pilgrim was originally expected to be shipped off-site for reprocessing. As a result, the need for significant on-site storage capacity was not contemplated in the design or federal approval of the facility. With the elimination of SNF reprocessing and adoption of the NWPA, Boston Edison relied on the Government to accept and dispose of its SNF in accordance with the Standard Contract. On June 17, 1983, Boston Edison executed a Standard Contract with DOE for the disposal of Pilgrim's SNF. Thereafter, Boston Edison paid all fees and met all contractual obligations.

C. Even After DOE Breached The Standard Contract, It Continued To Require Performance Of The Owners And Operators

Even after DOE knew it would be unable to begin disposing of SNF by January 31, 1998, it continued to require Boston Edison's performance under the Standard Contract. DOE made absolutely no provisions for either temporary or permanent SNF storage. Instead, DOE triggered the planning aspects of the Standard Contract, including the DCS process, as if it intended to perform by January 31, 1998. The Government also continued to assess the "One Mil Fee," which it continues to collect to this day. By the closing date of Boston Edison's sale of Pilgrim, Boston Edison's payments into the Nuclear Waste Fund exceeded $89 million.

By the late 1990s, there was no prospect that DOE would take custody or dispose of SNF from Pilgrim in the foreseeable future. DOE had failed to take the steps necessary to place into operation an SNF disposal facility and had failed to make provisions for the temporary storage of SNF until such time as a permanent SNF facility becomes available.[6] By 1994, no

[6] The Government attempts to excuse its behavior by focusing on events that occurred after the passage of the NWPA and the execution of the Standard Contract. For example, the Government argues that a Monitored Retrieval Storage facility, a temporary solution that might have allowed

repository had been built nor had DOE provided a temporary storage facility, and DOE announced that it did not anticipate it would be able to begin disposing of SNF by the 1998 deadline. *See* 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). DOE subsequently estimated that the earliest time a disposal site would be ready was 2010. 60 Fed. Reg. 21,793, 21,794 (May 3, 1995). DOE has moved its date of performance several times, even after the sale of Pilgrim. Most recently, DOE reported that it would begin acceptance and disposition of SNF some time after 2020.[7] Despite the moving deadline, DOE continues to collect fees from owners and operators of nuclear facilities.

In 1993, DOE approved Pilgrim's DCS for 1999. Between 1993 and 1997, Boston Edison continued to submit DCSs for approval. In 1997, when it became manifestly evident that a repository would not be in place by 1998, DOE officials suspended the DCS process. In September 1998, Boston Edison submitted a DCS application for 2004. On November 24, 1998, DOE rejected that application, stating that DOE "is not able at this time to approve your DCS submittal" and waiving the requirement under the Standard Contract that facilities provide a revised schedule within thirty days of a DCS rejection. Boston Edison did not submit a final delivery schedule because the suspension of the DCS process and other events indicated that DOE no longer planned to dispose of SNF in accordance with the previously filed DCS submissions or the requirements of the NWPA and the Standard Contract. Since DOE's breach, DOE renewed the DCS process in 2004 but then halted it again. DOE advised that a further

---

DOE to begin performance by January 31, 1998, was never opened because Congress did not remove the statutory link between construction of a repository and operation of a temporary facility. *Boston Edison*, 64 Fed. Cl. at 186. Such excuses do not absolve the Government of liability to utilities such as Boston Edison.

[7] According to Ward Sproat, director of Office of Civilian Radioactive Waste Management, "[b]ottom line is while [2017] is a best achievable schedule, the most probable schedule is probably in the neighborhood of plus three and a half years." Steven Tetreault, *Yucca Director Downplays Project Timeline*, Stephens Washington Bureau, Nov. 30, 2006.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

resumption of the DCS process would turn on a revised date for the initial operation of the Yucca Mountain repository.

### D. DOE's Performance At A Rate Of 3,000 MTU Per Year Is Reasonable And Is Consistent With DOE Documents And Statements

Although neither the NWPA nor the Standard Contract specifyies a particular rate of acceptance, Boston Edison will offer evidence at trial showing that an industry-wide acceptance rate of 3,000 MTU per year is reasonable and is consistent with the NWPA, the Standard Contract, and DOE documents and statements generated around the time of the Standard Contract. This rate is also consistent with Boston Edison's expectations and understanding before and after executing the Standard Contract. Boston Edison will prove that a 3,000 MTU rate will satisfy both Boston Edison's expectations and the several goals of the NWPA and the Standard Contract. In particular, an annual rate of 3,000 MTU will: (1) avoid additional storage of SNF; (2) allow reduction of the backlog; (3) allow for timely decommissioning of nuclear facilities; and (4) help ensure the efficiency of the Government's storage program. The rate suggested by the Government, however, does not satisfy these goals and otherwise perpetuates the situation that Congress intended to ameliorate.

#### 1. The 3,000 MTU Rate Is Consistent with the Understanding of the Parties and with Various DOE Documents and Statements

DOE made clear its understanding of a reasonable acceptance rate of SNF soon after enactment of the NWPA. DOE understood and intended that no utility would have to add additional spent fuel storage capacity after January 31, 1998. For example, in the December 1983 Draft Mission Plan, DOE assumed a 3,000 MTU annual rate as the rate that would "prevent, in the aggregate, the need for utilities to provide additional storage on-site after 1998."

DOE also understood and intended that the acceptance rate should reflect an efficient spent fuel acceptance program. The acceptance rate should reflect the capacity and

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

specifications of the repository so that it would not be overbuilt or underutilized. In addition, DOE understood and intended that the acceptance rate would be sufficient both to accommodate discharges of spent fuel from commercial reactors after January 31, 1998 and to work off the backlog of previously discharged spent fuel being stored by utilities as of that time. Nuclear utilities, including Boston Edison, shared these understandings.

Indeed, DOE's plans for the spent fuel acceptance program since its inception, up to and including its July 2004 Acceptance Capacity Ranking and Annual Priority Report ("ACR/APR"), have been consistent with, and largely have been predicated on, a 3,000 MTU per year acceptance rate. Numerous DOE documents and statements project that a 3,000 MTU steady-state annual acceptance rate with a five-year ramp-up period would fulfill the intent of the NWPA and the Standard Contract. These documents and statements include:

- At a December 12-15, 1983 Information Meeting sponsored by DOE's Office of Civilian Radioactive Waste Management ("OCRWM"),[8] the Acting Director of OCRWM indicated that the intent of the NWPA was that DOE would begin receiving SNF in 1998 at a rate such that utilities would not have to provide any additional SNF storage facilities on-site.

- The December 1983 Draft Civilian Radioactive Waste Management Program Mission Plan distributed by DOE for comment identified a 3,000 MTU annual steady-state rate as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998."

- The April 1984 Draft Mission Plan for the Civilian Radioactive Waste Management Program distributed by DOE for comment identified a 3,000 MTU annual steady-state acceptance rate after a five-year ramp-up period.

- The June 1985 Mission Plan for the Civilian Radioactive Waste Management Program identified a 3,000 MTU annual steady-state acceptance rate after a five-year ramp-up period (and also identified an enhanced performance system with a higher acceptance rate).

[8] The OCRWM was created by statute to carry out DOE's functions under the NWPA. 42 U.S.C. § 10224.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

- DOE's Rule 30(b)(6) witness on acceptance rates, Tom Pollog, testified that the 3,000 MTU rate was the rate that DOE determined in the mid-1980s would achieve the program objective of alleviating the need for utilities to construct additional on-site storage after 1998.

- Lake Barrett, who has been employed at OCRWM since 1985 in various positions, and who was Deputy Director at the time of his 2002 deposition, testified that the 3,000 MTU rate was established to comply with the intent of the NWPA. Mr. Barrett admitted that the intent of the NWPA was that the rate would accept and dispose of the SNF generated annually and work off the backlog. The rate was also intended to be efficient in terms of the capacity of the proposed repository and was supposed to preclude the need for additional on-site dry storage. Deputy Director Barrett's testimony about the proper balance of total life-cycle costs indicates that the 3,000 MTU rate is based on economic efficiency and the avoidance of economic waste, which was one of the fundamental objectives of the NWPA.

2. The 3,000 MTU Rate Avoids the Need for Additional Storage and Reduces the Backlog

A steady-state rate of 3,000 MTU annually after a short ramp-up period beginning in 1998 would have avoided significant economic waste by eliminating the need to construct significant numbers of expensive interim storage facilities on-site. Given the nature of the utilities' payment obligation under the Standard Contract, it would be unfair and contrary to public policy for DOE's contractual rate obligation to be one that engenders such economic waste.

In total, U.S. commercial nuclear power plants annually generate approximately 2,000 MTU of SNF. By January 31, 1998, the date on which DOE was to have started SNF acceptance, there were approximately 37,000 MTU of SNF that had been permanently discharged from commercial nuclear power plants. Boston Edison will prove at trial that a 3,000 MTU per year acceptance rate would have prevented virtually all utilities from incurring avoidable spent fuel storage costs after January 31, 1998. Such a rate would also have been programmatically efficient in that it would have been technologically achievable and would have helped to minimize program costs.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

The 3,000 MTU rate also furthers the NWPA's environmental and public safety goals. DOE used the 3,000 MTU rate for evaluating the environmental risks and consequences of transporting 70,000 MTU of SNF from the various nuclear plants around the nation to DOE's proposed repository in Nevada. In evaluating potential transportation impacts in Chapter 6 of its Final Environmental Impact Statement, DOE repeatedly notes that the planned duration of the transportation program is twenty-four years and that potential transportation impacts will therefore be limited in time. In addition, the 3,000 MTU rate reflects Congress's goal of reducing, beginning in 1998, the SNF in temporary storage at utility plant sites because of potential health and safety problems. Finally, as to what most likely would have happened had DOE not breached the Standard Contract (i.e., in the "non-breach world"), Deputy Director Barrett admitted that DOE would have operated the system at a rate of 3,000 MTU per year after a five-year ramp-up. In short, both the Government and the nuclear utilities expected an efficient and practicable rate of acceptance of 3,000 MTU per year, eliminating the need for additional at-reactor storage.

### 3. The Government Has Charged Boston Edison Fees Based on the 3,000 MTU Rate

The NWPA requires DOE to annually review the adequacy of the ongoing Standard Contract fees initially set by statute (42 U.S.C. § 10222(a)(4)), and DOE has repeatedly used a 3,000 MTU rate for determining the projected total system life-cycle cost which DOE then uses as the cost basis to determine the adequacy of the fees paid by the utility contract holders. Thus, DOE's fee adequacy assessments show that 3,000 MTU annually is the steady-state rate that Boston Edison and other utilities paid for under the Standard Contract.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

4. The Government's Suggested Rate of Acceptance Is Inconsistent with the Expectations of Boston Edison and with the Goals of the NWPA and the Standard Contract

The Government suggests that a rate based on the 1991 ACR is an appropriate rate. The rate includes a three-year ramp-up to 900 MTU per year and maintenance of that 900 MTU per year rate through the first twelve years of the program. In year thirteen, the rate increases to 1,800 MTU per year for the next five years and then increases to 3,000 MTU per year thereafter. This rate does not meet the goals of the NWPA and the Standard Contract, nor is it consistent with Boston Edison's expectations. The rate is inefficient because it underutilizes the available capacity of the proposed repository for nearly twenty years. Also, because of the slow ramp-up to 3,000 MTU, the rate would have caused additional on-site storage to be necessary after January 31, 1998, and would have increased the average post-shutdown storage period by more than seven years from what would be necessary under Boston Edison's proposed rate of acceptance. Even using the Government's proposed rate, however, Boston Edison will prove at trial that DOE's breach caused approximately $44.5 million in damages from increased decommissioning funding that Boston Edison was contractually obligated to transfer to Entergy.

E. DOE's Breach Adversely Affected The Sale Of Pilgrim

1. Background on the Sale of Pilgrim

In 1996, the Federal Energy Regulatory Commission ("FERC") issued FERC Orders 888 and 889. These orders were intended to eliminate institutional and structural barriers to achieving a national competitive market for electricity by requiring public utility companies, such as Boston Edison, to provide open-access transmission services across their local transmission systems. FERC determined that, by requiring the restructuring of the transmission segment of the nation's electric industry, local electric utilities would no longer be able to exercise vertical market power to inhibit the desired growth of a competitive electric generation industry. In response to the federal initiative to open energy markets to increased competition on

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

a national level, a number of states, including Massachusetts, initiated their own industry-restructuring programs designed to promote open competition for energy services.

Specifically, in November 1997, Massachusetts enacted legislation (the "Restructuring Act") to facilitate industry restructuring. Pursuant to the Restructuring Act, the Massachusetts Department of Telecommunications and Energy ("Mass. DTE") approved a restructuring plan for Boston Edison that required Boston Edison to divest its non-nuclear generation and value its nuclear generation assets, either administratively or via a public auction. Mass. DTE, D.P.U./D.T.E. 96-23, Feb. 24, 1998. Boston Edison decided the best approach was to obtain a market valuation through a competitive sales process.

2. Boston Edison Sold Pilgrim to Entergy and Assigned Its Standard Contract to Entergy

In April 1998, after the Government breached the Standard Contract, Boston Edison initiated a competitive auction process to sell Pilgrim. Boston Edison hired Reed Consulting Group to provide auction management services, including drafting an offering memorandum, soliciting potentially interested bidders, managing the due diligence process, and managing all aspects of the bidding process. Reed Consulting identified and solicited the interest of 175 potentially eligible bidders that were operationally and financially qualified to obtain an NRC operating license for Pilgrim. Mass. DTE, D.T.E. 98-119. The list included a wide range of energy industry participants, and all of the existing U.S. nuclear operators. *Id*. Each of the potential bidders was sent an Early Interest Letter ("EIL") that described in general terms the assets to be marketed and the sales process that would be followed. EIL recipients were invited to express their interest in participating in the auction. *Id*.

Despite these efforts, only nine parties signed the requisite Confidentiality Agreement and met the financial and operating qualifications for owning and operating Pilgrim. *Id*. Qualified bidders were provided with access to a significant amount of information regarding

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

Pilgrim, including: (1) a detailed offering memorandum; (2) various financial, operating, engineering, environmental, human resources, systems, nuclear fuel, and regulatory data; (3) the opportunity to conduct on-site due diligence at Pilgrim; (4) access to management and plant personnel for discussions; and (5) the ability to submit written questions to Boston Edison and receive prompt responses. By the end of the auction due diligence period, two parties, Entergy and AmerGen Energy Company, LLC ("AmerGen"), actually submitted final bids.

Both Entergy and AmerGen conducted extensive due diligence of Pilgrim as part of the sale process. Entergy's due diligence team was led by Dan Keuter and Carolyn Shanks. Each member was responsible for reviewing some aspect of the Pilgrim facility. The purpose of the due diligence was to assess all areas of Pilgrim operations, as well as garner a better understanding of the operations of the plant. The due diligence team consisted of a plant team, an engineering team, and a business team that visited Pilgrim and inspected the physical aspects of the plant, as well as reviewed contracts and outstanding liabilities related to the plant. Specifically, team members were asked to identify whether their assessment area was "adequate" or "not adequate" and, if possible, to identify an initial cost or annual cost expected to remedy the issue being assessed. As part of due diligence, Entergy team members identified necessary upgrades, one of which was the installation of four additional racks in Pilgrim's spent fuel pool. AmerGen performed a similar analysis of Pilgrim.

Entergy was ultimately selected as the winning bidder, and Boston Edison and Entergy entered into a Purchase and Sale Agreement (the "PSA"), dated November 18, 1998. After signing the PSA, Entergy and Boston Edison worked cooperatively to obtain the necessary regulatory approvals to consummate the transaction. These included, among others, approval from the NRC to transfer the operating license and approval of the transaction from the Mass.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

DTE. Both the NRC and the Mass. DTE eventually approved the transaction and license transfer.

As part of the sale of Pilgrim, Boston Edison assigned its DOE Standard Contract (which was then in breach) to Entergy, subject to a reservation of certain rights and claims. This provision arose from concerns expressed prior to the execution of the PSA by the Massachusetts Attorney General ("Mass. AG") that Boston Edison retain and vigorously pursue all claims that Boston Edison had against DOE because of its breach. The Mass. AG wanted Boston Edison to be able to pass on to ratepayers and wholesale customers any damages that were recovered from DOE. As a result of the Mass. AG's concerns, Boston Edison inserted without objection the language in the PSA reflecting that Boston Edison was retaining all of its claims against DOE. The agreed-upon version of that language is included in section 2.2(g) of the PSA and reflects that understanding.

When Boston Edison sought approval from the Mass. DTE for the Pilgrim transaction, Boston Edison, still aware of the Mass. AG's concerns regarding the retention of claims against DOE because of DOE's breach, testified that it had retained those claims as part of the PSA. Representatives from both Boston Edison and the Mass. AG testified that Boston Edison's retained claims were valued at more than $100 million. Entergy, who was present at the Mass. DTE proceedings and had reviewed Boston Edison's pre-filed testimony, never objected to, or contradicted any of the testimony related to Boston Edison's retention of claims. As a result of the proceedings, the Mass. DTE approved the sale in March 1999 and determined that the sales process was competitive and produced an appropriate value for Pilgrim pursuant to the Restructuring Act. Mass. DTE, D.T.E. 98-119.

The Pilgrim sale closed on July 13, 1999, at which time Entergy paid Boston Edison $80.96 million for the plant and its associated land, fuel inventory, and non-fuel inventory. As

part of the terms and conditions of the PSA, Boston Edison transferred to Entergy $427.9 million in order to fully fund the decommissioning trust funds associated with Pilgrim. The terms of the sale also included a Power Purchase Agreement between Boston Edison and Entergy, which provided value to Entergy and certainty of revenue for a defined period of time.

#### 3. Entergy Based Its Bid, in Part, on the Prospect and Necessities of Extended Storage of SNF On-Site at Pilgrim

Entergy employed a Discounted Cash Flow ("DCF") model to develop its purchase price for Pilgrim. This model was prepared by Jack Harrington and populated with data provided by the due diligence team. It included future operations and maintenance costs, capital costs, expected future revenue streams generated by the five-year power purchase agreement with Boston Edison, and forward price curves for the New England power market. Already a nuclear owner and operator, Entergy was aware that DOE had failed to begin acceptance of SNF under the Standard Contract. Thus, Entergy took into account in its assessment of Pilgrim costs associated with the future storage of SNF. Entergy identified a cost of $2.4 million associated with adding additional SNF storage racks in the wet pool at Pilgrim. These costs were also included in capital spending assumptions in the valuation model.

### F. DOE's Breach Significantly Reduced The Value That Boston Edison Received For Pilgrim

As a result of DOE's breach of the Standard Contract, Boston Edison suffered significant damages related to the diminished value it received in the sale of Pilgrim. These damages are due in large part to the enhanced risks recognized by potential buyers associated with the difficulties created by DOE's breach on both decommissioning and future on-site SNF storage costs. In particular, Boston Edison's analysis identifies two types of damages associated with DOE's breach – (1) the need to overfund its decommissioning trust fund that was transferred as part of the sale above that which was required to comply with the NRC's minimum

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

funding requirements, and (2) the diminished asset value that Boston Edison received for Pilgrim.

To quantify these two types of damages, Boston Edison determined market values for Pilgrim both in a scenario where DOE did not breach, but in fact began acceptance of SNF by January 31, 1998, and in a scenario where DOE did breach but began acceptance in 2010 (the date of performance assumed by Entergy in its bid calculations). Boston Edison used a set of assumptions about DOE's performance and the costs to decommission Pilgrim to determine cash flows in the two scenarios. Boston Edison then discounted the cash flows back to the present to determine two different market values for Pilgrim and two different costs for decommissioning, the difference of which determines, in part, the damages that Boston Edison suffered because of DOE's breach of the Standard Contract.

Boston Edison will show at trial that DOE's breach reduced the value that Boston Edison received for Pilgrim in three ways, for a total of $123.5 million: (1) the decommissioning funding that Entergy required Boston Edison to transfer was greater by $86.2 million than what it needed to be due to DOE's breach; (2) the need to install additional spent fuel pool racks reduced the value of Pilgrim by $0.947 million; and (3) due to increased risks resulting from DOE's breach, Entergy required a higher rate of return and had to finance the transaction entirely through equity, thereby reducing the asset value of Pilgrim by $36.4 million.

1. Boston Edison Transferred a Greater Amount in Its Decommissioning Fund to Address the Impact of DOE's Breach on Entergy's Future Costs for Decommissioning Pilgrim

DOE's failure to timely and completely fulfill its obligations under the NWPA and its commitments under the Standard Contract directly resulted in prospective purchasers accounting for the increased costs, risks, and difficulties brought about by DOE in their respective valuations of the asset and in the associated cost estimates for decommissioning. In addition, as an integral

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

part of the Pilgrim sales process, Boston Edison and Entergy were required by rules and regulations of the NRC to obtain NRC consent to the transfer of the Pilgrim operating license. As part of this process, Entergy was required to demonstrate that it was financially qualified to operate the facility and perform safe decommissioning of the facility at the end of its license. While the regulations provide for several options to satisfy the NRC's financial qualifications requirements, Entergy chose to satisfy the NRC by (1) obtaining a $50 million guarantee to cover operating costs if necessary, and (2) requiring a fully funded decommissioning trust to be transferred as part of the sale by Boston Edison. As Entergy represented to the NRC, the amount of the decommissioning trust it sought was well above the NRC minimum calculation in order to account for future costs associated with spent fuel storage, as well as other costs such as greenfielding the site. As described in further detail below, such amounts were substantially in excess of what would have been required if DOE had met its obligations under the NWPA and the Standard Contract.

a. Background on Decommissioning Pilgrim

When a power company decides to close its nuclear power plant permanently, the facility must be decommissioned by safely removing it from service, removing all fuel, and reducing residual radioactivity to a level that permits release of the property and termination of the operating license. The NRC has strict rules governing nuclear power plant decommissioning, which involves the cleanup of radioactively contaminated plant systems and structures and removal of the radioactive fuel. *See* NRC Fact Sheet on Decommissioning Nuclear Power Plants, 10 C.F.R. pt. 20 subpt. E, and 10 C.F.R. §§ 50.54(bb), 50.75, 50.82, 51.53, and 51.95.

Obtaining NRC approval of the license transfer for Pilgrim was an essential and critical element of the sales transaction between Boston Edison and Entergy. An integral element of obtaining, maintaining, and transferring an NRC license for a nuclear power plant

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

such as Pilgrim is the obligation of the existing license holder (Boston Edison) to provide sufficient funds to cover the *full* cost of decommissioning the licensed facilities in accordance with NRC requirements. Entergy assured the NRC that all future costs it would be required to bear as part of the decommissioning of Pilgrim were being covered as part of the sales transaction, including the funds that Boston Edison was required to transfer at closing. Additionally, Entergy repeatedly advised the NRC that the decommissioning trusts it would be receiving from Boston Edison included an amount in excess of the NRC minimum funding requirement in order to account for the future costs associated with on-site SNF storage and greenfielding of the site. These costs were significantly greater than would otherwise have been the case due to DOE's failure to perform its obligations under the NWPA and the Standard Contract.

Boston Edison retained NES, Inc. to prepare decommissioning cost estimates throughout Pilgrim's operating history. These estimates included both the cost to meet the NRC minimum requirements and costs associated with on-site SNF storage. The report that NES prepared in 1998 was an update to an earlier report that NES prepared in 1991. In the updated report, NES evaluated the variability in its cost estimate that was associated with the uncertainties in the DOE SNF storage program. NES noted that it was unknown when and at what rate DOE would eventually begin acceptance and disposal of SNF and that those variables significantly affected the post-shutdown storage and decommissioning costs related to Pilgrim.

b. Estimates of Decommissioning Costs and Risks in Entergy Bid

During the due diligence process, Entergy described the question of when DOE would be able to take Pilgrim's SNF as "easily the most complicated issue associated with decommissioning" and noted that fuel disposition costs were "the single largest cost component

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

of a plant decommissioning." This fact was also recognized by Boston Edison's advisors as well as AmerGen, the second highest bidder in the Pilgrim auction process.

Entergy was aware of the costs associated with decommissioning Pilgrim and the greater costs associated with extended on-site storage of SNF because of DOE's failure to perform. Indeed, the increased costs associated with decommissioning risks were recognized across the industry and in the financial community. "Over the next several years, more and more electric utilities will face the problem of what to do with spent fuel." Prudential Securities, Nuclear Power Plants – Annual Update, May 16, 1997, at 22-23. Further, a report prepared for DOE more than three years after the sale of Pilgrim specifically stated that disposal of SNF remained a critical barrier to investments in nuclear plants. The report also stated that "the long-term disposition of SNF remains a contentious open issue in the U.S. and a serious concern to many regarding the efficacy of proceeding with new nuclear plants." DOE, A Roadmap to Deploy New Nuclear Plants in the United States by 2010, Oct. 31, 2001.

c. Background on the Decommissioning Fund Transferred as Part of the Pilgrim Sale

Pursuant to the rules and regulations of the NRC, Boston Edison was required to deposit funds into a decommissioning trust sufficient to decommission Pilgrim at the end of its operating license. 10 C.F.R. § 50.75(e)(1)(ii). Up to the date of sale of Pilgrim, these trusts were funded by Boston Edison's customers, both retail and wholesale. The PSA for Pilgrim required that Boston Edison deliver a fully funded decommissioning trust at an amount equal to or greater than the minimum amount required by the NRC. The PSA did not include a specific amount for the decommissioning fund to be transferred because of uncertainty regarding tax consequences associated with the fund.[9] To resolve this uncertainty, Boston Edison and Entergy requested a

[9] The decommissioning trust was separated into two types of funds: a qualified fund ("QF") and a non-qualified fund ("NQF"). Generally, a QF has greater tax advantages, but more restrictions on transfer and use, than an NQF fund.

Private Letter Ruling ("PLR") from the IRS regarding the tax consequences associated with the transfer of the decommissioning fund. Upon the issuance of the PLR, Boston Edison transferred trust accounts totaling $427.9 million to Entergy in exchange for Entergy's assuming all decommissioning responsibilities for Pilgrim.

d. Decommissioning Cost Estimates

Boston Edison will prove at trial that, had DOE performed its obligations under the NWPA and the Standard Contract, the amount Boston Edison transferred to Entergy would have been significantly less than $427.9 million. TLG Services, Inc. ("TLG"), Entergy's decommissioning consultant, developed a decommissioning cost estimate for Entergy which forecasted SNF remaining on-site until 2043 and the need for costly on-site storage, all due to DOE's breach. Had DOE performed pursuant to the Standard Contract, there would have been no need for on-site storage. Therefore, the decommissioning cost estimate would have been significantly lower, the targeted funding amount would have been significantly lower, and the decommissioning trust fund amount transferred by Boston Edison to Entergy would have been significantly lower.

Entergy's assumptions were reasonable in 1998 and are consistent with the assumptions used by the other lead bidder for Pilgrim, AmerGen. AmerGen used BNFL, Inc. to assist with its decommissioning cost estimates for Pilgrim. BNFL also included on-site, dry cask storage in an independent spent fuel storage installation in its decommissioning cost estimates.

Consistent with the facts and assumptions described above, Boston Edison, in support of its damage claim, conducted a detailed analysis of the effect of DOE's breach on the decommissioning costs for Pilgrim as they were expected in 1998. Specifically, Boston Edison isolated the damages associated with DOE's breach by determining what the projected decommissioning costs and related funding requirement would have been had DOE performed

under the Standard Contract. By comparing the results of this analysis with a related analysis using Entergy's bid assumptions at the time of the Pilgrim sale, the difference in the funding requirement was determined. DOE's breach caused an increase in Pilgrim's projected decommissioning funding requirement, i.e., the amount that Boston Edison transferred to Entergy, of $86.2 million in 1999 dollars.

2. Entergy Included Costs Associated with Re-Racking Pilgrim's Spent Fuel Pool in Its DCF Valuation Model

The value of Pilgrim was further diminished because Entergy was required to purchase and install four additional racks for spent fuel storage within the plant's wet storage pool that would not have been necessary but for DOE's breach of the Standard Contract. After nuclear fuel has been used to generate electricity and is removed from the reactor core, it is stored on racks that are suspended in the spent fuel pool. Both Entergy and AmerGen specifically noted in their due diligence reports that the new owner of Pilgrim would be required to install four additional racks at a cost of $600,000 per rack for a total of $2.4 million. Entergy's due diligence report stated that Pilgrim would need the new racks in 2000, 2004, 2006, and 2008, to extend the full core reserve capacity to the end of the licensed life of the plant (i.e., 2012).

Using information derived in due diligence, Entergy included the costs associated with these racks in its DCF model, which was used to develop Entergy's purchase price for Pilgrim. Boston Edison will demonstrate at trial that the damages associated with the installation of these racks can be calculated by removing the costs of the racks from Entergy's DCF valuation of Pilgrim. Removing these costs from the DCF model increases the net present value of Pilgrim by $0.947 million. Thus, DOE's breach of the Standard Contract caused Boston Edison $0.947 million of damages related to future spent fuel pool re-racking costs that Entergy included in its valuation of Pilgrim.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

3. Entergy Used a Higher Rate of Return and Was Unable to Obtain External Financing

DOE's breach, and the resulting uncertain risks surrounding SNF storage and disposal, caused Entergy to rely on a higher rate of return in its valuation of Pilgrim than otherwise would have been required, thus producing a lower valuation and purchase price for Pilgrim. The higher rate reflected the increased risks associated with acquiring a nuclear plant with its single most important contract already in breach. DOE's breach thus increased the internal rate of return that Entergy's management and Board required for the Pilgrim investment to compensate for the increased risks of the transaction that were related to DOE's breach. To fairly compensate Entergy over the life of the projects for the risks inherent in the Pilgrim acquisition, Entergy's senior management and Board required a positive net present value for the investment of $30 million, which translated to a 24.73% internal rate of return. This elevated rate of return reflected the significant uncertainties that surrounded the future disposal of SNF and the possibility that SNF could be stored on the Pilgrim site for a long time.

In addition to the higher required return, Entergy's bid for Pilgrim also reflected its plan to finance the transaction entirely through the use of equity, rather than a more conventional mix of debt and equity. The use of all-equity financing also reflected the higher risks imposed on the transaction by the financial markets as a result of DOE's breach and caused the purchase price received by Boston Edison to be reduced. Comparable transactions involving non-nuclear baseload generation assets at the time of the Pilgrim sale demonstrate that a capital structure for the purchase of a baseload generation facility such as Pilgrim would have been financed using 50% debt and 50% equity in the absence of the nuclear-specific risks such as those imposed by DOE's breach of its SNF obligations.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

### G. Comparable Transactions Involving Other Similar, But Non-Nuclear, Electric-Generating Assets Demonstrate The Reasonableness Of Boston Edison's Calculation Of Damages Associated With The Diminished Value Of Pilgrim

As all nuclear plants were tainted by DOE's breach, a comparable transactions analysis of Pilgrim to other nuclear transactions cannot provide any useful information for the purposes of determining the price that would have been received by Boston Edison absent DOE's breach. However, sales of other non-nuclear comparable forms of baseload electric generating assets can provide a useful and commonly utilized benchmark as to the range of value that otherwise would have been attributed to Pilgrim in the absence of DOE's breach. Baseload assets are characterized by substantial upfront capital construction costs and relatively low marginal production costs, and are designed to provide a constant portion of electrical grid demand. Nuclear, coal, and hydro-electric power plants are all considered baseload assets.

A reasonable and accurate basis for comparable sales involves baseload generating assets in the New England, New York, and Mid-Atlantic region that were sold during the 1997 to 1999 time period (the time frame during which Pilgrim was sold). This limits both the impact of geographical market differences and the effect of different market conditions on asset prices over time. Boston Edison will demonstrate at trial that based upon an independent market comparables analysis, the economic analysis performed by Boston Edison of its SNF damages closely approximates the loss in market value produced by the comparables analysis. Boston Edison is not relying upon the comparables analysis as a measure of its SNF damages, but rather as a check against its economic damages calculation.

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

## III. CONTENTIONS OF LAW

### A. DOE Breached The Standard Contract And Boston Edison Should Be Awarded Its Resulting Damages

#### 1. Boston Edison Is Entitled to Recover Damages for DOE's Breach of the Standard Contract

DOE's breach of the Standard Contract is well established in the Federal Circuit. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract - the entire nuclear electric industry."); *see also N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). Granting Entergy's motion for summary judgment on liability, this Court also found that DOE partially breached the Standard Contract in this case prior to the closing, when the Standard Contract was held by Boston Edison. *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343 (2005). Further, this Court previously found that Boston Edison demonstrated a sufficient showing of damages to support a finding on liability against DOE for its breach. *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 188 (2005) (Lettow, J.) ("*Boston Edison*").

The remedy for breach of contract is "damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("*Indiana Michigan II*"). As the Federal Circuit has consistently held, "[d]amages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party . . . ; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)).

Boston Edison will demonstrate at trial that the value of Pilgrim was substantially diminished by DOE's failure to meet its obligations under the NWPA and the Standard Contract. These damages are fixed and readily ascertainable as of the closing date of the Pilgrim sales

transaction, and were, as this Court previously recognized, reasonably foreseeable at the time of the entry into the Standard Contract.

2. Under Well-Established Contract Principles, the Diminished Value of the Pilgrim Plant upon Sale by Boston Edison Is the Proper Measure for Damages

Applying long-standing principles of contract law, this Court has found that diminution in value is a proper measure for foreseeable damages. *See Consol. Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285, 290 (2005) (Lettow, J.) ("*Consolidated Edison*") ("Damages for diminished value may be awarded by this court as incidental or consequential damages where such damages are not unforeseeable or too remote."). Regarding DOE's breach of the Standard Contract, this Court further observed in *Consolidated Edison* that "[b]ecause DOE had to have contemplated that some facilities would be sold, it is also fair to infer that failure to adhere to the Standard Contract might result in the diminution of the value obtained from a sale." *Id.* This Court reached a similar conclusion regarding the diminution in value of the Pilgrim plant:

> That damages might arise from diminution in value was foreseeable. That sale of nuclear facilities was contemplated by Congress and by DOE is shown by the existence of the assignment provision of the NWPA, 42 U.S.C. § 10222(b)(3), and by Article XIV of the Standard Contract . . . . Boston Edison complied with the notice requirements and received no objection from DOE. It is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained from a sale. Such a diminution resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage.

*Boston Edison*, 64 Fed. Cl. at 183-84 (citation omitted). Confirming Boston Edison's ability to recover damages associated with the diminished value of the Pilgrim plant, this Court analogized the sale of Pilgrim to construction contracts where a party recovers for the diminution in value in market price arising from defective or incomplete construction. *Id.* at 182-83. Relying on Restatement (Second) of Contracts § 348 (1981), this Court observed:

> [A] special brand of incidental or consequential damages for construction of homes or facilities on property may be instructive by way of analogy to support Boston Edison's recovery of the diminution in value. For an alternative to loss-in-value of performance for construction contracts, the *Restatement (Second) Contracts* posits reference to the diminution in the market price of the property: "If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on (a) the diminution in the market price of the property caused by the breach . . . ." *Restatement (Second) Contracts* § 348(2).

*Boston Edison*, 64 Fed. Cl. at 182-83; *see also Consolidated Edison*, 67 Fed. Cl. at 290. Applying these Restatement principles to the sale of the Pilgrim plant, this Court found that "[d]iminution in value is assessed in the construction context when the cost of repairing defective construction far exceeds the loss in value." *Boston Edison*, 64 Fed. Cl. at 183. Where, as here, the Government is the ***only*** approved provider for the disposal of SNF, and there is no option of getting another contractor to repair the damage, "[d]iminution in value is left as the appropriate damage assessment." *Id*. In short, because the option of repairing or completing what DOE failed to do is not available to past and present nuclear owners and operators, like Boston Edison, "diminution in value can be an appropriate damage assessment." *Consolidated Edison*, 67 Fed. Cl. at 290.

3. Use of a Discounted Cash Flow Analysis Is an Accepted Reasonable and Appropriate Methodology to Determine Boston Edison's Damages with Reasonable Certainty

Section 348 of the Restatement (Second) of Contracts does not specify a method for determining market value, and this Court did not specify any particular method in its prior rulings in this case. Nonetheless, the Court of Federal Claims and the Federal Circuit have approved methods similar to the discounted cash flow analysis employed by Boston Edison in this case, and by Entergy in its valuation of Pilgrim.

For example, the Court of Federal Claims and the Federal Circuit have generally applied one of three methods to determine the fair market value of a property: (1) comparable

sales, (2) replacement cost, and/or (3) capitalization of income. *See Seravalli v. United States*, 845 F.2d 1571, 1573 (Fed. Cir. 1988) ("*Seravalli*"); *see also Cane Tenn., Inc. v. United States*, 71 Fed. Cl. 432, 438-39 (2005) ("*Cane Tennessee*"), *aff'd*, No. 06-5045, 2007 WL 188155 (Fed. Cir. Jan. 10, 2007).[10]

The Federal Circuit grants trial courts "considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case." *Seravalli*, 845 F.2d at 1575. Trial courts may select "a single method or some combination of different methods" to determine market value. *Id.* "No matter what valuation method is selected for a particular parcel of real property, the Supreme Court has cautioned that the 'assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety.'" *Cane Tennessee*, 71 Fed. Cl. at 439 (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)).

Boston Edison's damages expert, John Reed, used a capitalization of income analysis, also known as discounted cash flow analysis, to analyze the damages Boston Edison has incurred. The Court of Federal Claims and the Federal Circuit have recognized discounted cash flow analysis as an appropriate method to determine the market value of property. *See Foster v. United States*, 2 Cl. Ct. 426, 447 (1983) (recognizing, as a method of determining market value, "the capitalization of income approach (sometimes referred to as 'discounted cash flow' or the 'present worth of future income'), which relates earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at a present value");

---

[10] The Federal Circuit stated that it is "unwilling to restrict the trial courts to any single basis for determining fair market value." *Seravalli*, 845 F.2d at 1575. Further, the Federal Circuit has found that the reasoning of *Seravalli* is not limited to the takings context. In *Barrett Refining*, the Federal Circuit applied the reasoning of *Seravalli* to damages arising from an implied-in-fact contract, specifically noting that the statements in *Seravalli* were "entirely consistent with the concept of affording a trial court discretion." *Barrett Ref. Corp. v. United States*, 242 F.3d 1055, 1061 (Fed. Cir. 2001).

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

*Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 407-08 (1989) (discounted cash flow method used to value coal deposit), *aff'd*, 926 F.2d 1169 (Fed. Cir. 1991).

4. Boston Edison's Diminished Value Damages Were Reasonably Foreseeable and Caused by DOE's Breach

To establish foreseeability, a plaintiff must show that the resulting loss was foreseeable "because it followed from the breach a) in the ordinary course of events, or b) as a result of special circumstances beyond the ordinary course of events, that the party in breach had reason to know." *Landmark Land Co. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). Foreseeability is a question of fact. *Id.* at 1379. Generally, foreseeability is assessed at the time of contracting. *Indiana Michigan II*, 422 F.3d at 1373.

Notably, damages need only be "reasonably foreseeable," not actually and literally predicted. In other words:

> The existing rule requires only reason to foresee**,** not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 Arthur Linton Corbin, *Corbin on Contracts* § 1009 (1964), *cited in Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 476 (2006) ("*Precision Pine*") (citing *Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 86 (2006); *Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 130 (2004); *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126, 143-44 (2003)). Thus, the party seeking damages "need not show that a particular type of breach was foreseeable, but must prove that the general type and magnitude of damages were foreseeable." *Precision Pine*, 72 Fed. Cl. at 476.

In the SNF context, in *Yankee Atomic Electric Co. v. United States*, 73 Fed. Cl. 249 (2006), the court found that several costs associated with SNF storage required by DOE's breach

of the Standard Contract were foreseeable. The court found "[t]hat plaintiffs would incur storage expenses of the nature and magnitude sought here was reasonably foreseeable." *Id.* at 265. Specifically, "absent DOE performance the need to spend substantial sums for additional at-reactor storage was reasonably foreseeable at the time of contracting." *Id.* at 267. The court also found that the plaintiff had submitted sufficient evidence to show that its re-racking costs, the building of dry storage facilities, dual-purpose dry storage casks, and "increased storage costs" were foreseeable by the Government at the time of contracting.[11] *Id.* at 275, 283, 288, 298; *see also Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 414 (2006); *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 528 (2006).

In the Federal Circuit, reasonably foreseeable damages are allowed where the breach is a substantial causal factor in the damages. *See Indiana Michigan II*, 422 F.3d at 1373. Whether a breach is a substantial causal factor in resulting damages is a question of fact reviewed under the clear error standard. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355-56 (Fed. Cir. 2001). This Court previously rejected the Government's attempts to mischaracterize the "substantial factor" test, consistent with the law of this Circuit, which clearly indicates that a breach need not be "'the sole factor or sole cause'" of damages. *Am. Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 601 (2006) (quoting *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005)); *see also Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) ("*Citizens*") (applying "substantial factor" test rather than "but for" test was not abuse of discretion). Moreover, "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Citizens*, 474 F.3d at 1322; *see also Bank of Am., FSB v. United States*, 70 Fed. Cl. 246, 251 (2006) ("no business

[11] The court did find that, had the Government fully performed under the Standard Contract, the plaintiff would still have had to maintain a "wet" spent fuel pool for a certain period of time until DOE emptied it. *Id.* at 324. Thus, those costs were not recoverable, since they did not arise from the breach. *Id.*

judgment is exercised in a vacuum . . . [and it] is thus irrelevant that [the bank] may have had independent business reasons" for executing a transaction mitigating the breach) (discussing causation in the *Winstar* context). As discussed in greater detail above, the damages incurred by Boston Edison as manifested during the sale of Pilgrim were the reasonably foreseeable consequence of the Government's breach of the Standard Contract.

5. Because There Is No Standard Contract Term Specifying DOE's Rate of Performance Obligation, This Court Should Supply an Acceptance Rate Term Which Comports with Standards of Fairness and Policy and Is Consistent with the Intent of the NWPA and the Standard Contract

Well-established contract principles provide that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981); *see also Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 96 (2003) (Hodges, J.) ("*Indiana Michigan I*"). Stated differently, "the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("*David Nassif*").

When parties to a contract in a commercial setting fail to specify a term that is essential to a determination of their respective legal obligations, the missing term is supplied by the court based on standards of fairness and policy, rather than a hypothetical model of the bargaining process. *See* Restatement (Second) of Contracts § 204 (1981); *see also Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (where the Government's minimum order obligation under a contract was not expressly stated, the court supplied a reasonable minimum order amount following the above Restatement principles); *David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) (where the contract did not specify the size of a cafeteria that the building owner was required to furnish the Government, the court determined the required size

based on considerations of fairness); *Barco Urban Renewal Corp. v. Hous. Auth. of Atl. City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy.").

Similarly, the Federal Circuit concluded in *Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000), that there is an implied obligation on the part of the Government to carry out its contractual duties within a reasonable time:

> The government has an "ever-present obligation to carry out its contractual duties within a reasonable time.". . . When the contract does not specify the period in which the government must respond, "the law imposes an obligation to act within a reasonable period of time." That period is determined by "the reasonable expectations of the parties in the special circumstances in which they contracted."

*Id.* at 1291 (citations omitted); *see also* Restatement (Second) of Contracts § 204 cmt. d (1981) ("[I]f no time is specified, a term calling for performance within a reasonable time is supplied."). Implicit in DOE's express obligation to begin removing all SNF from domestic nuclear utilities beginning in 1998 is the obligation to complete that removal within a reasonable time, which requires a 3,000 MTU steady-state annual acceptance rate be achieved following a short ramp-up period.

This Court already has twice held that because there is no Standard Contract term specifying DOE's rate of performance obligation, the Court should supply an acceptance rate term which comports with standards of fairness and policy. *Indiana Michigan I*, 57 Fed. Cl. at 96 ("Here, the contract term is missing entirely."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (Hewitt, J.) ("The court will, as it is required to do, determine the missing acceptance rate term in further proceedings for that purpose." (citing *David Nassif*, 557 F.2d at 258)).

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

In ***Indiana Michigan I***, 57 Fed. Cl. 88, the court determined under principles of section 204 of the Restatement (Second) of Contracts that the Standard Contract required an acceptance rate of 400 metric tons in 1998, a ramp-up to an acceptance rate of 3,000 tons not later than the end of 2002, and a minimum rate of 3,000 tons annually thereafter. The court in ***Indiana Michigan I*** reached this conclusion after finding that the 3,000 MTU rate was consistent with the purpose and intent of the NWPA and the Standard Contract and the intent of the contracting parties. Specifically, the ***Indiana Michigan I*** decision held that the rate would keep up with the amount of SNF being generated and would "eliminate the need for additional storage capacity on site and . . . reduce the backlog of already-stored materials." ***Id.*** at 99-100. Similarly, the Court should supply an acceptance rate in this matter which is consistent with the purpose and intent of the NWPA and the Standard Contract and the intent of the contracting parties.

B. DOE's Actions Violated The Duty Of Good Faith And Fair Dealing

In addition to breaching the Standard Contract, DOE's actions leading up to its ultimate failure to begin acceptance of SNF in 1998 violated the duty of good faith and fair dealing. Though government officials are generally presumed to act in good faith, a plaintiff may show by clear and convincing evidence that the Government has not done so. ***See Am-Pro Protective Agency, Inc. v. United States***, 281 F.3d 1234, 1239 (Fed. Cir. 2002); ***see also Hubbard v. United States***, 52 Fed. Cl. 192, 196 (2002) (finding sufficient evidence that the Government acted in bad faith), ***aff'd in part, vacated in part***, 2007 WL 817647 (Fed. Cir. Mar. 20, 2007).

As this Court previously recognized, "[o]ne obligation imposed by the covenant is 'not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" ***Boston Edison***, 64 Fed. Cl. at 186 (quoting ***Centex Corp. v. United States***, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). Moreover, the covenant of good faith and fair dealing

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

"prevents the government from targeting its contracting partners' reasonable expectations." *Id.* (citing *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997)).

Boston Edison will demonstrate at trial that, as early as 1987, DOE knew it would be unable to begin disposing of SNF by January 31, 1998, but nonetheless continued to impose contractual obligations on utilities, including the continued imposition of a fee payment obligation. Similarly, the Government proceeded with contract planning and other administrative aspects of the planning process without taking any steps to mitigate the impact of the inevitable breach on the parties to which it was contractually bound. Moreover, during this planning process, the Government began articulating a rate of acceptance that was inconsistent with the intent of the NWPA and the Standard Contract.[12]

Taken as a whole, the facts at trial will demonstrate that the Government consciously disregarded circumstances operating to prevent its performance under the Standard Contract, and yet continued to lead Boston Edison, and other nuclear operators, to believe that the process was moving forward according to plan. Such conduct constitutes a violation of the implied duty of good faith and fair dealing for which Boston Edison is entitled to compensation.

[12] The Government may argue at trial that Congressional action, or other circumstances beyond its control, should act to absolve the Government from liability for violating the implied covenant. As an example, the Government has long urged this Court that its obligation to accept and dispose of SNF was dependent on the existence of an appropriate repository. As this Court observed, this argument was roundly rejected by the D.C. Circuit, which granted a writ of mandamus "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Boston Edison*, 64 Fed. Cl. at 187 n.21 (citations omitted).

*Protected and Confidential Material*
*To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order*

## IV. CONCLUSION

The Court should award damages in the amount of $123.5 million to Boston Edison, and such other amounts as may be necessary and appropriate for DOE's partial breach of the Standard Contract, as well as for its breach of the duty of good faith and fair dealing.

Dated: March 30, 2007

Respectfully submitted,

By: s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Tel: (202) 420-2200
Fax: (202) 420-2201

Counsel of Record for Boston Edison Company

Of Counsel:
Bradley D. Wine
Nicholas W. Mattia, Jr.
Bernard F. Sheehan
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street, 17th Floor
Boston, MA 02199-0228

**CERTIFICATE OF ELECTRONIC FILING**

I hereby certify that on March 30, 2007, a copy of the foregoing "Plaintiff Boston Edison Company's Memorandum of Contentions of Fact and Law" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Bradley Wine