**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on April 16, 2007)

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY**, Plaintiff, v. **THE UNITED STATES**, Defendant. | ) | |
| **ENTERGY NUCLEAR GENERATION CO.**, Plaintiff, v. **THE UNITED STATES**, Defendant. | ) | No. 99-447C<br>No. 03-2626C<br>(Judge Lettow) |

**PLAINTIFF ENTERGY NUCLEAR GENERATION COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff Entergy Nuclear Generation Co.

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
(601) 368-5572
(601) 368-5816 (fax)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iv

I. INTRODUCTION ........ 2

A. Resolved Issues of Fact And Law ........ 3

1. This Court Has Subject Matter Jurisdiction Over This Case ........ 3

2. Boston Edison And DOE Entered Into A Standard Contract ........ 4

3. DOE Breached The Standard Contract ........ 4

4. Boston Edison Solicited Bidders For Its Pilgrim Facility Through A Competitive Auction Process ........ 4

5. Boston Edison Required Bidders To Submit Indicative Bids With Decommissioning Funding Amounts Within Boston Edison's Range Of Estimates ........ 5

6. ENGC Was Selected As The Winning Bidder And Boston Edison and ENGC Entered Into A Purchase Agreement ........ 6

7. The Purchase And Sale Agreement Provided for the Transfer of Pilgrim's Standard Contract To ENGC ........ 6

8. Boston Edison's Assignment Of The Standard Contract To ENGC At The Closing Is The Dividing Line For The Accrual Of Claims ........ 6

B. Unresolved Issues of Fact And Law ........ 7

1. The Rate of Acceptance of SNF Under The Standard Contract ........ 7

2. DOE's Breach Did Not Cause Boston Edison Any Quantifiable Loss In The Sale Of Pilgrim ........ 9

II. CONTENTIONS OF FACT ........ 10

A. Introduction ........ 10

B. Boston Edison Cannot Claim Damages From The Sale Of The Pilgrim Facility to ENGC Because It Cannot Show That It Was Damaged By The Sale ........ 10

1. ENGC's Decommissioning Fund Transfer Bid Was Lower Than That Required By Boston Edison ........ 10

2. The Alleged Future Spent Fuel Storage Costs And Reracking Costs Were Not Incurred At The Time Of The Pilgrim Sale To ENGC, Are Speculative, And Are Prohibited Future Damages ........................... 12

3. Boston Edison Has No Evidence That ENGC Required A Higher Rate Of Return In Its Purchase Of Pilgrim ............................................ 14

4. ENGC's Use Of Internal Financing Was Not Unusual For A Deal Of This Size, and Comparisons To Non-Nuclear Deals Are Inapposite For Both Benchmarking The Deal Structure And The Calculation Of Damages ........................................................................ 15

C. A Spent Fuel Damages Claim Quantification Mentioned In State Regulatory Proceedings Surrounding the Pilgrim Sale Does Not Suggest That Boston Edison Retained Any Elements Of Its Present Diminution Claim ........................................................................................................ 16

III. CONTENTIONS OF LAW ........................................................................... 17

A. Boston Edison's Recovery of Damages Based On Assumed Future Decommissioning Costs and Future Rerack Costs Violates The Rule Against Prospective Damages Set Forth In *Indiana Michigan* ............................ 17

B. Boston Edison Validly Transferred Its Claims For Future Spent Fuel Damages To ENGC ......................................................................... 19

C. Determining Boston Edison's Claimed Diminution Damages Requires Rank Speculation ............................................................................. 22

D. The Purchase And Sale Agreement's Indemnification Provision Would Require Boston Edison To Indemnify ENGC If A Diminution Claim Is Paid And DOE Raises An Offset Claim ............................................................ 25

IV. CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

## Cases & Decisions

*Boston Edison Co. v. United States*,
64 Fed. Cl. 167 (2005) ("*Boston Edison I*") .......... 4, 7, 19

*Boston Edison Co. v. United States*,
67 Fed. Cl. 63 (2005) ("*Boston Edison II*") .......... 4, 6, 7

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) .......... 8

*Cosmo Constr. Co. v. United States*,
196 Ct. Cl. 463 (1971) .......... 10

*Entergy Nuclear Generation Co. v. United States*,
64 Fed. Cl. 336 (2005) .......... 6

*Entergy Nuclear Generation Co. v. United States*,
67 Fed. Cl. 63 (2005) .......... 6

*Fifth Third Bank of Western Ohio v. United States*,
402 F.3d 1221 (Fed. Cir. 2005) .......... 22

*Indiana Michigan Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) .......... 3, 17, 18, 19, 20, 21, 22, 24, 25

*Link v. Wabash R.R. Co.*,
370 U.S. 626 (1962) .......... 20

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000) .......... 3, 4

*National City Bank of Evansville v. United States*,
163 F. Supp. 846 (Ct. Cl. 1958) .......... 20, 21

*N. States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) .......... 3

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557 (Fed. Cir. 1997) .......... 22

*Sys. Fuels Inc. v. United States*,
73 Fed. Cl. 206 (2006) .......... 4

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006) .......... 8, 19

*Weston v. Dept. of Housing and Urban Development*,
724 F.2d 943 (Fed. Cir. 1983) .......... 20

**Statutes**

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983) .......... 4, 6

28 U.S.C. § 1491(a)(1) .......... 3, 4

42 U.S.C. § 10222 .......... 4, 6, 7

**Regulations and Rules**

10 C.F.R. § 50.2 .......... 11

10 C.F.R. § 50.75 .......... 11

RCFC Appendix A, 14(a) .......... 1

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 317 .......... 21

RESTATEMENT (SECOND) OF CONTRACTS § 344 .......... 10

RESTATEMENT (SECOND) OF CONTRACTS § 346 .......... 10

RESTATEMENT (SECOND) OF CONTRACTS § 350 .......... 10

RESTATEMENT (SECOND) OF CONTRACTS § 351 .......... 10

RESTATEMENT (SECOND) OF CONTRACTS § 352 .......... 22

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on April 16, 2007)

| | | |
|---|---|---|
| **BOSTON EDISON COMPANY**, Plaintiff, v. **THE UNITED STATES**, Defendant. | ) | No. 99-447C<br>No. 03-2626C<br>(Judge Lettow) |
| **ENTERGY NUCLEAR GENERATION CO.**, Plaintiff, v. **THE UNITED STATES**, Defendant. | ) | |

**PLAINTIFF ENTERGY NUCLEAR GENERATION COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's Order of February 26, 2007, and Rules of the United States Court of Federal Claims ("RCFC"), Appendix A ¶ 14(a), Plaintiff Entergy Nuclear Generation Company ("ENGC"), respectfully submits the following Memorandum of Contentions of Fact and Law in support of its position that Plaintiff Boston Edison Company ("Boston Edison") is not entitled to damages based on the alleged diminution in value of the Pilgrim Nuclear Power Station ("Pilgrim").

## I. INTRODUCTION

In this action, consolidated for a limited purpose, Boston Edison claims it incurred damages as a result of the Department of Energy's ("DOE") breach of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste ("Standard Contract") in the form of a diminished sales price for Pilgrim. According to Boston Edison's expert report of John J. Reed ("Reed Report"), the alleged diminished value of Pilgrim is composed of several different elements, including:

- The claimed requirement for a higher decommissioning trust transfer to the buyer from Boston Edison, in the damages amount of $86.2 million.
- The claimed adjustment of the sales price to account for future spent fuel pool racking costs in the damages amount of $0.947 million.
- The claimed requirement for a higher return on equity on the transaction, in the damages amount of fifty percent of $38.7 million.
- The claimed need for the buyer to finance the purchase entirely through equity, rather than debt and equity, in the damages amount of fifty percent of $34.1 million.

*See* Reed Report at 6-7.

In total, Boston Edison claims $123.5 million in damages on these bases. In its Memorandum of Contentions of Fact and Law, Boston Edison devotes a significant portion of its brief to a discussion of the differences between its position and the Government's position concerning the correct "acceptance rate" of spent nuclear fuel under the Standard Contract, and implies that this discussion "leads directly" to a determination that "DOE's breach reduced the value that Boston Edison received for Pilgrim." That discussion is irrelevant to the determination here, as any damages resulting from one or the other acceptance rate would be future damages accruing to ENGC, not Boston Edison, when such damages are incurred.

Despite Boston Edison's assertions, its claims based on a theory of diminution in value of the Pilgrim facility are precluded as a matter of law. Boston Edison suffered no losses in its sale of Pilgrim to ENGC. In fact, with respect to the decommissioning trust fund transfer requirement, Boston Edison obtained a better deal in the sale than it requested prior to the sale. Further, recovery of damages based on *assumed* future spent fuel storage costs that *may be incurred* during the decommissioning of Pilgrim violates the ban on future damages set out by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (2005) ("*Indiana Michigan*"). Additionally, because as part of the sale Boston Edison transferred claims for future spent fuel damages to ENGC, Boston Edison's damages claims predicated on future DOE non-performance under the Standard Contract belong to ENGC, not Boston Edison. Finally, attempting to determine the amount of any alleged diminution damages flowing from future DOE non-performance under the Standard Contract would require rampant speculation, contrary to the rule articulated in *Indiana Michigan*.

A. Resolved Issues of Fact And Law

1. This Court Has Subject Matter Jurisdiction Over This Case

The U.S. Court of Appeals for the Federal Circuit held that the U.S. Court of Federal Claims has jurisdiction over suits for partial breach of the Standard Contract brought by nuclear utilities against the Government. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) ("*Maine Yankee*"); *N. States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). More recently, this Court confirmed that the Tucker Act, 28 U.S.C. § 1491(a)(1), granted it subject matter

jurisdiction over claims arising under the Standard Contract. *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 179 (2005) (Lettow, J.) ("*Boston Edison I*").

2. Boston Edison And DOE Entered Into A Standard Contract

On June 17, 1983, pursuant to the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257-61 (1983) ("NWPA") (codified as amended at 42 U.S.C. § 10222), Boston Edison entered into the Standard Contract with the United States. The Standard Contract obligated the DOE to dispose of spent nuclear fuel ("SNF") and high-level radioactive waste generated at Pilgrim. *Id.*; Boston Edison's Amended Complaint ("Am. Compl.") ¶ 3. Under the Standard Contract, DOE was to begin accepting SNF for disposal no later than January 31, 1998. Standard Contract at Article II; 42 U.S.C. § 10222(a)(5)(B).

3. DOE Breached The Standard Contract

The DOE breached, and continues to breach, the Standard Contract at issue in this case by failing to dispose of the SNF at Pilgrim, as provided for by the Standard Contract. *Sys. Fuels, Inc. v. United States*, 73 Fed. Cl. 206, 208 n.2 (2006); *Boston Edison Co. v. United States*, 67 Fed. Cl. 63, 64 ("*Boston Edison II*"); Am. Compl. ¶ 4-5. The Federal Circuit held as a matter of law that the Government's failure to begin accepting SNF by January 31, 1998 was a partial breach of the Standard Contract, and that the breach "involved all the utilities that had signed the contract – the entire nuclear electric industry." *Maine Yankee*, 225 F.3d at 1342.

4. Boston Edison Solicited Bidders For Its Pilgrim Facility Through A Competitive Auction Process

Boston Edison decided to sell its Pilgrim facility and solicited bidders through a competitive auction process. Am. Compl. ¶ 50. During the bidding, Boston Edison

provided ENGC with a confidential Offering Memorandum. Boston Edison Company Confidential Memorandum ("Offering Memorandum") dated June 1998. In that Offering Memorandum, Boston Edison advised bidders of the decommissioning funding parameters with which it required bidders to comply prior to its auction of Pilgrim. *Id.* Among the parameters required by Boston Edison was a requirement concerning the funding of Boston Edison's decommissioning responsibility. Boston Edison stated that it

> intends to transfer the decommissioning responsibility for the facilities to the successful bidder. It is Boston Edison's intent to fully fund the estimated cost of decommissioning the plant, based upon an updated decommissioning cost study. . . . Boston Edison has prepared and distributed to prospective qualified bidders a draft study of the potential costs of decommissioning the plant.

*Id.* (emphasis added).

5. Boston Edison Required Bidders To Submit Indicative Bids With Decommissioning Funding Amounts Within Boston Edison's Range Of Estimates

Boston Edison further advised the bidders that they should submit an indicative bid with a decommissioning funding level acceptable to the bidder, but that the "funding level adopted by the bidder should be within the range of estimates contained in the draft decommissioning study." *Id.*; *see also* ENGC Indicative Bid dated July 31, 1998. Boston Edison's draft decommissioning study provided a range of estimates between $564 million to $788 million. Second Draft of the 1997 Decommissioning Study, dated April 1998. In response to the Offering Memorandum, ENGC submitted an Indicative Bid dated July 31, 1998.

6. ENGC Was Selected As The Winning Bidder And Boston Edison and ENGC Entered Into A Purchase Agreement

At the end of the bidding process, three bidders submitted final, binding bids, and ENGC was selected as the winning bidder. Am. Compl. ¶ 53. ENGC and Boston Edison entered into a Purchase and Sale Agreement for the sale of the Pilgrim facility, dated November 18, 1998. *See* Purchase and Sale Agreement Between Entergy Nuclear Generation Company and Boston Edison Company ("Purchase and Sale Agreement").

7. The Purchase And Sale Agreement Provided For The Transfer Of Pilgrim's Standard Contract To ENGC

The Purchase and Sale Agreement provided for the transfer of Pilgrim's Standard Contract to ENGC.[1] *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 338 (2005). The sale closed on July 13, 1999. *Boston Edison II*, 67 Fed. Cl. at 64; *Entergy Nuclear Generation Co. v. United States*, 67 Fed. Cl. 63, 64 (2005); Am. Comp. ¶ 4. As a result of the sale, ENGC ultimately received a decommissioning trust fund transfer from Boston Edison of $427.9 million, a figure that was below the range of Boston Edison's offered amounts by between $136 million and $360 million. Reed Report at 12.

8. Boston Edison's Assignment Of The Standard Contract To ENGC At The Closing Is The Dividing Line For The Accrual Of Claims

Boston Edison and Entergy construe the assignment of the Standard Contract as retaining for Boston Edison any claims accruing as of the closing date, with Entergy

[1] While contract rights against the government generally cannot be assigned without specific permission, the Standard Contract was assignable, as authorized by Section 302(b)(3) of the NWPA, as amended, 42 U.S.C. § 10222(b)(3), which provides in pertinent part that "the rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved." *Boston Edison II*, 67 Fed. Cl. at 64 n.1.

acquiring claims accruing thereafter. *Boston Edison I*, 64 Fed. Cl. at 170; Am. Compl. ¶ 55. The assignment by Boston Edison of Pilgrim's Standard Contract to ENGC constitutes a valid, enforceable assignment. 42 U.S.C. § 10222(b)(3); *Boston Edison II*, 67 Fed. Cl. at 64 n.1.

B. Unresolved Issues of Fact And Law

1. The Rate of Acceptance of SNF Under The Standard Contract

ENGC submits that the Court does not need to decide the acceptance rate that applies to DOE's obligation to pick up spent nuclear fuel, because, as will be addressed below, Boston Edison's diminution claims that depend on an acceptance rate fail as a matter of law for other reasons. Nonetheless, should the Court determine it needs to decide the acceptance rate issue, ENGC asserts that a 3,000 MTU per year acceptance rate should be applied.

Although neither the NWPA nor the Standard Contract set a rate of acceptance for SNF by DOE, at the time that Boston Edison signed the Standard Contract, both DOE and the Plaintiffs expected that DOE would perform at a rate sufficient to remove an industry-wide need for additional storage capacity after 1998 and work off the accumulated backlog. Boston Edison and ENGC agree that 3,000 metric tons of uranium ("MTU") per year, after an initial ramp-up period, is consistent with the goals of the Standard Contract to dispose of the SNF backlog, dispose of the annually-generated SNF, and preclude the need for further storage of SNF on-site after January 31, 1998. ENGC does not agree with Boston Edison's unsubstantiated claim that DOE's breach and the resulting need for further storage on-site after 1998 was a fact bidders considered when developing purchase offers for Pilgrim.

One of the purposes of the NWPA was to create a firm schedule for the removal of the accumulated SNF at commercial nuclear reactors. At the time the Pilgrim Standard Contract was signed, both DOE and utilities that signed the Standard Contract expected that DOE would perform at a rate sufficient to remove an industry-wide need for additional storage capacity after 1998 – the statutorily mandated date to begin performance – and to begin removal of the accumulated backlog of SNF that increased at Pilgrim (and other utilities' facilities).

Many of the witnesses the Government is expected to call at the upcoming trial have already acknowledged these goals. *See Tenn. Valley Auth. V. United States*, 69 Fed. Cl. 515, 519 (2006) (citing testimony of current DOE official Thomas E. Pollog and former DOE official Lake Barrett for the conclusion that:

> One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation. Another goal of the waste disposal program was to preclude utilities' need to provide for storage of spent fuel outside the pools attendant to their reactors.

*See also Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (citing deposition testimony and the Draft Mission Plan); *see also* Civilian Radioactive Waste Management Program Mission Plan, at 2-1 (Dec. 20, 1983 Draft), at SN045172 ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."); Robert Morgan (Acting Director of DOE's program), Program Overview, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Feb. 1984), at SN069599 stated:

> The basic strategy which we've only outlined in the mission plan, is that beginning in 1998, utilities will not

> have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

Plaintiffs expect to call Mr. Frank Rives (Director of Nuclear Fuels at Entergy, ENGC's parent company), who will confirm ENGC's similar understanding of these objectives of DOE's nuclear waste program. Mr. Rives has knowledge of these objectives for several different plants from the time of the Standard Contract's formation.

2. DOE's Breach Did Not Cause Boston Edison Any Quantifiable Loss In The Sale Of Pilgrim

Boston Edison suffered no loss in its sale of Pilgrim to ENGC, and cannot prove any damages due to an alleged diminution in value with any reasonable accuracy. As ENGC will show at trial, any damages flowing from future DOE non-performance, such as alleged higher decommissioning costs, or future spent fuel storage costs, were transferred to ENGC in the sale of Pilgrim and thus rightly belong to ENGC, not Boston Edison. Further, ENGC will show at trial that Boston Edison's method of calculating the alleged damages is unreasonable because small changes in the variables used in the calculation will result in significant differences in the damages estimates. Therefore, Boston Edison's damages are not, as Boston Edison would have it, "readily ascertainable as of the closing date of the transaction." In short, there is no causal linkage between Boston Edison's assertions of diminution in value and any fact in this case.

## II. CONTENTIONS OF FACT[2]

### A. Introduction

In order to support a finding on liability there must be some evidence of damage. *Cosmo Constr. Co. v. United States*, 196 Ct. Cl. 463, 469-470 (1971). The evidence of damages must be sufficient to demonstrate that the issue of liability is not purely academic, *i.e.*, that some damage has in fact been incurred. *Id.*; *see also* Restatement (Second) of Contracts §§344, 346, 350-51 (party alleging to have been injured must show that it sustained a *loss*).

### B. Boston Edison Cannot Claim Damages From The Sale Of The Pilgrim Facility to ENGC Because It Cannot Show That It Was Damaged By The Sale

In its Memorandum of Contentions of Fact and Law, Boston Edison claims that it was damaged by the sale of Pilgrim through an alleged higher decommissioning trust transfer to ENGC than would have been required, an alleged downward adjustment in the sales or market price related to future SNF reracking costs, an alleged higher rate of return used by ENGC in its valuation of Pilgrim than would have been required, and the use of an all-equity financing structure rather than a 50% debt and 50% equity financing structure. Because all of these alleged damages are either future and speculative, or unsupported by the facts, all fail as bases for recovery.

#### 1. ENGC's Decommissioning Fund Transfer Bid Was Lower Than That Required By Boston Edison

As discussed above, Boston Edison solicited bids and engaged in a competitive auction to sell the Pilgrim facility. Boston Edison distributed parameters with which it

[2] To the extent that any of the Contentions of Fact in this memorandum are deemed to be Contentions of Law, or vice versa, ENGC hereby incorporates them into the appropriate section.

required bidders to comply prior to the auction for Pilgrim. As regards decommissioning trust funds, Boston Edison was required to have accumulated in a decommissioning trust funds sufficient to decommission the radiological portion of Pilgrim at the end of its operating license. 10 C.F.R. § 50.75.[3] Boston Edison's decommissioning fund parameters provided a range of estimates between $564 million to $788 million. Second Draft of the 1997 Decommissioning Study; Reed Report at 12. As a result of the competitive auction, however, ENGC's bid called for Boston Edison to transfer a decommissioning fund of only $427.9 million, a figure that was well below Boston Edison's range of offered amounts by between $136 million and $360 million. Reed Report at 12. Thus, the amount by which ENGC reduced its decommissioning fund transfer requirement during the auction exceeds Boston Edison's claimed damages of $123.5 million by between $12 million and $236 million.

In effect, Boston Edison is attempting to claim damages in circumstances where it received a better deal than it had bargained for in the first place. ENGC's improved decommissioning trust fund offer completely swamps the amount Boston Edison claims for the future dry fuel storage costs that were allegedly included in the decommissioning trust fund transfer amount. As mentioned above, ENGC pared hundreds of millions of dollars from Boston Edison's proposed offer, to Boston Edison's benefit. The amounts

[3] Boston Edison appears to imply – incorrectly – that the NRC regulation required a deposit sufficient to decommission Pilgrim *in toto* rather than only the radiologically contaminated portion of the plant. *See* Boston Edison's Memorandum of Contentions of Fact and Law at 25; 10 CFR §§ 50.75, 50.2 (definition of "Decommission"). Additionally, Boston Edison is mistaken when it asserts that ENGC assured the Nuclear Regulatory Commission ("NRC") that "all future costs [ENGC] would be required to bear as part of the decommissioning of Pilgrim were being covered as part of the sale transaction." Boston Edison's Memorandum of Contentions of Fact and Law at 24. ENGC did not assure NRC that <u>all</u> such costs would be covered in the transaction.

removed from the decommissioning fund bid by ENGC are as likely as not the same dollars that would have been used for future spent fuel storage.[4]

2. The Alleged Future Spent Fuel Storage Costs And Reracking Costs Were Not Incurred At The Time Of The Pilgrim Sale To ENGC, Are Speculative, And Are Prohibited Future Damages

Boston Edison's alleged future reracking costs are prospective damages for anticipated future non-performance of DOE that, at the time of the sale, had not been incurred. The Reed Report states:

> The value received by [Boston Edison] BECO for the sale of Pilgrim was diminished due to the fact that [ENGC] Entergy was aware that it would be required to purchase and install four additional racks for the spent fuel pool at Pilgrim that would not have been necessary absent DOE's breach of the Standard Contract.

Reed Report at 22. To quantify the alleged impact on the sale price of Pilgrim, Mr. Reed "first replicated Entergy's DCF [discounted cash flow] model using Entergy's inputs and assumptions." *Id.* at 24. He then "validated the model by calculating the NPV [net present value] of Entergy's projected cash flows for Pilgrim using a discount rate of 24.73%." *Id.* at 24-25. Notwithstanding the fact that the racks had not been purchased,

[4] Under the terms of the Purchase and Sale Agreement, ENGC received decommissioning funds and the responsibility to decommission the plant, and will retain any funds left over in the trust after decommissioning is complete. However, in its indicative bid, ENGC offered Boston Edison an option to retain control over all decommissioning funds so that it would "retain those monies not actually expended on the decommissioning if the estimated decommissioning fund exceeds actual expenditures." If such an option had been selected, Boston Edison could not claim it was damaged by an excessive decommissioning trust fund transfer, but would have to await the incurrence of actual damages, if any, in order to make a claim. The key point is that Boston Edison selected the form of the decommissioning trust fund transfer, and could have chosen a form that would have completely eliminated its current damages claim here.

and the rack prices were nothing more than a "forecast cost" (*id.* at 24),[5] Mr. Reed next "removed the projected capital costs associated with the additional spent fuel racks from the DCF analysis," and "escalated the capital cost for each rack from 1999 to the year of purchase by the rate of inflation used in Entergy's DCF model and removed this capital cost from Entergy's overall capital expenditure level projected for that same year as stated in its DCF analysis." Reed Report at 25. He then "recalculated Entergy's DCF analysis to determine the impact of removing those capital expenditures from Entergy's valuation of Pilgrim." *Id.* Thus, using a "projected cost" of racks that had not been purchased at the time of the sale, and a financial model in which future racks were apparently never included, Boston Edison has created a "damages" item out of nothing more than conjecture.

This tedious recitation of Boston Edison's methodology is intended to demonstrate how speculation is heaped on speculation in this particular damages calculation.

Mr. Reed conceded in his report that the valuation model relied on by Entergy for purposes of bidding on Pilgrim "did not specifically include a line item break-out of the future capital costs" for the four spent fuel racks he identified. *Id.* at 25 fn.75. For support, Boston Edison can point only to assessments performed by ENGC during its due diligence of Pilgrim, which identified necessary upgrades, including the installation of four additional spent fuel racks at Pilgrim. Boston Edison's Memorandum of

[5] The source document Mr. Reed cites for the cost of racks he used in his analysis states "The projected cost of each rack is approximately $600,000 (plus escalation)." Entergy Discounted Cash Flow ("DCF") Model (emphasis added). Importantly, Boston Edison has no proof that Entergy used these projected costs in developing its purchase price for Pilgrim.

Contentions of Fact and Law at 19. Boston Edison, however, can provide no evidence that ENGC's bid was altered in any way due to any of these assessments.

Similarly, to the extent that any future spent fuel storage costs are anticipated by any decommissioning cost estimates, those costs have not been incurred, and even if they are ever incurred will most certainly not cost what the estimate predicted so many years in advance. Even assuming *arguendo* that ENGC had prepared an analysis in connection with the Pilgrim purchase in which it projected a sum certain for future decommissioning impacts relating to DOE default, and a sum certain for future racks, the costs would still be no more than *estimates* of prospective damages for anticipated future nonperformance of DOE. Boston Edison's claim presents no invoices to review, no payment receipts to check. The future spent fuel storage costs and all the reracking costs may or may not ever actually be incurred. There remains the possibility that legislation will provide a solution to the spent fuel problem. There remains the possibility that technology will evolve and the spent fuel solutions envisioned by ENGC at the time of the Pilgrim purchase will never be implemented, or will be implemented in a different manner and at a quite different cost. Until the future decommissioning costs or reracking costs are incurred, the costs are entirely speculative.

3. Boston Edison Has No Evidence That ENGC Required A Higher Rate Of Return In Its Purchase Of Pilgrim

Boston Edison provided no evidence that ENGC required a higher rate of return on its investment in Pilgrim due to alleged increased risk associated with DOE's breach of the Standard Contract. Boston Edison provides no "baseline" against which to measure the rate of return used for this deal, but simply assumes to know the intent and state of mind of ENGC's management and Board in acquiring Pilgrim. Boston Edison

claims that the DOE's breach was the single largest risk associated with purchasing Pilgrim. The evidence will show that there are a host of risks associated with owning and operating a nuclear plant, the chief being the risk of an extended shutdown, and the risk of DOE non-performance was not a substantial consideration in the Pilgrim sale. There is no evidence indicating that anyone at Entergy mandated the required rate of return for the Pilgrim bid to be increased on account of DOE breach of the Standard Contract.

4. ENGC's Use Of Internal Financing Was Not Unusual For A Deal Of This Size, and Comparisons To Non-Nuclear Deals Are Inapposite For Both Benchmarking The Deal Structure And The Calculation Of Damages

Boston Edison's assumption that alleged increased business risk associated with DOE's breach of the Standard Contract drove ENGC to use equity exclusively rather than a mix of debt and equity to finance the purchase of Pilgrim is incorrect, and the evidence will not support it. First, Boston Edison's attempt to analogize the financing structure of this deal to deals for non-nuclear generation facilities is inapposite. Unlike the numerous prior sales of non-nuclear generation facilities, the sale of Pilgrim was among the first of its kind for nuclear plants. Among many other differences, nuclear and non-nuclear power generation assets have very different and separate licensing, staffing, fuel and fuel procurement, security requirements and risk profiles, wholly unrelated to DOE's breach. Nuclear and non-nuclear power generation assets utilize very different skill sets across a wide range of labor requirements. An abnormal event at one nuclear plant may have substantial consequences for the rest of the industry, whereas non-nuclear generation facilities do not have similar liabilities imposed by every other plant in their industry. For example, the Three Mile Island event in March 1979 had very costly effects on all other nuclear plants in the U.S. In short, using deals for non-nuclear power generation

assets as a baseline against which to compare deals for nuclear power generation assets is neither useful nor a commonly utilized benchmark standard in the industry.

Second, asserting that ENGC would consider using any sort of debt for this deal is unsupported by the evidence. ENGC is a multi-billion dollar, Fortune 200 company, with substantial cash available. Asserting that ENGC would use debt, in any ratio, for this approximately $80 million deal, is akin to asserting that a normal, middle-class American wage earner would necessarily take out a home equity loan to pay for a $50 family dinner at a chain restaurant.

At trial, ENGC expects to show that non-nuclear power generation assets cannot be compared to nuclear power generation assets either for deal structures or for the purposes, as Boston Edison attempts, of calculating damages.

### C. A Spent Fuel Damages Claim Quantification Mentioned In State Regulatory Proceedings Surrounding the Pilgrim Sale Does Not Suggest That Boston Edison Retained Any Elements Of Its Present Diminution Claim

Prior to the closing of the Pilgrim sale, Boston Edison sought the approval of the Massachusetts Department of Telecommunications and Energy ("Mass. DTE") for the transaction. Boston Edison now alleges that ENGC heard testimony during state regulatory proceedings prior to the Pilgrim sale closing from the Massachusetts Attorney General that Boston Edison's DOE claims retained under the Pilgrim Purchase and Sale Agreement were valued at more than $100 million. Boston Edison Contentions of Fact and Law at 20. ENGC is not aware of any documentation (contemporaneous or otherwise) regarding the value of retained claims that shows how the $100 million figure was deduced. Neither does Boston Edison provide any indication that anyone at ENGC believed that these retained claims were in the nature of diminution of value. As support

for its implication that ENGC understood that Boston Edison had retained the claim it now asserts, Boston Edison points to ENGC's silence on the matter at the DTE proceedings. Boston Edison fails to point out that ENGC was not a party to the proceeding. The evidence will show that Boston Edison provided no details at the time of the DTE proceedings that its "retained claims" were in the nature of diminution claims that could later be offset against damages accruing to ENGC. Further, the evidence will show that ENGC had no duty to object to Boston Edison's claim at that time. Moreover, ENGC had a strong interest in seeing Boston Edison's application approved by the Mass. DTE, and would not be inclined to upset the proceedings even if Boston Edison there claimed (as it did not) that it owned ENGC's future damages claims.

## III. CONTENTIONS OF LAW

### A. Boston Edison's Recovery of Damages Based On Assumed Future Decommissioning Costs and Future Rerack Costs Violates The Rule Against Prospective Damages Set Forth In *Indiana Michigan*

Boston Edison's claim for damages based on a theory of diminution in value in its sale of the Pilgrim facility includes claims for damages in the form of a higher decommissioning funds transfer and future reracking costs. Both of these claims fail as a matter of law because to award such damages would violate the *Indiana Michigan* rule prohibiting prospective damages.

As for the alleged higher decommissioning trust fund transfer, the Reed Report claims:

> The amount of decommissioning funds transferred by [Boston Edison] BECO to [ENGC] Entergy included not only funds to decommission the facility and return the site to a greenfield condition that would have been required regardless of DOE's breach, but also included funds for future decommissioning-related costs that were a direct

> result of DOE's failure to meet its obligations pursuant to the Standard Contract.

Reed Report at 11. As for the alleged future reracking costs, the Reed Report claims:

> The value received by [Boston Edison] BECO for the sale of Pilgrim was diminished due to the fact that [ENGC] Entergy was aware that it would be required to purchase and install four additional racks for the spent fuel pool at Pilgrim that would not have been necessary absent DOE's breach of the Standard Contract.

*Id.* at 22. These "future" damages are nothing more than a projection of costs based on the effect of the anticipated future nonperformance of DOE. Importantly, these costs had not been incurred at the time of the sale of Pilgrim.

In *Indiana Michigan*, the Federal Circuit determined that prospective damages for anticipated future DOE non-performance could not be recovered in a partial breach of contract suit such as the one now before this Court. 422 F.2d at 1376. The *Indiana Michigan* decision articulated the rule of law as follows: "Because of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." *Id.* The decommissioning and reracking cost components of Boston Edison's diminution claim squarely run afoul of this rule.

The Reed Report calculates decommissioning damages by comparing the decommissioning funds actually transferred to ENGC against "a 'but for' decommissioning cost estimate for Pilgrim that determines what the projected decommissioning costs would have been as of 1997 and the funding requirement as of 1999 if DOE had not breached its SNF [spent nuclear fuel] obligations." *Id.* at 15. The need for the likes of a cost *estimate* and *projected* decommissioning costs reflects exactly

the type of speculative undertaking that the Federal Circuit in *Indiana Michigan* ruled was improper in these spent fuel damages cases.

The Reed Report's calculation of the reracking costs is similarly fatally flawed, as discussed in detail in Section II.B.2 above. Any estimates of future reracking costs due to DOE's default are just that – *estimates* of prospective damages for anticipated future nonperformance of DOE. Such estimates of future damages are not recoverable pursuant to *Indiana Michigan* rule.

B. Boston Edison Validly Transferred Its Claims For Future Spent Fuel Damages To ENGC

If and when any spent fuel storage or reracking damages are incurred and recoverable, the claims and any recovery belong to ENGC, not Boston Edison. Boston Edison expressly assigned such claims and associated costs to ENGC, and Boston Edison has no legal right to pursue them.

As expressed in the Purchase and Sale Agreement for the Pilgrim facility, the intent of the parties was to assign claims for future damages to ENGC. *Boston Edison I*, 64 Fed. Cl. at 170; Am. Compl. ¶ 55. While certain claims for past costs may have accrued by July 13, 1999, claims for future dry fuel storage and reracking costs had not. Those claims (should they ultimately accrue) were assigned to ENGC. In this partial breach case, those future claims are not yet ripe for adjudication.

Under the rule of *Indiana Michigan*, projected future damages are not recoverable until such time as actual expenditures reflecting those damages have been incurred. *Tenn. Valley Auth.*, 69 Fed. Cl. at 528 (citing *Indiana Michigan*., 422 F.3d at 1376-77). Boston Edison seeks to interpret the Purchase and Sale Agreement in a manner that construes all future damages claims as sale-price-reducers, which, under Boston Edison's

reading of the Purchase and Sale Agreement, belong to Boston Edison. In light of the *Indiana Michigan* decision, the "accrued" language in the Purchase and Sale Agreement can only mean, for purposes of a damages claim, that the costs must have already been incurred. Until the costs have been incurred, any claim remains inchoate.

The parties never intended that Boston Edison would be able to claim future damage elements it assigned to ENGC. According to Boston Edison's Amended Complaint in this case, the Purchase and Sale Agreement "expressly reserves to Boston Edison all claims against DOE related to the Standard Contract *up to the closing date of the sale*." Am. Compl. ¶ 55 (emphasis added). If it had been intended that Boston Edison could claim the benefit of damages not yet incurred as of the Closing Date, there would have been no reason to cite the closing date at all, either in the Purchase and Sale Agreement or in Boston Edison's complaint. As stated by Boston Edison counsel at a hearing before this court,

> Our case covers a different time period that the Entergy case covers. We have different damages than they have. There is no need for inquiry into the underlying intent of the asset purchase and sale agreement because it's clear on its face. It's an objective test. What does it say? It's quite clear on its face.

Hearing Transcript, Docket Nos. 99-447C & 03-2626C, June 14, 2005, Richard J. Conway, Esq. for Boston Edison, at 48 (emphasis added).[6]

The damage elements upon which Boston Edison bases the portion of its diminution claim related to future decommissioning and reracking costs were assigned to ENGC, and Boston Edison has no right to pursue them. "It is well established that an

[6] It should be noted that each party is bound by the acts of his lawyer-agent. *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962); *see also Weston v. Dept. of Housing and Urban Development*, 724 F.2d 943, 951 (Fed. Cir. 1983).

assignee stands in the shoes of the assignor." *National City Bank of Evansville v. United States*, 163 F. Supp. 846, 852 (Ct. Cl. 1958). Boston Edison sold these "shoes" to ENGC. Once the assignor has assigned the contract rights, its right to performance from the obligor is extinguished. *See* Restatement (Second) of Contracts § 317(1) (1981).

Furthermore, in the event the United States seeks an offset against ENGC's future claims, the Purchase and Sale Agreement contains a provision calling for certain indemnifications of ENGC by Boston Edison. The net effect of the contractual indemnity by Boston Edison of any offset claim against ENGC made by DOE is simply to run money around in a circle. In such an event, Boston Edison would be awarded a sum against DOE in this case, DOE would be awarded a sum against ENGC in ENGC's SNF case, and ENGC would be awarded a like sum against Boston Edison in an indemnification action – a colossal waste of judicial resources. This scenario further illustrates that the intent of the Purchase and Sale Agreement was to assign future damage claims to ENGC, not Boston Edison.

If Boston Edison's interpretation of the Purchase and Sale Agreement were accepted, the assignment to ENGC of future damages based on the Standard Contract becomes completely illusory. In Boston Edison's view, it is the owner of claims resulting from all future expenditures caused by the DOE's breach of the Standard Contract. In any event, the Court should not adopt an interpretation of the Purchase and Sale Agreement, or any claims arising thereunder, that would completely end-run the mandate against future damages set forth in the *Indiana Michigan* case.

C. Determining Boston Edison's Claimed Diminution Damages Requires Rank Speculation.

"[C]ontract law precludes recovery for speculative damages." *Indiana Michigan*, 422 F.3d at 1376 (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997)). The *Indiana Michiga*n bar on future damages is based on the fact that their ascertainment necessarily involves speculation – in fact, the inquiry in that case was branded as "highly speculative" by the Federal Circuit. 422 F.2d at 1376. This bar is consistent with the rule set out in the Restatement (Second) of Contracts § 352, which provides, "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."

As in *Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1237 (Fed. Cir. 2005), Boston Edison's diminution claim predicated on future SNF storage costs included in decommissioning costs "is based entirely on hypothetical costs that were never actually incurred." In *Fifth Third Bank*, the Federal Circuit affirmed the trial court's decision to preclude the plaintiff from even presenting its damages theory at trial, because the claim was "highly speculative." 402 F.3d at 1237. Boston Edison's claim suffers from the same infirmity as that present in *Fifth Third Bank*.

As noted above, quantification of any diminution in value claim requires speculation about future, hypothetical events. Thus, in order to award these diminution damages, the court must not only decide that speculation will be allowed, but what kinds of speculation in which to engage. A myriad of disparate possibilities exist.

For example, would the diminished damages be calculated based on the high bidder's view of the sale? Why not consider other bidders' view, since their perspective should have equally been infected by the DOE breach? Of course, it would be unlikely if

all the bidders' views were the same, as everyone will tend to handicap future events differently.

If only the high bidder's view is to be used to quantify the diminution damages, then what is to be done if the high bidder's quantification of the damages is not reasonable? Is a reasonableness test to be applied to the high bidder's view? If so, that solves the problem of an unreasonable damages quantification, but requires the court to speculate as to how a bidder *should* have bid. What if the high bidder's valuation documents knowingly overvalued the future DOE damages claim, but knowingly undervalued other items in compensation, or vice versa? It is submitted that the court cannot necessarily divine how a bid was put together even from looking at documents that might seem clear on their face. After all, Pilgrim was sold in a competitive bid environment, which cannot be as facilely recreated as Mr. Reed's report suggests.

If only the high bidder's view is to be used, what is to be done if that view is contradicted by other credible evidence? For example, the proof in this case will show that ENGC estimated costs for future spent fuel storage racks during its investigation prior to bidding on Pilgrim, but as matters developed, some of the racks were actually bought for considerably less than the estimated cost. The remaining racks have not yet been purchased, and may never be purchased.[7]

Boston Edison's expert, Mr. Reed, computes diminution damages from future spent fuel storage costs using his own analysis rather than ENGC's bid documents, finding that using the latter sources to "estimate [of] decommissioning-related damages resulting from DOE's breach . . . suffers from three significant shortcomings," which he

[7] This discussion completely puts aside the question of whether ENGC actually included rack costs in its bid development.

then enumerates. Reed Report at 17. If diminution damages can be computed without reference to bidders' documents, then logic dictates that the bidders' documents are in reality superfluous. If diminution damages are computed without reference to the bidders' documents, then can diminution damages be awarded when the bidders' documents show no evidence of diminution in the price? What if the bidders' documents clearly show diminution, without any of the so-called "significant shortcomings" Mr. Reed opines on here? Would an analysis such as Mr. Reed's still be used to quantify such damages?[8]

If the Court rules that future damages can be converted into present damages by selling a nuclear plant (or at least by transferring certain liabilities connected with the plant), could a sale of an entire nuclear business ripen future damages into a present claim? It is possible that a utility could sell its entire nuclear business unit.[9] Would that brook an exception to *Indiana Michigan* and permit collection of damages today? What if the sale were not at arm's-length? Would that change the result? What if the sale were at arm's length, but were designed as an artifice to defeat the *Indiana Michigan* rule? Should that matter?

The foregoing issues are but a few of those that are likely to arise should the court hold that diminution damages are payable before any expenditures on those damages have been made. The intractable nature of many of these complexities simply illustrates

[8] Another problem raised by Boston Edison's claim is that, as reflected in Mr. Reed's expert report and deposition testimony, it apparently includes "contingency" dollars. Reed Report at 19; Exhibit JJR2; Deposition Transcript of John J. Reed at 631-32 (Jan. 10, 2007).

[9] It is equally possible for an entire utility (including its nuclear business unit) to be sold. *See, e.g.*, *TXU Picks Mitsubishi For Reactor Design*, AUSTIN AMERICAN-STATESMAN, Mar. 15, 2007 (mentioning takeover bid of TXU).

the wisdom of the "no speculation" rule embodied in the *Indiana Michigan* decision and the Restatement of Contracts. ENGC respectfully submits that the Court should not embark down the path of awarding diminution damages without seriously considering how these thorny problems will be addressed.

D. The Purchase And Sale Agreement's Indemnification Provision Would Require Boston Edison To Indemnify ENGC If A Diminution Claim Is Paid And DOE Raises An Offset Claim

The following provides a brief explanation of the indemnification provisions of the Pilgrim Purchase and Sale Agreement, and an explanation of how those provisions would apply in the event Boston Edison is granted relief on its diminution in value claim, and, *pro tanto*, DOE is granted an offset against ENGC.

Section 9.3 of the PSA provides as follows:

> 9.3 Indemnity by the Seller. The Seller hereby agrees to indemnify, defend and hold harmless the Buyer, its Affiliates and any of their officers, directors, employees or agents against and in respect of all claims, Liabilities, obligations, judgments, Liens, injunctions, charges, orders, decrees, rulings, damages, dues, assessments, Taxes, losses, fines, penalties, damages, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or threatened action), arising out of any claim, damages, complaint, demand, cause of action, audit, investigation, hearing, action, suit or other proceeding asserted or initiated or otherwise existing in respect of any matter (collectively, the "Losses"), provided that such Losses exceed One Million Dollars ($1,000,000) in the aggregate and result or arise from:
>
> * * *
>
> (b) any Third-Party Claim against the Buyer based on Seller's ownership, operation or use of the Acquired Assets prior to the Closing that is not related to the Assumed Liabilities;
>
> (c) the Excluded Assets;

> (d) Liabilities not assumed by Buyer within the scope of Section 2.4;
>
> (e) Any breach by Seller of any covenant, agreement or obligation of the Seller contained in this Agreement or any certificate required to be delivered by Seller pursuant to this Agreement and any intentional misrepresentation or fraudulent breach of representation or warranty inducing Buyer to proceed to the Closing and causing Buyer to suffer Losses; or
>
> (f) Any contracts, leases or other agreements or commitments entered into or made by Seller with respect to the Acquired Assets, unless Buyer has agreed to assume Liabilities under such agreements or commitments.[10]

Subsection (b) calls for indemnification of any offset claim. An offset claim would be a "Third-Party[11] Claim against the Buyer based on Seller's ownership . . . of the Acquired Assets prior to the Closing."[12] Any offset claim would not be "related to the Assumed Liabilities." While the Standard Contract on its face is an "Assumed Liability," section 2.2(e) provides a carve-out of Material Contracts, of "all rights of the Seller in and to any causes of action against a Third Party relating to any period through the Closing Date." Thus, the Standard Contract is bifurcated into a pre-close liability (reserved to Boston Edison), and post-close liability (assigned to ENGC). Only the latter part is an "Assumed Liability." Since the pre-close portion of the DOE contract is not an "Assumed Liability," claims respecting that part of the contract must be indemnified by Boston Edison under subsection (b).

[10] Section 9.10 provides that this indemnification survives the Closing.

[11] Section 12 of the Purchase and Sale Agreement defines a Third Party as "a Person who is not a Party, an Affiliate of a Party, a Representative of a Party, a Representative of an Affiliate of a Party or a shareholder of any of a Party, a Party's Affiliate or a Party's Representative." In the context of an offset claim by the government against ENGC, the government would be a "Third Party."

[12] The "Acquired Assets" include the real property and improvements at the site, and the forward portion of the Material Contracts. Purchase and Sale Agreement, Section 2.1.

Indemnification under subsection (c) is also required because the offset claim arises from an Excluded Asset. "Excluded Assets" are defined in section 2.2, and section 2.2(e) includes within "Excluded Assets" causes of action against a Third Party relating to any period through the Closing Date. Thus, Boston Edison is liable to indemnify ENGC against any offset claim because that arises from an Excluded Asset, namely, the "rights of the Seller in and to any cause of action against a Third Party [the government] relating to any period through the Closing Date."

Indemnification under subsection (d) applies in the same manner as under subsection (c) because the offset claim arises from "Liabilities not assumed by Buyer within the scope of Section 2.4." One of the Liabilities not assumed in section 2.4 is "any Liability in respect of the Excluded Assets," which, as mentioned above, includes the DOE contract through the Closing Date.

Indemnification under subsection (e) applies because Boston Edison has instituted a cause of action against the government that would, in the case of an offset claim, have a Buyer Material Adverse Effect. Subsection (e) provides liability for "[a]ny breach by Seller of any covenant, agreement or obligation of the Seller contained in this Agreement. . . ." One of the covenants or agreements in the Purchase and Sale Agreement is, "Seller shall not institute or settle any such cause of action [i.e., causes of action against a Third Party relating to any period through the Closing Date] that would have a Buyer Material Adverse Effect." Section 2.2(e). A "Buyer Material Adverse Effect" is defined in section 12 as "any material adverse change in, or effect on, the business, financial condition, operations, results of operations or future prospects of Buyer, including any change or effect that is materially adverse to the Buyer's ability to own, operate or use

the Acquired Assets as so owned, operated and used by the Seller prior to the Effective Date." What is a "material adverse change" is not defined, but the indemnity in section 9.3 has a built-in $1,000,000 threshold, and for reference, Section 12 defines "Material Adverse Effect" as unexpected expenses aggregating $5,000,000 over two years or $10,000,000 over five years where individual occurrences under $1,000,000 are not considered. In any event, any offset claim that might be created by Boston Edison's diminution lawsuit would likely meet any of $1,000,000, $5,000,000, or $10,000,000 thresholds for materiality.

Indemnification under subsection (f) would be required because indemnity is required for contracts made by Seller "unless Buyer has agreed to assume Liabilities under such agreements or commitments." As noted above, the pre-Closing portion of the Standard Contract claim, under which Boston Edison's diminution claim has been filed, has been carved out under subsection 2.2(e).

## CONCLUSION

For the foregoing reasons, Plaintiff ENGC respectfully requests that this Court adopt the Contentions of Fact and Law as stated herein, and deny Boston Edison's claims of damages based on the alleged diminution in value of the Pilgrim Nuclear Power Station.

Dated: April 16, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by Daniel S. Herzfeld
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
Entergy Nuclear Generation Co.

Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
(601) 368-5572
(601) 368-5816 (fax)