IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BOSTON EDISON COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

ENTERGY NUCLEAR GENERATION CO.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 99-447C
No. 03-2626C
(Judge Lettow)

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER
Assistant Director

ALAN J. LO RE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT R. DAMELIN
PATRICK B. BRYAN
STEPHEN FINN
JOSHUA E. GARDNER
SONIA ORFIELD
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

April 30, 2007

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 8

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 8

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . 9

A. The Proposed Rule . . . . . . . . . . 9

B. Public Comments . . . . . . . . . . 10

C. The Final Rule . . . . . . . . . . 12

III. BOSTON EDISON'S EXECUTION OF ITS STANDARD CONTRACT . . . . 13

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 14

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . 15

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . 16

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . 16

B. The 1991 Annual Capacity Report . . . . . . . . . . 17

C. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . 19

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY . . . . . . . . . . 20

A. Program Reassessment And 1991 Draft Mission Plan Amendment . . . . 20

B. Preliminary Estimates Of The Total-System Cost For The Restructured Program . . . . . . . . . . 21

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . 22

IX. BOSTON EDISON DECIDES TO SELL ITS PILGRIM FACILITY . . . . . . . . 24

X. ENTERGY'S PURCHASE PRICE FOR PILGRIM . . . . . . . . . . . . . . . . . . . . . . 25

XI. BOSTON EDISON'S DECOMMISSIONING FUNDING PARAMETERS WITH REGARD TO THE PILGRIM AUCTION . . . . . . . . . . . . . . . . . . . . . . 25

XII. BOSTON EDISON'S COMPLAINT AND ASSIGNMENT OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I. BOSTON EDISON BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . . . . . . . . . . . 30

A. Boston Edison Has The Burden Of Proving All Elements Of Its Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B. Plaintiffs' Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" The Damages Asserted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C. Boston Edison Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D. Boston Edison Must Prove Its Damages With Reasonable Certainty . . . 35

II. BOSTON EDISON'S CLAIM FOR THE DIMINISHED SALES PRICE OF THE PILGRIM PLANT IS A CLAIM FOR UNRECOVERABLE CONSEQUENTIAL DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A. A Plaintiff May Not Obtain Consequential Damages For An Alleged Breach Of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. Boston Edison's Sale Of Pilgrim To Entergy Is Not Directly Related To The Standard Contract, But Rather Constitutes An Independent And Collateral Undertaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C. Contrary To Boston Edison's Assertion, The Government Is Not Somehow Precluded From Challenging The Foreseeability Of The Damages Sought By Boston Edison . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III. BOSTON EDISON'S CAUSATION THEORY FAILS BECAUSE IT CANNOT

MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A QUALITATIVE TWO-PART TEST OR AT AN ANNUAL RATE OF 3,000 MTU . . . . . 43

A. The NWPA Did Not Require Acceptance Of SNF At A 3,000 MTU Rate Or Under Any Particular Qualitative Standard . . . . . 43

B. The Standard Contract Did Not Require Acceptance of SNF At A 3,000 MTU Rate Or Pursuant To Any Qualitative Test . . . . . 45

C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract . . . . . 48

1. The Acceptance Schedule Was Established In The Dealings Between The Parties . . . . . 48

2. Boston Edison Will Be Unable To Establish That The Fees Which It Paid Into The NWF Were Based Upon Any Particular Rate Of SNF Acceptance . . . . . 51

IV. BOSTON EDISON CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN ITS CLAIMED DAMAGES AND DOE'S DELAY . . . . . 52

A. Entergy's Use Of A Particular Discount Rate And Financing Method Was Unaffected By DOE's Delay In SNF Acceptance . . . . . 52

B. Entergy Did Not Include Costs Associated With Re-Racking Pilgrim's Spent Fuel Pool In Its Valuation Model, And Would Not Have Paid More For Pilgrim Absent The Additional Racks . . . . . 54

V. BOSTON EDISON DID NOT TRANSFER A GREATER AMOUNT TO ENTERGY RELATED TO THE DECOMMISSIONING TRUST FUND DUE TO THE GOVERNMENT'S DELAY IN SPENT FUEL ACCEPTANCE . . . . 54

A. The NRC's Minimum Decommissioning Trust Fund Formula Expressly Excludes SNF Storage And Disposal Costs . . . . . 54

B. Boston Edison's Contention Regarding The Transfer Of "Excess" Trust Fund Amounts Is Factually Unsupported . . . . . 56

C. Events That Occurred After The Signing of the Purchase And Sale Agreement Are Irrelevant In Determining Whether Boston Edison Transferred More Money To Entergy As A Result Of DOE's Delay In

SNF Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VI. BOSTON EDISON FAILS TO REDUCE FROM ITS CLAIM THE COSTS ASSOCIATED WITH LOADING SNF TO DOE . . . . . . . . . . . . . . . . . . . . . . . 60

VII. BOSTON EDISON'S RECOVERY OF FUTURE COSTS RELATING TO RE-RACKING, AND DECOMMISSIONING, AS WELL AS BOSTON EDISON'S ALLEGED DAMAGES RELATING TO ENTERGY'S DISCOUNT RATE, VIOLATE THE COURT OF APPEALS RULING IN *INDIANA MICHIGAN* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

VIII. BOSTON EDISON'S ALLEGED RETENTION OF THE RIGHT TO SUE THE GOVERNMENT FOR CLAIMS ASSOCIATED WITH DOE'S DELAY IN ACCEPTANCE THAT POSTDATE THE PILGRIM SALE IS INVALID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

IX. BOSTON EDISON CANNOT ESTABLISH THAT DOE ACTED WITH A SPECIFIC INTENT TO HARM IT, PRECLUDING ITS CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING . . . . . . 64

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

# TABLE OF AUTHORITIES

## CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 30

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) . . . . . . . . . . 32, 60

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 31, 32

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 34

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) . . . . . . . . . . 42, 43

Boston Edison Co. v. United States,
67 Fed. Cl. 63 (2005) . . . . . . . . . . 29

California Fed. Bank v. United States,
395 F.3d 1268 (2005) . . . . . . . . . . 61

Citizens Federal Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007) . . . . . . . . . . 33

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) . . . . . . . . . . 32

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . 33

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984) . . . . . . . . . . 48

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . 39

Fifth Third Bank of Western Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005) . . . . . . . . . . 62

First Height Banks v. United States,
57 Fed. Cl. 162 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Granite Management Corp. v. United States,
74 Fed. Cl. 155 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . 67

Indiana Michigan Power Co. v. United States,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Kingsbury v. United States,
215 Ct. Cl. 136, 563 F.2d 1019 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Krueger Assoc. v. American Dist. Tele. Co. of Pa.,
247 F.3d 61 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

LaVan v. United States,
382 F.2d 1340 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Mosley v. City of Northwoods, Missouri,
415 F.3d 908 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Murphy v. Missouri Dep't of Corrections,
372 F.3d 979 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nebraska Public Power District v. United States,
74 Fed. Cl. 762 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975), cert. denied, 429 U.S. 866 (1976). . . . . . . . 31, 34

Northern State Power Co. v. United States Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38, 42

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Patterson v. United States,
173 Ct. Cl. 819, 354 F.2d 327 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Point Prods. A.G. v. Sony Music Entm't, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . 31

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36, 37

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Sacramento Municipal Utility District v. United States,
74 Fed. Cl. 727 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . 30

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . 31, 36

Scott Timber Co. v. United States,
33 F.3d 1358 (Fed. Cir. 2003) . . . . 37, 42

Shyface v. Secretary of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) . . . . 33

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996), . . . . *passim*

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002) . . . . 33

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . 31

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . 30

**STATUTES**

10 C.F.R. 50.75 . . . . 55

10 C.F.R. § 961.11, Art. II . . . . *passim*

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) . . . . 12

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . 8, 9, 10, 45

48 Fed. Reg. at 5462 . . . . 11, 12

42 U.S.C. §§ 10101-10270 . . . . 8

S. Rep. No. 100-152, at 1 (Sept. 1, 1987) . . . . 15

31 U.S.C. § 3727 . . . . 63, 64

42 U.S.C. § 10131(b)(1) . . . . 40

42 U.S.C. § 10139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 10162(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 10168(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 50

42 U.S.C. § 10172(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 10221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

42 U.S.C. § 10222(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 10222(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 40

42 U.S.C. § 10242(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BOSTON EDISON COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | |
| ENTERGY NUCLEAR GENERATION CO.,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 99-447C<br>No. 03-2626C<br>(Judge Lettow) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's order dated February 26, 2007, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

Unlike the vast majority of other spent nuclear fuel ("SNF") cases that utility plaintiffs have brought in this Court for damages associated with storage costs that actually have been incurred to date in connection with the Government's delay in accepting SNF and high-level radioactive waste ("HLW") from commercial nuclear reactors on January 31, 1998, pursuant to the Standard Contract, this case involves a claim for damages brought by one plaintiff, Boston Edison Company ("Boston Edison"), whose damages theory is based upon the projected SNF storage costs that another plaintiff, Entergy Nuclear Generation Company ("Entergy"), may or

may not incur at some distant time in the future. Notwithstanding the inherently speculative nature of such a claim, Boston Edison seeks recovery for $123.5 million that it allegedly incurred in connection with its July 13, 1999 sale of the Pilgrim Nuclear Power Station ("Pilgrim") to Entergy because of the Government's delay in beginning acceptance of SNF.

Boston Edison's claim for damages is based upon the following unsupported premises: (1) that, in a "but for" world where DOE had begun timely acceptance of SNF, the Government was contractually obligated to accept SNF from the nuclear industry at a rate of 3,000 metric tons per uranium ("MTU") per year, which is a rate that Boston Edison claims would have precluded the need for utilities to add additional at-reactor storage after 1998 (see Boston Edison's Memorandum of Contentions of Fact and Law, dated March 30, 2007 ("Boston Edison's Pretrial Br."), at 5); (2) that, in the "but for" world, Entergy would have paid approximately $74 million more for the Pilgrim plant than it actually paid because it would not have needed to account for approximately $1 million in future spent fuel pool re-racking costs, approximately $39 million in an internally-mandated return on equity, and approximately $34 million to compensate for the inability to finance the purchase through a combination of debt and equity (see id. at 3); and (3) that, in the "but for" world, Entergy would have reduced the monetary amount that it required Boston Edison to transfer to Entergy for purposes of decommissioning trust funding by approximately $86 million (see id. at 2). As discussed below, and as we will establish at trial, these contentions are unsupported by either the law or the facts in this case.

As an initial matter, Boston Edison's claims fail as a matter of law, as the claimed damages that Boston Edison seeks in this case were not foreseeable at the time of contract

formation and otherwise constitute remote and consequential damages that are not recoverable against the Government in a breach of contract action in this Court. It is beyond dispute that Boston Edison's sale of Pilgrim to Entergy does not flow directly from the Standard Contract, but, rather, constituted an independent and collateral undertaking that was wholly separate and distinct from the purposes of the Standard Contract. Accordingly, Boston Edison may not recover the alleged "diminution-in-value" costs that it now seeks against the Government.

With respect to the issue relating to the rate of SNF acceptance under the Standard Contract, Boston Edison asserts that, despite no acceptance rate in the contract, DOE was obligated to accept SNF in such a manner as to: (1) "dispose of the current backlog;" (2) "dispose of SNF generated annually," and (3) "preclude the need for further storage of SNF on-site after January 31, 1998." Boston Edison's Pretrial Br. at 5. Boston Edison further asserts that a 3,000 MTU rate of acceptance, after an initial ramp-up period, would meet these goals. Id. Further, Entergy claims that, "should the Court determine it needs to decide the acceptance rate issue . . . a 3,000 MTU per year acceptance rate should apply." Plaintiff Entergy Nuclear Generation Company's Memorandum of Contentions of Fact and Law ("Entergy's Pretrial Br."), at 7. Both Boston Edison and Entergy are incorrect.

Contrary to plaintiffs' claim that DOE was somehow contractually obligated to accept 3,000 MTUs of SNF shortly after 1998, it is undisputed that no such term appears in either the Standard Contract or the Nuclear Waste Policy Act of 1982 ("NWPA"), and the evidence at trial will establish that the process, identified in the Standard Contract, to define DOE's obligations with respect to particular utilities started in 1991 with the issuance of the 1991 Annual Capacity Report ("ACR"). Those utilities, such as Boston Edison, that had allocation rights in the first ten

years of the SNF acceptance program, as identified in the 1991 ACR, submitted delivery commitment schedules ("DCSs") to DOE to identify the SNF that they wished to have accepted. Indeed, Boston Edison followed this established contractual process and submitted a DCS in 1993 for the acceptance of SNF in 1999, which DOE subsequently approved. The 1991 ACR and subsequent approved DCSs of those utilities with an allocation in the first ten years of the repository or interim storage facility ("MRS") form the baseline for any damages analysis. If the Court rejects that argument, a serious question would arise regarding the enforceability of the Standard Contract, given that the rate term, one of the most essential parts of the Standard Contract, would be rendered wholly indefinite.[1]

In short, we will establish at trial that: (1) neither the NWPA nor Standard Contract required DOE to begin acceptance at any particular rate, let alone the rates that Boston Edison and Entergy advocates; (2) DOE continually and consistently – both before and after the parties signed the Standard Contract – rejected industry requests to include any qualitative or

---

[1/] In Northern States Power Co. v. United States Dept. of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997), the United States Court of Appeals for the District of Columbia circuit issued a writ of mandamus enjoining the Government from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States,73 Fed. Cl. 650, 673 (2006), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

quantitative minimum rate obligation into the Standard Contract; and (3) contrary to plaintiffs' assertions, plaintiffs cannot identify a single DOE program document that reflects performance beginning in 1998 at a single repository at a 3,000 MTU rate of acceptance after a four- or five-year ramp up.

The determination of the Government's obligation regarding the rate of acceptance is critical to establishing damages in this case for several reasons. First, Boston Edison's claim for damages associated with "excess" decommissioning funding hinges in large part upon the determination of the rate of acceptance. For example, Boston Edison concedes that, under a 900 MTU rate of acceptance through 2010, (a rate consistent with the Government's expected performance from the early-to-mid 1990s), with a ramp-up to 3,000 MTU by 2015, Entergy would have chosen to construct dry storage in the "but for" world. Consequently, under that rate of acceptance, Boston Edison's claimed "excess" decommissioning damages are cut by roughly 50 percent, as Boston Edison concedes that a substantial portion of the dry fuel storage costs that it alleges are contained in the fund transfer amount would not be incremental to DOE's delay in acceptance. Thus, by Boston Edison's own admission, using the 900 MTU rate of acceptance, with a ramp-up to 3,000 MTU by 2015, reduces Boston Edison's damages calculation by more than $41 million even if Boston Edison otherwise prevails fully on its theory of damages. Boston Edison's Pretrial Br., at 17. Second, because this Court has consolidated the Boston Edison and Entergy cases for purposes of determining, among other things, the proper rate of SNF acceptance, this Court must determine a proper rate of acceptance that will bind Entergy when Entergy ultimately pursues its own damages claim.

In addition, despite its assertions, Boston Edison will be unable to establish at trial that the price which Entergy paid for Pilgrim was in any way reduced because of DOE's delay in SNF acceptance. Indeed, we will establish through Entergy's contemporneous documents and the testimony of Entergy's own personnel that DOE's delay in acceptance in no way affected the price that Entergy paid for Pilgrim. For example, we expect that Entergy personnel will testify that, although Entergy included in its valuation model for Pilgrim a $17.7 million reserve for unidentified future capital additions, Entergy never specifically identified a cost associated with reracking activities. Indeed, Entergy's personnel will explain that, even had it included the reracking activities in its valuation model, given the relatively de minimus cost, Entergy would not have paid more for Pilgrim absent the rerack. Further, we will establish through the testimony of Entergy personnel that, in using a particular discount rate and rate of return requirements, Entergy did not account for any potential risks associated with DOE's delay in SNF acceptance and, instead, used a generic discount rate associated with many of Entergy's new business ventures. Similarly, contrary to Boston Edison's contentions, we will present testimony from Entergy's own personnel indicating that Entergy did not account for any potential risk associated with DOE's delay in SNF acceptance in its use of equity financing in connection with the Pilgrim sale.

We also will establish at trial that Entergy did not require Boston Edison to transfer to Entergy an increased decommissioning trust fund to account for DOE's delay in SNF acceptance. Specifically, we will show that Entergy actually agreed to receive from Boston Edison less than Boston Edison itself originally estimated it would have to transfer to the buyer of Pilgrim plant. Further, we will establish that the amount of the decommissioning transfer was

consistent with the United States Nuclear Regulatory Commission ("NRC") minimum funding amount, which expressly excludes costs for SNF storage and disposal. We will also establish through the testimony of Entergy personnel that, although Entergy was willing to accept only the NRC minimum, Entergy anticipated that the growth in the decommissioning fund over time would ultimately cover the entire amount of money necessary to fully decommission the plant, including costs associated with the disposal of SNF and the greenfielding of the site.

Further, notwithstanding the fact that Boston Edison has the burden to demonstrate the scope of activities in the "but for" world, Boston Edison provides no adjustments to its damages claim for the costs that it avoided as a result of DOE's delay in acceptance. Because of DOE's delay, Boston Edison did not incur costs that it would have incurred had DOE timely performed, such as the costs associated with loading SNF into DOE transportation casks. Consequently, the cost of loading SNF to DOE should be deducted from Boston Edison's damages claim, as it is a cost that Boston Edison would have incurred in the "but for" world that it avoided in the actual world. Accordingly, to the extent that Boston Edison does not present any evidence to establish these "but for" world activities, it fails to meet its burden of proof and cannot establish its claimed damages with reasonable certainty.

In sum, we will establish at trial that Boston Edison's diminution-in-value claim is based upon the false premise that Entergy paid less for Pilgrim and that Entergy received more from Boston Edison in its transfer of the decommissioning fund because of DOE's delay in SNF acceptance. At bottom, the only witnesses who can properly answer that question are the individuals at Entergy who were responsible for Entergy's purchase of Pilgrim. We will establish at trial through those witnesses and their contemporaneous documents that DOE's

delay in SNF acceptance affected neither the amount that Entergy paid for Pilgrim nor the amount that it required Boston Edison to transfer for the Pilgrim decommissioning trust fund.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE STANDARD CONTRACT THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a facility for

disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI"), an association of the nuclear power industry to which Boston Edison and Entergy belonged, and whose comments Boston Edison actively endorsed, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 2.034, Attachment A at 2 (ARC0010334).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.063 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id.

TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth a statutorily-required Mission Plan.[2] For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 2.043, attachment 1 at 1 (ARC0010439).

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX.2.34, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at 5(ARC0010337). See also DX 2.14 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.69 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

---

[2/] In June 1985, in accordance with the requirements of 42 U.S.C. § 10221 (1982), DOE issued the Mission Plan to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt EEI's suggestion, which Boston Edison and many other utilities endorsed, to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. The utilities acknowledged that DOE rejected their requests regarding the inclusion of a qualitative

description of the acceptance rate in both internal memoranda and correspondence with DOE. In a letter to Robert Morgan of DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 32, Attachment 1 at 1 (SN011050).[3] The Government will show at trial that DOE determined it could not include this requirement due to the number of uncertainties concerning the acceptance of SNF by DOE beginning in 1998. Instead, the contract provided that the acceptance rate would be developed later through the promulgation of the 1991 ACR.

Finally, the Standard Contract contained an integration clause which provided:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[4]

## III. BOSTON EDISON'S EXECUTION OF ITS STANDARD CONTRACT

On June 17, 1983, Boston Edison Company executed its Standard Contract with DOE. DX 1. Boston Edison's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See 10 C.F.R. § 961.11.

---

3/ DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 2.043, attachment 1 at 1 (ARC00010439).

4/ The Standard Contract also included a "Disputes" clause which provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 42 at 25-26 (HQR0031129-30). The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[5] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 42 at 29 (HQR0031133). The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 90 at 29 (HQR031133).

As mentioned above, at the time of the rulemaking, DOE expressly rejected utility requests to make the rates contained in the Mission Plan contractually binding. In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of

5/ Today, utilities discharge approximately 2,000 MTU of SNF per year.

the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988. Significantly, DOE explained that it could nonetheless begin waste acceptance in 1998 at an MRS facility. DX 48 at 6 (HQR0031634). Consistent with the 1985 Mission Plan, the 1987 Mission Plan Amendment acknowledged the importance of the Annual Capacity Report that would be issued in 1991: namely, that it would be used in the DCS process. DX 48 at 60 (HQR0031687).

V. <u>THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT</u>

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a

repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[6] This later restriction was imposed to avoid the perception that an MRS would became a de facto repository.

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 47 at 2 (HQR0012713) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"), DX 55 at 1 (HQR0012617), DX 64 at 2 (HQR0012494). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 47 at 2 (HQR0012713), DX 55 at 2 (HQR0012618), DX 64 at 2 (HQR0012494).

---

[6] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year. DX 73 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992, and was specifically referenced in the Standard Contract. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 73at 2 (HQR0020804). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at 2, 7.

As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| 2007 | 900 |
| 2008 | 900 |
| TOTAL | 8,200 |

DX 73 at 5 (HQR0020807). This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0020806). Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be broken. Id.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 76 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to

properly complete the DCS forms."); DX 77 at 2 (SN170373) (same); DX 49 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding").

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 87 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 87 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF] . . . and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 102 at 1 (HQR0290678). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at 4 (HQR0290681). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also

> reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at 3-4 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at 1.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a permanent repository until 2010 because there was insufficient time to perform the scientific investigation necessary. DX 435 at vii-x (EDB001449-1452). Significantly, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 70 at HQR0030799. In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS:

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This

> could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Id. at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit upon the MRS until the repository began operations in 2010. Id. at 205-206.

B. Preliminary Estimates Of The Total-System Cost For The Restructured Program

DOE's anticipation of performance at an MRS by 1998 was also reflected in the cost analyses that it performed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The 1 mil per kilowatt hour fee that contract holders pay was set by Congress when enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if he finds the fee inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates, and other factors. The current program plans, including acceptance rate projections, type and location of receiving facilities, and the scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total-System Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSC"), DOE utilized a schedule that was explicitly based upon acceptance starting in 1998 at an MRS. DX 65, at PNL1071666-68. SNF

acceptance in the first ten years are identical to the first ten years under the 1991 ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSC contemplates that 400 MTU rather than 600 MTU would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted at a permanent repository. In years thirteen through seventeen, 1,800 MTU would be accepted, and only in year eighteen (2015) would the system accept 3,000 MTU. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to Boston Edison and other utilities, along with the instructions for the submission of DCSs. DX 78. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 436, DX 68, DX 71, DX 59. After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 80. Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

On December 6, 1993, DOE approved a DCS that Boston Edison had submitted for acceptance of 3.88 MTU of SNF between January 31, 1999, and January 30, 2000. Through its approval of this DCS, DOE agreed to accept 3.88 MTU of SNF from Boston Edison at some point in time between January 31, 1999, and January 30, 2000.

On January 18, 1995, DOE approved a DCS that Boston Edison had submitted for acceptance of 25.42 MTU of SNF between January 31, 2000, and January 30, 2001. Through its approval of this DCS, DOE agreed to accept 25.42 MTU of SNF from Boston at some point in time between January 31, 2000, and January 30, 2001. Subsequently, on January 25, 1996, DOE approved a DCS that Boston Edison had submitted for acceptance of 82.60 MTU of SNF between January 31, 2001, and January 30, 2002.[7] Through its approval of this DCS, DOE

---

[7/] On September 29, 1998, after DOE announced that it would be unable to perform by 1998, Boston Edison also submitted a DCS for acceptance of 11.41 MTU of SNF between January 31, 2004, and January 30, 2005. By letter dated November 24, 1998, Beth Tomasoni, the DOE contracting officer, informed Boston Edison that DOE "is not able at this time to approve your DCS submittal" and, "[c]onsequently, the Department hereby waives until further notice the

agreed to accept 82.608 MTU of SNF from Boston at some point in time between January 31, 2001, and January 30, 2002.

## IX. BOSTON EDISON DECIDES TO SELL ITS PILGRIM FACILITY

In 1997, in the wake of the deregulation of electricity markets at both the Federal and state levels in the late 1990s, Boston Edison decided to sell its Pilgrim plant, along with its entire electric generating business unit, through a competitive auction process. Boston Edison's auction represented the first sale of a nuclear power plant in the nascent, deregulated marketplace for nuclear power plant assets.[8]

Boston Edison engaged the services of the Reed Consulting Group to conduct the auction upon behalf of Boston Edison. Among other services performed, Reed Consulting was involved in drafting the offering memoranda, soliciting potentially interested bidders, and otherwise managing all aspects of the Pilgrim bidding process. In particular, two primary representatives of Reed Consulting Group – Mr. John Reed, the president and chief executive officer of Reed Consulting Group at the time of the Pilgrim auction, whom Boston Edison subsequently retained

---

contract requirement that you provide a revised schedule within 30 days."

[8] Approximately 17 nuclear plants, or interests in nuclear plants, have been sold in the marketplace to private power marketing entities (such as Entergy) in the years following the Pilgrim sale in the late 1990s. As we will demonstrate at trial, in the wake of the Pilgrim auction, the prices that these buyers have paid for nuclear plants have increased dramatically from the time of the Pilgrim sale. Such a trend undercuts Boston Edison's assertion that DOE's delay in SNF acceptance is the primary risk factor that caused a depressed market for the sale of Pilgrim in the late 1990s. Indeed, as we will demonstrate at trial, there were other significant risk factors associated with the Pilgrim sale – such as the risk of an extended plant shutdown, Pilgrim's poor record of operating performance, and the nascent, undeveloped market for nuclear assets – that bidders such as Entergy took into account in considering the appropriate purchase price for Pilgrim in the late 1990s.

as an expert witnesses in connection with this case, and Mr. Nicholas Mattia[9] – were the Reed Consulting officers responsible for the management of the auction and otherwise were integral actors with respect to the marketing of Boston Edison's nuclear assets, engaging bidders through two phases of the auction process, and working with Boston Edison and Entergy to close the Pilgrim sale and complete the Purchase and Sale Agreement between Boston Edison and Entergy.

X. ENTERGY'S PURCHASE PRICE FOR PILGRIM

On July 30, 1998, Entergy submitted its indicative bid for Pilgrim. In this indicative bid, Entergy offered $145 million for Pilgrim. By September 1998, Entergy determined internally that it would be willing to pay anywhere from $80 million to $120 million, depending upon the particular scenario that Entergy used. On October 15, 1998, Entergy submitted its final bid to Boston Edison, indicating a purchase price of $80 million.

XI. BOSTON EDISON'S DECOMMISSIONING FUNDING PARAMETERS WITH REGARD TO THE PILGRIM AUCTION

During the auction process, Boston Edison advised bidders of Pilgrim that Boston Edison would transfer to the buyer a trust fund that would grow to be sufficient to cover the costs associated with decommissioning the plant following the termination of Pilgrim's operating license, which, at the time of sale, was set to expire in 2012. Based upon a decommissioning study that Boston Edison prepared before the auction, Boston Edison further advised bidders that they should submit an initial "indicative bid" with a decommissioning funding level between

[9] From 1998 to 2001, a period of time encompassing the Pilgrim auction and sale, Mr. Mattia worked for Reed Consulting in a non-legal capacity. Subsequently, Mr. Mattia joined the law firm of Dickstein Shapiro LLP in 2003. Mr. Mattia is identified as "of counsel" on virtually all Boston Edison pleadings and court filings in this case since 2004, when Dickstein Shapiro LLP became Boston Edison's counsel in this case.

$564 million and $788 million. In its indicative bid, dated July 30, 1998, Entergy initially sought a decommissioning fund of $590 million. However, by the time that Entergy submitted its binding bid on October 15, 1998, Entergy had reduced the decommissioning fund requirement in the bid to $535 million. By October 29, 1998, in an effort to offer a more competitive bid, Entergy indicated that it was willing to accept from Boston Edison a decommissioning fund as low as $415 million, depending on the tax consequences of the transfer. The next day, in a further effort to present a competitive bid, Entergy reduced its decommissioning funding requirement to $400 million, again depending on the tax consequences of the transfer. Ultimately, on November 18, 1998, Boston Edison and Entergy signed the Purchase and Sale Agreement, requiring that Boston Edison transfer to Entergy a range between $396 and $466 million, with this $70 million range reflecting the potential tax treatment of the fund transfer. Significantly, when the parties entered into the Purchase and Sale Agreement, Entergy had calculated the NRC minimum for Pilgrim as approximately $396 million. This is significant because the NRC's minimum decommissioning funding requirement expressly excludes the cost of SNF storage and disposal.

In December 1999, after the parties signed the Purchase and Sale Agreement, the NRC adjusted the calculation of the NRC minimum. Specifically, the NRC changed the calculation related to low-level radioactive waste disposal, resulting in a lower NRC minimum decommissioning amount for the decommissioning of Pilgrim. Consequently, the NRC minimum for decommissioning Pilgrim dropped from $396 million to $327 million. Despite this adjustment to the NRC minimum, the amount that the parties agreed to transfer for decommissioning did not change.

Entergy's winning bid for the Pilgrim plant ultimately required a decommissioning fund transfer of only $427.9 million. As we will show at trial, the amount that the parties agreed to transfer in the decommissioning trust fund was consistent with the minimum amount that the NRC prescribed, which, by regulation, expressly excludes costs associated with SNF storage and disposal.[10] Therefore, Boston Edison will be unable to establish at trial that it somehow transferred excess decommissioning funds to Entergy as a result of DOE's delay in SNF acceptance.

## XII. BOSTON EDISON'S COMPLAINT AND ASSIGNMENT OF CONTRACT

On November 18, 1998, Boston Edison and Entergy executed the "Purchase and Sale Agreement Between Entergy Nuclear Generation Company and Boston Edison Company ("Purchase and Sale Agreement"). Pursuant to the Purchase and Sale Agreement, Boston Edison assigned its rights under the Standard Contract to Entergy.[11] Nevertheless, pursuant to the Purchase and Sale Agreement, Boston Edison retained claims against DOE that had accrued as of the closing date, whether those claims related to "periods prior to or following the closing date," and Entergy acquired the right to claims against DOE accruing after the closing date of the Pilgrim sale. See DX 265 (Purchase and Sale Agreement, § 2.2(g)).

Thereafter, on July 13, 1999, the same date upon which the parties executed the assignment, Boston Edison transferred its Pilgrim nuclear plant to Entergy. On that same day,

---

10/ As a consequence, as Entergy indicates in its pretrial briefing, the amount by which Entergy reduced its decommissioning fund transfer requirement during the auction exceeds Boston Edison's claimed damages of $123.5 million by between $12 million and $236 million. See Entergy's Pretrial Br., at 11.

11/ Mr. Mattia, who was then employed by Reed Consulting as a consultant upon Boston Edison's behalf, participated as Boston Edison's representative with respect to the drafting of the assignment provision in the Purchase and Sale Agreement.

Boston Edison informed DOE's Office of Procurement Operations of its assignment of contract. In its letter, Boston Edison stated that it had "transferred title to spent nuclear fuel and high-level radioactive waste located at the Pilgrim Nuclear Power Station to Entergy Nuclear Generation Company, effective July 13, 1999." DX 395. Boston Edison further stated that, "pursuant to the terms of the Purchase and Sale Agreement dated November 18, 1998, Boston Edison Company has, effective July 13, 1999, consummated the sale of Pilgrim Nuclear Power Station to Entergy Nuclear Generation Company, and that such sale includes the transfer and assignment of Boston Edison's rights and obligations under the captioned contract, with the exception of any claims against the Department of Energy accrued prior to the date of transfer." Id. Boston Edison attached to its letter a copy of the Assignment of Contract executed in connection with the assignment.

DOE did not begin accepting SNF and/or HLW from the nuclear utilities under the Standard Contracts by January 31, 1998. On July 12, 1999, Boston Edison filed its complaint in this Court, through its counsel at the time, Shaw Pittman LLP (now Pillsbury Winthrop Shaw Pittman), seeking damages for DOE's alleged partial breach of the Standard Contract between Boston Edison and DOE, DOE's alleged breach of the duty of good faith and fair dealing, and damages arising from an alleged taking of property by the Government pursuant to the Fifth Amendment of the United States Constitution. Subsequently, on January 13, 2004, after the substitution of counsel, Boston Edison filed an amended complaint in this Court, alleging damages based upon a diminution-in-value theory, for breach of contract, breach of the duty of good faith and fair dealing, and a taking of property.

On November 5, 2003, Entergy filed its own complaint in this Court, seeking to recover "significant damages" allegedly caused by DOE's delay in beginning SNF acceptance in

connection with the Pilgrim nuclear plant. Entergy Compl. ¶ 1. These damages include the costs that Entergy allegedly incurred to provide for "extended on-site storage" of SNF as a result of the breach, Entergy Compl. ¶ 21, even though Boston Edison had alleged that Entergy, at least in part, had already compensated itself for those costs through a reduction in the Pilgrim purchase price. Entergy also claimed that it had, and continues to incur, damages, "including but not limited to regulatory costs associated with efforts to ensure sufficient on-site storage capacity or alternative off-site storage capacity to permit continued operation of its nuclear plant." Id.

Given that the claims that Boston Edison and Entergy assert involved multiple common factual and legal issues, on July 29, 2005, the Court ordered that the two cases be consolidated for the limited purpose of addressing issues relating to: (1) contract formation; (2) contract implementation through the date of the Pilgrim sale; and (3) Boston Edison's diminution-in-value claim, and the Government's attendant offset claim against Entergy.[12] See Boston Edison Co. v. United States, 67 Fed. Cl. 63, 67 (2005).

---

[12]/ To the extent that the Court awards damages to Boston Edison in this case, the Government will assert a corresponding offset against Entergy with respect to the damages that Entergy seeks in its separate claim against the United States for damages arising from the Government's partial breach of the Standard Contract.

## DISCUSSION

### I. BOSTON EDISON BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. Boston Edison Has The Burden Of Proving All Elements Of Its Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). As the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, Boston Edison bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

As Boston Edison concedes, "[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed." See Boston Edison's Pretrial Br., at 30 (citing Indiana Michigan, 422 F.3d at 1373).

Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."[13] Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); PG&E, 73 Fed. Cl. at 385 (same). Although "the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract," that effort must be "at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (quoting Restatement of Contracts § 329 cmt. e), cert. denied, 429 U.S. 866 (1976).

### B. Plaintiffs' Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" The Damages Asserted

Boston Edison must establish that, "but for" the breach of contract, the asserted harm would not have been suffered. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). Boston Edison also must introduce clear proof that it was injured as a direct result of the defendant's breach. Myerle, 33 Ct. Cl. at 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121

---

13/ To the extent that either Boston Edison or Entergy assert that the "but for" world is speculative and, therefore, not susceptible of proof, and given Boston Edison's and Entergy's burden of proving costs in the "but for" world, it is unclear how Boston Edison and Entergy will meet that burden.

Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. In addition, because Entergy's claim against the Government is consolidated with Boston Edison's claim for purposes of issues relating to contract formation, Entergy shares the same burden as Boston Edison to demonstrate the necessary "causation" elements discussed above.

Hence, to prove causation, Boston Edison and Entergy must establish the "but for" world so that the Court can identify whether Boston Edison's claimed damages are, in fact, incremental to DOE's partial breach. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); see Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 386 (2006) ("Plaintiff bears the burden of 'establishing a what might have been' with reasonable certainty had the defendant performed the Standard Contract"), appeal pending, No. 07-5046 (Fed. Cir. docketed Jan. 24, 2007). A plaintiff cannot recover as damages from the Government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet Sav. Bank, 339 F.3d at 1345. Without establishing that "but for" world, Boston Edison and Entergy leaves the Court with no mechanism by which to determine whether Boston Edison's claimed "diminution in value" in connection with the Pilgrim sale was a direct result of the Government's partial breach.

Indeed, this Court's recent decision in Pacific Gas & Electric Co. v. United States, 73 Fed. 333 (2006), further articulates the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world. In PG&E, the Court addressed the

applicable legal standard by recognizing at the outset that "[t]he goal of awarding damages for breach of contract – that of placing the injured party in as good a position as it would have had the breaching party fully performed the contract – is well settled." PG&E, 73 Fed. Cl. at 378 Significantly, in reaching that conclusion, the Court cited to, among other authorities, the Federal Circuit's decision in Indiana Michigan. Id. Further, in addressing the issue of the DOE's contractual obligation regarding a rate of acceptance under the Standard Contract, the Court acknowledged that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386; see id. at 406 ("To derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach."). The Court further clarified that PG&E's alleged expectancy damages could only be measured by reference to a world where DOE performed and that, without reference to the performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375, n.38.[14]

[14]/ Recently, in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), the Federal Circuit stated that "the selection of an appropriate causation standard depends upon the facts of the particular case and that, depending lies largely within the trial court's discretion" and that, depending upon the circumstances, the trial court may utilize the "substantial factor" causation test rather than the "but for" test. Id. at 1318-19. Yet, even under the "substantial factor" test, the plaintiff cannot avoid its obligation to establish that, absent DOE's delay, it would not have incurred the costs that it is seeking. The plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999); see Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 105 (2004) ("Plaintiff must prove that the changes . . . that were imposed by the breaching provisions of FIRREA were a substantial factor causing the alleged loss, that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks.").

Even in tort cases, where the "substantial factor" test for causation developed, that test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to

### C. Boston Edison Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable

Boston Edison also must establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682, 524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001). As part of the foreseeability determination, Boston Edison must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See

---

the indivisible injury." Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988). The "substantial factor" test originated in tort law to analyze concurrent cause cases. Prosser & Keaton, The Law of Torts 266-68 (5th ed. 1984). A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if, had CBS not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73, at 261 (1935), for the proposition that, in a breach of contract case, a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A A. Corbin, Corbin on Contracts §§ 992 & 997 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.'" Krofft, 653 F. Supp. at 1534 (quoting Corbin, supra, § 992, at 6).

Accordingly, in the contract context, when claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002). Without a "but for" world against which to compare the activities and costs that were actually required following the breach, there is no basis for determining whether a particular cost or activity is an incremental result of DOE's delay, given that there is no basis for knowing what costs and activities would have been required absent the breach. See Granite, 74 Fed. Cl. at 170 ("[b]ecause plaintiff did not present evidence on what FNB would have looked like in the 'but for' world without the $250 million from Ford, it has not demonstrated a valid claim for expectancy damages").

Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts, § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).

D. Boston Edison Must Prove Its Damages With Reasonable Certainty

Boston Edison also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). Hence, even if Boston Edison can meet its burden to show that DOE's delay in SNF acceptance somehow resulted in a diminished value for Pilgrim, Boston Edison has the burden to establish that each component of its alleged diminution-in-value damages theory can be calculated with reasonable certainty.

II. BOSTON EDISON'S CLAIM FOR THE DIMINISHED SALES PRICE OF THE PILGRIM PLANT IS A CLAIM FOR UNRECOVERABLE CONSEQUENTIAL DAMAGES

A. A Plaintiff May Not Obtain Consequential Damages For An Alleged Breach Of Contract

The Federal Circuit has repeatedly held that "remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages, such as the instant case." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 886, 524 F.2d 707, 720

(1975)); see LaVan v. United States, 382 F.2d 1340, 1351 (Fed. Cir. 2004); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). As the United States Court of Claims has explained this rule:

> The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement . . . Where such damages are the proximate result of a defendant's breach of contract, they are recoverable . . . However, while damages resulting from the natural and probable consequences of the breach complained of [are recoverable], damages remotely or consequently resulting from the breach are not allowed.

Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 742-43 (1980) (citing Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 504-05, 346 F.2d 585, 589 (1965), and Ramsey v. United States, 121 Ct. Cl. 426, 433, 101 F. Supp. 357 (1951)). Indeed, not "every injury resulting from a breach of contract is remediable in damages." San Carlos Irrigation, 111 F.3d at 1563 (quoting Wells Fargo, 88 F.3d at 1022).

The Federal Circuit routinely looks to the purpose of the breached contract to determine whether the claimed damages were "consequential" to the breach rather than a direct damage. In Wells Fargo, a bank filed a breach of contract action when the Government failed to honor its commitment to provide a guarantee for a particular construction loan that the bank extended pursuant to a Federal program. 88 F.3d at 1017. This Court had ruled that the Government had breached its contract with the bank and awarded profits that the bank allegedly lost because it was unable to make additional loans because the Government's refusal to issue the guarantee required the bank to maintain a capital reserve. Id. at 1018. The Federal Circuit reversed the award of lost profit damages, explaining that the "purpose of the guarantee was to enable Wells Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make." Id. In reaching this conclusion, the Federal Circuit explained that lost profits that

would have been realized from "independent and collateral undertakings," rather than those that would have "grown out of the contract itself," are, as a matter of law, unrecoverable:

> [I]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Id. at 1022-23 (emphasis added) (quoting Ramsey v. United States, 101 F. Supp. 353, 121 Ct. Cl. 426 (1951)).

Similarly, in Scott Timber Co. v. United States, 33 F.3d 1358 (Fed. Cir. 2003), a timber contractor claimed that the Government breached various timber sales contracts when the Government suspended performance on the contracts to protect an endangered bird species that was indigenous to the area covered by the contracts. In addition to claiming damages equal to the cost of obtaining replacement timber in the open market, the contractor also sought costs related to its sawmill operations, including labor, taxes and insurance. Id. at 1372. This Court granted the Government's motion for summary judgment with respect to the costs related to the plaintiffs sawmill operations, concluding that they were "remote and speculative damages and therefore not recoverable." Id. The Federal Circuit affirmed, explaining that the plaintiff's "sawmill expenses are not directly related to the timber sales contracts. Any sawmill costs were not a direct result of the suspensions in this case." Id.; see First Height Banks v. United States, 57 Fed. Cl. 162, 174 (2003) ("We hold, as a matter of law, that the subject of the bargain was confined to the opportunity to take advantage of the tax laws; that it would not have been foreseeable to federal negotiators that plaintiffs were entering into the arrangement to secure

future funds for homebuilding projects. Absent some specific reference, those projects, and the potential profits on them, were simply too remote to be within the parties' contemplation as a potential collateral damage from a breach.").

In fact, in Olin Jones, this Court's predecessor, the Court of Claims, recognized that the type of diminished business value damages that Boston Edison seeks in this case are too remote and consequential, as a matter of law, to constitute a recoverable damage. In Olin Jones, the plaintiff claimed that, based upon the Government's delay in making contract payments on a particular contract, the plaintiff could not obtain bonding on other contracts, crippling its ability to obtain new contracts or work. Olin Jones, 225 Ct. Cl. at 742. The Court of Claims recognized that, to decide whether a damage is too remote or consequential for recovery, "it is necessary to examine the kinds of damages sought, and to decide which resulted directly and proximately from the asserted breach, and which, even if proven at trial, would be too remote or speculative to qualify as compensable damages." Id. at 743. Although the Court of Claims found that those damages relating to "completion of this particular contract" could be sufficiently direct to warrant a trial, there could, as a matter of law, "be no recovery for general loss of business, the claimed loss of the entire [company's] net worth, and losses [on] the non-federal work – are all deemed too remote and consequential." Id. at 744 (emphasis added) (quoting William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973)). Finding that the claimed "speculative alleged loss of future contracts and work . . . comes within the losses of outside business, outside contracts, and general company worth referred to in Green," the Court of Claims barred the trial commissioner from further considering these damages "since we hold as a matter of law that, even assuming such damages could be proven, they are too remote and indirect to be recoverable in this breach action." Id.

Conversely, the Federal Circuit affirmed this Court's ruling that certain lost profits were not overly remote and uncertain as a matter of law because the plaintiff's anticipated profits flowed directly from the alleged breached contract. Energy Capital Corp. v. United States, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002). In that case, a lender had entered into a contract with the Department of Housing and Urban Development ("HUD") to originate loans to owners of HUD properties in exchange for HUD's treatment of the lender's loans in a way that gave the lender security for its loans. Id. at 1317. Before the lender originated any loans, HUD terminated the contract. Id. at 1319. The lender sued the Government for breach of contract, asserting that it was entitled to lost profits. Id. The Federal Circuit held that the lender's damages were not overly remote or speculative because the lost transactions flowed directly from and were the intended purpose of the breached contract:

> [I]n the present case, Energy Capital's anticipated profits flowed directly from the AHELP agreement and not from "other independent and collateral undertakings." As the Court of Federal Claims found, the express purpose of the AHELP agreement was to permit Energy Capital to make up to $200 million worth of loans to HUD-assisted property owners. When the government breached the AHELP agreement, Energy Capital was no longer able to issue those loans, and its resulting loss of profits flowed directly from the government's breach.

Id. at 1328-29 (citations omitted) (emphasis added).

B. Boston Edison's Sale Of Pilgrim To Entergy Is Not Directly Related To The Standard Contract, But Rather Constitutes An Independent And Collateral Undertaking

The gravamen of Boston Edison's claim for damages is that, as a direct and proximate result of DOE's failure to meet its obligation to remove SNF, the value of Pilgrim was substantially reduced. However, it is beyond dispute that the sale of Pilgrim to Entergy does not flow directly from the Standard Contract, but, instead, constitutes an independent and collateral

undertaking. Pursuant to the NWPA, the Secretary is authorized to enter into contracts "for the acceptance of title, subsequent transportation, and disposal" of SNF. 42 U.S.C. § 10222(a)(1) (2004).

Section 10131 of Title 42 of the United States Code provides the purposes behind the NWPA:

> (1) to establish a schedule for siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> (3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and
>
> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

42 U.S.C. § 10131(b)(1)-(4) (2004).

Similarly, the purposes of the Standard Contract are set forth in its preamble and mirror those of the NWPA:

> Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and
>
> Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as

> expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and
>
> Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and
>
> Whereas, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high-level radioactive waste; and
>
> Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and
>
> Whereas the Purchaser desires to obtain disposal services from DOE; and
>
> Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth[.]

10 C.F.R. § 961.11.

As the NWPA establishes, the sole purpose of the Standard Contract is to create a commitment on the part of the Federal Government to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities to pay for the cost of such acceptance and disposal. The Standard Contract contains numerous provisions dealing with the manner in which SNF acceptance from an individual contract holder will be accomplished. Although the Standard Contract permits assignment of the contract upon sale of the nuclear reactor to which the contract relates, 10 C.F.R. § 961.11, Art. XIV, it is not concerned with assisting in sales transactions or with the value or price of any sale. To the contrary, the potential sale of a nuclear utility from one private entity to another is a transaction wholly separate and distinct from the purpose of the Standard Contract. The loss of sales value claimed here is no different in nature than the loss of profits on other transactions claimed in

Wells Fargo and Scott Timber or the loss of general net worth discussed in Olin Jones and William Green. Like in those cases, the damages sought by Boston Edison for the alleged devaluation of its Pilgrim plant and its reduced 1999 sales price are not recoverable because they do not directly flow from the breach, but, instead, arise from "independent and collateral undertakings."

C. Contrary To Boston Edison's Assertion, The Government Is Not Somehow Precluded From Challenging The Foreseeability Of The Damages Sought By Boston Edison

As Boston Edison concedes in its pretrial brief, whether the alleged injury stemming from a partial breach of contract was "foreseeable" at the time of contract formation is a question of fact to be determined at trial. See Boston Edison's Pretrial Br., at 34; Indiana Michigan, 422 F.2d at 1373. Nevertheless, Boston Edison adopts the inconsistent position that the damages it now seeks in this case relating to the alleged "diminution in value" of the Pilgrim plant already have been found to be "foreseeable," based upon the existence of the assignment provision in the NWPA and in Article XIV of the Standard Contract. See Boston Edison's Pretrial Br., at 4. In support for its assertion, Boston Edison cites to the Court's order in connection with the Government's motion for summary judgment, in which we sought to dismiss Boston Edison's complaint based upon, among other grounds, lack of standing. See id. (citing Boston Edison Co. v. United States, 64 Fed. Cl. 167, 183-184 (2005)). Although the Court previously has ruled that "Boston Edison's diminution-in-value claim alleges adequate injury in fact for purposes of standing," Boston Edison, 64 Fed. Cl. at 183, the Court expressly reserved the right to adjudicate subsequently the Government's assertion that the damages sought by Boston Edison were impermissibly "remote, speculative, and unforeseeable to be recovered." Id. Indeed, as the Court noted in its ruling, "[a]t this stage, where standing is at issue, both [Boston Edison's]

diminution-in-value theory of damages to supply injury in fact for standing and the [Government's] remote-damage defense to that theory have potential merit." Id. at 183 n.17 (refusing Boston Edison's motion to strike the Government's claim that Boston Edison's damages were too remote, speculative, and unforeseeable).

Hence, contrary to Boston Edison's contention, Boston Edison has the burden to show at trial that the specific diminution-in-value damages that it now seeks were foreseeable at the time that the parties executed the Standard Contract. As discussed above, and as we will establish at trial, such damages were not contemplated by DOE at the time of contract formation[15]

## III. BOSTON EDISON'S CAUSATION THEORY FAILS BECAUSE IT CANNOT MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A QUALITATIVE TWO-PART TEST OR AT AN ANNUAL RATE OF 3,000 MTU

### A. The NWPA Did Not Require Acceptance Of SNF At A 3,000 MTU Rate Or Under Any Particular Qualitative Standard

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original)

[15] Boston Edison's claim that the law of the case doctrine applies, and prevents the Court from determining whether Boston Edison's claimed damages are consequential, remote, overly speculative, and unforeseeable because the Court previously denied the Government's motion for summary judgment, is incorrect as a matter of law. See Boston Edison's Pretrial Br., at 4-5. The law of the case doctrine generally only applies after the appeal of a trial court decision. See Mosley v. City of Northwoods, Missouri, 415 F.3d 908, 911 (8th Cir. 2005) (holding that denial of motion for summary of judgment does not constitute law of the case, and that defendant could renew motion for summary judgment); Krueger Assoc. v. American Dist. Tele. Co. of Pa., 247 F.3d 61, 65 (3rd Cir. 2001) (same); Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 986 (8th Cir. 2004) ("an initial denial of summary judgment does not establish 'law of the case' such that a ruling may not be revisited"). Here, the fact that the Court previously denied the Government's motion for summary judgment has no preclusive effect.

(quoting Wells Fargo, 88 F.3d at 1021); see PG&E, 73 Fed. Cl. at 375 (same). Indeed, in its pretrial brief, Boston Edison embraces and recognizes this but-for world concept as the cornerstone of its damages theory in this case. Specifically, Boston Edison states that it "will elicit proof at trial that will isolate the effect of DOE's breach by comparing what happened in the "actual" (breach) world to what would have happened had DOE performed as required." Boston Edison's Pretrial Br., at 5. Boston Edison further recognizes in its pretrial brief that the rate of acceptance is the linchpin to any causation analysis, because the rate of acceptance dictates the costs that the owner of Pilgrim would have to incur in the "but for" world.[16]

Boston Edison has asserted in its pretrial brief at least two distinct contract obligations that the NWPA allegedly imposes upon DOE.[17] First, Boston Edison alleges that the NWPA obligated DOE to begin accepting SNF in a manner that would obviate the need for any Standard Contract-holder to incur additional costs related to on-site storage of SNF after January 31, 1998. Boston Edison's Pretrial Br., at 5, 8. Second, Boston Edison asserts that DOE was obligated to accept SNF at a rate sufficient to meet the amount of SNF then being generated and to reduce the backlog of SNF at reactor sites prior to January 31, 1998. Id. These assertions are misplaced. Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular rate, let alone a rate that would obligate DOE to meet any qualitative obligation that Boston Edison claims in its pretrial brief. Indeed, as the Court recently concluded in PG&E,

---

16/ Curiously, Boston Edison's current position that DOE's rate of acceptance is critical to its calculation of damages lies in stark contrast to the assertions of counsel for Boston Edison to this Court that Boston Edison "d[oes] not care about [the rate of acceptance.]" Hrg. Tr. 17, June 15, 2005. Nevertheless, Boston Edison now recognizes the importance of the rate of acceptance and has put the issue squarely before the Court in the forthcoming trial.

17/ Because of the identical nature of the assertions of Entergy and Boston Edison on this issue, and the Court's consolidation order in this case, we have incorporated our response to Entergy into our response to Boston Edison.

> Plaintiff fails to cite, and the court has not discovered, any provision in the NWPA, or any statement in the legislative history of the NWPA (if the court could consider it – which plaintiff does not address), that indicates that Congress intended to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage. Rather, the plain language of the NWPA clearly states the Act's "purposes," none of which is to eliminate the need for additional at-reactor storage at utilities after January 31, 1998.

PG&E, 73 Fed. Cl. at 389 (citing 42 U.S.C. § 10131(b)). The Court's conclusion in PG&E should apply with equal force in this case.

B. The Standard Contract Did Not Require Acceptance of SNF At A 3,000 MTU Rate Or Pursuant To Any Qualitative Test

Contrary to the plaintiffs' assertions, the Standard Contract does not require acceptance of SNF at a 3,000 MTU steady-state rate. The parties' understanding that DOE was not obligated to accept SNF at any particular rate or pursuant to a qualitative test continued through the development of the Standard Contract. See PG&E, 73 Fed. Cl. at 395. On February 4, 1983, DOE published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract (48 Fed. Reg. 5458 (Feb. 4, 1983)), which identified a mechanism for determining the order and rate at which SNF would be accepted. The Government will show at trial that, in January 1983, EEI, an association of nuclear power utilities to which Boston Edison belonged and which Boston Edison considered to be its representative, submitted comments regarding the Standard Contract, received an advance draft contract, and submitted to DOE its own draft contract for DOE to use in its Federal Register notice. EEI's draft contract included language obligating DOE to begin accepting SNF at a rate tied to the amount of SNF that was being generated plus work off the backlog, and there was no mention in this submission of avoiding on-site storage after 1998.

Despite the requests of EEI – as well as Boston Edison itself – to create specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. See PG&E, 73 Fed. Cl. at 348 (acknowledging that "DOE did not adopt the suggestion of EEI and many of the utilities . . . to incorporate into the Standard Contract a firm commitment from DOE regarding the rate of DOE's acceptance of SNF from utilities"). Indeed, Boston Edison concedes this point. See Boston Edison's Pretrial Br., at 8. Uncertainties surrounding the waste acceptance program that was to commence 15 years in the future prevented DOE from committing to any particular rate of acceptance. See PG&E, 73 Fed. Cl. at 349.[18] Instead of including a rate of acceptance or qualitative test in the contract, DOE included a provision that obligated DOE to begin issuing an APR and ACR as the date for commencement drew closer. The Standard Contract obligated DOE to begin publishing ACRs in 1987. The clauses tied to the issuance of the APRs and ACRs defined for contract holders the manner by which DOE would commit to acceptance. See PG&E, 73 Fed. Cl. at 399 ("the parties understood that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule[ ] would be determined, and the parties substantially carried out this process before DOE's breach.").

---

18/ After DOE issued the draft contract, EEI provided member utilities with comments upon the draft. A February 18, 1983 letter reflected EEI/UNWMG's consideration that the inclusion of a "repository receiving rate adequate to cover current generation plus working of the backlog on a reasonable schedule" was among the "significant issues" to be addressed in their comments to the draft contract. See DX 21. However, in a March 7, 1983 letter from Mr. Loring Mills of EEI transmitting the formal EEI/UNWMG comments to the draft Standard Contract, EEI requested that DOE permit Standard Contract holders to negotiate with DOE regarding the rate of acceptance after the promulgation of the Standard Contract. See DX 2.34.

Even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance. However, DOE rejected any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate or qualitative obligation into the Standard Contract, EEI continued to press the matter. As late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract.[19]

The evidence will demonstrate that, not only did the Standard Contract not obligate DOE to accept SNF at a 3,000 MTU rate or consistent with any particular qualitative obligation, DOE rejected, both before and after contracting, repeated attempts by the industry to include such terms. These repeated requests, and DOE's rejection of the requests, is unequivocal evidence

---

19/ Indeed, the documents upon which Boston Edison relies in its pretrial brief – the 1983 and 1984 Draft Mission Plans, the 1985 Mission Plan, and the Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Feb. 1984), see Boston Edison's Pretrial Br., at 14 – were all issued after the Standard Contract was signed and, therefore, cannot be evidence of any meeting of the minds or "intent" as to the Standard Contract. See, e.g., PG&E, 73 Fed. Cl. at 383 n.41 ("despite plaintiff's statement that 'the parties understood from the time of contracting . . . that a reasonable acceptance rate should accomplish [the two part obligation," not one of the numerous citations provided by plaintiff in support of this statement is contemporaneous with or antecedent to the execution of the Standard Contract between the parties on June 30, 1983"). The Court in PG&E explained that the Draft Mission Plan contained many "program plans, goals and aspirations that were, at that early date, necessarily based on assumptions that OCRWM recognized may or may not be realistic or accurate as the waste disposal program further developed." PG&E, 73 Fed. Cl. at 356. Similarly, the Court in Sacramento Municipal Utility District v. United States, 74 Fed. Cl. 727 (2005), appeal pending, No. 07-5052 (Fed. Cir. docketed Fed. 6, 2007), recently characterized the Draft Mission Plans as "rank speculation." Id. at 729. Further, although Boston Edison cites to one portion of the 1983 Information Meeting, in another portion of that meeting, Loring Mills, Vice President of Nuclear Affairs for EEI at the time of the meeting (and a witness for the Government in this case), expressed his concern that Mr. Morgan had not committed to any particular performance standards, including a particular rate of acceptance. PG&E, 73 Fed. Cl. at 357-58. Finally, Boston Edison ignores the fact that, during contract formation, DOE expressly rejected the request by one utility that DOE contractually obligate itself to perform at the rates of acceptance articulated in the Mission Plan.

that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their inclusion was unable to secure adoption of statements in contract). Simply put, Boston Edison should not be allowed to obtain through litigation what it failed to obtain through the contract formation process. PG&E, 73 Fed. Cl. at 396-97 (rejecting imposition of 3,000 MTU rate as contractual obligation because, to do so, "the court would run afoul of the general principle of contract law that 'the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred.") .

### C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract

#### 1. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although Boston Edision asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's

delay. Indeed, as the Court explained in PG&E, the Court's adoption of the plaintiffs' position would render parts of the contract meaningless:

> If the court were to insert a firm acceptance rate obligation of 3,000 MTU/year in the Standard Contract, or if it were the understanding of the parties that the Standard Contract continued a firm acceptance rate obligation that the court should somehow enforce, then the ACR provision would be rendered "inexplicable, inoperative . . . , insignificant, meaningless, [or] superfluous." If there existed a firm acceptance rate obligation, there would be no need to "project[ ]" the "annual receiving capacity for the DOE facility" and update such projections annually.

PG&E, 73 Fed. Cl. at 387 (citations omitted).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

DOE and the utilities, including Boston Edison, acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we will anticipate establish at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[20]

---

[20] Boston Edison's proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations that Congress imposed through the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. See, e.g., PG&E, 73 Fed. Cl. at 390, n.49 ("The fact that Congress, in the 1987 Amendment Act, authorized use of an MRS facility to begin acceptance in 1998, and placed a capacity limitation of 10,000 MTU on the MRS facility until operation of a repository . . . supports the court's view that Congress did not intend to obligate DOE to collect spent fuel at a rate sufficient to prevent utilities from having to incur any additional costs after January 31, 1998 for at-reactor storage."). As stated above, in 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. After the instructions were issued, numerous utilities, including Boston Edison, submitted DCSs that were then approved by DOE. In fact, in compliance with this procedure, Boston Edision submitted a DCS for the Pilgrim facility in 1993, for delivery of 3.88 MTUs to DOE in 1999, consistent with the 1991 ACR, and without objection or complaint about its submission. In sum, we will show at trial that, rather than object or assert that DOE was somehow "obligated" to perform at any qualitative or quantitative rate, let alone the rate that Boston Edison now claims, Boston Edison recognized and accepted the rates contained in the 1991 ACR.

2. Boston Edison Will Be Unable To Establish That The Fees Which It Paid Into The NWF Were Based Upon Any Particular Rate Of SNF Acceptance

Boston Edison asserts in its pretrial brief that an acceptance rate of "3,000 MTU annually is the steady-state that Boston Edison and other utilities paid for under the Standard Contract." Boston Edison's Pretrial Br., at 16. We will establish at trial that this claim is false and that, rather than paying for a particular rate of acceptance in any particular year, utilities are paying for the entire waste acceptance program that will span decades and will cover the acceptance, transportation, disposal, and permanent emplacement of SNF. This long-term understanding of the funding for the waste acceptance program is evidenced by the fact that the fee adequacy studies which DOE performed revealed that DOE did not recommend adjustment to the fee during the period that DOE planned to meet its contractual and statutory obligation by commencing acceptance at an MRS rather than a repository.[21]

---

21/ In its pretrial brief, Boston Edison appears to suggest that DOE somehow acted improperly by continuing the DCS process and collecting fees from Boston Edison after it knew it would be unable to begin SNF acceptance by January 31, 1998. Boston Edison's Pretrial Br.,

## IV. BOSTON EDISON CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN ITS CLAIMED DAMAGES AND DOE'S DELAY

### A. Entergy's Use Of A Particular Discount Rate And Financing Method Was Unaffected By DOE's Delay In SNF Acceptance

In its pretrial brief, Boston Edison contends that Entergy relied upon a higher discount rate in its valuation of Pilgrim to reflect the risks and uncertainties associated with the Government's delay in SNF acceptance. Boston Edison's Pretrial Br., at 28. Consequently, Boston Edison claims that Entergy's use of a higher discount rate resulted in a lower valuation and purchase price for Pilgrim by $36.4 million. Id. Boston Edison's contention is unsupported by the facts in this case.

At trial, the Government will present testimony from Entergy's own personnel that Entergy did not account for any potential risk associated with DOE's delay in SNF acceptance in either its discount rate or net present value ("NPV") requirements. Rather, we expect Entergy's personnel to explain that the discount rate which Entergy employed for the Pilgrim acquisition was an "off the shelf" discount rate used for many of Entergy's new business ventures – both nuclear and non-nuclear. This "off the shelf" discount rate reflected the risk inherent in entering any new line of business and did not reflect risks associated with DOE's delay in SNF acceptance. Further, both Entergy's employees and the Government's expert economist, Dr. Jonathan Neuberger, will explain why accounting for the risk of SNF disposal in both the discount rate and the decommissioning trust fund would amount to double-counting the same risk.

---

at 11. Contrary to this suggestion, DOE's actions were wholly proper given that Boston Edison is claiming only a partial breach of the Standard Contract and thus expects that DOE will perform. Boston Edison's Pretrial Br., at 40. Indeed, given this expectation of performance, it would be improper for DOE to have ceased its attempts to perform the Standard Contract after it knew that it could not begin acceptance by January 31, 1998.

Boston Edison also claims that Entergy's senior management and Board required a specific positive NPV of approximately $30 million from the Pilgrim acquisition, Boston Edison's Pretrial Br., at 28, largely to compensate Entergy for breach-related risk. Contrary to this claim, we will demonstrate that, although Entergy sought an unspecified positive return from the Pilgrim investment, this positive NPV was simply the reward to Entergy's shareholders for making the Pilgrim investment. Boston Edison will be unable to meet its burden of demonstrating that this positive NPV was in any way affected by DOE's delay in SNF acceptance.

Further, Boston Edison's contention that Entergy's use of 100-percent equity financing was a direct result of DOE's delay in SNF acceptance is misplaced. Boston Edison's Pretrial Br., at 28. Rather, Entergy personnel will explain that the reason that it chose to finance the sale with 100 percent equity, rather than a mix of debt and equity, was because the Pilgrim acquisition was a first-of-its-kind transaction in an undeveloped and recently deregulated market. Indeed, Entergy personnel will testify that the investment community had concerns with the viability of the nuclear market generally, primarily because of the deregulated nature of the market and the uncertainty as to whether owners of nuclear plants would be able to recoup their investments absent recovery directly from the ratepayers. Further, Entergy personnel will explain that the Pilgrim acquisition was a relatively small investment and that financing the investment with 100-percent equity did not affect Entergy's overall capitalization. Accordingly, Boston Edison will be unable to meet its burden of establishing that Entergy's use of a particular discount rate or financing option was influenced by DOE's delay in SNF acceptance and that this delay had the claimed effect on the value that Boston Edison realized in the Pilgrim sale.

### B. Entergy Did Not Include Costs Associated With Re-Racking Pilgrim's Spent Fuel Pool In Its Valuation Model, And Would Not Have Paid More For Pilgrim Absent The Additional Racks

Boston Edison also contends that the value of Pilgrim was diminished by an additional $0.947 million because Entergy factored into its bid price the cost for additional SNF pool racks that would not have been required had DOE timely performed. Boston Edison's Pretrial Br., at 27. However, Boston Edison has presented no evidence that the cost associated with those rack additions were either included in Entergy's valuation model or, to the extent that these costs were included in the valuation model, that Entergy would have paid more for Pilgrim absent these future rack additions.

At trial, we will demonstrate that Entergy included in its valuation model a $17.7 million reserve for future one-time costs. Entergy did not ascribe particular costs within this reserve amount, but, rather, included this amount as a "catch all" for any future capital additions. We expect Entergy's personnel to testify at trial that no one from Entergy ever specifically ascribed a cost associated with the future reracking activities in Entergy's valuation model. Indeed, because the cost of the future rack additions was relatively minimal, Entergy's employees will explain that, even had it included the reracks in the valuation model (an assumption that Boston Edison will be unable to establish at trial), Entergy would not have paid any more for Pilgrim in the absence of the rack additions.

## V. BOSTON EDISON DID NOT TRANSFER A GREATER AMOUNT TO ENTERGY RELATED TO THE DECOMMISSIONING TRUST FUND DUE TO THE GOVERNMENT'S DELAY IN SPENT FUEL ACCEPTANCE

### A. The NRC's Minimum Decommissioning Trust Fund Formula Expressly Excludes SNF Storage And Disposal Costs

In its pretrial brief, Boston Edison claims that it will establish at trial that Entergy required Boston Edison to transfer approximately $86 million more to Entergy in

decommissioning trust funds than it would have had DOE begun timely SNF acceptance under the Standard Contract. Boston Edison's Pretrial Br., at 2, 22. Although Boston Edison squarely has the burden of demonstrating that it paid more to Entergy for funding the decommissioning trust as a result of DOE's delay in SNF acceptance, Boston Edison will be unable to meet this burden. As we will demonstrate at trial, both the contemporaneous evidence and Entergy's own personnel will establish that Entergy did not require Boston Edison to transfer more funds in the decommissioning trust as a result of DOE's delay in SNF acceptance.[22]

When a nuclear power plant is shut down permanently, the radioactive materials at the site must be disposed of in a way that allows the operator to terminate its NRC license. This process, known as "decommissioning," is governed by NRC regulations. Those regulations establish a minimum funding amount that a utility is generally required to maintain in a trust fund, or commit to otherwise, for the purpose of decommissioning. The NRC's decommissioning funding minimum, contained at 10 C.F.R. 50.75, is a formula based upon two factors: (1) the power rating of the particular reactor; and (2) the type of reactor (i.e., pressurized water reactor or boiling water reactor). These costs, contained in 1986 dollars, are then escalated to other-year dollars based upon three factors: (1) labor costs; (2) low-level radioactive waste disposal; and (3) energy. Indeed, the NRC's decommissioning minimum expressly excludes the costs associated with the storage of spent fuel or removal of non-radioactive structures and materials. Consequently, funding to the NRC's decommissioning

---

[22] In its pretrial brief, Boston Edison incorrectly characterizes its decommissioning trust fund payments to Entergy as "part of the diminished value" that it received for Pilgrim. Boston Edison's Pretrial Br., at 2, 22. Because the decommissioning trust fund payment reflects money paid from Boston Edison to Entergy, and does not contribute to the ultimate purchase price for Pilgrim, it cannot represent the "value" – diminished or otherwise – that Boston Edison received for Pilgrim.

minimum necessarily means that the funding amount excludes the costs associated with SNF storage and disposal.

Further, if the plant is sold, those same NRC regulations require that the buyer demonstrate that it is able to perform safe decommissioning of the facility at the end of its license. In this case, when it purchased Pilgrim, Entergy made this showing by demonstrating that Boston Edison transferred a decommissioning fund consistent with the NRC's decommissioning minimum formula.

B. Boston Edison's Contention Regarding The Transfer Of "Excess" Trust Fund Amounts Is Factually Unsupported

In an effort to quantify its alleged damages regarding Boston Edison's decommissioning trust transfer to Entergy, Boston Edison has performed two estimates of the cost of decommissioning Pilgrim – one that allegedly reflects the costs that would have been associated with decommissioning Pilgrim had DOE begun accepting spent nuclear fuel in 1998, and one that allegedly reflects the actual costs that will be associated with decommissioning Pilgrim in light of DOE's delay. See Boston Edison's Pretrial Br., at 26. Boston Edison then prepared a present value analysis for both scenarios and concluded that the difference between the two scenarios represented the amount that Boston Edison would not have been required to transfer in the absence of DOE's delay. See Boston Edison's Pretrial Br., at 26-27.

As the Government will show at trial, Boston Edison's damages analysis is fatally flawed. Boston Edison's theory that it was required to transfer additional funds to Entergy because of DOE's delay completely fails to account for the course of negotiations during the competitive bidding process. At the outset of the bidding process, Entergy asked Boston Edison for the transfer of a significantly greater amount than what it ultimately required Boston Edison to transfer. In its indicative bid, dated July 30, 1998, Entergy initially sought a decommissioning

fund of $590 million. However, by the time that Entergy submitted its binding bid on October 15, 1998, Entergy had reduced the decommissioning fund requirement in the bid to $535 million. By October 29, 1998, in an effort to offer a competitive bid, Entergy indicated that it was willing to accept a decommissioning fund as low as $415 million, depending on the tax consequences of the transfer.[23] The next day, in a further effort to present a competitive bid, Entergy reduced its decommissioning funding requirement to $400 million, again depending on the tax consequences of the transfer. Ultimately, on November 18, 1998, Boston Edison and Entergy signed the Purchase and Sale Agreement, requiring that Boston Edison transfer to Entergy a range between $396 and $466 million, with this $70 million range reflecting the potential tax treatment of the fund transfer.[24] Significantly, when the parties entered into the Purchase and Sale Agreement, Entergy had calculated the NRC minimum for Pilgrim as approximately $396 million.[25] In short,

---

23/ Because Entergy was a non-regulated utility, there was an issue at the time of the sale concerning the tax treatment of the decommissioning trust fund transfer. Specifically, Boston Edison and Entergy sought a private letter ruling from the Internal Revenue Service in an effort to avoid negative tax treatment for the fund transfer. Because the private letter ruling was not obtained until after the sale had been completed, the parties established a $70 million provisional trust to account for the potential different tax consequences of the decommissioning trust transfer.

24/ As a result of the IRS private letter ruling, Boston Edison ultimately transferred approximately $427 million to Entergy for decommissioning. Of the $70 million provisional trust, Entergy transferred back to Boston Edison approximately $42.5 million.

25/ Further, beginning in 1994, Boston Edison had a duty to mitigate damages relating to DOE's delayed SNF acceptance. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005). Given that Boston Edison bases its damages claim, in large part, upon the theory that it transferred excess funds to Entergy that exceeded the NRC minimum amount to account for the increased storage costs that it estimated that Entergy would have to incur in the future based upon DOE's delayed acceptance, Boston Edison had a duty to minimize the amount of money that it paid in connection with the decommissioning trust transfer. To the extent that Entergy would have accepted a decommissioning trust fund from Boston Edison that was funded consistent with the NRC minimum requirements (which, by regulation, expressly exclude costs associated with SNF storage), Boston Edison was obligated, by virtue of its duty to mitigate, to transfer only the NRC minimum amount to Entergy. Therefore, even if Boston Edison is able to demonstrate at trial that the decommissioning trust fund that it transferred to

because the parties agreed to transfer an amount consistent with the NRC minimum, and the NRC minimum expressly excludes costs associated with SNF storage and disposal, Boston Edison will be unable to establish that Boston Edison somehow transferred excess funds to Entergy as a result of DOE's delay in SNF acceptance.[26]

C. Events That Occurred After The Signing of the Purchase And Sale Agreement Are Irrelevant In Determining Whether Boston Edison Transferred More Money To Entergy As A Result Of DOE's Delay In SNF Acceptance

In its pretrial brief, Boston Edison completely ignores the fact that the amount to which the plaintiffs agreed to in their Purchase and Sale Agreement was consistent with the NRC minimum, which excludes SNF storage and disposal costs. Instead, Boston Edison focuses upon facts subsequent to the execution of the Purchase and Sale Agreement, which, as we explain below, are irrelevant in determining what Boston Edison would have transferred to Entergy had DOE performed under the Standard Contract.

In December 1999, after the parties signed the Purchase and Sale Agreement, the NRC adjusted the calculation of the NRC minimum. Specifically, the NRC changed the calculation related to low-level radioactive waste disposal, resulting in a lower NRC minimum

Entergy, in fact, contained funds that were earmarked to cover the costs associated with future SNF storage – which, as a factual matter, is unsupported – Boston Edison failed to meet its duty to mitigate damages to the extent that Entergy would have been willing to accept less for decommissioning. In short, in the unlikely event that Boston Edison can establish that it paid more to Entergy as a result of DOE's delay, that payment represents a failure of Boston Edison to reasonably mitigate its claimed damages.

[26] Of course, even had DOE performed, there would be some costs associated with the storage and disposal of SNF post-shutdown. For example, it is beyond dispute that, under the Standard Contract, DOE is not obligated to accept SNF that is cooler than five years discharged fuel. Consequently, even had Entergy shut down the Pilgrim plant in 2012, as it assumed in its bid, Entergy would have been responsible for post-shutdown storage costs at least through 2017, and likely significantly longer. Boston Edison simply ignores this fact and assumes, without any analysis, that any costs associated with the storage of SNF necessarily would be related to DOE's delay in SNF acceptance.

decommissioning amount for the decommissioning of Pilgrim. Consequently, the NRC minimum for decommissioning Pilgrim dropped from $396 million to $327 million.[27] Despite this adjustment to the NRC minimum, the amount that the parties agreed to transfer in the Purchase and Sale Agreement for decommissioning did not change. Consequently, although Entergy's transfer request was independent of DOE's delay in SNF acceptance, during the process of obtaining sale approval, the parties were able to represent to the NRC that funds in excess of the revised NRC minimum were being transferred, and that this amount above the NRC minimum could be used to address the cost of SNF disposal.

Although Boston Edison's entire damages theory related to decommissioning hinges upon events before and after the signing of the Purchase and Sale Agreement, and completely ignores the agreement reflected in the Purchase and Sale Agreement, those events simply do not show the basis upon which the parties agreed. In other words, we will establish at trial that, at the time of the execution of the Purchase and Sale Agreement for the Pilgrim plant, Entergy requested that Boston Edison transfer an amount consistent with the NRC minimum amount, and Boston Edision agreed to do so. Indeed, the NRC minimum was so important that the parties agreed that funding could not be below that level for fear of not meeting NRC regulations.

Accordingly, Boston Edison will be unable to meet its burden of proving that Entergy required any additional funding of the decommissioning trust as a result of DOE's delay in SNF acceptance. The happenstance that the NRC minimum calculation was later recalculated and reduced after the parties signed the Purchase and Sale Agreement, and thus the parties later indicated to the NRC that some of the amounts in excess of the new NRC minimum calculation

---

27/ Notably, this $69 million reduction in the NRC minimum is $17 million less than the $86 million that Boston Edison claims it was "damaged" in terms of the amount that it transferred to Entergy as a result of DOE's delay.

could be used for SNF disposal, does not alter the fact that Entergy did not require greater decommissioning funding because of DOE's delay in SNF acceptance. The subsequent removal of that minimum cannot retroactively affect the understanding of Entergy and Boston Edison that the transfer amount was not influenced by DOE's delay.[28]

## VI. BOSTON EDISON FAILS TO REDUCE FROM ITS CLAIM THE COSTS ASSOCIATED WITH LOADING SNF TO DOE

As discussed above, and as Boston Edison concedes, Boston Edison has the burden of demonstrating the scope of activities in the "but for" world and that the costs it incurred in the actual world are incremental to DOE's delay in acceptance. Bluebonnet, 67 Fed. Cl. at 238-39 (plaintiffs must establish plausible "but-for world" as part of causation analysis). Although Boston Edison assumes that DOE's first acceptance of Boston Edison's SNF would have occurred in 1999 had DOE performed, Boston Edison has provided no adjustment to its damages claim for loading SNF to DOE had performance begun upon an industry-wide basis in 1998. We will demonstrate at trial that the correct damages methodology requires the adjustment of those loading costs from the damages claim. Consequently, the cost of loading DOE transportation casks should be deducted from Boston Edison's damages claim, as it is a cost that Boston Edison would have incurred in the "but for" world that it avoided in the actual world. See California Fed., 395 F.3d at 1268 (non-breaching party may not "be awarded more than it would have received if the contract had been performed"). To the extent that Boston Edison does not present

---

[28]/ Even assuming Boston Edison's flawed premise that Entergy required more for decommissioning because of DOE's delay in SNF acceptance, as we will demonstrate at trial, Boston Edison cannot meet its burden of showing the extent to which Boston Edison was allegedly damaged as a result of this "excess" transfer. At trial, we will show that Boston Edison's claim for excess decommissioning funding is predicated upon a host of unproven and incorrect assumptions, resulting in an ability to provide the Court with any meaningful basis to determine the extent to which – if any – Boston Edison was allegedly damaged as a result of the transfer of monies to Entergy for decommissioning.

any evidence to establish these "but for" world activities, it fails to meet its burden of proof and cannot establish its claimed damages with reasonable certainty.

## VII. BOSTON EDISON'S RECOVERY OF FUTURE COSTS RELATING TO RE-RACKING, AND DECOMMISSIONING, AS WELL AS BOSTON EDISON'S ALLEGED DAMAGES RELATING TO ENTERGY'S DISCOUNT RATE, VIOLATE THE COURT OF APPEALS RULING IN *INDIANA MICHIGAN*

Boston Edison's claim for damages related to the transfer of the decommissioning fund, future reracking costs, and the discount rate that Entergy utilized in connection with the Pilgrim purchase fail as a matter of law, pursuant to the appellate court's ruling in Indiana Michigan precluding prospective damages.

With respect to Boston Edison's allegedly higher decommissioing trust transfer, as it asserts in its pretrial brief, Boston Edison maintains that it transferred to Entergy funds for future decommissioning-related costs. Similarly, as to its claim for future reracking costs, Boston Edison alleges that the value that it received for Pilgrim was diminished because of the fact that Entergy was aware that it would be required, in the future, to purchase and install four additional racks for the spent fuel pool at Pilgrim that would not have been necessary but for DOE's partial breach of the Standard Contract. At the time of the sale, however, as Boston Edison readily concedes, the decommissioning and reracking damages that it now seeks are based upon wholly upon cost estimates and projections that Boston Edison's retained experts prepared for purposes of this litigation. Further, with respect to Boston Edison's damages relating to Entergy's method in financing the Pilgrim purchase, Boston Edison asserts that the discount rate upon which Entergy relied in its Pilgrim valuation was higher to reflect the uncertainties associated with the Government's future acceptance of SNF.

Because these claims relate to costs that Entergy may (or may not) ever incur in the future, they run afoul of the rule articulated by the Federal Circuit in Indiana Michigan:

"Because of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach." Indiana Michigan, 422 F.2d at 1376 (citation omitted). Indeed, given that the quantification of Boston Edison's diminution in value claim necessarily requires speculation as to future events, which may or may not occur, Boston Edison's diminution claims relating to its decommissioning fund transfer and alleged re-racking costs should be denied because they are entirely "based entirely on hypothetical costs that were never actually incurred."[29] Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005). Accordingly, Boston Edison is precluded as a matter of law from recovering, in a partial breach case, the decommissioning, re-racking, and discount rate-related "damages" that it asserts in this case.[30]

## VIII. BOSTON EDISON'S ALLEGED RETENTION OF THE RIGHT TO SUE THE GOVERNMENT FOR CLAIMS ASSOCIATED WITH DOE'S DELAY IN ACCEPTANCE THAT POSTDATE THE PILGRIM SALE IS INVALID

In addition to the prohibition of future damages pursuant to Indiana Michigan, Boston Edison's alleged retention of claims relating to SNF storage or reracking costs that post-date the Pilgrim sale is invalid pursuant to the Assignment of Claims Act (the "Claims Act"), codified at 31 U.S.C. § 3727, which generally governs and limits the ability of Government contractors to assign their claims against the Government. The pertinent provisions of the Claims Act place

---

[29] Additionally, because Boston Edison's damages claims are predicated upon certain decommissioing cost studies that are, in turn, premised upon certain "contigency" factors, such a fact is further evidence of the impermissibly speculative nature of the damages sought by Boston Edison.

[30] On April 11, 2007, Entergy filed a motion for partial summary judgement regarding Boston Edison's diminution claims, based, in part, upon the application of the Indiana Michigan rule prohibiting prospective damages. The deadline for the filing of responses to Entergy's partial summary judgment motion is May 14, 2007. The Government intends to file a response in connection with Entergy's motion for partial summary judgement on or before May 14, 2007.

certain limitations upon an entity's ability to assign its damages claims against the Government to a third party:

> (a) In this section, "assignment" means (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or (2) the authorization to receive payment for any part of the claim.
>
> (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727 (formerly 31 U.S.C. § 203).

The Claims Act protects the Government's ability to defend itself by ensuring availability of information concerning a claim at issue. For example, the Claims Act aids the Government in defending itself by preventing claims from being assigned several different times, protecting against plaintiffs who may have no documents or information relevant to the dispute. The purpose of the Claims Act is three-fold:

> first, to prevent persons of influence from buying up claims which might then be improperly urged upon Government officials; second, to prevent possible multiple payment of claims and avoid the necessity of the investigation of alleged assignments by permitting the Government to deal only with the original claimant; and third, to preserve for the Government defenses and counterclaims which might not be available against an assignee.

Kingsbury v. United States, 215 Ct. Cl. 136, 144-45, 563 F.2d 1019, 1024 (1977); see Patterson v. United States, 173 Ct. Cl. 819, 823, 354 F.2d 327, 329 (1965).

In this case, pursuant to the Purchase and Sale Agreement, Boston Edison retained claims against DOE that had accrued as of the closing date, whether those claims related to "periods

prior to or following the closing date," and Entergy acquired the right to claims against DOE accruing after the closing date of the Pilgrim sale. See DX 265 (Purchase and Sale Agreement, § 2.2(g)). As discussed above, however, the damages that Boston Edison asserts with respect to decommissioning, re-racking, and the discount rate upon which Entergy relied in valuating Pilgrim are predicated upon future events that had not taken place at the time of the sale and otherwise relate to DOE's future performance under the Standard Contract. In accordance with the assignment provision of the Standard Contract, such claims, if and when they occur, belong to Entergy, not to Boston Edison, as they necessarily relate to events that post-date the sale. If the Court were to interpret the assignment provision of the Purchase and Sale Agreement as Boston Edison suggests, the Court would permit Boston Edison, instead of Entergy, to seek damages for future, projected events that have not transpired, and would further impose upon the United States the burden of obtaining an offset against Entergy in its separate lawsuit against the Government for SNF-related claims. Such an interpretation of the Purchase and Sale Agreement would violate the Claims Act, as it would lead to a scenario in which the Government might be require to make "multiple payment of claims" to two separate claimants based upon the same contract. Kingsbury, 215 Ct. Cl. at 144-45, 563 F.2d at 1024.

## IX. BOSTON EDISON CANNOT ESTABLISH THAT DOE ACTED WITH A SPECIFIC INTENT TO HARM IT, PRECLUDING ITS CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

In its pretrial brief, Boston Edison claims that DOE violated the duty of good faith and fair dealing because DOE knew, as early as 1987, "that it would be unable to begin disposing of SNF by January 31, 1998, but nonetheless continued to impose contractual obligations on utilities, including the continued imposition of a fee payment obligation." Boston Edison's Pretrial Br., at 39. Boston Edison's claim fails as both a matter of fact and as a matter of law.

First, as we will demonstrate at trial, although DOE was aware in 1987 that it would not be able to begin performance at a permanent repository beginning in 1998, DOE planned on beginning performance in 1998 through the use of a monitored retrievable storage ("MRS") facility. DOE's planned MRS was entirely consistent with its obligations under the Standard Contract. Indeed, as the United States Court of Appeals for the District of Columbia Circuit has held, DOE was not obligated to begin accepting SNF beginning in 1998 at a permanent Federal repository, see Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996), but could have properly done so at an MRS.

Boston Edison's suggestion that the Government's announcement in 1987 somehow constitutes a breach directly conflicts with the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), that the SNF plaintiffs' duty to mitigate damages based upon DOE's impending partial breach arose in 1994, not before that date. The Federal Circuit in Indiana Michigan held that SNF plaintiffs seeking partial breach damages potentially may recover damages that pre-date the 1998 partial contract breach, assuming that they establish causation and foreseeability, as part of their duty to mitigate. It stated that "Section 350, comment b of the Restatement of Contracts advises that '[o]nce a party has reason to know that performance by the other party will not be forthcoming," whether pre-breach or post-breach, "he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" Id. at 1375 (emphasis added). Once a party has "reason to know" that the other party will not perform, he is then obligated to attempt to mitigate his damages, and he is "not precluded from recovery . . . to the extent that [he] has made reasonable but unsuccessful efforts to avoid loss." Id. (quoting Restatement (Second) of Contracts § 350(2)).

Indeed, evaluating DOE's announcements regarding its acceptance of SNF, the Federal Circuit held that, "because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps" at that time. Id. at 1375 (emphasis added). In identifying this date, the appellate court rejected the plaintiff's argument that, based upon DOE announcements in 1987 and 1989, plaintiff reasonably believed that DOE would not perform. In the 1987 and 1989 documents to which the Indiana Michigan plaintiff referred, see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649 n.22 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), DOE represented that, although it would not have a repository available by 1998, it still anticipated being able timely to begin SNF acceptance at a temporary facility. Consequently, Boston Edison's suggestion that DOE knew in 1987 that it would not be able to perform by 1998 is unsupported as a matter of fact and as a matter of law.

Finally, Boston Edison has claimed a partial breach of the Standard Contract. Boston Edison's Pretrial Br., at 40. Under a partial breach of contract theory, Boston Edison has a continuing obligation to perform under the contract, while awaiting expected future performance from the Government. Absent declaring a total breach of contract, Boston Edison has no basis to assert that DOE has violated the duty of good faith and fair dealing by demanding that Boston Edison continue to fulfill Boston Edison's contractual obligations.

## CONCLUSION

For the reasons outlined above, the United States respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Alan J. Lo Re
ALAN J. LO RE
Senior Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0226
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

PATRICK B. BRYAN
SCOTT R. DAMELIN
STEPHEN P. FINN
JOSHUA E. GARDNER
SONIA M. ORFIELD
Trial Attorneys
Department of Justice

April 30, 2007

Attorneys for Defendant