# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BOSTON EDISON COMPANY PLAINTIFF

VERSUS NO. 99-447C

THE UNITED STATES DEFENDANT

ENTERGY NUCLEAR GENERATION, CO. PLAINTIFF

---

ENTERGY NUCLEAR GENERATION, CO. PLAINTIFF

VS. NO. 03-2626C

THE UNITED STATES DEFENDANT

**************************************************

DEPOSITION OF DONALD R. DENTON

**************************************************

APPEARANCES NOTED HEREIN

DATE: MARCH 23, 2007
PLACE: ENTERGY HQ
1340 ESCHELON PARKWAY
JACKSON, MISSISSIPPI
TIME: 9:00 a.m.

REPORTED BY: AMANDA M. WOOTTON, CSR, RPR

APPEARANCES:

Patrick B. Bryan, Esquire
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

Stephen Finn, Esquire
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

Bradley D. Wine, Esquire
Dickstein Shapiro, LLP
1825 Eye Street NW
Washington, DC 20006-5403

Lisa M. Barbas, Esquire
Dickstein Shapiro, LLP
1825 Eye Street NW
Washington, DC 20006-5403

Samuel Morris, Esquire
Wise, Carter, Child & Caraway
Post Office Box 651
Jackson, Mississippi 39205-0651

TABLE OF CONTENTS


| | |
|---|---|
| Appearances | 3 |
| Examination by Mr. Wine | 5 |
| Exhibit 1 | 42 |
| Exhibit 2 | 48 |
| Exhibit 3 | 58 |
| Exhibit 4 | 67 |
| Exhibit 5 | 71 |
| Exhibit 6 | 75 |
| Exhibit 7 | 90 |
| Exhibit 8 | 96 |
| Exhibit 9 | 104 |
| Exhibit 10 | 116 |
| Exhibit 11 | 118 |
| Exhibit 12 | 120 |
| Exhibit 13 | 121 |
| Exhibit 14 | 126 |
| Exhibit 15 | 128 |
| Exhibit 16 | 141 |
| Exhibit 17 | 147 |
| Exhibit 18 | 157 |
| Exhibit 19 | 162 |
| Conclusion of Deposition | 184 |
| Certificate of Deponent | 185 |

Correction Sheet 186

* * * * * *

DONALD R. DENTON,

after having first been duly sworn, was examined and testified under oath as follows, to-wit:

E X A M I N A T I O N

EXAMINATION BY MR. WINE:

Q Please state your full name for the record.

A Donald R. Denton.

Q Mr. Denton, good morning. My name is Brad Wine. We met just a couple of minutes ago. This is my colleague Lisa Barbas.

A Yes.

Q We're with the law firm of Dickstein Shapiro and represent Boston Edison in this matter currently pending before the United States Court of Federal Claims against the United States government. And we're here to take your deposition today. Have you had your deposition taken before?

A In the past probably. Yes.

Q Do you recall how many times you've given depositions before?

A Maybe a couple of times.

Q Has it been in the context of spent

nuclear fuel litigation?

A Rates.

Q Oh, rate-related issues?

A I was a rate manager. Used to testify in rate cases.

Q Well, since you've gone through this exercise before, I'll be real brief in describing the ground rules the next few hours. I'm going to ask you a series of questions. I'm going to hope that they'll be concise and that you'll be able to comprehend what I'm looking for. If you don't, please ask me to clarify so that I can make sure that we have a clear record that reflects your understanding of the facts relevant to this case. I need you to answer audibly so that the court reporter can record your responses to my question. She cannot take down nods or head shakes as responses to my questions so I'll need you to give an audible answer that she can record.

At any time if you need to take a break, just ask me for one and we'll break for any reason at all. And I'm happy to accommodate you and that's true of anyone here in the room. Let's see if there are any other quick ground rules that we need to go over briefly. Again, I think you'll find this to be a familiar exercise based on your prior experiences.

Is there any reason that you can't offer full and complete answers to the questions I'm offering? Any kind of medications that you're on or any medical condition that might affect your ability to answer questions?

A Not to my knowledge.

MR. MORRIS: Before we get started, we want to reserve the right to read and sign.

MR. WINE: Absolutely. Absolutely. Terrific. Let's see if there is anything else that I need to --

MR. WINE: (Continuing.)

Q You're represented by counsel here today?

A Yes, I am.

Q And can you identify your counsel so that we have it for the record.

A Sam.

MR. MORRIS: Morris.

A Morris.

MR. WINE: (Continuing.)

Q Mr. Morris with the Wise Carter firm?

A Yes.

Q Terrific. Could you tell me how you prepared for today's deposition, Mr. Denton?

A I haven't really prepared for it.

Q No preparation at all?
A No. I spoke with Sam and said be here at nine o'clock and...
Q And here you are?
A Yeah. And I asked him what the topic was and --
MR. MORRIS: Don't talk about what we talked about.
MR. WINE: Yeah. I'm not interested in the substance of your conversations with Mr. Morris.
Any conversations with anyone else?
A No.
MR. WINE: (Continuing.)
Q Did you get any phone calls or speak with Charlie Minott at all about today's deposition?
A No.
Q When was the last time you spoke with Mr. Minott?
A I don't recall, but it's been probably four or five years.
Q Okay. Have you ever testified at trial before?
A Tax trial.
Q Tax cases.

A I was tax manager, yes, sir.
Q Got you. Review any documents for purposes of today's deposition?
A No.
Q Let's see. Now, do you have any understanding of the underlying litigation, what this lawsuit is about?
A Not really.
Q Okay. That's fine. We might keep it that way today depending on what we talk about. Let's start by way of a little bit of background. Could you describe for me your educational background post high school and all of the degrees that you've received, Mr. Denton?
A Degree in accounting from University of Central Arkansas. CPA's license in Arkansas and Mississippi.
Q Where did you go to undergraduate school? Is that the University of Central Arkansas?
A University of Central Arkansas.
Q Okay. And that's where you got your CPA degree.
A Yes.
Q Okay. Any other degrees or licenses that you possess?

A No.

Q Okay. Are you currently a Certified Public Accountant, you're maintaining that certification?

A I'm in retirement, but, yes, I am.

Q Okay. Are you a member of any professional organizations?

A The AICPA, the Arkansas Society of CPAs, the Mississippi Society of CPAs.

Q Have you ever done any teaching, Mr. Denton?

A No.

Q Okay. Have you ever served as an expert witness in any matters?

A Yes.

Q And can you describe that for me.

A Served as a expert witness in rate cases in Missouri and rate filing with the FERC. That's basically it.

Q Okay. Now, I will tell you generally the underlying litigation in which you're offering testimony is with respect to spent nuclear fuel litigation that is ongoing. If I use that term or discuss "spent nuclear fuel litigation," do you have an understanding of what that is?

A Generally.
Q Okay. Have you testified or given any testimony on behalf of Entergy or any other entity in any spent nuclear fuel litigation?
A No.
Q Okay. All right. Let's start with the work that you're doing now and then work our way back. Describe -- can you give me your title for your present employment?
A Retired.
Q You're retired. So you're out of the business. How long have you been retired?
A About a year.
Q Okay. You retired in spring of 2006?
A Right. July 1st, 2006.
Q Okay. Very good. And where do you reside now that you're retired?
A Madison, Mississippi.
Q Okay. Are you doing any kind of consulting work in your retirement or anything like that?
A No.
Q Okay. Prior to your retirement, immediately before your retirement, what was your -- describe for me your employment.

A I was the director of business services at Entergy Nuclear unregulated.

Q How long had you held that position?

A Since 1999.

Q Okay. And describe for me what all that entailed.

A I was basically the acting chief financial officer but I was in -- had responsibility for all of the books and records of the unregulated nuclear company.

Q Okay. Who replaced you when you retired; do you know?

A I wasn't exactly replaced but Theo Bunting is the chief financial officer that consolidated the regulated and unregulated into one position.

Q Okay. And in this CFO role, what types of issues particular to nuclear plants were you responsible for? Describe for me a bit your portfolio.

A Preparing the financial statements and reviewing them, management reporting, preparing data for the 10Ks and Qs and SEC filings. Maintaining the accounting standards in FASB, implementing the new accounting standards for the unregulated nuclear

portion of the company, separate company within Entergy.

Q Okay. Before I forget and I apologize that I'm taking things out of order, are you being compensated for your time here today?

A Not to my knowledge.

MR. WINE: You should talk to Mr. Morris.

MR. MORRIS: Don't give him ideas.

A Came in on my off Friday.

MR. WINE: (Continuing.)

Q Okay. Now, you started this -- you began your position as director of business services in '99, you said?

A Yes.

Q Okay. Did you have any responsibility for filings with the Nuclear Regulatory Commission with respect specifically to decommissioning trust funds?

A No.

Q Okay. Do you know during your time as the director of business services who was responsible for that aspect of the nuclear portfolio?

A Yes.

Q Who was that?

A The director of licensing in the northeast. I don't know the individual's name.
Q Okay.
A But the licensing group filed the NRC filings.
Q Okay. Did you have any role in reviewing those before they went in?
MR. BRYAN: Objection. Vague.
MR. WINE: You can answer my question.
A I'm sorry. I didn't understand what the comment was.
MR. MORRIS: He made an objection as to the technical nature of the question but you can answer.
A Okay. Would you repeat the question, please.
MR. WINE: Can you read it back.
(Whereupon, the question was read back by the court reporter.)
MR. BRYAN: Objection. Vague.
A Yes, I normally reviewed them.
MR. WINE: (Continuing.)
Q And what was the purpose of you reviewing those filings?

A I would have to provide them the information off the financial statements as to the amount of assets in the decommissioning fund.
Q So you were privy to amounts in the funds at any given time?
A I recorded them on a monthly basis.
Q Okay. Prior to 1999 when you were serving as -- now I want you to walk me back. Pretend like we're reviewing your resume. What were you doing prior to '99?
A Director of support at Arkansas Nuclear One, one of our nuclear plants.
Q And what did that entail?
A I had the business function at the plant, the materials, security, all of the support functions at a nuclear plant.
Q Okay. And what -- when did you begin in that position?
A I believe it was 1992.
Q So from '92 to '99 for that seven-year period. And then prior to that position, what was your job?
A I was controller, director of accounting for SERI, the Grand Gulf nuclear plant. And then that job turned into director of accounting for all of the

nuclear plants.
Q And describe for me your role first -- or describe for me what you were responsible for as director of controlling for Grand Gulf and director of accounting for all nuclear.
A Closing the books, payroll, all of the disbursements, all of the accounting functions.
Q Okay. And when did you begin in that position?
A 1986.
Q Okay. So '86 to '92 there. Okay. And then let's go prior to '86. What were you responsible -- what was your job?
A I was the tax manager for Arkansas Power and Light Company, a subsidiary of Entergy, taxes and rates.
Q Is this the capacity where you gave testimony or were --
A Yes.
Q -- involved in rate cases?
A Yes, prepared and filed testimony.
Q Got you. And what was the time frame for your tenure as tax manager?
A About 1979 to '86.
Q Okay. Any employment predating that tax

manager role?
A I was the manager of internal auditing from '78 to '79 for Arkansas Power and Light Company.
Q Anything else before that?
A I worked in public accounting for two years from '75 to '78, two to three years.
Q Is this immediately after getting your CPA?
A Yes.
Q All right. Terrific. Now, were you serving as the director of licensing at the time of Entergy's acquisition of the Pilgram plant in Plymouth, Massachusetts?
A No. I was never a director of licensing.
Q I apologize. I wrote that note down here. The director of business services, I apologize.
A No.
Q What was your role at the time of the acquisition of the Pilgram plant?
A I was the director of support at Arkansas Nuclear One.
Q Okay. So when you became the director of business services in 1999, the Pilgram plant had already been integrated into Entergy's nuclear portfolio; is that correct?

A Yes.
Q Okay. When -- in the context of your role as director of business services, did you have any interactions, particularly in the late '90s, '99 and into 2000, 2001, with a gentleman by the name of Charlie Minott?
A I knew Charlie, yes.
Q Okay. And how did you come to know Charlie?
A Charlie worked at our Pilgram plant.
Q Uh-huh.
A And he was -- and I dealt with him on several projects.
Q Did you obtain information from Mr. Minott for purposes of the financial work that you were doing in your capacity?
MR. BRYAN: Objection. Vague.
A No.
MR. WINE: (Continuing.)
Q Okay. Describe for me your dealings with Mr. Minott.
A He was usually a project manager on a construction project or something we were working on, and I dealt with him in the capacity of him being the project manager and his budgets and costs.

Q Were you responsible for overseeing the filing of Entergy's 10K in March of 2000?

MR. BRYAN: Objection. Vague.

A No.

MR. WINE: (Continuing.)

Q Do you understand my question?

A Yes.

Q Okay. When did you begin in your -- when did -- which 10Ks were you responsible for overseeing?

A I didn't file the 10Ks.

Q Okay.

A I provided data and reviewed the 10Ks.

Q I see. And so for the March of 2000 10K filing, were you involved in that process?

A I'm not sure. At some point in time, I became involved with them, yes.

Q Okay. We may look at some documents during the course of today in an effort to refresh your recollection or see what you may know about some of the -- either SEC filings or other related filings and whether or not your job touched those at any given time.

Do you have any familiarity with the Nuclear Waste Policy Act?

A Not really.

Q Do you have any understanding of what that act does or provides for?

MR. BRYAN: Objection. Vague. Calls for a legal conclusion.

A No.

MR. WINE: (Continuing.)

Q No understanding. Okay. Do you have an understanding of what the standard contract is?

MR. BRYAN: Same objections.

A No.

MR. WINE: (Continuing.)

Q Okay. Never heard that term before?

A No.

Q Okay. So if I were to ask you if you had an understanding of what DOE's responsibilities were pursuant to the standard contract, you wouldn't know?

MR. BRYAN: Same objections.

A No.

MR. WINE: (Continuing.)

Q Okay. Outside of your area of expertise.

Did you have any involvement in recording or -- strike that.

Did any of your work for Entergy ever involve payments to the Department of Energy for fees pursuant to -- for fees associated with the pickup and storage

of spent nuclear fuel?
A No.
Q That never crossed your desk at all?
A No.
Q Okay.
A I assume it was -- it was probably included in our financial records, but I didn't have any direct responsibility for it, no.
Q Okay. What responsibility -- insofar as there was any kind of plant-specific responsibilities that you had, can you describe for me what -- what involvement in your roles you had with the Pilgram plant in Plymouth, Massachusetts, how you might interact with the folks at Pilgram in your day-to-day work.
A I really didn't have any direct responsibility with the plants.
Q Uh-huh.
A I -- I reviewed the financial statements and normally on a quarterly basis, I would review the financial statements with the plant VP.
Q Okay. How did you become familiar with the decommissioning trust fund for the Pilgram plant?
MR. BRYAN: Objection. Assumes facts not in evidence.

MR. WINE: (Continuing.)
Q Well, let's start then. Let's go back. Is there a -- during your tenure at Entergy, were you aware that there was a decommissioning trust fund for the Pilgram plant?
A Yes.
Q Okay. And how did you become familiar with that?
A I recorded the earnings on the assets every month.
Q Okay. When did you first begin recording earnings on the assets of the Pilgram plant?
A Probably in late '99, 2000 time frame.
Q Okay. Right after the acquisition of Pilgram from Boston Edison?
A We created the unregulated nuclear company, and I came in as the business services manager.
Q Any of your work in recording the earnings on the decommissioning trust involve designations for what are called 50-75 purposes or NRC minimum purposes?
A No. It was all one lump-sum number to me.
Q Okay. And you didn't care what those

funds were for -- designated for within that trust fund, correct?

A No. It was one number.

Q Okay. All right. Is it fair to say that you weren't involved in any way, shape or form in the acquisition of the Pilgram plant by Entergy from Boston Edison?

A I was not.

Q Not on the deal team?

A No.

Q Not on any kind of due diligence team?

A No.

Q You weren't privy to any of the meetings that took place regarding Entergy's decision whether to buy the Pilgram plant or not?

A No. That was purchased already.

Q Okay. Did your review of the financial statements for plants include a review of liabilities or projected future costs for plants?

A Yes.

Q And did you do that specifically for Pilgrim?

A Yes.

Q And what liabilities did you look at, to the best of your recollection, with respect to the

Pilgrim plant?

A All the liabilities.

Q Did you look at any liabilities associated with spent nuclear storage?

A Not specifically.

Q Okay. If I use a term ISFSI or spent on-site interim storage facility, do you understand what that is?

A Yes.

Q And did any of the expenses or liabilities of the Pilgrim plant involve on-site interim storage costs?

MR. BRYAN: Objection. Vague.

MR. MORRIS: Join in the objection.

MR. WINE: (Continuing.)

Q You can answer the question.

A Would you repeat that question.

(Whereupon, the question was read back by the court reporter.)

A We recorded the liability for the decommissioning. The decommissioning, the asset retirement obligation was recorded on the plant.

MR. WINE: (Continuing.)

Q Do you know how Entergy went about setting the number for decommissioning of the Pilgrim

plant, how they got that number?
MR. BRYAN: Objection. Vague.
A In general, yes.
MR. WINE: (Continuing.)
Q How was that?
A Decommissioning studies.
Q Okay. And do you know which decommissioning studies were utilized for purposes of setting that number?
MR. MORRIS: You're talking about at the time of the purchase.
MR. WINE: (Continuing.)
Q Yeah. In the late '90s, early 2000.
A I have no idea what the original study was.
Q Have you heard of the NES study before?
A I'm not sure.
Q Okay. If I were to tell you that the NES study is a study performed by Boston Edison before the sale of the Pilgrim plant, does that have any impact on your recollection of whether or not that was a study utilized for setting the decommissioning number used by Entergy?
A I knew that they had an outside study. I do not know who did it.

Q Who authored it. Okay. Did you actually review any of those studies?
A No.
Q Okay. You relied on other folks to review the studies and give you a number?
A We contracted that function with TLG.
Q Okay. Oh, okay. So TLG was involved in this process?
A Right. They would have been the one reviewing those studies.
Q Okay. Did you at any time record any unfunded liabilities associated with decommissioning in the '99 to 2000 frame?
MR. BRYAN: Objection. Vague.

MR. WINE: (Continuing.)
Q For the Pilgrim plant?
A I'm not sure I understand the question.
Q Okay. If I use the term "unfunded liabilities," are you familiar with that term in general?
MR. BRYAN: Objection. vague.
A Yes.
MR. WINE: (Continuing.)
Q And what would be your understanding of the concept of an unfunded liability?

A A liability where there was no cash provided or no asset provided.
Q Book to cover that future liability or cost?
A I would suppose so, yes.
Q Okay. And at any time in the late '99 through the early 2000 time period, did anyone address to you potential unfunded liabilities, particularly associated with decommissioning of the Pilgrim plant?
MR. BRYAN: Objection. Vague.
A Yes.
MR. WINE: (Continuing.)
Q And what was that?
A It was my understanding that the amount of funds that we received from BECO were not sufficient to decommission the plant.
Q How did you come to that understanding?
A We compared the liability with the assets. And the liability was larger than the assets.
Q When did this issue first arise?
MR. BRYAN: Objection. Vague.
MR. WINE: (Continuing.)
Q Do you understand my question?
A I would say initially when I came into the job.

Q Okay. In the '99, 2000 time frame?
A Yes.
Q And who raised this issue with you?
A I guess I raised the issue.
Q How did you become aware of it?
A When I reviewed the liability accounts and the trusts and found that the trust was not sufficient to cover the liability. I did report that to senior management. They said they were aware of that.
Q Who within senior management did you report that to?
A I suppose it would have been John Wilder, the CFO of Entergy.
Q Was Mr. Wilder the person who said he was aware of that situation?
A He said in general the team was aware of that when they purchased the plant.
Q Okay. Did Mr. Wilder explain how Entergy intended to address that?
A I believe he said that on acquiring the plant, there was exit strategy. And the exit strategy says that we would run the plant for some period of time until the funds could grow to be sufficient to begin the initial decommissioning of the plant.

Q How long would that be?
A The exit strategy said at least five years.
Q And what rate of growth was assumed in order to get to that point?
A I'm not sure.
Q Okay. Did you -- did you report that -- the unfunded liability that you just mentioned to me in any of the 10K filings or any of the inputs of the 10K filings that you provided on behalf of Entergy?
MR. BRYAN: Objection. Vague.
A No.
MR. WINE: (Continuing.)
Q Why not?
A It was in there. The liability was in there and the asset was in there.
Q Okay. Explain -- what asset was in there?
A The decommissioning trust fund.
Q Okay. The decommissioning trust fund was an asset of the company's and the potential costs associated with decommissioning or projected for decommissioning were a liability. And if I understand your testimony correctly, the liability associated or projected for decommissioning was greater than the

amount of the asset, correct?

A That was my understanding, yes.

Q Okay. And was that explained or provided in Entergy's 10K filings?

A Not to my knowledge.

Q Would that be required?

A Not to my knowledge.

Q Do you -- was it your view that that was a material unfunded liability or an immaterial unfunded liability?

MR. BRYAN: Objection. Vague.

MR. MORRIS: Join in the objection.

A I wouldn't know whether it was considered material or not.

MR. WINE: (Continuing.)

Q You wouldn't characterize it one way or the other?

A No.

Q Okay. And is it your position or was it your understanding from your conversation with Mr. Wilder that it would not be considered or that there would be no unfunded liabilities after five years of growth in the decommissioning trust fund?

A No. That was not my understanding.

Q Okay. Well, what was your understanding

of Mr. Wilder's explanation to you?
A That it would be at least five years but it could be longer.
Q Okay. Could it be less than five years?
A Didn't think so.
Q Okay.
A Minimum of five years.
Q Did the period of time depend on performance of the holdings of the trust?
A I'm sure, yes.
Q Okay. Were -- and again, your -- your concern or understanding was solely with respect to the aggregate amount of the trust fund, not with respect to meeting any kind of regulatory requirements imposed by the NRC or other oversight agencies, correct?
A I didn't have that responsibility, no.
Q Okay. Now, I will tell you that at the time of Pilgrim's acquisition in 1999, the then forecasted end of license life was 2012. Did you ever have that understanding?
A Yes.
Q Okay. Was it the view of Entergy that if Pilgrim had operated until the end of its license life, that there wouldn't be unfunded liabilities

associated with the decommissioning of the Pilgrim plant?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Join in the objection.

A I don't recall anything about that.

MR. WINE: (Continuing.)

Q Did y'all ever look at that issue?

MR. BRYAN: Same objection.

A We would look at different scenarios but I can't recall whether it was funded fully at 2012 or not.

MR. WINE: (Continuing.)

Q What kind of scenarios did you look at? We already talked about a five-year scenario. What other scenarios did you look at?

A The accounting standards board issued a FASB -- I think it's FASB 143 that required that you look at alternatives and under the FASB 143, we did look at different alternatives. I can't tell you when we started that. Maybe 2001, '2, '3. But we normally would look at a -- an extended life. We would look at a probability that would say shut it down in 2012 and decommission it and we would look at one and say what if the plant broke and we immediately had to

decommission it.
Q Okay. So these were alternatives that you-all addressed from an accounting perspective to address this gap between projected decommissioning liabilities and the amount in the decommissioning trust fund, correct?
A Well, to determine the asset retirement obligation.
Q Okay.
A What was in the -- what was in the asset account was really irrelevant to this calculation.
Q I see.
A We just wanted to know what did you think the liability was based on probability analysis.
Q Okay. And then these alternatives were ways to mitigate the potential impact of any unfunded liability on the company, correct?
A I don't think so.
Q Or is that a mischaracterization?
A It's a mischaracterization.
Q Okay. Explain to me again what the purpose of examining these accounting alternatives was.
A To determine your most probable outcome for what the liability would be --

Q I see.
A -- rather than just saying one scenario. We used three scenarios.
Q Okay. So again, and you may have already provided this in your testimony and I apologize. But let's walk through the three alternatives that Entergy utilized for purposes of the Pilgrim plant in this time frame. The first we talked about was an early exit strategy, correct?
A Yes.
Q Approximately five years?
A I'm saying -- the five years was not one of the strategies, no.
Q Okay.
A That was, I think, at the acquisition of the plant. I think that was the strategy.
Q That they consider?
A Right.
Q Okay. What were the three then that they considered subsequent to the acquisition of the plant?
A It would be license renewal or shut down at the end of the original license or immediate decommissioning.
Q Okay.
A Now, that's my recollection of what they

were.

Q Do you know if the company considered any of these three alternatives in formulating its bid to acquire the Pilgrim plant?

A No. No. Did not.

Q The company did not consider any of these three or you don't know?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. WINE: (Continuing.)

Q And let me be clear because I --

A That requirement didn't come about until after we acquired the plant.

Q The FASB requirement didn't?

A Right.

Q I guess I'm asking you a slightly different question. And let me first address Mr. Bryan's objection here. I don't want you to speculate. If you don't know something, I want you to tell me because I want to be able to probe your recollection and your understanding of certain facts. My question was a little different. Do you know if the company, in formulating its bid to acquire the Pilgrim plant, modeled either immediate -- an immediate decommissioning or a 2012 shutdown in

formulating its decision whether or not to buy the Pilgrim plant? Are you privy to that?

A No, I'm not.

Q You're not privy to that?

A No.

Q Okay. All right. Let's see. Now, what other -- did you have any other conversations with Mr. Wilder or anyone else regarding Entergy's assumptions or analyses performed at the time of the Pilgrim acquisition?

A I'm not sure I understand your question.

Q Okay. Well, we talked a little bit about a conversation or conversations that you had with John Wilder regarding potential unfunded liabilities, correct?

A Uh-huh. (Affirmative response.)

Q And Mr. Wilder's explanation of what the company assumed at the time of acquisition to address that unfunded liability, correct?

A Yes.

Q Any other conversations with either Mr. Wilder or anyone else regarding the company's analysis of the financial aspects of the Pilgrim plant at the time of acquisition?

A Not to my recollection.

Q Okay. Have you ever had any conversations with Ms. Connie Wells regarding financial aspects of the Pilgrim plant?
A Not to my knowledge.
Q How about Carolyn Shanks?
A Not to my knowledge.
Q Dan Keiter?
A Maybe Dan. Dan usually was on the acquisition teams.
Q Okay. And what would be -- so Mr. Keiter being involved in the acquisition of assets would be one of the bases for you to interact with him, correct?
MR. BRYAN: Objection to the extent it mischaracterizes his testimony.
A Not on the Pilgrim acquisition but on subsequent acquisitions.
MR. WINE: (Continuing.)
Q On other ones. I see. Did you have any conversations with Mr. Keiter that you recall with respect to the Pilgrim acquisition?
A I can't recall any.
Q Do you recall having any conversations with Charlie Minott regarding reporting of the decommissioning trust fund to the Nuclear Regulatory

Commission?

A I probably had conversations with Charlie. He helped prepare those filings for the Pilgrim plant.

Q Okay. Could you characterize those conversations or describe for me those conversations that you had with Mr. Minott to the best of your recollection?

A I don't remember the details of it, no.

Q Okay. Okay. Do you remember providing any information in the early 2000 to I'd say 2002 time frame to the general accounting office regarding Entergy's reporting of decommissioning trust fund amounts?

A I don't record, and I don't --

Q You don't recall that?

A -- recall that. It could have been.

Q Do you recall in general with respect -- without respect to time frames such communications with the general accounting office?

A No.

Q Okay. Subsequent to acquisition, do you know if Entergy ever performed any kind of evaluation analysis of the Pilgrim plant?

MR. MORRIS: Objection. Vague.

A I'm not sure what your question is.
MR. WINE: (Continuing.)
Q Okay.
A Of the Pilgrim plant.
Q Well, we talked about you recording it and monitoring the performance of the decommissioning trust fund for Pilgrim, correct?
A Yes.
Q And you did that for all of the nuclear plants or was it against the non-regulated nuclear plants within the Entergy portfolio, correct?
A Yes.
Q Besides monitoring that asset, did you evaluate or monitor any of the other assets associated with the Pilgrim plant on a regular or periodic basis?
A We prepared financial statements that included all of the assets and reviewed them on a monthly basis.
Q Okay. Is it fair to say you had nothing to do with examining financing or purchase options for the Pilgrim plant on behalf of Entergy?
A I had nothing to do with that.
Q Okay. Just want to weed things out of here so I know which documents to show you, Mr. Denton, so if you will just indulge me momentarily.

Fair to say you were not -- fair to say you were not involved in the negotiation of the terms of the purchase and sale agreement between Entergy and Boston Edison Company?

A Was not involved.

Q Okay. Do you know who was on behalf of Entergy in that process?

A I would have thought Dan Keiter and maybe Carolyn Shanks, but those are the only two names I would recall.

Q Were you involved in the acquisition of any other nuclear facilities on Entergy's behalf post 1999?

A Yes. I would say yes.

Q Okay. Could you tell --

A All of them.

Q All of them?

A (Witness nods head affirmatively.)

Q Which ones specifically do you recall being involved with?

A The Indian Point units.

Q Uh-huh.

A Fitzpatrick and Vermont Yankee funds.

Q And what was your role in those acquisitions?

A To set up the accounting for those as we -- payroll accounting, set up financial statements for them.

Q Okay.

A Those were all set up as individual companies and we prepared the books and records for each one of those companies.

Q Okay.

A So my role was to initialize the accounting and then prepare the accounting on a monthly basis.

Q Okay. If I use the term "NRC minimum" with respect to a decommissioning trust fund, do you have an understanding of what that concept means?

A Yes.

Q What is your understanding of that concept?

A NRC requires decommissioning of the radiological portions of the plant.

Q Okay. Do you know if that -- the NRC minimum includes or excludes funding amounts required for spent nuclear storage demolition of non-radiological structures in Green Fielding?

A I'm not specifically sure that it does or doesn't.

Q Okay. With respect to Indian Point, Fitzpatrick and Vermont Yankee, did you have anything to do with Entergy's analysis or potential analysis of financing of those purchases?
A No.
Q Nothing to do with analysis of the means of funding those acquisitions?
A No.
Q Do you have any knowledge irrespective of your involvement of whether or not those plants were purchased utilizing third-party financing?
A To my knowledge, there was no third-party financing.
Q It was all self financed?
A Yes.
Q Okay. All right. I am going to show you some documents. I want to see a -- a couple of things. I want to see your recollection of facts associated with these documents. I also want to see if you, during the course of your employment, reviewed these documents yourself in any way, shape or form. So we are going to get some documents in front of you and ask you some specific questions about them.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 1 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you a document that has been marked Denton Exhibit No. 1 for purposes of your deposition today. I ask you to review that document, and while you're reviewing it, I'm going to describe it for the record. The document has been produced in this litigation has been Bates stamped ENGC/BECO DOE 1st RFP-3-770 through 777. It is a cover letter from J. F. Alexander, director of nuclear assessment, on Entergy letterhead, dated March 20th, 2000, to the US Nuclear Regulatory Commission with a report on the NRC decommissioning fund assurance report for Entergy associated with the Pilgrim nuclear power station. I ask you to review that document, Mr. Denton, and tell me if you've ever seen this document before.

A I can't remember seeing the document, no.

Q Okay. Do you know Mr. -- or were you familiar with Mr. Alexander during your tenure at Entergy?

A Yes, I think he was the licensing director at Pilgrim.

Q Okay. And did your office and Mr. Alexander's office interact in any way?

A Not normally.

Q Okay. To the extent that Mr. Alexander was required to report funding information to the Nuclear Regulatory Commission, would he get that information from you or would he maintain that information in his own office?

A I would say they would -- some of the information would come from me.

Q Okay. Now, on this letter, it identifies Mr. Minott as a point of contact and I think you and I already talked about Mr. Minott and your interactions with him. It also identifies at the bottom, a Mr. Allen Wang and a Mr. Robert Wood, both with the US Nuclear Regulatory Commission. Are you familiar with either of those gentlemen?

A No.

Q Never had any dealings with them to the best of your recollection?

A Not to my recollection.

Q Okay. I'd like you to turn to the attachment, if you would, and specifically to the page marked Bates 772 in the lower right-hand corner.

A (Witness complies.)

Q Do you have any familiarity with this form of document and the numbers or the data that is being transmitted here by Entergy to the Nuclear

Regulatory Commission?

A Not specifically. In general, I do.

Q Okay. What is your general understanding of this form and the data contained herein?

A That this would be the form that the company reported to the NRC. The NRC minimum.

Q Okay. Do you know a Mr. Cliff Gatlin?

A Yes.

Q Who is Mr. Gatlin?

A He was the business manager at Pilgrim plant.

Q Okay. And did you have any conversations with Mr. Gatlin regarding reports like this to the Nuclear Regulatory Commission?

A He most likely would have been the individual to request data.

Q Okay. Now, for purposes of facilitating our conversation about this document, I'll make a couple of -- just kind of stipulations or statements about my understanding of what's contained and if you feel that I'm erroneously characterizing certain aspects of the document, feel free to correct me. But it's my understanding based upon the testimony of prior witnesses that the number reflected on line 1, the $337 million figure reflects the NRC minimum,

basically a formulaic calculation for the Pilgrim plant at this point in time for this filing, right?

MR. BRYAN: Objection. Foundation. Assumes facts not in evidence.

MR. MORRIS: Join in the objection.

A I really have no idea.

MR. WINE: (Continuing.)

Q Okay. And that the $558 million figure below that is an escalation of that first figure using a specific escalation rate out to a specific point in time, in this case to December 2016?

MR. BRYAN: Objection. Foundation. Assumes facts not in evidence.

MR. MORRIS: Join in the objection.

MR. WINE: (Continuing.)

Q Again, do you have any reason to disagree with my reading or my assessment of that number?

A I would read that that's what it says on line 2. That's the escalated amount.

Q Now, on line 3 in particular, this is where I want to begin our focus. It says the decommissioning trust fund amount accumulated at December 31, 1999, for scope defined in Item 1 above is $282,365,375. Do you see that?

A Yes.

Q Do you have an understanding of what that dollar figure represents?

A In general, I'd say according to what's written there, that's the trust asset.

Q Okay. Now, there is a footnote here to that figure and it specifically says that the NRC formulas and the calculated trust fund amounts herein exclude the cost of dismantling or demolishing non-radiological systems and structures as well as costs to manage and store spent fuel until transfer to DOE. In December of 1999, December 31, 1999, would you have been serving in the role of director of business services?

A Yes.

Q And would you have a familiarity with the amount in the Pilgrim decommissioning trust fund as of that date?

A I don't recall what it was.

Q Okay. Is it -- do you have a recollection of whether or not the decommissioning trust fund for Pilgrim was -- in December of 1999 was $282 million as reflected on this form or some amount greater or less than that $282 million figure reflected herein?

A Line 3 would indicate it's 282 million

but I couldn't tell you whether that's correct or not.

Q Okay. Very good. Well, we'll look at some documents and see if in fact that may refresh your recollection. You can put that document away and we'll continue to look at some additional documents related to decommissioning numbers here.

MR. WINE: Hold on a second.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 2 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you a document that has been marked Denton Exhibit 2 for purposes of today's deposition. It is a document that is printed on both the front and the back side. While you're reviewing that document, I'm going to describe it for the record. It was produced by Entergy in this litigation and contains the Bates label in the bottom right-hand corner ENGC/BECO DOE 1st RFP-3-257 through 258. It appears to be a string of e-mail communications originating at the bottom of the page from Carolyn Thompson to you dated July 11th, 2000 and then a series of communications resulting finally in a communication to Ms. Thompson from Mr. Minott on July 12th, 2000, and then you're CC'ed along with some other folks in that final communication. Once you've

had a chance to review this, Mr. Denton, I ask you if you're familiar with the document.

A I'm not familiar with the document.

Q Okay. Let's walk through it and discuss it and see if that refreshes your recollection. Starting again at the bottom with the original e-mail from Carolyn Thompson to you dated July 11th, 2000. Ms. Thompson writes: Don, Jerry Yelverton gave Gene an action item to provide him with the following by this Friday. Now, let's stop there for a second. Do you know who Mr. Yelverton is?

A Yes.

Q And what was Mr. Yelverton's role at the time that this e-mail was written to the best of your recollection?

A He was the CEO of nuclear.

Q Okay. And who -- do you know who the Gene is referred herein?

A I believe that was his secretary.

Q Okay. Now, there are three bulleted items underneath that initial sentence. The first is copies of decommissioning studies for all Entergy owned nuclear units. Second is decommissioning trust agreements and the third is decommissioning funding status reports. And

Ms. Thompson ends her request to you at the bottom. It says, Do you have a copy of these for Pilgrim? Can you provide these? If not, who should I contact?

Are these the kinds of documents that your office typically maintained in the 2000 time period?

A No.

Q Okay. Now, let's look up the page to the response to Ms. Thompson's initial e-mail. And it's sent from you but it appears that it's being written by someone else. Can you explain that for me.

A Linda Iupe was a senior accountant for me --

Q Okay.

A -- in my group.

Q So Ms. Iupe was in your -- in your group at this time, correct?

A Yes.

Q And was it an ordinary practice for Ms. Iupe to respond to e-mails sent to you in your absence?

A If I was out of the office, I would normally have my secretary if something had a priority on it, to route it to one of the senior accountants.

Q Okay. Do you recall being out of the office for any reasons in the July 2000 time frame,

any part of an extended absence from employment or anything?

A I don't recall, no.

Q Okay. Now, Ms. Iupe responds to Ms. Thompson in the following manner: Carolyn, Don Denton is out of the office. Cliff is at the power house this week. However, I think Charlie Minott at Pilgrim should have this information since he just recently had to file some information with the NRC. I believe Charlie filed the minimum required funding information to the NRC and we have trust fund statements information in our office. See me if you need them.

Let's stop there for a minute.

Do you have an understanding of what Ms. Iupe means when she refers to "minimum required funding information"?

A I think it would be this document. (Indicating.)

Q The NRC minimum?

A Minimum file.

Q Okay. And then she says, We have trust fund statement information in our office.

Ever be the case that the information or the minimum required funding information would be

different from the trust fund statement information?

MR. BRYAN: Objection. Vague.

A I can't say.

MR. WINE: (Continuing.)

Q Okay. Are you familiar -- have you ever seen a situation where a -- where Entergy reports out one number to the NRC for NRC minimum purposes but that the trust fund actually contains a greater amount of funding in it than the amount reported to the NRC?

A Not to my knowledge.

Q You've never seen that?

A Not to my knowledge.

Q Okay. Then further up it looks like Ms. -- Ms. Thompson is still on the e-mail address as writing to Mr. Minott and CC's you. Do you recall being CC'ed on this communication?

A It says I was but no, I do not recall.

Q You don't recall this particular e-mail?

A No.

Q Is it fair to say that if your name appears on one of these e-mails, that you likely received it in the ordinary course of business?

A Sometimes I did and sometimes I didn't.

Q Okay. Well, let me ask you, when you received e-mail, particularly in the 2000 time frame,

was it ever the case that an e-mail sent specifically to your e-mail address would go to someone else like a secretary --

A Yes.

Q -- or some other person?

A My secretary scanned and opened all of my e-mails.

Q Okay. And so you -- it's possible that you received some of them but not others?

A Yes.

Q Okay. Would this be the kind of e-mail that you would have expected her to provide you or to take care of on her own?

MR. BRYAN: Objection. Vague.

A I would have expected her to assign this to a senior accountant.

MR. WINE: (Continuing.)

Q Okay. Like Ms. Iupe?

A Yes.

Q Okay. Now, let's go to the final e-mail in this string at the top of the page from Charlie Minott to Ms. Thompson. And again, you're CC'ed on here, as is Ms. Iupe, a -- a Robert Bellamy and a William Riggs. Do you know all of those individuals? We haven't talked about Mr. Bellamy or Mr. Riggs yet.

A I know Mr. Bellamy. I don't know Mr. Riggs.
Q What was Mr. Bellamy's role to the best of your recollection?
A Vice president of the Pilgrim plant.
Q Okay. And it's titled "Decommissioning Study Pilgrim." And Mr. Minott writes, Carolyn, Mike Bellamy will give Don Denton -- and in parentheses, it says, He's here today -- the 1998 decommissioning study and the March 2000 letter to the NRC on decommissioning funding.
Let me stop here for a second. When Mr. Minott wrote he's here today, did that mean that you were at the Pilgrim plant?
MR. MORRIS: Objection.
A Appears that's where I was out of the office to is the Pilgrim plant.
MR. WINE: (Continuing.)
Q Why were you visiting the Pilgrim plant?
A I went up about once a quarter to visit with all of the VPs to go over their financial statements with them.
Q Okay. And then it says, open parentheses, this letter also has copies of the trust agreements, close parentheses, period. Do you recall

anything specific about your trip to the Pilgrim plant in the July 2000 time period?

A No.

Q Anything out of the ordinary, standard -- or a standard type of meeting?

A I can't recall the meeting at all.

Q No recollection of it at all?

A No.

Q Do you normally keep notes of meetings like that when you were to go up quarterly to a particular site?

A No.

Q Okay. Any recordation of your -- of the meetings or the events that took place when you met at a plant with senior executives?

A No.

Q Okay. The e-mail continues, note the '98 study was done for Boston Edison and does not correlate with the total decommissioning costs I understand Entergy is using for Pilgrim, $572 million, period.

Let's stop there. Do you recall this $572 million to be the amount of the decommissioning cost or liability that we discussed earlier being utilized by Entergy for the Pilgrim plant?

MR. BRYAN: Objection. Foundation.
A I can't remember.
MR. WINE: (Continuing.)
Q Whether it was this number or something else?
A No.
Q Okay. It says, I suggest you contact Mary Ball Markow. She is in the process of finding the basis for this number. I'll be here if you have any other questions.
Do you know who Ms. Markow is?
A Yes, I do.
Q Who is she?
A She was a part-time accountant that worked, I think, probably with the acquisitions group.
Q Okay. Do you know why any of these individuals would be interested for finding the basis of the $572 million figure?
MR. BRYAN: Objection to the extent it calls for speculation.
A No.
MR. WINE: (Continuing.)
Q Don't know?
A No, I don't know.
Q Okay. Do you recall the first time you

met Mr. Bellamy?
A Yes, I suppose I do.
Q And when was that?
A It was in the mid '90s.
Q Okay. And in what context?
A I was the director of support at A and O and he was the director of support at River Bend, a sister plant.
Q Okay. Is it a fair assessment or characterization to state that Mr. Bellamy was transferred up to Plymouth, Massachusetts, the Pilgrim plant after Entergy's acquisition of Pilgrim from Boston Edison?
A I'm not sure of the time frame but he was transferred. He went up there as the VP of the plant.
Q He was not a Boston Edison employee prior to the acquisition?
A No. He was an Entergy employee.
Q Okay. Very good. I think we've exhausted that document. And let's go ahead and put that aside. We'll take a look at another document.
We've been going for about an hour. Do you want to take a break here?
A I'm fine if you do.
MR. WINE: Let's keep going for a

little while longer and then we'll take a break just to give everyone some stretch time.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 3 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you a document that has been marked Denton Exhibit 3 for purposes of your deposition today. I ask you to read it and while you're reviewing the document, I'm going to describe it for the record. The document was produced by Entergy in this matter and I'm going to read -- it has two Bates numbers on it. I'm going to read the one on the right. It's Bates labeled ENGC/BECO OCT11 site visit dash one through two. It is an e-mail string to which -- on which you've been copied in at least one instance. The original e-mail from Charlie Minott dated Friday February 16th, 2001, to John Gerety and you'll see that you're one of several people that was CC'ed on that e-mail string, at least that initial or original e-mail from Mr. Minott to Mr. Gerety and then there are a couple of responses to that e-mail subsequent to its original transmittal by Mr. Minott.

MR. MORRIS: Just for the record, I just wanted to identify this particular document was produced pursuant to the

protective order and so it should be treated accordingly when attached to the transcript and any testimony that is solicited relating to this document, we would also like to designate under the protective order.

MR. WINE: (Continuing.)

Q Okay. I'm going to ask you some specific questions, Mr. Denton, focusing on the first e-mail. And I should warn you again, as you see, in the effort of saving trees, we've printed this document on front and back. So I'm going to focus my questions at least initially on Mr. Minott's initial e-mail that appears at the bottom of page 1 and the opposite side of that page.

First of all, let's begin with this. Do you recall having received this e-mail communication from Mr. Minott?

A No, I do not. I really don't.

Q Now, we had talked about the previous e-mail communication that some e-mail fell into a category of communication that you would receive and respond to directly and others would be assigned out to senior accountants. Can you tell me which -- reviewing this today, which category this communication would fall under?

A If it didn't require any action, it might just go away.
Q Okay. And no one would respond to it?
A It's a possibility.
Q Okay.
A It would not be assigned to a senior accountant until there was action required on our part.
Q Now, let's look at the people in the e-mail header first of all. John Gerety is a name that I don't know that we have mentioned prior to now in today's deposition. Do you recall who Mr. Gerety was or is?
A No.
Q Okay. We've talked about Robert Bellamy. I don't recall if we've mentioned Clifford Gatlin before. Have we discussed Mr. Gatlin?
A Yes.
Q Okay. Your name appears there. William Riggs we talked about before. John Alexander, I think we saw a letter from Mr. Alexander before. And Steven Brennion I believe is a new name. Do you recall who Mr. Brennion is?
A No, I do not.
Q Okay. Let's look at the substance of the

e-mail. And the subject line is Pilgrim decommissioning funding report to the NRC. Let's stop there for a second. Do you recall being in the group of individuals that would receive and/or review decommissioning funding reports for Pilgrim before being sent to the Nuclear Regulatory Commission?

A I would normally verify the assets.

Q Okay. And the accuracy of the information contained therein?

A Yes.

Q How do you go about confirming the accuracy of the numbers contained in the report to the NRC?

A I would normally check the number back to what we had given to them.

Q Okay. And in order to do that, would you check to see whether the number in the draft report to go to the NRC matched the number that you were recording at that specific time for the decommissioning trust fund?

MR. BRYAN: Objection. Vague.

A Yes.

MR. WINE: (Continuing.)

Q Okay. The answer is yes?

A Yes.

Q Okay. And again, I think I asked you this question previously, but in the context for that review for accuracy, was it ever the case that Mr. Minott or anyone else associated with the Pilgrim plant would provide you with a number to be given to the NRC that was less than the amount that was then being recorded by your office for the entirety of the decommissioning trust?

A Not to my knowledge.

Q Okay. Now, let's read Mr. Minott's e-mail here. It says, Attached is a draft of the summary page for the funding report due to the NRC 3/31/01. It shows that we have a 5 percent projected margin over the NRC minimum funding level of 641 million versus 612 million minimum and that last year's report showed a projected 16 percent margin. Okay.

Let's stop there. Do you recall any discussions in this time frame about changes in the margin, the decommissioning trust fund associated with the NRC minimum amount?

A No.

Q You don't recall that at all?

A (Witness nods head negatively.)

Q Mr. Minott then goes on to explain why

that reduction occurred. He says the reduction was caused by -- the first bullet is only a 4 percent increase in the trust balance. 262 or would that be 82 million to 294 million. I can't tell if that is an eight or a two. Can you. Should be able to do the math. Four percent growth would be a 62 or 94. I think it is likely 282 million. Let me look. And in fact, in -- yeah, in Denton Exhibit 1 which was the December 31, 1999, filing, Entergy reported a $282 million trust fund amount for the NRC minimum. So I believe this is a $282 million figure. Do you have any reason to disagree with that reading?

MR. BRYAN: Objection. Foundation.

A I would read that number as 282 million on that line.

MR. WINE: (Continuing.)

Q Okay. Then the next bullet is a 10 percent increase in NRC's calculated minimum decommissioning costs and then he lists the major drivers. Do you have any recollection or were you ever familiar with changes in the NRC minimum calculation?

A No.

MR. BRYAN: Counsel, just for the record, you're reading from the e-mail dated

February 16th, 2001.

MR. WINE: That's correct.

MR. WINE: (Continuing.)

Q Now, let's look after the bullets on the back of the exhibit. Flip the page over. It says in bold, While we are now above the minimum funding, if we have lackluster trust fund performance or continued high increases in NRC decommissioning minimum costs between now and when the next report is due in two years, we may be facing a situation where we are below minimum. Let's stop there. Do you recall this -- this issue ever being raised or discussed relative to your shop?

MR. BRYAN: Objection. Vague. Lack of foundation. Assumes facts not in evidence.

A I don't recall this specific item here in this e-mail, no.

MR. WINE: (Continuing.)

Q How about in general the issues articulated in this e-mail, do you recall those being raised?

MR. BRYAN: Same objections.

A There was a review of the annual NRC minimum to see if in fact we met the minimum or not. That was the purpose of the annual filing to the NRC.

MR. WINE: (Continuing.)
Q And do you ever recall conversations about concerns that Entergy had in meeting the minimum in future years as articulated in this document?
MR. BRYAN: Same objections.
A Yes. Yes, in some of the years we didn't meet the minimums.
MR. WINE: (Continuing.)
Q Okay. Do you recall that specifically with respect to the Pilgrim plant or is that with respect to other plants?
A I can't remember which ones.
Q Okay. It says below that block, We need to minimize the potential of this outcome. Suggest we meet to consider strategies to address the above thoughts.
Do you recall any meetings that you participated in regarding this subject?
A I do not recall, no.
Q Now, in the e-mail string, some of the names are in all caps, I notice. Mike Caruso's, Susan Warbington's, your name and some of them aren't. Do you know why that might take place?
A No.
Q Is there any correlation between the

folks who are in all caps and the folks that worked at Entergy corporate versus plant-specific sites? Is that potentially one explanation? I'm just trying to figure out why some might be represented that way and others aren't.

MR. BRYAN: Objection. Lack of foundation.

MR. MORRIS: Objection. Calls for speculation.

A No, I have no idea.

MR. WINE: (Continuing.)

Q Let's look at Mike Volpi. Who is Mike Volpi?

A I don't know.

Q You don't recall that individual. How about Susan Warbington?

A Yes.

Q Who is she?

A She was a manager, like a budgeting manager.

Q Okay. Did she work at --

A I'm not sure what time frame this is. She later became the director of the budgeting group for the Northeast.

Q Okay. Did she work in your organization?

A No.
Q Okay. Let's see here. How about Michael Caruso?
A Yes, I know Mike.
Q And what was Mr. Caruso's job at this time?
A He's assistant treasurer of Entergy.
Q Okay. And what was your interaction with Mr. Caruso at this time?
A Very little. He managed the decommissioning trust funds, the assets with the banks. And had very little interaction with Caruso.
Q Outside of reporting the results of that interaction on a quarterly basis and the results of his management with the banks --
A He told the banks how he wanted the treasury group and Entergy managed the asset funds and he was the asset fund manager.
Q Okay. Let's take a look at another document very similar to this one.
MR. MORRIS: Before we move on, would this be a good time to take a break?
MR. WINE: Yeah. Absolutely.
(Off the record.)
(DOCUMENT MARKED AS DEPOSITION EXHIBIT

NO. 4 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, we're back on the record. I've handed you a document that has been marked Denton Exhibit 4 for purposes of today's deposition. I ask you to review it. Like the others, it's printed on both sides of the document and has been produced in this matter by Entergy Bates labeled ENGC/BECO DOE 1st RFP-3-279 to 280. Ask you to review it. I will tell you that it's very similar to the document we looked at that was marked Denton Exhibit 3 with one addition and that is that there is a -- an attachment which purports to be the Entergy filing on behalf of Pilgrim for the NRC decommissioning funding assurance report and that appears on the back of that document. Once you review this, I ask if you are familiar with or recall having received this document?

A No, I'm not familiar with it.

Q Okay. It does show again in the original e-mail sent by Charlie Minott to John Gerety that you were CC'ed in the e-mail and that this document was attached. Do you have any reason to believe that that wasn't the case?

MR. BRYAN: Objection. Foundation.

A No.

MR. WINE: (Continuing.)

Q And on the subsequent page, the actual report itself, we looked at an earlier exhibit that was similar to this, another NRC filing but for an earlier time period actually, the preceding year. Do you recall that?

A Yes.

Q Okay. And again, focusing on line 3, this entry, the 293 purports to be the amount in the decommissioning trust fund being maintained by Entergy for the -- for the Pilgrim plant at this time, correct?

A That's what it says.

Q Okay. And again, it contains this footnote regarding exclusion of costs for dismantling or demolishing non-radiological systems and structures as well as costs to manage and store spent fuel until transfer to DOE. Do you see that?

A Yes.

Q Do you know why that provision or that disclaimer was included in this report?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation.

MR. MORRIS: Join in the objection.

A No.

MR. WINE: (Continuing.)

Q No, you don't know?

A No.

Q Okay. Do you recall receiving this draft report before it was submitted to the Nuclear Regulatory Commission?

A I don't recall, no.

Q Would you have been involved, or your office or your department been involved in verifying the accuracy of this report before it was transmitted to the NRC?

MR. BRYAN: Objection. Vague.

MR. WINE: (Continuing.)

Q Do you understand my question?

A I think I do. I would have been involved in reviewing the accuracy of the data that I provided to them.

Q Okay. And describe to me what data on this report you would be specifically checking. Would it be primarily this Item 3?

A Line 3.

Q Line 3?

MR. MORRIS: Objection to the extent I think that mischaracterizes his testimony. But if he understood.

MR. BRYAN: Same objection?

MR. WINE: I'm sorry, can you read back the witness's answer.

(Whereupon, the answer was read back by the court reporter.)

MR. WINE: (Continuing.)

Q And so how would you go about verifying the accuracy of the number reported in line 3 of this report?

A I would have looked at what we had given them and said that it was the same number that we gave them.

Q Okay. And do you ever recall having a conversation with anyone within the Entergy organization that the number being reported to the NRC did not match the number being tracked by your organization as being the amount contained in the decommissioning trust fund?

A I don't recall that, no.

Q Okay. Let's go ahead and take a look at, just for purposes of establishing a record here, another exhibit. You can put that one to the side.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 5 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, you've been handed a document that has been marked Denton Exhibit No. 5 for purposes of today's deposition. While you're reviewing the document, I'll describe it for the record. It is a documented produced by Entergy in this matter Bates labeled ENGC/BECO DOE 1st RFP-3-753 through 769. The first page is a cover letter again from J. F. Alexander to the Nuclear Regulatory Commission dated March 20th, 2001. I ask you to review the document, Mr. Denton, and tell me if you're at all familiar with it.

A I'm not familiar with it.

Q Okay. I will represent to you for the record, and please correct me if you have any basis to disagree with my representation, that this document appears to be the final version of the NRC decommissioning funding assurance report submitted by Entergy for the Pilgrim plant for the 2000 time period and submitted by Entergy on March 20th, 2001. Do you have any reason to disagree with that characterization?

MR. BRYAN: Objection. Foundation.

A I really don't have any knowledge of this.

MR. WINE: (Continuing.)
Q Okay. And again, if you focus your attention briefly to page 755, Bates label on the bottom right-hand corner of the document, it again my representation this appears to be the final as-submitted version of the form that we looked at in the previous exhibit that was attached to that -- that February 2001 e-mail. Again, any reason to disagree with or -- to disagree with that characterization?
MR. BRYAN: Objection. Foundation.
MR. MORRIS: Same objection.
A I just don't have any knowledge of it.
MR. WINE: (Continuing.)
Q Of what this is. Okay. Also attached as attachment 2 on page 760 is an amendment to the provisional decommissioning trust agreement. And the actual amendment to that agreement is attached here too. Do you have any familiarity with this document? Was this the kind of document that you would review or be involved with in your role at the company?
MR. BRYAN: Objection. Foundation.
A Could I have a moment to review the document?
MR. WINE: Absolutely. Please do.
A I have no recollection of this document,

although the issue contained in the document, I have a general understanding of.

MR. WINE: (Continuing.)

Q Okay. And what's your -- what's your general understanding of the document?

A There was a tax issue upon purchasing the decommissioning -- purchasing the plant and acquiring the decommissioning. The question was whether or not any of those funds that were acquired would become taxable income to the purchaser.

Q Uh-huh.

A As assurance against that, I think there was a provisional amount noted in the purchase and sale agreement or that's the way it normally -- that was on all of the plants. We had no assurance that the funds would not become taxable. And we set up a provisional asset and then if we got favorable ruling, normally the provisional asset would go back to the seller.

Q Okay.

A If we got unfavorable ruling, it would become cost required to pay the taxes on the fund.

Q Do you have a familiarity of what that amount was with respect to the Pilgram plant in particular?

A No. I remember there probably was an amount, but I don't know what that amount was.

Q Okay. Are those amounts that would be characterized as being in a qualified and unqualified trust for these purposes, have you heard that terminology used before for this?

A No. That's not -- not the same.

Q A different issue altogether?

A To my knowledge, yes.

Q Okay. Let's look at another exhibit. I think we're finished with that one.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 6 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I've handed you a document that has been marked Denton Exhibit 6 for purposes of your deposition. It is Bates labeled ENGC/BECO DOE 1st RFP-3-298. It is an e-mail from Charlie Minott to Charlie Minott and also CC'ing a Steven Brennion relating to a phone call with Connie Wells and others regarding the Pilgrim decommissioning report. I ask you to review the contents. I'm going to ask you specifically whether you were familiar with any of the conversations that are referred to in this e-mail because I note that you're not on the e-mail itself.

I'll give you a minute to take a look at it before I ask you specific questions.

(Witness examines document.)

A Okay, I've reviewed it.

Q All right. Now, do you recall, sitting here today, any conversations in the 2000, 2001 time period regarding the sufficiency of the amounts in the decommissioning trust for the Pilgrim plant just based on your recollection?

A No.

Q You don't recall that. Okay. The document, again, I characterized it before. It's notes regarding a phone call or a couple of conversations and I'd like to start with the top of the e-mail first. He describes who was on the phone call and, again, it doesn't appear that your name was one of the participants during that phone call. And then it says bottom line, Connie wants our report to look like the New York plants. She wants us to resubmit our report issued previously on March 20th to the NRC and change it as follows. Now, let's stop there.

Do you recall any discussions within the Entergy organization regarding modification of NRC reporting to reflect a consistent reporting or to

reflect the types of reports that were submitted for Entergy's New York plants?

A No.

Q No recollection of that?

A No.

Q Okay. It says below that, quote, use all of the trust as 50.75. Do you know what is meant by that italicized notation? Do you have any understanding independent of --

MR. MORRIS: Objection. Speculation.

A General.

MR. WINE: (Continuing.)

Q What is your understanding?

MR. MORRIS: Same objection.

A My understanding would be that is the NRC requirement.

MR. WINE: (Continuing.)

Q Okay. And what does the use all the trust as 50.75 mean, as you understand it?

MR. MORRIS: Objection to the extent it calls for speculation.

MR. BRYAN: Same objection.

A I have no idea what that means other than to say it's one number.

MR. WINE: (Continuing.)
Q Okay. Now, it says here her logic is the 466 million initial was to grow to meet NRC minimum. Let's stop there.
Do you have a recollection of that $466 million amount and what that represents?
A No.
Q Okay. If I represented to you that that 466 amount was the amount transferred by Boston Edison to Entergy in its decommissioning trust fund, would that sound familiar to you or do you have any reason to disagree with that characterization?
MR. MORRIS: Objection. Speculation.
MR. BRYAN: Lack of foundation.
A I don't recall what the number was, but...
MR. WINE: (Continuing.)
Q Okay. But do you recall whether the number approximated $466 million?
MR. MORRIS: Same objection.
A No.
MR. WINE: (Continuing.)
Q Okay. Now, the e-mail continues. I noted last year when we did the report, no one from

Entergy and in parentheses it says Podkin, Reed, TLG, Wells, Caruso, Denton, close parentheses, knew what the split between fuel and decom money was in the trust or sale amount.

Now, it specifically references Denton. Do you know if that is a reference to you or not?

A I would say most likely it is.

Q Okay. Do you know of any other Dentons within the Entergy organization?

A There are some, but, no.

Q Okay. Do you know -- do you recall a conversation with Mr. Minott regarding the, quote, split between fuel and decom money in the trust or sale amount prior to this e-mail?

A No.

Q You don't have any recollection of that conversation?

A No. I would not have known any split.

Q Okay.

A I had one number on the books.

Q Do you understand what is meant by a split in a decommissioning trust fund?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A No, not really.
MR. WINE: (Continuing.)
Q Okay. No understanding of what that word means?
A One number on the books.
Q Okay. It says cut off fund growth at 2012. Despite 50.75 language to the contrary. Strike that. For purposes of my examination, I don't think it's necessary to go through that.
Let's look toward the bottom of the e-mail to a specific paragraph that begins Mike Bellamy. We talked about Mr. Bellamy previously. Mike Bellamy later had a discussion. Mike Kansler after we -- now, first of all, do you know who Mike Kansler is?
A Yes.
Q And who is Mr. Kansler?
A He was the president of the northeast unregulated nuclear.
Q Okay. And it says here that Mr. Bellamy and Mr. Kansler had a discussion after we, and in parentheses, Mr. Minott describes who he means by we, Alexander, Fulton, Stone, Gatlin, Brennion and me, presumably meaning Mr. Minott briefed Mike. Were you ever briefed on this conversation between Mr. Bellamy and Mr. Kansler?

MR. BRYAN: Objection. Lack of foundation.

A I can't remember it.

MR. WINE: (Continuing.)

Q Okay. It says bottom line, We do not redo the report. Stop there for a second.

Do you recall any conversation about redoing the report that was provided to the NRC in March of 2000?

A No.

Q Okay. One, we want to keep the money -- to keep money to the extent we can in the fuel side so we can fund this if necessary.

Do you understand what is meant by that phrase?

MR. MORRIS: Objection.

MR. BRYAN: Objection. Calls for speculation.

MR. MORRIS: Same objection.

A No.

MR. WINE: (Continuing.)

Q No understanding of that at all?

A It would appear that they're trying to break the fund into portions, but, no.

Q Were you aware that Entergy reported to the NRC that the fund was split or broken into

portions prior to this e-mail?

MR. BRYAN: Same objection.

A No.

MR. WINE: (Continuing.)

Q You weren't aware of that?

A No.

Q Okay. It says if in the decom, it cannot be used for its intended purpose. Do you understand what that sentence means?

MR. MORRIS: Objection. Speculation.

MR. BRYAN: Same objection.

A No.

MR. WINE: (Continuing.)

Q Were you aware that if money was reported as being held in a trust fund for 50.75 purposes, it could not be used for other purposes such as spent nuclear fuel storage, Green Fielding or demolition of non-radioactive structures?

MR. MORRIS: Object to the extent it calls for a legal conclusion.

MR. BRYAN: And lack of foundation.

A I have no understanding of that but --

MR. WINE: (Continuing.)

Q Okay.

A -- my understanding is the 50.75 is the NRC radiological requirement.

Q Okay. It says also, too, we have a commitment with the AG not to use SAFESTOR. Do you have any understanding of what that means?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A Generally.

MR. WINE: (Continuing.)

Q You have an understanding of what that means generally?

A Yes.

Q And what does that mean?

A It's my understanding that the Massachusetts attorney general and Entergy had entered into an agreement to where if the plant was shut down, they would be immediately decommissioned.

Q Okay.

A Now, whatever that definition of decommissioning was and it could have been SAFESTOR.

Q Okay. What -- how did you come to that understanding?

A I believe Mr. Bellamy told me that.

Q And why was it that you became in

possession of that information? How is it that you became aware of that?

A When I became aware that the decommissioning liability was under funded, I asked what were our options at that point in time. And he said well, we shut the plant down. And the -- the acquisition had a strategy, an exit strategy for acquiring Pilgrim that would say run the plant until the decommissioning fund grew sufficient to meet the liability and then shut the plant down.

Q Okay.

A And at that point in time, said do we decommission. Said we have an agreement with the attorney general of Massachusetts that we would immediately decommission although they didn't say there are many alternatives or what you would do in decommissioning.

Q But SAFESTOR was not one of the options that Entergy could employ?

A I don't agree with that, but, yes, that's what this letter says.

Q Why don't you agree with that?

A I think you could use any decommissioning option you wanted. Just decommission it.

Q Okay. Irrespective of what it may or may

not have agreed to with the Massachusetts attorney general?

A It's my understanding the attorney general didn't specify what method of decommissioning, just that we would immediately decommission. SAFESTOR is a decommissioning option.

Q Okay. Is SAFESTOR, based on your understanding and your work, is SAFESTOR the same thing as immediate decommissioning or is there a difference?

MR. BRYAN: Objection. Vague.

A I'm not absolutely sure but I would say that SAFESTOR was to put the plant in a safe condition and complete the decommissioning at a later time.

MR. WINE: (Continuing.)

Q Okay. And let me make sure I understand. When you use the term "decommissioning," do you mean decommissioning as defined by the NRC or do you mean complete decommissioning of the plant to include storage of spent nuclear fuel, demolition of non-radioactive structures and Green Fielding?

MR. BRYAN: Objection. Lack of foundation. Objection to the extent it calls for a legal conclusion.

A Would you repeat that question.

MR. WINE: Could you read it back.
(Whereupon, the question was read back by the court reporter.)
A In general, decommissioning is only the radiological portions required by the NRC but I think the company had agreed on the other portions with the Massachusetts officials.
MR. WINE: (Continuing.)
Q Okay.
A That's not a legal requirement. That's a -- I think that was an agreement on the side.
Q Were you involved in any of those negotiations with the Massachusetts authorities?
A No, I was not.
Q So your information about that agreement is through other sources?
A Through Mr. Bellamy.
Q Exclusively Mr. Bellamy?
A I think he was the one that entered into that agreement.
Q All right. Was your office working with Mr. Minott in this time period on decommissioning reporting issues; do you recall?
A I think initially Charlie did the -- it appears that Charlie did the NRC minimum filings.

Q Okay.
A Later on that became a central group within the corporate group, the corporate director of licensing. These were actually filed by director of licensing and Pilgrim.
Q Okay.
A Later on that became a centralized function and all of the filings went through the central group in White Plains.
Q Do you know why that change was made?
A Initially we didn't have a corporate group.
Q Uh-huh.
A And as we acquired additional nuclear units, there was a corporate group to manage the fleet.
Q Do you remember or do you recall any questions or criticisms arising within Entergy regarding the manner in which Mr. Minott was reporting to the NRC decommissioning amounts?
A I recall that Charlie had some opinions on how to report it, yes.
Q What were Mr. Minott's opinions?
A I think he wanted to try to break the funds out and we told him we didn't have a breakout of

funds.

Q Okay. What do you mean by break the funds out?

A I guess between the NRC radiological portion and the non-radiological portion.

Q Were you aware that he did that in the 1999 and 2000 filings?

A No.

Q You weren't aware of that?

A No.

Q Okay. And why did you tell Mr. Minott that that's not the way Entergy was going to submit NRC filings?

A Been my general understanding that that was not the proper way to file it.

Q Okay. Were you aware of any characterization of the amounts transferred in the decommissioning trust at the time of the sale that represented any kind of breakout or split as you've just described it?

MR. BRYAN: Objection. Lack of foundation.

A No. I was not privy to any of that.

MR. WINE: (Continuing.)

Q Okay. Were you aware of any

representations made by Entergy to the NRC at the time of the sale regarding the composition of the decommissioning trust?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation.

MR. MORRIS: Same objection.

A No.

MR. WINE: You weren't aware of that?

MR. MORRIS: When he's objecting, give him a chance to finish his objection.

A Okay.

MR. WINE: (Continuing.)

Q You weren't aware of that?

A No.

Q Okay. We'll look at some documents in a minute on that item.

Let's take a look at -- are you aware if the amount transferred in the Pilgrim acquisition as far as the amount in the decommissioning trust was based on an independent decommissioning study as opposed to purely the number necessary to meet the NRC minimum?

A I'm not aware.

Q Okay. One way or the other?

A No.

Q Okay. Let's take a look at 14, Lisa.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 7 AND ATTACHED.)
MR. WINE: (Continuing.)
Q Mr. Denton, you've been handed a document that's been marked Denton Exhibit 7 for purposes of today's deposition. While you review it, I'll describe it for the record. It's an e-mail string that was produced by Entergy Bates labeled ENGC/BECO DOE 1st RFP-3-301. It is an e-mail chain, again, originating from Charlie Minott to Cliff Gatlin on Thursday, April 12th, 2001, and then Mr. Gatlin responds to Mr. Minott on April 21st and CC's you as well as Ms. Iupe and John Gerety. I ask you to review the document and tell me if you're familiar with it.
A (Witness complies.)
Q Mr. Denton, have you had an opportunity to review that document?
A Yes.
Q Do you recall either the e-mail communication herein or the agenda that is being discussed in the e-mail?
A No.
Q You have no recollection?
A No.

Q Let's look at the document and see if you recall any of the concepts discussed herein. Mr. Minott originally writes to Mr. Gatlin -- first of all, who is Cliff Gatlin?

A Business manager.

Q Okay.

A At the Pilgrim plant.

Q Okay. And he's proposing a draft agenda for a meeting regarding decommissioning -- on decommissioning and he writes Cliff, I was asked to work up some draft agenda items for our meeting right after the outage to understand the basis for the initial trust amount and in here it's 423 million, the related decommissioning estimate and the target real growth of the trust amount. Now, let's -- let me stop right there.

Do you recall -- did your office task Mr. Minott with coming up with this agenda?

A No.

Q Okay. Let's look at the $423 million figure. Mr. Minott says, To understand the basis for the initial trust amount, this $423 million, do you recall that the initial trust amount being transferred from Boston Edison to Entergy was $423 million?

MR. BRYAN: Objection. Lack of

foundation.

MR. MORRIS: Same objection.

A I have no recollection of what the number was.

MR. WINE: (Continuing.)

Q Okay. Now, further down, he says, I look to you to change as needed and also to suggest who the players should be. From my perspective, we need someone from Item A below who really knows the answer to the four questions. So far, I can't find anyone. Also who would be the appropriate decision-makers to address Items B and C.

So let's look at the agenda specifically as presented by Mr. Minott below.

Item A on his agenda is basis for initial trust amount and he has four questions. He wants to know the basis for the $782 million figure and then in parentheses, it says 2012 and then dollar figure.

Do you have an understanding of what those numbers represent?

MR. BRYAN: Objection. Lack of foundation, calls for speculation.

A Not really.

MR. WINE: (Continuing.)

Q Okay. I read that to mean 782 million

using $2,012. Is that consistent with your reading of it sitting here today?

MR. BRYAN: Same objection.

MR. MORRIS: Same objection.

A That's what I would read it, yes.

MR. WINE: (Continuing.)

Q Okay. So it says basis for $782 million targeted decommissioning trust fund amount. Do you recall examining the basis for that $782 million figure?

A No.

Q Okay. No recollection of meetings or discussions regarding the basis for that amount?

A No.

Q Okay. Then No. 2 on the agenda, relationship to TLG adjusted decommissioning estimate of 578 million. And then it says $97. Do you have a recollection of that task or that inquiry?

A No.

Q Let's look at the next one. Basis for Entergy alteration of above $578 million to 572 million. Do you recall an analysis of that?

A No.

Q And then four, split of decommissioning, 50.75 and spent fuel, 50/50 4BB costs. Do you have

any recollection of that?
A No.
Q Do you know what is meant by that Item No. 4, do you have an understanding, sitting here today, what that means?
MR. BRYAN: Objection. Lack of foundation. Calls for speculation.
MR. MORRIS: Same objection.
A I'm not sure.
MR. WINE: (Continuing.)
Q You're not sure?
A It would appear that Mr. Minott was trying to split the number between the NRC radiological and the spent fuel costs.
Q Okay. And then he talks about strategy for trust fund investment, but I don't know that I'm concerned with any of that, in B. In C, $50 million decommissioning guarantee. I'm not going to ask you any questions about that.
Then Mr. Gatlin at the top of the exhibit responds to Mr. Minott. And he says Charlie, and he CC's you on this e-mail. Charlie, the agenda looks good to me. I think many of the same players should be involved. Don Denton, Mike Caruso, John Gerety, Susan Warbington, John Jacobs, Linda Iupe and

yourself. Do you recall being involved with this group of people to examine any of these issues?

A No.

Q Okay. I honestly don't know who would fit your Item A. I suspect it may have been Dan Keiter but that's just a guess.

Do you recall having any discussions with Mr. Keiter regarding the items described in Item A of Mr. Minott's agenda?

A No.

Q Okay. It says I will copy Linda Iupe on this e-mail. Maybe she and Don Denton can determine who that individual is.

Do you recall whether you or Ms. Iupe had any discussions regarding this issue?

A No.

Q Did Ms. Iupe ever report to you on any analysis that she performed on Item A?

A No, not to my knowledge.

Q Okay. It says in Section 3, you refer to the parent guarantee that Pilgrim currently must maintain for catastrophic events associated with Pilgrim. We had originally hoped that this amount could be shared amongst the Northeast but for some reason, it could not happen. I'm pretty sure that Don

Denton can speak to that issue.

Do you have any familiarity with that issue, Mr. Denton?

A A general familiarity with it.

Q What is your understanding or familiarity with it?

A That there were -- there were guarantees that were required over and above the trust and these were like Entergy parent guarantees and it would appear that Mr. Gatlin is saying that they would want the $150 million guarantee to cover all of the nuclear units and that maybe that wasn't the case. In my opinion, I don't think that was a case. I think each plant had its own guarantee.

Q And it was on a plant-specific basis?

A Yes.

Q Okay. You can put that document aside. We're going to look at another document.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 8 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you a document that's been marked Denton Exhibit 8 for purposes of your deposition. While you're reviewing it, I will describe it for the record. It is Bates labeled

ENGC/BECO DOE 1st RFP-3-307. It is as an e-mail dated August 13th, 2001, to you, CC'ing Clifford Gatlin. And once you've had a chance to review it, I ask you if you recall receiving this document?

A I do not recall.

Q Okay. Now, again, previously we talked about your characterization -- or your categorization of e-mail communications, ones that you would respond to directly or ones that you would give to someone else to respond. Do you know which one this fits into?

A Probably be one that I would respond to.

Q Okay. And why is it that this is something that you would specifically respond to?

A There is a question asked directly to me.

Q Okay. But you have no present recollection of this communication sitting here today?

A No.

Q Okay. Now, let me read the e-mail and ask you some questions about its content. It says, Don, I understand Entergy identifies areas of potential financial risks. Risk profiles. Question mark.

Are you familiar with a term, a risk profile item or document like that?

A Yes.
Q What is that?
A It is part of the overall quarterly financial review. We try to identify all of the potential risks in the company, material risks, financial risks.
Q Okay. Why are those created?
A In order for the officers and executives who sign off on the 10Ks and 10Qs to know what the risks are before they sign them.
Q And is that just an internal document or are those risk items reported to regulatory authorities such as the SEC?
MR. BRYAN: Objection. Vague.
A It's an internal item.
MR. WINE: (Continuing.)
Q So once a risk profile item is created, how is it used within the company? Describe to me what happens to that risk profile item.
A It was a group within Entergy who reviewed the risk items and determined whether there was any reporting requirements for them.
Q Okay.
A Or that was there a strategy to mitigate those risks.

Q Okay. And were you part of that group?
A No.
Q Who was that group?
A I'm not sure. It would have been the chief financial officer and a group appointed by him in New Orleans at Entergy.
Q Okay. Now, Mr. Minott continues in his e-mail to you, Is there any such item identified to address potential financial obligations for Pilgrim post shutdown spent fuel storage. If so, may I get a copy of it from Mike Bellamy.
Do you recall Mr. Minott asking you for a risk profile item associated with post shutdown spent fuel storage?
A Not specifically, no.
Q Okay. Do you recall any conversations with Mr. Minott regarding the creation of or identification of a risk profile item on this subject matter?
A I believe Charlie was trying to -- in the decommissioning estimates, in the decommissioning studies that were prepared by TLG, the outside consultant, Charlie wanted them to try to -- included in there overall was the spent fuel issue. But I think Charlie wanted them to try to break it out

separately.

Q So let me just make sure I understand the answer that you just gave. The TLG decommissioning cost analysis included spent fuel storage costs, correct?

A They normally would be asked to include that, yes, all of the -- all of the decommissioning liability.

Q Do you know if TLG specifically included that with respect to the Pilgrim plant?

A No.

Q You don't have a specific recollection?

A I don't think it was ever broken out.

Q Now, tell me what you mean by "broken out." What do you mean by that?

A The preparation of the decommissioning study is extremely complicated, three- to six-month process. They run analytical models and they identify all of the asset retirement obligations at that point in time. Somewhere buried in all of that would have normally would have been the spent fuel liabilities.

Q Uh-huh.

A But when they give us a number, they just give us one number.

Q They give you an aggregate number and say

this is what it's going to cost to decommission the plant and it's your understanding that within that number, it includes spent fuel storage costs?

A Normally it would.

Q Okay. Now, Mr. -- Mr. Minott continues here. From what I can gather, the 400 million funding received from Boston Edison was based on an amount to cover the NRC minimum decommissioning amount required under 10CFR50.75. This NRC amount does not fund post shutdown spent fuel storage costs which are required under 10CFR50.54. Now, let's stop there.

Do you have any understanding or recollection of the matters related by Mr. Minott in this aspect of his e-mail?

MR. BRYAN: Objection. Vague.

A I don't really know. I don't remember the e-mail. But in general, Charlie was trying to break those two different numbers out.

MR. WINE: (Continuing.)

Q Okay. And he says these post shutdown spent fuel storage costs can be significant even if DOE were to perform as specified in their contract. Is there any light that you can shed on this.

Now, let's look at the first sentence that I just read to you. These post shutdown spent fuel

storage costs can be significant even if DOE were to perform as specified in their contract, did you share Mr. Minott's view or characterization of those costs?

A I think I disagreed with Mr. Minott.

Q How so?

A Because our fund was just one number and it was there entirely to decommission the plant the radiological portions.

Q Okay. And so what about the cost associated with spent fuel storage costs, did you have any view of the significance of those costs?

MR. BRYAN: Objection. Lack of foundation.

A Not really, no.

MR. WINE: (Continuing.)

Q Okay. Who within the Entergy organization would be responsible for tracking issues such as spent fuel storage costs, either on a corporate or a plant-specific basis?

MR. BRYAN: Objection. Vague as to tracking.

A I don't really know. Normally those costs don't come into play until you actually start doing the dry fuel storage.

MR. WINE: (Continuing.)

Q Okay. Had -- we had talked previously about strategic risk items, risk profiles rather. Did Entergy regularly engage in the practice of creating strategic risk profiles for its individual plants associated with spent fuel storage costs?

A Not to my knowledge.

Q It wasn't a practice or a procedure on a corporate level?

A I think as each of the plants got to the point where in their planning horizon, I'm saying in a one- to three-year time frame, if they saw that they were going to have to go into spent fuel storage, at that point in time, they would start rolling that into all of the data.

Q Okay.

A And that would be project management at each one of the plants.

Q Do you know if that were the case for Pilgrim in the 2001 time frame?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation.

MR. MORRIS: Same objection.

A No, I really don't know. I don't think we were able to do this with Charlie.

MR. WINE: (Continuing.)
Q Why not?
A I don't think the numbers existed.
Q Okay. Was it possible to go to TLG and say could you specifically isolate the numbers that you're projecting for spent nuclear fuel storage?
MR. BRYAN: Objection. Calls for speculation.
MR. MORRIS: Same objection.
A I'm not sure. I assume TLG would be able to do that. In the later studies that TLG did on the other plants, we specifically requested them to do that.
MR. WINE: (Continuing.)
Q Why?
A To know what the number was.
Q And what did you do with this data? How did -- why did you -- why did you want to know what that specific number was?
MR. BRYAN: Objection. Vague.
A I think we just wanted to know what the liability, what that piece of liability was.
MR. WINE: Let's look at 16.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 9 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, you've been handed a document that has been marked Denton Exhibit 9 for purposes of today's deposition. It is Bates labeled ENGC/BECO supplemental 2 DOE 1st RFP3-1. I will represent for the record that this document was produced by counsel for Entergy on February 2nd, 2007, in response -- I'm sorry. On February 9th, 2007, in response to specific requests that we made, Boston Edison made to produce risk profile items referenced by Charlie Minott in his deposition. Ask you to review this document and tell me if you're familiar with it.

A I'm not familiar with this document.

Q Okay. Don't ever recall having received it?

A No.

Q Now, again, this was represented to us as being a risk profile item by counsel for Entergy. In your experience, is there a specific form that these risk profile items are written under or anything like that? Can you describe for me whether this document conforms to your understanding of what a risk profile item should look like?

MR. BRYAN: Objection. Vague.

A I would say I'm not familiar with this

format at all, that there was a form that we would fill out or that Entergy would fill out on all of the risk items and in my opinion, this is where the plant was just trying to identify all of the potential risks.

MR. WINE: (Continuing.)

Q Okay. Do you know if that form or that kind of form was ever created for the Pilgrim plant in this time frame for spent nuclear fuel storage costs?

A No. Most likely Charlie would have submitted this to the Entergy group and -- as a potential risk and they would have evaluated it and determined whether it made the final list or not.

Q If this was considered in that regard, would you have been within the recipient group of folks to have reviewed this document?

A May or may not have, depending on whether they sent it to me.

Q Now, the document says at the bottom that you're one of the two responsible parties designated for this profile item or draft risk item. Is that consistent with your understanding?

MR. BRYAN: Objection. Lack of foundation.

A No.

MR. WINE: (Continuing.)
Q Were you ever aware that you were identified as a responsible party for this draft risk item?
A No.
Q Do you know who so designated you as a responsible party?
A No.
Q Do you know who drafted this risk item?
A No.
Q Now, let's look at the top. It says potential risks. The current decommissioning trust fund does not specifically contain funding for post shutdown spent fuel storage. Is that consistent with your understanding?
MR. BRYAN: Objection. The document speaks for itself.
A I can't say. But I was aware that the current decommissioning fund did not have enough money in it.
MR. WINE: (Continuing.)
Q Okay. But I'm asking a slightly different question. Do you know whether the fund specifically contained funding for post shutdown spent fuel storage?

A In my opinion, no.
Q Okay. And what's the basis for your opinion?
A There was one number and it was all for 50.75.
Q And where did you learn that? How did you come to that understanding?
A Just my general knowledge.
Q Okay. Were you -- do you know if that was the case from Entergy's perspective at the time of closing on the sale of the Pilgrim plant from Boston Edison to Entergy?
MR. BRYAN: Objection to the extent it calls for speculation.
MR. MORRIS: Same objection.
A I don't know what their assumptions were.
MR. WINE: (Continuing.)
Q Well, based on your experience as a corporate executive for Entergy, was it always the case that the decommissioning trust fund was solely populated by $5075 or was it ever not the case?
MR. BRYAN: Objection to the extent it calls for speculation.
MR. MORRIS: Same objection.
A I can't tell you for sure but it's my

understanding that it was only 5075.
MR. WINE: (Continuing.)
Q Okay. Now, it says this liability could range from 75 million to 200 million depending on the shutdown scenario. TenCFR50.54BB requires funding for these costs. Did you ever have an understanding as to the quantifications related herein for spent fuel storage costs?
MR. MORRIS: Objection. Vague.
A No.
MR. WINE: (Continuing.)
Q No?
A No.
Q Were these numbers ever presented to you as potential unfunded liabilities for the company associated with spent fuel storage costs?
A Not to my knowledge, no.
Q Okay. Would that be -- strike that.
Would this be the kind of data that you would receive in inputting information into the SEC filings that you discussed earlier?
A Yes.
Q Okay. And you don't recall ever receiving this information in order to put -- provide that data to Entergy corporate for its SEC filings?

MR. BRYAN: Objection. Asked and answered.
A I don't recall ever receiving this data.
MR. WINE: (Continuing.)
Q Okay. Sitting here today, in hindsight, in 2001, would this be the kind of data that you would have wanted to have in order to file a complete and accurate SEC filing?
MR. BRYAN: Objection. Vague. Objection. Lack of foundation. Objection. Calls for speculation.
A We -- we requested that the plants identify any and all risks.
MR. WINE: (Continuing.)
Q Okay.
A And if they -- if the plant thought that this was a risk, we would want them to identify it.
Q Okay.
A Whether or not it impacted the SEC filings would be a different matter. Majority of the potential items identified for the plants were not.
Q Based on your experience, is a potential liability in the range of 75 to 200 million for a specific plant, in this case Pilgrim, a significant liability such that you would have reported it as part

of the SEC filings?
MR. BRYAN: Objection. Asked and answered.
MR. WINE: I don't think I did.
A I can't tell you there was a committee that made that decision, but in my opinion, no.
MR. WINE: (Continuing.)
Q Okay. Why not?
A This liability was not mature.
Q Okay. How significant would the liability have to be in order to become a material liability?
A Now, I did not use the word "material." I said mature.
Q Oh, mature. I apologize. It's my hearing. In order to be mature. Now, tell me what you mean by -- by "mature."
A We would look out into the time frame and say what is the probability of this happening and there -- while it may be identified, it wouldn't be an item to be reported within the 10K.
Q You previously testified that one of the exit strategies that Pilgrim considered was to grow the plant until such time -- grow the fund, I'm sorry, decommissioning fund until such time as it could

decommission the plant and we talked about a five-year or potentially more time frame for that. If that was an exit strategy that Pilgrim was considering or Entergy was considering in the late '90s, early 2000 time period, wouldn't looking at shutdown -- spent fuel costs at shutdown be mature under that exit strategy?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A I'm not -- I'm not real sure what was included in that exit strategy, only that there was insufficient funds in the decommissioning trusts at that time. I'm not sure what the components would have been.

MR. WINE: (Continuing.)

Q Is it that the funds were insufficient because they didn't include spent fuel storage costs as well?

MR. BRYAN: Same objection.

A It would have been my opinion they weren't sufficient to meet the 50.75, the NRC minimum requirements.

MR. WINE: (Continuing.)

Q Now, there is a note here in this

draft risk item. It says delaying decommissioning to further build the trust fund to cover these costs has been mentioned as a partial solution to this. However, this has not been shown to create any appreciable net increase in cash flow and also is not a possible option for Pilgrim due to a provision in the NRC license transfer to Entergy that prevents delayed decommissioning.

Do you understand what's being relayed in this note contained in this draft risk item?

MR. BRYAN: Objection. Calls for speculation.

A No, I don't. I'm not sure what's being said here.

MR. WINE: (Continuing.)

Q Is this matter consistent with our prior discussion of the agreement with the Massachusetts attorney general regarding SAFESTOR as an option for Pilgrim?

A I think the last portion is referring to that, yes.

Q Okay. Now, it says current actions and there is one noted. TLG is preparing a revised decommissioning and post shutdown spent fuel storage cost estimate for Pilgrim assuming license renewal.

This will define the extent of liability. This study may show the decommissioning cost portion is lower than anticipated and therefore a portion of the funds now in the trust could be allocated to cover the fuel storage liability. Outside of the context of this document, do you recall this action item at all?

A Only to say that this is incorrect.

Q Why is it incorrect?

A NRC won't allow you to consider license renewal in calculating your liability.

Q Let's look at the last line or line and a half. A portion of the funds now in trust could be allocated to cover the fuel storage liability.

Is that an accurate statement?

MR. BRYAN: Objection. Vague.

MR. MORRIS: Same objection.

MR. BRYAN: Calls for speculation.

A The fund was designated for the NRC radiological portions. If at the end of the decommissioning, it was my general understanding if there were any funds remaining after the radiological portion of the plant was decommissioned, you could do whatever you wished with them. They would become company assets. They could certainly be used for that or any other purposes.

MR. WINE: (Continuing.)

Q Okay. Let me further explore your answer there. NRC minimum establishes a dollar amount that it believes using its formula should be reserved in a trust fund for purposes of decommissioning of radiological structures, correct?

A Yes.

Q And if a company such as Entergy and let's say for the purposes of this examination that that minimum amount is let's say $327 million, okay. If the company is able to decommission for some amount less than $327 million, what would happen to the residual in the fund?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A I'm not real sure but it would be my opinion that that would become a company asset.

MR. WINE: (Continuing.)

Q Company could do with it whatever it wished?

A Well, unless -- there were some provisions in the purchase and sale agreement that calls for that if there was any leftover to go to the seller.

Q Okay.
A I'm not sure what the government agreement was.
MR. WINE: Let's go ahead and take a look at another document.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 10 AND ATTACHED.)
MR. WINE: (Continuing.)
Q Mr. Denton, you're being handed a document that has been marked Denton Exhibit 10 for purposes of your deposition. It is an e-mail Bates labeled ENGC/BECO DOE 1st RFP-3-339. It's an e-mail from Charlie Minott to you CC'ing Cliff Gatlin dated January 16th, 2002. Ask you to review the document and tell me if you recall having received this e-mail from Mr. Minott.
A I don't recall the e-mail, no.
Q Okay. Would this be the kind of e-mail that fit into the category of you having to respond to it or delegating it to someone else?
A I probably would have responded directly to Charlie.
Q Okay. Now, the e-mail states, Don, would we be able to have TLG do an additional step in the Pilgrim study they're doing for you to break down the

total costs they've prepared into NRC defined decommissioning costs post shutdown spent fuel storage costs and Green Field costs. Let's stop there.

Is that question consistent with the conversation we had earlier about breaking out the TLG study where that aggregate dollar amount comes from and how it's populated.?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation.

A Could you repeat the question.

MR. WINE: (Continuing.)

Q Sure. I'll try to simplify it. We earlier talked about requests that the company made to TLG to --

A Split the numbers out.

Q To split the numbers out. Is that question associated with your prior testimony on that point?

MR. BRYAN: Same objections.

A I would say yes. TLG was requested to break the numbers out and the components and be sure that they were provided for adequately.

MR. WINE: (Continuing.)

Q Okay.

A There may or may not have been in there.

Q Okay.
A We're saying in the future, we want to address those items.
Q Okay. Put that document away. Let's take a look at another one.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 11 AND ATTACHED.)
MR. WINE: (Continuing.)
Q Mr. Denton, I've handed you a document that has been marked Denton Exhibit 11 for purposes of today's deposition. It is an e-mail from Charlie Minott to you and Robert Bellamy, Bates labeled ENGC/BECO DOE 1st RFP-3338. Ask you to review the document and tell me if you're familiar with it.
A No, I'm not familiar with it at all.
Q Now, the subject matter is strategic decommissioning group. Are you familiar with such a group?
A Never heard of it.
Q Okay. Mr. Minott writes to you and Mr. Bellamy, Don, I explained the goals of this group to Mike. He supports my participation in the group. Once you talk with White Plains and obtain concurrence, please let me know how I can help. Charlie.

And you have no recollection of this group sitting here today?
A None whatsoever.
Q Do you have any recollection of Mr. Minott making any kind of request to join a group to discuss decommissioning issues?
A No.
Q Okay. Do you know what action was taken with respect to this request?
A No.
Q Okay. Is it about this time in early 2002 that Entergy began centralizing its reporting of decommissioning trust fund amounts?
A I'm not sure of the dates but after we acquired Pilgrim in '99 and acquired another plant in 2000 and another one in 2001. So 2002, we would have just about had the fleet completed, yes. I would say there was probably a centralized group by this time.
Q Okay.
A And what Charlie was doing at the Pilgrim plant was transferred up to the corporate group most likely at this point in time.
Q Okay. Once that happened, did Mr. Minott continue to have any role in decommissioning related issues for the Pilgrim plant?

A I think at some time he backed out of that, but I can't specifically say what date.

Q Okay.

A There was a time when Charlie no longer was involved in the decommissioning function.

Q Okay. Put that aside and we'll look at another document.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 12 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I've handed you what has been marked Denton Exhibit 12 for purposes of today's deposition. While you're reviewing it, I'll describe it for the record. It is an e-mail from Charlie Minott to Geoff Griffiths dated February 19th, 2002, and Bates labeled ENGC/BECO DOE 1st RFP-3-337. And it relates to a conversation that Mr. Minott says he had with you in this time period. Once you have had a chance to review it, tell me if you're familiar with the contents described therein.

A No. I'm not familiar with this at all.

Q Okay. Is this, again, along the lines of the discussion that we've already had about tasking TLG to break out costs in its decommissioning studies?

A Yes.

Q Okay. And there's a question toward the bottom, its says you mentioned you gave Don a range of total costs. I believe the variable was escalation.

Before TLG goes through the effort to allocate costs to the above categories, do we need to get Don's agreement on a most likely scenario.

Do you ever recall someone asking you for the selection of a most likely scenario for purposes of TLG's analysis on spent nuclear fuel storage costs?

A No.

Q Okay.

A By this time, we probably had multiple scenarios required in the recording of the liability.

Q And what was the -- that requirement the result of?

A The Financial Accounting Standards Board requirement. I want to say FASB143 asset retirement obligations. And while we did weight the scenarios, I would not say that there would have been a most likely scenario, no.

Q Okay. Let's put that one aside. And...

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 13 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I've just handed you a

document that's been marked Denton Exhibit 13 for purposes of your deposition. While you're reviewing it, I'm going to describe it for the record. It was a document e-mail chain produced by Entergy, Bates labeled ENGC/BECO DOT 1st RFP-3-332 and while I note that you're not copied on the e-mails, I want to ask you questions about the subject matter that's being related or discussed in the e-mail string. So just take a brief moment to review it and then we'll go through specific items contained herein.

A (Witness complies.) Okay.

Q All right. Now, your initial e-mail that started this chain was written on June 25th, 2002, from a William -- can you help me with the pronunciation of the last name?

A Cloutier.

Q Cloutier. And who is Mr. Cloutier?

A He is an individual with TLG.

Q Okay. And it was written to Charlie Minott and to Geoff Griffiths. And Mr. Cloutier writes, Charlie, the analysis prepared for Pilgrim is being re-reviewed internally with the intent that any lessons learned from Maine Yankee will be incorporated.

During this time frame, do you recall Entergy

reviewing either the Pilgrim decommissioning analysis generally or any of its plants decommissioning studies for purposes of learning lessons from its Maine Yankee experience?

A Yes.

MR. BRYAN: Objection. Vague.

MR. WINE: (Continuing.)

Q Yes?

MR. MORRIS: Go ahead, you can answer.

A Yes.

MR. WINE: (Continuing.)

Q And what was the purpose of this analysis?

A To try to validate -- there are literally hundreds and thousands of escalations and factors and cost indices and we had actual decommissioning experience at Maine Yankee and Entergy decommissioned the plant and had the real live hands-on experience. We requested that the engineers from Maine Yankee talk to the engineers at TLG and try to determine the very best numbers for all of this based on actual experience.

Q Got you. So Entergy is looking at the experience at Maine Yankee and trying to take lessons

learned from that specific experience to the assumptions and analyses being performed at other plants, correct?

A The volume of work, the cost of the work, etc. The engineering requirements. The NRC requirements. Everything.

Q Now, Charlie Minott responds back and says, Bill, thanks for the update. My concern in waiting until end of summer to resolve from the study what percentage of costs fall outside of the NRC 50.75 definition is if the change to the decommissioning funding rule and RG1.159 get issued by the commission before then, we will be scrambling to identify these costs and to determine the amount we want to transfer from our single trusts into a separate trust before the rule goes into effect. Thoughts.

Now, do you have any recollection of any concerns within the Entergy organization consistent with what Mr. Minott is writing here to Mr. Cloutier?

A No.

Q Do you have any understanding as to his reference to single trusts versus separate trusts?

A No.

Q What that represents?

A No.

Q Did you ever look at setting separate trust funds or even subaccounts within a single trust for various costs associated with decommissioning of a plant including the Pilgrim plant?
A I believe that's what Charlie was wanting to do but no, I don't think we ever did that.
Q Why not?
A The money was there for the radiological decommissioning of the plant only.
Q Okay. And then Mr. Cloutier writes back to Mr. Minott on June 26th, 2002, Charlie, we've requested to generate updated estimates for the remaining non-regulated units. One of these objectives in relooking at the Pilgrim estimate is to establish a consistent set of assumptions that can be used to support the estimates for the other Northeast units. Now, let's stop there.
Is that consistent with your earlier testimony of gaining lessons learned from Maine Yankee and being consistent across the Entergy organization for decommissioning estimates?
A That's the way I would read that.
Q Okay. It says, Our intention is work with each site to define the estimating bases and attempt to establish some level of commonality. While

we believe that our current model for Pilgrim is reasonable, there may be other scenarios and alternatives that should be evaluated in assessing total system liability.

Again, is that consistent with kind of incorporating lessons learned?

A That's the way I would read it.

MR. WINE: Okay. We can put that aside.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 14 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you what's been marked Denton Exhibit 14 for your deposition. I ask you to review that document. While you're doing so, I will describe it for the record. It is an e-mail chain originating from Linda Iupe to Charlie Minott and it is -- has been produced by Entergy Bates labeled ENGC/BECO DOE 1st RFP-3-330. Once you've had a chance to review that, Mr. Denton, just tell me so I can ask you some specific questions about the contents of this document.

A Okay.

Q Now, the original e-mail from Ms. Iupe to Charlie Minott in July of 2002 is titled "NRC filing

regarding minimum decom funding." And she says, Charlie, we're gathering some information for a data request and need to know how many NRC filings Pilgrim has made under Entergy ownership regarding the minimum decommissioning funding. We know it is either one or two. Can you provide the filing dates or years covered. Is the filing required every two years, thanks.

Do you recall Ms. Iupe or anyone within your group asking for this information in the July 2002 time frame?

A No.

Q Do you recall why she would be asking for this information?

A No.

Q Do you have any understanding as to whether or not it's associated with a request that was received by Entergy from the general accounting office?

MR. BRYAN: Objection. Calls for speculation.

A No.

MR. WINE: (Continuing.)

Q Do you ever -- do you recall such a request from the general accounting office?

A We had literally hundreds of data requests but no, not specifically.

Q Okay. All right. And then at the top, and Mr. -- Mr. Minott responds to Ms. Iupe and she writes back and she says, Thanks, please keep Don Denton and/or me in the loop for the December filing.

Do you know why Ms. Iupe was asking that Mr. Minott keep you or her involved or in the loop for Entergy's December 2002 filing on behalf of Pilgrim?

MR. BRYAN: Objection to the extent it calls for speculation.

A I don't know specifically what that means but in general, we did provide the asset number.

MR. WINE: (Continuing.)

Q Okay.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 15 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I've handed you a document that's been marked Denton Exhibit 15 for purposes of your deposition today. I ask you to review it. It's been printed on both the front and the back of that paper. And while you're doing so, I'm going to review it or describe it for the record. The document that has been marked as Denton 15 is an e-mail chain

produced by Entergy. Two pages. Bates labeled ENGC/BECO DOE 1st RFP-3-345 through 346 regarding GAO survey Pilgrim draft. And originates on Monday, August 19th, 2002, to you from a Christopher Foster. Once you've had a chance to look at that, Mr. Denton, I'd like to ask you some questions about it.

MR. MORRIS: And although while he's looking at it, just reviewing the e-mail myself, although it has not been stamped under the protective order, I do note that the content of the e-mail from the sender was noted to be considered confidential so I would ask that this document also be treated by confidential in the protective order and that all testimony related to this document be treated the same.

A Okay.

MR. WINE: (Continuing.)

Q All right. Now, in the original e-mail from Chris Foster to you on the back of that document and he says, Don, attached is draft of the GAO survey from Pilgrim with supporting documentation included on the last page.

Do you recall getting this GAO survey from Mr. Foster having reviewed this e-mail string?

A No.

Q Okay. Now, if you look above, you write back and I'm assuming this is you because on the bottom of the first page it says, from Don Denton, and it's written to Charlie Minott, Doug Ellis and Michael Caruso. Is it fair to say that you wrote this e-mail?

A It appears I did.

Q Now, you note that the information in the files is considered confidential as not to be shared with individuals who do not have a need to know. Do you recall why you made that notation on that e-mail?

A No.

Q Okay. And you write, Charlie, we've been requested to complete a GAO survey of decommissioning trust assets for Pilgrim. The GAO forms contain some historical data for Pilgrim for the year 2000. It shows $293,842,657. I assume that's what we reported to the NRC as the NRC minimum amount. Can you review the 2000 data and call me. And you give your phone number.

Do you recall tasking Mr. Minott with that?

A No.

Q Do you have any recollection, sitting here today, why you asked him to review that information?

A It appears that we had received a GAO survey.

Q Okay. Now, you write to Mr. Ellis, Doug, I've attached a draft copy for your review. I will send you a final copy when it's completed. Do you recall that instruction to Mr. Ellis?

A No.

Q And then you write to Mike Caruso, Mike, we obtained this data from the Pilgrim trust reports. We had to calculate and here you write interpolate some of the earnings data. Can you review the data and can call me at -- and then you give your phone number. Thanks for your help.

Do you recall that instruction to Mr. Caruso?

A No.

Q Do you recall why you or your organization had to calculate or interpolate some of the earnings data associated with this exercise?

A Apparently, it was requested on the GAO survey.

Q And what is -- I think I know this but what is meant by the parenthetical interpolate?

A I think interpolation is calculating an average between two numbers. Some is at four and some is at five and the whole is at some average of the

two.
Q Okay. Now, let's look at the top of the e-mail from Mr. Minott to you and to the rest of the folks noted herein, including Doug Ellis, Michael Caruso and then on the CC, Christopher Foster, Thomas McElhinney and Brian Collins. First of all, who is Chris Foster?
A Senior accountant that worked for me.
Q Okay. Thomas McElhinney?
A I don't know.
Q Or Brian Collins?
A He was the business manager at Pilgrim subsequent to Cliff Gatlin.
Q Okay. Now, Mr. Minott writes to you and before we get into this, you've reviewed this document. You have no recollection, sitting here today, having received this e-mail?
A No.
Q Okay. He writes, Don, the amount of $293,842,657 was the December 31, 2000, balance in the trust fund for the NRC defined decommissioning, open parentheses, 10CFR50.75 scope, period. This was reported to the NRC in our March 20th, 2001, letter to them. And then he goes about describing how he arrived at that number. The $293.8 million was

derived as follows. The trust balance as of 12/31/2000 and you had a provisional trust of 28,150,913, a qualified trust of 166,345,621 and a non-qualified trust of 254,118,210 with a total of 448,614,744. Are you with me so far?

A That's what it says.

Q Okay. It says, Based on the Pilgrim decommissioning estimate, 65.5 percent of the total projected post shutdown costs are attributable to the scope related to NRC's definition of decommissioning and the remaining 34.5 percent are for post shutdown fuel storage in Green Field costs. Now, let's stop right here.

Sitting here today, is this the first time that you recall being informed that there was a split of 65.5 and 34.5 in the reporting of the -- to the NRC in the amount of the decommissioning trust for the Pilgrim site?

A Yes.

Q Is that surprising to you?

A Yes, I don't think it's accurate.

Q Okay. And just talking about the veracity of the document, it does report that you are a recipient of it. Do you have any reason to doubt that you were a recipient of this e-mail

communication?

A No. It's indicated that I received it.

Q Okay. But you have no recollection of having reviewed it or an understanding of the contents of the document?

A I have a general recollection that Charlie was of the opinion that he wanted to break out the radiological portion from the fuel portion and I totally disagreed with him.

Q Okay.

A Said it was not the correct thing to do.

Q Okay. But you have no recollection that that was in fact what Entergy did do with its NRC reporting in 1999 and 2000?

MR. BRYAN: Object.

A No.

MR. WINE: (Continuing.)

Q Okay. Then the e-mail continues. These fuel and Green Field costs are excluded from NRC minimum funding calculations per NRC direction. So we multiply the total trust balance of 448,614,744 by the 65.5 percent to arrive at the $293,842,657 result. This represents the amount of the trust allocated to fund the NRC defined scope of decommissioning as of December 2001.

Again, this is your first time being aware of Mr. Minott's reporting to the NRC for these purposes?

MR. BRYAN: Objection. Lack of foundation, calls for speculation.

A Yes.

MR. WINE: (Continuing.)

Q Okay. Now, when we looked at them previously, you had received drafts of the NRC filings that Mr. Minott was reporting to the NRC, correct?

A Yes.

Q And with respect to the 2000 filing, we had reviewed the actual and the draft report to the NRC that contained the $293 million amount, correct?

A I'm not sure what the number was, but...

Q I'll stipulate we streamline it and not have to go back and forth through exhibits. But to satisfy yourself, I'm happy to show you the exhibits again if you'd like.

A If you say so.

Q Okay. And if I understand what Mr. Minott is relating to you in this exhibit, the amount that he reported to the NRC didn't match the amount that was actually in the trust fund, the total aggregate amount that your office maintains, correct?

A It would appear that way.

Q Okay. Wouldn't you have noticed that differential in the review process before that NRC report was filed in 2000?
A It should have been.
Q Do you have any idea why it wasn't?
A No.
Q Okay. Did you delegate that responsibility to a specific individual on your staff?
A I had staff that reviewed all of the filings.
Q Do you recall specifically who was responsible for reviewing the filing for Pilgrim in this time frame?
A No.
Q Okay. To the extent that an amount less than the decommissioning trust fund some 34 and a half percent less than was actually in Entergy's decommissioning trust for Pilgrim was reported to the NRC, do you view such reporting as being erroneous?
MR. BRYAN: Objection. Vague. Calls for a legal conclusion.
A I'm not sure. I'm not sure what was actually reported to the NRC.
MR. WINE: (Continuing.)
Q Okay. So you're not sure that the

$293,842,657 was actually reported to the NRC in December 31, 2000?

A No.

Q Okay. Well, let's go back and look at the exhibits real quick and I'll find it for you.

MS. BARBAS: It's Exhibit 5.

MR. WINE: (Continuing.)

Q I'm providing the witness with what was previously marked as Exhibit 5 and asking him to review it for specific reference. The amount reported to the NRC on December 31st, 2000, for Pilgrim -- for Entergy on behalf of the Pilgrim plant. And specifically refer the witness to line 3 of that report.

A That appears to be the same number.

Q Okay. Now, and in the present exhibit that we're looking at, Exhibit No. 15, Mr. Minott describes how he did his math in order to get to the number that is referenced in line 3 of Exhibit 5. Do you see that?

A Yes.

Q And so my question to you is, is the filing to the NRC in December 31, 2000, erroneous based on the math that Mr. Minott describes in Exhibit No. 15?

MR. MORRIS: Objection to form.
MR. BRYAN: Objection. Vague.
A The number that I would have provided Charlie most likely would have been subject to checking the 448 million. Would have been the correct number.
MR. WINE: (Continuing.)
Q Okay. And if -- and again, do you have any reason to believe that the number before you in Exhibit 5 is something other than the number reported to the NRC?
A It appears that it is the filing.
Q Okay. And sitting here today, looking at the number and understanding how it was arrived at, do you believe that that number provided to the NRC in December of 2000 was erroneous?
MR. MORRIS: Objection to form.
MR. BRYAN: Objection. Vague.
A I don't think it was the correct number.
MR. WINE: (Continuing.)
Q Okay. Had you noticed that error in December of 2000, would you have asked that it had been corrected?
A I believe that that was noted and that it was requested that he correct it.

Q When was that noted?
A In one of these e-mails.
Q Okay. Oh, in the conversation with Connie Wells?
A Yes.
Q Okay. And you recall that e-mail also stated that an ultimate decision was made not to correct that filing, correct?
A Because in my opinion, they were corrected in the subsequent filing.
Q Okay. Do you recall that the same thing, same methodology was utilized for the prior NRC submission --
MR. BRYAN: Objection. Vague.
MR. WINE: (Continuing.)
Q -- by Mr. Minott?
A No, I have no idea.
Q Okay. Let's look at --
MS. BARBAS: Exhibit 1.
MR. WINE: Let the record reflect that I have provided the witness with Exhibit 1 that was previously marked as the NRC submission and again direct the witness to review line item 3, the $282 million figure and ask him to review that and become familiar with

it again.

A Okay.

MR. WINE: (Continuing.)

Q And I'm asking the witness, does it appear that again in the submission of this filing Entergy reported out a portion of its decommissioning trust fund for the Pilgrim plant rather than the entirety of the Pilgrim decommissioning trust fund?

MR. BRYAN: Objection. Speculation.

MR. MORRIS: Objection. Vague.

A I'm not sure.

MR. WINE: (Continuing.)

Q Okay. Well, if in 2000, a year after Exhibit 1 was prepared, there was $448,614,744 in the Pilgrim decommissioning trust, do you think it's reasonable that the difference between that amount, the 448 million and the 282 million contained in the 1999 NRC filing was the result of growth in the decommissioning trust over the intervening year?

MR. BRYAN: Objection. Vague.

A I can't say.

MR. BRYAN: Calls for speculation.

MR. WINE: (Continuing.)

Q Have you ever seen growth like that in your experience for an individual decommissioning

trust fund?
A Probably not.
Q Pretty significant growth?
A Yes.
Q Okay. Let's put all of these to the side and we'll move on to another document.
(Off the record.)
MR. WINE: (Continuing.)
Q Mr. Denton, before I continue showing you an additional document, I wanted to ask you specifically we talked about Dan Keiter earlier. I've got to keep all of my people straight. And is it fair to say if I wanted to know details about the specifics of the Pilgrim plant transaction, what was assumed by Entergy, what happened during the transaction, things like that, that he is a good source of information and a superior source of information as compared to you for that kind of knowledge?
A It is my understanding he was the team leader.
Q Okay. Okay. Terrific.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 16 AND ATTACHED.)
MR. WINE: (Continuing.)
Q Mr. Denton, I'm handing you what's been

marked Denton Exhibit 16 for purposes of today's deposition. I ask you to review it. It's been printed on both front and back and given counsel's note earlier about the confidential nature of the content, we'll go ahead and treat this document as we did the preceding exhibit given the confidentiality concern. While you're reviewing the document, I'm going to describe it for the record. It's an e-mail with an attachment produced by Entergy and Bates labeled ENGC/BECO DOE 1st RFP-3-347 through 352. It is an e-mail from Christopher Foster to Doug Ellis with a CC to you and then at the top it also looks like Mr. Ellis may have forwarded this to Charlie Minott as well. It is -- subject line is GAO survey dash Pilgrim final. And indeed the attachment to this appears to be a survey on nuclear plant -- power plant decommissioning trust funds and that this survey is specifically for the Pilgrim nuclear station.
Mr. Denton, once you've had a chance to review the document, I'd like to ask you some questions about it.

A Okay.

Q Mr. Denton, do you recall this document?

A In general.

Q Okay. And what's your recollection of this document? Give me the background of this.

A That someone at Entergy forwarded this document to us and asked us to try to fill it out.

Q Okay. And in fact, you're identified as the contact person on behalf of Entergy for this survey; is that correct?

A Yes.

Q Okay. And do you understand why the GAO was conducting this analysis?

A No.

Q Okay. If you turn to the page Bates labeled 349 for a moment. I'd like to ask you some questions here. In particular, I'd like to first direct your attention to Column A, the 1998 entry. And Column A is for companies to state what the trust fund balance that was reported in a given year as of December 31st of that year. And for 1998, the survey says $160,828,500 and then underneath that, it says balance shown is not correct. And there's an asterisk by that. And at the bottom, it says if you entered a corrected balance for the trust fund for calendar year 1998 or 2000, please explain why. And it says, In 2000, the previous balance represents the NRC minimum requirement radiological areas only. In 1998, Entergy did not own the plant and has no data related to the balances.

Do you understand why the 1998 figure was noted as not correct?

A No.

MR. BRYAN: Objection.

MR. WINE: (Continuing.)

Q No recollection of that?

A No.

Q Okay. Now, let's look up at 1999. It says that the trust fund balance that was reported in that year was $431,092,176. Do you see that?

A Yes.

Q And next to it, it says in Column B, total contribution deposits in dollars, 427,590,000. Do you have an understanding what that dollar figure represents?

A Most likely that would be the amount initially acquired at the Pilgrim.

Q The amount in the trust fund at the time of the acquisition?

A That's what it would appear to be.

Q And then the 431 figure is growth of that amount between the time of the transaction and December 31, 1999?

A That's what it would appear to be.

Q Okay. Now, we looked at Exhibit 1 in

your deposition to the 1999 NRC filing by Entergy for the Pilgrim plant; do you recall that?

A Yes.

Q And in fact, for ease of our examination, I'm going to show that to you again so you can refer to it. And if you'd open up that document and turn to I believe the third page there. Yes. The third page. And look at line Item 3. What amount is being reported to the NRC in 1999 in this document?

A 282,365,375.

Q Okay. Do you have any understanding or knowledge as to why for this GAO survey Entergy reported in Column A an amount of 431 million as opposed to the 282 million that it reported to the Nuclear Regulatory Commission at that time?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A No.

MR. WINE: (Continuing.)

Q Okay. Any idea why as in the item in the column for 2000 and 1999, Entergy did not note that as an incorrect amount?

MR. BRYAN: Same objection.

MR. MORRIS: Same objection.

A No.

MR. WINE: (Continuing.)

Q Okay. Let's look at 2000. It says that in item -- in Column A, an amount of 293,842,657 was reported to the NRC. Do you see where I'm getting that; do you see where it says that?

A Yes.

Q And in fact, that's consistent with the figure that we saw in Exhibit 5 of your deposition, the amount that was reported to the NRC at that date, correct?

A It would appear to be.

Q Okay. And then below that, Entergy wrote that that number was not correct. And it -- that the GAO was to enter the correct balance of 455,915,831. Do you see that?

A Yes.

Q Do you know why that notation was made?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

MR. BRYAN: Lack of foundation.

A I would assume that that notation was there because the 455 was the correct number.

MR. WINE: (Continuing.)
Q Okay. Do you know why a similar notation wasn't made for the 1999 number given your explanation?
MR. BRYAN: Same objections.
MR. MORRIS: Objection.
A I would say that number most likely represents the cash in the back. Should be cash in the bank.
MR. WINE: (Continuing.)
Q Do you know if these corrections were ever brought to the attention to the Nuclear Regulatory Commission?
MR. BRYAN: Same objections.
A I can't say.
MR. WINE: (Continuing.)
Q Do you know why you were identified as the point of contact for the GAO on this data?
A I think we were asked to pull the data together for this filing.
Q Okay. Let's take a look at another document.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 17 AND ATTACHED.)

MR. WINE: (Continuing.)
Q Mr. Denton, I'm handing you a document that's been marked Denton Exhibit 17 for purposes of your deposition. While you're reviewing this document, I'm going to describe it for the record. It's a string of e-mail communication produced by Entergy in this matter Bates labeled ENGC/BECO DOE 1st RFP-3-356. The original e-mail was from Charlie Minott to you CC'ing a number of individuals dated March 3rd, 2003. And then it appears that Mr. Minott forwarded that to Cliff Gatlin as well on March 11th. I ask you to review the document and then I'd like to ask you some questions about it.
A Okay.
Q Now, at the very beginning of the original e-mail, Mr. Minott references an earlier conversation that he had with you. Do you have any recollection of Mr. Minott and you speaking at or about this time frame regarding the subject matter contained herein?
A No.
Q Okay. Now, Mr. Minott continues that he'd like to make two recommendations on Pilgrim's decommissioning funding. Before I continue, my understanding from your prior testimony was by this

time or before this time, Entergy had centralized its decommissioning reporting and other functions within the company as opposed to doing on the site-specific basis. Do you have any other reason -- strike that.

Do you know why Mr. Minott was involved still in decommissioning issues at this point in time, March 2003?

A I can't say when he ceased from decommissioning, but he had a very large interest in decommissioning and we actually had a hard time getting him out of it.

Q Had to pull him off kicking and screaming?

A Yes.

Q Okay. Now, he makes two recommendations here. He says on No. 1, on Pilgrim's decommissioning funding report due to the NRC on March 31, 2003, include 314 million of the 455.9 million trust balance as the portion of the fund allocated to 10CFR50.75. Now, let's stop here.

Do you have an understanding of what Mr. Minott is suggesting here in the sentence I just read to you?

MR. BRYAN: Objection to the extent it calls for speculation.

MR. MORRIS: Same objection.

A In my opinion, Charlie is recommending to break the fund out in between the NRC acquired decommissioning and the non-required.
MR. WINE: (Continuing.)
Q Okay. And was that consistent with your understanding of how Entergy was going to be reporting to the NRC or inconsistent?
A It's inconsistent.
Q Okay.
A Strongly recommended that he not do it.
Q Okay.
A That all of the funds were only 50.75 funds.
Q Okay. Now, it says this $314 million amount escalated at 2 percent per year to the mid point of the decommissioning cash flow, 13 years from 12/31/02, just exceeds TLG's calculated NRC minimum for Pilgrim of $405.8 million. Do you see that?
A Yes.
Q Now, is it fair to say by this time in March of 2003, given the analysis that Mr. Minott has performed, that Entergy had enough money in its decommissioning trust fund to cover anticipated decommissioning costs as forecasted by TLG for Pilgrim?

A I have no knowledge of that.
Q Okay. Well, let's look at this. He says there's $455.9 million in the trust balance; is that correct?
A I think that's probably --
MR. BRYAN: Objection. Lack of foundation.
A That's a -- that -- it would indicate in this report over here that that's an accurate number.
MR. WINE: (Continuing.)
Q Okay. And that TLG has calculated an NRC minimum of 405.8 million. So at the very least, Entergy had enough money to cover the NRC minimum, correct?
MR. BRYAN: Objection. Lack of foundation. Assumes facts not in evidence.
A If those numbers were correct.
MR. WINE: (Continuing.)
Q Okay. Let's look at his second recommendation. He also recommends that, quote,

Create a subaccount within Mellon's Pilgrim trust for the 141.9 million. Here he shows how he did the math there, 455.9 less 314, period. This subaccount will contain all non-10CFR50.75 costs such as post shutdown spent fuel costs. Do you see that?

A Yes.

Q Do you remember Mr. Minott making this recommendation to you?

A I remember in general he wanted us to split it out. The answer was no.

Q Okay. He says, Separating these costs provides additional flexibility and control to Entergy in the use of these funds.

Did you share that belief?

A No.

Q Okay. It says here --

A Mr. --

Q I'm sorry. Go ahead.

A Mr. Minott was of the opinion that he might be able to get some of those funds out of the decommissioning trust in order for the current operation of the plant. I said no, it's not allowed. You can't do it. The only reason he wanted to segregate was because he wanted to see if he could spend some of the money on his projects.

Q Uh-huh. So that's why you resisted it?

A Well, because it was the wrong thing to do. It was illegal.

Q What makes it illegal to do that?

MR. BRYAN: Objection. Calls for a

legal conclusion.

MR. MORRIS: Join.

A Right. I wouldn't know what makes it illegal.

MR. WINE: (Continuing.)

Q Well, you said it was prohibited and I want to know the basis for your understanding of why it was prohibited.

MR. BRYAN: Same objection.

A 10CFR50.75 requires that you set aside money in trusts for radiological decommissioning of the plant. All of the money in that trust is set aside for radiological decommissioning. You can't get any of the money until you decommission the plant. If there happens to be some left over, you can get some money out of it but not until after the process was over.

MR. WINE: (Continuing.)

Q Okay.

A Charlie thought he might be able to get some money early and I said you don't know -- No. 1, there is no basis for what he was trying to do. He wanted to allocate and he had no basis for an allocation. And he was wrong, No. 2. It's all 50.75 money. There's nothing in there for dry fuel storage

or anything else. Not one penny.

Q Okay. When did that start to be the case?

A It's always been the case.

Q From the time Entergy took Pilgrim into its custody?

A I'm just saying there is one number in there and that number is solely for 50.75.

Q Okay. Now, he continues -- can you -- my colleague reminds me. Can you explain to me the basis for your understanding of that assertion?

A Which one?

Q The one he just testified about. You said there is one number in there and that number is solely for 50.75. I want to know what your basis for that statement is.

A I talked to our licensing personnel and said explain to me how the money works in the decommissioning fund. The licensing personnel agreed the money in there is specifically set aside for radiological decommissioning.

Q Who are those people?

A That would have been the director of licensing.

Q And tell me the name of that person.

A Alexander.

Q Okay. And do you know when Mr. Alexander -- what Mr. Alexander's role was at the company in late '98, early '99?

A Most likely he was a BECO employee.

Q He was a Boston Edison employee.

Okay. Now, do you know what projects Mr. Minott wanted to use this money for?

A No. In general just construction projects.

Q Any of them have to do with spent fuel storage?

A I wouldn't know.

Q Construction of an ISFSI?

A No.

Q Okay.

A There was never -- there was no intention of an ISFSI at that point in time.

Q Okay. Did you ever see or review any documents that specifically substantiate your position that all of the money in Pilgrim's decommissioning trust fund from the inception of Entergy's ownership of the Pilgrim plant was for 50.75 purposes?

MR. BRYAN: Objection. Vague.

A It was just my general understanding that

they were all for radiological decommissioning.
MR. WINE: (Continuing.)
Q Okay. Now, he says at the end here, the NRC recognizes those utilities with commingled trust funds will want to create a subaccount and have given utilities until 12/24/2003 to make the transition.
Were you aware of any rule by the NRC about commingled trust funds and the creation of subaccounts from the NRC?
A No.
Q Any of that familiar to you at all?
A I think Charlie was advocating this but we said no.
Q Okay. Let's go ahead and show you another document.
Do you understand the basis for Mr. Minott's assertion or the positions that he's advocating in the exhibit that we just reviewed?
MR. BRYAN: Objection. Assumes facts not in evidence. Lack of foundation. Calls for speculation.
A No. In my opinion, Charlie just wanted to subdivide the account so he thought he might be able to get some of the money out and spend it.

MR. WINE: (Continuing.)

Q Okay. Do you think he was making up this position about the NRC rule going into effect by 12/24/2003?

MR. BRYAN: Objection to the extent it calls for speculation.

A I have no idea.

MR. WINE: (Continuing.)

Q Let's look at another document.

(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 18 AND ATTACHED.)

MR. WINE: (Continuing.)

Q Mr. Denton, I'm handing you a document that has been marked Denton Exhibit 18 for purposes of today's deposition. While you review it, I'm going to describe it for the record. It is a document produced by Entergy in this matter Bates labeled ENGC/BECO DOE 1st RFP-3-778 through 793. It's a letter dated March 31, 2003, by Entergy, a Mr. Mike Kansler to the Nuclear Regulatory Commission containing what appears to be all of the status decommissioning funding reports for all of the plants then owned by Entergy. I ask you to review it and once you have, I'd like to talk to you about that document.

A Okay.

Q All right. I direct your attention specifically to the entry for the Pilgrim plant at Bates label 785. Do you see that?

A Yes.

Q Now, the format of this report has changed slightly from the previous two exhibits that we looked at, the 1999 and the 2000 filing and previously I had directed your attention to Line No. 3 and this time I think I'm directing you to Line No. 2, a $455.91 million amount. Do you have an understanding of what that amount represents?

MR. BRYAN: Objection. Vague. Lack of foundation.

A According to the description on line 2, it is the amount accumulated over the calendar year. Should be a trust fund balance.

MR. WINE: (Continuing.)

Q Okay. And is it fair to say that of the three decommissioning status reports that we've looked at so far today, this is the first one that I've shown you that has indicated or reported to the NRC the total aggregate amount in Entergy's decommissioning trust fund for the Pilgrim plant?

A I think the GAO report had this but not the NRC.

Q None of the prior NRC reports?
A That's correct.
Q Okay. And so this report is consistent with your prior testimony that all of the amounts in Entergy's decommissioning trust fund are to be used solely for 50.75 purposes, correct?
A Yes.
Q Okay. And if I understand this correctly, right under that $455.91 million figure is an $859.68 million figure. Do you have an understanding as to what that $859 million figure represents?
MR. BRYAN: Objection. Lack of foundation. It's vague.
A The description would indicate that is a balance escalated at 5 percent through 2015. Would have been -- I'm not sure why that date. Mid point of decommissioning is what it says.
MR. WINE: (Continuing.)
Q Okay. And is it fair to say that you -- in order to determine whether you have a sufficient amount in your decommissioning trust fund pursuant to the NRC standards, one must compare that line item to the second sub line item on this document, the $599 million amount which as I understand from reading

this document is the then NRC minimum escalated out 3 percent per year to the same date as the $859 million. And take your time to review this and tell me if you disagree with the way I've just analyzed those two numbers.

MR. BRYAN: Objection. Vague. Lack of foundation.

A Could you repeat the question.

MR. WINE: (Continuing.)

Q Sure. Let me go through and tell you how I'm reading this document and you tell me if you read it any differently. The first number, this $408 million number at the top of the document is the amount calculated by Entergy for the NRC minimum for Pilgrim as of December 31st, 2002. Are you with me so far?

A Okay.

Q And then Entergy takes that $408 million number and escalates it out to December 2015, the mid point in the anticipated decommissioning in the Pilgrim plant using a 3 percent growth rate per year. Do you agree with that?

A That's what it would indicate.

Q Okay. And then what Entergy reports in Item 2 is that the present amount in its trust fund as

of December 31, 2002, is $455.91 million, correct?

A Yes.

Q And that's consistent with the prior testimony you gave to me about that number?

A I think that's the correct number.

Q And what Entergy did next on this form is take that $455 million figure and escalate that out using a 5 percent annual growth rate to the mid point of decommissioning December 2015 and that resulted in a number of $859,680,000, correct?

A It would appear if the math works.

Q And based on this, does it also appear that Entergy is projecting a $260 million surplus when you compare the $859 million that it expects to have in its decommissioning trust fund in December 2015 using a 5 percent annual growth rate to the 599,400,000 that it would need to have in its trust fund as of December 2015?

A I would say based on escalation of 3 percent on the liability and 5 percent on the asset, that's what the numbers would be.

Q Would those be reasonable escalation rates to assume?

MR. BRYAN: Objection. Vague. Lack of foundation.

MR. MORRIS: Same objection.
A I don't really know.
MR. WINE: (Continuing.)
Q Did your group give any input to the escalation or growth rates used by Entergy in reporting out these numbers to the NRC?
A I doubt it.
Q Not from your group?
A I doubt it.
Q Did that come from the licensing group?
A From decommissioning group.
Q Okay. I think I've got one more document to show you. I'd like to ask you some questions about it.
(DOCUMENT MARKED AS DEPOSITION EXHIBIT NO. 19 AND ATTACHED.)
MR. WINE: (Continuing.)
Q Mr. Denton, I've handed you a document that's been marked Denton Exhibit 19 for purposes of today's deposition. It is -- while you review the document, I'll describe it for the record. It is a document produced by Entergy Bates labeled ENGC/BECO DOE 1st RFP-21-3431 through 3471. It is a document dated January 22nd, 1999. A letter from Mr. Ted Sullivan, vice president nuclear and station director,

Boston Edison Company to the nuclear -- I'm sorry, I'm sorry. It's to Ted Sullivan from the Nuclear Regulatory Commission, gentleman by the name of Allen Wang. The subject is request for additional information regarding the transfer of facility operating license for the Pilgrim nuclear power station. And once you've had a chance to review the document, I'd like to ask you some questions about it. Take your time.

MR. BRYAN: I'd just like to object to the foundation of this document.

MR. WINE: What do you mean, Counsel?

MR. BRYAN: I'll withdraw that objection.

MR. WINE: (Continuing.)

Q I should also represent for the record and to help facilitate your review of the document, Mr. Denton, that this is actually a compilation of a number of different documents, all contained and produced to us in a series. But I, just for purposes of your review, wanted to note that for the record because I'm going to take you through the documents not in the order that they are labeled but in chronological order as they appear in the compilation.

A There is a lot here.
Q Yeah. There is. And to be fair to you, Mr. Denton, I'll direct you to some specific provisions. I'm not going to test you and none of the questions that I'm asking you today are designed to be a memory quiz or a pop test. I'll ask you to direct your attention to specific areas of the document.
I believe you testified earlier today that you were involved in multiple transactions that Entergy participated in the acquisition of nuclear plants. I think there were three or four of them that you specifically referenced, correct?
A Yes.
Q In that process, were you -- are you familiar with or were you in any way involved with the license transfer application process and/or the decommissioning trust fund transfer process between the prior owner of those nuclear power stations that Entergy acquired?
A No.
Q No. Okay. So I'd like to ask you some specific questions and again, your prior testimony was that you were not involved in December '98, early mid 1999 with the acquisition of the Pilgrim power plant by Entergy, correct?

A That's correct.

Q Okay. Let's -- first of all, have you seen -- have you seen any component of this document before in the course of your work for Entergy?

A Not to my recollection.

Q Okay. I'd like to direct you through certain parts of the document and get your understanding of the information contained therein. If you turn to the page of this exhibit labeled 3450.

A (Witness complies.)

Q This part of the document is the actual license transfer application submitted by Boston Edison and Entergy to the Nuclear Regulatory Commission to approve the sale of the Pilgrim nuclear power plant by Boston Edison to Entergy.

A Okay.

Q And certain representations are made herein. Before we get to those representations that I have specific questions for you about, I want you to look at the letter itself and get your understanding of Ted Sullivan who is the vice president of nuclear and station director for Boston Edison at the time who signs this letter. Was Mr. Sullivan still at Pilgrim when you were holding the position that you held in 1999 after the acquisition by Entergy at the Pilgrim

plant?
A He was there a short time and then he transferred to the Fitzpatrick plant.
Q He became an Entergy employee, though?
A Yes.
Q Okay. And Entergy moved him from Pilgrim to Fitzpatrick?
A Yes.
Q Okay. Look at, if you will, page 3454.
A (Witness complies.)
Q And it shows that Jerry Yelverton was attesting to the accuracy of the representations made herein on behalf of the Entergy company, Entergy Nuclear Generation Company. Do you see that?
A Yes.
Q And again, what was Mr. Yelverton's title at this time?
A According to this -- according to this, he was president and chief operating officer.
Q And was he holding that position when you began in your role supervising the Entergy or the Pilgrim plant -- well, I'm sorry. Strike that.
I don't want to misstate your role or title. And I want to make sure I get it correct. When you were director of business services, did Mr. Yelverton

hold the position of president and chief operating officer?

A No.

Q Do you know -- was Mr. Yelverton still with the company at that time?

A Yes.

Q What was his title then?

A He had moved up to the CEO.

Q Okay. Got a promotion?

A Yes.

Q Okay. Now, I direct your attention to page 3464 of this document at the top of the page. Both Boston Edison and Entergy -- Entergy Nuclear Generation Company make the following statement here. There is no unfunded financial liability associated with the decommissioning of Pilgrim. Entergy nuclear will receive a fully funded decommissioning trust at the closing of the Pilgrim sale. Let me stop right there.

Are those two statements consistent with your understanding of what Entergy received as a result of the Entergy -- Pilgrim transaction?

MR. BRYAN: Objection. Assumes facts not in evidence. Lack of foundation.

MR. MORRIS: Same objection.

A No.

MR. WINE: (Continuing.)

Q How is it inconsistent?

A In my opinion, the -- from my observation and my discussions, the fund was inadequately funded. We were under funded.

Q And who were those discussions with?

A With John Wilder.

Q Okay. And do you know where Mr. Wilder got that information?

A No. It just -- it was based on -- it was my understanding that there was an agreed upon amount for the decommissioning trust but that money was not transferred over. BECO only transferred a portion of that money over as a part of the settlement to buy the plant.

Q What portion of the money did they transfer?

A I don't know. But the portion was less than the amount needed for decommissioning of the plant. I don't know what the numbers were.

Q Okay. Any understanding or knowledge as to why Mr. Yelverton would attest to a statement that is inconsistent with Mr. Wilder's assessment?

MR. BRYAN: Objection. Assumes

facts not in evidence, lack of foundation, calls for speculation.

MR. MORRIS: Join.

A No. But may I point out on the next page.

MR. WINE: (Continuing.)

Q Yeah.

A Item K, decommissioning funds at closing will deposit decommissioning trust sufficient to satisfy the minimum funding requirements under 10CFR50.85 at expiration. And then goes on to talk about that number being between 396 and 466. In my opinion, Mr. Yelverton may have been thinking this was the minimum funding requirement.

Q Okay. That's -- is that speculation on your part or do you know that that's what Mr. Yelverton was thinking?

A I'm saying this statement over here says fully funded. I read that to be fully funded under 50.75.

Q Well, then, let's read the next sentence. Based on financial analysis and independent expert decommissioning costs and funding studies, this amount will be adequate to fund future decommissioning cash flows and he says please refer to Section K regarding

decommissioning funding. You still believe that in fact it was for 50.75 purposes as opposed to decommissioning cash flows in general?

MR. BRYAN: Same objections.

A When I read Section K, it led me to believe this was 50.75.

MR. WINE: (Continuing.)

Q Okay. Let's keep reading Section K then. If you turn to the page after that, Bates labeled 3466. There is a chart there and it's redacted but it says that the NRC minimum as of 1999 was 396 million and that Entergy's calculation was 466 million. Do you see that difference there? It says underneath that, that the current Entergy nuclear cost estimate is higher than the NRC minimum amount due to the inclusion of spent fuel storage costs and costs to remove non-radioactive structures. Do you see that?

A Yes.

Q Is that consistent with the testimony that you previously gave that the amount was simply to account for the difference of -- for 50.75 purposes?

MR. BRYAN: Objection. Lack of foundation. He was not involved in --

MR. WINE: Wait, Counsel, you can make an objection. You can't speak to it. You

can make your objection.

MR. BRYAN: I'm making my objection, Counsel.

MR. WINE: So what is your objection?

MR. BRYAN: Objection, lack of foundation. He was not the author of this document, he was not involved in the sale.

MR. WINE: So your objection is lack of foundation.

MR. BRYAN: My objection is on the record. Lack of foundation.

MR. MORRIS: Same objection.

MR. WINE: (Continuing.)

Q Let me ask you questions about this.

A Well, I haven't had time to read this in entire detail. I did focus on this Section K. Based on my reading of Section K, I assumed that this was only 50.75.

Q Okay.

A I really haven't had a chance to read this other yet.

Q And just for the record, the part that I've directed you to read is also Section K of the report, correct?

A It appears to continue on this page.

Q Do you want to go ahead and take a look at the rest of it to see if that helps you to answer the rest of my questions?

MR. MORRIS: Go ahead and take your time and read it.

A (Witness complies.)

MR. WINE: (Continuing.)

Q All right. Now, you've testified throughout the day today that the amount in the decommissioning trust fund was strictly for 50.75 purposes. Is that an accurate characterization of your prior testimony?

A Yes.

Q And as I read this document, it says that the NRC minimum calculation, the 50.75 calculation performed by Entergy and BECO and attested to by Mr. Yelverton and by Mr. Sullivan in this document was 396 million. But that Entergy -- that an amount of 466 million was going to be transferred as a result of this transaction. And that the first line of the paragraph immediately under that chart is that the current Entergy nuclear cost estimate is higher than the NRC minimum amount due to the inclusion of spent fuel storage costs and costs to remove non-radioactive

structures. Is that consistent with or inconsistent with your prior testimony that all amounts in the decommissioning trust fund for the Pilgrim plant were solely for 50.75 purposes?

MR. BRYAN: Again, objection. Lack of foundation. Calls for speculation. He's not the author of this document.

MR. MORRIS: Join.

A I'm not sure of the accuracy of this document, but it's my understanding that all of the money in the fund is strictly for radiological portions. If there is anything left over, you can do anything you want to with it which could include this and may not.

MR. WINE: (Continuing.)

Q Would it be fair to say based on your experience while you were an executive with the Entergy organization, that if Mr. Yelverton were to sign and attest and swear out an affidavit to the accuracy of an document that people within the Entergy organization would review it pretty darn closely and make sure that it was accurate before he signed it and verified as to its authenticity and accuracy?

MR. MORRIS: Objection. Speculation.

MR. BRYAN: Objection. Speculation, assumes facts not in evidence. Lack of foundation.

A I believe Mr. Yelverton signed this before the closing date of the plant, months later.

MR. WINE: (Continuing.)

Q Okay.

A I'm not sure that all of these are the final numbers.

Q Let's look at some other documents then within the exhibit that I gave you earlier. Particularly, let's turn to the first page of the exhibit. And the NRC transmits to Mr. Sullivan what they call a request for additional information. In your involvement with Entergy's acquisition of the several plants you referred to earlier in your testimony, were you ever involved with providing data to the company for purposes of satisfying a request for additional information received by the NRC attendant to the approval of the sale of a plant?

A No.

Q No. Okay. I will represent to you that on January 22, 1999, the Nuclear Regulatory Commission sent a list of requests for additional information that are contained and represented in the exhibit and

noted on page 2 of this exhibit Bates labeled 3432, specifically articulates eight different requests for additional information. And I'm going to specifically ask you some questions about Boston Edison and Entergy's response to these requests for additional information. The one that I'm specifically going to ask you about are questions three and four to determine whether or not the answers given to the Nuclear Regulatory Commission by Entergy and Boston Edison are consistent with your prior testimony. Let's look, first of all, in the enclosure at Question No. 3. It says Enclosure 1, Section 2K, which I'll represent to you is Section K that we were just looking at and that you just testified about in the license transfer application. It says what provision is Entergy nuclear making for decommissioning costs that exceed current estimates by greater than assumed inflation rate. Also what will be the source of funds to cover non NRC defined decommissioning costs pursuant to the Entergy calculation on page 9 of Enclosure 1. Is the purpose of the provisional trust to provide assurance for such costs.

Now, before we get to the second RAI that I want to ask questions about, let's flip back to Entergy and Boston Edison Company's response to that

RAI which you'll find on Bates No. 3442. Now, this is a redacted version of the actual document that was submitted to the NRC. But like the license transfer application, it was signed by and on behalf of both Entergy and Boston Edison, the same individuals we looked at earlier and actually the response to the RAIs was submitted by cover letter by Mr. J. Alexander and you'll see that on page 3437, if you'll look there before we get to the substance of the responses.

Is this the same Mr. Alexander that you talked about -- you testified about before as the head of the licensing group?

A Yes.

Q And that he had information about what the content of the trust fund was at the time of the sale?

A I'm not sure.

Q Okay. Let's look at page 3442. The RAI is reproduced at the top in bold. Question three, reference one. And so we've already read it so I'm not going to repeat it for the record here. But I want to direct your amount -- your attention to the third full paragraph that appears on the page. I'm going to read it for the record. It says the amount Entergy nuclear will receive from Boston Edison at

closing is based on an independent estimate for future decommissioning costs. This estimate includes the cost of removal and disposal of spent fuel and non-radioactive structures and materials beyond that necessary to terminate the NRC license. Do you see that?

A Yes.

Q Okay. Is that statement consistent with or inconsistent with your understanding that the only amounts contained in the decommissioning trust fund for the Pilgrim plant were for 50.75 purposes?

MR. BRYAN: Again, objection. Lack of foundation. Assumes facts not in evidence. Calls for speculation.

A I would say yes.

MR. WINE: (Continuing.)

Q Okay. How is it consistent?

A I would say it's inconsistent.

Q It's inconsistent.

A Since it was my understanding of 10.50.75.

Q In fact, it seems to indicate that there are amounts for non-50.75 purposes in the decommissioning trust, correct?

A I'm saying if there's any left over after

50.75, you can do anything you want to with it.

Q Okay.

A It's not specified that it's going to be what it's going to be.

Q Let me direct your attention to the previous paragraph. It says according to 10CFR50.75E11, quote, a licensee may take credit for projected earnings on the prepaid decommissioning trust funds using up to a 2 percent annual real rate of return from the time of future funds collection through the projected decommissioning period. In calculating the amount required for prepayment, here $466 million, Entergy nuclear was conservative in assuming a real growth rate as identified in reference one, enclosure one, page 9. Now, let me stop there.

Did you -- do you share the belief that Entergy was conservative in assuming a real growth rate as identified in the reference one, enclosure one, page 9?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation.

MR. MORRIS: Join.

A I have no -- no understanding of that.

MR. WINE: (Continuing.)

Q Okay. It says further that Entergy

nuclear will be solely liable for decommissioning upon closing and that's consistent with your understanding, correct?

A That's true.

Q Okay. And that any additional funds required will be provided through a parent, associate or affiliate company guarantee, letter of credit or similar financial arrangement. That's consistent with your understanding as well?

MR. BRYAN: Same objections.

A Yes.

MR. WINE: (Continuing.)

Q It says, However, Entergy nuclear expects to mitigate any inflation rate risks through efficiencies and cost improvements realized in the decommissioning process. Is that consistent with your understanding as well?

A Yes.

Q Okay. Now, let's turn back -- well, you know, for purposes of moving forward, let's focus now on the fourth request for additional information that was posed by the NRC to Entergy and Boston Edison. It's reprinted on 3442 along with the response and ask you to focus on that now. The question -- request for additional information that the NRC posed to Entergy

and to Boston Edison was, quote, with the publication of new reg 1307, revision 8, quote, report on the waste burial charges, end quote, the NRC minimum decommissioning cost formula amount is likely to be reduced for those nuclear plants using Barnwell for low level waste disposal including Pilgrim. What is the impact of revision 8 on Entergy nuclear's calculations and the amount to be transferred from Boston Edison to Entergy nuclear for decommissioning funds.

And the response given by Entergy and Boston Edison on page 3442 reads as follows: There is no impact on the amount to be transferred from Boston Edison to Entergy nuclear for decommissioning. The amount Entergy nuclear will receive from Boston Edison at closing is based upon an independent estimate for future decommissioning costs. This amount is greater than the revised NRC minimum amount $327 million using new reg 1307, revision 8, waste vendor rate, close parentheses. Due to the inclusion of the cost to remove and dispose of spent fuel and non-radioactive structures and materials beyond that necessary to terminate the license and the inclusion of contingency, period. Do you see that?

A Yes.

Q Is that statement consistent or inconsistent with your prior testimony and understanding that the total amount in the decommissioning trust fund for Pilgrim was solely for 50.75 purposes?

MR. BRYAN: Objection. Lack of foundation. Calls for speculation. He's not the author of this document.

MR. MORRIS: Same objection.

A I continue to maintain all of the funds in the trust asset are for 50.75.

MR. WINE: (Continuing.)

Q How about at the time of transfer, though? Does this document not state specifically that amounts in excess of 50.75 purposes were transferred in the decommissioning trust fund?

MR. BRYAN: Same objections. Lack of foundation. Assumes facts not in evidence. Calls for speculation.

A I don't understand it to say that, no.

MR. WINE: (Continuing.)

Q What's your understanding of what this says?

A I'm not sure what it's saying.

Q If you were an executive at Entergy at

the time that this was provided to the Nuclear Regulatory Commission and asked to review and comment on this before your boss, Jerry Yelverton, signed and attested to its accuracy, would you have recommended that this statement be made to the Nuclear Regulatory Commission?

MR. MORRIS: Objection. Complete speculation.

MR. BRYAN: Objection. Speculation. Lack of foundation, assumes facts not in evidence.

A I'm not a licensing expert but I would say that everything in the trust asset is specifically for radiological decommissioning and only for that. If there's anything left over, you can do anything you want with it. But you must -- you must satisfy 50.75 first and the assets are there dedicated to that, all of them.

MR. WINE: (Continuing.)

Q Is Mr. Alexander a licensing expert?

A Mr. Alexander was the licensing director.

Q And he's the individual that transmitted this response to the Nuclear Regulatory Commission?

MR. BRYAN: Objection. Lack of foundation.

A I suppose he was.

MR. WINE: Let me take two minutes with my colleague just to see if we have any further questions.

(Off the record.)

MR. WINE: (Continuing.)

Q I just have a short series of questions to ask you by way of cleanup and follow-up, Mr. Denton, and I'll be done. Were you involved in the preparation of the 10K filing to the SEC for the period immediately following Entergy's acquisition of the Pilgrim plant from Boston Edison?

A I'm not certain.

Q Okay. That would have been in the 1999 -- I'm sorry, the March 2000 10K filing. Would you have been in your director of business operations?

A Probably very limited at that time.

Q Okay. Do you recall whether or not Entergy reported any unfunded liabilities associated with the acquisition of the Pilgrim plant in that 10K filing?

A No, I don't recall.

Q Do you recall Entergy reporting any unfunded liabilities associated with spent fuel storage costs at any of its plants during your time as

director of business operations?

A I think as we got into the dry fuel storage program at each one of the plants, we started to report the costs and estimates on them.

Q Okay. Do you recall that that was ever done for Pilgrim?

A Not -- not to my knowledge, I don't recall.

Q Okay.

MR. WINE: I have no further questions for the witness at this time.

MR. BRYAN: We have no questions at this time for Mr. Denton.

MR. MORRIS: And I don't either.

MR. WINE: Wonderful. Mr. Denton, I appreciate you taking time out of your Friday to sit with us.

(CONCLUSION OF DEPOSITION.)

CERTIFICATE OF DEPONENT

I,__________________________, do hereby certify that the foregoing testimony is true and accurate to the best of my knowledge and belief, as originally transcribed, or with the changes as noted on the attached Correction Sheet.

Subscribed and sworn to before me this the __________ day of ____________, 2007.

_______________________

Notary Public

My Commission Expires:

CORRECTION SHEET

I,_________________________, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief.

CORRECTION PAGE LINE REASON

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

__________________________________________________

Subscribed and sworn to before me this the ______ day of _____________, 2007.

_________________________

Notary Public

My Commission Expires: